UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| Walter Louis Franklin, II, Trustee For the Estate of Terrance Terrell Franklin, <br><br> Plaintiff, <br><br> v. <br><br> LUCAS PETERSON individually, and in his official capacity; MICHAEL MEATH, individually, and in his official capacity; JANEÉ HARTEAU, Chief of Police for the Minneapolis Police Department, individually and in her official capacity; and the CITY OF MINNEAPOLIS, <br><br> Defendants. | CASE FILE NO.: <br><br> COMPLAINT <br><br> (JURY TRIAL DEMAND) |

To:   Defendants above named and their respective attorneys. This is an action for damages brought pursuant to 42 U.S.C. §§ 1983, and various Amendments to the United States Constitution. The Plaintiff also brings Minnesota common law claims including Wrongful Death pursuant to 2013 Minn. Stat. § 573.02.

## I.   INTRODUCTION

1. This action arises out of the wrongful killing of a young, African American male by members of the Minneapolis Police Department (MPD), a killing that need not and should not have happened – but was entirely foreseeable.

2. For many years, certain members of the MPD, who have some squad cars with the words displayed, "To Protect and Serve with Compassion", operated in the field (and still do) with no compassion with persons of color, often engaged in excessive force, and over time, became more militarized which was especially true for the MPD SWAT team.

3. While these traits were present over the span of many years, and became progressively

1

worse, City of Minneapolis politicians, and others in positions of power, did essentially nothing other than approve and observe large payouts to those victimized by MPD personnel. These persons included former Mayor R.T. Rybak, the Minneapolis City Council, and in particular, long-time Council President, Barb Johnson, former police chief, Timothy Dolan, Hennepin County Attorney, Michael Freeman, and John Delmonico, head of the police union for MPD personnel.

4. The death of this young victim was caused by a long standing culture of disregard for the rights of young, African American males who to in-the-field MPD personnel were considered the enemy, and in part, due to a culture that bread racism to the point that racism grew to be endemic in the MPD ranks, which was especially true for MPD SWAT. The overall goal was to convey a theme to African Americans in Minneapolis that the City of Minneapolis was not "nigger friendly." Those referenced in Paragraph 3 were fully aware of most if not all of this racist reality.

5. During the time of the MPD SWAT team's interaction with the victim in this case, Plaintiff's Decedent, Terrance Terrell Franklin, an MPD SWAT member, believed to be Defendant Lucas Peterson, called Franklin "little nigger" in the moments before Peterson and another SWAT member killed Franklin. Franklin presented no threat to the SWAT team since he had been successfully apprehended, clearly had surrendered, had both of his hands in the air at the moment he was killed in a surrender position, and was unarmed. Nonetheless, TF was killed under color of law in an execution fashion due to anger, excessive force, and militarization.

## II.   JURISDICTION AND VENUE

6. This Court has original and supplemental jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1367, as Plaintiff's claims are based on the Decedent's rights under the United States Constitution, state law, and common law.

7. Venue in this Court is appropriate since the unlawful practices delineated herein occurred within this State and District.

2

### III.  PARTIES

8. Plaintiff's Decedent, Terrance Terrell Franklin (TF), was born in Minneapolis, Minnesota on May 30, 1990. TF was a resident of Minneapolis when he died as a result of homicide by MPD on May 10, 2013.

9. TF is survived by the following heirs and next of kin: Father Walter Louis Franklin, II; Mother Cassandra Dancy; Grandfather Walter Lee Franklin; Sister Classie Franklin; Brother Walter Franklin, III; Sister Carissa Franklin; Minor Brother M.T.S.M.; Minor Sister K.L.M.; and Minor Son N.A.M.

10. Mr. Franklin's father, Plaintiff designated herein, has been appointed by a Hennepin County judge as trustee for purposes of commencing this action. Plaintiff resides in a suburb of the Twin Cities.

11. In May of 2013, Defendants Lucas Peterson and Michael Meath were employed, and still are employed, as police officers with MPD, and therefore, with the City of Minneapolis.

12. Defendant Janeé Harteau was at all material times, and still is, the police chief for MPD, and as such employed by, the City of Minneapolis.

