# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

| | |
|---|---|
| **Walter Louis Franklin, II, Trustee For the Estate of Terrance Terrell Franklin,** ) ) ) ) | **CASE FILE NO.:** |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | **COMPLAINT** |
| ) | |
| **LUCAS PETERSON individually, and in his official capacity; MICHAEL MEATH, individually, and in his official capacity; JANEÉ HARTEAU, Chief of Police for the Minneapolis Police Department, individually and in her official capacity; and the CITY OF MINNEAPOLIS,** ) ) ) ) ) ) ) ) ) ) | **(JURY TRIAL DEMAND)** |
| **Defendants.** | |

To:     Defendants above named and their respective attorneys.  This is an action for damages brought pursuant to 42 U.S.C. §§ 1983, and various Amendments to the United States Constitution.  The Plaintiff also brings Minnesota common law claims including Wrongful Death pursuant to 2013 Minn. Stat. § 573.02.

## I.     <u>INTRODUCTION</u>

1.  This action arises out of the wrongful killing of a young, African American male by members of the Minneapolis Police Department (MPD), a killing that need not and should not have happened – but was entirely foreseeable.

2.  For many years, certain members of the MPD, who have some squad cars with the words displayed, "To Protect and Serve with Compassion", operated in the field (and still do) with no compassion with persons of color, often engaged in excessive force, and over time, became more militarized which was especially true for the MPD SWAT team.

3.  While these traits were present over the span of many years, and became progressively

worse, City of Minneapolis politicians, and others in positions of power, did essentially nothing other than approve and observe large payouts to those victimized by MPD personnel.  These persons included former Mayor R.T. Rybak, the Minneapolis City Council, and in particular, long-time Council President, Barb Johnson, former police chief, Timothy Dolan, Hennepin County Attorney, Michael Freeman, and John Delmonico, head of the police union for MPD personnel.

4.   The death of this young victim was caused by a long standing culture of disregard for the rights of young, African American males who to in-the-field MPD personnel were considered the enemy, and in part, due to a culture that bread racism to the point that racism grew to be endemic in the MPD ranks, which was especially true for MPD SWAT.  The overall goal was to convey a theme to African Americans in Minneapolis that the City of Minneapolis was not "nigger friendly."  Those referenced in Paragraph 3 were fully aware of most if not all of this racist reality.

5.   During the time of the MPD SWAT team's interaction with the victim in this case, Plaintiff's Decedent, Terrance Terrell Franklin, an MPD SWAT member, believed to be Defendant Lucas Peterson, called Franklin "little nigger" in the moments before Peterson and another SWAT member killed Franklin.  Franklin presented no threat to the SWAT team since he had been successfully apprehended, clearly had surrendered, had both of his hands in the air at the moment he was killed in a surrender position, and was unarmed.  Nonetheless, TF was killed under color of law in an execution fashion due to anger, excessive force, and militarization.

## II.      JURISDICTION AND VENUE

6.   This Court has original and supplemental jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1367, as Plaintiff's claims are based on the Decedent's rights under the United States Constitution, state law, and common law.

7.   Venue in this Court is appropriate since the unlawful practices delineated herein occurred within this State and District.

2

### III.   PARTIES

8.   Plaintiff's Decedent, Terrance Terrell Franklin (TF), was born in Minneapolis, Minnesota on May 30, 1990.  TF was a resident of Minneapolis when he died as a result of homicide by MPD on May 10, 2013.

9.   TF is survived by the following heirs and next of kin:  Father Walter Louis Franklin, II; Mother Cassandra Dancy; Grandfather Walter Lee Franklin; Sister Classie Franklin; Brother Walter Franklin, III; Sister Carissa Franklin; Minor Brother M.T.S.M.; Minor Sister K.L.M.; and Minor Son N.A.M.

10.   Mr. Franklin's father, Plaintiff designated herein, has been appointed by a Hennepin County judge as trustee for purposes of commencing this action.  Plaintiff resides in a suburb of the Twin Cities.

11.   In May of 2013, Defendants Lucas Peterson and Michael Meath were employed, and still are employed, as police officers with MPD, and therefore, with the City of Minneapolis.

12.   Defendant Janeé Harteau was at all material times, and still is, the police chief for MPD, and as such employed by, the City of Minneapolis.

13.   Defendant City of Minneapolis (Defendant City) is a municipality in the State of Minnesota and considered to be the appropriate entity legally responsible for claims arising out of excessive force and other inappropriate, illegal, and/or negligent conduct engaged in by MPD personnel and negligence of members of the Minneapolis City Council and the mayor of Minneapolis.

### IV.   FACTUAL BACKGROUND

#### A.  Facts Leading up to the Wrongful Killing of Terrance Franklin

14.   On May 10, 2013, Terrance Franklin (TF) was legally at the home of a female friend, an apartment complex in South Minneapolis.  At that time, a person contacted the MPD with the belief that TF may have been involved in a burglary that happened at an earlier date – apparently, weeks before.

3

15.  When MPD personnel arrived, TF was in a motor vehicle with the friend and her two children.  After questioning began, TF proceeded to leave the scene by driving a short distance and exited the vehicle on foot.