13. Defendant City of Minneapolis (Defendant City) is a municipality in the State of Minnesota and considered to be the appropriate entity legally responsible for claims arising out of excessive force and other inappropriate, illegal, and/or negligent conduct engaged in by MPD personnel and negligence of members of the Minneapolis City Council and the mayor of Minneapolis.

### IV.  FACTUAL BACKGROUND

**A. Facts Leading up to the Wrongful Killing of Terrance Franklin**

14. On May 10, 2013, Terrance Franklin (TF) was legally at the home of a female friend, an apartment complex in South Minneapolis. At that time, a person contacted the MPD with the belief that TF may have been involved in a burglary that happened at an earlier date – apparently, weeks before.

15. When MPD personnel arrived, TF was in a motor vehicle with the friend and her two children. After questioning began, TF proceeded to leave the scene by driving a short distance and exited the vehicle on foot.

16. At that time, MPD summoned a huge number of personnel to the scene and surrounding area with the intention of apprehending TF. Although TF was unarmed, many MPD personnel were running through neighborhoods and adjoining areas with guns drawn. Although the exact total is not known at this time, it could be accurately categorized as dozens. The only crime for which TF was being sought was for fleeing police.

17. TF was subsequently located in a South Minneapolis home with the address 2717 Bryant Avenue South. While there, TF, via cell phone before MPD personnel arrived, called three women. TF was very scared, said nothing negative about law enforcement, and did not articulate a desire to injure or kill anyone with the MPD. TF was not suicidal on that date nor had he ever been suicidal.

18. MPD personnel subsequently arrived at the home and summoned the MPD SWAT team for the purpose of apprehending TF.

19. As a predicate to SWAT members entering the home, and in particular, the basement area, where TF was presumed to be, a police dog (K9 Unit) was directed to the basement where the dog had contact with TF.

20. SWAT members subsequently entered the basement and began to extricate the K9 Unit from Franklin. As this process occurred, an MP5 firearm of one of the six SWAT members, a machine-gun-type firearm, discharged due to a firearm phenomenon known as "accidental discharge" with one round each accidentally striking two separate SWAT team members. This scenario was entirely accidental, had nothing to do with any intentional or unintentional act of TF, and only two rounds discharged. This was not "friendly fire", a term defined as a conscious act of shooting by MPD personnel that injured one of their own.

21. Soon thereafter, after the accidental discharge, the K9 Unit was taken from the basement by his K9 escort/officer, and TF was easily apprehended. He was now alone in the basement with four members of the SWAT team who possessed a total of a minimum of six

4

firearms.

22. These SWAT members reasonably believed there were no witnesses, but unbeknownst to them, a citizen was physically situated across the street from the Bryant Avenue home they were in, and videotaped with a so called "smart phone." This act of videotaping recorded not only visual images, but audio of communication of SWAT team members with TF in the basement, and vice versa, as the events transpired.

23. During this time, probably due to the injured officers, one or more SWAT members in the basement keyed the shoulder mic of their communication system which caused sounds to project out from the basement through the mics of MPD personnel who were situated in front of the Bryant Avenue home. The citizen's act of recording with his smart phone therefore memorialized these sounds. It is possible sounds also came out of the MPD squad that was positioned in front of the home.

24. The video, referred to herein as the "Gaines' Video", was subsequently posted on YouTube and was available to MPD investigators for forensic testing and enhancement without having to secure the actual phone from the citizen. To date, this testing has never been done officially by anyone associated with the MPD even though the MPD was aware of the significance of evidence on this video no later than 30 days from the time of TF's death – and probably much earlier.

25. The second references herein noted are from the 62-second total-length Gaines' Video posted on YouTube which was subsequently placed into evidence by MPD as part of the official investigation – but never enhanced or dealt with in any official investigative capacity such as forensic analysis.

- Second 9 (elapsed time from beginning): "**Mookie**."
This was TF's nickname and was spoken by TF after he was successfully apprehended by SWAT members and asked his name.

26. At second 11, an MPD officer in front of the home says: "**Officer shot**." This therefore gave a clear delineated time as to when at least one officer had been shot, although the actual time of the accidental injury to the officers occurred long before – estimated to be 90 to

120 seconds.

27. As the matter progressed, due to anger and militarization, even after TF had been safely apprehended, a SWAT member says:

- Second 24: "**Damn freakin nigger!**"

This statement was directed to TF who the SWAT team viewed as the enemy since he was young, African American, and had attempted to evade arrest.