16.  At that time, MPD summoned a huge number of personnel to the scene and surrounding area with the intention of apprehending TF.  Although TF was unarmed, many MPD personnel were running through neighborhoods and adjoining areas with guns drawn.  Although the exact total is not known at this time, it could be accurately categorized as dozens.  The only crime for which TF was being sought was for fleeing police.

17.  TF was subsequently located in a South Minneapolis home with the address 2717 Bryant Avenue South.  While there, TF, via cell phone before MPD personnel arrived, called three women.  TF was very scared, said nothing negative about law enforcement, and did not articulate a desire to injure or kill anyone with the MPD.   TF was not suicidal on that date nor had he ever been suicidal.

18.  MPD personnel subsequently arrived at the home and summoned the MPD SWAT team for the purpose of apprehending TF.

19.  As a predicate to SWAT members entering the home, and in particular, the basement area, where TF was presumed to be, a police dog (K9 Unit) was directed to the basement where the dog had contact with TF.

20.  SWAT members subsequently entered the basement and began to extricate the K9 Unit from Franklin.  As this process occurred, an MP5 firearm of one of the six SWAT members, a machine-gun-type firearm, discharged due to a firearm phenomenon known as "accidental discharge" with one round each accidentally striking two separate SWAT team members.  This scenario was entirely accidental, had nothing to do with any intentional or unintentional act of TF, and only two rounds discharged.  This was not "friendly fire", a term defined as a conscious act of shooting by MPD personnel that injured one of their own.

21.  Soon thereafter, after the accidental discharge, the K9 Unit was taken from the basement by his K9 escort/officer, and TF was easily apprehended.  He was now alone in the basement with four members of the SWAT team who possessed a total of a minimum of six

4

firearms.

22.   These SWAT members reasonably believed there were no witnesses, but unbeknownst to them, a citizen was physically situated across the street from the Bryant Avenue home they were in, and videotaped with a so called "smart phone."  This act of videotaping recorded not only visual images, but audio of communication of SWAT team members with TF in the basement, and vice versa, as the events transpired.

23.   During this time, probably due to the injured officers, one or more SWAT members in the basement keyed the shoulder mic of their communication system which caused sounds to project out from the basement through the mics of MPD personnel who were situated in front of the Bryant Avenue home.  The citizen's act of recording with his smart phone therefore memorialized these sounds.  It is possible sounds also came out of the MPD squad that was positioned in front of the home.

24.   The video, referred to herein as the "Gaines' Video", was subsequently posted on YouTube and was available to MPD investigators for forensic testing and enhancement without having to secure the actual phone from the citizen.  To date, this testing has never been done officially by anyone associated with the MPD even though the MPD was aware of the significance of evidence on this video no later than 30 days from the time of TF's death – and probably much earlier.

25.   The second references herein noted are from the 62-second total-length Gaines' Video posted on YouTube which was subsequently placed into evidence by MPD as part of the official investigation – but never enhanced or dealt with in any official investigative capacity such as forensic analysis.

- Second 9 (elapsed time from beginning):  "**Mookie**."
This was TF's nickname and was spoken by TF after he was successfully apprehended by SWAT members and asked his name.

26.   At second 11, an MPD officer in front of the home says:  "**Officer shot**."  This therefore gave a clear delineated time as to when at least one officer had been shot, although the actual time of the accidental injury to the officers occurred long before – estimated to be 90 to

5

120 seconds.

27.  As the matter progressed, due to anger and militarization, even after TF had been safely apprehended, a SWAT member says:

- Second 24:  "**Damn freakin nigger**!"

This statement was directed to TF who the SWAT team viewed as the enemy since he was young, African American, and had attempted to evade arrest.

28.  TF, annoyed that he was being called a racist name, responded in this fashion:

- Second 27:  "**Man, let me go**!"

At this point, TF was now alive for at the very least 16 seconds after the words "officer shot" were spoken which was a huge contradiction from the later, bogus story the MPD SWAT members would come up with as to what they alleged happened in the basement.  (The actual time frame from accidental shooting to TF's death was close to or in excess of two minutes.) TF was obviously still alive at second 27.

29.  After TF asked to be let go, he was in fact let go (but not allowed to leave the basement) since the primary impetus of the SWAT team at that time was to assess the injury situation of the two accidentally injured SWAT members.  TF merely hunkered back to the side or rear of the basement – in a state of fear – after being released.  TF complied with directives and wanted to be taken from the basement alive.

30.  As the matter progressed, the SWAT members became angry, which was especially true for Lucas Peterson, who had a history of excessive-force type conduct against persons of color.  He said to TF:

- Second 43:  "**Come out little nigger**!"

Then said:

-Second 45-46: "**Don't go putting those hands up now**!"

TF had clearly capitulated and put his hands in the air in fear, even though he had not been asked to.  Thirty-five seconds had elapsed since "officer shot" could be heard on the Gaines' video, and TF was still alive.

31.     Soon thereafter, Peterson began to shoot TF with his sidearm.  Another SWAT team member, Michael Meath, shot also.  Every round that entered TF's body was described in the autopsy report as "right sided" with a total of ten rounds striking TF's body.