28. TF, annoyed that he was being called a racist name, responded in this fashion:

- Second 27: "**Man, let me go!**"

At this point, TF was now alive for at the very least 16 seconds after the words "officer shot" were spoken which was a huge contradiction from the later, bogus story the MPD SWAT members would come up with as to what they alleged happened in the basement. (The actual time frame from accidental shooting to TF's death was close to or in excess of two minutes.) TF was obviously still alive at second 27.

29. After TF asked to be let go, he was in fact let go (but not allowed to leave the basement) since the primary impetus of the SWAT team at that time was to assess the injury situation of the two accidentally injured SWAT members. TF merely hunkered back to the side or rear of the basement – in a state of fear – after being released. TF complied with directives and wanted to be taken from the basement alive.

30. As the matter progressed, the SWAT members became angry, which was especially true for Lucas Peterson, who had a history of excessive-force type conduct against persons of color. He said to TF:

- Second 43: "**Come out little nigger!**"

Then said:

- Second 45-46: "**Don't go putting those hands up now!**"

TF had clearly capitulated and put his hands in the air in fear, even though he had not been asked to. Thirty-five seconds had elapsed since "officer shot" could be heard on the Gaines' video, and TF was still alive.

31. Soon thereafter, Peterson began to shoot TF with his sidearm. Another SWAT team member, Michael Meath, shot also. Every round that entered TF's body was described in the autopsy report as "right sided" with a total of ten rounds striking TF's body.

32. The killing of TF was execution-style in nature with six of the ten rounds hitting his head including the right temple and right ear. Overall, the wound pattern area was small.

33. TF's hands were in the air in a surrender position when he was killed with a bullet entering his "right axilla" as confirmed from the autopsy report which anatomy part is commonly known as the armpit. This part of the body would not have been exposed had TF's hands and arms been down. When juxtaposed with the sounds at second 45-46, entry into the armpit was not a surprise.

## B. Events Subsequent to Terrance Franklin's Killing; The MPD's Investigation and Intentional Conduct by MPD Personnel to Taint Public Opinion and the Grand Jury Process

### a. Initial Improper PR Conduct of MPD

34. Over 30 minutes had elapsed since TF's intentional killing when an MPD squad vehicle, heading to the TF homicide scene, proceeded through a red light killing a motorcyclist and severely injuring his female passenger. Since TF was already wrongfully killed long before, there was no reason at all for a squad to be going through a red light.

35. Witnesses at the scene of the accident reported that MPD personnel did not administer first aid to the female passenger before ambulance personnel arrived. (It was apparent the cycle operator was dead after impact.) Both citizen victims were of color – Hispanic ethnicity.

36. Those in the MPD hierarchy[1], including Chief Janeé Harteau, realized the Department had a public relations (PR) nightmare. From that point forward, MPD personnel, both officially and unofficially, but intentionally, began a PR course of conduct designed to dishonestly disparage and demonize Terrance Franklin causing emotional distress to the heirs of

---

[1] MPD hierarchy from this point forward is defined as Chief Harteau, Deputy Police Chief Kris Arneson, and others to be determined in discovery, especially those who had decision making authority for the Franklin homicide investigation and also surrounding matters for same such as PR.

7

Terrance Franklin. The ultimate goal was to blame TF for everything that happened on May 10, 2013.

37. MPD's first act in this regard was to tell the public – with an official press release – that TF had an "extensive" criminal record. This release occurred within 24 hours of the homicide. MPD never defined for the public what was meant by the term "extensive" or how it had any relevance whatsoever to the events of May 10, 2013. Plaintiff alleges that although TF had a criminal record, the characterization of "extensive" was false, and MPD failed to inform the public that TF had no history of violence to police personnel at any time in his life.

38. Then on May 18, 2013, the Star Tribune, the largest circulated print paper in Minneapolis, had a front-page story reporting that TF had shot two officers and was subsequently killed by MPD SWAT members. The source for the story was unnamed MPD personnel which was a blatant violation of the Department's Policy Manual. This served to taint the investigation and also the subsequent grand jury proceedings. Chief Harteau acknowledged this in part in her response to the reporters. Based on reasonable information and belief, this violation was never investigated within the Department nor was anyone for the MPD ever disciplined.