32.     The killing of TF was execution-style in nature with six of the ten rounds hitting his head including the right temple and right ear.  Overall, the wound pattern area was small.

33.     TF's hands were in the air in a surrender position when he was killed with a bullet entering his "right axilla" as confirmed from the autopsy report which anatomy part is commonly known as the armpit.  This part of the body would not have been exposed had TF's hands and arms been down.  When juxtaposed with the sounds at second 45-46, entry into the armpit was not a surprise.

## B.  Events Subsequent to Terrance Franklin's Killing; The MPD's Investigation and Intentional Conduct by MPD Personnel to Taint Public Opinion and the Grand Jury Process

### a.  Initial Improper PR Conduct of MPD

34.     Over 30 minutes had elapsed since TF's intentional killing when an MPD squad vehicle, heading to the TF homicide scene, proceeded through a red light killing a motorcyclist and severely injuring his female passenger.  Since TF was already wrongfully killed long before, there was no reason at all for a squad to be going through a red light.

35.     Witnesses at the scene of the accident reported that MPD personnel did not administer first aid to the female passenger before ambulance personnel arrived. (It was apparent the cycle operator was dead after impact.)  Both citizen victims were of color – Hispanic ethnicity.

36.     Those in the MPD hierarchy[1], including Chief Janeé Harteau, realized the Department had a public relations (PR) nightmare.  From that point forward, MPD personnel, both officially and unofficially, but intentionally, began a PR course of conduct designed to dishonestly disparage and demonize Terrance Franklin causing emotional distress to the heirs of

---

[1] MPD hierarchy from this point forward is defined as Chief Harteau, Deputy Police Chief Kris Arneson, and others to be determined in discovery, especially those who had decision making authority for the Franklin homicide investigation and also surrounding matters for same such as PR.

Terrance Franklin.  The ultimate goal was to blame TF for everything that happened on May 10, 2013.

37.     MPD's first act in this regard was to tell the public – with an official press release – that TF had an "extensive" criminal record.  This release occurred within 24 hours of the homicide.  MPD never defined for the public what was meant by the term "extensive" or how it had any relevance whatsoever to the events of May 10, 2013.  Plaintiff alleges that although TF had a criminal record, the characterization of "extensive" was false, and MPD failed to inform the public that TF had no history of violence to police personnel at any time in his life.

38.     Then on May 18, 2013, the Star Tribune, the largest circulated print paper in Minneapolis, had a front-page story reporting that TF had shot two officers and was subsequently killed by MPD SWAT members.  The source for the story was unnamed MPD personnel which was a blatant violation of the Department's Policy Manual.  This served to taint the investigation and also the subsequent grand jury proceedings.  Chief Harteau acknowledged this in part in her response to the reporters.  Based on reasonable information and belief, this violation was never investigated within the Department nor was anyone for the MPD ever disciplined.

39.     Although Chief Harteau recognized this blatant violation of Department policy, it was not until December of 2013, long after the grand jury decision, that she made clear to the public the violation, and did in fact issue a letter to every member of MPD, that future conduct like this could result in not only employment termination, but also criminal charges.

40.     It was clear that this December conduct of Chief Harteau was a direct response to what occurred in the Franklin matter, but she conveniently did not refer to the Franklin homicide at all in her letter to MPD personnel nor did she disseminate this fact to Twin Cities media.

41.     The public had already been tainted by MPD's conduct as early as May 18, 2013, which clearly had an effect on the ultimate grand jury process, but there still could have been hope for truth and the rule of law with the Franklin matter with a proper investigation, but this did not occur.

**b. The MPD's Botched Investigation**

42.     The Franklin homicide investigation began in earnest.  One of the first mistakes of the MPD hierarchy was to allow the basement SWAT members multiple days to give their statements – even the two shooters, as noted below:

- Lucas Peterson:  4 days
- Michael Meath:  14 days
- Ricardo Muro:  20 days

43.     This lengthy time frame enhanced the possibility that the basement SWAT members could concoct a false story as to what happened.  Statements of friends and family of TF were secured on the date of TF's homicide at the Department.  This was an obvious recognition by MPD that statements should be taken right away to get the most valid, truthful, accurate information.

44.     It was apparent that the MPD hierarchy does not believe this basic investigatory concept applied to their own employees even though MPD personnel serve the public and are compensated by the taxpaying public.  This delay effected the integrity of the investigation and further ensured that the public, and the heirs of TF, would never get the truth of what actually happened from the perspective of the purported official investigation.

45.     The officer of the squad who killed the cycle operator citizen, as another example, had not given a recorded statement as of five days post accident.  Chief Harteau's response to this was to say on May 15, 2013:  "We are moving as quickly as we can.  The goal is to be right and accurate."  It was finally admitted by MPD on this date that their employee did proceed through a red light which meant the dead citizen had a green.  MPD had to admit this since there were eye witnesses who could confirm the light status of the vehicle operators unlike the killing of TF for which there were no eye witnesses outside of the basement MPD SWAT team.  However, the MPD hierarchy should have known, and may have already known, by this date, about the huge problems with the Gaines' video.