39. Although Chief Harteau recognized this blatant violation of Department policy, it was not until December of 2013, long after the grand jury decision, that she made clear to the public the violation, and did in fact issue a letter to every member of MPD, that future conduct like this could result in not only employment termination, but also criminal charges.

40. It was clear that this December conduct of Chief Harteau was a direct response to what occurred in the Franklin matter, but she conveniently did not refer to the Franklin homicide at all in her letter to MPD personnel nor did she disseminate this fact to Twin Cities media.

41. The public had already been tainted by MPD's conduct as early as May 18, 2013, which clearly had an effect on the ultimate grand jury process, but there still could have been hope for truth and the rule of law with the Franklin matter with a proper investigation, but this did not occur.

### b. The MPD's Botched Investigation

42.  The Franklin homicide investigation began in earnest. One of the first mistakes of the MPD hierarchy was to allow the basement SWAT members multiple days to give their statements – even the two shooters, as noted below:

- Lucas Peterson: 4 days
- Michael Meath: 14 days
- Ricardo Muro: 20 days

43.  This lengthy time frame enhanced the possibility that the basement SWAT members could concoct a false story as to what happened. Statements of friends and family of TF were secured on the date of TF's homicide at the Department. This was an obvious recognition by MPD that statements should be taken right away to get the most valid, truthful, accurate information.

44.  It was apparent that the MPD hierarchy does not believe this basic investigatory concept applied to their own employees even though MPD personnel serve the public and are compensated by the taxpaying public. This delay effected the integrity of the investigation and further ensured that the public, and the heirs of TF, would never get the truth of what actually happened from the perspective of the purported official investigation.

45.  The officer of the squad who killed the cycle operator citizen, as another example, had not given a recorded statement as of five days post accident. Chief Harteau's response to this was to say on May 15, 2013: "We are moving as quickly as we can. The goal is to be right and accurate." It was finally admitted by MPD on this date that their employee did proceed through a red light which meant the dead citizen had a green. MPD had to admit this since there were eye witnesses who could confirm the light status of the vehicle operators unlike the killing of TF for which there were no eye witnesses outside of the basement MPD SWAT team. However, the MPD hierarchy should have known, and may have already known, by this date, about the huge problems with the Gaines' video.

a. They never secured the smart phone from Jimmy Gaines or interviewed him as to what he heard that day. Without securing the phone, this prevented them from engaging in valid forensic enhancement of same.

b. Since Mr. Gaines posted a 62-second clip on YouTube that contained evidence of substance, the homicide investigators could have performed forensic enhancements off of that source. They did not.

c. The homicide investigators never addressed or pointed out in their reports the obvious concern that any reasonable, competent investigator would have had that a bullet had entered TF's right armpit which would create the potential that TF's arms were raised in a surrender/submissive position at the time he was killed. This was of course confirmed in the Gaines' video but never delineated in any official report because the homicide investigators chose to ignore it and the obvious implications it had for the two MPD SWAT shooters.

d. Although they were aware of the story of the MPD SWAT members that TF had allegedly shot a police gun, they did not engage in the technique of gunshot residue (GSR) testing of TF's body, something that could have easily been done since TF's body was in the morgue for several days before it was released to a funeral home. This process would ascertain by a swabbing of the hands and arms if TF had fired a gun. TF's family was denied access to TF's body during this time frame. GSR testing was not done because the investigators knew the test result would be negative. This was the perfect time for the MPD hierarchy, such as Chief Harteau, to step in and make sure this common sense investigatory technique was performed. These MPD officials did nothing in this regard.

e. Although the homicide investigators knew or should have known early on that there was a time gap problem between the time an officer was hit by accidental discharge and the time frame Franklin was killed – which was a huge contradiction from the SWAT team's version – they engaged in no substantive, active investigation regarding that issue. This was a matter that should have been dealt with in detail, and would have been, by an outside investigatory entity.

f. SWAT member Lucas Peterson had a long, extensive, shocking history of excessive force which should have resulted in an intense interrogation of him, but that never happened. The questions of Peterson from his statement could be accurately described as softball in nature, with no vigorous, tough questions whatsoever. An outside agency would have engaged in vigorous questioning especially upon hearing Peterson's version which had major holes and was confirmed to be false from the Gaines' video.