46.     Had the MPD hierarchy ensured that the Gaines' audio was enhanced, for which they had plenty of time before the SWAT members were statementized (same was posted on YouTube within 24 hours of TF's death), they would have known at that time that the SWAT members were not telling the truth and could have done in-depth interrogations, a technique that clearly would have been utilized by an outside agency.  This was not done, and to date, not only has Mr. Gaines never been interviewed, his phone has never been secured for forensic analysis by MPD investigators.  It was almost as if the MPD acted as if this crucial piece of evidence did not exist.

47.     Even after the SWAT team statements were secured, the MPD homicide investigators could have secured supplemental statements from the SWAT team members since, as time went by, it became more and more apparent that the Gaines' video contained important evidence.  This was never done, and the MPD hierarchy never engaged in any reasonable effort to ensure this was done.  This was especially true for the two SWAT members who actually shot and killed TF.

48.     The MPD hierarchy knew that the Gaines' video was a major problem but simply made the concerted decision to ignore it up to and even after the grand jury proceeding.  The goal was to prevail with the grand jury and to simply refer to the grand jury result when asked about the Franklin homicide after that favorable result.  They also knew or should have known that this would potentially effect the Franklin heirs in terms of getting justice in any future civil lawsuit since the jury pool would be potentially tainted.

49.     Since the MPD ignored the Gaines' video, it is reasonable to assume that the grand jurors never heard this important evidence especially when juxtaposed with the autopsy report regarding the armpit wound.  The Hennepin County Attorney's Office (HCAO), under the leadership of Hennepin County Attorney Michael Freeman, never stepped in to correct this huge oversight or even suggest that this investigation be conducted even though that office had the job of presenting the evidence to the grand jury.  The MPD leadership, based on past dealings with Freeman, knew he would not be a fly in the ointment, meaning get in their way, and help to ensure justice for the Franklin heirs and those who sought the truth like the citizens of Minneapolis.  Freeman, to maintain the cooperation of the MPD with the many prosecutions of

his office, and therefore for political reasons, did not want to rock the boat with MPD and their purported official investigation.  He also needed the support of law enforcement to get reelected.

50.     A primary reason in part the MPD hierarchy chose to ignore the Gaines' video, which an outside entity like the Minnesota BCA would not have, was because they knew or should have known that their SWAT members could be heard multiple times using the word "nigger", and therefore, they did not want to take the PR hit with audio enhancement confirming use of that word.  MPD had a public perception of being racist that had existed for many years, and the Gaines' audio would have confirmed this. (Since May of 2013, incidents in Green Bay, Wisconsin and Apple Valley, Minnesota have relevant ample evidence of racist behavior by MPD personnel including MPD SWAT members in Green Bay quoted on video as using the N word and saying, "Green Bay is too nigger friendly").

51.     The MPD hierarchy could have requested – and should have requested – that due to the strange circumstances of this homicide and subsequent specious version of the basement SWAT members, that an outside entity investigate the matter, or at least do a supplemental investigation.  This was never done because the MPD hierarchy knew or should have known that an outside investigation could blow the cover of the false story of the basement SWAT members, and therefore, erode public perception to a potential new low for the history of the Department.

52.     Not surprisingly, the subsequent investigation by the MPD investigators, and primarily the homicide investigators, had major problems (see Paragraph 53) due in part to the fact that these Department employees did not want to create evidence that not only could result in the termination of their peers, but also, potential criminal indictments.  This could cause them to be ostracized within their own department, and this reality was in essence a form of the Blue Code of Silence, a concept alive and well in the MPD in light of the facts of the Franklin homicide and many other matters prior.  This was one reason of many as to why there was a clear conflict of interest.

53.     The major mistakes, which consisted in part of simply ignoring evidence, made primarily by the MPD homicide investigators, are listed here but are not all inclusive:

a. They never secured the smart phone from Jimmy Gaines or interviewed him as to what he heard that day.  Without securing the phone, this prevented them from engaging in valid forensic enhancement of same.

b. Since Mr. Gaines posted a 62-second clip on YouTube that contained evidence of substance, the homicide investigators could have performed forensic enhancements off of that source.  They did not.

c. The homicide investigators never addressed or pointed out in their reports the obvious concern that any reasonable, competent investigator would have had that a bullet had entered TF's right armpit which would create the potential that TF's arms were raised in a surrender/submissive position at the time he was killed.  This was of course confirmed in the Gaines' video but never delineated in any official report because the homicide investigators chose to ignore it and the obvious implications it had for the two MPD SWAT shooters.

d. Although they were aware of the story of the MPD SWAT members that TF had allegedly shot a police gun, they did not engage in the technique of gunshot residue (GSR) testing of TF's body, something that could have easily been done since TF's body was in the morgue for several days before it was released to a funeral home.  This process would ascertain by a swabbing of the hands and arms if TF had fired a gun.  TF's family was denied access to TF's body during this time frame.  GSR testing was not done because the investigators knew the test result would be negative.  This was the perfect time for the MPD hierarchy, such as Chief Harteau, to step in and make sure this common sense investigatory technique was performed.  These MPD officials did nothing in this regard.

e. Although the homicide investigators knew or should have known early on that there was a time gap problem between the time an officer was hit by accidental discharge and the time frame Franklin was killed – which was a huge contradiction from the SWAT team's version – they engaged in no substantive, active investigation regarding that issue.  This was a matter that should have been dealt with in detail, and would have been, by an outside investigatory entity.

f. SWAT member Lucas Peterson had a long, extensive, shocking history of excessive force which should have resulted in an intense interrogation of him, but that never happened.  The questions of Peterson from his statement could be accurately described as softball in nature, with no vigorous, tough questions whatsoever.  An outside agency would have engaged in vigorous questioning especially upon hearing Peterson's version which had major holes and was confirmed to be false from the Gaines' video.

g. The crime scene was poorly controlled which enhanced the probability of corruption for the later DNA testing.