12

g. The crime scene was poorly controlled which enhanced the probability of corruption for the later DNA testing.

54. Because of the investigatory mistakes and the MPD PR manipulation of the media and public, the grand jury process was tainted, and the grand jurors did not receive critical evidence which made the "no bill" result no surprise at all. County Attorney Freeman was responsible for the inaction of his office in not requesting that investigatory measures be engaged in like those listed in Paragraph 53. Although it is highly probable that Freeman and members of his office were aware of these problems, nothing was done for obvious political reasons. No member of MPD has ever been successfully charged through the grand jury process for excessive force or wrongful death of a citizen during the time of Freeman's many-year tenure as Hennepin County Attorney. This reality emboldened in-the-field SWAT cops like Peterson and Meath before the events of May 10, 2013.

55. The police union for the MPD (Police Officers Federation of Minneapolis), primarily through police union head John Delmonico, it is reasonably believed, assisted the basement SWAT personnel with delaying the process of giving statements. Delmonico was in the middle of the investigation from the beginning, and even through his influence, prevented investigation on the issue of whether the two injured officers were under the influence of anything improper by ceasing blood draws in a hospital[2]. Although Plaintiff does not contend that the SWAT personnel were under the influence, Delmonico knew or should have known of the inadequacies of the MPD's investigation, and like Freeman, did nothing. Since May of 2013, Delmonico has publicly opposed the common sense plan of MPD in certain cases to have an outside entity investigate cases rather than always having investigations done internally by the MPD. Delmonico's conduct over the years has been to almost always support cops to the detriment of public safety, and as such, MPD personnel at large were aware of this before May 10, 2013, including Peterson and Meath.

c. **<u>Improper MPD Disclosure to Star Tribune in August of 2013</u>**

56. On August 16, 2013, the Star Tribune reported that TF's DNA was found on a gun of one of the basement SWAT members. The unnamed sources for this story were members

---

[2] Page 65 of the 288-page MPD homicide report.

13

90. It is well established in Minnesota and Federal common law, statutory law, Constitutional law, police officer protocol, and the basic concept of moral decendcy, that the use of deadly force should be a last resort and reserved for the direst of circumstances, such as those involving a grave threat of great bodily harm or death.

91. The use of deadly force by Defendants Michael Meath and Lucas Peterson was extreme, outrageous, and totally unwarranted in light of the circumstances. Their wrongful acts and omissions constitute wrongful conduct resulting in the wrongful death of Terrance Terrell Franklin for which Minn. Stat. § 573.02 allows recovery.

92. As a direct and proximate result of Defendants' actions, Plaintiff and the other heirs and next-of-kin have been injured, as a result of this wrongful death in the same ways as delineated in paragraphs 83 and 84 above.

93. Defendants, as a result of their outrageous and illegal behavior, are liable to Plaintiff and the other heirs and next-of-kin for the aforementioned injuries as well as punitive damages for this wrongful death.

94. Total damages suffered for this wrongful death are in excess of $1,000,000 to be further determined at trial.

## VII.   COUNT 3

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

## INTENTIONAL CONDUCT TO MANIPULATE MEDIA AND PUBLIC FOR FAVORABLE GRAND JURY RESULT

95. Plaintiff realleges and incorporates the allegations in the preceding paragraphs all as more fully set forth herein.

96. As detailed in Paragraph 36, and also in Paragraphs 34 to 41 and also Paragraphs 42 to 44, MPD's TF demonization strategy, which was predicated on the false story of the

Dated: May 9, 2014

PADDEN & McCOLLISTER, PLLC

By: _/s/ Michael B. Padden_
Michael B. Padden, #177519
Matthew D. McCollister, # 0390048
8687 Eagle Point Boulevard
Lake Elmo, MN 55042-8628
Phone: (651) 789-6545
Fax: (651) 433-7123
Email: mike.padden@paddenlaw.com
*Attorneys for Plaintiff*

J. Ashwin Madia
Madia Law LLC
345 Union Plaza
333 Washington Avenue North
Minneapolis, MN 55401
Direct: (612) 349-2723
Fax: (612) 235-3357
Email: jamadia@madialaw.com
*Attorney for Plaintiff*