54.     Because of the investigatory mistakes and the MPD PR manipulation of the media and public, the grand jury process was tainted, and the grand jurors did not receive critical evidence which made the "no bill" result no surprise at all.  County Attorney Freeman was responsible for the inaction of his office in not requesting that investigatory measures be engaged in like those listed in Paragraph 53.  Although it is highly probable that Freeman and members of his office were aware of these problems, nothing was done for obvious political reasons.  No member of MPD has ever been successfully charged through the grand jury process for excessive force or wrongful death of a citizen during the time of Freeman's many-year tenure as Hennepin County Attorney.  This reality emboldened in-the-field SWAT cops like Peterson and Meath before the events of May 10, 2013.

55.     The police union for the MPD (Police Officers Federation of Minneapolis), primarily through police union head John Delmonico, it is reasonably believed, assisted the basement SWAT personnel with delaying the process of giving statements.  Delmonico was in the middle of the investigation from the beginning, and even through his influence, prevented investigation on the issue of whether the two injured officers were under the influence of anything improper by ceasing blood draws in a hospital[2].  Although Plaintiff does not contend that the SWAT personnel were under the influence, Delmonico knew or should have known of the inadequacies of the MPD's investigation, and like Freeman, did nothing.  Since May of 2013, Delmonico has publicly opposed the common sense plan of MPD in certain cases to have an outside entity investigate cases rather than always having investigations done internally by the MPD.  Delmonico's conduct over the years has been to almost always support cops to the detriment of public safety, and as such, MPD personnel at large were aware of this before May 10, 2013, including Peterson and Meath.

### c.  Improper MPD Disclosure to Star Tribune in August of 2013

56.     On August 16, 2013, the Star Tribune reported that TF's DNA was found on a gun of one of the basement SWAT members.  The unnamed sources for this story were members

---

[2] Page 65 of the 288-page MPD homicide report.

of MPD which was once again a blatant violation of Department policy and further tainted the subsequent grand jury process.

57.     Although this release was unofficial in the sense that the MPD hierarchy was not aware this information would be released, the MPD hierarchy failed to tell the public certain information, in light of the improper impression that this supposedly meant that TF had shot a police gun.  They could and should have told the public this to level the playing field, in light of their employees' intentional Policy Manual violation:

    a.  That the MPD had never conducted GSR testing which would have proven whether TF  had in fact shot a gun.

    b.  That there was a large time gap between the time an officer was shot, and the time TF was killed.

    c.  That TF's arms were in the air in a surrender position when he was killed.

    d.  That TF had in fact been successfully apprehended before he was killed.

### d.  MPD's Strange Power-Point Presentation After Grand Jury's Decision

58.     On the day the no-bill decision was rendered by the Grand Jury regarding the conduct of Peterson and Meath, September 19, 2013, a completely predictable decision considering the MPD's incompetent investigation, the MPD hierarchy, with Chief Harteau taking the lead role, had a "power-point" press conference.  Their presentation was perhaps unprecedented in Department history, on the heels of a grand jury decision, but was perfectly in line with the Department's TF demonetization strategy since May 10, 2013, and same caused additional emotional distress to the heirs of Terrance Franklin.

59.     What was most important about this presentation was not what was said during the presentation, but what occurred during the Q and A portion, something MPD could not control since reporters could ask any question they wanted.  This process was only open to the media, but the MPD hierarchy believed that it would receive page one headlines and be covered by all major television news stations in the Twin Cities market - which did in fact happen.

60.     During the presentation, an image was shown of TF off of an elevator camera in the apartment complex he was in soon before he was killed.  Chief Harteau failed to tell the Twin

14

Cities press corp that there was nothing sinister about the image at all and that TF was at that location legally and with the permission of one of the apartment owners.

61.     Not surprisingly, during her presentation, she mentioned not one word about the Gaines' video, the gap in time between an officer being shot and TF's homicide, and the fact that her Department did not engage in the common sense GSR process.

62.     She also failed to mention this – and has not said anything about it since or before September 19, 2013: before May 10, 2013, Lucas Peterson had 13 excessive force complaints that had cost the city $700,000 since the time he joined the force in 1999.  Since 2006, the city had settled nine claims involving Peterson, more than any other officer, as of July of 2013, for that seven-year time period.  The Department has never disclosed the racial make up of the Peterson victims[3].

63.     During the Q and A, after the prepared presentation was over, a Twin Cities television reporter asked Harteau whether GSR testing had been conducted[4].  Her answer was that it had not been done – the first time anyone for the Department had admitted this.  When asked why, her response was that TF's DNA was on the gun.  The Chief had apparently failed to remember that TF's DNA was not determined to be on the gun until August of 2013, three months after the homicide.  Therefore, the issue was and is how could Chief Harteau have known TF's DNA was on the gun back when the critical decision making process to conduct or not to conduct the testing was made?  This revelation leads to the very real potential that TF's DNA was planted, a matter that will be addressed in depth in discovery and for which there is other ample evidence as noted throughout this complaint.

**e.  MPD's 3/5/14 Presentation Regarding Terrance Franklin**

64.     In another strange media event on March 5, 2014, the MPD hierarchy called a press conference.  This time the speaker was Deputy Chief Arneson.  MPD alleged that a gun had been found supposedly linking TF to a stolen gun.  The other implication apparently was that TF had a gun on him at some point on the day he was killed.

---

[3] Meath has had his own issues with racism and excessive force and had been successfully sued for same before May 10, 2013.  The City paid $169,500 in a case involving his conduct.
[4] The reporter was Tom Hauser of local ABC affiliate, channel 5 television, KSTP.

65.     During the presser, the point was not made that there was no evidence TF was armed with any weapon whatsoever during the time he was in the Bryant Avenue home where he was killed.

66.     Even though the grand jury process was over, this presser confirmed the strategy to demonize TF, and that the process was not only designed to effect the grand jury decision, but also, effect any later civil case by improperly tainting the jury pool.  Since the grand jury decision had already been rendered 5 ½ months before, and since TF was dead, the MPD hierarchy knew full well there would never be a criminal prosecution, and TF would not be able to defend himself, in light of these accusations, almost 10 months after his death.

67.     Chief Deputy Arneson also failed to mention recent criminal investigations by MPD that were presented for prosecution to HCAO that had major problems and resulted in acquittals like:

a. **State v. Chambers:** In April of 2012, two men were shot by two perpetrators while seated in a car in North Minneapolis.  MPD failed to secure blood evidence at the scene, made numerous mistakes during the investigation, and the wrong man was charged. Although MPD became aware of the evidence of the actual perpetrator after the time this man was charged, MPD refused to engage in additional substantive investigation.  The prosecutor for Mr. Freeman's office (HCAO) did nothing to correct this injustice. Chambers, who is African American, was acquitted by a Hennepin County jury after only two hours of deliberation regarding six serious felony counts including aiding and abetting attempted second degree murder.  The injustice to Chambers was exacerbated by the fact that he sat in jail for 7 months for a crime he had nothing to do with because he could not make bail.

b. **State v. Scudder:** In July of 2013, the HCAO charged Scudder with a felony domestic based on an MPD Investigation.  Although this defendant was a victim of a knife wound, which made clear the alleged victim was not a victim at all and should have been charged, the prosecution proceeded forward.  Although it was clear the alleged victim had zero credibility, something MPD's investigation should have determined, the HCAO's prosecutor for the case refused to dismiss.  The defendant was acquitted in February of 2014 after only 8 minutes of deliberation by a Hennepin County jury.  This injustice would not have occurred had the MPD not have made the flawed recommendation to HCAO which was then incompetently prosecuted by HCAO.

16

### C.  The MPD's Problems with Lawsuits and Payouts for Police Officer Conduct During Mayoral Tenure of R.T. Ryback

68.      Although the MPD had huge problems with excessive force against people of color before January of 2002, this portion of the Complaint, will concern events and problems with the MPD during the mayoral tenure of R.T. Rybak which began in January of 2002.  Mayor Rybak's three terms as mayor (12 years) ended in December of 2013.  During his time as mayor, millions were paid out by the City due to the conduct of MPD cops.

69.      After Mayor Rybak's election in 2001, he recognized the problems with the MPD, and his common sense solution was to choose a man named William McManus to be police chief, a choice that was eventually approved by the City Council.  McManus was someone outside of MPD – not part of their culture – who had impeccable credentials, and was committed to a police department managing concept known as "Community Policing (CP)".  In essence, with this form of police department management, police officers have a stake – and are part of – the communities they serve.  The reality of this concept also would be that officers of color would be promoted to command positions.

70.      Mayor Rybak knew, and was counseled by those in the know, that CP was imperative for the MPD, and this was a primary reason why he chose McManus for chief.  Another factor was that over time, MPD SWAT was becoming more and more militarized with a clear us versus them mentality.

71.      McManus began his tenure as chief in February of 2004 and began to promote African American officers into command positions.  He also began other efforts to indoctrinate CP into the Department.  However, something negative happened:  he was not receiving support from Mayor Rybak and the City Council.

72.      Due to this lack of support, McManus ended up resigning in April of 2006[5].  He said this to persons outside of MPD, before his resignation:  "They are not allowing me to do my job."  "They" was a reference to Mayor Rybak and the Minneapolis City Council.

---

[5] He is now Chief of Police in San Antonio Texas.

73.    Mayor Rybak's major concern regarding his eventual lack of support for Chief McManus was the potential to lose the support of law enforcement which could affect his ability to get reelected.  Based on reasonable information and belief, a significant factor with the MPD's lack of support for McManus was the police union referenced in paragraph 55.

74.    In 2006, Mayor Rybak chose Timothy Dolan as chief, someone who was part of the MPD culture, a complete polar opposite of McManus.  Dolan's management style did not include CP which exacerbated a mentality in MPD ranks of us versus them with the "them" being the public, or in essence, anyone outside of the MPD.  Dolan was eventually approved by the Minneapolis City Council.

75.    Dolan's tenure as chief ended in January of 2013.  During his time as chief, he provided almost no discipline at all for MPD cops who engaged in excessive force.  This characteristic  emboldened those in MPD like Peterson and Meath.

76.    From 2006 to 2012, the City of Minneapolis paid out an astronomical $14,026,858 due to the conduct of MPD personnel[6].  Barb Johnson became Council President in 2006, but she did and has done nothing of substance during her tenure as Council President (she is still Council President as of the date of this complaint) even though she was aware of the problems with MPD personnel during her entire career on the Council.  The reason for this was due to her close affiliation with law enforcement and her close political affiliation with Mayor Rybak.  Johnson, like Freeman, Delmonico, and Rybak, sent a message to in-the-field cops like Peterson and Meath before May 10, 2013 – we are not going to do anything discipline wise when you engage in excessive force in the field.  It was this background which led to the killing of TF – an unarmed black man who had surrendered.

77.    If things were not bad enough, in 2012, Mayor Rybak disbanded the Police Civilian Review Authority (PCRA), a civilian oversight entity.  Disbanding this entity represented the last bastion of hope for those committed to limiting the excessive force of out of control in-the-field MPD cops.  In 2010, PCRA said this correctly about Chief Dolan: "He has not made discipline a priority.  PCRA has no confidence that chief Dolan and the MPD

_____

[6] Things did not get better in 2013.  A payout was made for a single case for $3.075 million that year due to a 2010 incident.

command staff will issue discipline on sustained allegations of misconduct going forward." This clear statement had no effect on Mayor Rybak and the Minneapolis City Council.

78.     In the Fall of 2012, a new entity was created which was called the Office of Police Conduct Review.  Critics were concerned this new entity would be meaningless in terms of discipline for MPD personnel.  They were right.  As of August of 2013, 439 complaint cases were presented, but not one officer was disciplined.

79.     Although MPD has an Internal Affairs division, over the many years of its existence, substantive discipline rarely occurred through this entity.  For example, of the 95 payouts from 2006 to 2012, only 8 resulted in officers being disciplined.  Of these, only 5 received reprimands, and only 3 were terminated.  This failure of Internal Affairs to discipline is another factor that emboldened cops like Peterson and Meath for May of 2013.

## V.     COUNT 1

### EXCESSIVE FORCE/UNREASONABLE SEARCH AND SEIZURE

### THE UNITED STATES CONSTITUTUION-TITLE 42 U.S.C. § 1983

80.     Plaintiff realleges and incorporates the allegations in the preceding paragraphs all as more fully set forth herein.

81.     Title 42 U.S.C. § prohibits, *inter alia*, state actors from depriving citizens of rights, privileges, or immunities secured by the United States Constitution, including the right to be free from excessive force and unreasonable search and seizures as guaranteed by the Fourth Amendment and incorporated through the Fourteenth Amendment.  This right was clearly established at all times relevant to this complaint.

82.     In violation of Title 42 U.S.C. §1983, Defendants, acting under the color of state law, deprived Plaintiff's Decedent, Terrance Terrell Franklin of rights, privileges, and immunities secured by the Constitution by using excessive, unreasonable, and deadly force resulting in Terrance Terrell Franklin's death.

83.     Defendants' actions were not objectively reasonably under the Fourth Amendment for the purposes of qualified immunity under the totality of the circumstances and as

a direct and proximate result of their actions, Plaintiff's Decedent and the Decedent's heirs and Next of Kin have been injured, suffering his wrongful death, physical, mental, and emotional pain, discomfort, embarrassment, fear, anxiety, and have been effected in other ways, including public scorn, and a generally diminished sense of personal safety, and for attorneys' fees and other costs associated with the commencement of this lawsuit.

84.     Further, Plaintiff and the heirs and next of kin of Plaintiff's Decedent have suffered pecuniary and other losses including, but not limited to, economic damages, and a loss of Decedent's aid, comfort, companionship, guidance, and protection.  This is especially true for the minor son of Plaintiff's Decedent referenced in paragraph 9.

85.     Defendants, as a result of their outrageous and illegal behavior, are liable to Plaintiff and the other heirs and next-of-kin for the aforementioned injuries and damages as well as punitive damages.

86.     Total damages suffered are in excess of $1,000,000, to be further determined at trial.

87.     Punitive damages are also properly awardable against Defendants and are hereby claimed as a matter of federal common law, Smith v Wade,  461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn.Stat § 549.20.

## VI.    COUNT 2

## WRONGFUL DEATH

### 2013 MINN. STAT. § 573.02

88.     Plaintiff realleges and incorporates the allegations in the preceding paragraphs all as more fully set forth herein.

89.     Minn. Stat. §573.02 provides a cause of action for Decedent's estate when a death is caused by a wrongful act or omission of any person or corporation.

90.     It is well established in Minnesota and Federal common law, statutory law, Constitutional law, police officer protocol, and the basic concept of moral decendcy, that the use of deadly force should be a last resort and reserved for the direst of circumstances, such as those involving a grave threat of great bodily harm or death.

91.     The use of deadly force by Defendants Michael Meath and Lucas Peterson was extreme, outrageous, and totally unwarranted in light of the circumstances.  Their wrongful acts and omissions constitute wrongful conduct resulting in the wrongful death of Terrance Terrell Franklin for which Minn. Stat. § 573.02 allows recovery.

92.     As a direct and proximate result of Defendants' actions, Plaintiff and the other heirs and next-of-kin have been injured, as a result of this wrongful death in the same ways as delineated in paragraphs 83 and 84 above.

93.     Defendants, as a result of their outrageous and illegal behavior, are liable to Plaintiff and the other heirs and next-of-kin for the aforementioned injuries as well as punitive damages for this wrongful death.

94.     Total damages suffered for this wrongful death are in excess of $1,000,000 to be further determined at trial.

## VII.   COUNT 3

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

## INTENTIONAL CONDUCT TO MANIPULATE MEDIA AND PUBLIC FOR FAVORABLE GRAND JURY RESULT

95.     Plaintiff realleges and incorporates the allegations in the preceding paragraphs all as more fully set forth herein.

96.     As detailed in Paragraph 36, and also in Paragraphs 34 to 41 and also Paragraphs 42 to 44, MPD's TF demonization strategy, which was predicated on the false story of the basement SWAT members, fueled by the MPD's hierarchy allowing multiple days for statements, constituted acts designed to intentionally inflict emotional distress upon the adult

heirs of TF – who were privy to the conduct via media coverage and the ultimate Grand Jury result – did in fact inflict emotional distress among Plaintiff and the other adult heirs of TF.

97.     The ultimate purpose of this intentional conduct was to manipulate the media and public which was killed by the botched investigation detailed in Paragraphs 42 through 55.  MPD did improperly obtain a favorable result with the Grand Jury which will be detailed in the transcript of the proceedings[7], and further caused emotional distress to the heirs of TF and affected their ability to secure a favorable result in this case via additional costs and attorney time for their attorneys to secure justice for Plaintiff and the other heirs of TF.  All of this conduct previously detailed was intentional by MPD personnel and the MPD hierarchy and did in fact inflict emotional distress upon Plaintiff and the other adult heirs.

## VIII.  COUNT 4

## NEGLIGENCE

98.     Plaintiff realleges and incorporates the allegations in the preceding paragraphs all as more fully set forth herein.

99.     MPD was negligent for failing to properly train MPD personnel regarding proper use of and safety precautions for MP5 firearms.

100.     MPD was negligent for selecting Peterson and Meath for the SWAT team based on their work histories before selection on the SWAT teams.  Even after selected, which was negligent in the first place, both should have been subsequently removed before May 10, 2013.

101.     MPD negligently investigated the homicide of Terrance Franklin as detailed in this Complaint.

102.     MPD was negligent in the supervision and training of the basement SWAT members.

103.     Mayor Rybak and the Minneapolis City Council were negligent in not engaging in reasonable conduct from 2002 on to curb the militarization and history of excessive force of

---

[7] Plaintiff will bring a motion in Hennepin County District Court to secure the Grand Jury transcript.

MPD in-the-field cops who also engaged in racism long before, and after, January of 2002.  Had these entities engaged in those reasonable efforts, Plaintiff's Decedent Terrance Franklin would not have been wrongfully killed on May 10, 2013.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff requests that this Court enter a judgment in favor of Plaintiff and against Defendant as follows:

A.  An Order granting Plaintiff joint and several judgments against Defendants;

B.  An Order granting Plaintiff compensatory damages in such amount as a jury may determine but not less than $1,000,000;

C.  An Order granting Plaintiff punitive damages in such amount as a jury may determine but not less than $1,000,000;

D.  An Order for Defendants to pay Plaintiff's costs, interest, and attorneys' fees; and

E.  An Order for Defendants to pay any and all further relief available such as any relief this Court may consider equitable or appropriate.

**Plaintiff demands a jury trial.**

**PADDEN & McCOLLISTER, PLLC**

Dated:  May 9, 2014                 By:/s/ Michael B. Padden

                                             Michael B. Padden, #177519
                                             Matthew D. McCollister, # 0390048
                                             8687 Eagle Point Boulevard
                                             Lake Elmo, MN 55042-8628
                                             Phone:  (651) 789-6545
                                             Fax:  (651) 433-7123
                                             Email:  mike.padden@paddenlaw.com
                                             ***Attorneys for Plaintiff***

                                             J. Ashwin Madia
                                             Madia Law LLC
                                             345 Union Plaza
                                             333 Washington Avenue North
                                             Minneapolis, MN 55401
                                             Direct:  (612) 349-2723
                                             Fax:  (612) 235-3357
                                             Email:  jamadia@madialaw.com
                                             ***Attorney for Plaintiff***

24