| Case Report with Supplements | Minneapolis Police Department | CCN: MP-13-143872 |
|---|---|---|

## Report Details

| | | | |
|---|---|---|---|
| **Reporting Officer:** | 003200: Robert Illetschko | **Approval Status:** | Approved |
| **Assisting Officer:** | | **Approval Date:** | May 10, 2013 |
| **Supervising Officer:** | 007441: David Voss | **Date Returned:** | |
| **Approving Supervisor:** | 007441: David C Voss | **Return Count:** | 0 |
| **Call/Sqd:** | 8513 | **Date Printed:** | May 13, 2014 |
| **Precinct:** | 05 | **Last Uploaded:** | Jan 29, 2014 |
| **Related CCN :** | -- | **Solvability:** | 70 |
| **Reported Date:** | May 10, 2013 18:15 | **Primary Routed Unit:** | 4123 - Homicide |
| **Entered By:** | 003200 | **Assigned Investigators:** | 004898: Kjos, Ann<br>005786: Porras, Luis |

## Incident Details

| | | | | | | |
|---|---|---|---|---|---|---|
| **Offense1:** | JHOMIC | **Desc:** | Justifiable Homicide | **Statute:** | 609.065 | **Attempted:** |
| **Offense2:** | ASLT1 | **Desc:** | Aslt-great Bodily Hm | **Statute:** | 609.221 | **Attempted:** |
| **Offense3:** | FORCE | **Desc:** | Use Of Force | **Statute:** | | **Attempted:** |
| **Address:** | 2717 Bryant AV S<br>MINNEAPOLIS, MN 55408 | | | | | |
| **Occurred From:** | 05/10/2013 15:30 | | | **Dispatched:** | 15:30:00 | |
| **Occurred To:** | 05/10/2013 15:58 | | | **Arrived:** | 15:30:00 | |
| **Location:** | 28 ST W/27 ST W | | | **Cleared:** | 19:30:00 | |
| **Minor Involved:** | No | | | | | |

## Public Data

Officers responded to listed address. Officers were assaulted and force was employed in response.

## Victim

| | | | | | |
|---|---|---|---|---|---|
| **Role / Role #:** | V001 | | | | |
| **Name:** | Muro, Ricardo Nmn | | | | |
| **Residence:** | 350 5 AV S<br>Minneapolis, MN 55415 | | | | |
| **Telephone:** | W:612-673-2941 | | | | |
| **Date of Birth:** | | **Event Age:** 20 | | **Est. Age:** 20 - 40 | |
| **Race:** | Other/Mixed Race | **Medical Treatment:** | Yes | | |
| **Sex:** | Male | **Prior Injury:** | No | | |
| **Height:** | 507 - 510 | | | | |
| **Build:** | ME | | | | |
| **Victim of:** | ASLT1 | | | | |

### *Personal Description*

| Category | Description | Related Offense | Comments |
|---|---|---|---|
| Agg Aslt Circm | Aslt on Officer | ASLT1 | |
| Employment Status | Employed | | |
| Force Used | No | | |
| Victim Was | Shot/Shot At | ASLT1 | |
| Weapon Used | Long Rifle | ASLT1 | |

Lathrop Decl. Ex. 6

## Victim

| | | | | | |
|---|---|---|---|---|---|
| **Role / Role #:** | V002 | | | | |
| **Name:** | Meath, Michael J | | | | |
| **Residence:** | 350 5 AV S<br>Minneapolis, MN 55415 | | | | |
| **Telephone:** | W:612-673-2941 | | | | |
| **Date of Birth:** | | **Event Age:** 20 | | **Est. Age:** 20 - 40 | |
| **Race:** | Other/Mixed Race | **Medical Treatment:** | Yes | | |
| **Sex:** | Male | **Prior Injury:** | No | | |
| **Height:** | 507 - 510 | | | | |
| **Build:** | ME | | | | |
| **Victim of:** | ASLT1 | | | | |

### *Personal Description*

| Category | Description | Related Offense | Comments |
|---|---|---|---|
| Agg Aslt Circm | Aslt on Officer | ASLT1 | |
| Employment Status | Employed | | |
| Force Used | No | | |
| Victim Was | Shot/Shot At | ASLT1 | |
| Weapon Used | Long Rifle | ASLT1 | |

## Victim

| | | | | | |
|---|---|---|---|---|---|
| **Role / Role #:** | V003 | | | | |
| **Name:** | Franklin, Terrance Terrall | | | | |
| **Residence:** | ███████████████ | | | | |
| **Telephone:** | C:██████████ | | | | |
| **Date of Birth:** | ████/1990 | **Event Age:** 22 | | **Est. Age:** 22 - 22 | |
| **Race:** | Black | **Medical Treatment:** | No | | |
| **Sex:** | Male | **Prior Injury:** | No | | |
| **Height:** | 510 - 511 | | | | |
| **Build:** | ME | | | | |
| **Victim of:** | JHOMIC | | | | |

### *Personal Description*

| Category | Description | Related Offense | Comments |
|---|---|---|---|
| Employment Status | Unknown | | |
| Force Used | No | | |

## Suspect

| | | | | | |
|---|---|---|---|---|---|
| **Role / Role #:** | S001 | | | | |
| **Name:** | Franklin, Terrance Terrall | | | | |
| **Residence:** | ███████████████ | | | | |
| **Telephone:** | C:██████████ | | | | |
| **Date of Birth:** | ████/1990 | **Event Age:** 22 | | **Est. Age:** 22 - 22 | |
| **Race:** | Black | | | | |
| **Sex:** | Male | | | | |
| **Height:** | 510 - 511 | | | | |
| **Build:** | ME | | | | |

### *Personal Description*

Lathrop Decl. Ex. 6

| Category | Description | Related Offense | Comments |
|---|---|---|---|
| Agg Aslt Circm | Aslt on Officer | ASLT1 | |
| Employment Status | Unknown | | |
| Force Used | No | | |
| Jus. Hom. by Officer | Attacked Officer | ASLT1 | |
| Weapon Used | Long Rifle | ASLT1 | |

## Witness

| | |
|---|---|
| **Role / Role #:** | W001 |
| **Name:** | Keohen, Shawn |
| **Residence:** | ███████ W Apt. 328 |
| | Minneapolis, |
| **Telephone:** | H:███████  W:███████ |
| **Date of Birth:** | ███/1987   **Event Age:** 26   **Est. Age:** 26 - 26 |
| **Race:** | White |
| **Sex:** | Male |
| **Height:** | |
| **Build:** | |

### *Personal Description*

| Category | Description | Related Offense | Comments |
|---|---|---|---|
| Employment Status | Employed | | |

## Relationships

None Defined

## Non-Inventoried Property

## Property and Evidence

| PI# | Item # | Description | Owner | Qty | Make/Mod/Ser # | Auth ID | Dsp Dt | Dsp Mnr |
|---|---|---|---|---|---|---|---|---|
| 2013-15712 | 1 | CRIME SCENE ENTRY LOG | | 1 | | 099533 | | Continue To Hold |
| 2013-15748 | 1 | CRIME SCENE ENTRY LOG | | 1 | | 099533 | | Continue To Hold |
| 2013-15752 | 1 | CRIME SCENE ENTRY LOG | | 1 | | 099533 | | Continue To Hold |
| 2013-15757 | 1 | NOTEBOOK | | 1 | | 099533 | | Continue To Hold |
| 2013-15966 | 1 | BOX CNTG. ONE KNIFE "WUSTHOF",W/6 1/2" BLADE W/WHITE POWDERY SUBSTANCE, FROM KITCHEN | | 1 | | 099533 | | Continue To Hold |
| 2013-15966 | 2 | BOX CNTG. ONE KNIFE, W/8 1/2" BLADE W/WHITE POWDERY SUBSTANCE, FROM KITCHEN | | 1 | | 099533 | | Continue To Hold |
| 2013-15968 | 1 | BAG CNTG. LG BOOSTMOBILE CELL PHONE, MARKED "E", FROM WATER HEATER ROOM | | 1 | | 099533 | | Continue To Hold |
| 2013-15968 | 2 | BAG CNTG. BLUE FLEECE BELT FROM WATER HEATER ROOM | | 1 | | 099533 | | Continue To Hold |
| 2013-15970 | 1 | ENV. CNTG. ONE BLUE BUTTON, MARKED "A", FROM FRONT YARD | | 1 | | 099533 | | Continue To Hold |
| 2013-15970 | 2 | ENV. CNTG. 3 BLUE BUTTONS, MARKED "B", FROM FRONT YARD | | 1 | | 099533 | | Continue To Hold |

Lathrop Decl. Ex. 6

| | | | | | |
|---|---|---|---|---|---|
| 2013-15972 | 1 | ENV. CNTG. DREADLOCK FROM LAUNDRY ROOM FLOOR | 1 | 099533 | Continue To Hold |
| 2013-15972 | 2 | ENV. CNTG. DREADLOCK FROM LAUNDRY ROOM IN STACK OF PLASTIC BINS | 1 | 099533 | Continue To Hold |
| 2013-15973 | 1 | ENV. CNTG. 2 DNA SWABS FROM KNIFE DRAWER KNOB IN KITCHEN | 1 | 099533 | Continue To Hold |
| 2013-15974 | 1 | ENV. CNTG. ONE FEDERAL .45 AUTO+P DCC, MARKED "C" FROM LAUNDRY ROOM | 1 | 099533 | Continue To Hold |
| 2013-15974 | 10 | ENV. CNTG. ONE FC 9mm LUGER DCC, MARKED "M" FROM LAUNDRY ROOM | 1 | 099533 | Continue To Hold |
| 2013-15974 | 11 | ENV. CNTG. ONE FC 9mm LUGER DCC, UNMARKED, FROM LAUNDRY ROOM | 1 | 099533 | Continue To Hold |
| 2013-15974 | 12 | ENV. CNTG. ONE FIRED BULLET FROM CLOSET FLOOR IN LAUNDRY ROOM | 1 | 099533 | Continue To Hold |
| 2013-15974 | 13 | ENV. CNTG. ONE FIRED BULLET FROM TOOL BOX TRAY IN CLOSET OF LAUNDRY ROOM | 1 | 099533 | Continue To Hold |
| 2013-15974 | 2 | ENV. CNTG. ONE FC 9mm LUGER DCC, MARKED "D" FROM LAUNDRY ROOM | 1 | 099533 | Continue To Hold |
| 2013-15974 | 3 | ENV. CNTG. ONE FC 9mm LUGER DCC, MARKED "F" FROM LAUNDRY ROOM | 1 | 099533 | Continue To Hold |
| 2013-15974 | 4 | ENV. CNTG. ONE FC 9mm LUGER DCC, MARKED "G" FROM LAUNDRY ROOM | 1 | 099533 | Continue To Hold |
| 2013-15974 | 5 | ENV. CNTG. ONE FEDERAL .45 AUTO+P DCC, MARKED "H" FROM LAUNDRY ROOM | 1 | 099533 | Continue To Hold |
| 2013-15974 | 6 | ENV. CNTG. ONE FC 9mm LUGER DCC, MARKED "I" FROM LAUNDRY ROOM | 1 | 099533 | Continue To Hold |
| 2013-15974 | 7 | ENV. CNTG. ONE FEDERAL .45 AUTO+P DCC, MARKED "J" FROM LAUNDRY ROOM | 1 | 099533 | Continue To Hold |
| 2013-15974 | 8 | ENV. CNTG. ONE FEDERAL .45 AUTO+P DCC, MARKED "K" FROM LAUNDRY ROOM | 1 | 099533 | Continue To Hold |
| 2013-15974 | 9 | ENV. CNTG. ONE FC 9mm+P DCC, MARKED "L" FROM LAUNDRY ROOM | 1 | 099533 | Continue To Hold |
| 2013-15977 | 1 | ENV. CNTG. 2 BLS SWABS FROM FRAMING AT BOTTOM OF BASEMENT STAIRS, MARKED #1 | 1 | 099533 | Continue To Hold |
| 2013-15977 | 10 | ENV. CNTG. 2 BLS SWABS FROM LAUNDRY ROOM, MARKED #10 | 1 | 099533 | Continue To Hold |
| 2013-15977 | 11 | ENV. CNTG. 2 BLS SWABS FROM LAUNDRY ROOM, MARKED #11 | 1 | 099533 | Continue To Hold |
| 2013-15977 | 12 | ENV. CNTG. 2 BLS SWABS FROM LAUNDRY ROOM, MARKED #12 | 1 | 099533 | Continue To Hold |
| 2013-15977 | 2 | ENV. CNTG. 2 BLS SWABS FROM WATER HEATER ROOM, MARKED #2 | 1 | 099533 | Continue To Hold |
| 2013-15977 | 3 | ENV. CNTG. 2 BLS SWABS FROM EXTERIOR LAUNDRY ROOM DOOR FRAME, MARKED #3 | 1 | 099533 | Continue To Hold |
| 2013-15977 | 4 | ENV. CNTG. 2 BLS SWABS FROM EXTERIOR LAUNDRY ROOM DOOR FRAME, MARKED #4 | 1 | 099533 | Continue To Hold |
| 2013-15977 | 5 | ENV. CNTG. 2 BLS SWABS FROM LAUNDRY ROOM, MARKED #5 | 1 | 099533 | Continue To Hold |
| 2013-15977 | 6 | ENV. CNTG. 2 BLS SWABS FROM LAUNDRY ROOM, MARKED #6 | 1 | 099533 | Continue To Hold |
| 2013-15977 | 7 | ENV. CNTG. 2 BLS SWABS FROM LAUNDRY ROOM, MARKED #7 | 1 | 099533 | Continue To Hold |
| 2013-15977 | 8 | ENV. CNTG. 2 BLS SWABS FROM LAUNDRY ROOM, MARKED #8 | 1 | 099533 | Continue To Hold |

Lathrop Decl. Ex. 6

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 2013-15977 | 9 | ENV. CNTG. 2 BLS SWABS FROM LAUNDRY ROOM, MARKED #9 | 1 | | 099533 | | Continue To Hold |
| 2013-15979 | 1 | ENV. CNTG. WHITE POWDERY SUBSTANCE FROM BLADE OF KNIFE W/8 1/2" BLADE UNDER P.I. 13-15966 | 1 | | 099533 | | Continue To Hold |
| 2013-15979 | 2 | ENV. CNTG. WHITE POWDERY SUBSTANCE FROM BLADE OF WUSTHOF KNIFE UNDER P.I. 13-15966 | 1 | | 099533 | | Continue To Hold |
| 2013-15982 | 1 | ENV. CNTG. 2 DNA SWABS FROM HANDLE OF KNIFE W/8 1/2" BLADE UNDER P.I. 13-15966 | 1 | | 099533 | | Continue To Hold |
| 2013-15982 | 10 | ENV. CNTG. ONE DNA SWAB FROM FIRED BULLET UNDER P.I. 13-15974 LN. 13 | 1 | | 099533 | | Continue To Hold |
| 2013-15982 | 2 | ENV. CNTG. 2 DNA SWABS FROM HANDLE OF WUSTHOF KNIFE UNDER P.I. 13-15966 | 1 | | 099533 | | Continue To Hold |
| 2013-15982 | 3 | ENV. CNTG. 2 DNA SWABS FROM LG BOOSTMOBILE CELL PHONE UNDER P.I. 13-15968 | 1 | | 099533 | | Continue To Hold |
| 2013-15982 | 4 | ENV. CNTG. ONE BLS SWAB FROM DCC UNDER P.I. 13-15974 LN. 1 | 1 | | 099533 | | Continue To Hold |
| 2013-15982 | 5 | ENV. CNTG. ONE BLS SWAB FROM DCC UNDER P.I. 13-15974 LN. 2 | 1 | | 099533 | | Continue To Hold |
| 2013-15982 | 6 | ENV. CNTG. ONE BLS SWAB FROM DCC UNDER P.I. 13-15974 LN. 5 | 1 | | 099533 | | Continue To Hold |
| 2013-15982 | 7 | ENV. CNTG. ONE BLS SWAB FROM DCC UNDER P.I. 13-15974 LN. 10 | 1 | | 099533 | | Continue To Hold |
| 2013-15982 | 8 | ENV. CNTG. ONE BLS SWAB FROM DCC UNDER P.I. 13-15974 LN. 11 | 1 | | 099533 | | Continue To Hold |
| 2013-15982 | 9 | ENV. CNTG. ONE BLS SWAB FROM FIRED BULLET P.I. 13-15974 LN. 12 | 1 | | 099533 | | Continue To Hold |
| 2013-16342 | 1 | BAG CNTG HK MP5 9MM X 19 CAL AUTOMATIC SUB-MACHINE GUN | 1 | 62350264 | 005786 | Oct 9, 2013 | Release |
| 2013-16342 | 2 | ENV CNTG 9MM X 19 MAGAZINE | 1 | | 005786 | Oct 9, 2013 | Release |
| 2013-16342 | 3 | ENV CNTG FC 9MM LUGER LIVE CARTRIDGE (FM CHAMBER) | 1 | | 005786 | Oct 9, 2013 | Release |
| 2013-16342 | 4 | ENV CNTG 22 FC 9MM LUGER & 2 FC 9MM +P LIVE CARTRIDGES | 1 | | 099533 | | Continue To Hold |
| 2013-16346 | 1 | ENV CNTG 2 DNA SWABS (FM GRIPS OF MP5) | 1 | | 099533 | | Continue To Hold |
| 2013-16346 | 2 | ENV CNTG 2 DNA SWABS (FM TRIGGER OF MP5) | 1 | | 099533 | | Continue To Hold |
| 2013-16346 | 3 | ENV CNTG 2 DNA SWABS (FM TRIGGER GUARD OF MP5) | 1 | | 099533 | | Continue To Hold |
| 2013-16346 | 4 | ENV CNTG 2 DNA SWABS (FM FOREGRIPS OF MP5) | 1 | | 099533 | | Continue To Hold |
| 2013-16346 | 5 | ENV CNTG 2 DNA SWABS (FM STOCK OF MP5) | 1 | | 099533 | | Continue To Hold |
| 2013-16346 | 6 | ENV CNTG 2 DNA SWABS (FM BBL OF MP5) | 1 | | 099533 | | Continue To Hold |
| 2013-16346 | 7 | ENV CNTG 2 DNA SWABS (FM TACTICAL LIGHT OF MP5) | 1 | | 099533 | | Continue To Hold |
| 2013-16346 | 8 | ENV CNTG 2 DNA SWABS (FM MAGAZINE OF MP5) | 1 | | 099533 | | Continue To Hold |
| 2013-16386 | 1 | AUDIO DISC INTERVIEW (R. SALAH) | 1 | | 099533 | | Continue |

Lathrop Decl. Ex. 6

|  |  |  |  |  | To Hold |
|---|---|---|---|---|---|
| 2013-16386 | 2 | AUDIO DISC INTERVIEW (HAUGH) | 1 | 099533 | Continue To Hold |
| 2013-16386 | 3 | AUDIO DISC INTERVIEW (COMTRERAS) | 1 | 099533 | Continue To Hold |
| 2013-16386 | 4 | AUDIO DISC INTERVIEW (KEOHEN) | 1 | 099533 | Continue To Hold |
| 2013-16387 | 1 | OFFICER UNIFORM SHIRT W/BLS (MURO) | 1 | 099533 | Continue To Hold |
| 2013-16388 | 1 | SILVER COLORED PENS | 2 | 099533 | Continue To Hold |
| 2013-16388 | 2 | HAND CUFF KEY TOOL | 1 | 099533 | Continue To Hold |
| 2013-16397 | 1 | ENV. CONT. BUCCAL SWAB FROM OFF. DURAND | 1 | 099533 | Continue To Hold |
| 2013-16398 | 1 | ENV. CONT. BUCCAL SWAB FROM DOC, D. SCHEIBEL | 1 | 099533 | Continue To Hold |
| 2013-16564 | 1 | ENVELOPE CNTG BLOOD STAIN PREP | 1 | 099533 | Continue To Hold |
| 2013-16565 | 1 | ENVELOPE CNTG PROJECTILE FRAGMENT # 1 | 1 | 099533 | Continue To Hold |
| 2013-16565 | 10 | ENVELOPE CNTG PROJECTILE FRAGMENT # 10 | 1 | 099533 | Continue To Hold |
| 2013-16565 | 11 | ENVELOPE CNTG PROJECTILE FRAGMENT # 11 | 1 | 099533 | Continue To Hold |
| 2013-16565 | 12 | ENVELOPE CNTG PROJECTILE FRAGMENT # 12 | 1 | 099533 | Continue To Hold |
| 2013-16565 | 2 | ENVELOPE CNTG PROJECTILE FRAGMENT # 2 | 1 | 099533 | Continue To Hold |
| 2013-16565 | 3 | ENVELOPE CNTG PROJECTILE FRAGMENT # 3 | 1 | 099533 | Continue To Hold |
| 2013-16565 | 4 | ENVELOPE CNTG PROJECTILE FRAGMENT # 4 | 1 | 099533 | Continue To Hold |
| 2013-16565 | 5 | ENVELOPE CNTG PROJECTILE FRAGMENT # 5 | 1 | 099533 | Continue To Hold |
| 2013-16565 | 6 | ENVELOPE CNTG PROJECTILE FRAGMENT # 6 | 1 | 099533 | Continue To Hold |
| 2013-16565 | 7 | ENVELOPE CNTG PROJECTILE FRAGMENT # 7 | 1 | 099533 | Continue To Hold |
| 2013-16565 | 8 | ENVELOPE CNTG PROJECTILE FRAGMENT # 8 | 1 | 099533 | Continue To Hold |
| 2013-16565 | 9 | ENVELOPE CNTG PROJECTILE FRAGMENT # 9 | 1 | 099533 | Continue To Hold |
| 2013-16833 | 1 | SIGNED Q & A STATEMENT FROM OFFICER DURAND | 1 | 099533 | Continue To Hold |
| 2013-16833 | 2 | SIGNED Q & A STATEMENT FROM OFFICER PETERSON | 1 | 099533 | Continue To Hold |
| 2013-16833 | 3 | SIGNED Q & A STATEMENT FROM SGT STENDER | 1 | 099533 | Continue To Hold |
| 2013-16833 | 4 | CONFIRMATORY PHOTO VIEWED BY ANQUANETTE HOLLMAN | 1 | 099533 | Continue To Hold |
| 2013-16833 | 5 | CONFIRMATORY PHOTO VIEWED BY IFRAH MOHAMAD | 1 | 099533 | Continue To Hold |
| 2013-16833 | 6 | STILL PHOTO FROM SURV VIDEO 2743 | 1 | 099533 | Continue |

Lathrop Decl. Ex. 6

| | | | | | |
|---|---|---|---|---|---|
| | | LYNDALE AVE S. | | | To Hold |
| 2013-16835 | 1 | THUMB DRIVE-SURV VIDEO FROM 2743 LYNDALE AVE S | 1 | 099533 | Continue To Hold |
| 2013-16836 | 1 | BUCCAL SWAB FROM OFFICER PETERSON | 1 | 099533 | Continue To Hold |
| 2013-16849 | 1 | AUDIO DISC INTERVIEW CALA SCOTT | 1 | 099533 | Continue To Hold |
| 2013-16849 | 2 | AUDIO DISC PHONE CALL DAVE SCHEIBEL | 1 | 099533 | Continue To Hold |
| 2013-17215 | 1 | VIDEO DISC INTERVIEW W/A. HOLLMAN | 1 | 099533 | Continue To Hold |
| 2013-17216 | 1 | PRINTOUT OF ANQUANETTE HOLLMAN'S FACEBOOK PAGE | 1 | 099533 | Continue To Hold |
| 2013-17575 | 1 | SEALED ENVELOPE CONTAINING RIGHT HAND NAIL CLIPPINGS | 1 | 099533 | Continue To Hold |
| 2013-17575 | 10 | HCME EVIDENCE RECEIPT | 1 | 099533 | Continue To Hold |
| 2013-17575 | 2 | SEALED ENVELOPE CONTAINING LEFT HAND NAIL CLIPPINGS | 1 | 099533 | Continue To Hold |
| 2013-17575 | 3 | SEALED ENVELOPE CONTAINING PULLED HEAD HAIR | 1 | 099533 | Continue To Hold |
| 2013-17575 | 4 | SEALED ENVELOPE CONTAINING CUT SEAL FROM DRYING RACK | 1 | 099533 | Continue To Hold |
| 2013-17575 | 5 | SEALED BAG CONTAINING RIGHT HAND BAG | 1 | 099533 | Continue To Hold |
| 2013-17575 | 6 | SEALED BAG CONTAINING LEFT HAND BAG | 1 | 099533 | Continue To Hold |
| 2013-17575 | 7 | SEALED BAG CONTAINING BODY BAG 1 | 1 | 099533 | Continue To Hold |
| 2013-17575 | 8 | SEALED BAG CONTAINING BODY BAG 2 | 1 | 099533 | Continue To Hold |
| 2013-17575 | 9 | SEALED BAG CONTAINING TRAUMA SHEET, FLOOR | 1 | 099533 | Continue To Hold |
| 2013-17582 | 1 | SEALED BAG CONTAINING SHOES | 1 | 099533 | Continue To Hold |
| 2013-17582 | 2 | SEALED BAG CONTAINING ROBE | 1 | 099533 | Continue To Hold |
| 2013-17582 | 3 | SEALED BAG CONTAINING PANTS | 1 | 099533 | Continue To Hold |
| 2013-17582 | 4 | SEALED BAG CONTAINING SOCKS | 1 | 099533 | Continue To Hold |
| 2013-17582 | 5 | SEALED BAG CONTAINING SHIRT | 1 | 099533 | Continue To Hold |
| 2013-17582 | 6 | SEALED BAG CONTAINING UNDERWEAR | 1 | 099533 | Continue To Hold |
| 2013-17583 | 1 | BUCCAL SWAB (OFFICER MEATH) | 1 | 099533 | Continue To Hold |
| 2013-17584 | 1 | MPD SUPPLEMENT (OFFICER MEATH Q & A ) | 1 | 099533 | Continue To Hold |
| 2013-17585 | 1 | MN EBT CARD FOR MICHAEL J ONEAL | 1 | 099533 | Continue To Hold |
| 2013-17585 | 10 | DRYER SHEET | 1 | 099533 | Continue To Hold |
| 2013-17585 | 11 | TAN PIECE OF PLASTIC | 1 | 099533 | Continue |

Lathrop Decl. Ex. 6

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | To Hold |
| 2013-17585 | 2 | MN EBT CARD FOR TERRANCE T FRANKLIN | 1 | | 099533 | Continue To Hold |
| 2013-17585 | 3 | ACCOUNT NOW VISA DEBIT CARD FOR TERRANCE T FRANKLIN | 1 | | 099533 | Continue To Hold |
| 2013-17585 | 4 | GREEN DOT VISA DEBIT CARD | 1 | | 099533 | Continue To Hold |
| 2013-17585 | 5 | SKY DECK PLAYERS CARDS | 3 | | 099533 | Continue To Hold |
| 2013-17585 | 6 | MY SA REWARDS CARD | 1 | | 099533 | Continue To Hold |
| 2013-17585 | 7 | WALMART GIFT CARD | 1 | | 099533 | Continue To Hold |
| 2013-17585 | 8 | MOVIE TICKET STUBS | 2 | | 099533 | Continue To Hold |
| 2013-17585 | 9 | WHITE LIGHTER | 1 | | 099533 | Continue To Hold |
| 2013-17587 | 1 | EARRING, WHITE METAL POST TYPE WITH CLEAR STONES | 1 | | 099533 | Continue To Hold |
| 2013-17588 | 1 | $50.00 BILL | 1 | | 099533 | Continue To Hold |
| 2013-17588 | 2 | $20.00 BILLS | 8 | | 099533 | Continue To Hold |
| 2013-17588 | 3 | $1.00 BILLS | 14 | | 099533 | Continue To Hold |
| 2013-17588 | 4 | QUARTERS | 2 | | 099533 | Continue To Hold |
| 2013-17588 | 5 | NICKEL | 1 | | 099533 | Continue To Hold |
| 2013-17588 | 6 | PENNIES | 6 | | 099533 | Continue To Hold |
| 2013-17589 | 1 | BAG GREEN LEAFY SUBSTANCE | 1 | | 099533 | Continue To Hold |
| 2013-18199 | 1 | AUDIO DISC INTERVIEW (HAUGH) | 1 | | 099533 | Continue To Hold |
| 2013-18327 | 1 | BUCCAL SWAB FROM OFCR MURO | 1 | | 099533 | Continue To Hold |
| 2013-18328 | 1 | STATEMENT | 1 | | 099533 | Continue To Hold |
| 2013-18711 | 1 | BAG CNTG DARK BKUE "HOLLISTER" HOODED JACKET (FM DRIVER SEAT) | 1 | | 099533 | Continue To Hold |
| 2013-18713 | 1 | ENVELOPE CNTG KIMONO THIN PACKAGE, BIC LIGHTER, TWO KEYS & USB DRIVE (FM RIGHT POCKET) | 1 | | 099533 | Continue To Hold |
| 2013-18715 | 1 | ENVELOPE CNTG KEYRING W/ THREE KEYS, PACK OF GUM & LG TRAVEL ADAPTER (FM LEFT POCKET) | 1 | | 099533 | Continue To Hold |
| 2013-18717 | 1 | ENVELOPE CNTG DNA SWABS (FM EXTERIOR DRIVER DOOR HANDLE) | 1 | | 099533 | Continue To Hold |
| 2013-18717 | 10 | ENVELOPE CNTG DNA SWABS (FM INTERIOR REAR LIFT GATE GRIP HANDLE) | 1 | | 099533 | Continue To Hold |
| 2013-18717 | 11 | ENVELOPE CNTG DNA SWABS (FM STEERING WHEEL) | 1 | | 099533 | Continue To Hold |
| 2013-18717 | 12 | ENVELOPE CNTG DNA SWABS (FM TURN | 1 | | 099533 | Continue |

Lathrop Decl. Ex. 6

| | | | | | | |
|---|---|---|---|---|---|---|
| | | SIGNAL ARM/SWITCH) | | | | To Hold |
| 2013-18717 | 13 | ENVELOPE CNTG DNA SWABS (FM WIPER ARM/SWITCH) | 1 | | 099533 | Continue To Hold |
| 2013-18717 | 14 | ENVELOPE CNTG DNA SWABS (FM CRUISE CONTROL ARM/SWITCH) | 1 | | 099533 | Continue To Hold |
| 2013-18717 | 15 | ENVELOPE CNTG DNA SWABS (FM GEAR SHIFT KNOB/LEVER) | 1 | | 099533 | Continue To Hold |
| 2013-18717 | 16 | ENVELOPE CNTG DNA SWABS (FM RADIO CONTROLS) | 1 | | 099533 | Continue To Hold |
| 2013-18717 | 17 | ENVELOPE CNTG DNA SWABS (FM HEAT/COOL CONTROLS) | 1 | | 099533 | Continue To Hold |
| 2013-18717 | 2 | ENVELOPE CNTG DNA SWABS (FM INTERIOR DRIVER DOOR HANDLES & CONTROLS) | 1 | | 099533 | Continue To Hold |
| 2013-18717 | 3 | ENVELOPE CNTG DNA SWABS (FM EXTERIOR REAR DRIVER DOOR HANDLE) | 1 | | 099533 | Continue To Hold |
| 2013-18717 | 4 | ENVELOPE CNTG DNA SWABS (FM INTERIOR REAR DRIVER DOOR HANDLES) | 1 | | 099533 | Continue To Hold |
| 2013-18717 | 5 | ENVELOPE CNTG DNA SWABS (FM EXTERIOR FRONT PASSENGER DOOR HANDLE) | 1 | | 099533 | Continue To Hold |
| 2013-18717 | 6 | ENVELOPE CNTG DNA SWABS (FM INTERIOR FRONT PASSENGER DOOR HANDLES & CONTROLS) | 1 | | 099533 | Continue To Hold |
| 2013-18717 | 7 | ENVELOPE CNTG DNA SWABS (FM EXTERIOR REAR PASSENGER DOOR HANDLE) | 1 | | 099533 | Continue To Hold |
| 2013-18717 | 8 | ENVELOPE CNTG DNA SWABS (FM INTERIOR REAR PASSENGER DOOR HANDLES) | 1 | | 099533 | Continue To Hold |
| 2013-18717 | 9 | ENVELOPE CNTG DNA SWABS (FM EXTERIOR REAR GATE LIFT HANDLE) | 1 | | 099533 | Continue To Hold |
| 2013-19057 | 1 | ENVELOPE CONT BUCCAL SWABS (SGT STENDER) | 1 | | 099533 | Continue To Hold |
| 2013-19063 | 1 | BAG W/"AIR JORDAN" BAG, PS3 GAMES, MISC. CORDS, PERS. EFF. | 1 | | 099533 | Continue To Hold |
| 2013-19063 | 10 | ENV. CONT. DNA SWAB FROM MOUTH OF BOTTLE ON LN. 9 | 1 | | 099533 | Continue To Hold |
| 2013-19063 | 2 | SONY PS3 GAME CONSOLE (IN LN. 1) | 1 | Sony/Cech-3001a/CF765564410 | 099533 | Continue To Hold |
| 2013-19063 | 3 | TRIO TABLET, UNK. S/N (IN LN. 1) | 1 | Trio/Stealth Pro | 099533 | Continue To Hold |
| 2013-19063 | 4 | ENV. CONT. SILVER APPLE iPOD, FROM GLOVEBOX | 1 | | 099533 | Continue To Hold |
| 2013-19063 | 5 | ENV. CONT. PIECE OF FRONT PASSENGER SIDE BUMPER W/POSS. PAINT TRANSFER | 1 | | 099533 | Continue To Hold |
| 2013-19063 | 6 | ENV. CONT. PIECE OF FRONT PASSENGER QUARTER PANEL W/POSS. PAINT TRANSFER | 1 | | 099533 | Continue To Hold |
| 2013-19063 | 7 | ENV. CONT. MN. DMV REG. RECIEPT FOR MN. LIC. # 647-KLW, NAME OF CALA SCOTT | 1 | | 099533 | Continue To Hold |
| 2013-19063 | 8 | ENV. W/STRAW FROM MC DONALDS CUP, LOCATED IN CENTER CONSOLE, PASSENGER SIDE CUP HOLDER | 1 | | 099533 | Continue To Hold |
| 2013-19063 | 9 | BAG W/EMPTY BRISK PINK LEMONADE BOTTLE, FROM BETWEEN DRIVER & FRONT PASSENGER SEAT | 1 | | 099533 | Continue To Hold |
| 2013-19223 | 1 | BUCCAL SWAB FROM STRAUSS | 1 | | 099533 | Continue To Hold |

Lathrop Decl. Ex. 6

| Case/Item | | Description | Qty | Make/Model | Tag | Date | Status |
|---|---|---|---|---|---|---|---|
| 2013-19265 | 1 | VIDEO DISC-IFRAH MOHAMAD | 1 | | 099533 | | Continue To Hold |
| 2013-19265 | 2 | VIDEO DISC-CALA SCOTT | 1 | | 099533 | | Continue To Hold |
| 2013-19266 | 1 | AUDIO DISC-IFRAH MOHAMAD | 1 | | 099533 | | Continue To Hold |
| 2013-19266 | 2 | AUDIO DISC-CALA SCOTT | 1 | | 099533 | | Continue To Hold |
| 2013-19266 | 3 | AUDIO DISC-TAMIKA O'NEAL | 1 | | 099533 | | Continue To Hold |
| 2013-19266 | 4 | ARTICLE FROM STAR TRIBUNE, RE: INTERVIEW W/ANN VANBELLINGER | 1 | | 099533 | | Continue To Hold |
| 2013-19446 | 1 | AUDIO DISC - JAMES KAJU - 5/31/13 | 1 | | 099533 | | Continue To Hold |
| 2013-19547 | 1 | SIG SAUER .45 CAL. SEMI-AUTO, 4" BBL. PISTOL W/MAG | 1 | Sig Sauer/P220/G361048 | 005786 | Oct 3, 2013 | Release |
| 2013-19548 | 1 | ENV. CNTG. ONE FEDERAL .45 AUTO +P LIVE CARTRIDGE (FROM CHAMBER OF .45 CAL. SIG SAUER) | 1 | | 005786 | Oct 3, 2013 | Release |
| 2013-19548 | 2 | ENV. CNTG. THREE FEDERAL .45 AUTO +P LIVE CARTRIDGES (FROM .45 CAL. SIG SAUER MAGAZINE) | 1 | | 005786 | Oct 3, 2013 | Release |
| 2013-19548 | 3 | BAG CNTG. PMAG MAGAZINE W/"MEATH" CNTG. QTY OF LIVE RIFLE CARTRIDGES | 1 | | 005786 | Oct 3, 2013 | Release |
| 2013-19549 | 1 | BAG CNTG. SAFARILAND LEG HOLSTER W/BLS (FM FLOOR OF WATER HEATER ROOM) | 1 | | 005786 | Oct 3, 2013 | Release |
| 2013-19549 | 2 | BAG CNTG. 5 PAPER BAGS W/BLS (FM FLOOR OF WATER HEATER ROOM) | 1 | | 099533 | | Continue To Hold |
| 2013-19549 | 3 | BAG CNTG. PAIR BLACK OAKLEY SUNGLASSES FRAMES (FM FLOOR OUTSIDE LAUNDRY ROOM) | 1 | | 099533 | | Continue To Hold |
| 2013-19549 | 4 | BAG CNTG. TWO SUNGLASSES LENSES (FM FLOOR NEAR CLOTHES RACK IN LAUNDRY ROOM) | 1 | | 099533 | | Continue To Hold |
| 2013-19549 | 5 | BAG CNTG. PAIR OF BLK HARLEY DAVIDSON SUNGLASSES (FM UNDER CLOTHES RACK IN LAUNDRY ROOM) | 1 | | 099533 | | Continue To Hold |
| 2013-19550 | 1 | ENV. CNTG. 2 DNA SWABS (FROM GRIPS OF .45 CAL. SIG SAUER) | 1 | | 099533 | | Continue To Hold |
| 2013-19550 | 2 | ENV. CNTG. 2 DNA SWABS (FROM TRIGGER OF .45 CAL. SIG SAUER) | 1 | | 099533 | | Continue To Hold |
| 2013-19550 | 3 | ENV. CNTG. 2 DNA SWABS (FROM BBL. OF .45 CAL. SIG SAUER) | 1 | | 099533 | | Continue To Hold |
| 2013-19550 | 4 | ENV. CNTG. 2 DNA SWABS (FROM MAGAZINE OF .45 CAL. SIG SAUER) | 1 | | 099533 | | Continue To Hold |
| 2013-19550 | 5 | ENV. CNTG. 2 DNA SWABS (FROM TWO SUNGLASSES LENSES) | 1 | | 099533 | | Continue To Hold |
| 2013-19550 | 6 | ENV. CNTG. 2 DNA SWABS (FROM BLACK OAKLEY SUNGLASSES FRAMES) | 1 | | 099533 | | Continue To Hold |
| 2013-19550 | 7 | ENV. CNTG. 2 DNA SWABS (FROM BLACK HARLEY DAVIDSON SUNGLASSES) | 1 | | 099533 | | Continue To Hold |
| 2013-19550 | 8 | ENV. CNTG. 2 BLS SWABS (FROM SAFARILAND LEG HOLSTER) | 1 | | 099533 | | Continue To Hold |
| 2013-20824 | 1 | VIDEO DISC/ YOUTUBE VIDEO | 1 | | 099533 | | Continue To Hold |
| 2013-20827 | 1 | STILL IMAGES (VIEWED/SIGNED BY BROOKE | 1 | | 099533 | | Continue |

Lathrop Decl. Ex. 6

| | | | | | |
|---|---|---|---|---|---|
| | | SUTTON) | | | To Hold |
| 2013-22809 | 1 | ENVELOPE CNTG QTY OF HCMC MEDICAL RECORDS OFFICER MURO | 1 | 099533 | Continue To Hold |
| 2013-22809 | 2 | ENVELOPE CNTG QTY OF HCMC MEDICAL RECORDS OFFICER MEATH | 1 | 099533 | Continue To Hold |
| 2013-25541 | 1 | AUDIO DISC-BROOKE SUTTON, 06/17/2013 | 1 | 099533 | Continue To Hold |
| 2013-32339 | 1 | SEALED ENVELOPE CNTG FIRED PROJECTILE | 1 | 007961 | Hold For Adjudication |
| 2013-32340 | 1 | FOREIGN BODY RELEASE FORM | 1 | 007961 | Hold For Adjudication |
| 2013-32340 | 2 | HCMC REPORT | 1 | 007961 | Hold For Adjudication |
| 2013-32343 | 1 | USB FLASHDRIVE/ VIDEO FM SHAWN KEOHEN CELL PHONE | 1 | 007961 | Hold For Adjudication |
| 2013-33044 | 1 | ENVELOPE CNTG MEDICAL RECORDS FOR MEATH | 1 | 007961 | Hold For Adjudication |
| 2013-33479 | 1 | QUANTITY OF MEDICALS RECORDS & FORMS (OFFICER PETERSON) | 1 | 007961 | Hold For Adjudication |
| 2013-34036 | 1 | DATA DISC CELL PHONE EXAM | 1 | 007961 | Hold For Adjudication |
| 2013-34106 | 1 | AUDIO DISC/ 911 PHONE CALL (FM 612-207-7361) | 1 | 007961 | Hold For Adjudication |
| 2013-34106 | 2 | STATE OF MN ADMINISTRATIVE SUBPOENA (612-207-7361) | 1 | 007961 | Hold For Adjudication |
| 2013-35082 | 1 | QUANTITY OF PHONE RECORDS (FM 612-207-7361) | 1 | 007961 | Hold For Adjudication |

## Case Supplements

**119 supplements begin on the following page.**

---

| **Supplement number:** | **1** | **CCN: MP-13-143872** | **Author:** | **005276 - Jason Okerberg** |
|---|---|---|---|---|

Supplement of Off J.Okerberg #005276 on 05/10/2013 18:32


On 05-10-2013 I was working marked squad 312 with my partner Officer Hanson in full uniform. We were driving squad 8321 P# 76417. Earlier in the day squads from Fifth Precinct called out that they were in pursuit of a blue PT Cruiser that just hit a marked squad in there Precinct. They called out the vehicle was traveling east on 28th Street and the vehicle was passing Lyndale Avenue possibly coming into Third Precinct. We were at the intersection at 28th and Portland Avenue as they aired the chase. We did not see the vehicle cross over the intersection but saw the squads go by us traveling east on 28th Street. We then canvassed the area for the vehicle but was GOA. We then went back to regular patrol.

We were out on a directed patrol at Chicago and Franklin Avenue when we heard there was shoots fired at 2717 Bryant Avenue south. We went to the area of the call code three. We arrived and I saw Officer Meath from SWAT unit on the front lawn of 2717 Bryant Avenue south. I saw he had a gun shot wound to his right upper leg by his pelvic bone. I assisted Officer Luke Peterson with putting on a tourniquet above the wound to control bleeding. Officer Peterson monitored the pressure and he elevated his right leg as i kept his right elevated until EMS arrived. Officer Meath was alert and communicating with Officers. He asked for some water and drank from a water bottle. There appeared to be little bleeding and we cut away his pants to see if there any other bullet holes none were found at the scene. HCMC Ambulance crew arrived and took control of the Officer and transported him . I was given his duty belt and the front part of his ballistic vest while they took him away. He had his radio on the belt and two magazines in the pouch but no gun in the holster. We were cleared at the scene to bring his equipment to the Hospital.

We then went to HCMC to give his gear to a supervisor and saw Sgt Olson from Third Precinct day watch on scene and he advised me to give it to Sgt Voss CAR 710 that was also at the Hospital. I got it out of our squad trunk and gave it to Sgt Olson

Lathrop Decl. Ex. 6

who walked it cross the lot to Sgt Voss who placed it in his trunk. We were then clear to do report.

**END of Supplement 1**

---

| **Supplement number:** | **2** | **CCN: MP-13-143872** | **Author:** | **002705 - Andrew Hanson** |

---

Supplement of Off A.Hanson #002705 on 05/10/2013 18:34


On 05/10/2013 at approximately 1531 hours I was assigned to marked squad 312 with my partner, Officer Okerberg, when we responded to an Officer involved shooting at 2717 Bryant Av S. While on the way to the call it was aired that 2 Officers had been struck.

Upon arrival I noticed a group of Officers in the front yard providing medical attention to Officer Meath. It appeared that he had a gunshot wound to his upper leg area and that he had enough Officers attending to him. I then assisted with securing the scene on the outside of the house and directing EMS personnel to the injured Officers. My partner and I took control of Officer Meath's gunbelt including the radio but no service weapon along with half of his ballistic vest. The items were secured in the trunk of our squad.

Moments later we were told that enough Officers were on the scene and that we could clear and meet up with a supervisor at HCMC with Officer Meath's duty gear. My partner and I then went to HCMC and spoke with Sgt. Olson. He advised us that we should give Officer Meath's duty gear to Sgt. Voss. The duty gear was given to Sgt. Voss outside of HCMC near the APS entrance.

**END of Supplement 2**

---

| **Supplement number:** | **25** | **CCN: MP-13-143872** | **Author:** | **006736 - Stephen Sporny** |

---

Supplement of Off S.Sporny #006736 on 05/10/2013 22:56

On 05/10/2013 I was working Squad 593 when I heard that Squad 504 was involved in a FLEE (CCN 13-143770). I responded to the area to assist in looking for the suspect, the description of the suspect was given as a Black Male, wearing a white tank top and red pants.

I continued checking the area when I heard 1280 say they had a broken rear house window at 2717 Bryant Ave S and were asking for an available car to respond to the rear of the address.

I responded to the rear of the house and on my arrival DOC DAVE (2306) was in at the rear of the address already and 1280 was at the rear door waiting for K-9 to arrive. Sgt. Stender arrived with K-9 and Doc Dave and myself took cover at the rear of the residence in the alley.

I observed 1280 with Sgt. Stender and K-9 enter the residence and at was quiet inside the residence while 1280 was searching and then approx. 2 to 3 mins in the residence I had an unknown Male Voice yelling Police K-9 come out.
Then I heard what appeared to be a loud crashing sound as if someone was fighting inside the residence. At this point I heard a single pop and then within a very short amount of time (20 to 30 secs) I heard approximately 8- 10 more loud pops and at this point DOC DAVE and myself ran up to the rear door and Sgt. Stender came running out with his dog and secured his dog in his squad and also directed me to move squads from the rear of the alley and order EMS to the scene Code 3.

I then cleared the alley and started to direct other officers on 28th St W to shut down all northbound and southbound traffic to have a direct route for EMS and FIRE to get to the hospital.

I spoke with 710 (Sgt. Porras) and he ok'd this is a supplement and I stayed on scene and assisted with the perimeter until relieved around 2200hrs.

**END of Supplement 25**

---

| **Supplement number:** | **26** | **CCN: MP-13-143872** | **Author:** | **000293 - John Grove** |

---

Supplement of Off J.Grove #000293 on 05/10/2013 23:22


On 05-10-2013 I was working squad 510 with my partner, Officer Diedrich. We responded to a call where a vehicle had struck squad 504 and was involved in a pursuit (CCN 13-143770). Shortly after the pursuit, Officers learned that the suspect vehicle was back in the area of 27 St W and Lyndale Av S. Some remarks in the call stated:

Lathrop Decl. Ex. 6

Appended, 15:31:58] CLR SHAWN CB....ADVG M JUST RAN INS "FLANDRS BICYCLE SHOP* WRG BRIGHT RED PANTS****[Shared] [Shared]

CLR SHAWN CB....ADVG M JUST RAN INS "FLANDRS BICYCLE SHOP* WRG BRIGHT RED PANTS****

[Appended, 15:31:58] BIZ IS AT LYNDALE/27 ST W*****[Shared] [Shared]

Other squads responded and eventually squad 8513 observed the suspect running on foot. A perimeter was set and my partner and I initially set up at 27 St and Lyndale Av S. The suspect was again observed and the perimeter became 27 St to 28 St, Aldrich Av S to Bryant Av S. My partner and I moved positions and set up at 28 St and Aldrich Av S.

Multiple resources responded and the block was searched by SWAT and K9. As I held my spot on the perimeter, one of the individuals who approached me asking enter the perimeter to was the resident of 2717 Bryant Av S, JAMES BICKAL. At the time, that block was still being searched. I told BICKAL it was not safe for him to return to his home at this time. I also told him that if he stood by at this corner I would tell him when we finished the search and it was safe for him to return home.

Another person who approached me while I was at my position on the perimeter was the original caller, SHAWN KEOHEN. KEOHEN reported that he had still images of the suspect (from surveillance cameras) inside the building today. He asked if they would be helpful and I instructed him to print them and bring them back. KEOHEN returned a short time later with the images of the suspect who was wearing red pants and a black shirt. The suspect also had long dreadlocks. I asked KEOHEN to bring the extra copies of the images to other officers nearby on the perimeter.

The search was eventually completed on the 2700 block from Aldrich to Bryant Av S. Once this was done and that part of the perimeter secured, I told BICKAL he could return home. It was not known at this time that BICKAL'S home had been broken into.

The perimeter had been extended to Colfax Av S at some point and the Bryant to Colfax block was going to be searched next.

At this time my partner and I went to 27 St W and Bryant Av S to see where we may be needed. As we were there, BICKAL approached Officer Mooney (who was also at this intersection) and told Officer Mooney that his home, 2717 Bryant, had been broken into. Officer Mooney aired this information. My partner and I went to the front of the house to secure the perimeter of the house. Other officers from Transit PD were also at the front of the home. SWAT responded to the rear of the home. Because the front was already covered, I went to the rear of the home and covered that side as SWAT made entry to check the home.

As SWAT was checking inside, I could observe officers go through the kitchen to the basement. A short time later I heard gunshots from inside the home and ran inside. As I ran inside, I crossed paths with K9 Officer Stender who was taking his dog out of the home. Officer Stender stated officers had been shot. I attempted to air that Officers were down and ordered EMS code 3, but I am not sure if my transmission went through.

I proceeded to the basement and came across Officer Muro at the bottom of the stairs. He had been shot in the upper right thigh. I observed one apparent bullet wound. Other officers attempted to place a tourniquet on the leg. We then carried Officer Muro up the stairs and out to the front on the street to wait for ambulance. Once on the street, we cut away his pant leg and removed his duty belt to better apply the tourniquet.

An ambulance arrived and I helped place Officer Muro on the stretcher. My partner and I then assisted on closing down a safe travel route to the hospital. We ended up stopping Stevens Av traffic at 28 St W. After the ambulance was reported safe at the hospital we returned to the scene. Sgt Moore directed us to canvas the entire even side of the block and the odd side of the block south of the incident address. The following is the result of my canvas:

2704 Bryant: no answer.

2712 Bryant: RUSSELL NELSON DOB ████ 1949, phone ██████████ and ALLEN POPPE DOB ████ 1959, phone ███-███████. Both were home and saw the police search but never saw the suspect.

2728 Bryant: JAHI HENRY DOB ████ 1993, phone ██████████ Saw the police search but never saw the suspect.

2734 Bryant: KARRIE PALUCH DOB ████ 1984, phone ███████████. Saw the police search but never saw the suspect.

2742 Bryant: no answer.

2752 Bryant: no answer.

2757 Bryant: KAREN GOHDES DOB ████ 1963, phone ███████████. Saw the police search but never saw the suspect.



Lathrop Decl. Ex. 6

2745 Bryant: JASON PASCHALL DOB ███-1972, phone ████████ . Saw the police search but never saw the suspect.

2733 Bryant: JOSHUA BURDY DOB ████ 1977, phone ████████ and SALLIE WATSON DOB ████ 1976, phone ████ ████ . Both saw the police search but never saw the suspect.

2729 Bryant: no answer.

2725 Bryant: KENNETH OMUNDSON DOB ███ 1931, phone ████████ . Did not see or hear anything.

After my canvas I was directed to provide further scene security at the front of the incident address. I was later released from the scene to complete reports.

**END of Supplement 26**

---

| **Supplement number:** | **27** | **CCN: MP-13-143872** | **Author:** | **004849 - Gerald Moore** |
| --- | --- | --- | --- | --- |

Supplement of Sgt G.Moore #004849 on 05/10/2013 23:22
This supervisor was in full MPD uniform and working a fully marked MPD squad (Chevy Tahoe). This officer heard a priority one call come out of a suspicious vehicle at 2743 Lyndale Av So. Here are comments from the start of that call: APT 106.....RE: CCN 13-134082/INFO/INS FRM 5/2 & 13132627/BURGDR/FRM 5/1....#1 DARK BLU PT CRUISER/LIC 647KLW W/BM & BF-- BOTH WHO WERE PART OF BREAK....BM LATE 20'S/DREDS
5/10/2013 14:01:23 094131 Response [Appended, 15:32:00] APT 106.....RE: CCN 13-134082/INFO/INS FRM 5/2 & 13132627/BURGDR/FRM 5/1....#1 DARK BLU PT CRUISER/LIC 647KLW W/BM & BF-- BOTH WHO WERE PART OF BREAK....BM LATE 20'S/DREDS[Shared] [Shared]

I responded from 5th pct along with sqd 504, and I overheard Car 2306 from the DOC, answer up that he was just coming up to the address. Myself and sqd 504 arrived in the area and were directed to the south east parking lot by Car 2306. Ofcrs located the PT Cruiser, plt number 647KLW. The vehicle was parked facing west and it was occupied once, according to 2306. However, when officers reached the lot, we observed 2 persons inside of the car. A B/M behind the steering wheel with dreadlocks and a B/F in the passenger seat front. Officers exited their squads and I began to order the driver to shut off the car. The car was shut off. He was then ordered to remove the keys from the ignition, which the driver did, however, he hesitated when ordered to throw them to the ground. He then placed the keys back into the ignition, restarted the car and began backing up. Officers continued to give commands as the suspect put the car into reverse. Car 2306 (plainclothes) went up to the passenger window with his service weapon drawn and ordered the driver to shut off the car. The driver disregarded the orders and began to back out of the parking spot.

The suspect vehicle began to pick up speed and turned the wheel sharply to proceed SB out of the parking lot. This put the suspect vehicle on a direct collision course with sqd 504 and Sgt Smulski. This officer had clear shot at the driver of the vehicle which was now lurching forward towards Sgt Smulski and I was in the process of lining up a possible shot, when I overheard the female passenger yell out that she had he kids in the car. The suspect vehicle lurched right at sqd 504 and struck the car door closing it shut. Sgt Smulski was able to jump out of the way. The suspect vehicle was now accelerating out of the parking lot and driving E/B on 28th St.

This had become a flee here are the comments from this portion of the call. 502 EB ON 28
5/10/2013 14:12:26 112776 Response 502 RQ PS ,115066
5/10/2013 14:12:26 112776 Response [Appended, 15:31:59] 502 RQ PS ,115066[Shared] [Shared]
5/10/2013 14:12:40 112776 Response 502 EB ON 28 FROM GRAND - STRUCK 504[Shared] [Shared]
5/10/2013 14:12:40 112776 Response 502 EB ON 28 FROM GRAND - STRUCK 504
5/10/2013 14:13:27 112776 Response 502 GONE THRU 1 AV APPROACHING STEVENS
5/10/2013 14:13:27 112776 Response [Appended, 15:31:59] 502 GONE THRU 1 AV APPROACHING STEVENS[Shared] [Shared]
5/10/2013 14:13:34 093401 Response [Appended, 15:31:59] AIRED ON CH 1[Shared] [Shared]
5/10/2013 14:13:34 093401 Response AIRED ON CH 1
5/10/2013 14:13:58 112776 Response 502 EB 28 PORTLAND
5/10/2013 14:13:58 112776 Response [Appended, 15:31:59] 502 EB 28 PORTLAND[Shared] [Shared]
5/10/2013 14:14:33 112776 Response [Appended, 15:31:59] 502 EB ON 28 AT PARK[Shared] [Shared]
5/10/2013 14:14:33 112776 Response 502 EB ON 28 AT PARK
5/10/2013 14:14:34 093401 Response CONSTRUCTION AT 28/BLOOM .. BLOCKED
5/10/2013 14:14:34 093401 Response [Appended, 15:31:59] CONSTRUCTION AT 28/BLOOM .. BLOCKED[Shared] [Shared]
5/10/2013 14:14:38 064631 Response [Appended, 15:31:59] AIRED CH2[Shared] [Shared]
5/10/2013 14:14:38 064631 Response AIRED CH2
5/10/2013 14:14:51 112776 Response 502 LOST SIGHT OF VEH
5/10/2013 14:14:51 112776 Response [Appended, 15:31:59] 502 LOST SIGHT OF VEH[Shared] [Shared]

Lathrop Decl. Ex. 6

This officer shut off my emergency equipment and started checking the area in 3rd precinct. Here are some more comments from this portion of the call: [Appended, 15:31:58] CLR SHAWN CB....ADVG M JUST RAN INS "FLANDRS BICYCLE SHOP* WRG BRIGHT RED PANTS****[Shared] [Shared]
5/10/2013 14:16:21 094131 Response CLR SHAWN CB....ADVG M JUST RAN INS "FLANDRS BICYCLE SHOP* WRG BRIGHT RED PANTS****
5/10/2013 14:16:32 094131 Response [Appended, 15:31:58] BIZ IS AT LYNDALE/27 ST W*****[Shared] [Shared]
5/10/2013 14:16:32 094131 Response BIZ IS AT LYNDALE/27 ST W*****
5/10/2013 14:16:38 094131 Response [Appended, 15:31:58] SE CORNER[Shared] [Shared]
5/10/2013 14:16:38 094131 Response SE CORNER
5/10/2013 14:17:07 094131 Response [Appended, 15:31:58] ADVG CLR HAS ON CAMERA- VEH STRIKING THE MPLS SQD ...CLR CAN MAKE COPY FOR POL****[Shared] [Shared]
5/10/2013 14:17:07 094131 Response ADVG CLR HAS ON CAMERA- VEH STRIKING THE MPLS SQD ...CLR CAN MAKE COPY FOR POL****
5/10/2013 14:17:27 094131 Response [Appended, 15:31:58] M HAS BLK SHIRT/BRIGHT RED PANTS[Shared] [Shared]
5/10/2013 14:17:27 094131 Response M HAS BLK SHIRT/BRIGHT RED PANTS

Myself and squad 8513 ofcr Illetschko proceeded towards the area where the suspect was last seen running. The comments continued to come in from the caller at Flanders Bike store: Appended, 15:31:58] Backed up 504 with 9981[Shared] [Shared]
5/10/2013 14:17:38 SYS Response [Appended, 15:31:58] [Appended, 14:21:29] Possible E911 Wireless Phase 2 update[Shared] [Shared]
5/10/2013 14:17:38 SYS Response [Appended, 14:21:29] Possible E911 Wireless Phase 2 update
5/10/2013 14:17:59 094131 Response [Appended, 15:31:58] CLR HAS NOT SEEN M COME OUT OF THE FRT OF BIZ****[Shared] [Shared]
5/10/2013 14:17:59 094131 Response CLR HAS NOT SEEN M COME OUT OF THE FRT OF BIZ****
5/10/2013 14:18:08 094131 Response [Appended, 15:31:58] CLR CANNOT SEE THE BACK ENTR****[Shared] [Shared]
5/10/2013 14:18:08 094131 Response CLR CANNOT SEE THE BACK ENTR****
5/10/2013 14:18:31 112776 Response 502 HEADING BACK TO 27/LYNDALE
5/10/2013 14:18:31 112776 Response [Appended, 15:31:58] 502 HEADING BACK TO 27/LYNDALE[Shared] [Shared]
5/10/2013 14:18:42 112776 Response [Appended, 15:31:57] 502 IS CLR STILL SEEING SUSP[Shared] [Shared]
5/10/2013 14:18:42 112776 Response 502 IS CLR STILL SEEING SUSP
5/10/2013 14:18:47 112776 Response 502 SUSP BM DRIVER DRED AND BF PASSENGER
5/10/2013 14:18:47 112776 Response [Appended, 15:31:57] 502 SUSP BM DRIVER DRED AND BF PASSENGER[Shared] [Shared]
5/10/2013 14:19:04 094131 Response [Appended, 15:31:57] TC STILL HAS ORIG CLR ON PH****[Shared] [Shared]
5/10/2013 14:19:04 094131 Response TC STILL HAS ORIG CLR ON PH****
5/10/2013 14:19:08 112776 Response 8513 AST'ING AT FLANDERS
5/10/2013 14:19:08 112776 Response [Appended, 15:31:57] 8513 AST'ING AT FLANDERS[Shared] [Shared]
5/10/2013 14:19:33 112776 Response [Appended, 15:31:57] 502 DO THEY STILL HAVE SIGHT OF SUSP?[Shared] [Shared]
5/10/2013 14:19:33 112776 Response 502 DO THEY STILL HAVE SIGHT OF SUSP?
5/10/2013 14:19:48 094131 Response [Appended, 15:31:57] CLR HAS NOT SEEN SUSPECT COME OUT THE FRT-- HE CANNOT SEE THE REAR ENTR*****[Shared] [Shared]
5/10/2013 14:19:48 094131 Response CLR HAS NOT SEEN SUSPECT COME OUT THE FRT-- HE CANNOT SEE THE REAR ENTR*****
5/10/2013 14:20:26 060933 Response [Appended, 14:21:29] CLR SAW POLICE OFCRS CHASING A NAVY BLU PT CRUISER ..DRIVER OF VEH LEFT CAR IN APT COMPLEX LOT ON THE CORNER ..BF WRG SKINNY BLU JNS AND 2 KIDS JUST WALKED OUT OF THE CAR ..DRIVER/SUSP BM, DREADS IN A PONYTAIL, UNK COLOR SHIRT, RED PA
5/10/2013 14:20:26 060933 Response NTS LS HOPPING FENCES WB IN AREA ..

Officers were enroute to try and get ahead of the suspect and crossed over 27th and Lyndale since there were reports of the suspect running W/B. Here are some more comments: [Appended, 14:21:29] BF WAS CARRYING A CHILD IN A CARSEAT AND HOLDING HAND OF A 2YO CHILD WHEN SHE GOT OUT OF THE CAR
5/10/2013 14:20:45 060933 Response [Appended, 14:21:29] BF WAS CARRYING A CHILD IN A CARSEAT AND HOLDING HAND OF A 2YO CHILD WHEN SHE GOT OUT OF THE CAR[Shared] [Shared]
5/10/2013 14:21:03 094131 Response [Appended, 15:31:57] CLR SAW HIM ONLY RUNNING AFTER HITTING COP CAR AND HE WENT INS FLANDERS****[Shared] [Shared]
5/10/2013 14:21:03 094131 Response CLR SAW HIM ONLY RUNNING AFTER HITTING COP CAR AND HE WENT INS FLANDERS****
5/10/2013 14:21:58 112776 Response 8513 BM DREDS RUNNING WB
5/10/2013 14:21:58 112776 Response [Appended, 15:31:57] 8513 BM DREDS RUNNING WB[Shared] [Shared]
5/10/2013 14:22:01 094131 Response [Appended, 15:31:57] ADVG M IS RUNNING SB ON LYNDALE & CUTTING WEST BOUND DWN 27 ST W****[Shared] [Shared]
5/10/2013 14:22:01 094131 Response ADVG M IS RUNNING SB ON LYNDALE & CUTTING WEST BOUND DWN 27 ST W****

Lathrop Decl. Ex. 6

5/10/2013 14:22:08 112776 Response Backed up 502 with 824
5/10/2013 14:22:08 112776 Response [Appended, 15:31:57] Backed up 502 with 824[Shared] [Shared]
5/10/2013 14:22:54 031779 Response [Appended, 15:31:57] ALD/27 L/S WB 2700 BLOCK ALDRICH - BM/DREDS/BLK SHIRT/RED PANTS[Shared] [Shared]
5/10/2013 14:22:54 031779 Response ALD/27 L/S WB 2700 BLOCK ALDRICH - BM/DREDS/BLK SHIRT/RED PANTS
5/10/2013 14:23:26 031779 Response 27/BRYANT - NEED CAR AT COLFAX
5/10/2013 14:23:26 031779 Response [Appended, 15:31:56] 27/BRYANT - NEED CAR AT COLFAX[Shared] [Shared]
5/10/2013 14:23:35 031779 Response [Appended, 15:31:56] 962 AT 26/HARRIET - NEEDING TO MEET AT 2700 BLOCK OF ALDRICH[Shared] [Shared]
5/10/2013 14:23:35 031779 Response 962 AT 26/HARRIET - NEEDING TO MEET AT 2700 BLOCK OF ALDRICH
5/10/2013 14:23:47 094131 Response [Appended, 15:31:56] CLR ADVG M IS BTWN HERE/LYNDALE & BRYANT--[Shared] [Shared]
5/10/2013 14:23:47 094131 Response CLR ADVG M IS BTWN HERE/LYNDALE & BRYANT--
5/10/2013 14:23:48 031779 Response SET UP PERIMETER
5/10/2013 14:23:48 031779 Response [Appended, 15:31:56] SET UP PERIMETER[Shared] [Shared]


At this time officers established a perimeter that stretched from 27th to 28th St West, Lyndale Av S to Colfax Av S. K9 was summoned and sqd 962, ofcr J. Murphy arrived and began to do a possible track of the suspect. Officers began a search of all open doors, exposed porches, open garages and etc. Squad 1280 was arriving in the area and asked where could they assist. They were instructed to help out with search of a home at 2700 block of Aldrich Av S. In the meantime, sqd 520 responded to 500 West 28th st along with sqd 507 on a report that the PT Cruiser was in the parking lot there. Sqd 507 Sgt Dungeon arrived and found Mn plt 647KLW parked in the lot unoccupied. The vehicle was secured and sqd 520 officers Bjostad/Christensen took over its security.


K9 continued to search W/B between 27th to 28th/Lyndale to Colfax Av S., when I was approached by a female who was asking about her car. She stated that he car was a blue 2002 PT Cruiser. She gave me her name and she was id'd verbally as Cala Denise Scott, dob █████-1991. She told me that her id was in the car and she was called by a friend who told her that she could pick up her car at 28th/Bryant Av S. I asked her if she knew what her license plate was and she said she did not. I ran her car on my squad MDC and discovered that she was the registered owner of the car. She also stated that she had loaned her car to a friend that she had only known for three weeks. She gave me the nickname of "Mookie" and described him as being a B/M, 6'0"-2", med to dark complex, medium afro, and a some facial hair. She did not know his address or his correct name. However, she had his cell phone number of ███████. This officer tried to have this cellphone number pinged, however, Channel 7 could not get any significant off of this number except for the name on the account Stephanie Ann Barrington.


This officer tried to obtain more information from Cala, such as her home or business address. She was reluctant to give me any of her personal information and she kept insisting that she get her car back. I explained to her that if she helps us, she can help herself. She kept saying that she did not want to get involved. I explained to her that she was involved since her car was used to commit a crime. She did describe "Mookie" as wearing blue jeans and a blue sweater. At this time, K9 officer A. Stender arrived at 27th/Bryant and he was speaking with the members of 1280, when officers were approached by a resident of 2717 Bryant Av S, who stated that there was a window broken on the side of his house and he believed that someone maybe inside. Officer Stender got his dog and 1280 along with car 2306 entered the dwelling at 2717 Bryant Av S.


While speaking with Cala about getting some additional info, I overheard on the officers call out "SHIOTS FIRED". These are the following comments: **EMS TO REAR- OFFICER SHOT 2717 BRYANT AV S *** [Shared]
5/10/2013 15:30:32 111009 Response [Appended, 15:31:51] **EMS TO REAR- OFFICER SHOT 2717 BRYANT AV S *** [Shared] [Shared]
5/10/2013 15:30:36 111009 Response [Appended, 15:31:51] CODE 3 [Shared] [Shared]
5/10/2013 15:30:36 111009 Response CODE 3 [Shared]
5/10/2013 15:30:48 109646 Response Backed up 502 with 483 [Shared]
5/10/2013 15:30:48 109646 Response [Appended, 15:31:51] Backed up 502 with 483 [Shared] [Shared]
5/10/2013 15:31:05 031779 Response [Appended, 15:31:51] REQ EMS BE NOTIFIED THAT STAAB ROOM HCMC NOTIFIED - OFCR SHOT [Shared] [Shared]
5/10/2013 15:31:05 031779 Response REQ EMS BE NOTIFIED THAT STAAB ROOM HCMC NOTIFIED - OFCR SHOT [Shared]
5/10/2013 15:31:14 031779 Response T159 INJ'D COP OUT THEB ACK [Shared]
5/10/2013 15:31:14 066784 Response Secondary Location for 354: 2717 BRYANT AV S,,MINNEAPOLIS, MN 55408. [Shared]
5/10/2013 15:31:14 066784 Response [Appended, 15:31:51] Secondary Location for 354: 2717 BRYANT AV S,,MINNEAPOLIS, MN 55408. [Shared] [Shared]
5/10/2013 15:31:14 031779 Response [Appended, 15:31:51] T159 INJ'D COP OUT THEB ACK [Shared] [Shared]
5/10/2013 15:31:15 066784 Response [Appended, 15:31:51] Backed up 1280 with 354 [Shared] [Shared]
5/10/2013 15:31:15 066784 Response Backed up 1280 with 354 [Shared]


At this moment, Cala Scott was placed in the rear of Sqd 502 as precaution, since it appeared that she may know more than

Lathrop Decl. Ex. 6

what she was telling officers. Officers between Bryant and Colfax Av S, began to collapse on that address and as officers began to approach the house, it was learned that a second officer had been shot. A second ambulance was ordered code 3 for this location. I began to close in on the address, and as I did, I learned that a suspect was also down. Moments later officers removed one of the wound officers out of the house and began to give him first aid on the sidewalk. This officer had taken a round to his right thigh. The second officer was brought out of the house and officers began to perform first aid on him as well. Both officers were members of the SWAT team. Both ambulance and rescue arrived and the first officer was taken away to HCMC by ambulance and there was a squad escort. Rescue provided advance first aid to the second officer and a second ambulance took him to HCMC as well. This officer summoned on of the firefighters/paramedic and he was asked to check on the status of the suspect who I was told was still in the basement. It was later confirmed, that the suspect had no pulse and was pronounced deceased.

At this time, I took over command of the scene and had crime scene tape put up from Aldrich to Colfax/27th to 28th st. The alleys were also shut off. Officers were assigned to copy down the names and badge numbers of every officer entering the crime scene. There was also a inner perimeter put up around the immediate home where the incident had occurred. Officer Hubert form sqd 8519 was responsible for documenting officers coming and going from the address. Car 710 was notified and responded to the scene along Commander Arrandondo IAU, Commander Johnson CID, D/C Arneson (Investigations), and Sgt McCarty PIO. It should be noted that Insp Diaz was already on-site during the early stages when officers were searching for the suspect who ran from officers. Car 2306 confirmed that person that the female passenger of the AT Cruiser referred to as "Bookie" was the same person that was now DOA on the basement floor of 2717 Bryant Ad S.

I was given the following information: When officers entered 2717 Bryant Ad S, they went down to the basement area and it appeared that the dog was hitting on the presence of someone hiding. Ofcr Stender called out to this person to come out, however, no one did. As officers came around a water heater, the suspect reached up and grabbed a SWAT officers service weapon. Because it was fully automatic, several rounds were discharged, striking two members of the SWAT team. The suspect was also shot, but at this time, I don't know who fired at the suspect.
The officer whose weapon was grabbed was placed in the front seat of Sgt Kingsbury's sqd and taken from the area, which is standard procedure for a critical incident. At some point, Sgt Kingsbury was summoned back to the scene so that the B of I could take possession of the automatic service weapon and photograph it. The involved officer was eventually brought down to room 108 by Sgt Kingsbury.

i had officers start canvassing the block to find potential witnesses. I also received a call from sqd 520 that was back at 500 West 28th street. Ofcr Bjostad stated that he had at least two good witnesses that observed the suspect running from officers prior to the shooting. I gave this information to Sgt A. Kjos (car 710). Sgt Kjos was also told about Cala Scott being in the rear of Sqd 502 in the event she wanted to talk to her.

During the course of the preliminary investigation, I was contacted by dispatch that they were adding some remarks to the call and I needed to read. I went back to Squad 502 and read the following remarks: REC CALL FRM MALE EDWARD JOHNSON IN ST LOUIS PARK SAYING HIS SON ERIK JOHNSON SAW THE SUSPECT EARLIER WHEN CALL STARTED IF ANYONE WOULD NEED TO TALK WITH HIM HE CAN BE REACHED AT 612 408 1066. *********NOW HAVE ERIN WILLLIAMS/CELL CB ████....ADVG SHE GOT A TEXT MSG FRM FRND WHO IS INV AND CLAIMS POSS W/SUSPECT & SEZ HE IS POSS W/SUSPECT AND IS HIDING UNDER SOME PORCH IN UNK-- ADVG HE TOLD THE SUSPECT TO NOT TAKE THE PT CRUISER- AND H
5/10/2013 17:15:10 094131 Response E WAS WAITING FOR SOMEONE TO COME GET HIM AND TAKE HIM OUT OF THE STATE***** [Shared]
5/10/2013 17:16:38 F066101 Response 746 REQ CAR 21 TO ROOM 100 FOR PHOTOS [Shared]
5/10/2013 17:17:26 094131 Response CLR ADVG M SHE GOT MSG FRM IS: TAYLOR/SIMEON BM SHORT/STOCKY....CLR ADVG THE TEXT MSG IS SAYING HE TOLD THE SUSPECT TO NOT TAKE THE PT CRUISER AND HE IS HIDING UNDER UNK PORCH-- CLR DOES NOT KNOW WHERE THE MALE IS HIDING....ADVG GOT TXT MSG FRM CELL PH
5/10/2013 17:17:26 094131 Response NUMB- ████████ [Shared]

M HAS NAME TATTOO'D ON NECK [Shared]
5/10/2013 17:18:19 094131 Response GOT MSG AT 1618 HRS & SAID HE NEEDS TO GET OUT OF STATE & HE NEEDS CLR & GOT UPSET WHEN ASKED IF IT WAS ON THE NEWS.....CLR CAN BE REACHED AT ████████ [Shared]
5/10/2013 17:19:44 F066101 Response.

Erin Williams was contacted by this officer and she told me the following in brief: That a party by the name of Simeon Romell Taylor was texting her saying he was hiding under a porch somewhere in south Mpls, and he needed to get out of the state. Also, he had told his friend not to take the PT Cruiser. He also wanted her to puck him up. Officers did find an address for Simeon Taylor of ████████ and a 3rd pct squad (360) checked the address with negative results. Inside and outside were checked, and a family stated they did not know a Simeon Taylor and had been in the home for a year. She flat out refused to help Mr. Taylor but was trying to get his whereabouts to provide for officers. All this information was turned out to Sgt C. Thomson (710). At this time, it was learned that both officers were stable and were expected to make full recoveries.

Officers began to consolidate the scene and relieve some officers so they could start their reports. Currently, only the block o

Lathrop Decl. Ex. 6

Bryant 27th/28th to Aldrich is blocked off. It maybe sometime before the mapping of the house is done.

At this time myself and Sgt Smulski were relieved by Lt Kelley, who assumed Incident Commander status over the scene and we cleared.

CASE CONT'D-OPEN
SGT. G.T. MOORE
5TH PCT PATROL SUPVR
**END of Supplement 27**

---

| Supplement number: | 28 | CCN: MP-13-143872 | Author: | 005825 - Michael Primozich |
|---|---|---|---|---|

Supplement of Off M.Primozich #005825 on 05/10/2013 23:31

STATEMENT OF OFFICER PRIMOZICH TYPED ON 05/10/13 AT 23:12 HOURS:

On 05/10/13 I was working for the Minneapolis Police Department. I was assigned to the Violent Criminal Apprehension Team (VCAT). My supervisor was Sgt Holly Keegel. I was working with Sgt Keegel and Officer Dubuc/Faulconer. I was driving an unmarked civilian type vehicle assigned by the unit supervisor.

On 05/10/13 the VCAT team was asked by Sgt Kjos and Porras of the Minneapolis Homicide unit to locate a witness related to their case. The name of the witness was Anquanette Andrea Hollman (DOB█████92).

VCAT team members came up with an address of 2743 Lyndale Avenue South. Officer Dubuc and I rode together to 2743 Lyndale Avenue South and parked along the south side of the building. We observed the apartment entrance but could not get in past the secure door. We walked along the west side of the building and then started to walk back to the south entrance.

As we walked back I observed Acquanette Andrea Hollman getting out of a vehicle that was now parked. Along with Acquanette Hollman were her twin sister Annette and her mother. They had three small children with them belonging to the twin daughters.

I introduced myself and my supervisor arrived. Acquanette Hollman agreed to come to Room 108 and speak with Sgt Kjos and Porras. Sgt Keegel rode with me during the transport. Acquanette's mother followed us to Minneapolis city hall to wait for her daughter.
**END of Supplement 28**

---

| Supplement number: | 29 | CCN: MP-13-143872 | Author: | 003668 - Holly Keegel |
|---|---|---|---|---|

Supplement of Sgt H.Keegel #003668 on 05/10/2013 23:32
I am currently assigned to Car 1405, Supervisor of the MPD Violent Criminal Apprehension Team, (VCAT Unit), where I work in plainclothes and drive an unmarked vehicle. On 5-10-13, I was contacted by Sergeants Kjos and Porras of the MPD Homicide Unit, who requested our assistance in locating ANQUANETTE ANDREA HOLLMAN, DOB █████-92, in regards to their investigation.

VCAT Officers Primozich, Dubuc, Faulconer and I went to 2743 Lyndale Avenue South to check for HOLLMAN. Officer Faulconer was riding with me and just as we exited our vehicle, Officer Primozich informed me that they were talking to HOLLMAN on 28th Street just east of Lyndale. We arrived and I introduced myself to HOLLMAN who was standing on the sidewalk with her children, sister and mother. I told HOLLMAN that Investigators would like to talk to her and she agreed to come to City Hall.

Officer Primozich and I transported HOLLMAN to City Hall, Room 108. HOLLMAN'S mother followed us in her own vehicle and walked upstairs with us to Room 108 where she was seated in the waiting room. HOLLMAN was seated in Interview Room F where she met with Sergeants Kjos and Porras.
**END of Supplement 29**

---

| Supplement number: | 30 | CCN: MP-13-143872 | Author: | 007884 - Ker Yang |
|---|---|---|---|---|

Supplement of Off K.Yang #007884 on 05/11/2013 00:06

On 5/10/2013, at approximately 1530 hours, I was preparing myself for shift work to start at 1600 hours when I heard over the air that officers had been shot at 2717 Bryant Ave S. I jumped in Squad 514 and responded to the scene. I assisted with taping

Lathrop Decl. Ex. 6

off the area at 28th St W/Colfax Ave S. I stayed at that post until I was instructed by Sgt. Dudgeon to relieve Officer Do at 27th St W between Aldrich Ave S. and Bryant Ave S

At approximately 1850 hours, I relieved Officer Do and took over logging of the MPD Crime Scene Entry Log. I stayed at that post until I was instructed by Lt. Kelly to secure from the scene at approximately 2315 hours.

The Crime Scene Entry Log was property inventoried at P&E Locker, in number 48.

**END of Supplement 30**

---

| Supplement number: | 31 | CCN: MP-13-143872 | Author: | 003171 - Debra Hubert |
|---|---|---|---|---|

---

Supplement of Off D.Hubert #003171 on 05/11/2013 00:17

On 5-10-13, I was working Squad 8519 Able. I was in a marked squad car and in full uniform.

At approximately 1430 hours I responded as a perimeter officer to the alley on 28 St W, Aldrich Av S to Bryant Av S. SWAT officers were checking the area and I was to keep vehicle and pedestrian traffic out of the alley.

Once SWAT cleared this alley, they were going to move WB. I moved to 26 St W and Dupont Av S and held the perimeter there.

Squad 824 aired that the homeowner of 2717 Bryant Av S returned home to find his back door broken. SWAT officers responded and confirmed that there was forced entry to the rear of this address. They aired that they were checking the address.

A short while later, I heard DOC Dave Schiebel #2306 air that shots were fired and officers were shot. I responded to the scene.

When I arrived, I saw two SWAT officers being carried out of 2717 Bryant Av S by other officers. I went to the north side door of the address to see if additional help was needed inside the house. A short while later, Sgt. Moore (#4849) told me to start logging the people who went inside the address. Because the scene was dynamic, I did not have time to get a log from my squad car. I posted at the north side door and began writing down the names of those who entered in my notebook.

There were two doors on the north side of the house: an inside door and an outside door. They were both open when I arrived. Once you enter this door/enter the house, straight ahead are steps that go down to the basement. To the left are steps that go up to the kitchen.

Because this situation was dynamic, people were coming and going. I was only able to get the times of some of those who entered the house. Some officers who found out I was keeping a log came to me and told me that they had been inside the house prior to my arrival. Below are the names of the individuals who entered the house through the north side door. It should be noted that I did not document where the individual went once they walked through the door, only that they did. I did not document how long each individual was inside the residence or if they came and went.

Officer Hubert #3171
Officer Gorman #2343
Officer Durand #1627
Officer Laux #4035
DOC Officer Schiebel #2306
Transit Officer Degree #354
MFD Captain Schmitz (Rescue 1)
MFD Firefighter Shacon (Rescue 1)
Officer Westlund #7674
Officer Peterson #5630
Sgt. Strauss #6927
Sgt. Stender #6791
Officer Schoonover #6379
Transit Officer Wyatt #123
Officer Fairbanks #1901
Sgt. Moore #4849

Lathrop Decl. Ex. 6

The above individuals had all entered the residence before 1626 hours.

Sgt. Green #2429 entered at 1626 hours
Sgt. Thompson #7201 entered at 1626 hours
Sgt. Metcalf #4755 entered at 1628 hours
Sgt. Kjos #4898 entered at 1631 hours
FS Jacobson #108064 (Car 21) entered at 1720 hours
FS Hummel #119676 (Car 21) entered at 1720 hours
FS Berget #113500 (Car 21) entered at 1735 hours
Lt. Kelly #3691 entered at 1755 hours

Homeowner James Bickal entered the home with homicide investigators at 1908 hours. Bickal got his cat and supplies for the cat as well as clothes. Bickal did not go in the basement.

Lisa Estes (ME Investigator) entered at 2024 hours
Emily Osterberg (ME Investigator) entered at 2024 hours
Enid Boeding, MD (ME Office) entered at 2025 hours

At approximately 2040 hours, Lt. Kelly told me to secure my post and return to the precinct to do my report.

I will property inventory my notebook which contains the above log information.

**END of Supplement 31**

---

| **Supplement number:** | **32** | **CCN: MP-13-143872** | **Author:** | **030291 - Anne Deneen** |
|---|---|---|---|---|

Supplement of Sgt A.Deneen #030291 on 05/11/2013 00:45
Statement of Sgt. A. M. Deneen Badge 30291
On 5/10/13 while working Squad 804 I was monitoring Channel 3 when I heard 'shots fired' on the above call. I responded immediately and while enroute it was toned as a help call.
I arrived on 28th and Bryant av s and began to assist with shutting down traffic for ambulance to transport wounded officers to the hospital.

After the ambulances left the scene I assisted Sgt. Dudgeon in setting up the perimeter along 28th street and then later along 27th street initially Aldrich av s to Colfax av s.

I then assisted in directing another ambulance to the area for a medical involving a witness. I maintained the perimeter at 27th and Colfax until a city officer took my post. I then cleared at 1658 and went back in service.

**END of Supplement 32**

---

| **Supplement number:** | **33** | **CCN: MP-13-143872** | **Author:** | **001613 - Rena Dudgeon** |
|---|---|---|---|---|

Supplement of Sgt R.Dudgeon #001613 on 05/11/2013 01:18
CCN 13-143872

While working squad 507, as the Day Beat Patrol Supervisor, I was enroute to a PERGUN at a High School when I heard on my Police radio- EMS to the rear-Officer shot 2717 Bryant. I confirmed that Officers at the High School were CODE4 and responded to the Officer down call. (Related CCN 13-143770).

Upon my arrival I assisted with the scene. I directed Officers to secure an inner and outter perimeter. I assisted in securing the scene with crime scene tape. I assisted with the perimeter and remained on scene until released by the IC Lt. Kelly (5502).

**END of Supplement 33**

---

| **Supplement number:** | **34** | **CCN: MP-13-143872** | **Author:** | **004407 - Gary Manty** |
|---|---|---|---|---|

Supplement of Sgt G.Manty #004407 on 05/11/2013 01:25

On 05/10/13 at approximately 1530 Hours I responded to 2717 Bryant Avenue South in reference to a HELP call where two Officers had been shot, and Officer Involved Shooting. Upon arrival I was requested to be an Escort to one of the Officers involved in the incident, Officer Lucas Peterson. I had Officer Peterson come to my Squad and after clearing the scene I transported him to room 100 City Hall. I stayed with Officer Peterson at City Hall, HCMC and transported him to the SOC where

Lathrop Decl. Ex. 6

Car 21 met us to take his uniform pant and shirt. At approximately 2030 Hours I was released from the Escort.

**END of Supplement 34**

| | | | | |
|---|---|---|---|---|
| **Supplement number:** | **35** | **CCN: MP-13-143872** | **Author:** | **006374 - Jason Schmitt** |

Supplement of Off J.Schmitt #006374 on 05/11/2013 01:39

On 05-10-13 at approx 1915 hours we were requested to go to the incident scene to assist with relieving other officers. Officer Gottsch and I were tasked with holding the perimeter at the 2717 Bryant Av S. A crime log was completed and inventoried . At approx 2345 hours, the medical examiner requested my assistance with the removal of A1 from the basement of the home. I walked down the stairs and carried one end of the body bag containing A1 up the stairs and outside of the house to a waiting gurney. We stayed on scene until cleared by 710. When cleared the scene at approx. 0120 hours and removed the remaining crime scene tape.

**END of Supplement 35**

| | | | | |
|---|---|---|---|---|
| **Supplement number:** | **36** | **CCN: MP-13-143872** | **Author:** | **003702 - Jonathon Kingsbury** |

Supplement of Sgt J.Kingsbury #003702 on 05/11/2013 01:39

On 5-10-13 at approximately 1530 hours I was at the 4th Pct and I heard via the radio that two officers had been shot in 5th Pct. I immediately headed to the scene.

Upon arrival at the scene I met with Sgt. Stender. He asked me to be an "escort officer" for Officer Durand. At that point I walked Officer Durand over to my squad (which had been driven to the front of the address by another officer) and we sat inside.

Note that at this time Sgt. Stender placed Officer Durand's MP5 in my trunk, and Officer Durand was in possession of Officer Meath's handgun.

I drove us out of the perimeter and waited a few blocks away until I was called back by Lt. Kelly. When we returned, I met with Sgt. Porras who instructed me to drive back to the scene and have Car 21 recover the MP5 and the handgun. See his supplement for details.

I then drove Officer Durand to Room 100. I waited with him until we were released, at which time I drove him to HCMC. We checked on the status of the injured officers. After that I drove him to the SOC where we met Car 21. Officer Durand's shirt was then taken as evidence.

Other Officers and I then drove Officer Durand home.

**END of Supplement 36**

| | | | | |
|---|---|---|---|---|
| **Supplement number:** | **37** | **CCN: MP-13-143872** | **Author:** | **001575 - Mack Dominguez** |

Supplement of Off M.Dominguez #001575 on 05/11/2013 01:48

On 05-10-2013 I was working marked squad 516a. I was requested to 2717 Bryant Ave S to provide rear security at the shooting location. I was at my post until squad 5502 secured the perimeter.

**END of Supplement 37**

| | | | | |
|---|---|---|---|---|
| **Supplement number:** | **38** | **CCN: MP-13-143872** | **Author:** | **003691 - John Kelly III** |

Supplement of Lt J.Kelly III #003691 on 05/11/2013 02:08

STATEMENT OF LT. J. KELLY ON 5/11/13 AT 0115 HOURS

Lathrop Decl. Ex. 6

On 5/10/13 I was working Off-Duty at G&K Services 621 Olson Memorial Highway. I was monitoring a FLEE incident in the 5th Precinct that started at approximately 1412 hours. Sgt. Moore aired that the suspect struck a marked squad. Responding Officers had set up a perimeter and were searching for a suspect who had fled on foot. I later heard officers air that they were checking on an address that had forced entry and that the home owner reported as a possible burglary in progress.

At approximately 1530 hours I heard officer(s) air that an officer had been shot. I heard the address was on the 2700 block of Bryant Ave. S. I immediately responded Code 3 to assist. I learned while en route that 2 officers had been shot.

Upon arrival I assisted with the scene, 2717 Bryant Ave. S. I learned that 2 officers were shot and the suspect involved was shot and deceased. I directed officers responding to assist with clearing a route to HCMC for injured officers' transport. I learned that Sgt. Moore was the Incident Commander. I assisted with managing the outer perimeter and the shift needs. I directed Sgt. Dudgeon to manage the outer perimeter of the scene. I directed Officer Mark Johnson, the senior officer on 5th Precinct Middle Watch to be acting sergeant until relieved. He handled roll-call. Sgt. Sand later took over.

Once the scene was under control, I assisted with managing resources. We had approximately 10 St. Paul Police Officers assist with the perimeter.

At approximately 1906 hours I aired that I was the Incident Commander and relieved Sgt. Moore. I later relieved Sgt. Dudgeon and took charge of the entire scene.

I requested response by the Salvation Army for food and beverage for officers on scene. I continued to coordinate the scene, manage resources, and assisted investigators with scene management.

At approximately 2330 hours the Medical Examiner's Office personnel arrived. I assisted them with carrying the deceased from the north door to the stretcher. I authorized the board up company to respond and board up the rear door.

The Crime Lab personnel cleared and the investigators secured the house. All officers including myself cleared the scene at approximately 0122 hours.

**END of Supplement 38**

---

| Supplement number: | 39 | CCN: MP-13-143872 | Author: | 002357 - Matthew Gottsch |
|---|---|---|---|---|

Supplement of Off M.Gottsch #002357 on 05/11/2013 02:22

On 05/10/13 at about 1915 hours I was working squad 522 with my partner, Officer SCHMITT, when we were requested to relieve officers at the intersection of 27th St W and Bryant Ave S, per 508. Officers were on scene providing crime scene security for an officer involved shooting scene.

Upon arrival we posted temporarily at the intersection of 27th and Bryant before 5502 requested my partner and I move to the crime scene at 2717 Bryant Ave S and relieve officers there. I took over the crime scene log at the residence and provided crime scene security at the front door.

I later requested Boardup respond to the residence to secure the rear door, per 710.

After the Medical Examiner and Crime Lab had cleared the scene, I helped remove the remaining crime scene tape from around the residence. My partner and I cleared the scene at approximately 0120 hours, per 710.

**END of Supplement 39**

---

| Supplement number: | 40 | CCN: MP-13-143872 | Author: | 001711 - Jon Edwards |
|---|---|---|---|---|

Supplement of Off J.Edwards #001711 on 05/11/2013 03:49

On 05-10-13 I was assigned to the 5th precinct Community Response Team (CRT). I responded to the scene (along with Sgt Sand) as officers were holding a perimeter in search of the suspect at large.

I sat at the Northeast corner of 28th and Colfax with Sgt Sand in an unmarked car as squad 590 assisting on the perimeter in searching for the suspect. At this time, I then heard that a broken window was found at 2717 Bryant Av S and that the suspect was possibly inside and that SWAT would be making entry. I then heard 2 Officers were shot in 2717 Bryant Ave S. I then went to the front of this house and started to clear the intersection and the block to make way for the ambulances to come through. Once the two ambulances left the area I assisted in making sure the perimeter was secure and I remained on the perimeter

Lathrop Decl. Ex. 6

(assisting with securing spots at 28th and Aldrich and 27th and Bryant) until relieved by Dogwatch Sgt Radke.

**END of Supplement 40**

| Supplement number: | 41 | CCN: MP-13-143872 | Author: | 007441 - David Voss |
|---|---|---|---|---|

Transfer to HOMICIDE UNIT

**END of Supplement 41**

| Supplement number: | 42 | CCN: MP-13-143872 | Author: | 001536 - Anthony Diaz |
|---|---|---|---|---|

Supplement of Insp A.Diaz #001536 on 05/11/2013 09:47

On May 10th At approximately 1415 hours I was monitoring channel 3 radio traffic and Heard Sqd 502 Sgt Moore stating he had lost a PT Cruiser vehicle in the area of 28th and Park av so. I respond to the area.

While enroute the suspect apparently doubled back and returned to the area of 27th and Lyndale so, and I heard sqd 8513 Off Illetschko state on air he observed the suspect running. Sgt Moore and off Illetschko coordinated setting up a perimeter to contain the suspect. Officers on the perimeter had a surveillance photo of the suspect given to them by the complainant from the 911 call. Canine was called to the area for a search.

I Met with Sgt Moore and Smulksi on 27th Bryant to Colfax so and was briefed on the situation. They originally responded on a suspicious person/ vehicle possible involved in a burglary 911 call.. Upon stopping for questioning by them, the suspect fled in the suspect vehicle and nearly struck Sgt Smulski hitting her fully marked squad as he took off.

The perimeter was held by officers as 1280 Sgt Stender and his SWAT team along with canine did a search of the area. At approximately 1530 hours they were searching 2717 Bryant after a neighbor had discovered forced entry to the rear of his home and alerted officers.

Several minutes later Officers came on the air stating shots had been fired and there was an officer down. I ran to the north west corner of 2717 Bryant, a single family home and maintained perimeter on the househwith other officers. Officers carried out injured Officer Ricardo Muro who was being treated. He was the first to get loaded on to an ambulance. I moved up to the north side door and met the second injured officer, Mike Meath and helped carry him to the front lawn. Officer Meath was bleeding from his right upper thigh. A turnecut had been applied to stop the bleeding. EMS and Fire rescue arrived and began treating Officer Meath. He was loaded up onto the ambulance and an escort was provided for both officers to HCMC. Sgt Stender advised me The suspect had been killed during the attack on the officers.

Sgt Stender Identified the involved officers and they were accompanied by Sgts Manty and Kingsbury. Sgt Moore was the Incident Commander and Lt. Kelly was assisting. After the scene was under control I drove to HCMC and briefed AC Clark and Chief Harteau. I then returned to the scene. St Paul responded to assist us and helped with the perimeter of the scene. During the Course of the evening A male party showed at the scene who said he may be the deceased father. Lt. Kelly and I along with PIO McCarty spoke with a Walter Franklin. Lt. Kelly Took his information and passed it along to the Investigators. I cleared the scene after the body was removed from 2717 Bryant so.

**END of Supplement 42**

| Supplement number: | 43 | CCN: MP-13-143872 | Author: | 004807 - Dean Milner |
|---|---|---|---|---|

Supplement of Off D.Milner #004807 on 05/11/2013 11:13

On 05/10/2013 I was assigned to marked squad 340 along with my partner, Officer McCarthy (badge 04520). At approximately 1416 hours, we were patrolling and heard dispatch channel 1 air information regarding 5th precinct officers involvement in a vehicle pursuit. I immediately switched my portable radio on to channel 3 to monitor the incident. We immediately became aware that the pursuit was EB on 28th Street heading toward the 3rd precinct. We responded to the area to assist. While still en route, squad 502 (Sgt. Moore) aired they had lost sight of the vehicle near East 28th Street/Chicago Avenue South. The vehicle was described as a dark blue Chrysler PT Cruiser bearing MN plate 647KLW.

As we arrived in the area, information was aired that witnesses had sighted a possible suspect flee on foot from the listed vehicle, near the 2700 block of Aldrich, on foot. The suspect was described as a black male, late 20's with dreadlocks, wearing a black tank top and red pants. As we began to canvas the area in our squad, we had dispatch assign us to the call.

Eventually, a perimeter was established and we continued our search while K-9 and 1280 searched on foot. At approximately

Lathrop Decl. Ex. 6

1515 hours, 1280 advised that the homeowner of 2717 Bryant just returned and discovered forced entry to their home. Officer McCarthy and I moved our position to the SE corner of Bryant/West 27th Street. 1280 then aired that they would be searching the address.

At approximately 1520 hours, 1280 aired "Shots fired…shots fired!" followed by information that at least one officer had been shot. I approached the rear of the address on foot with my firearm drawn. As I neared the rear door, Sgt. Stender was exiting and directing the evacuation of Officers Muro and Meath. I was told by one of the officers that the suspect was "down", meaning no longer a threat. I was given Officer Meath's rifle for safekeeping.

As the team attended to the wounded officers, I helped clear the street in front of the incident address for a loading zone. Once the first ambulance arrived, I helped get Officer Muro loaded for transport and they departed, code 3, for HCMC. I then continued clearing the loading zone for the second ambulance. On arrival, I entered and prepared to ride down with Officer Meath. I gave custody of his rifle to Officer Grant Johnson prior to transport. On the run to HCMC, I stabilized Officer Meath's injured right leg. Once at the hospital, I posted outside of Officer Muro's ER room.

While still at HCMC, I was informed by Inspector Sullivan that Officer Josh Young was involved in a fatal accident while en route to assist at the shooting scene. Once secured from the hospital, Officer McCarthy and I went to City Hall, room 100, to be with Officer Young. After Officer Young was secured, we took him back to the station to change and gather his belongings. I then drove him to his house, where Officer McCarthy and I stayed with him until his significant other arrived home. She returned around 2245 hours and we left him in her care along with a critical incident sheet that was provided by EAP. Upon leaving, I telephoned Sgt. Karl Olson and Lt. Delmonico to update them.

**END of Supplement 43**

| Supplement number: | 44 | CCN: MP-13-143872 | Author: | 007441 - David Voss |
| --- | --- | --- | --- | --- |

Supplement of Sgt D.Voss #007441 on 05/11/2013 14:20
SUPPLEMENT OF SGT. D. VOSS, DAYWATCH CAR 710 -- 5-10-13

5-10-13, 1530 HRS
I was working daywatch as Homicide Car 710. I was notified by dispatch and Lt. Zimmerman of a burglary suspect that fled from officers. Squads pursued the suspect to the 2700 block of Lyndale. The suspect ran and hid for a bit, then kicked in a door at 2717 Bryant Ave South to hide inside there. Officers went inside to apprehend him and shots were fired with two uniformed MPD officers hit by gunfire.

Sgt. Wagner and I headed to HCMC to oversee operations there. Sgt.'s Kjos and Porras were assigned to go to the scene and conduct that part of the investigation.

1545 HRS
I learned from dispatch that the burglary suspect was fatally wounded by officers at 2717 Bryant and would remain there as a DOA. Officers Meath and Muro were taken urgently to HCMC by MPD escort. They were treated for non life threatening gunshot wounds. Both had been shot in the upper right thigh(s).

1555 HRS
I began to gather the wounded officers clothing and duty belts / guns. I wanted to get these items asap amid the confusion of so many officers and MPD adminstration that began to gather at HCMC.

Sgt. Biederman assisted me in gathering Ofc. Muro's items. I was able to immediately take Ofc. Muro's duty belt with his gun still inside its holster along with parts of his uniform that had cut been off and were still with him. I learned that other parts of his uniform had been cut away during emergency medical treatment on scene. I was told that Ofc. Muro's gun had not been fired by the assisting officers from his (SWAT) unit.

Once in my possession, I immediately secured them in the trunk of my unmarked vehicle parked at the hospital. My vehicle was not accessed by anyone because I had the keys.

1640 HRS
I was notified by Sgt. Dudgeon that she was at 26th and Blaisdell Ave South working a motorcycle accident where the driver of the motorcycle struck an MPD squad going Code3 to assist on the officer involved shooting. The male motorcycle driver was DOA on scene and his female passenger was brought to HCMC for emergency treatment. Sgt. Dudgeon needed more officers to help protect that scene.

I immediately aired my request to dispatch for more officers to help at that related scene.

I then met with Ofc. Meath. He was still undergoing treatment inside the stabilization room at HCMC. He did not have his duty

Lathrop Decl. Ex. 6

belt or gun. Only parts of his uniform and boots were in a "patient belongings" bag by his bedside. I gathered these items and stowed them in my vehicle separately from Ofc. Muro's.

I began to seek assistance from a SWAT team member, Sgt. Sheldon in trying to locate Ofc. Muro's gun and uniform. I was later notified by Lt. Jack Kelly acting as Incident Commander that part of Ofc. Meeth's gun belt and uniform were found on scene. I requested they immediately be brought to me for later examination.

I also found out that one of the officers (unknown) on scene after the shooting retained Ofc. Meath's duty gun which was then turned over to Sgt. Porras on scene at 2717 Bryant. The other parts of Ofc. Meath's uniform were preserved at the scene.

I requested Sgt. Wagner coordinate and witness the "MedTox" blood draws from both involved officers as per the MPD critical incident policy. I wanted these samples taken asap, if possible, before either officer went up to surgery or too much time would elapse.

I later learned that the "MedTox" blood draws were stopped by MPD Federation President John Delmonico.

1800 HRS
Sgt. Wagner and I returned to the Homicide Office to continue assisting with the investigation.

1930 HRS
I met with MPD Crime Lab Tech Michael Schultz. At my request he took possession of the involved officers belongings (incl. Ofc. Muro's handgun) into his custody for processing in the crime lab office.


SGT. D. VOSS
**END of Supplement 44**

---

| **Supplement number:** | **45** | **CCN: MP-13-143872** | **Author:** | **119690 - David Carlisle** |
|---|---|---|---|---|

Supplement of FS D.Carlisle #119690 on 05/12/2013 04:56
Crime Lab Unit - HCME ID report
CCN: 13-143872

On 5/12/2013, Hennepin County Medical Examiner (HCME) personnel requested us to help identify ME# 13-2385 and provided a tentative name of TERRENCE TERRELL FRANKLIN, DOB ███ 1990. A corresponding finger print card was obtained bearing the name, TERRENCE TERRELL FRANKLIN, DOB ███ 1990; MPD# 08005332.

Under the supervision of OFC Fahnhorst, I obtained an impression from the #6 left thumb of ME# 13-2385.

The print was brought to the Crime Lab Unit, where OFC Fahnhorst compared and identified the #6 left thumb of ME# 13-2385 to the #6 left thumb of FRANKLIN.

The identification was verified by FS Schultz and myself.

HCME was notified via phone and fax.

The obtained impression and the finger print card will be retained in the Crime Lab Unit major case files.

We hereby certify that this is a report of the conclusions of an examination performed by us.


FS Carlisle
OFC Fahnhorst
FS Schultz
MPD Crime Lab Unit
**END of Supplement 45**

---

| **Supplement number:** | **46** | **CCN: MP-13-143872** | **Author:** | **002999 - Griffin Hillbo** |
|---|---|---|---|---|

Supplement of Off G.Hillbo #002999 on 05/12/2013 15:10

On 05/10/2013, I was working squad 145 with my partner SGT BLACKWELL. We were on duty, wearing full MPD uniforms, and driving a City of Minneapolis Marked squad car. I am also the MPD Swat Paramedic and continue my training and patient care

Lathrop Decl. Ex. 6

with Hennepin County Medical Center.

At approximately 1531 hours, we heard on channel 3 that two officers had been shot at 2717 Bryant Av S. We responded to this scene and I assisted with medical care for one of the officers that had sustained a gun shot wound. I then assisted another Paramedic with care for this officer in the ambulance until reaching HCMC.

Sgt PETERSON then assigned me to a security post outside the Emergency Room. I remained on post until released.

**END of Supplement 46**

---

| Supplement number: | 47 | CCN: MP-13-143872 | Author: | 004520 - Michael Mc Carthy |

---

Supplement of Off M.Mc Carthy #004520 on 05/12/2013 17:42

On 5/10/2013 at 1424 hours, while working squad 340 with OFF MILNER, we responded to the 5th Precinct to assist squads on setting up a perimeter in search for a suspect who had fled from officers. Officers in the 5th Precinct had been involved in a vehicle pursuit of the suspect and the suspect was now on foot and believed to be in the area of 27-28 Street, Aldrich to Bryant Av. The vehicle they had been pursuing was a blue PT cruiser MN 647 KLW. The vehicle had been located in the area but the suspect was still at large. The suspect was described as a black male, dreadlocks, wearing red pants and a black tank top.

We assisted on the perimeter while other officers were searching the area on foot. At 1515 hours information was aired that a resident returning home to 2717 Bryant Av S found signs of forced entry at the back of the home. Swat officers (1280) were assisting with the search on foot and confirmed that there was forced entry and that they would be checking inside of the home.

At 1530 hours officers aired that shots were fired and 2 officers were down. At this point we responded to the address just as other officers were bringing OFF MURO and OFF MEATH out of the home. Both had gunshot wounds to their legs. I assisted in securing the scene until paramedics arrived. I then escorted the second ambulance down to HCMC code 3 (lights and siren).

I assisted with security at HCMC and while there learned that there had been a fatal squad/motorcycle accident involving OFF YOUNG. OFF YOUNG is assigned to our squad and is one of our partners on 340. After clearing the hospital we responded to room 100 of City Hall to assist OFF YOUNG. When he was released at City Hall we transported him to the 3rd Precinct and then transported him home and stayed with him until his fiance was able to respond.

**END of Supplement 47**

---

| Supplement number: | 48 | CCN: MP-13-143872 | Author: | 004849 - Gerald Moore |

---

Supplement of Sgt G.Moore #004849 on 05/12/2013 20:33
CCN 13-143872, TYPED BY ST


STATEMENT OF INVESTIGATOR DAVE SCHIEBEL OF THE STATE POLICE DOC FUGITIVE UNIT

On 05-10-13 at approximately 1400 hours, I was in the area of 26th and Lyndale Avenue South looking for a DOC Fugitive by the name of BUTCHER (OID NUMBER: 203594). BUTCHER was allegedly signing in the area to collect money.

At approximately 1407 hours Channel 3 broadcasted that they had received information that a burglary suspect was in a blue PT Cruiser (Minnesota License 647-KLW). This vehicle was supposedly parked in the southeast parking lot of 2743 Lyndale Avenue South. The Dispatcher tried numerous times to get squads clear to respond to this call. I heard Squad 502, who I knew to be a one person squad, state he would respond from the precinct. The Dispatcher asked for a back-up for him several times but no one responded. I was a block away and I answered up on the radio and stated 2306 would back up Squad 502.

I arrived in the area in about 30 seconds and observed this PT Cruiser to be occupied 2743 Lyndale Avenue South. I informed Dispatch that the vehicle was occupied and I would maintain surveillance until it moved. About this time Squad 502 and Squad 507 pulled into the parking lot. The occupants of the PT Cruiser became aware of the police presence and attempted to back out of their parking spot. A felony stop was initiated and at first it appeared the occupants were going to comply with the felony stop. The driver, a Black male, who was wearing a black tank top and red shorts suddenly started the vehicle and placed it in reverse. I approached the passenger side of the vehicle, pointed my handgun at the subject and told him to shut the vehicle off and to raise his hands. The subject did not comply and I could see his right foot was on the gas pedal and he was attempting to get the car to accelerate. Squad 507 was directly in his path. I explained to him that if he drove his vehicle in Squad 507's direction I would shoot him. A female, who was laying down on the passenger side, suddenly appeared and stated, "Don't shoot him. There's children in the car." I then observed movement in the back seat which appeared to be children. I then holstered my handgun and attempted to reach in and grab the keys. I was unable to do so and the car

Lathrop Decl. Ex. 6

sped towards Squad 507. She jumped out of the way and it appeared the vehicle struck her car door. The PT Cruiser went eastbound 28th Street with Squad 507 and Squad 502 in pursuit.

I followed the squads for a short amount of time and then turned south on Park Avenue to look for the vehicle. At approximately 1416 hours Channel 3 broadcasted that the Black male who attempted to run over the Minneapolis Police officer was in a bike store at 2707 Lyndale Avenue South. I proceeded to that area. A short time later I observed the Black male run across Lyndale Avenue westbound 27th Street to 28th Street between the houses. The subject crossed Aldrich Avenue. By this time numerous squads were in the area and were setting up a perimeter. I pulled up to the alley Aldrich Avenue to Bryant Avenue, 27th Street to 28th Street, and observed the Black male run across the alley but did not cross Colfax Avenue.

A good perimeter was established and I knew the subject was located in the perimeter. I was assigned as a cover officer for Canine Officer 952. Along with his dog we searched the 2700 2800 block of Aldrich to Bryant. We located a couple of unsecured residences and searched them with no success. At this time Car 1280 arrived in the area and we again searched the block with a fresh canine and other officers. We were about to search Bryant to Colfax when a home owner stated that someone had kicked his door in to 2717 Bryant Avenue. Myself, a Minneapolis Officer and MTC Officer were assigned to the rear perimeter of this residence. Car 1280 and Canine SERGEANT STENDER entered this residence to search for the Suspect. At approximately 1530 hours, I heard numerous shots fired from inside this residence. I broadcasted over Channel 3 that we had shots fired and officers needed help at 2717 Bryant Avenue South. Myself and the MTC Officer pushed open the north side door to this residence. I observed SERGEANT STENDER coming out of the basement. I stated, "Andy is everything alright?" He stated, "No we have an officer shot." SERGEANT STENDER was taking his dog out of the residence at this time. I radioed Channel 3 that we had shots fired and an officer down and I asked for an ambulance Code 3.

I proceeded down the basement stairs and observed OFFICER MURO limping towards the stairs. I asked him if he was hit and he stated, "yes". We laid him on the stairs and myself and the MTC Officer applied a tourniquet to his leg. The gunshot wound appeared to be in his upper right thigh area. We were able to get the tourniquet above his knee. At this time OFFICER MEATH also stated he had been hit. I broadcasted we had two officers shot and needed additional ambulance and rescue to respond Code 3. We gave first aid to OFFICER MEATH. I was informed the Suspect was in the room next to us and was down. I broadcasted that the Suspect was down and then entered that area. I pointed my handgun at the Black male and ordered him to show me his hands. He did not respond. I then observed what appeared to be bullet wounds to his head. I checked for a brachial and carotid pulse but found nothing. We were removing the officers from the basement at this time. I radioed to have a paramedic respond to the basement to check the Suspect's condition. At this time a Minneapolis Officer handed me his MP5 so he could assist in removing his fellow officers out of the basement. He stated that this was the weapon that caused the injuries to the officers. I slung the weapon over my shoulder and continued to search the Suspect's area for a gun. At this time two Swat Officers entered the basement to assist me. The officer who gave me his MP5 then came back to the basement and asked for his gun back. I then returned this weapon to him. The Swat Officer stated they were good and I could clear the basement area. I then left the basement area and proceeded to the front of the residence where the officers were receiving first aid. I was asked to assist in escorting the ambulances to HCMC Code 3, which I did.

**END of Supplement 48**

| | | | | |
|---|---|---|---|---|
| **Supplement number:** | **49** | **CCN: MP-13-143872** | **Author:** | **006419 - Jamy Schwartz** |

Supplement of Off J.Schwartz #006419 on 05/10/2013 18:54

While working squad 360 with my partner, Officer Greer, we responded to a HELP call in the 5th Pct. Ofc heard dispatch, tone a help call but Ofc weren't sure on the location. I did hear dispatch advised 27/Bryant but not north or south.

I switched our squad radio over to 5th Pct channel which was channel 3. I heard Ofc airing there were Ofc shot and medical was needed code 3. Officers responded to the scene of the help call.

Ofc were advised to post up at 26/Aldrich Av S and stop SB traffic. Greer and I stayed at that location until we were advised we could clear the call.

**END of Supplement 49**

| | | | | |
|---|---|---|---|---|
| **Supplement number:** | **50** | **CCN: MP-13-143872** | **Author:** | **000369 - Danyelle De Rose** |

Supplement of Off D.De Rose #000369 on 05/10/2013 19:13

SUPPLEMENT OF OFFICER DeROSE, BADGE #0369, ON 05-10-2013 AT 1724 HOURS
CCN: 13-143770

On today's date I was assigned to the VCAT unit which is a plain clothes unit and we wear our badges around our necks to

**Lathrop Decl. Ex. 6**

identify ourselves, we also drive unmark vehicles. VCAT officers were assigned to conduct surveillance on an unrelated case on Chicago Ave between 35 and 38 St. S as we were clear this location I heard the emergency tone and dispatch air that an officer is down at 2717 Bryant Ave S. I aired this to my team via our Nextels and headed to this location.

Once I arrived at 2717 Bryant Ave S I made contact with Sgt Moore who stated he was in charge at the scene. I asked if he need the VCAT unit so I could report back to my Sgt, Sgt Keegel. Sgt G. Moore stated that he had a female later ID as Scott, Cala Denise 11-6-91 in the rear of his squad that he would like me to talk to. When I got over to Sgt G. Moore's squad Officer Morales was standing by and Sgt Gangnon was also standing by the squad. Sgt Gangnon said that Sgt Smulski asked him to talk to the Scott, Cala Denise in the rear of Sgt G. Moore's vehicle.

Sgt Gangnon spoke to Scott, Cala Denise while I spoke to her co-worker Mohamed, Ifrah Bashir ████-1991. (████████████ Cell ████████) I asked I. Mohamed how she got to 27/Bryant Ave S. and she stated that she works with C. Scott at Salama Child Care (1411 Nicollet Ave S, ████) and C. Scott asked her to driver her to 28/Bryant Ave S. I. Mohamed drove (MN 307 GRM) C. Scott to 27/Bryant Ave S to the location where I was talking with her. As I was talking to I. Mohamed, C. Scott said "she does not know anything she just drove me here after I got a call saying I could pick my car up at this location. "I. Mohamed went on to say that she has no idea what is going on that she heard shots and she does not know C. Scott's boyfriend.

At this point I went to see if any of the investigators were on scene to see what they would like us to do with I. Mohamed and C. Scott. I found Sgt A. Kjos who asked that we bring C. Scott down to 108. When I returned the HCMC paramedics were on scene treating I. Mohamed for an asthma attack. It should be noted that they were called prior to me speaking with I. Mohamed.

Officer Morales rode with the paramedics and I. Mohamed to HCMC to be treated. I transported C. Scott in my unmarked vehicle to room 108 for Sgt A. Kjos and Sgt Gangnon followed me. While I was transporting C. Scott to City Hall I asked her what her boyfriends name was and she said "Mookie" was a friend she had just met him a couple of weeks ago. C. Scott went on to say she did not know his real name. We arrived at city hall and C. Scott was placed in room F with an open door for Sgt A. Kjos and was given water and accesses to the bathroom.

**END of Supplement 50**

---

| **Supplement number:** | **51** | **CCN: MP-13-143872** | **Author:** | **002195 - Phillip Gangnon** |
|---|---|---|---|---|

Supplement of Sgt P.Gangnon #002195 on 05/10/2013 20:02

On 4/10/13 I was working 5th Pct. Investigations. I was contacted by Sgt. Smulski squad 502. Who informed me they had been involved in a car chase with the male who I had sent an attempt to ID surveillance photos out on in regards to a burglary of dwelling CCN 13-32627 which occurred on 4/30/2013. She informed me they had perimeter set up and was currently searching for the suspect but they were with a female suspect who was in the surveillance video from the burglary. I was on my way to speak with the female who Sgt. Smulski was out with in the area of 27 ST/ Colfax AV S. In route it was aired that 2 officers had been shot.

When I arrived at the scene I observed 2 Females sitting in the rear of Squad 502 one was a Somali female and the other was a black female who I immediately recognized as the female suspect in my surveillance video. I observed Sgt. Smulski walking towards the squad from Bryant and I went and spoke with. She informed me that the male suspect had been involved in the shooting and was DOA. I went over to squad 502 where Officer Morales had just had the Somali female step out of the car as she was reportedly having trouble breathing. Off. DE Rose from VCAT unit spoke with the Somali female.

I spoke to the other female who was sitting in the back of the squad with the door open legs sticking out unhand cuffed. She Identified herself as Cala Denise Scott DOB ████ 91 address ████████████████ phone ████████████. I did not mention anything to Scott about my burglary investigation or surveillance video. I asked Scott what was going on. She told me she had barrowed her car to her friend "Mookie" she stated "Mookie" was his knick name and stated she did not know his real name. Mookie had sent her a text message around 1300 hours telling her she could pick her car up in the area of 28 ST and Bryant. Her friend the Somali female had driven her to the area where they found the police with her car. She asked the police what was going on and they told her someone had hit a squad car with it and fled. She said the Police were looking for Mookie when they heard the gun shots and Mookie had apparently shot at the police. The officers placed her and her friend in the squad and left. I asked if she knew where "Mookie" lives and she said no. I asked if she knew if he lived in the area and she said no but his sister lives around 28th and Bryant but she not sure which house she lives in.

Officer Morales went with the Somali female to the hospital as she was having asthma problems and was taken by ambulance. Officer De Rose transported Scott to room 108 per car 710 requests I followed her in my car.

**END of Supplement 51**

---

| **Supplement number:** | **52** | **CCN: MP-13-143872** | **Author:** | **003200 - Robert Illetschko** |
|---|---|---|---|---|

Lathrop Decl. Ex. 6

Supplement of Off R.Illetschko #003200 on 05/10/2013 20:13

On 5/10/2013 at 14:01 hours, I assisted squads 502 Sgt Moore, and 504 Sgt Smulski, and DOC 2306 on a report of a suspicious vehicle that was parked near the address of 2743 Lyndale AV S. The remarks stated that the caller was observing a vehicle described as a PT Cruiser, Mn 647-KLW, and occupants that he believed to be involved in a prior burglary. Enroute to the call, I heard Squad 502 air that the suspicious vehicle had fled from him and squad 504 and that the suspicious vehicle had struck 504's squad car.

As I was arriving on the call, I noticed that 502 and 504 were traveling e/b on 28th St from the incident location looking for the Pt Cruiser that had fled from them. I assisted in checking into the 3rd Pct for the PT Cruiser.

Enroute back to the 5th Pct, dispatch informed us that the original caller of the suspicious vehicle had called back and stated that he observed one of the occupants of the suspicious vehicle run into Flanders bike shop near the intersection of 27th St/Lyndale Av S. The male was described as a black male with dred locks, wearing a black shirt and red pants. I arrived to the s/e corner of 27th St/Lyndale Av S and pulled my squad to the curb in front of 2701 Lyndale Av, where I was facing s/b looking at the front of Flanders bike shop, 2707 Lyndale Av S. I then noticed a black male with dred locks wearing a black shirt and red pants exit the front of Flanders.

The black male noticed my marked squad and immediately began to run w/b across Lyndale Av S. I pursued the black male in my squad as he ran w/b into the alley behind 2711 Aldrich Av S. I informed dispatch with the direction and description of the male. As I was following, the black male climbed the fence and entered the backyard of 2711 Aldrich AV. I continued n/b in the alley and then drove to the intersection of 27th ST/Aldrich Av S. At this point a pedestrian in front of 2711 Aldrich Av pointed across the street and indicated to me that the black male continued w/b through the yards at 2710 Aldrich. I asked for a perimeter to be set up and I posted at the intersection of 28th St/Aldrich. When assisting squads arrived, sq 510 took my intersection and I went back to 2711 Aldrich Av S to show canine where the black male was last seen running.

Once canine began the track, I took perimeter on 28th St/Dupont AV S and maintained that position until I heard that there were shots fired inside of 2717 Bryant Av S where officers had been shot. I then drove to the intersection of 28th St/Bryant Av S where I assisted in maintaining a perimeter and traffic control. I stayed at that intersection until I was relieved by Sgt Dudgeon to complete reports.

**END of Supplement 52**

---

| Supplement number: | 53 | CCN: MP-13-143872 | Author: | 000293 - John Grove |
|---|---|---|---|---|

Supplement of Off J.Grove #000293 on 05/10/2013 21:06

On 05-10-2013 I was working squad 510 with my partner, Officer Diedrich. At approximately 1412 hours we responded to assist squads in a motor vehicle pursuit. I heard squad 502, Sgt Moore air that he was eastbound on 28 St from Grand Av S and that the suspect vehicle had struck squad 504.

My partner and I were on another call at 29 St and Pillsbury Av S. When we heard the pursuit aired we responded to 28 St W, north on Pleasant Av from 29 St. I observed a squad car with red lights and siren eastbound on 28 St as I was north on Pleasant Av.

I turned east on 28 St and observed one squad in front of me. Information was aired moments later that the pursuit was through 1 Av and approaching Stevens Av. As I continued east on 28 St the air was tied up with traffic and my partner was not able to air that we were involved. As I drove over the crest of the 28 St bridge over 35 W, I could see further east on 28 St. For the first time in this pursuit I became aware that there were three other squads involved. As soon as I realized there were three other squads involved I pulled to the side of the road and turned off my emergency equipment.

I continued east slowly on the side of the road and heard 502 state that he lost sight of the vehicle. My partner and I checked the area, driving slower than the posted speed limit. A few minutes later my partner and I located a blue PT Cruiser (the suspect vehicle description) that was westbound on Lake St at 10 Av S. We were eastbound on Lake St and the vehicle was traveling at us, but it was too far away to see the license plate. We pulled in front of the vehicle and I activated the emergency lights. The driver was a black male, but as we got close enough to the vehicle to see more detail of the driver and the license plate, we realized we had the wrong vehicle. The stop was terminated and the driver let go on his way quickly and without us identifying him.

A couple of minutes later it was determined the suspect vehicle was actually back in the area of the initial call. Another squad aired that he saw the suspect on foot and we responded back to that area to assist.

**END of Supplement 53**

Lathrop Decl. Ex. 6

| Supplement number: | 54 | CCN: MP-13-143872 | Author: | 001098 - John Christensen |

Supplement of Off J.Christensen #001098 on 05/10/2013 21:24
On 5/10/2013, I was working marked MPD squad 520, along with my partner OFFICER BJOSTAD, we were both in full MPD duty uniform.

At about 1412 hours, squads 502 and 504 were involved in a FLEE where the suspect vehicle had rammed squad 504 at 2743-Lyndale ave so. We were on another call where we had just finished a transport and then headed to the area to help squads 502 and 504.

Squad 507 located the suspect vehicle behind, 500- W28th ST. and at 1427 hours we went to this location to assist squad 507 in clearing the vehicle as it was unknown if it was occupied due to bright sunlight and tinting of the windows on the suspect vehicle. The car was cleared and my partner and I stayed with the vehicle and taped off the area around the parking lot of 500-W28th st. We then assumed positions on opposite corners of 500-W28th ST as we were not sure if suspects had entered this building.

While searching for the suspect an Officer involved shooting occurred related to this call at 2717-Bryant ave so. that CCN is 13-143872.

I Canvassed the east side of Harriet ave so. starting at 2729-Harriet ave so. the upper unit. The resident, ANFINSON,RACHEL ANNE▮▮▮▮▮1984, cell phone number▮▮▮▮▮▮▮▮, stated she had seen a Black male, run away from the vehicle we had secured. ANFINSON stated she had been out on her roof sunbathing, this is across the street from 500-W 28th ST. She stated she heard the vehicle, which was east bound on W28th ST turn North bound onto Harriet ave so. and then WB into the parking lot of 500-W28th st. and parked at an angle to the building. She said the male quickly got of the vehicle and ran West bound hopping the fences and running through the yards, she saw him hop two fences and then lost sight of him.

ANFINSON, said she had called 911 to report this at 1414 hours. She described the Black male she had seen running away from 647-KLW, a dark blue PT CRUISER; as having dread locks or braids and wearing red pants. she was unsure of his height because the events happened quickly. She also said he was muscular.

ANFINSON, further stated after about one minute of the black male fleeing the vehicle, she saw a black female, 20's, petit and wearing, "skinny light blue wash jeans". This female exited the vehicle, got into the vehicle in the drivers spot and repositioned the vehicle in the parking spot so it was straight and not parked at a funny angle. The black female then retreived two children from the vehicle. One child appeared by size to be about two or three and another child who was in a baby's type car seat. The black female grabbed the older child by the hand and picked up the other child by the handle of the car seat and exited the parking lot area of 500-W 28th st onto Harriet ave so. and then walked across W28th st and and continued south bound on Harriet and out of sight.

I also canvassed at 2733-Harriet ave so. resident had just arrived home and had seen nothing.

I also canvassed at 2737-Harriet ave so. resident had just arrived home and had seen nothing.

OFFICERS never went into the vehicle to search it and told SGT.'s KJOS and PORRAS this information.

OFFICERS stayed with vehicle until photos were taken by car 21.

At the request of car 21, we were to order the tow for 647-KLW, call car 22 with at a phone number provided by car 21, wait with the vehicle and escorted the vehicle to the forensic garage where we were met by car 22. The tow driver, did not enter the vehicle either, just hooked it and winched it onto a flatbed and transported the vehicle to forensic garage. At the forensic garage the tow driver off loaded the vehicle into the garage with car 22 watching this process, we left the garage and returned to Pct. 5.

**END of Supplement 54**

| Supplement number: | 55 | CCN: MP-13-143872 | Author: | 000468 - Katherine Smulski |

Supplement of Sgt K.Smulski #000468 on 05/10/2013 21:30
I responded with squad 502, Sgt. Moore to a suspicious vehicle at 2743 Lyndale Ave South at 1410 hours. Information from MECC call:
APT 106.....RE: CCN 13-134082/INFO/INS FRM 5/2 & 13132627/BURGDR/FRM 5/1....#1 DARK BLU PT CRUISER/LIC 647KLW W/BM & BF-- BOTH WHO WERE PART OF BREAK....BM LATE 20'S/DREDS
5/10/2013 14:01:23 094131 Response [Appended, 15:32:00] APT 106.....RE: CCN 13-134082/INFO/INS FRM 5/2 & 13132627/BURGDR/FRM 5/1....#1 DARK BLU PT CRUISER/LIC 647KLW W/BM & BF-- BOTH WHO WERE PART OF BREAK....BM LATE 20'S/DREDS[Shared] [Shared]

Lathrop Decl. Ex. 6

5/10/2013 14:01:51 094131 Response [Appended, 15:32:00] ADVG THEY ARE SUSPECTS INV IN BURGD ON 5/2...CLR ALSO GAVE POL FOOTAGE ON 5/2[Shared] [Shared]

I pulled into the lot (northbound) from 28th Street West. The parking lot is east of 2743 Lyndale Ave South. I immediately observed the blue PT Cruiser parked facing WB toward the building. Car 2306 was already at the scene. The PT Cruiser was occupied by a black male (driver) with dreads and a black female in the front passenger seat. I could not tell if there was anyone in the back seat. Sgt. Moore began verbally telling the driver to show his hands, but the driver did not comply. Sgt. Moore told the driver to shut the vehicle off and to throw the keys out the window, the driver did not comply to the verbal commands. I drew my handgun and pointed it at the driver. Seeing that the driver was not responding to commands and observing the vehicle windows to be closed, I used the squad PA to order him to show his hands, turn the vehicle off and to throw the keys out the window. The driver again did not respond to my commands.

I observed the vehicle began to back up slowly and I observed the vehicle wheels began to turn toward my direction. I was standing just to the left of my open squad door and I moved to the front of the squad when it appeared that the driver was headed straight towards me. I observed the vehicle to pass by me and the vehicle struck the drivers door on squad 504 P# 76644, causing the door to close. I immediately got into 504 and back into traffic with my emergency lights and sirens on, traffic was at a moderate level and I drove EB on 28th looking for the suspect vehicle. I observed a similar blue colored vehicle at about 28th St and 1st Ave South and I attempted to catch up to the vehicle. I lost sight of the vehicle and was at no time near enough to be in a pursuit. I activated the emergency lights/sirens when I saw the blue vehicle and turned off the lights/sirens when I lost sight of the vehicle. I caught up to the vehicle about 28th and 10th Ave South and discovered that it was not the right vehicle. The color of the vehicle was the same but it was a different make.

I attempted to air this information but discovered that the squad radio had moved over to TAC3 so I went to my portable radio to inform officers that I had not found the vehicle.

Within a short time information was aired that a male matching the description from vehicle was seen going into Flanders Bike Shop (2707 Lyndale Ave South). The caller had seen officers with the vehicle earlier. I began to drive back to the area of 27th and Lyndale Ave South. In route I heard squad 8513 air that he had seen the suspect running SB on Lyndale Ave South and then WB in the 2700 block. Squads arrived in the area and immediately set up a perimeter. I maintained the corner of 27th and Aldrich. Squad 920 responded to the scene and took a picture of the squad door. There is 4 by 4 inch transfer but no dent in the door.

At 1507 hours we were told to release the perimeter on Aldrich and to fill in areas west of Aldrich (2700 block). At 1515 hours information was aired that a homeowner found the back door glass smashed and 1280 who had been in the area assisting, responded to 2717 Bryant Ave South. I was on the perimeter on 27th between Bryant and Colfax Ave South . 1280 confirmed forced entry to the home. While maintaining the perimeter I heard someone air that shots had been fired and that an officer had been shot. I began running toward 2717 Bryant Ave South and information was aired that a second officer had been shot. As I approached the house I observed a white male standing directly across the street and I told him to get to the ground as the situation in the home was unsafe. I then observed a second male standing nearby and he was also told to get to ground and I had both males crawl NB behind parked vehicles and they were escorted out of the area by Officer Hubert.

Crime scene tape was put up at 28th and Bryant and 27th and Bryant Ave South. An inner area directly near the scene was taped off. I contacted 710 and was advised that Sgt. Porras and Sgt. Kjos were enroute. Crime scene logs were established.

I left the scene at 1911 hours after being relieved by Lt. Kelly.

**END of Supplement 55**

---

| Supplement number: | 56 | CCN: MP-13-143872 | Author: | 000548 - John Biederman |
|---|---|---|---|---|

Supplement of Sgt J.Biederman #000548 on 05/10/2013 21:39

On May 10, 2013, I responded to Hennepin County Medical Center in relation to this call. I arrived at the same time that Officer Meath was arriving.

I went to the emergency department and stood by Officers Muro, Valencia, and Staufenberg. I was directed by Sergeant Voss to act as an escort officer. I retrieved the front portion of Officer Muro's ballistic vest and his gun belt (to include his pistol) from Officer Valencia and turned this over to Sergeant Voss.

When Officer Muro was being brought to surgery Officer Staufenberg went with Sergeants Peterson and Sauvageao to go to city hall at around 1811 hours. I directed Officer Staufenberg to take a portion of Officer Muro's shirt with him, as Sergeant Voss had collected the rest of his clothes and this portion of the shirt was underneath Officer Muro on the hospital bed.

I transported Officer Valencia to city hall where he had his photograph taken at the request of Sergeant Porras.

Lathrop Decl. Ex. 6

I then returned Officer Valencia to the hospital and cleared.

**END of Supplement 56**

| Supplement number: | 57 | CCN: MP-13-143872 | Author: | 007229 - Brian Thureson |
|---|---|---|---|---|

Supplement of Off B.Thureson #007229 on 05/10/2013 21:39

On the above date and time, I was in K9 class training when I overheard an officer involved shooting near the listed location. I drove up to the kennel and changed into my full MPD uniform and picked up my K9 partner HAUS who is a certified Police Dog through the United States Police Canine Association. I traveled to the location with Officer FAHEY.

Once on scene at 27th and Bryant Ave S, Sgt Smulski asked me if I could conduct an article search on the path the suspect was last seen running. I removed HAUS and placed him on a leash. I was brought over to the 2700 block of Lyndale Avenue South and was shown the route the suspect took westbound on foot. We conducted an article search westbound from the alley Lyndale to Aldrich to the rear of 2711 Aldrich Ave S westbound across Aldrich to 2710 Aldrich where it was confirmed the suspect ran through via a witness. We searched westbound to the rear of the incident address. We did not locate anything of evidentary value. Officer Fahey was my cover officer on this.

**END of Supplement 57**

| Supplement number: | 58 | CCN: MP-13-143872 | Author: | 007577 - Scott Watry |
|---|---|---|---|---|

Supplement of Off S.Watry #007577 on 05/10/2013 21:41

On 05-10-2013, I was assigned to Squad 582. At appox 1500 hours, I was clearing Headquarters when 502 aired that there was a Flee with a blue PT Cruiser. A short time later it was aired that they were setting up a perimeter for the Suspect west of Aldrich Av S.

I arrived on the perimeter near Dupont, on the 2700 block. I then heard that 1280 was going to check 2717 Bryant Av S for the Suspect. A short time later I heard Officers state that shots were fired and an Officer was shot.

I blocked off 28th St W and Lyndale Av S for Fire and EMS rigs. I then went back to the scene. I was instructed to put up Police Tape around the address of 2717 Bryant Av S.

I then secured the rear the rear of the address and the alley. I was then relieved by Officer Domiguez. I then cleared the scene.

**END of Supplement 58**

| Supplement number: | 59 | CCN: MP-13-143872 | Author: | 030283 - James Bjostad |
|---|---|---|---|---|

Supplement of Off J.Bjostad #030283 on 05/10/2013 22:01

On 05/10/2013, at approximately 1410 hours, while working in full MPD uniform with OFFICER JOHN P. CHRISTENSEN as my partner, we were assigned to marked squad 520.

We were on a PD ACCIDENT at 6030 NICOLLET AV.S. . We had gathered info and began to head north as I overheard Squads 502 and 504, SGT's G. MOORE and K.SMULSKI responding to a call at 2743 LYNDALE AV.S. .

At one point I overheard police radio transmission from SQUAD 502 SGT. G. MOORE that the SUSPECT VEHICLE, a BLUE PT CRUISER, was fleeing from them EB on W. 28th ST. I heard SGT. MOORE air info the SUSPECT VEHICLE had struck Squad 504.

We began to head towards that area to assist. I advised DISPATCH we were responding to assist. As we got near to the scene, info was being called in by several callers as to seeing the SUSPECT running around in the area WEST of LYNDALE near ALDRICH AV.S. and BRYANT AV.S. . The SUSPECT was described as a BLACK MALE, LATE 20's, BRIADED HAIR, wearing a BLACK SHIRT and RED PANTS.

Several squads were in the area looking and we overheard info coming in from another caller that she had seen the SUSPECT VEHICLE, A BLUE PT CRUISER stop at the rear of an apartment building and the SUSPECT had fled out of the vehicle and was running, jumping fences. There was also mention of a FEMALE leaving the car and also kids leaving the car.

Squad 507 SGT. R. DUDGEON aired that she had located the SUSPECT VEHICLE at the rear of 500 W. 28th ST. At

Lathrop Decl. Ex. 6

approximately 1427 hours we went and assisted Squad 507 at the SUSPECT VEHICLE. We approached the SUSPECT vehicle, MN. plates 647KLW, and found the vehicle was unoccupied. We remained at this location with the SUSPECT VEHICLE as other Officer's continued searching the area to the WEST of our location. The SUSPECT vehicle was parked facing SOUTH, next to the building, 2 spaces EAST of the back service door of the apartment building at 500 W. 28th ST.

A while later, A WHITE FEMALE exited the back door of the apartment building and I asked her if she knew if anyone from this apartment building owned this BLUE PT CRUISER. She said she was a resident of this building and she said she did not know of anyone in this building owning this SUSPECT PT CRUISER. I asked her if she saw anyone today leaving this SUSPECT PT CRUISER and she said no she did not. This FEMALE then gave me the name and phone number of the caretaker of this building, HEATHER SHEEHAN, ████████. This FEMALE RESIDENT then left in her RED FOUR-DOOR CAR that was parked in the back lot, SOUTH DAKOTA PLATES, 1ACN77.

We were at this location at the rear of 500 W. 28th ST. for quite some time securing the SUSPECT VEHICLE BLUE PT CRUISER . At approximately 1530 hours, I overheard police radio transmissions that an OFFICER had been shot and a HELP CALL declared at 2717 BRYANT AV.S.

A short time later, I was approached by a MALE NEIGHBOR who stated he lived across the street on the ODD-numbered side of HARRIET AV.S. in the 2700-block. He advised me the woman who had been sitting out on her roof approximately 4 houses NORTH of W. 28th ST. on the ODD-side had been the one who called 9-1-1 to report the SUSPECT VEHICLE pulling into this rear lot quickly and seeing the SUSPECT MALE DRIVER exit the vehicle and run WB through the yards jumping fences.

I advised my partner, OFFICER JOHN CHRISTENSEN of this and he went over to speak to her. While Officer CHRISTENSEN spoke to her, I was approached by a FEMALE RESIDENT who came out the back door of the apartment building at 500 W. 28th ST. She was ID'ed as, JILLIAN JANE SUTHERLAND ████/1987 , of 500 W. 28th ST., Apartment # 10, MN DL # ████████, CELL PHONE # ████████, WORK #████ (Tuttle's Eat, Bowl and Play in HOPKINS, MN. ) . Her vehicle, MN. 143GXV, a GOLD IMPALA, was parked directly next to SUSPECT's BLUE PT CRUISER. SUTHERLAND asked me if she could leave for work. I asked her if she had seen anything reagrding the SUSPECT VEHICLE and she said , "Yes."

JILLIAN SUTHERLAND stated she lives in the 3rd floor apartment that has windows facing NORTH, which overlooks the rear lot to her building at 500 W. 28th ST. . JILLIAN SUTHERLAND said her attention was drawn to the back lot because she heard the sounds of a speeding car. SUTHERLAND looked out her apartment window to see the SUSPECT VEHICLE BLUE PT CRUISER racing into the rear lot and parking next to her vehicle at a crooked angle.

SUTHERLAND states she saw the SUSPECT DRIVER exit the BLUE PT CRUISER and run WB and then jumping over a chainlink fence at the west edge of their apartment building parking lot. SUTHERLAND described the SUSPECT DRIVER as a BLACK MALE, MID 20's IN AGE, MID-NECK LENGTH BRAIDED HAIR, THINNISH BUILD, WEARING A RED SHIRT.

SUTHERLAND stated she then saw a BLACK or LIGHTER SKINNED MIXED RACE FEMALE MID 20's IN AGE, WEARING POSSIBLY A WHITE SHIRT, WITH A LARGER BUST AREA, in the front passenger seat of the BLUE PT CRUISER. This FEMALE passenger had a purse sitting ontop of her lap. SUTHERLAND thought she heard the SUSPECT FEMALE PASSENGER say something to the effect that she was scared. After approximately one minute, SUTHERLAND saw the FEMALE get out of the PT CRUISER. SUTHERLAND thought this wasn't her business and she backed away from the windows. A short time later SUTHERLAND looked back out the windows and saw the PT CRUISER had been straightened out and it was now parked in the space next to her vehicle nicely, within the painted parking space lines in their lot. SUTHERLAND saw nothing further. I ID'ed SUTHERLAND and informed SGT. G. MOORE that we had two WITNESSES to the SUSPECT's VEHICLE being parked at the rear of 500 W. 28th ST. . He then informed CAR 710.

We then used police crime scene tape and blocked off the lot and area around the SUSPECT VEHICLE and held our position.

At 1541 hours while still in our position behind 500 W. 28th ST., a vehicle drove by me EB in the EAST-WEST alley with a BLACK MALE DRIVER, MN. plates 200AVJ. At 1546 hours, another vehicle drove by EB in this same alley, occupied by a BLACK MALE DRIVER, BLACK MALE FRONT SEAT PASSENGER and a BLACK FEMALE in the BACK SEAT BEHIND THE DRIVER, MN. plates 027ERV.

CAR 710 SGT. ANN KJOS contacted OFFICER JOHN CHRISTENSEN by phone. A short time later CAR 710 arrived at our location and gathered info from us. They advised us to stand by for CAR 21.

A short time later CAR 21 arrived and photographed the SUSPECT PT CRUISER and the area. We were advised to impound the SUSPECT VEHICLE and follow it down to the FORENSIC GARAGE.

RAPID RECOVERY TOW arrived at approximately 1824 hours and we followed the tow truck and SUSPECT VEHICLE to the FORENSIC GARAGE where we were let in by OFFICER FAHNHORST. The SUSPECT car was secured inside the FORENSIC GARAGE.

Lathrop Decl. Ex. 6

We cleared the FORENSIC GARAGE and briefly returned to the 2717 BRYANT AV.S. location where we were advised to maintain perimeter security in front of the address per SGT. DUDGEON and LT. KELLY.

We were there from 1914 hours until 1946 hours when we were relieved by other Officer's and released by LT. KELLY, Squad 5502. We returned to the 5th precinct station to complete statements.

**END of Supplement 59**

| Supplement number: | 60 | CCN: MP-13-143872 | Author: | 004849 - Gerald Moore |
|---|---|---|---|---|

Supplement of Sgt G.Moore #004849 on 05/10/2013 23:00
This supervisor was in full MPD uniform and working a fully marked MPD squad (Chevy Tahoe). This officer heard a priority one call come out of a suspicious vehicle at 2743 Lyndale Av So. Here are comments from the start of that call: APT 106.....RE: CCN 13-134082/INFO/INS FRM 5/2 & 13132627/BURGDR/FRM 5/1....#1 DARK BLU PT CRUISER/LIC 647KLW W/BM & BF-- BOTH WHO WERE PART OF BREAK....BM LATE 20'S/DREDS
5/10/2013 14:01:23 094131 Response [Appended, 15:32:00] APT 106.....RE: CCN 13-134082/INFO/INS FRM 5/2 & 13132627/BURGDR/FRM 5/1....#1 DARK BLU PT CRUISER/LIC 647KLW W/BM & BF-- BOTH WHO WERE PART OF BREAK....BM LATE 20'S/DREDS[Shared] [Shared]

I responded from 5th pct along with sqd 504, and I overheard Car 2306 from the DOC, answer up that he was just coming up to the address. Myself and sqd 504 arrived in the area and were directed to the south east parking lot by Car 2306. Ofcrs located the PT Cruiser, plt number 647KLW. The vehicle was parked facing west and it was occupied once, according to 2306. However, when officers reached the lot, we observed 2 persons inside of the car. A B/M behind the steering wheel with dreadlocks and a B/F in the passenger seat front. Officers exited their squads and I began to order the driver to shut off the car. The car was shut off. He was then ordered to remove the keys from the ignition, which the driver did, however, he hesitated when ordered to throw them to the ground. He then placed the keys back into the ignition, restarted the car and began backing up. Officers continued to give commands as the suspect put the car into reverse. Car 2306 (plainclothes) went up to the passenger window with his service weapon drawn and ordered the driver to shut off the car. The driver disregarded the orders and began to back out of the parking spot.

The suspect vehicle began to pick up speed and turned the wheel sharply to proceed SB out of the parking lot. This put the suspect vehicle on a direct collision course with sqd 504 and Sgt Smulski. This officer had clear shot at the driver of the vehicle which was now lurching forward towards Sgt Smulski and I was in the process of lining up a possible shot, when I overheard the female passenger yell out that she had he kids in the car. The suspect vehicle lurched right at sqd 504 and struck the car door closing it shut. Sgt Smulski was able to jump out of the way. The suspect vehicle was now accelerating out of the parking lot and driving E/B on 28th St.

This had became a flee here are the comments from this portion of the call. 502 EB ON 28
5/10/2013 14:12:26 112776 Response 502 RQ PS ,115066
5/10/2013 14:12:26 112776 Response [Appended, 15:31:59] 502 RQ PS ,115066[Shared] [Shared]
5/10/2013 14:12:40 112776 Response [Appended, 15:31:59] 502 EB ON 28 FROM GRAND - STRUCK 504[Shared] [Shared]
5/10/2013 14:12:40 112776 Response 502 EB ON 28 FROM GRAND - STRUCK 504
5/10/2013 14:13:27 112776 Response 502 GONE THRU 1 AV APPROACHING STEVENS
5/10/2013 14:13:27 112776 Response [Appended, 15:31:59] 502 GONE THRU 1 AV APPROACHING STEVENS[Shared] [Shared]
5/10/2013 14:13:34 093401 Response [Appended, 15:31:59] AIRED ON CH 1[Shared] [Shared]
5/10/2013 14:13:34 093401 Response AIRED ON CH 1
5/10/2013 14:13:58 112776 Response 502 EB 28 PORTLAND
5/10/2013 14:13:58 112776 Response [Appended, 15:31:59] 502 EB 28 PORTLAND[Shared] [Shared]
5/10/2013 14:14:33 112776 Response [Appended, 15:31:59] 502 EB ON 28 AT PARK[Shared] [Shared]
5/10/2013 14:14:33 112776 Response 502 EB ON 28 AT PARK
5/10/2013 14:14:34 093401 Response CONSTRUCTION AT 28/BLOOM .. BLOCKED
5/10/2013 14:14:34 093401 Response [Appended, 15:31:59] CONSTRUCTION AT 28/BLOOM .. BLOCKED[Shared] [Shared]
5/10/2013 14:14:38 064631 Response [Appended, 15:31:59] AIRED CH2[Shared] [Shared]
5/10/2013 14:14:38 064631 Response AIRED CH2
5/10/2013 14:14:51 112776 Response 502 LOST SIGHT OF VEH
5/10/2013 14:14:51 112776 Response [Appended, 15:31:59] 502 LOST SIGHT OF VEH[Shared] [Shared]

This officer shut off my emergency equipment and started checking the area in 3rd precinct. Here are some more comments from this portion of the call: [Appended, 15:31:58] CLR SHAWN CB....ADVG M JUST RAN INS "FLANDRS BICYCLE SHOP* WRG BRIGHT RED PANTS****[Shared] [Shared]
5/10/2013 14:16:21 094131 Response CLR SHAWN CB....ADVG M JUST RAN INS "FLANDRS BICYCLE SHOP* WRG BRIGHT RED PANTS****

Lathrop Decl. Ex. 6

5/10/2013 14:16:32 094131 Response [Appended, 15:31:58] BIZ IS AT LYNDALE/27 ST W*****[Shared] [Shared]
5/10/2013 14:16:32 094131 Response BIZ IS AT LYNDALE/27 ST W*****
5/10/2013 14:16:38 094131 Response [Appended, 15:31:58] SE CORNER[Shared] [Shared]
5/10/2013 14:16:38 094131 Response SE CORNER
5/10/2013 14:17:07 094131 Response [Appended, 15:31:58] ADVG CLR HAS ON CAMERA- VEH STRIKING THE MPLS SQD
...CLR CAN MAKE COPY FOR POL****[Shared] [Shared]
5/10/2013 14:17:07 094131 Response ADVG CLR HAS ON CAMERA- VEH STRIKING THE MPLS SQD ...CLR CAN MAKE
COPY FOR POL****
5/10/2013 14:17:27 094131 Response [Appended, 15:31:58] M HAS BLK SHIRT/BRIGHT RED PANTS[Shared] [Shared]
5/10/2013 14:17:27 094131 Response M HAS BLK SHIRT/BRIGHT RED PANTS

Myself and squad 8513 ofcr Illetschko proceeded towards the area where the suspect was last seen running. The comments
continued to come in from the caller at Flanders Bike store: Appended, 15:31:58] Backed up 504 with 9981[Shared] [Shared]
5/10/2013 14:17:38 SYS Response [Appended, 15:31:58] [Appended, 14:21:29] Possible E911 Wireless Phase 2
update[Shared] [Shared]
5/10/2013 14:17:38 SYS Response [Appended, 14:21:29] Possible E911 Wireless Phase 2 update
5/10/2013 14:17:59 094131 Response [Appended, 15:31:58] CLR HAS NOT SEEN M COME OUT OF THE FRT OF
BIZ****[Shared] [Shared]
5/10/2013 14:17:59 094131 Response CLR HAS NOT SEEN M COME OUT OF THE FRT OF BIZ****
5/10/2013 14:18:08 094131 Response [Appended, 15:31:58] CLR CANNOT SEE THE BACK ENTR****[Shared] [Shared]
5/10/2013 14:18:08 094131 Response CLR CANNOT SEE THE BACK ENTR****
5/10/2013 14:18:31 112776 Response 502 HEADING BACK TO 27/LYNDALE
5/10/2013 14:18:31 112776 Response [Appended, 15:31:58] 502 HEADING BACK TO 27/LYNDALE[Shared] [Shared]
5/10/2013 14:18:42 112776 Response [Appended, 15:31:57] 502 IS CLR STILL SEEING SUSP[Shared] [Shared]
5/10/2013 14:18:42 112776 Response 502 IS CLR STILL SEEING SUSP
5/10/2013 14:18:47 112776 Response 502 SUSP BM DRIVER DRED AND BF PASSENGER
5/10/2013 14:18:47 112776 Response [Appended, 15:31:57] 502 SUSP BM DRIVER DRED AND BF PASSENGER[Shared]
[Shared]
5/10/2013 14:19:04 094131 Response [Appended, 15:31:57] TC STILL HAS ORIG CLR ON PH****[Shared] [Shared]
5/10/2013 14:19:04 094131 Response TC STILL HAS ORIG CLR ON PH****
5/10/2013 14:19:08 112776 Response 8513 AST'ING AT FLANDERS
5/10/2013 14:19:08 112776 Response [Appended, 15:31:57] 8513 AST'ING AT FLANDERS[Shared] [Shared]
5/10/2013 14:19:33 112776 Response [Appended, 15:31:57] 502 DO THEY STILL HAVE SIGHT OF SUSP?[Shared] [Shared]
5/10/2013 14:19:33 112776 Response 502 DO THEY STILL HAVE SIGHT OF SUSP?
5/10/2013 14:19:48 094131 Response [Appended, 15:31:57] CLR HAS NOT SEEN SUSPECT COME OUT THE FRT-- HE
CANNOT SEE THE REAR ENTR*****[Shared] [Shared]
5/10/2013 14:19:48 094131 Response CLR HAS NOT SEEN SUSPECT COME OUT THE FRT-- HE CANNOT SEE THE REAR
ENTR*****
5/10/2013 14:20:26 060933 Response [Appended, 14:21:29] CLR SAW POLICE OFCRS CHASING A NAVY BLU PT CRUISER
..DRIVER OF VEH LEFT CAR IN APT COMPLEX LOT ON THE CORNER ..BF WRG SKINNY BLU JNS AND 2 KIDS JUST
WALKED OUT OF THE CAR ..DRIVER/SUSP BM, DREADS IN A PONYTAIL, UNK COLOR SHIRT, RED PA
5/10/2013 14:20:26 060933 Response NTS LS HOPPING FENCES WB IN AREA ..

Officers were enroute to try and get ahead of the suspect and crossed over 27th and Lyndale since there were reports of the
suspect running W/B. Here are some more comments: [Appended, 14:21:29] BF WAS CARRYING A CHILD IN A CARSEAT
AND HOLDING HAND OF A 2YO CHILD WHEN SHE GOT OUT OF THE CAR
5/10/2013 14:20:45 060933 Response [Appended, 15:31:57] [Appended, 14:21:29] BF WAS CARRYING A CHILD IN A
CARSEAT AND HOLDING HAND OF A 2YO CHILD WHEN SHE GOT OUT OF THE CAR[Shared] [Shared]
5/10/2013 14:21:03 094131 Response [Appended, 15:31:57] CLR SAW HIM ONLY RUNNING AFTER HITTING COP CAR AND
HE WENT INS FLANDERS****[Shared] [Shared]
5/10/2013 14:21:03 094131 Response CLR SAW HIM ONLY RUNNING AFTER HITTING COP CAR AND HE WENT INS
FLANDERS****
5/10/2013 14:21:58 112776 Response 8513 BM DREDS RUNNING WB
5/10/2013 14:21:58 112776 Response [Appended, 15:31:57] 8513 BM DREDS RUNNING WB[Shared] [Shared]
5/10/2013 14:22:01 094131 Response [Appended, 15:31:57] ADVG M IS RUNNING SB ON LYNDALE & CUTTING WEST
BOUND DWN 27 ST W****[Shared] [Shared]
5/10/2013 14:22:01 094131 Response ADVG M IS RUNNING SB ON LYNDALE & CUTTING WEST BOUND DWN 27 ST W****

5/10/2013 14:22:08 112776 Response Backed up 502 with 824
5/10/2013 14:22:08 112776 Response [Appended, 15:31:57] Backed up 502 with 824[Shared] [Shared]
5/10/2013 14:22:54 031779 Response [Appended, 15:31:57] ALD/27 L/S WB 2700 BLOCK ALDRICH - BM/DREDS/BLK
SHIRT/RED PANTS[Shared] [Shared]
5/10/2013 14:22:54 031779 Response ALD/27 L/S WB 2700 BLOCK ALDRICH - BM/DREDS/BLK SHIRT/RED PANTS
5/10/2013 14:23:26 031779 Response 27/BRYANT - NEED CAR AT COLFAX

Lathrop Decl. Ex. 6

5/10/2013 14:23:26 031779 Response [Appended, 15:31:56] 27/BRYANT - NEED CAR AT COLFAX[Shared] [Shared]
5/10/2013 14:23:35 031779 Response [Appended, 15:31:56] 962 AT 26/HARRIET - NEEDING TO MEET AT 2700 BLOCK OF ALDRICH[Shared] [Shared]
5/10/2013 14:23:35 031779 Response 962 AT 26/HARRIET - NEEDING TO MEET AT 2700 BLOCK OF ALDRICH
5/10/2013 14:23:47 094131 Response [Appended, 15:31:56] CLR ADVG M IS BTWN HERE/LYNDALE & BRYANT--[Shared] [Shared]
5/10/2013 14:23:47 094131 Response CLR ADVG M IS BTWN HERE/LYNDALE & BRYANT--
5/10/2013 14:23:48 031779 Response SET UP PERIMETER
5/10/2013 14:23:48 031779 Response [Appended, 15:31:56] SET UP PERIMETER[Shared] [Shared]

At this time officers established a perimeter that stretched from 27th to 28th St West, Lyndale Av S to Colfax Av S. K9 was summoned and sqd 962, ofcr J. Murphy arrived and began to do a possible track of the suspect. Officers began a search of all open doors, exposed porches, open garages and etc. Squad 1280 was arriving in the area and asked where could they assist. They were instructed to help out with search of a home at 2700 block of Aldrich Av S. In the meantime, sqd 520 responded to 500 West 28th st along with sqd 507 on a report that the PT Cruiser was in the parking lot there. Sqd 507 Sgt Dungeon arrived and found Mn plt 647KLW parked in the lot unoccupied. The vehicle was secured and sqd 520 officers Bjostad/Christensen took over its security.

K9 continued to search W/B between 27th to 28th/Lyndale to Colfax Av S., when I was approached by a female who was asking about her car. She stated that he car was a blue 2002 PT Cruiser. She gave me her name and she was id'd verbally as Cala Denise Scott, dob/████-1991. She told me that her id was in the car and she was called by a friend who told her that she could pick up her car at 28th/Bryant Av S. I asked her if she knew what her license plate was and she said she did not. I ran her car on my squad MDC and discovered that she was the registered owner of the car. She also stated that she had loaned her car to a friend that she had only known for three weeks. She gave me the nickname of "Mookie" and described him as being a B/M, 6'0"-2", med to dark complex, medium afro, and a some facial hair. She did not know his address or his correct name. However, she had his cell phone number of ████████. This officer tried to have this cellphone number pinged, however, Channel 7 could not get any significant off of this number except for the name on the account Stephanie Ann Barrington.

This officer tried to obtain more information from Cala, such as her home or business address. She was reluctant to give me any of her personal information and she kept insisting that she get her car back. I explained to her that if she helps us, she can help herself. She kept saying that she did not want to get involved. I explained to her that she was involved since her car was used to commit a crime. She did describe "Mookie" as wearing blue jeans and a blue sweater. At this time, K9 officer A. Stender arrived at 27th/Bryant and he was speaking with the members of 1280, when officers were approached by a resident of 2717 Bryant Av S, who stated that there was a window broken on the side of his house and he believed that someone maybe inside. Officer Stender got his dog and 1280 along with car 2306 entered the dwelling at 2717 Bryant Av S.

While speaking with Cala about getting some additional info, I overheard on the officers call out "SHIOTS FIRED". These are the following comments: **EMS TO REAR- OFFICER SHOT 2717 BRYANT AV S *** [Shared]
5/10/2013 15:30:32 111009 Response [Appended, 15:31:51] **EMS TO REAR- OFFICER SHOT 2717 BRYANT AV S *** [Shared] [Shared]
5/10/2013 15:30:36 111009 Response [Appended, 15:31:51] CODE 3 [Shared] [Shared]
5/10/2013 15:30:36 111009 Response CODE 3 [Shared]
5/10/2013 15:30:48 109646 Response Backed up 502 with 483 [Shared]
5/10/2013 15:30:48 109646 Response [Appended, 15:31:51] Backed up 502 with 483 [Shared] [Shared]
5/10/2013 15:31:05 031779 Response [Appended, 15:31:51] REQ EMS BE NOTIFIED THAT STAAB ROOM HCMC NOTIFIED - OFCR SHOT [Shared] [Shared]
5/10/2013 15:31:05 031779 Response REQ EMS BE NOTIFIED THAT STAAB ROOM HCMC NOTIFIED - OFCR SHOT [Shared]
5/10/2013 15:31:14 031779 Response T159 INJ'D COP OUT THEB ACK [Shared]
5/10/2013 15:31:14 066784 Response Secondary Location for 354: 2717 BRYANT AV S,,MINNEAPOLIS, MN 55408. [Shared]
5/10/2013 15:31:14 066784 Response [Appended, 15:31:51] Secondary Location for 354: 2717 BRYANT AV S,,MINNEAPOLIS, MN 55408. [Shared]
5/10/2013 15:31:14 031779 Response [Appended, 15:31:51] T159 INJ'D COP OUT THEB ACK [Shared] [Shared]
5/10/2013 15:31:15 066784 Response [Appended, 15:31:51] Backed up 1280 with 354 [Shared] [Shared]
5/10/2013 15:31:15 066784 Response Backed up 1280 with 354 [Shared]

At this moment, Cala Scott was placed in the rear of Sqd 502 as precaution, since it appeared that she may know more than what she was telling officers. Officers between Bryant and Colfax Av S, began to collapse on that address and as officers began to approach the house, it was learned that a second officer had been shot. A second ambulance was ordered code 3 for this location. I began to close in on the address, and as I did, I learned that a suspect was also down. Moments later officers removed one of the wound officers out of the house and began to give him first aid on the sidewalk. This officer had taken a round to his right thigh. The second officer was brought out of the house and officers began to perform first aid on him as well. Both officers were members of the SWAT team. Both ambulance and rescue arrived and the first officer was taken away to

Lathrop Decl. Ex. 6

HCMC by ambulance and there was a squad escort. Rescue provided advance first aid to the second officer and a second ambulance took him to HCMC as well. This officer summoned on of the firefighters/paramedic and he was asked to check on the status of the suspect who I was told was still in the basement. It was later confirmed, that the suspect had no pulse and was pronounced deceased.

At this time, I took over command of the scene and had crime scene tape put up from Aldrich to Colfax/27th to 28th st. The alleys were also shut off. Officers were assigned to copy down the names and badge numbers of every officer entering the crime scene. There was also a inner perimeter put up around the immediate home where the incident had occurred. Officer Hubert form sqd 8519 was responsible for documenting officers coming and going from the address. Car 710 was notified and responded to the scene along Commander Arrandondo IAU, Commander Johnson CID, D/C Arneson (Investigations), andSgt McCarty PIO. It should be noted that Insp Diaz was already on-site during the early stages when officers were searching for the suspect who ran from officers. Car 2306 confirmed that person that the female passenger of the AT Cruiser referred to as "Bookie" was the same person that was now DOA on the basement floor of 2717 Bryant Ad S.

I was given the following information: When officers entered 2717 Bryant Ad S, they went down to the basement area and it appeared that the dog was hitting on the presence of someone hiding. Ofcr Stender called out to this person to come out, however, no one did. As officers came around a water heater, the suspect reached up and grabbed a SWAT officers service weapon. Because it was fully automatic, several rounds were discharged, striking two members of the SWAT team. The suspect was also shot, but at this time, I don't know who fired at the suspect.
The officer whose weapon was grabbed was placed in the front seat of Sgt Kingsbury's sqd and taken from the area, which is standard procedure for a critical incident. At some point, Sgt Kingsbury was summoned back to the scene so that the B of I could take possession of the automatic service weapon and photograph it. The involved officer was eventually brought down to room 108 by Sgt Kingsbury.

i had officers start canvassing the block to find potential witnesses. I also received a call from sqd 520 that was back at 500 West 28th street. Ofcr Bjostad stated that he had at least two good witnesses that observed the suspect running from officers prior to the shooting. I gave this information to Sgt A. Kjos (car 710). Sgt Kjos was also told about Cala Scott being in the rear of Sqd 502 in the event she wanted to talk to her.

During the course of the preliminary investigation, I was contacted by dispatch that they were adding some remarks to the call and I needed to read. I went back to Squad 502 and read the following remarks: REC CALL FRM MALE EDWARD JOHNSON IN ST LOUIS PARK SAYING HIS ERIK JOHNSON SAW THE SUSPECT EARLIER WHEN CALL STARTED IF ANYONE WOULD NEED TO TALK WITH HIM HE CAN BE REACHED AT ███████. *********NOW HAVE ERIN WILLLIAMS/CELL CB ██████5....ADVG SHE GOT A TEXT MSG FRM FRND WHO IS INV AND CLAIMS POSS W/SUSPECT & SEZ HE IS POSS W/SUSPECT AND IS HIDING UNDER SOME PORCH IN UNK-- ADVG HE TOLD THE SUSPECT TO NOT TAKE THE PT CRUISER- AND H
5/10/2013 17:15:10 094131 Response E WAS WAITING FOR SOMEONE TO COME GET HIM AND TAKE HIM OUT OF THE STATE***** [Shared]
5/10/2013 17:16:38 F066101 Response 746 REQ CAR 21 TO ROOM 100 FOR PHOTOS [Shared]
5/10/2013 17:17:26 094131 Response CLR ADVG M SHE GOT MSG FRM IS: TAYLOR/SIMEON BM SHORT/STOCKY....CLR ADVG THE TEXT MSG IS SAYING HE TOLD THE SUSPECT TO NOT TAKE THE PT CRUISER AND HE IS HIDING UNDER UNK PORCH-- CLR DOES NOT KNOW WHERE THE MALE IS HIDING....ADVG GOT TXT MSG FRM CELL PH
5/10/2013 17:17:26 094131 Response NUMB- ███████ [Shared]

M HAS NAME TATTOO'D ON NECK [Shared]
5/10/2013 17:18:19 094131 Response GOT MSG AT 1618 HRS & SAID HE NEEDS TO GET OUT OF STATE & HE NEEDS CLR & GOT UPSET WHEN ASKED IF IT WAS ON THE NEWS.....CLR CAN BE REACHED AT ████████ [Shared]
5/10/2013 17:19:44 F066101 Response.

Erin Williams was contacted by this officer and she told me the following in brief: That a party by the name of Simeon Romell Taylor was texting her saying he was hiding under a porch somewhere in south Mpls, and he needed to get out of the state. Also, he had told his friend not to take the PT Cruiser. He also wanted to puck him up. Officers did find an address for Simeon Taylor of 3636 Cedar Av S and a 3rd pct squad (360) checked the address with negative results. Inside and outside were checked, and a family stated they did not know a Simeon Taylor and had been in the home for a year. She flat out refused to help Mr. Taylor but was trying to get his whereabouts to provide for officers. All this information was turned out to Sgt C. Thomson (710). At this time, it was learned that both officers were stable and were expected to make full recoveries.

Officers began to consolidate the scene and relieve some officers so they could start their reports. Currently, only the block o Bryant 27th/28th to Aldrich is blocked off. It maybe sometime before the mapping of the house is done.

At this time myself and Sgt Smulski were relieved by Lt Kelley, who assumed Incident Commander status over the scene and we cleared.

CASE CONT'D-OPEN

Lathrop Decl. Ex. 6

SGT. G.T. MOORE
5TH PCT PATROL SUPVR

**END of Supplement 60**

---

| Supplement number: | 61 | CCN: MP-13-143872 | Author: | 001613 - Rena Dudgeon |
|---|---|---|---|---|

---

Supplement of Sgt R.Dudgeon #001613 on 05/11/2013 00:17
CCN 13-143770

While working squad 507, as the Day Beat Patrol Supervisor, I heard 502 advise that he would be responding to a SUSPICIOUS VEHICLE. The SUSPV was reported to have been used in a burglary of a dwelling (CCN 13-134082). It was described as a dark blue PT Cruiser lic 647KLW with a B/M and B/F. The B/M was described as late 20/s dreds.

Squad 502 advised that the SUSPV was EB on 28th from Grand and had struck 504. 502 lost sight of the vehicle before I could get into a position to assist.

Dispatch advised a caller reported seeing Police Officers chasing a navy PT Cruiser and reported that the driver left the car in an apartment complex on the corner. The occupants/SUSPECTS were seen hopping fences and fleeing WB through the yards. The occupants were described as a BF wearing skinny blue jeans with two kids and the driver was described as a B/M, dreads in a pony tail with an unknown color shirt and red pants.

I responded to the area in an attempt to locate the vehicle while 502, assisting squads and K9 were responding to the area to locate the SUSPECTS.

I located the PT Cruiser in the rear parking lot behind 500 W. 27th St. I advised dispatch. 520 (Officers Bjostad and Christensen) responded to assist me. The vehicle was unoccupied and had what appeared to be fresh white paint transfer on the front right bumper. The vehicle was unoccupied. I requested a K9 respond to assist at our location when they were able to. 520 remained at the scene with the vehicle. I went to assist Officers on the perimeter as they were attempting to locate the SUSPECTS.

I took a position on W. 27th at the alley between Lyndale and Aldrich. When my portion of the perimeter was released by 908 I responded to a PERGUN at a high school.

It should be noted that my MVR tape was removed for a prior CCN for property inventory as evidence. I then responded to several priority1 calls and didn't have an opportunity to replace it prior to responding to this call. My squad P# is 76388.

**END of Supplement 61**

---

| Supplement number: | 62 | CCN: MP-13-143872 | Author: | 006379 - Kurtis Schoonover |
|---|---|---|---|---|

---

Supplement of Off K.Schoonover #006379 on 05/11/2013 01:53

On 05/10/2013 at approximately 1530 hours while returning to the 5th PCT from part time at 2500 East Lake ST a help call was aired for 2717 Bryant AVE S, and I responded to that address.

Once I arrived I was directed by a supervisor there to speak to the owner of 2717 Bryant AV S: JAMES BICKAL ███ 1960 ███████ MN DL ███████). JAMES BICKAL left 2717 Bryant AV S at approximately 0600 hours and attempted to return to the house shortly before 1500 hours. He initially tried to drive to his house up the alley from 28 ST but was turned away by police. He parked his car on 28 ST and stood at the intersection of 28 ST and Aldrich for a while, approximately 20 minutes, until the search had continued west. JAMES BICKAL then got back in his car, drove up the alley to his house, and parked in the garage. He then walked up to the back door to his house and noticed that the rug on the back entry was askew and a window on his back door was broken. As the police had moved west, JAMES BICKAL walked over to the intersection of 27 ST and Bryant AV S and told an officer there that his back window had been smashed. JAMES BICKAL said the police then took over from there.

After speaking with JAMES BICKAL I was told by a supervisor to enter 2717 Bryant AV S, relieve an officer that was in the basement, and secure the basement. I relieved the officer, and then secured the basement until I was released by the incident commander.

**END of Supplement 62**

---

| Supplement number: | 63 | CCN: MP-13-143872 | Author: | 003287 - Steven Jensen |
|---|---|---|---|---|

Lathrop Decl. Ex. 6

Supplement of Off S.Jensen #003287 on 05/11/2013 06:27
-MPD Crime Lab Unit (13-143770)

On 5/10/13 at approximately 2050 hours, Sgt. Biederman requested Car 21 to take overall photographs of an MPD officer in regards to the critical incident (OIS). I photographed Officer Juan Valencia, Badge #7375, in his MPD uniform in our Lab.

The photographs are retained in the Crime Lab Unit.

Officer Jensen
Minneapolis Police Department Crime Lab Unit

**END of Supplement 63**

| Supplement number: | 64 | CCN: MP-13-143872 | Author: | 004523 - Stephen McCarty |
| --- | --- | --- | --- | --- |

Supplement of Sgt S.McCarty #004523 on 05/11/2013 09:39

On May 10, I was assigned to Car 6. At approximately 1600 hours I responded to 2717 Bryant Avenue South on critical incident. I was advised that two officers had been injured at the scene and a suspect was dead. Upon arriving I spoke to Deputy Chief Arneson, Commander Cathy Johnson, Inspector Diaz, Lieutenant Kelly, among others.

I helped coordinate media efforts with Ms. Cyndi Barrington, who was at HCMC and City Hall. I remained at this scene and in addition to dealing with media related issues; I assisted uniformed officers with perimeter security.

**END of Supplement 64**

| Supplement number: | 65 | CCN: MP-13-143872 | Author: | 004064 - Richard Lee |
| --- | --- | --- | --- | --- |

Critical Incident

**END of Supplement 65**

| Supplement number: | 66 | CCN: MP-13-143872 | Author: | 030277 - Thomas Fahey |
| --- | --- | --- | --- | --- |

Supplement of Off T.Fahey #030277 on 05/11/2013 10:51

On the above date and time, I was in K9 class training when I overheard an officer involved shooting near the listed location. I changed into my full MPD uniform and met Officer Thureson at the police canine kennel. Officer Thureson grabbed his caine HAUS and then we responded to the 5th pct. to assist if needed

Sgt Smulski wanted an article search conducted that of the route that the suspect had taken from the rear of 27th/Lyndale S. We responded over to this location and then Officer Thureson deployed his canine for the article search. I was Officer Thuresons cover officer while the search was being conducted. We were unable to locate anything from the search, but I did locate a party who was sitting in his back yard at 2710 Lyndale S. when the suspect ran through his back yard. He gave me his name as, GAJAVADA, FRANK dob ███ 1962, 2710 Lyndale S, cell number ████████ He also informed me that he thought the guys was holding something in his right hand as he was running through his back yard. After he ran through the yard he said the suspect ran southbound in the alley and then he lost sight of him. I then inform Sgt Thompson from homicide of this information and then he responded over and talked to GAJAVADA.

**END of Supplement 66**

| Supplement number: | 67 | CCN: MP-13-143872 | Author: | 001895 - Peter Fahnhorst |
| --- | --- | --- | --- | --- |

Supplement of Off P.Fahnhorst #001895 on 05/11/2013 22:20
Crime Lab
13-143770

On 5-10-2013 at approximately 1840 hours, I responded to the MPD Forensic Garage to meet Squad 520 (Officer Christensen and Officer Bjostad). Squad 520 had escorted a tow truck that was transporting MN 647-KLW (a blue Chrysler PT Cruiser) to the MPD Forensic Garage. MN 647-KLW had been involved in a FLEE.

MN 647-KLW was placed inside the MPD Forensic Garage.

Lathrop Decl. Ex. 6

Officer Fahnhorst
MPD Crime Lab Unit
**END of Supplement 67**

| Supplement number: | 68 | CCN: MP-13-143872 | Author: | 116525 - Michael Schultz |
|---|---|---|---|---|

Supplement of FS M.Schultz #116525 on 05/12/2013 02:59
13-143770

On 5/10/2013 at approximately 1800 hours, I responded to City Hall room 100 to photograph several officers.

I took overall photographs of Officer Lucas Peterson (badge #5630) as well as close up photographs, with scale, of minor injuries and areas of a blood-like substance (BLS) on his hands, left arm, clothing, and face. I swabbed separate areas of BLS on Officer Peterson's left forearm, left hand, right hand, and face. I then collected the following items from Officer Peterson:

-Sig Sauer "P226" 9mm semi-auto handgun with light (S/N UU703096) and BLS
-Magazine (removed from handgun by Ofc. Peterson prior to my arrival) with quantity of live cartridges
-"FC 9mm+P" live cartridge from chamber of handgun (removed by Ofc. Peterson in my presence)
-Two spare magazines with quantity of live cartridges

I took overall photographs of Officer Mark Durand (badge #1627) as well as close up photographs, with scale, of a minor injury to his right forearm and BLS on his left forearm and clothing. I swabbed the area of BLS on Officer Durand's left forearm. I then collected the following from Officer Durand:

-Spare magazine with quantity of live cartridges

I took overall photographs of Sergeant Andy Stender (badge #6791) as well as close up photographs of BLS on his right and left hands. I then swabbed separate areas of BLS on Sergeant Stender's right and left hands.

I took overall photographs of Officers Laux (badge #4035) and Staufenberg (badge #6765).

The collected items were brought back to the Crime Lab Unit.

At approximately 1900 hours, I was contacted by Sergeant Voss (710) and took custody of clothes and items belonging to Officers Meath and Muro that he had collected from the Hennepin County Medical Center (HCMC).

The collected items were placed in the Crime Lab Unit evidence room.

At approximately 1930 hours, I responded to the Special Operations Division (4119 Dupont Ave N). I collected one MPD uniform shirt (size 16.5) and one pair of uniform pants (size 35.5-39) both with BLS, from Officer Lucas Peterson. I also collected one MPD uniform shirt (size M) with BLS from Officer Durand.

The collected items were brought back to the Crime Lab Unit.

Upon returning to the Crime Lab Unit, I photographed all of the collected items. I swabbed Officer Peterson's handgun for possible DNA related evidence. I also swabbed an area of BLS on the grips of the hand gun. I examined the magazines recovered from Officers Peterson and Durand with the following results:

Officer Peterson:
-Magazine containing 8 "FC 9mm+P" and 7 "FC 9mm Luger" live cartridges
-Spare magazine (designated "A") containing 11 "FC 9mm+P" and 9 "FC 9mm Luger" live cartridges (removed by me)
-Spare magazine (designated "B") containing 5 "FC 9mm+P" and 15 "FC 9mm Luger" live cartridges (removed by me)

Officer Durand:
-Spare magazine containing 27 "FC 9mm Luger" live cartridges (removed by me)

I then examined the clothes and items from Officers Meath and Muro with the following results:

Officer Meath:
-1 gun belt with radio and two spare magazines containing 8 "Federal 45 AUTO +P" live cartridges apiece (removed by me)
-1 blue bullet proof vest with original packaging from HCMC
-1 pair of cut blue uniform pants and belt with BLS and defect (defect photographed with scale)

Lathrop Decl. Ex. 6

-1 cut blue "Finish Line" shirt with BLS
-1 cut pair of blue underwear with BLS
-2 tourniquets with BLS
-1 set of keys in HCMC envelope
-1 cut blue MPD uniform shirt with nametag, pins, badge, cards, calendar book, handcuff key, and BLS
-1 pair of gray socks and 1 pair of black Nike size 9 boots with original HCMC packaging

Officer Muro:
-1 gun belt with radio and Sig Sauer "P226" 9mm semi-auto handgun (S/N U779353) with light
-1 magazine (removed from handgun by me) containing 17 "FC 9mm+P" live cartridges (removed from magazine by me)
-1 "FC 9mm+P" live cartridge from chamber of handgun (removed by me)
-1 pair of black Danner boots size 9.5 with belt keeper
-1 pair of cut blue uniform pants with belt, defect (photographed with scale by me), and BLS, with original HCMC packaging
-1 black folding knife from pocket of uniform pants
-1 tourniquet
-1 pair of blue socks (1 cut)
-1 blue bullet proof vest

The photographs will be retained in the Crime Lab Unit files. The BLS swabs, DNA swabs, and all of the collected items were inventoried with the Property and Evidence Unit.

I hereby certify that this is a report of the conclusions of an examination performed by me.

FS Michael Schultz
Minneapolis Police Department
Crime Lab Unit

**END of Supplement 68**

| Supplement number: | 69 | CCN: MP-13-143872 | Author: | 004898 - Ann Kjos |
|---|---|---|---|---|

Supplement of Sgt A.Kjos #004898 on 05/13/2013 13:03

On 5/10/2013 at about 1530 hours, Sgt. Porras and I were notified of a shooting in south Mpls. We were told two Minneapolis Police Officers were shot while searching for a suspect who had been involved in a motor vehicle pursuit with 5th Pct Officers.

Sgt. Porras and I along with Sgt. Charles Green responded to 2717 Bryant Av S. While en route, we were monitoring our police radio and noted the two victim officers were in ambulances, being transported to HCMC. It was further aired no other ambulances were needed at the scene.

Sgt. Porras and I arrived via Bryant Av coming southbound from W 24th ST. As we approached W 27th St, I could see the area was secured with yellow crime scene tape as well as uniformed officers and marked MPD squad cars. After checking in with Officer Mike Becker, we were allowed to enter the crime scene.

Sgt. Porras and I met with Sgt. Andy Stender who gave us a very brief account of what led up to the shooting of two MPLS police officers. Sgt. Stender said he and his Car 1280 Team were assisting 5th Pct Officers as they were searching the area for a male who bailed from a vehicle. Sgt. Stender said during their search of the neighborhood, they learned the backdoor of 2717 Bryant Av S had been kicked-in and the 2-story single family home was unsecure.

Sgt. Stender stated he and his K-9 partner along with officers from his 1280 team entered the house and conducted a search. We were told during this search, the K-9 located a male hiding in the basement. Suspect resisted both the K-9 and the officers. Sgt. Stender said while fighting with the suspect, suspect grabbed an officer's gun and shots were fired. Sgt. Stender said Officer Mike Meath and Officer Ricardo Muro were both struck by bullets and they were currently en route to HCMC with very serious gunshot wounds to their legs. Sgt. Stender said the suspect is DOA. Sgt. Stender said the only officers involved in this incident are officers from his 1280 team; Officers Mike Meath, Ricardo Muro, Luc Peterson, Mark Durand, Juan Valencia, Steve Laux and himself.

Because we could not speak at length with Sgt. Stender and it was currently unclear which officers were involved in the shooting and which officers witnessed the shooting, we told Sgt. Stender all the members of his team need to go down to Room 100 and meet with their Federation Representative. Sgt. Porras and I stated we would be down as soon as we could clear the scene.

It had been decided Sgt.s Chris Thomsen and Chuck Green would be in charge of the scene while Sgt. Porras and I were the primary investigators on the case. Sgt. Porras made sure all the involved officers had escort officers as well as making sure all

Lathrop Decl. Ex. 6

the officers equipment and weapons were accounted for and secured.

Sgt.s Thomsen and Green walked me through the scene. We first walked to the rear of 2717 Bryant Av S and I noted the address had an enclosed back porch with the half-glassed door leading into what looked to be the kitchen of the home. I could see the window in this door was broken and the door was standing open. Sgt. Thomsen said it appears the suspect kicked the back door to gain entry to the home. The back door faces the alley (east).

Sgt. Thomsen and I then entered the home via the north facing side door. As I entered, I noted the stairway to the basement was directly in front of me. To my left was a short stairway which led to an open area where you can go left into the kitchen or straight into the living room or straight and right to the stairway to the upstairs. Sgt. Thomsen and I first went to the basement and at the bottom, I was told to turn to the left. After turning left, I noted a small, dark room to my immediate left and a laundry room straight in front of me. I entered the laundry room and saw the suspect lying on the floor. I could see a Blood Like Substance (BLS) on the suspect's head and torso. I noted the suspect was wearing red sweatpants with the word MINNESOTA written in white down the right pant leg, a black short sleeved t-shirt and black NIKE tennis shoes. I could see this male was black and had long dread locks in his hair. On his right arm, I noted the word PRINCE tattooed on his forearm and the word NINO tattooed on his bicep.

Sgt. Thomsen and I walked through the rest of the house. In the kitchen I noted a multi colored scarf lying in the middle of the floor. Nothing else appeared out of place on the main level. We walked to the upper level and could not tell if anything had been disturbed.

I exited the home and met with Sgt. Kathy Smulski and Sgt Gerald Moore. Sgt. Smulski stated she and Sgt. Moore responded to a Suspicious Vehicle call at 2743 Lyndale Av S. Apparently there has been several burglaries at this address and a witness from one of these burglaries called 911 stating the suspect is back at the building. This witness told 911 the suspect was in a PT Cruiser, MN Lic. 647-KLW. Sgt. Smulski said she and Sgt. Moore arrived at the address and located the occupied PT Cruiser in the parking lot of 2743 Lyndale Av S.

Sgt Smulski said they attempted to make contact with the driver of the PT Cruiser but he fled in the vehicle, striking the driver side front door of her squad as he accelerated out of the parking lot. Sgt Smulski said they attempted to pursue the suspect driving the PT Cruiser but lost sight of him after he left the parking lot of 2743 Lyndale Av S. I was told citizens began calling 911 about a suspicious person running through yards. This suspicious person matched the description of Sgts Smulski and Moore's FLEEING suspect.

Sgt Smulski said another citizen told officers the suspect was just seen in the area of W 27th St and Bryant Av S. A three block perimeter was set up and Car 1280 - SOD SWAT members began searching the area. Sgt Smulski said they then received info the home owner of 2717 Bryant Av S arrived home and found their back door kicked in. Members of the 1280 SWAT Unit entered 2717 Bryant Av S and minutes later, shots were fired from inside the home.

Sgt Moore stated the owner of the PT Cruiser had arrived in the area. I asked how she knew to come here and he said she apparently received a phone call from an unknown person telling her her PT Cruiser was at 27th and Bryant Av S and she was supposed to come over here and recover her car. Sgt Moore further stated the owner of this PT Cruiser was at work when she received the phone call and she was driven to the area by a co-worker. This co-worker was later identified as Ifrah Bashir Mohamed, dob ████/1991.

I asked Sgt Moore if both the owner of the car and Ms. Mohamed be brought to our office in the MPD Courthouse, Room 108 so Sgt Porras and I can interview them there. It was later learned Ms. Mohamed had an asthma attack and was transported to HCMC via ambulance. Officer Mike Morales stayed with Ifrah Mohamed until she was released from the hospital. The car Ms. Mohamed drove to the scene was legally parked by Officer Dani De Rose. The key was taken to the hospital and given to Ms. Mohamed.

I next spoke with Officer John Christenson and Officer James Bjostad on Squad 520. These officers located the blue PT Cruiser, MN Lic 647-KLW, parked behind 500 W 28th ST, the intersection of Garfield and W 28th St. Officer Christenson said he spoke to a female who lives on Garfield and witnessed the PT Cruiser turn off of EB W 28th ST onto NB Garfield at a high rate of speed. This witness told Officer Christenson the driver of the PT Cruiser turned into the parking lot of 500 W 28th ST, stopped in the parking lot and jumped out of the car. The witness said the driver then jumped a couple fences and ran out of her view. This female witness said the driver was a BM, 20-30 yrs, 6-0 to 6-3, muscular with dread locks in his hair and wearing red pants. About a minute after the BM driver ran from the PT Cruiser, the female witness told Officer Christenson a female exited the front passenger seat and got into the driver seat. The female moved the PT Cruiser from the position it was left, in to a parking stall against the building. This female then removed to young children from the back seat of the PT Cruiser and all walked away from the car.

I next spoke with Officer Bjostad who said he spoke with a female who lived in a third floor apartment of 500 W 28th St. This witness heard a car accelerate into the parking lot of her building. This witness looked out her apartment building window and could see a PT Cruiser was just stopping in the parking lot. This witness observed a BM wearing a red shirt exit the driver's

Lathrop Decl. Ex. 6

seat, jump a fence and run out of her view. This witness could see down into the PT Cruiser and noted a female was seated in the front passenger seat. About a minute went by then the witness observed the female exit the car and get into the driver's seat. The female repositioned the PT Cruiser into a regular parking stall then removed two small children from the back seat. The female and kids walked away from the car and out of this witness's view.

I told Officer Christenson I would send over someone from the Crime Lab to take photographs of the PT Cruiser. After these pictures were taken, I asked Officer Christenson if he would have the car towed to the MPLS Impound Lot and have it placed inside the Forensic Garage.

Sgt Porras and I then cleared the Bryant Av scene and went to Headquarters. It was decided Sgt Porras would speak with the administration officials and federation representatives while I interview the owner of the PT Cruiser, CALA DENISE SCOTT, dob ████1991. CALA was in interview Room F. This room is equipped to audio and video record. The recording equipment was activated and the video can be reviewed for complete details of my interview. Our conversation in brief:

CALA said she received a phone call from a male friend who told her to come to 27th and Bryant Av S to pick up her PT Cruiser. CALA said she works at SALAMA CHILD CARE, 1411 Nicollet Av S and asked a co-worker to drive her so she could get her car. CALA said when she arrived in the area, there were police officers everywhere. CALA said she told an officer she was the owner of a PT Cruiser and eventually she was placed in the back of a squad car.

I asked CALA who was driving her car this afternoon and she said her friend, MOOKIE. CALA eventually told me MOOKIE's real name is TERRANCE FRANKLIN and TERRANCE is 22 years old. CALA said she and FRANKLIN have been dating for only a month. Today, FRANKLIN apparently dropped CALA off at work at about 1300 hours and was supposed to return with food for her lunch. CALA said she called TERRANCE to ask about her food and when he answered, TERRANCE told her, her car was at 27th and Bryant Av S. CALA said she then heard what sounded like swishing, almost like someone was running. CALA said TERRANCE never came back on the phone and she eventually hung up. CALA said she continually tried to call FRANKLIN back but the phone would immediately go to voicemail.

I asked CALA what TERRANCE phone number was and she said it was ████████, further stating the phone is a black and grey, slide-type cell phone. CALA allowed me to look at her call detail and her text messages. I noted at 2:05 pm, CALA sent a text from her phone stating "What you doin?" There was no response to this text. I next looked at the call detail and noted at 12:23 pm there was a 10 minute call incoming to CALA's phone from TERRANCE's phone and another 11 minute incoming call to CALA's phone at 12:45 pm. Then at 2:18 pm there is a 5 minute call incoming to CALA's phone from the cell number she said TERRANCE FRANKLIN utilizes. I next note a phone call between CALA's phone which is outgoing to TERRANCE's phone at 2:24 with a 5 minute conversation. After this 5 minute phone call, there are multiple outgoing calls from CALA's phone to TERRANCE's cell beginning at 2:24 pm for 2 seconds; 2:35 pm-2 secs; 2:35 pm-1 sec; 2:36-1 sec; 2:37-2 secs; 2:41-1 sec; 2:41-canceled.

While I was out at the 27th and Bryant scene, I noted officers had copies of a photograph which had been taken from surveillance video at 2743 Lyndale Av S. I was told officers responded to that address because the male featured in this photograph was the suspect of previous burglaries. This photograph was taken from today's surveillance video. One of the officers at the Bryant scene gave me their copy of that photograph.

I showed CALA the photograph from 2743 Lyndale surveillance video which featured a black male wearing a black t-shirt, red sweat pants and had dread locks in his hair. I asked CALA if she recognized this male and she said it was MOOKIE or TERRANCE TERRELL FRANKLIN, dob ████/1990. I later obtained a picture of TERRANCE FRANKLIN, dob ████1990 from M-RAP and showed it to CALA. CALA said this is the male she knows as MOOKIE and is the male who was allowed to use her PT Cruiser today. CALA did not sign either photograph. Both noted pictures will be property inventoried into this case.

I asked CALA if TERRANCE had another girlfriend or kids with any other females. CALA said TERRANCE has a son with a female she knows only as Ashley. I asked CALA to remain in Room F until I could verify she was at work when she received the phone call from TERRANCE to pick up her PT Cruiser.

Ifrah Mohamed had been released from HCMC and was now seated in Room O. Room O is equipped to audio and video record. Before entering the room, I activated the recording equipment. Please review the video of my interview with Ifrah for complete details. Our conversation in brief:

Ifrah said she lives at 1420 Portland Av S, #207 and her cell phone number is ████████. Ifrah said she does work as a receptionist at SALAMA CHILD CARE and was at work today when her co-worker, CALA, asked her to give her a ride to 27th and Bryant Av S. Ifrah said CALA apparently received a phone call from a male named MOOKIE who told her he car was at this location. When they arrived, Ifrah said there were police officers everywhere and they were eventually placed in the back of a police car. Ifrah said it was very hot in the back of this car and she began having difficulty breathing. Ifrah said she went to the hospital and was treated for an asthma attack.

Lathrop Decl. Ex. 6

Both Ifrah and CALA were allowed to leave. Officer Morales drove Ifrah and CALA to 27th and Bryant Av S so Ifrah could retrieve her car. From there, Ifrah was giving CALA a ride home.

I spoke briefly with Sgt Sara Metcalf who stated she and Officer Michael Honeycutt went to 2743 Lyndale Av S and spoke to the caller on Squad 502 and 504 Suspicious Vehicle call. Sgt Metcalf was able to obtain video which was placed on a memory stick. This memory stick was turned over to Sgt Porras and I to review prior to inventory. Sgt Metcalf did say during her conversation with the 911 caller, the 911 caller stated he believed the suspect in this string of burglaries is frequently visiting the occupants of apartment 302.

I reviewed the surveillance video from 2743 Lyndale Av S and noted the stick contained 4 videos. One of the videos shows a male exiting a PT Cruiser which was left parked just outside a door into the building. I could see the driver of the PT Cruiser was a black male wearing red pants, a black t-shirt and had dread locks in his hair. Another video showed this same male enter the elevator and in this video, I could see there was white lettering down the right leg of this male's red sweat pants. I immediately recognize this male to be TERRANCE TERRELL FRANKLIN, dob ███/1990. When the elevator doors open, a female enters and hands an infant carrier to FRANKLIN. The female, a young female toddler, FRANKLIN and the baby can be seen in a third video walking through the lobby and out of the building.

Please note, the female entering the elevator with FRANKLIN is a short, thin black female with long hair. This female is wearing a black sleeveless shirt and white and black skinny-type pants.

The last video shows a PT Cruiser park in a stall with the nose of the car toward the building. Minutes later, a marked MPD Tahoe and a marked MPD squad enter the parking lot and the officer from the squad can be seen yelling at the persons in the PT Cruiser while remaining near the open door of their squad. The officer leaves the cover of their squad door and approaches the occupants of the PT Cruiser. When the officer gets near the PT Cruiser, the driver of this car accelerates away. The driver strikes the open door of the marked squad, then turns EB on W 28th ST and out of the camera's view.

Sgt Porras and I are told the family of TERRANCE FRANKLIN wanted to speak with us and we meet with them in interview Room A. We told them whatever details we could share with them then learned their daughter; TAMIKA O'NEAL received a phone call from a female she knows as ANQUENETTE (unknown last). This female apparently told TAMIKA; TEARRANCE was dead at 28th and Bryant Av N and they needed to get over there as soon as possible.

After speaking with the family, Sgt Porras and I interviewed TAMIKA in Room A. The recording equipment was activated in this room and the interview will be down loaded to DVD. For complete details, please review the video of the interview. Our conversation in brief:

Tamika O'Neal said her cell phone number is ████████ and at about "5'ish" she received a phone call from ANQUANETTE HOLMS or HOLLMEN (Tamika is unsure of correct pronunciation of last name). ANQUANETTE apparently told Tamika "MOOKIE is dead". Tamika said the phone call was cut off and every time she tried to call ANQUANETTE back, the message said the phone wasn't in service. Tamika was able to reach ANQUANETTE via ANQUANETTE's sister's phone / ████████. Tamika stated ANQUANETTE was not able to give her any details but told her she needed to get down to 28th and Bryant Av S because MOOKIE was dead. Tamika verified MOOKIE is her brother, TERRANCE TERRELL FRANKLIN, dob ███/1990.

Via CAPRs, Sgt Porras was able to locate a female with a similar name who listed a home address of 2743 Lyndale Av S, #302 - ANQUANETTE ANDREA HOLLMAN, dob ███ 1992. Sgt Porras was able to print a picture of ANQUANETTE HOLLMAN, dob ███/92. Sgt Porras showed this photo to Tamika who stated this is the female who was with TERRANCE earlier today, further stating the female pictured called Tamika telling her MOOKIE was dead. Tamika signed this photo and it will be entered into this case.

Sgt Holly Keegel with the MPD Violent Criminal Apprehension Team was in the office and I requested she and her team attempt to locate ANQUANETTE HOLLMAN, dob ███/92. At about 10:30 pm, Sgt Keegel called stating her team was able to locate Ms. HOLLMAN as she and her mother were leaving 2743 Lyndale Av S. Sgt Keegel said her team will transport Ms. HOLLMAN to Room 108 and her mother will also respond and will be available if investigators need to speak with her.

ANQUANETTE was placed in Room F. The recording equipment was activated and did capture the interview. Please review the video of this interview for complete details. Our conversation in brief:

ANQUENETTE said she and "MOOKIE" or TERRELL have been dating for about 3 months. ANQUENETTE said MOOKIE arrived at her 2743 Lyndale address at about 2 pm and after getting in her car, he parked and began "rolling a blunt". ANQUENETTE said within 5 minutes, the police pull up. ANQUENETTE said as soon as MOOKIE saw the police, he started to pull off but they stopped him. ANQUANETTE said the police officers were yelling for them to put their hands up. ANQUANETTE said she had her hands on the dash in front of her and kept telling MOOKIE to do the same. MOOKIE never said anything according to ANQUANETTE. She said he took off, striking the police car as they left and after driving a couple blocks, he pulled in behind a building and ran. ANQUANETTE said this is not normal behavior for MOOKIE and could not understand why he was acting the way he was.

Lathrop Decl. Ex. 6

I asked ANQUANETTE if she moved the car after MOOKIE ran off and she said she did. I asked her where the keys for this car were now and she said they were at her grandmother's apartment on Lyndale Av S. It was decided ANQUANETTE would ride home with her mother. Sgt Porras and I would follow and retrieve the keys for CALA SCOTT's PT Cruiser.

After retrieving the keys, Sgt Porras and I secured for the night.

Sgt Ann Kjos
Homicide Unit

**END of Supplement 69**

---

| Supplement number: | 70 | CCN: MP-13-143872 | Author: | 003055 - Chad Hofius |
| --- | --- | --- | --- | --- |

Supplement of Off C.Hofius #003055 on 05/13/2013 14:09

13-143872

While working Beat 8114able, I heard the Officer Down call at the above address. Upon arrival, I assisted with traffic control at 27th St and Lyndale Ave. S. I then was notified by Sgt. Nelson (105) to report to HCMC. I then drove to HCMC and I was assigned to the Media Staging area located at the intersection of 8th St. S and Park Ave S. until relieved.

**END of Supplement 70**

---

| Supplement number: | 71 | CCN: MP-13-143872 | Author: | 004898 - Ann Kjos |
| --- | --- | --- | --- | --- |

Supplement of Sgt A.Kjos #004898 on 05/13/2013 14:23

On 5/11/2013 Sgt Porras and I attended the autopsy of TERRANCE TERRELL FRANKLIN, dob ▓ 1990. The Hennepin County Medical Examiner's Office has assigned the case number 13-2385 to FRANKLIN's death. Please review Sgt Porras report for details on this autopsy. Please note, while at the autopsy, Dr. Boeding removed a dark blue NAUTICA terry cloth robe with white piping from FRANKLIN's body. From viewing video taken before this incident occurred, I knew FRANKLIN was not wearing a robe when he was at 2743 Lyndale Av S earlier in the day on 5/10/13. Because it was possible FRANKLIN obtained this robe from the home of 2717 Bryant Av S, I took a picture of it using my city issued iPhone.

At about 1400 hours, Sgt Porras and I met with Ben BICKAL and his wife, Kristin BICKAL. Ben and Kristin live at 2717 Bryant Av S and Sgt Porras and I wanted to conduct a recorded Q/A with Mr. BICKAL. Prior to this interview, I showed Mr. BICKAL the picture of the robe removed from FRANKLIN's body during autopsy. Mr. BICKAL immediately recognized this item as his, further stating it was likely taken from his upstairs bedroom.

At that point I asked if they noticed any other items missing from their home. Ms. BICKAL said she would check and returned seconds later stating spare cash she keeps in her dresser drawer was now missing. I went with Ms. BICKAL while Sgt Porras conducted the Q/A with Mr. BICKAL.

Ms. BICKAL brought me upstairs to their master bedroom which takes up the most western area of the second level. Immediately upon entering the bedroom, Ms. BICKAL walked into a large closet where her dresser rests. Ms. BICKAL started to open her top most dresser drawer when I asked her to stop. It was learned Ms. BICKAL has opened the top drawer many times since being allowed back into her home and it was determined the recovery of latent prints from a suspect was unlikely. Ms. BICKAL stated she usually keeps approximately $200 in cash on the far left side of the top drawer of her dresser. Ms. BICKAL said she does not hide this money and anyone could easily see the money once the top drawer was opened. I took pictures of the dresser with my city issued iPhone.

When done with the dresser, Ms. BICKAL pointed to the coat rack standing in the SW corner of the bedroom and said her husband's robe is usually hanging on that coat rack. Ms. BICKAL then pointed out all the scarfs hanging on the closet door just inside the master bedroom door. Ms. BICKAL said the scarf which was found on the kitchen floor would have been taken from this closet door. Ms. BICKAL did not think anything else was missing or disturbed but would continue to look and notify either Sgt Porras or I if she discovers anything.

As we were leaving, Sgt Porras said during his interview with Mr. BICKAL, he heard one of his neighbors may have seen the suspect run through their yard before he broke into his home.

Sgt Porras and I were able to determine that neighbor is Elizabeth Thompson, dob ▓ 1979. Ms. Thompson lives at 2710 Aldrich Av S and her home phone number is ▓. Ms. Thompson said she was sitting in her backyard with her friend Frank yesterday afternoon when a BM ran from the front, through the back yard and into the alley; out of their sight. Almost immediately, Ms. Thompson said she and Frank heard sirens. Elizabeth said they believed the male running through her yard

Lathrop Decl. Ex. 6

may be running from police officers and immediately notified officers in a passing squad car.

Ms. Thompson described the black male as wearing red pants and having dread locks in his hair.

Secured for the day.

Sgt Ann Kjos
Homicide Unit
**END of Supplement 71**

---

| Supplement number: | 72 | CCN: MP-13-143872 | Author: | 007201 - Christopher Thomsen |
| --- | --- | --- | --- | --- |

---

Supplement of Sgt C.Thomsen #007201 on 05/13/2013 15:57
SCENE REPORT - BASEMENT BY SGT THOMSEN
CCN 13-143,872

On 5-10-2013 while off-duty, I was advised of Officer-involved shooting that had just occurred in the 5th Precinct. I responded to the scene after making contact with my partner, Sgt Green. Sgt Green advised that he was riding to the scene with Sgts Porras and Kjos from the office. I arrived at the scene shortly after 1600 hrs and parked in the 2600 block of Bryant Ave S and walked to the front of 2717 Bryant Ave S where I met with Sgt Green. Sgt Green advised that he and I would be responsible for documenting the scene at 2717 Brant Ave S.
Sgt Green was in the process of documenting the exterior of the scene and it was determined that he would continue to document the exterior, main floor and upper floor of the address. Sgt Green and I conducted a walk-through of the scene after entering the house at approx. 1626 hrs. After doing an initial walk-through of the scene, I met with Officers as well as Sgts Porras and Kjos outside the residence.
While speaking with Officers outside the scene, I was approached by Officers Mooney and Grove. Officer Mooney provided me with a photograph of the suspect in this case. This photo was provided to him and other Officers at the scene by the maintenance worker at the apartment building at 2743 Lyndale Ave S. The piece of paper contained two photos. The top photo is of a black male wearing red sweat pants and a black t-shirt. This photo matches the clothing and appearance of the suspect that I had just observed DOA in the basement of 2717 Bryant Ave S. I gave this photo to Sgt Kjos and obtained another copy of this photo from Officer Grove. I asked Officer Grove to document how he obtained these photos from the maintenance worker.

While at the scene, I also spoke with Sgt Moore and he advised me that the suspect in this case had possibly been in Flanders Bike Shop while the suspect was attempting to elude the police prior to the shooting.

Sgt Metcalf and Officer Honeycutt approached me while at the scene and asked if they could be of assistance. I asked them to follow-up with the information that was provided by the 911 caller at 2743 Lyndale Ave S and obtain any video that they might have. I also asked that they follow-up on the information that the suspect may have been in Flanders Bike Shop and again secure any evidence or video from Flanders Bike Shop.
While I was at the scene, Officer Fahey advised me that he was approached by a resident of 2710 Aldrich Ave who stated that he observed the suspect run through his yard prior to the shooting. I met briefly with the witness, FRANK GAJAVADA, dob: ███ -62 who provided me with the phone number of ████████  FRANK stated that he was sitting the back yard of 2710 Aldrich and he could hear what he knew to be squad cars in the area by the way the engines sound. FRANK said that about the same time, he saw a black male run from his front yard on Aldrich through his back yard and into the alley. FRANK thought that the male was wearing black and red. FRANK said that once the male got to the alley he ran southbound in the alley. FRANK said that he himself walked to the alley to see where the suspect had gone, but the suspect could no longer be seen in the alley. I showed FRANK the picture of the suspect that was provided to me by Officer Grove and FRANK stated that this was the same male that ran through the yard. FRANK stated the also in the back yard when the suspect ran through was ELIZABETH THOMPSON. FRANK mentioned that it appeared that the suspect had something in his hand when he was running. He stated that it didn't look like a gun but that it was black and about the size of a pack of cigarettes.

BASEMENT SCENE
The basement of 2717 Bryant Ave S can be accessed using the north door of the residence. Entering through this door one can go up a short staircase to the left to the main floor of the residence or the staircase straight ahead goes into the basement.
After descending the 8 stairs to the basement, there is an old boiler type heater in a closet that is slightly to the left and across the small hallway. To the right or west as you are standing at the bottom of the stairs is a storage area. This area is somewhat cluttered and as you continue to the south there is another storage area to the left and a small bathroom.
Returning to the stairs that come down from the area of the north door, immediately to the east of the stairway is a small closet area that contains the hot water heater. The hot water heater is set back 3 to 4 feet. There is sufficient room on the left side of the water heater to access the small area behind the water heater and there is a small opening on the left that opens up to the area under the stairway. The area behind the water heater was checked by Crime Lab Unit personnel and no evidence was located.

Lathrop Decl. Ex. 6

Inside this small closet there were blood droplets that were documented by the Crime Lab. There was also a handgun holster and a blue draw string from a robe and a shoe print impression on a paper bag that was documented. There was also a cell phone recovered from the floor of the closet near the water heater.

To the east of this small closet is the laundry room. As you enter the laundry room there is a clothes rack with several items of clothing hanging from it immediately to the right. To the east of the clothes rack is a double sink. At the back of the laundry room along the east wall is the washing machine on the right, the dryer is to left of the washer and there is another clothes rack to the left of the dryer. The decedent in this case is located on the floor of the laundry room with his head oriented to the north. The decedent is lying on his left side facing the dryer. To the north of the decedents head is a set of built-in wooden cabinets. There was a substantial amount of blood near the decedents head but in an effort not to disturb evidence in the laundry room, items were not moved until the scene was documented by the Crime Lab Unit and the personnel from the Medical Examiner's Office completed their initial scene survey.

Once the scene was documented and the Medical Examiner's Office completed their initial assessment, items were moved in an effort to locate, mark and document other items of evidence. Near the threshold of the laundry room door there was a pair of sunglasses under a green colored coat. The frame of the glasses was under the coat and the lenses were recovered from just inside the laundry room. There was also a tan colored rifle magazine recovered from the floor of the laundry room.
As items were removed from the laundry room the Crime Lab personnel was able to locate several discharged cartridge casings. At least 2 fired bullets were also located in the laundry room. Discharged cartridge casings that were recovered consisted of both .45 and 9mm casings. Refer to Crime Lab report for the exact locations and descriptions of the recovered casings.

At 2250 hrs I asked Officer Gottsch to order Boardup so that they could secure the back door that had been broken open by the suspect. Boardup arrived and secured the door.

At 2300 hrs I contacted the Medical Examiner's Office and asked that they respond to 2717 Bryant Ave S to recover the decedent in this case. The body was recovered by the Hennepin County Medical Examiner's employees. The Crime Lab personnel completed searching the laundry room after the body was removed. Sgt Green and I cleared the scene at 0120 hrs along with the Crime Lab Unit. I secured the north door prior to leaving. I also secured the dead bolt of the front door using the key that was in the front door. I placed the key in an envelope and left it on Sgt Porras' desk.

Sgt Thomsen
Homicide Unit

**END of Supplement 72**

---

| Supplement number: | 73 | CCN: MP-13-143872 | Author: | 006791 - Andrew Stender |
|---|---|---|---|---|

---

Supplement of Sgt A.Stender #006791 on 05/13/2013 18:59
STATEMENT OF SGT. STENDER, BADGE 6791, ON 5/13/13
CCN 13-143872
TYPED BY LM

Q: I want to make it clear to you that this is a voluntary statement. This is a criminal investigation into the recent incident you were involved in. The Minneapolis Police Department Homicide Unit is conducting this investigation and the information gathered will be presented to the Hennepin County Attorney. The county attorney may and usually does present matters such as this to the grand jury. The grand jury determines whether or not criminal charges are justified under the law. Your decision to or not to provide a statement will not and cannot be used against you in any employment matter. Do you understand what I have just explained to you?
A: Yes.

Q: Sgt. STENDER, can you tell us how long you have been employed with the Minneapolis Police Department?
A: Since March 2nd, 1992.

Q: Prior to working for Minneapolis PD, did you work for any other police agency(s)?
A: Yes. I worked for the Fillmore County Sheriff's Office and the Preston Police Department.

Q: Are you currently a member of the MPD SWAT and if so, were you working in that capacity on May 10th, 2013?
A: Yes.

Q: What was your assignment/call sign that day and who were you working with?
A: I was assigned to the 1280 Warrant Team as a Sergeant. In the afternoon of the 10th, I was driving my marked K9 squad with my K9 partner, NASH. The rest of the 1280 Team were in the white Sprinter van and that was Officer PETERSON, Officer

DURAND, Officer LAUX, Officer VALENCIA, Officer MURO, Officer MEATH, and Officer STAUFFENBERG.

Q: Sgt. Stender, on the VisiNet print out, only Officers Laux and Meath are signed on to Car 1280. Can you explain why only two of your team members are signed on to this call sign and did MECC have a complete list of all officers and supervisors assigned to Car 1280 on May 10th, 2013?
A: The practice is whoever picks up the 1280 van signs onto the MDC to show that we're in service. They enter their badge number and sometimes enter the sergeant's badge number or another officer's badge number. I did not send a complete list to MECC to advise them all of the team members' names.

Q: Can you describe the uniform you were wearing that day and the type of weapon you had both on your duty belt and available to you in your police vehicle (1280 van)?
A: I was wearing the Minneapolis short-sleeved police shirt and blue cargo pants, and on my duty belt I had my Smith & Wesson M & P .45 caliber handgun. In my squad car I had my M4 rifle available to me. My department issued MP5 was stored in the 1280 van.

Q: How many bullets do you keep in your weapon? Please include both the magazine and if there was a bullet chambered into the gun.
A: In my handgun there are ten rounds in the magazine and one in the chamber. In my MP5 I do not keep one chambered but there are 28 rounds in each magazine. In my M4 I do not keep one chambered but there are also 28 rounds in each magazine.

Q: How many magazines are on your duty belt?
A: I keep two spare magazines on my duty belt with ten rounds in each magazine.

Q: On May 10th at about 1430 hours did you and members of your 1280 team assist with the search of the area surrounding W 27th St and Bryant Av S, Mpls?
A: Yes I did.

Q: Can you explain what or who you were searching for, was this person wanted for a specific reason and if you knew a description of the person you were searching for?
A: I had been monitoring Channel 3, the 5th Pct., and heard the incident taking place and the description. The person that we were searching for had fled Squad 502 and 504 in a PT Cruiser and a vehicle pursuit had ensued. A short time later information was aired that the suspect of the PT Cruiser had exited the car near the area of 27th and Lyndale Ave. S. The suspect was then seen running into Flanders Bike Shop. The description was a black male wearing a black top and red pants and he had long dreadlocks.

Q: Did you and your 1280 team members assist in a search of the area surrounding 27th and Bryant Ave. S.
A: I arrived before the 1280 van did and assisted officers with searching the house on the corner of 28th and Aldrich. After finding nobody inside, I came outside and the 1280 van and officers had arrived. I then made the decision that the 1280 Team members and I, along with my K9 NASH, would search 27th to 28th on the odd side of Bryant. We continued searching this half block house to house and did not locate anybody. As we arrived near 27th Street, an unidentified male approached me and handed me a flyer which he said was a picture of the suspect. This picture showed a black male with dreads wearing a black t-shirt and red pants. We then shifted our focus to the even side of Bryant and started coming south from 27th towards 28th Street West.

Q: At some point, did you learn a homeowner of a house within the perimeter you are searching came home to discover his house had been broken into and if so, what did you do?
A: I heard a radio transmission that the homeowner at 2717 Bryant had come home and found that his house had been broken into. I was directly across from this address when I heard this radio transmission and immediately ran over to investigate. I went to the rear of the residence and saw that the glass on the rear door had been broken. I then went back to my squad car and grabbed my K9 NASH and told the 1280 members present to prepare to search the residence. When I came back to the rear door of 2717 Bryant, 1280 Team members (Officer PETERSON, Officer DURAND, Officer MEATH, Officer MURO) were standing and ready. I approached the door with K9 NASH and observed that the door was shut and not standing open. As I looked closer, I saw the hole in the glass and I also saw damage to the door and to the frame. One of the officers pushed the door open and we stopped. Inside on the floor I saw broken glass and the locking mechanism for the door lying on the floor.

Q: What happened next?
A: Believing that this was a good burglary and before deploying my dog, I gave a loud verbal K9 announcement identifying myself as a Minneapolis Police K9 Unit and that whoever was inside should announce themselves or they would get bit. I received no response and I again gave the same announcement. Again no response. I then released my dog into the residence and myself and team members started searching for the burglar. As we moved throughout the main floor, I continually identified ourselves as a police K9 unit and told whoever was inside to come or they would get bit. While moving through the kitchen, I saw the basement stairwell and I directed Officer DURAND to stay posted on that stairwell as we searched the rest of the house. We first searched the main floor and did not find the burglar. We then shifted our focus to the upstairs with my K9 partner at my side. At the base of the stairwell I again hollered Police K9, come out or you're going to get bit. I received no

Lathrop Decl. Ex. 6

response so I released my dog upstairs and he started to search. Myself and team members also went upstairs and waited as my K9 searched the upstairs. As NASH went into the bedroom, I followed him in there and he showed serious interest in the closet area. The other officers covered me as I looked in the closet with NASH, but I did not find anything. We then cleared the rest of the upstairs and did not locate the burglar.

Q: Where did you go next?
A: We then went down to the main level, where Officer DURAND was covering the basement stairwell. Officer DURAND told me that he thought that he had heard noises downstairs and believed that somebody was down there. At this time, a cat ran between Officer DURAND and myself and went down the basement. This appeared to be the same cat that my dog had encountered earlier while searching earlier. At this time, I screamed and identified myself as the Police K9 Unit telling anybody downstairs they had nowhere to go and they needed to come up now or they were going to get hurt. I did not receive any response so I again hollered this as loud as I could, identifying myself as the Police K9 Unit and that whoever was downstairs needed to come up immediately or they were going to get hurt.

I then released K9 NASH downstairs and he started to search. I then heard a commotion in the southwest corner of the basement. As I approached, I saw that NASH had a cat in its mouth and I told him to drop it. He dropped the cat and the cat ran past us to the main floor. I then redirected K9 NASH to search and team members then moved down the stairs. After letting NASH work for a short time, we entered the basement and I observed that he had cleared the southwest corner area. I then directed him to the northwest room in the basement, which contained a cat litter box. He searched in this room and did not find anybody.

Q: Can you explain what type of lighting you had in the basement as you were searching?
A: Overall it was dark downstairs. There was some natural light that had come through, but I had to use my flashlight to do a proper search of the rooms.

Q: What did you do next?
A: I then sent NASH into the northeast corner room, where the washer and dryer were. I followed him into this room and began to check as he was searching. I looked inside the washer and dryer and found nobody. I then looked into the northwest corner of this room and saw that NASH was staring at the wall and I saw his head go up towards the ceiling. This is an indication to me that he had found a scent and was attempting to locate its source. It was also an indicator to me that the suspect was probably on the other side of the wall.

Q: What were your other team members doing at this point and briefly describe the approximate dimensions of the basement?
A: I had posted Officer DURAND to cover the storage area next to and under the stairway. The rest of the officers had entered the room with me and were double checking the areas where my dog had looked. As far as the dimensions of the basement, it was very chopped up and I would estimate the area where the washer and dryer were to be eight feet by ten feet.

Q: What did you do next?
A: As I looked at K9 NASH, he quickly turned around and went to the storage area where Officer DURAND was posted, directly on the other side of the wall from where we were at. I felt that NASH was going after something so I quickly followed him and saw him go past Officer DURAND and attempt to get into the storage area, which had a door lying on its side, Styrofoam, and a water heater. NASH could not get to the rear of the storage room so we started to remove the Styrofoam and the door and NASH was then able to get to the rear of the storage room. He quickly turned to the left, which was an open storage area directly under the stairway, but he did not find anything. I then stepped back as far as I could and also did not see anything under the stairs or anybody in the room. I then backed out but NASH would not come with me. He continued to air scent, stand with his head and nose up in the air attempting to locate the source of the scent. He then went back under the stairs and quickly came out and went to the area behind the water heater. Here he stuck his nose directly behind the water heater and hesitated. He then took his paw and moved something and then growled as he was pulling something out. A black male wearing black t-shirt then stood up, knocking stuff over, as NASH continued to hold onto a sweatshirt that he had in his mouth. I then saw red pants and remembered the flyer that the person had shown us near 27th Street, which was a photograph of the suspect.

Q: Could you tell if the suspect was wearing this sweatshirt or just holding it?
A: It appeared that he had been wearing it because as NASH pulled him away the sweatshirt was around his elbows and they in a tug of war situation.

Q: Was NASH able to get the suspect out from behind the water heater?
A: NASH pulled the suspect out of his hiding spot, the suspect stood up and he then kicked at NASH. I then told the suspect that I needed to see his hands. Both of his hands were behind his back in the area of the small of his back. I could see that NASH had a hold of his sweatshirt causing his elbows to be pulled down and back. The suspect just stared at me. I then said, "Show me your fucking hands," and again the suspect just stared at me. Again I told him to show me his hands, and this time he twisted a little bit from side to side. Thinking that he might have a gun in his hand, I went farther into the room and punched him in the face as hard as I could. The suspect just stood there and looked at me with a vacant deep stare and did not respond to my commands. I was especially concerned because I had punched him very hard in the face and received no reaction from

Lathrop Decl. Ex. 6

him. I then took my flashlight and struck him over his right eye as hard as I could. Once again the suspect just stood and stared at me with a deep vacant stare. Thinking of what other options I had, I asked any team members if they had a taser with them, and nobody stated that they did.

Q: How far away from the suspect were you at this point and were there other team members in the closet with you?
A: I was about an arm's length away from the suspect but alone without any other team members because the closet was narrow and there was not room for anybody else to be abreast of me.

Q: What happened next?
A: I went deeper into the closet, grabbed the suspect by the head, and started to pull him out with a headlock while NASH was still on the suspect. I started to get him out of the closet as he continued to resist and attempt to pull away from me. Officer MEATH then assisted me with getting him completely out of the closet and into the laundry room area. Officer PETERSON then stepped in and I gave up my head position to him. I then heard an officer holler, "Don't be grabbing for my gun, are you grabbing for my gun?" I then directed my attention down to NASH and saw that he had readjusted from the sweatshirt and now had the pants leg of the suspect. I then heard an officer holler, "He's got a gun, he's got a gun," and I then heard two separate gunshots. Officer MURO then told me that he'd been shot in the leg. I then heard somebody say, "He's got the gun," and then I heard numerous gunshots.

Q: During this fight, were you ever able to take the suspect to the ground?
A: No, I was not.

Q: What happened next?
A: I removed NASH from the suspect because I did not want any officers to get hurt by my dog, and I grabbed Officer MURO by the collar and assisted him with getting out of the room. While I helped him get out of the room, I remember seeing that the door into the laundry room ended up getting closed as I pulled Officer MURO out.

Q: Could you tell what was happening in the laundry room at this point?
A: I heard officers hollering inside, but my attention was on Officer MURO and getting him out of the way so I don't know exactly what was said.

Q: Did you hear anymore gunshots coming from inside the laundry room?
A: No.

Q: What happened next?
A: I got Officer MURO to the stairs and I left him there because I had to get my dog out of the scene and placed into my squad because he was a huge distraction. NASH was attempting to get back into the room where the suspect was at. I then ran out to my car with NASH, and while doing so got onto the radio to advise that an officer had been shot and that we needed ambulance and rescue code three. I then gave a route for the ambulance to come in at the rear alley, but once I got to my squad I realized there were too many squads there so I had to change the direction in the alley.

Q: At this point were you aware that another officer had been shot?
A: No I was not. I learned of this on the radio as I ran back to the house.

Q: Do you remember where your team members were when you returned back to the house?
A: As I got back to the north side of the house, team members had gotten Officer MURO out of the basement and he was lying on the front yard. I then got on the radio and advised dispatch again that the route for the ambulance had changed and that I wanted them to come down Bryant directly in front of the address. I then went back to the house and saw that officers were bringing up Officer MEATH and I was just getting in the way, so I went back to assist with Officer MURO.

Q: Did you know the status of the suspect at this point?
A: I heard something on the radio about the suspect being shot, but I don't remember exactly what it was.

Q: Did you continue to assist with Officer MURO?
A: I found that the officers had not properly applied the tourniquet and they were not able to get above the wound, so I cut Officer MURO's pants off, repositioned the tourniquet, and cinched it down.

Q: Did you have a tourniquet kit available to you?
A: I had my kit in my cargo pants pocket, had it out and was going to apply it to Officer MURO, but we were able to adjust and reuse the tourniquet that had been put on him. A short time later the ambulance arrived and I assisted with getting Officer MURO onto the stretcher and into the ambulance. I then assigned Officer VALENCIA to ride in the ambulance with Officer MURO and to stay with him until relieved by a supervisor.

Q: So once Officer MURO left in the ambulance, what were your duties at the scene?
A: I then focused my attention to Officer MEATH, who was lying on the front yard of 2717 Bryant. Officers had already put on a

Lathrop Decl. Ex. 6

tourniquet, but I assisted ambulance when they arrived with getting Officer MEATH onto the cot and stretcher and loading him into the ambulance. I then assigned Officer STAUFFENBERG to ride in the ambulance with Officer MEATH and to stay with him until relieved by a supervisor.

Q: What did you do next?
A: I assigned Officer LAUX to go down in the basement to stay with the suspect and Officer DURAND until relieved. I learned that Officer PETERSON had discharged his weapon at the suspect so I assigned him with Sgt. MANTY as his escort officer and removed Officer PETERSON from the scene. I also learned that Officer DURAND had his MP5 machine gun manipulated by the suspect and that rounds went off. I then assigned Officer DURAND to be with Sgt. KINGSBURY as his escort officer and removed him from the scene.
Sgt. STRAUSS then showed up at the scene and I assigned him the basement scene with the suspect. Inspector DIAZ asked how he could help and I told him that I would take care of the scene if he would take care of the perimeter and everything outside, and he then made assignments. I did request that two officers be assigned to the north side door to keep people from entering, and this task was assigned to Officer FAIRBANKS and Officer HUBER. A short time later Sgt. KJOS and Sgt. PORRAS arrived, and I quickly advised them of what I knew.

Q: Can you briefly clarify which door the victim officers were removed from the home?
A: The officers were brought up the basement stairs and outside via the main level door located on the north side of the house.

Q: At some point were you assigned an escort officer and told that you and your team members should respond to Room 100?
A: Sgt. GREG FREEMAN was assigned as my escort officer and we went down to Room 100 at City Hall. While in Room 100, I had my photograph taken by the B of I and they also took swabs of the blood that was on my left hand.

Q: Can you think of anything that I may not have asked you that you feel would be pertinent to this investigation?
A: Not at this time.

Q: To the best of your knowledge is this a true and accurate statement?
A: Yes it is.

_____

Sgt. Stender

_____

Witness

**END of Supplement 73**

---

| Supplement number: | 74 | CCN: MP-13-143872 | Author: | 007375 - Juan Valencia |
|---|---|---|---|---|

Supplement of Off J.Valencia #007375 on 05/13/2013 21:10
On 05-10-13 I was assigned to 1280 working warrant service with Sgt. Stender as our Sgt. We were on a detail getting the Bear Cat and the other 1280 van ready for the precinct open houses. We were at the SWAT garage when we heard a vehicle pursuit going on in 5th precinct. I remember hearing that the suspect was possibly wanted for burglaries in the area and that he was a black male wearing red pants and had dread locks.
Once we arrived on scene at 28st W and Bryant Ave So. officers had a perimeter set up at which time Sgt. Stender informed us that there was a two block perimeter set up and we were going to search the blocks with the K9's. My partners and I spread out on the block and pushed it North while Sgt. Stender was working K9 Nash looking for the suspect. Once we reached 27th St W I assisted Officer Murphy and his K9 partner in checking the 2700 block of Bryant to Colfax for the suspect. While we were checking the block for the suspect I heard on the radio that there was a citizen that came home and found his rear door kicked in. I later heard that Sgt. Stender with a couple of officers were going to go inside 2717 Bryant Ave So and check the address for suspect.
I was still one block West of the incident address checking for the suspect when I heard a radio that I believed to be from Sgt. Stender that there were shots fired and officers down. I immediately ran through the yards to 2717 Bryant Ave so and entered through the rear door. When I got inside I realized that the officers that were shot were down stairs. I ran to the stairs and saw my partner Officer Muro sitting at the bottom of the stairs holding his leg. I realized at this time that it was Ricardo that was shot and by this time there were offices trying to assist him up the stairs. I immediately threw some bags that were sitting in front of the side door just above the steps so we would be able to get him out of the house using that side door, which was located on the North side of the house. Once I had the door open two or three officers lifted him up the stairs at which time I assisted them in carrying Ricardo to the street so we could meet the ambulance.
Once we got to the street I realized that the tourniquet was not very tight and that his uniform pants were probably restricting it. Myself and Sgt. Stender cut his pants off, or the pant leg on the leg that was shot and reapplied the tourniquet to his upper

Lathrop Decl. Ex. 6

thigh to stop the bleeding. Once we had the tourniquet on I remember the paramedics showing up at which time we put him on a stretcher and into the ambulance. I rode in the ambulance to the hospital with Ricardo and tried to support his leg on the ride to HCMC while the paramedics worked on him.

Once in the hospital I handed Ricardo's gun belt along with his gun to Sgt. Biederman.

**END of Supplement 74**

---

| **Supplement number:** | **75** | **CCN: MP-13-143872** | **Author:** | **006765 - John Staufenberg** |
| --- | --- | --- | --- | --- |

---

Supplement of Off J.Staufenberg #006765 on 05/13/2013 21:12
On 05/10/13 I was working on the 1280 Warrant team. I was in my Mpls Police Uniform.
We were at the SWAT garage downtown when we heard a Vehicle Flee get aired in 5th PCT. We started that way to assist. We were driving the SWAT Sprinter van. As we were on our way I heard over the radio that the fleeing vehicle had rammed a squad car and tried running over a Police Officer. I also heard that the suspect was a possible suspect in a Burglary. They aired that the suspect was a black male with dreadlocks and red pants. I then heard over the radio that the Suspect had bailed from the vehicle and was now on foot in the area of 27 St W and Bryant Ave S. Officers later aired that they had a house in the area that the suspect possibly ran into. Before we got there they aired that they searched the house and it was clear.
They then aired that they were going to keep searching with the K9's and it sounded as if they had a good perimeter set up.
We arrived on the scene at 28th St W and Bryant Ave S and assisted Sgt Stender and Officer Murphy with searching the area on foot. They both had their K9's.
I assisted both k9's while we searched North from 28th St, covering the East side of Bryant Av.
As we were assisting in the search a civilian approached us and gave us a flyer with 2 pictures of the suspect on it. The person in the photos was a black male with dreadlocks. They appeared to be surveillance photos.
After we searched that block Sgt Stender had Officer Valencia and I assist Officer Murphy and his K9 with searching the West side of Bryant Av going South from 27th St.
Someone aired that a neighbor at 2717 Bryant Av S came home to find his back door broken into. A short time later Sgt Stender aired that he and Officers were going to be checking inside the home along with his K9.
After a period of time I then heard an Officer get on the air and say that Officers had been shot.
I immediately ran North in the alley then East on 27th St and then South on Bryant Av. As I got to the front of 2717 Bryant Av I saw Officers carrying Officer Meath and Officer Muro out of the basement door on the North side of the house. They brought both Officers to the front yard and began working on both of their legs.
It appeared to me that both Officers had been shot in the right leg.
I attempted to assist with the Officers but there were too many Officers around them. I then made sure squad cars got moved and the street was clear so the ambulances could get through.
Once the first ambulance arrived I assisted in loading Officer Muro into it.
I then assisted in loading Officer Meath into the ambulance and got into the back to ride down with him.
I held Officer Meath's right leg in the air while riding down to HCMC. Once at the hospital several Officers went with Officer Meath to his room. Once in his room, I then went to Officer Muro's room and stayed with him.

**END of Supplement 75**

---

| **Supplement number:** | **76** | **CCN: MP-13-143872** | **Author:** | **005786 - Luis Porras** |
| --- | --- | --- | --- | --- |

---

Supplement of Sgt L.Porras #005786 on 05/13/2013 21:14
Supplement of Sgt. Luis Porras
1-143872

Autopsy report of Terrence Terrell Franklin DOB ▮▮▮▮ 1990

On 05-13-2013, at approximately 0830 hours, Sgt. Kjos and I went to the Medical Examiners' Office and met with Dr. Enid Boeding. Dr. Boeding would be conducting the post examination of Mr. Franklin. (ME# 13-2385)

As we approached the examination table, we observed Mr. Franklin lying on his back wearing black and red tennis shoes, red colored sweatpants with MINNESOTA down the right leg, blue and green plaid underwear, a black T-shirt and he had dreads in his hair.

It should be noted that Mr. Franklin was also wearing a blue robe with white piping. (Nautica Brand)

Mr. Franklin had a tattoo of "Sheila" on his chest, underneath that was "RIP" and then "Hollywood" and two stars. On his right forearm was a tattoo of the word "Prince" and on his left forearm was the word "Mookie".

On his right bicep was a tattoo "Nino$" on his left bicep "Guru".

The following items were on the person of Mr. Franklin:

Lathrop Decl. Ex. 6

1) Small baggie of suspected marijuana
2) 2 ticket stubs to "The Great Gatsby" dated 05-10-2013
3) Approximately $224 dollars in U.S. currency
4) One white lighter
5) 3 Players Card from Skydeck
6) 1 EBT card from Terrance Franklin
7) 1 EBT card from Michael O'Neal
8) 1 Super America Rewards card
9) 1 Walmart Gift card
10) 1 Visa card # ███████████
11) 1 Green Dot Visa # ███████████
12) .65 cents in Miscellaneous change

Dr. Boeding informed Sgt. Kjos and I that there were several defects in Franklins head, neck, his right upper arm area and another defect in his upper right side of his torso. She also told us that 8 projectiles were recovered during the post exam.

The cause of death was multiple GSW's and it was going to be classified as a Homicide.

Sgt. Luis Porras
Homicide Unit
Case Open

**END of Supplement 76**

---

| **Supplement number:** | 77 | **CCN:** MP-13-143872 | **Author:** | **004898 - Ann Kjos** |
|---|---|---|---|---|

---

Supplement of Sgt A.Kjos #004898 on 05/13/2013 21:15
STATEMENT OF OFFICER DURAND, BADGE 1627, ON 5/13/13
CCN 13-143872
TYPED BY LM

Q: I want to make it clear to you that this is a voluntary statement. This is a criminal investigation into the recent incident you were involved in. The Minneapolis Police Department Homicide Unit is conducting this investigation and the information gathered will be presented to the Hennepin County Attorney. The county attorney may and usually does present matters such as this to the grand jury. The grand jury determines whether or not criminal charges are justified under the law. Your decision to or not to provide a statement will not and cannot be used against you in any employment matter. Do you understand what I have just explained to you?
A: Yes.

Q: Officer DURAND, can you tell us how long you have been employed with the Minneapolis Police Department?
A: 13 years.

Q: Prior to working for Minneapolis PD, did you work for any other police agency(s)?
A: No.

Q: Are you currently a member of the MPD SWAT and if so, were you working in that capacity on May 10th, 2013?
A: Yes to both.

Q: What was your assignment/call sign that day and who were you working with?
A: We were 1280 was the call sign and I was in the van with Officers STAUFFENBERG, VALENCIA, LUKE PETERSON, RICARDO MURO, and STEVE LAUX.

Q: Can you describe the uniform you were wearing that day and the type of weapon you had both on your duty belt and available to you in your police vehicle (1280 van)?
A: I was in full Minneapolis Police blue uniform. I carried a Sig Sauer P226 9mm handgun. I also had a MP5 submachine gun, which is a 9mm, in the van.

Q: How many bullets do you keep in your weapon? Please include both the magazine and if there was a bullet chambered into the gun.
A: My Sig Sauer has a 15-round magazine plus one in the chamber and I carry two spare magazines for that. The MP5 I leave unloaded while in the van, and with it I have two 27-round magazines.

Q: Do you regularly qualify with the weapons you are assigned?
A: Yes. The handgun is at least once a year through the department range. In order to carry the MP5 you need to attend and

Lathrop Decl. Ex. 6

pass a sub gun school. I attended the sub gun school at Camp Ripley in July of 2012. We are required to qualify with our sub gun at least three times per year to maintain proficiency with this weapon system. My last qualification with my city-issued MP5 was April 29th, 2013.

Q: On May 10th at about 1430 hours did you and members of your 1280 team assist with the search of the area surrounding W 27th St and Bryant Av S, Mpls?
A: Yes.

Q: Can you explain what or who you were searching for, was this person wanted for a specific reason and if you knew a description of the person you were searching for?
A: We were searching for a male from a vehicle flee where they nearly hit 5th Pct. Supervisor. He was described as a black male with dreadlocks and red pants.

Q: Do you recall how you received this information?
A: It was aired over the radio.

Q: Did you and your 1280 team members assist in a search of the area surrounding 27th and Bryant Ave. S.
A: Yes.

Q: At some point, did you learn a homeowner of a house within the perimeter you are searching came home to discover his house had been broken into and if so, what did you do?
A: Yes we learned that 2717 Bryant had forced entry in the rear. At this point I was on the corner of 28th and Bryant and I ran to the front of the address. As I was doing this, Sgt. STENDER was coordinating by radio to have good perimeter on the house. When I arrived in front, I went around the north side to the rear where the homeowner had reported the door forced open. I went onto the rear deck and I observed the broken glass and broken doorframe. At this point I held on the door until we had sufficient officers to make entry.

Q: At some point was entry made into the home?
A: Yes. We entered from the back into the kitchen with the K9 clearing as we went. I moved forward and held on the stairway leading to the basement.

Q: Can you explain when you say I held onto the stairway to the basement what you mean by that?
A: By holding on the stairway what I mean is I'm covering with my weapon to make sure no one else comes up or goes down.

Q: While on this position, could you hear Sgt. STENDER giving verbal commands?
A: I heard Sgt. STENDER announce as we entered Police K9 and he repeated this as we went into each room clearing the main floor. Once they cleared the main floor they went upstairs announcing Police K9 as they went through the rooms upstairs.

Q: Could you hear anything anywhere else in the home?
A: As officers were upstairs I could hear rustling coming from the basement.

Q: Could you tell who or what was making those sounds?
A: It sounded like somebody was covering themselves with objects or attempting to conceal themselves behind items in the basement.

Q: At some point did Sgt. STENDER and the rest of the team clear the other two levels and then come to your position?
A: Yes. Once they had cleared the upstairs, they came down from upstairs to me. I then notified Sgt. STENDER that I had heard this noise from the basement. While I was relaying this information, I did observe the homeowner's cat run downstairs past me.

Q: At this point does Sgt. STENDER and his K9 begin a search of the basement and who entered the basement to assist?
A: Before we went downstairs, Sgt. STENDER announced several times Police K9 show yourself or you will get bit. Sgt. STENDER then took his dog down the stairs and I followed close behind. With me was Officer MEATH, Officer MURO, and Officer PETERSON.

Q: As you entered the basement, could you describe what the lighting situation was?
A: The only natural lighting seemed to be coming from the top of the stairway from a side door. There wasn't much overhead lighting.

Q: Can you briefly describe the layout of the basement?
A: At the bottom of the stairs to the right was a small pantry. Straight ahead was open space that wrapped around to the left. To the immediate left at the bottom of the stairs was a short hallway that went into a laundry room. When you pass through this hallway, there are bifold closet doors on your right and open space underneath the stairway on the left. The whole basement didn't seem to have any artificial light that we could find and was filled with clutter.

Lathrop Decl. Ex. 6

Q: Did you maintain a specific position while in the basement or what was your exact duty while you were in the basement?
A: As we hit the bottom of the stairs, Sgt. STENDER again announced Police K9 and his dog searched ahead and to the right. As Sgt. STENDER went with his K9, I button hooked covering to the right in the pantry. I held this position while the K9 searched the basement.

Q: What happened next?
A: Once the K9 had cleared the area in front of me and the pantry area, they proceeded to the laundry room. When they did this, I visually cleared the pantry and then stepped towards the laundry room. As I was approaching the laundry area, the K9 came out and attempted to go under the stairs.

Q: Were you able to make it more accessible for the K9?
A: Yes. I pulled several pieces of Styrofoam insulation, a wooden door, and a wooden box that were in the way of the K9 getting behind the water heater that was located under the stairs.

Q: What happened after the K9 was able to gain access to this area?
A: The K9 turned behind the water heater and grabbed at something.

Q: Could you see inside this closet that the K9 was in?
A: At this point, I moved to the right side of this area under the stairs directly in front of the water heater. I used the flashlight mounted on my MP5 to attempt to light the area and cover Sgt. STENDER as he went into this crawl space.

Q: From the illumination of your flashlight, what could you see inside this crawl space?
A: There was clutter in front of the water and still a little clutter the K9 had to climb over to get behind the water heater, and I could see part of a blue sweatshirt and it appeared that that's what the K9 was biting.

Q: At this point could you see a person in this room?
A: Not at first, no.

Q: What happened next?
A: As the K9 struggled with the sweatshirt, I then saw a black male stand up. I could see that he had long dreadlocks and I was sure this was the suspect we were looking for.

Q: At this point did the suspect surrender to your commands?
A: No. The suspect throughout the entire ordeal did not say a word. He did not comply with the loud verbal commands that were being given to him and he continued to struggle with officers.

Q: Was the K9 ever able to drag the suspect out of this room?
A: The K9 had a hold of the suspect's blue sweatshirt and was dragging him toward the side of the water heater. At that point Sgt. STENDER had stepped into this space to attempt to get control of the suspect. At this point I maintained my position on the right side wall illuminating the area with my weapon mounted flashlight.

Q: What happened next?
A: I then saw Sgt. STENDER strike the suspect in the face, which seemed to have no effect. The suspect continued to struggle with the K9 and Sgt. STENDER and additional officers had entered into the limited space available to gain control. At this point I heard an officer yell, "What are you grabbing for?" I then heard him say, "Are you grabbing for my gun?" I could see that the suspect was moving towards the opening and having a long gun I took a step backwards to keep it away from the event unfolding.

Q: When you stepped backwards, where did that put you in the basement?
A: I was in the doorway to the laundry room at this point.

Q: At this point how far were you from the suspect?
A: It was several feet. At this point I could see that officers were attempting to gain control of the suspect by taking him to the floor, at this point I dropped the muzzle of my long gun and turned off the flashlight to prevent muzzle sweep of anyone. As the suspect was nearly out of the space, he exploded out with force, striking me backwards into the laundry room.

Q: Did the suspect push you backwards or grab you and drive you backwards?
A: It was much like a football tackle with his head down driving from the hips.

Q: What happened next?
A: The suspect slammed me against the dryer which I hit with my back. He landed on top of me in front of the dryer and I was able to roll to my right where he was laying across me. As I'm knocked backwards, I take my right hand from the pistol grip of the MP5 to brace from the fall and double check my handgun, that it was still in its holster. As I was falling, I looked down and I

Lathrop Decl. Ex. 6

could see that his finger was now inside the trigger well on my MP5. I took my left hand and attempted to push the muzzle of the barrel down and away towards my left. I screamed, "He's got a gun, he's got a gun," and then two shots went off. And as I looked to my left I could see officers entering the room. I felt the recoil of the gun as it went off, with a short pause and a second shot. The suspect continued to hold onto my MP5 as I struggled to maintain control. At this point I put both hands on top of the barrel in an attempt to bring it down, and I yelled again, "He's got a gun, he's got a gun."

Q: What happened next?
A: As I'm attempting to push the barrel down, the flashlight mounted to it is turned on and Officer PETERSON was able to visually see what was going on and comes in close proximity to me and fires his weapon at the suspect several times. Officer PETERSON had taken a position partially straddling me putting the muzzle of my MP5 in close proximity to his body armor to prevent anyone else from being shot. He did this as he fired his weapon.

Q: So to be clear, can you describe the suspect's position in relation to your position and then later Officer PETERSON's position?
A: As I was going down from being tackled, the shots were fired. I ended up with the suspect laying across part of my legs with his head near my right shoulder and Officer PETERSON came in from the left, straddling over me and the suspect.

Q: At any time during this event did you pull the trigger on your MP5?
A: No. During our training, we index our finger along the selector out of the trigger well so that accidental discharges do not happen. The finger is indexed running parallel to the muzzle.

Q: Did you know officers had been shot?
A: After the first shot rang out, I heard one of the officers say they had been hit, but I did not realize that two officers were injured.

Q: Do you know how many times the suspect fired the MP5?
A: I recall two shots being fired from my MP5.

Q: At one point you indicated that the flashlight came on on your MP5. Who turned this flashlight on?
A: I did. It came on accidentally during the struggle when my hand was by the muzzle.

Q: Can you describe how your MP5 was secured on your body during this incident?
A: I use a single point sling that goes around my neck and left shoulder. This allows me to manipulate the gun from either hand. The sling is made of heavy-duty nylon strapping and a nickel-plated buckle. The sling attaches to the rear of the weapon, allowing it when not held to be pointed directly at the ground. By using a single point sling, it allows me to move the weapon 180 degrees in any direction, including up and down and side to side.

Q: On your MP5, how many different fire selections are there and during this event, what firing position was selected?
A: The MP5 has a safe, a semiautomatic which fires a single projectile every time you squeeze the trigger, and a full automatic fire selection. With full automatic if you squeeze and hold the trigger, you will expend all the rounds in the magazine until empty or you take your finger off. As we proceeded into this house, I moved the selector to the semiauto position.

Q: After Officer PETERSON shot the suspect, did you hear anymore gunshots?
A: No.

Q: After the suspect was down, what happened next?
A: At this point I became aware that Officer MEATH had been shot also. Officer PETERSON had already taken a hold of a tourniquet and was applying the tourniquet to Officer MEATH's leg. While he was doing this, I was talking to both officers and I used the flashlight mounted on my MP5 to light up the room. We were able to get the tourniquet on. At this point we left the laundry room and saw that Officer MURO was being tended to on the stairway and then both officers were taken through the side door out of the house. I helped Officer MEATH up the stairs and laid him in the front yard. Once in the front yard, I tore the buttons off of Officer MEATH's shirt and took his ballistic vest off. His duty belt was also removed and his legs were elevated to treat for shock.

Q: What happened next?
A: Several other officers had arrived and were tending to Officer MEATH. I then proceeded back into the basement. As I came down the stairs, I noticed firefighters going by the side door and I called them down the stairs to check on the suspect. They informed me that there was no pulse.

Q: After learning the suspect was DOA, what did you do next?
A: I stayed in the basement until I was relieved, at which point I was assigned Sgt. KINGSBURY as an escort supervisor. I got into Sgt. KINGSBURY's squad car.

Q: At any point did another officer or law enforcement personnel touch your weapon with ungloved hands?

Lathrop Decl. Ex. 6

A: Yes. I don't know his last name but he's known as D.O.C. DAVE.

Q: Can you explain how D.O.C. DAVE happened to handle your weapon?
A: When I came out of the laundry room, he was helping with Officer MURO on the stairs, and as I went to help Officer MEATH up the stairs I asked DOC DAVE to hold my MP5 so it wouldn't get in the way as I carried Officer MEATH up the stairs. Once we were upstairs, I took control again of the MP5.

Q: Do you know how D.O.C. DAVE held your weapon?
A: It appeared that he just held onto it from the stock portion with the muzzle pointing down.

Q: Did anyone take possession of your MP5 after this event was over?
A: Yes. My MP5 was secured in the trunk of the squad car I sat in until Car 21 arrived and took possession of it. It should be noted that while Officer PETERSON was applying the tourniquet to Officer MEATH's leg, I took control of Officer MEATH's gun and placed it in my back pocket. I kept physical control of this weapon until it was turned over to Car 21.

Q: Can you think of anything that I may not have asked you that you feel would be pertinent to this investigation?
A: Not at this time.

Q: To the best of your knowledge is this a true and accurate statement?
A: Yes.


_____

Officer Durand


_____

Witness

**END of Supplement 77**

---

| Supplement number: | 78 | CCN: MP-13-143872 | Author: | 005786 - Luis Porras |

---

Supplement of Sgt L.Porras #005786 on 05/13/2013 21:17
Supplement of Sgt. Luis Porras
13-143872


On 05-10-2013 at approximately 1530 hours, I was in Room 108 with Sgt. Kjos when Cmdr. Folkens informed us that two Minneapolis Police Officers had just been shot in south Minneapolis. Sgt. Kjos immediately grabbed her portable and we began monitoring the transmissions from the incident.

I heard Minneapolis Officers ordering for ambulances CODE 3 to their location, in and out routes and travel to HCMC. After a few minutes, we informed Commanders Johnson and Folkens that we would be responding to the scene.

Sgt. Kjos and I would be responsible for the interviews, while Sgt. Green and Thomsen would be responsible for the actual crime scene.

At approximately 1550 hours, Sgt's Kjos, Green and I arrived at West 27th Street and Bryant Ave South. Sgt. Kjos arrived from the North on Bryant Ave south and parked our squad facing Southbound on Bryant Ave just North of 2717 Bryant Ave South.

Upon our arrival, we were met by Officer Becker who logged all three of us into the crime scene, to include time in and badge numbers. I observed yellow Police Crime scene tape already strung up and uniformed Officers in marked squads on the perimeter maintaining the integrity of the crime scene.

As I walked in, Sgt. Kjos and I met up with Sgt. Stender who briefed us. He told us that this call had originated from a FLEE a little earlier, where the driver had bailed from the vehicle and ran and broke into 2717 Bryant Ave South.

Sgt. Stender had told us that he was in the area with his K9 and they had gone into 2717 Bryant Ave South in an attempt to locate the individual who had fled on foot. Stender said that his K9 had located the individual; he began fighting with his K9 and then him.

Other Officers, (Peterson, Duran, Muro and Meath) came to assist him, shots were fired, striking Officers Muro and Meath and causing the death of suspect.

Lathrop Decl. Ex. 6

Sgt. Stender then told us that Officer Luke Peterson was with escort Officer Sgt, Manty and that Officer Duran was with escort Officer Sgt. Kingsbury.

I spoke with Sgt. Moore who was the Incident commander. He told me that this incident started from a prior call which turned into a FLEE at 2743 Lyndale Ave South. The driver of that car pulled in behind 500 West 28th Street and ran on foot, breaking into 2717 Bryant Ave South. Minneapolis Officers located the suspect, shots were fired inside the residence resulting in the death of the suspect and two Officers were also shot.

I was able to locate the home owner of 2717 Bryant Ave South, James Bickal. Mr. Bickal told me at that time that he was arriving on his way home from work at approximately 1530 hours and when he arrived he saw lots of Police Officers in his neighborhood. Bickal said that he noticed his house had been broken into his house and that the Police went in to check it out. Bickal said at that time he did hear a lot of screaming and yelling but wasn't aware of what lead up to that.

Bickal did ask if there was someone dead in his house and I informed him that there was, and unfortunately his house was now a crime scene and that it would need to be processed as such. I advised Bickal that MPD Crime Lab would need to process it for potential evidence and that it may take several hours.

Prior to leaving Mr. Bickal, I provided him with my business card and told him that I would return on Saturday (05-11-13) to get a formal taped statement.

I then called with Sgt. Kingsbury who was with Officer Duran. Sgt. Kingsbury told me that Duran had the handgun that belonged to Officer Meath and that Duran's MP5 was in the back of his squad's trunk.

I told Sgt. Kingsbury to return to 2717 Bryant Ave South, that MPD Crime Lab had arrived that I wanted them to take possession of Officer Meath's handgun and Duran's MP5.

Sgt. Kingsbury returned to my location and met up with Crime Lab Personnel. They took possession of Officer Meath's handgun and the MP5. I gave them strict instructions that no testing, fingerprints or DNA was to be done until we could establish some details as to what happened inside and that wouldn't happen until all the involved Officers could be interviewed.

I then met with FS Berget and she inquired about the PT Cruiser and where it currently was. I told her that the PT Cruiser was behind 500 West 28th Street. I asked IC Sgt. Moore if we could have an escort Officer take her to where the vehicle was at so she could process it.

Officer Dietrich was assigned to take her to 500 West 28th Street. FS Berget was asked to take overall photos of the scene, the vehicle and have it towed to the forensic garage for processing at a later date.

I remained at the scene until Sgt. Thomsen arrived. Sgt. Kjos and I met with him and Sgt. Green prior to us leaving, leaving them in charge of the scene.

Upon our arrival back to Room 108, I stopped into Room 100 and met up with Lt. Kroll. I explained to him that before any of the involved Officers were to leave, I would like the Crime Lab to take overall photographs of them in their uniforms. Also, any of the Officers that have BLS on them, I wanted them swabbed for DNA and their uniforms collected.

See FS Schultz report for those details.
Once back in 108, I met up with Sgt. Kjos and she told me the decedents name was Terrance Terrell Franklin DOB - 1990.

At approximately 2015 hours, Sgt. Kjos and I met with the family of Franklin. We met them in interview Room "A". Present from the family was Sheila O'Neal (mother) Walter Franklin (father) Marcia Frierson (Aunt) and Reverend Ian Bethel.

During a conversation with Ms. O'Neil, she told Sgt. Kjos and I that her daughter, Tamika O'Neal had called her and told her that "Mookie" was dead. "Mookie is the nickname for Terrance Franklin.

We explained to Ms. O'Neal that we were interested in knowing the name of his girlfriend that was with him prior to the incident. She told us a name of Anquanette Hollman. She told Sgt. Kjos and I that she did not have a cellular number for her and also had never met her therefore would not be able to identify her from a photo.

Ms. O'Neal called her daughter, Tamika O'Neal, who told us that she was on her way down to Room 108 to speak to us.

At approximately 2100 hours, Sgt. Kjos and I met with Tamika O'Neal in interview room "A". She told us that she got a phone call from "Anquanette "saying that "Mookie" was dead. She told Tamika that they were rolling a "blunt" when the Police approached them and he ran from the car.

Lathrop Decl. Ex. 6

Anquanette told Tamika that the Police had gone over to her grandmothers' house looking for him.

I searched our CAPRS system and did locate an Anquanette Andrea Hollman DOB ███-92. I presented a DVS photo for this person to Tamika and she positively identified her as "Mookie's" girlfriend and the person he was with at the time of Police contact.

Tamika signed and dated this photo for Sgt. Kjos and I and it will now become a permanent part of this case.

Prior to ending this interview, Tamika told Sgt. Kjos and I that her brother Terrance had a cellular phone and his number was ██████████.

Interview terminated.

Sgt. Kjos and I then provided Sgt. Keegel the information pertaining to Anquanette Hollman. We explained to Sgt. Keegel that Hollman was the female passenger in the PT Cruiser at the time the Police had approached the vehicle behind 500 West 28th Street.

At approximately 2230 hours, we were contacted by Sgt. Keegel. She told us that Hollman had been located and was en route to Room 108.

At approximately 2305 hours, Sgt. Kjos and I me with Hollman in interview Room "A". It should be noted that interview Room "A" is equipped with both audio and Video capabilities to capture the entire interview.

The following is a summary of that interview with Hollman. Please refer to transcript and or CD for complete details.

Hollman stated that "Mookie" (Terrance Terrell Franklin) picked her up at 2743 Lyndale Avenue south around 2pm that day.

Hollman stated that they had been in the car for about 5 minutes when the cops approached them. Hollman told us that Franklin drove off in the vehicle and that that she told him to stop and even tried to get the keys out of the ignition.

Hollman said that they only travelled a couple blocks and parked behind an apartment building. While there, they began to roll a "Joint" and the police approached them again. This time the Police had their weapons drawn and they were ordered to place their hands on the dash.

Hollman said that she complied and that "Mookie" took off running from the vehicle. Hollman then admitted to repositioning the PT Cruiser into a parking spot and she then got her two kids out of the car and walked away from the scene.

Interview terminated.

On 05-11-2013, Sgt. Kjos and I returned to 2743 Lyndale Ave South with Hollman. She handed me the keys to the PT Cruiser, which will be property inventoried.

Sgt. Luis Porras
Homicide Unit
Case Open
**END of Supplement 78**

---

| Supplement number: | 79 | CCN: MP-13-143872 | Author: | 004035 - Steven Laux |
|---|---|---|---|---|

Supplement of Off S.Laux #004035 on 05/13/2013 21:20

TYPED BY SC, CCN 13-143872

On 5/10/13 I was assigned to Car 1280, along with my partners, Officers MEATH, MURO, STAUFENBERG, VALENCIA, DURAND, and L. PETERSON. The sergeant of the team was Sgt. STENDER, who was out patrolling in his K9 squad with K9 partner, NASH. All of us, except the sergeant, were in the white 1280 Sprinter vehicle, which is our work vehicle for the cycle.

We were in the van downtown when I heard the dispatcher state that there was a vehicle chase in the 5th Pct, which was on a different channel from the one I was monitoring. We then switched over and as a team, started driving toward that location from downtown. The vehicle that was being pursued was lost in the 3rd Pct, but then a short time later, it was reported that it was seen at a business in the 2700 block of Lyndale Av S. We continued toward that location. A suspect description had been aired and was that of a young, black male, with a thin build, and dread locks, wearing red pants.

Lathrop Decl. Ex. 6

Officers were checking a couple of possible locations and we proceeded first to the area of approx 27th and Grand Av S. After checking a short time and finding nothing, I then recall hearing Sgt. STENDER state he was going to continue an area search in the area of 28th and Bryant and was requesting a cover officer.

As a team, we then responded to that area and met up with Sgt. STENDER, squad 908. I retrieved my patrol rifle from the van and took up a position on the perimeter on Aldrich Av S. After a while, the K9 teams took a break before continuing to do their search, moving west. When the K9 search continued, I then took up a position on the perimeter at 28th and Bryant, where our vehicle was located. After a while, the search continued but then it was aired that a homeowner had returned home and discovered that his home had been broken into. The address was given as 2717 Bryant Av S, which was in the area that K9s were searching.

As officers went over to 2717 Bryant, I stayed at my position at 28th and Bryant. I then heard an officer air confirming that there was a burglary with forced entry at 2717 Bryant Av S and that officers were going to go inside and check. A short time later, while still at 28th and Bryant Av S, I heard an officer air that an officer had been shot at 2717 Bryant Av S.

I then ran to the backyard of this address, at which time I was instructed by Sgt. STENDER to start moving vehicles out of the alley for a path for the ambulance. I moved a couple of squads, but there was an unmarked pickup truck, which I did not have keys to. The path for the ambulance and medics then changed to the front of the address on Bryant Av S. I then went out there in an attempt to start moving vehicles. At this time, I observed an ambulance already out there and Officer MEATH being attended to. I was then instructed by Sgt. STENDER to go inside the house to the basement and assist with securing the basement.

I went into the basement of 2717 Bryant Av S and observed a few officers down there. I stated I was there to assist them in security and could relieve any of them if they needed. I then asked where the suspect was and was directed to the laundry room. After finding the laundry room and observing the suspect that I was sent to guard, I asked Officer DURAND if the medics had been down there. He did not know and I could not find anyone else who did know.

I then went in to check on the suspect, who was lying in the laundry room on his left side in a fetal position. I observed the suspect was a young, black male, with dread locks and wearing red pants. I could not observe any respirations or find any kind of pulse. The suspect had severe trauma to the head. Very shortly after this, two Minneapolis Firefighters came downstairs to check on the suspect. They moved the body a little bit so they could check the suspect in a few different locations for a pulse, but they could not find anything and declared him dead.

I continued to stay in the basement in the doorway of the laundry room where the suspect was until I was relieved by Officer SCHOONOVER. I was instructed by Officer SCHOONOVER to find Sgt. STENDER. I found him in the front yard of the scene and I was informed that I was to go to room 100 at CITY HALL. Officer SCHENEMAN drove our van from the scene, along with me as the passenger, to CITY HALL, where I was dropped off and proceeded to room 100.

**END of Supplement 79**

---

**Supplement number:      80      CCN: MP-13-143872      Author:            004898 - Ann Kjos**

---

Supplement of Sgt A.Kjos #004898 on 05/14/2013 11:34
STATEMENT OF OFFICER DURAND, BADGE 1627, on 5/14/13
CCN 13-143872
TYPED BY LM

Phone Interview:

Q: Officer DURAND, do you understand that this is still a voluntary statement and you are aware that your attorney, FRED BRUNO, is here as well, is that correct?
A: Yes.

Q: And I just have one follow-up question for you. Yesterday when you told us while Officer PETERSON was applying the tourniquet to Officer MEATH's leg, you grabbed Officer MEATH's gun. Is that correct?
A: Yes, it is.

Q: Where did you grab that gun from?
A: He was holding it in his left hand.

Q: And it was after that you put his gun in your back pocket?
A: Yes.

Lathrop Decl. Ex. 6

_____

Officer Durrand

_____

Witness

**END of Supplement 80**

---

| Supplement number: | 81 | CCN: MP-13-143872 | Author: | 119676 - Brenda Hummel |
|---|---|---|---|---|

---

Supplement of For S B.Hummel #119676 on 05/14/2013 14:32
Scene Report
CCN: 13-143872

On 05/10/2013, at approximately 1602 hours, Car 21 was requested by dispatch to respond to a Motor Vehicle Chase (CCN 13-143770) at 2717 Bryant Ave S. Upon arrival, we were met by officers who informed us that the call had been upgraded to an Officer Involved Shooting. Sergeants Porras and Kjos briefed us on the scene.

It was explained that officers were in pursuit of a dark blue PT Cruiser which was believed to be involved in a recent burglary. At some point during the pursuit, MPD marked squad 504 was struck by the PT Cruiser. The suspect vehicle continued to flee and eventually parked in the parking lot of the apartment complex at 500 W 28th St. The driver (suspect) of the PT Cruiser then fled on foot. Officers set up a perimeter and began an extensive search of the area. Around the same time, the homeowner of 2717 Bryant Ave S returned home and reported that the rear main door of his dwelling had been damaged. The dwelling was searched by officers and K9, and the suspect was located in the basement. A struggle ensued between the suspect and officers in the basement laundry room; two officers and the suspect were shot. The officers were assisted up the stairs, and through the north side and rear doors of the dwelling. EMS arrived on scene and tended to the officers on the front yard of the dwelling, before transporting them to HCMC. The suspect was pronounced DOA in the basement laundry room.

Sergeants Porras and Kjos requested that we first collect firearms belonging to two of the officers involved and photograph the suspect vehicle.

FS Jacobson and I met Sgt Kingsbury, who pointed out the location of the firearms which were secured in MPD marked squad 423. A semi-automatic handgun was located on the floor of the front passenger seat. Its hammer was not cocked, its slide was forward, and its magazine was seated. An MP5 sub-machine gun was located in the trunk. Its safety was on, its adjustable stock was not locked, and its magazine was seated. Under the supervision of FS Jacobson, I photographed the firearms. I then pulled the stock of the MP5 back until it locked in place, and collected both loaded firearms.

FS Berget responded to a parking lot north of 500 W 28th St where she was met by Officers Bjostad and Christensen who were securing the suspect vehicle. A dark blue PT Cruiser (MN 647KLW) was observed parked facing south along the south side of the parking lot. The front passenger window was partially open and all doors to the vehicle were unlocked. FS Berget photographed this vehicle, as well as MPD marked squad 504 in the parking lot to include damage to the driver's side door of squad 504. Officers Bjostad and Christensen remained with the vehicle.

Upon securing the firearms and once FS Berget returned to the scene, an initial walkthrough of 2717 Bryant Av S was conducted and the following observations were made:

2717 Bryant Ave S is a west-facing, single-family dwelling consisting of a main floor, 2nd floor, and basement. The rear main door is located on the east side of the dwelling inside an unsecured screened-in porch. The rear main door leads into the kitchen. Stairs west of the kitchen lead down to a north-facing side door, and then south into the basement. A small room east of the basement stairs contains a water heater, and to the east of this room is the laundry room. Adjacent to the water heater room is another small room containing the furnace. The remaining area of the basement (west and south of the basement stairs) is comprised of storage space, an additional storage room, and a small bathroom.

Four blue buttons and EMS supplies were observed in the front yard, just west of the dwelling.

Damage was observed to the lock, door, and frame of the rear main door (point of entry, POE). Shards of broken glass, pieces of wood, and a lock were located on the floor near the POE. Two knives with a white powdery substance were observed on the kitchen counter and the knife drawer was partially ajar. Storage bins and recyclables had been displaced during the search by officers, and were observed in a hallway southwest of the kitchen. The remaining rooms on the main floor and second floor of the dwelling were undisturbed.

Blood-like substance (BLS) was noted on the exterior east side framing at the bottom of the basement stairs, near the doorway

Lathrop Decl. Ex. 6

to the water heater room. Additional BLS was noted on the west wall of the water heater room and several paper bags on the floor. A possible bullet hole was noted in the east wall, directly behind the water heater.

BLS was noted on the exterior north side frame of the laundry room door. Directly inside the door, along the south wall is a rolling clothes rack and directly east of the clothes rack is the double sink. The washer and dryer are situated along the east wall of the room and are next to another rolling clothes rack in the northeast corner of the room. A set of built-in closet doors line the north wall of the room. Several cat litter boxes, trash cans, laundry baskets, tool boxes and miscellaneous items were strewn about the room. Discharged cartridge casings (DCCs) were located within the laundry room. Two bullet holes were observed in the frame of one of the closet doors, along the north wall. Another possible bullet hole was located in a cardboard box along the west wall. BLS was observed on the west and north walls of the room, as well as the ceiling, other appliances and items.

The deceased male suspect was observed lying on his left side, with his head near the north wall of the laundry room. His legs were bent and his feet were pointing south. The deceased was wearing a black t-shirt, red sweatpants and athletic shoes. A dark blue fleece-type robe was on his left arm. Injuries were noted to his head and upper body. A large area of BLS was below the deceased's head.

Under the supervision of FS Jacobson, I took overall photographs of the scene.

FS Jacobson placed evidence markers (EM) A--D next to the following items:
A & B- Buttons (in grass on north side of front yard, west of dwelling)
C- DCC (on storage bin next to tool bucket; laundry room)
D- DCC (on floor in BLS near deceased's head; laundry room)

Photographs were taken of items marked A-D.

FS Berget took video of the scene.

I processed the following areas/items for latent print evidence:
-Exterior/Interior POE door, glass, and knob (kitchen)
-Seven shards of broken glass (floor near POE)

One latent print was developed on the exterior POE door knob. The latent print was subsequently labeled, photographed, and lifted.

Ridge detail, which was insufficient for comparison purposes, was developed on the interior of the POE glass. No other ridge detail was developed.

It should be noted that officers were going in/out of the rear screen door and rear porch door prior to our arrival and while we were on scene.

Personnel from the Hennepin County Medical Examiner's office arrived to observe the scene prior to our secondary search.

A search for additional items of evidence was conducted. The search resulted in locating and placing EM's (E--M) next to the following items:
E- Cell phone (on floor; water heater room)
F- DCC (on floor in front of washing machine; laundry room)
G- DCC (on floor near deceased's left foot; laundry room)
H- DCC (on floor near vacuum cleaner; laundry room)
I- DCC (in stack of plastic bins near north wall; laundry room)
J- DCC (on floor near deceased's left foot; laundry room)
K- DCC (on floor near deceased's back; laundry room)
L- DCC (in pocket of wall organizer on north wall; laundry room)
M- DCC (on floor under ladder along west wall; laundry room)

The following items were also located during our search, but were not marked with evidence markers:
-Paper bags with BLS (on floor; water heater room)
-Leg holster with BLS (on floor; water heater room)
-Belt (on floor; water heater room)
-Sunglasses frames (on floor outside of laundry room; under jacket)
-Two sunglasses lenses (on floor near clothes rack along south wall; laundry room)
-Sunglasses (underneath clothes rack along south wall; laundry room)
-Rifle magazine (underneath clothes rack along south wall; laundry room)
-Dreadlock (on floor in cat litter; laundry room)

Lathrop Decl. Ex. 6

-Dreadlock (in stack of plastic bins near north wall; laundry room)

FS Jacobson and FS Berget took approximate measurements and prepared rough sketches of the front yard, main floor, and basement to include marked items A through M.

Additional photographs were taken of items located in the secondary search.

FS Jacobson collected marked items A-D, marked items F-M, the magazine and dreadlocks. FS Berget collected marked item E and the remaining unmarked items of evidence.

Sgt Thomsen and Sgt Green confirmed with the homeowner that the kitchen knives on the kitchen counter belonged to him, but he had not removed them from the kitchen knife drawer. FS Jacobson swabbed the knife drawer knob for possible DNA evidence and collected both knives.

FS Jacobson and I marked (1-12), photographed with scale, and swabbed the following areas of BLS:
1- Exterior framing at bottom of basement stairs (east side)
2- West wall of water heater room
3- Exterior laundry room door frame (north side)
4- Exterior laundry room door frame (north side)
5- Floor near doorway (laundry room)
6- White board in front of washer and dryer (laundry room)
7- White board in front of washer and dryer (laundry room)
8- Side of white garbage can in front of white board (laundry room)
9- Front of dryer (laundry room)
10- Front of dryer (laundry room)
11- North wall of laundry room
12- West wall of laundry room

Personnel from the Hennepin County Medical Examiner's office returned and took custody of the deceased. The deceased was removed and the area underneath him was examined and photographed.

The following additional items of evidence were observed:
-DCC (on floor under deceased; laundry room)
-Fired bullet (in red tool box organizer tray; laundry room closet along north wall)
-Fired bullet (on floor; laundry room closet along north wall)

FS Jacobson collected the DCC and fired bullets.

It should be noted that the east wall of the water heater room and the cardboard box along the west wall of the laundry room were examined and it was concluded that the damage observed was not related to the incident.

All of the collected items were brought back to the Crime Lab Unit, examined, and found to be:

A- One blue button
B- Three blue buttons
C- "Federal 45 Auto+P" DCC with BLS
D- "FC 9mm Luger" DCC with BLS
E- LG Boost Mobile cell phone
F- "FC 9mm Luger" DCC
G- "FC 9mm Luger" DCC
H- "Federal 45 Auto+P" DCC with BLS
I- "FC 9mm Luger" DCC
J- "Federal 45 Auto+P" DCC
K- "Federal 45 Auto+P" DCC
L- "FC 9mm+P" DCC
M- "FC 9mm Luger" DCC with BLS
-Anthropologie paper bag with BLS and footwear outsole impressions
-One brown Roundy's paper bag with BLS containing one brown Roundy's paper bag
-One brown Roundy's paper bag with BLS containing one brown Lund's paper bag
-Safariland leg holster with BLS
-Blue fleece belt
-Black Oakley sunglasses frames
-Two sunglasses lenses
-Black Harley Davidson sunglasses

Lathrop Decl. Ex. 6

-"PMAG" magazine with "MEATH" written on it, containing a quantity of live rifle cartridges
-Two dreadlocks
-Wusthof black-handled kitchen knife with white powdery substance on blade (Approximate measurements: Blade- 6.5", Overall- 12")
-Black-handled kitchen knife with white powdery substance on blade (Approximate measurements: Blade- 8.5", Overall- 13")
-"FC 9mm Luger" DCC with BLS (unmarked, under deceased)
-Fired bullet (red toolbox organizer tray)
-Fired bullet with BLS (from floor)

-Sig Sauer .45 caliber semi-automatic handgun (Model: P220, S/N G361048, etched into handgun was "#1 4686") with:
-Model TLR-1 Streamlight (S/N C4-187351) attached
-One "Federal 45 Auto+P" live cartridge in chamber
-Magazine containing three "Federal 45 Auto+P" live cartridges
-HK MP5 9mmx19 caliber sub-machine gun (S/N 62-350264) with:
-Tactical light attached
-One "FC 9mm Luger" live cartridge in chamber
-Magazine containing twenty-two "FC 9mm Luger" live cartridges, and two "FC 9mm+P" live cartridges (Tape on bottom of magazine with "3" written on it)

Processing of the collected items will occur on a later date, with the results to be reported in a following supplement.

The latent print (exterior POE door knob) will be analyzed for quality with the results to be reported in a following supplement.

All of the collected items will be inventoried in the Property and Evidence Unit.

The photographs, latent lift, video, and rough sketches will be retained within the Crime Lab Unit's major case files.

WE HEREBY CERTIFY THAT THIS IS THE REPORT OF THE CONCLUSIONS OF AN EXAMINATION PERFORMED BY US

FS B. Hummel
Minneapolis Police Dept - Crime Lab Unit

FS K. Jacobson
Minneapolis Police Dept - Crime Lab Unit

FS A. Berget
Minneapolis Police Dept - Crime Lab Unit

**END of Supplement 81**

---

| **Supplement number:** | **82** | **CCN: MP-13-143872** | **Author:** | **003398 - Grant Johnson** |

---

Supplement of Off G.Johnson #003398 on 05/14/2013 15:46
On May 10th, while working squad 8112, I Officer Johnson badge #3398 with Officer Collier Badge #1216 were in the area of 27th and Lyndale ave S. when a call of a chase in the area and the suspect on foot in that area running west bound through the yards. The suspect was described as a black male wearing red pants.

We took up a position on the corner of 27th Ave S. and Colfax Ave S. as part of the perimeter to try and contain and locate the suspect in the area.

We assisted Officers holding the perimeter, as 1280 officers were clearing a house at 2717 Bryant ave S. that had been found to have been broken into recently.

When the call of shots fired and Officers down in the listed house, as a current member of the SWAT team, I responded to the house with my assigned SWAT rifle to assist the team members at the scene.

Upon arrival at the house within 20 seconds, I took up a position on the NorthWest corner of the house, and as I moved to assist the officers in the house, it was aired that the suspect was down, and the injured officers were coming out.

I assisted Officer Muro first coming out of the basement door, and then Officer Meath. I looked at Officer Meaths right leg that had a tourniquet on it near his groin. Officer Peterson was holding pressure on his upper thigh area as he was carried out.

I observed there to be a significant amount of wet fluid and blood on his leg in this area, and fresh blood coming out between Officer Petersons fingers.

Lathrop Decl. Ex. 6

I then grabbed my tourniquet and applied it to Officer Meaths right leg, just below the first tourniquet. The tourniquet was tightened until the flow of blood coming from his leg and the area of the bullet wound had ceased.

I then asked Sgt Blackwell to start setting up and ensure there was a corridor on the route to the hospital for the two officers.

I then helped remove Officer Meaths duty belt and equipment, and asked Officer Hilbo to cut the pant leg off of Officer Meaths right leg to get a better look at the wound, and check for an exit wound, or other injuries in that area. None were located after the secondary sweep of the area, and at this time, Fire/Rescue arrived, and took over primary care for Officer Meath.

I was advised of the the route being set for the ambulance, and took charge of the leading squads to escort the ambulance to HCMC. I had Officer Collier get our squad ready and positioned for the escort to the hospital.

Once the ambulance arrived, and Officer Meath was loaded onto the rig for transport, we then escorted that ambulance with Officer Collier driving to HCMC. Upon arrival, I accompanied Officer Meath into the STAB room, and stayed with Officer Meath until relieved by SGT Peterson.

**END of Supplement 82**

---

| Supplement number: | 83 | CCN: MP-13-143872 | Author: | 004898 - Ann Kjos |
|---|---|---|---|---|

---

Supplement of Sgt A.Kjos #004898 on 05/14/2013 16:15
STATEMENT OF OFFICER PETERSON, BADGE 5630, ON 5/14/13
CCN 13-143872
TYPED BY LM

Q: I want to make it clear to you that this is a voluntary statement. This is a criminal investigation into the recent incident you were involved in. The Minneapolis Police Department Homicide Unit is conducting this investigation and the information gathered will be presented to the Hennepin County Attorney. The county attorney may and usually does present matters such as this to the grand jury. The grand jury determines whether or not criminal charges are justified under the law. Your decision to or not to provide a statement will not and cannot be used against you in any employment matter. Do you understand what I have just explained to you?
A: Yes.

Q: Officer PETERSON, can you tell us how long you have been employed with the Minneapolis Police Department?
A: Since 6/14/99.

Q: Prior to working for Minneapolis PD, did you work for any other police agency(s)?
A: No.

Q: Are you currently a member of the MPD SWAT and if so, were you working in that capacity on May 10th, 2013?
A: Yes I am and I was working on that day.

Q: What was your assignment/call sign that day and who were you working with?
A: Our assignment was our on-duty MPD SWAT Team Call sign 1280 and I was working with Sgt. STENDER, Officer DURAND, Officer VALENCIA, Officer MURO, Officer STAUFENBERG, Officer MEATH, and Officer LAUX.

Q: Can you describe the uniform you were wearing that day and the type of weapon you had both on your duty belt and available to you in your police vehicle (1280 van)?
A: I was wearing my MPD full uniform consisting of my blue short-sleeve uniform shirt, blue BDU pants, black uniform boots, and a tactical duty belt with a drop leg holster, radio, handcuffs, and spare magazines. My handgun is a Sig Sauer P226 9mm TAC OPS that I was wearing on my duty belt. The additional weapons that I had available to me inside of the 1280 van were an M4 rifle, MP5 submachine gun, Avon shotgun, and additional ammunition for those weapons.

Q: How many bullets do you keep in your weapon? Please include both the magazine and if there was a bullet chambered into the gun.
A: My handgun was loaded with a 20-round magazine and an additional bullet in the chamber and I had two spare 20-round magazines on my duty belt. For my M4 rifle I have three magazines loaded with 28 rounds but this weapon is kept unloaded inside of the van until it is needed. For my MP5 submachine gun it has three magazines loaded with 28 rounds and is also kept unloaded. The Avon shotgun is not loaded and remains in the van.

Q: Do you regularly qualify with the weapons you are assigned?
A: Yes. Not only do I qualify through the MPD range for my handgun, but I also qualify with each individual weapon regularly and my recent qualifications for all of my listed weapons was conducted on April 29, 2013.

Lathrop Decl. Ex. 6

Q: On May 10th at about 1430 hours did you and members of your 1280 team assist with the search of the area surrounding W 27th St and Bryant Av S, Mpls?
A: Yes.

Q: Can you explain what or who you were searching for, was this person wanted for a specific reason and if you knew a description of the person you were searching for?
A: My 1280 team was at the ERU garage when I overheard radio transmissions involving a flee which was taking place in the 5th Pct. Specific details that I had heard was that a 911 caller had recognized the suspect who had burglarized his home in a vehicle that was parked outside in a PT Cruiser. A short time later I overheard that this PT Cruiser was fleeing from Squad 502 and the suspect had rammed a marked MPD squad car with this vehicle. I then heard that the suspect had fled on foot from the vehicle and entered a business near 27th and Lyndale Avenue South, which was described to be a bike shop. The suspect was described as a black male with long dreadlocks, wearing red pants. By this time the 1280 team had begun to respond to the area. While listening to the radio traffic, a foot chase had now begun with the suspect as well. Our 1280 supervisor, Sgt. STENDER, had been patrolling in his own squad car with his K9 partner NASH and was on scene assisting in locating the suspect. Officers involved in the foot chase had lost the suspect in the area of 27th and Aldrich and Sgt. STENDER requested 1280's assistance at this location. Our 1280 team arrived to assist and began a yard to yard search for the suspect within a perimeter that officers had established in an attempt to apprehend him. At this time I was approached by an unknown male who had surveillance photographs that were in color of the suspect we were looking for. It showed a medium complected black male with dreadlocks and red pants.

Q: At some point, did you learn a homeowner of a house within the perimeter you are searching came home to discover his house had been broken into and if so, what did you do?
A: Yes I did. Our team had just concluded searching the 2700 block of Bryant Avenue South and were working on the Colfax Avenue side of this block when an officer aired that a homeowner had found his back door broken into and gave the address of 2717 Bryant Avenue South. I was directly across the street from this address with Sgt. STENDER and his K9 partner NASH along with Officer MURO. The three of us immediately responded to this address.

Q: What did you find when you arrived at that address?
A: Upon entering the back porch of this address, I observed that a single glass pane window had been punched and was broken with the glass on the inside of the residence. The door appeared to have been closed but I could see that it had been forced open and the lock mechanism was lying on the floor. At this time it was apparent to me that the homeowner was indeed a victim of a burglary and I requested to meet with the homeowner via my portable radio to speak with him.

Q: What did your conversation with the homeowner consist of?
A: I met with the homeowner and I asked him several questions. I asked him if anyone was supposed to be inside of his house, to which he replied no. I asked him if anyone had permission to be in his home, and he replied no. I asked the homeowner if he had secured his back door when he left and if it had been broken previously, to which he replied no it was locked. I asked him if he had any pets, to which he replied that he had a cat that was loose in the home. I informed him that he was a victim of a burglary and that we were going to utilize a K9 dog to assist us in searching for a possible suspect. The burglary victim and homeowner told me, "Okay, just don't hurt the cat."

Q: What did you do next?
A: I remember airing to officers that it was indeed an actual burglary and I joined the members of my 1280 team that had positioned themselves at the back door of the victim's residence at 2717 Bryant Avenue South. This team consisted of myself, Officer MURO, Officer MEATH, Officer DURAND, and Sgt. STENDER and his K9 partner NASH. Once our team was back together, the door was pushed open and Sgt. STENDER began to scream announcements into the back door of the home. These announcements consisted of "Minneapolis Police", "K9 Unit." He also stated that the suspect should come out with his hands up or he was going to be hurt. It should be noted that while we worked as a team inside, Sgt. STENDER repeatedly continued with this announcement as we entered rooms and changed levels within the home.

Q: At some point do you enter the home to search and if so what is each team member's function?
A: Yes we did. Systematically we entered the home and as a group searched the main level first. At Sgt. STENDER's direction, he placed Officer DURAND at the stairwell leading into the basement to hold the basement as we progressed upstairs. My role in the search was that of a close cover officer while Sgt. STENDER handled his K9 partner NASH. We checked upstairs as well but were not able to locate the suspect and I observed that K9 NASH was not indicating on the presence of any suspect. As we checked the main and upper level, I specifically removed bags of clothing and other furniture from potential hiding spots that included beds, dressers, closets, and other small rooms as the house was very large. This was done to confirm that the K9 had not missed the suspect on the first two levels.

Q: At this point are you satisfied that you thoroughly searched these two levels and proceed to the basement?
A: Yes.

Q: Do you have a conversation with Officer DURAND prior to searching the basement?

Lathrop Decl. Ex. 6

A: Yes I did. Officer DURAND, who had been holding on the basement, whispered to me that, "He's down there." Officer DURAND further whispered to me that he had heard the suspect moving stuff around. At this time I asked him if it was the cat and he did not have a chance to reply as the cat came running by us and proceeded to crash down into the basement. This confirmed to me that Officer DURAND had indeed heard the burglary suspect in the basement.

Q: What happened next?
A: Sgt. STENDER began to announce yet again our presence and purpose on scene, which consisted of Minneapolis Police K9 hollering downstairs that you're under arrest that we knew the suspect was down there and to come up. Sgt. STENDER reiterated this by hollering into the basement multiple times before we went down to find him. Then we listened and waited, giving the suspect ample time to either verbalize with us or present himself for arrest. I estimate that this time period was no less than 30 to 40 seconds. At this time, Sgt. STENDER and his K9 partner, along with Officer DURAND and myself cleared the stairwell and entered into the basement. Sgt. STENDER was first into the basement and allowed his K9 partner NASH to begin to search as he had done in the previous levels of the home. At this time I hear a commotion coming from my right side as I was holding left which would face east into the basement. This commotion consisted of K9 NASH chasing the cat, which caused me to look and see that K9 NASH had the cat in his mouth. Sgt. STENDER gave a simple direction to his K9 partner and the dog released the cat and the cat fled back upstairs.

Q: So once the cat was out of the basement, was Sgt. STENDER and the rest of your team able to do a more thorough search?
A: Yes. Sgt. STENDER had encountered a large basement and called for a "trailer," which is a SWAT term that means additional officers are needed to assist. At this time, Officers MURO and MEATH joined us in the basement. A thorough systematic search then began for the suspect.

Q: While in the basement can you describe the lighting situation and the layout of this basement?
A: The basement at the bottom of the stairs opened both left and right. I do not know what the right consisted of, but the left side led into a small laundry room and also had a small utility closet. The basement was dark and the only light we had was from the natural light coming into the basement from the open stairwell along with flashlights individual officers had.

Q: At some point did Sgt. STENDER clear the right side of the basement and come to your position?
A: Yes. Sgt. STENDER and his K9 partner met me on the east side of the home and we entered into a room that I can best describe as a laundry room. At this time I again was a cover officer for Sgt. STENDER, and Sgt. STENDER with the assistance of his K9 partner began to search this laundry room. While watching the pair work, I was utilizing the flashlight mounted on my handgun to illuminate the area and assist Sgt. STENDER in seeing. While doing this, I observed that K9 NASH put his head up in the air and for the first time it was obvious he was indicating on scent. K9 NASH then put his nose up against the wall that separated the laundry room from the utility closet. K9 NASH then immediately exited the laundry room and then entered into the small utility closet. As I watched K9 NASH, it was apparent that he could not get inside of this closet because it was stacked with clutter. Sgt. STENDER then got into this small space and began to hand things out to us to get out of the way. These items consisted of Styrofoam boxes and a heavy wooden door.

Q: What happened next?
A: K9 NASH got behind a water heater and I could tell that Sgt. STENDER had encountered the suspect. Still utilizing my mounted flashlight on my handgun, I observed the suspect's head above the water heater. When I observed the suspect's head, I knew immediately that it was the suspect involved in the flee from the photograph that was shown to me earlier. I also could tell that K9 NASH was biting him.

Q: Was K9 NASH able to pull the suspect out from behind the water heater?
A: No. The suspect simply stood there and would not come out. Sgt. STENDER was screaming at the suspect telling him, "Show me your hands, show me your hands!" As I was watching the suspect's face and eyes, I could tell that he appeared immune to pain from the dog bite and was not phased by our presence or commands. He appeared almost vacant during this intense confrontation.

Q: Where is Officer DURAND when you encountered the suspect in this utility room?
A: Officer DURAND was on my right side and because of my position I had forced him to step into the laundry room because of the close quarters we were dealing with.

Q: What happened next?
A: Due to Sgt. STENDER's continued commands to have the suspect show us his hands and his non-compliance with those directions, Sgt. STENDER punched the suspect in the face very hard. I watched in amazement as the suspect appeared to have no reaction to this strike and stood there as if he did not feel it. Sgt. STENDER then struck the suspect in the face with his flashlight while continuing to yell show us your hands. I watched again as the suspect felt no pain and it appeared that this strike did nothing but cause him to start bleeding from his face. While Sgt. STENDER was doing this, I could hear K9 NASH growling and knew he was biting the suspect, but the suspect was immune to this as well. At this time I holstered my handgun and watched through dim lighting as Sgt. STENDER approached and grabbed the suspect by his head and tried to pull him out of this small space. Officer MEATH also was assisting Sgt. STENDER by attempting to pull him out as well. I could see that the

Lathrop Decl. Ex. 6

suspect freed himself from a long-sleeved shirt or jacket he was wearing. When he was free of this long-sleeved clothing item, I heard an officer begin to yell, "What are you grabbing at, you grabbing my gun?" I remember this being a frantic question. Then the suspect started to wildly throw punches as he drove himself out of this utility closet with his head down. The suspect punched me in the side of the face with a wild swing, which caused my sunglasses that were on top of my head to fly off. The suspect was charging at me with his head down like a bull and hit me full force, knocking me into the wall. At this time I remember attempting to control his head by grabbing it and wrapping his long dreadlocks in my fingers. I then attempted to pull him down to the ground, but he began to thrash his head left and right to free himself from my grasp. All of a sudden the suspect was free from my grasp and I remember looking and seeing his hair that had been ripped from his head in my hands. The suspect then hit Officer DURAND, who was to my right and the suspect's left. The suspect struck him like a football player tackles someone with their head down. I remember seeing the suspect take Officer DURAND off his feet and he drove him into the darkness of the laundry room.

Q: What did you hear next?
A: I heard a loud collision with what I knew to be the dryer. It sounded like a loud metal bang that had been caused by the force of an impact. I knew that it was the dryer because I had remembered the layout of the room and knew that the dryer was on the northeast side of the laundry room. I entered the dark room and tried to locate both Officer DURAND and the suspect.

Q: Could you hear Officer DURAND and the suspect wrestling around?
A: I don't hear the fight that had ensued but I did hear Officer MURO begin to scream that he had been shot. I also remember hearing Officer MEATH screaming that he had been shot as well.

Q: When these officers were shot, where were they in relation to you?
A: Officer MURO was directly behind me and I knew this from his initial screams. Officer MEATH was to my left and slightly behind me as I could hear his screaming as well.

Q: Did you hear any gunshots or see a muzzle flash just prior to Officers MEATH and MURO screaming that they had been shot?
A: No, I can't remember hearing the shots or muzzle flash, but I do remember hearing Officer DURAND yelling that the suspect had a gun.

Q: Do you remember specifically what Officer DURAND was yelling?
A: Yes. Officer DURAND was yelling, "He's got a gun, he's got a gun."

Q: At this point had you yet been able to locate Officer DURAND?
A: No, it was complete darkness, but I knew the general area that he had been tackled into by the suspect and closed the distance into this area. At this point a flashlight turned on and I realized that it was the flashlight from Officer DURAND's MP5 submachine gun. This flashlight was mounted on the weapon and backlit both Officer DURAND and the suspect. When the light turned on, the light beam was around my waistline of my gun belt. I could see that the suspect was on Officer DURAND's right side and Officer DURAND appeared to have been pinned down by the suspect and even though the suspect was not on top of Officer DURAND, I remember recognizing that the suspect had control of him. When this flashlight turned on, I remember seeing it travel up my uniform shirt and it began to track upward towards my head.

Q: Who has control of the MP5?
A: Officer DURAND had the MP5 and it was attached to him by his one point sling; however, the suspect was in control of the pistol grip of the submachine gun with his hand. The suspect was using the sling as a fulcrum on Officer DURAND's body.

Q: What happened next?

A: I recognized that the suspect was scanning the room and I could tell due to the flashlight beam on me that the gun was coming up high. I knew the suspect was trying to find a target. At this time I remember feeling that I was going to get shot in the head and knew due to the close proximity that officers around me would be hit high as well. I knew from seeing the suspect's eyes that he was actually aiming at us using the flashlight that had turned on to his advantage. The suspect was using this flashlight that had turned on to find an officer to shoot at. I recognized that Officer DURAND knew the gun was also traveling high and he was physically forcing down the muzzle.

Q: Knowing that two officers had been shot, what did you do next?
A: The suspect was going to continue to shoot at us so I collapsed into the submachine gun. I did this because my brain told me to trap the barrel of the gun with my bullet proof vest. I instinctively knew I would survive gunshot rounds to my vest and I also knew that by doing this it would prevent officers behind me from taking additional gunshots. I used myself and vest essentially as a body bunker for the officers behind me and to prevent the suspect from shooting me in the head.

Q: What happened next?
A: I could feel the submachine gun being worked by the suspect against my body weight, so I reached out in the darkness and felt for his head. I needed to do this because the light was either trapped by my body or had shut off. The barrel of the

Lathrop Decl. Ex. 6

submachine gun was still trapped by my midsection and I could feel that the suspect was still trying to work the weapon and was in control of it. I remember feeling the dreadlocks in the suspect's hair again and knew in the darkness where he was at. I also knew that Officer DURAND was close to the suspect's head so I brought my handgun close to me and at a different angle as to not shoot Officer DURAND. I knew that I had to kill the suspect to prevent getting shot so I shot him.

Q: Do you know how many times you fired your weapon at the suspect?
A: I believe I shot two to four times.

Q: Did you hear any other gunshots at this time?
A: From my left side I did not hear gunshots, but I could feel the explosion of a firearm. I remember flinching from this and remembering that it was Officer MEATH that was to my left shooting the suspect.

Q: Did these gunshots that you believe came from Officer MEATH's gun come at the same time as you were firing your weapon?
A: Absolutely. Officer MEATH's shots were in such close succession to mine that I believe that is why I did not hear the gunshots.

Q: Do you remember removing your handgun from your holster before shooting the suspect?
A: No I don't remember. I just remember collapsing on the submachine gun to prevent my death. My gun was in my hand, I located the suspect in the dark, and shot.

Q: From the time you entered the laundry room after the suspect tackled Officer DURAND to the time the suspect was shot, how much time do you think passed.
A: It seems like it lasted 20 minutes; however, from the officers being shot to the flashlight coming on and the suspect aiming at us to eventually him dying was no longer than seconds.

Q: When you collapsed your body weight trapping the barrel of the MP5 against your vest, do you recall if you fell to your knees, or were you fully erect or somewhere in between?
A: It was almost as if the gun held me up. The suspect had control of the MP5 but his control of it did not allow me to fall on the ground. If I can explain it any way, it would be as if someone held a straight arm up and someone leaned into it and it keeps you upright. My position was that of a crouch and I feel as if I was almost hovering above Officer DURAND.

Q: After shooting the suspect, did this stop the threat?
A: Absolutely. I recognized immediately from the collapse of the MP5 against my body weight that there was no longer a fight or a threat.

Q: What did you do next?
A: As soon as the threat to our lives was over, I knew that officers had been shot, potentially fatally, and I went to help those officers. Officer MEATH handed me his tourniquet. It was dark in the room but I knew it to be a tourniquet due to the reflective red tab that is part of the material. It should be noted that I am starting to gain some "night vision" at this point as well. Officer MEATH said, "LUKE, get it on," and then something to the effect of where the injury was located, which I knew to be in the upper right thigh. I could tell that Officer MEATH had collapsed to the ground. In the dark I began to feel Officer MEATH's right leg and worked from his knee towards his groin until I found what I knew to be blood spurting on my hand. I then applied a great deal of pressure to this wound and could feel the blood seeping through my fingers as it flowed from the gunshot wound. Just due to the blood, I knew the injury was severe. I managed to open the tourniquet and slide it under his leg and began to yell for light. Officer DURAND then used a flashlight to illuminate the injury to Officer MEATH. I was then able to loop the strap and began to cinch the tourniquet down. I used my right hand to feel in the dark for Officer MEATH's penis and worked the tourniquet to that point as I knew that it was high enough on his groin to stop the flow of blood. This was done with Officer DURAND's assistance, who was extremely calming, instructive, reassuring, and gave direction to me on when the tourniquet was in the right place by telling me it's high enough. I then straddled Officer MEATH and remember pulling and cinching the tourniquet as hard as I could around his upper thigh. Again, with Officer DURAND's calming assistance and continued direction, he instructed me to finish strapping the tourniquet under Officer MEATH's leg and then I twisted the twisting device on the tourniquet, tightening it further. I then began to feel for the wound and recognized that it was no longer bleeding or spurting blood. At this point I knew that Officer DURAND and I had successfully applied the tourniquet. During the application of the tourniquet I remember feeling very emotional and scared. I felt as if Officer MEATH would die. I was almost panicked and was yelling for an ambulance and Officer DURAND assured me several times that one was on the way.

Q: What happens after you get the tourniquet applied to Officer MEATH's leg?
A: I began to drag Officer MEATH out of the room and towards where I knew the stairwell to be; however, when we got to the opening of the laundry room I realized that the door was shut, blocking out any light source. Officer DURAND opened this door and immediately I could see. Officer DURAND and I then attempted to pick Officer MEATH up but he began to scream in pain, so instead the two of us half dragged half carried Officer MEATH up the stairwell and out of the house.

Q: Did Officer MEATH remain conscious?

Lathrop Decl. Ex. 6

A: When Officer MEATH was out of the house, I carried him in my arms to the front lawn and laid him on his back. At this time, Officer MEATH was still conscious and complained of pain in his stomach. I had to put his leg on my shoulder to elevate it and began to take his gun belt off. Once the gun belt was removed, Officer DURAND ripped open his shirt and removed his bullet proof vest and I began to pat him down as I had done in the basement checking for additional gunshot wounds. I then held Officer MEATH's hand and Officer MEATH appeared to slip in and out of consciousness.

Q: At some point was Officer MEATH placed in an ambulance?
A: Yes. Sgt. STENDER and I carried Officer MEATH via a portable backboard to an arriving ambulance where he was secured on their cart and placed in the back of the ambulance. I stayed with him at the ambulance until I was relieved.

Q: What happens next?
A: I went to check on the suspect in the basement and observed that he had massive head trauma and was deceased. I went upstairs and realized that I was covered in blood. I had it on my hands, arms, uniform, face, and hair. I went to the burglary victim's kitchen sink and began to wash stuff out of my hair and off of my face. I was instructed by someone to cease washing myself for evidentiary purposes.

Q: At this point were you assigned an escort supervisor?
A: Yes, Sgt. STENDER had paired me with Sgt. MANTY. I stayed with Sgt. MANTY and he transported me to Room 100. At Room 100 I was photographed by MPD Crime Lab personnel along with blood swabbing. They also recovered my firearm, uniform shirt, and uniform pants. I gave a blood sample and urine test in Room 100.

Q: Was it ever established that you sustained any injuries during this event?
A: Yes. While in Room 100 I felt a sharp pain below my belly button and below my bullet proof vest. It felt as if I had been jabbed with something blunt. I was checked by Sgt. STENDER with the thought that I had been shot in my vest, but I had not and the injury appeared to not show any bruising at this time. At this current time I have a rash that has developed on my upper left leg where the blood had soaked into my uniform pants.

Q: Can you think of anything that I may not have asked you that you feel may be pertinent to this investigation?
A: Not at this time.

Q: To the best of your knowledge, is this a true and accurate statement?
A: Yes.


_____

Officer Peterson


_____

Witness

**END of Supplement 83**

---

**Supplement number:**   **84**   **CCN: MP-13-143872**   **Author:**   **999916 - Geoffrey Wyatt**

---

Supplement of Off G.Wyatt #999916 on 05/14/2013 17:55
Statement of MTPD Officer G. Wyatt badge #65055

While officers were on routine patrol, they overheard on MPD channel 3 that 5th Pct squads were in pursuit of a vehicle that had just struck an occupied MPD squad car. Officer Degree and I did not respond to the pursuit, but continued to monitor the radio traffic. Officers were driving "routine" SB on Chicago near Franklin Ave - the south side of our patrol area and turned WB on 26th St. Since I was FTO'ing Officer Degree who is a part time officer and who does not work for MPD, I wanted to get him some exposure to MPD's radio traffic and get him familiar with how MPD handles calls.

Shortly after officers turned WB on 26th, MTPD dispatch sent a call of an assault to MTPD squad 140 at 10th and Hennepin. Myself and MTPD Officer Degree advised dispatch that we would back MTPD squad 140. Since Park Ave is closed at Hwy 94, I elected to continue WB on 26th with the intent to go north on Nicollet Ave to back up Sqd. 140.

While enroute to back sqd. 140, Officer Ayers, he advised that he had arrived and that the suspects were GOA. As Officer Ayers was arriving and advising dispatch, MPD officers aired that they had located the vehicle at 27th and Harriet Ave and that officers were in a foot chase with the suspect WB 27th crossing Lyndale Ave S and were requesting additional squads to assist. I got on MTPD main channel and acknowledged 140's report of GOA and then advised dispatch that we would be assisting MPD. At this time, Officer Degree and myself were close by, so we drove to Colfax and 27th and headed south on Colfax to get ahead of the suspect.

Lathrop Decl. Ex. 6

Officer Degree and I took up a perimeter position in the alley on 28th St, Colfax - Bryant and held the position while MPD Squad 1280 and 908, Sgt. Stender, searched the houses 27th - 28th / Bryant - Aldrich. As MPD Squad 908 aired that perimeter units Bryant - Aldrich could secure, another officer got on the air and advised that the homeowner of 2717 Bryant Ave S had arrived home and located the rear door window had been broken out leading him to believe that a burglary had occurred. I noted that while 908 had been searching with his K-9, he aired that the K-9 had strongly indicated in the alley near that residence.

Sqd. 908 got on MPD channel 3 and requested officers assist him in setting up a perimeter around this house. At this time, 1280 units were already on foot in the alley that Officer Degree and I were watching, so we cleared from our perimeter to assist Sqd. 908. Upon arrival at the address, we were the first or second squad to arrive to assist 908. Sqd. 908 requested that Officer Degree and I cover the front of the house while he and 1280 units checked inside the house.

While holding the perimeter from the street, I heard on MPD channel 3 that they had shots fired inside the house and that there were officers hit. I grabbed the active shooter bag from our squad to get a tourniquet for the injured officers. One officer already had a tourniquet and applied it to Officer Muro, so I went to check on Officer Meath who was being carried up the stairs with a gunshot wound to his right leg. I assisted other officers in carrying Officer Meath up the stairs. Once outside I applied the tourniquet to Officer Meath's leg and stayed with him in the front yard until medics arrived to take over care of Officer Meath.

After both officers were taken by ambulance, Officer Degree and I spoke with Sgt. Stender who advised us that we were clear to leave the area and requested that we add supplements to the report. At this time, I notified MTPD Sgt. Raymond of the incident and what had happened.

MTPD CCN: 13-6439
MPD CCN: 13-143778
13-143872

**END of Supplement 84**

| Supplement number: | 85 | CCN: MP-13-143872 | Author: | 999916 - Geoffrey Wyatt |
|---|---|---|---|---|

Supplement of Off G.Wyatt #999916 on 05/14/2013 17:57
Uploaded for Officer C. Degree - MTPD

Statement of MTPD Officer C. Degree badge #73152

Transit Squad 159 (Wyatt/DeGree) was monitoring MPD radio traffic regarding a vehicle pursuit of a dark blue PT Cruiser near the area of 28th and Lyndale. The vehicle was reported to have struck an MPD squad car.
We continued to monitor this event as a radio report regarding the suspects left the vehicle, near the area of 27th and Harriet and fled on foot west from this location.

We were within close proximity to this event and took up an empty spot on the perimeter near 28th and Bryant at the mouth of the alley. We stood by this location and continued coverage of this area as MPD SWAT and K9 conducted a yard to yard search east of our location.

We monitored a call from MPD dispatch stating a male caller came home and found a broken rear window to his house and the homeowner had not been through the house. This location was reported as 2717 S. Bryant AVE and was within the perimeter area. This location was very close to our perimeter location. We also monitored requests from MPD SWAT and K9 for an officer to cover the front of the house.

We arrived at 2717 S. Bryant AVE and found there were no officers covering the front of the house. Officer Wyatt and I took up positions on the front side of the house and monitored as SWAT and K9 made entry into the house. At the time we arrived Officer Wyatt and I were the only two officers covering this side of the house.

I was on the northwest corner of the house and could hear the K9 officer making loud and clear verbal announcements announcing his presence and requesting anyone inside the house to come out. As I was watching my corner the homeowner indicated to me there should be nobody else in the house. The homeowner did indicate there was a cat in the residence. I told the homeowner to wait at the neighbor's house.

I continued to take up my position for several minutes until I heard loud yelling which sounded muffled. From my training and experience it sounded as if officers were making contact with a suspect. I moved to the west side of the house near their point of entry. I then heard what through my training and experience sounded like two gunshots followed by several more gunshots.

Lathrop Decl. Ex. 6

This was followed by more yelling. I was now at the back step to the house, the west side, with one other officer from Minneapolis and a Department of Corrections Agent Dave Shieble from their fugitive apprehension unit.

I went to the basement and discovered Officer Muro at the base of the basement stairs. This staircase was located on the north side of the house near the middle of the house. I could see Officer Muro was limping and indicated to me he had been shot in his leg. I could see a hole in Officer Muro's right pant leg near the upper part of his thigh had a hole in it. The hole was high on his right thigh and close to his pelvis area. The area around the hole was blood soaked. One of the officers on scene handed me a tourniquet and I applied the tourniquet above Officer Muro's wound. Officer Muro appeared to be in a great deal of pain. As we prepared Officer Muro to move, other officers in the basement indicated there was a second officers who had been shot.

I then assisted with carrying Officer Muro out of the house through a north door at the top of the basement stairs and out to the street. Once out in the street we started to remove his duty belt and cut his pants off to expose the wound. HCMC medics arrived and began to treat Officer Muro.

I gave my information to an MPD officer for the crime scene log; we cleared the scene a short time later.

**END of Supplement 85**

---

| | | | | |
|---|---|---|---|---|
| **Supplement number:** | **86** | **CCN: MP-13-143872** | **Author:** | **002429 - Charles Green IV** |

---

Supplement of Sgt C.Green IV #002429 on 05/14/2013 19:41
710 RESPONSE RE: CCN 13-143872

On 5/10/2013, I was assigned as a Sergeant Investigator in the Minneapolis Police Department Criminal Investigation Division Homicide Unit. In this capacity, my duties include, but are not limited to, planning and execution of investigations involving murders, suspicious deaths, stranger kidnappings and critical incidents.

On 5/10/2013, I was working my office duties in the Minneapolis Police Department Homicide Unit, when I learned of an Officer Involved Shooting incident that was occurring on Bryant Avenue South, in Minneapolis, Hennepin County. (Reference Minneapolis Police Department Incident Detail Report 13-143872). I proceeded to the location of the shooting with Sergeant Kjos and Sergeant Porras, to assist them with Crime Scene responsibilities.

On 5/10/2013, at approximately 1550 hours, I arrived at the north end of the 2700 block Bryant Avenue South; a residential area located in South Minneapolis. Upon arriving inside the perimeter, I provided Officer Becker with my name and badge number for the Minneapolis Police Department Crime Scene Entry Log. I observed multiple Minneapolis Police Department marked squads were in the area and yellow crime scene tape was used to establish a large perimeter around the streets and alleys surrounding the 2700 block of Bryant Avenue South. As I approached mid-block, the 2700 Block of Bryant Avenue South, I observed that there was additional yellow crime scene tape establishing an inner perimeter around 2717 Bryant Avenue South, with multiple Uniformed Patrol Offices and Plain Clothes Officers providing scene security.

I received initial information that the scene of the Officer Involved Shooting was primarily contained in the basement of 2717 Bryant Avenue South, where a deceased male, whose identity was not known at the time, was still in the basement of the address. I entered the residence through the north exterior doorway, providing Officer Hubert my name and badge number for the Minneapolis Police Department Crime Scene Entry Log for the interior of the residence.

Once inside the residence I observed uniformed officers maintaining interior scene security on the first floor and in the basement. I conducted an initial walk-through of the basement area, where I observed the deceased in a laundry room area located in the north east corner of the basement. When Sergeant Thomsen arrived at the scene to assist, we conducted another walk-through of the exterior and interior of the residence, to include the basement area. It was determined that I would document the exterior of the residence and the interior 1st and 2nd floors of the residence. Sergeant Thomsen would document the interior basement of the residence. (See Supplement "SCENE REPORT - BASEMENT BY SGT THOMSEN" for complete information).

EXTERIOR - STRUCTURE
I observed 2717 Bryant Avenue South to be a west facing residential single family structure located approximately mid-block on the east side of the 2700 block of Bryant Avenue South. The structure faces Bryant Avenue South. To the north of 2700 block of Bryant Avenue South is a single family residential structure, identified as 2715 Bryant Avenue South, and to the south of the 2700 block of Bryant Avenue South is a residential structure, identified as 2721 Bryant Avenue South; it is not known if 2721 Bryant Avenue South is a single-family or multi-family structure.
2717 Bryant Avenue has a dark green exterior, light green colored trim, and an exterior red/maroon front wood/screen/glass porch door, which from outside opens outward left to right. The porch door opens into a furnished porch area that runs along the west side of the house. Inside the porch is an exterior door, which from outside opens outward, left to right, into a small vestibule area, and then an interior door, which from the inside opens inward, left to right. Along the north side of the structure, at ground level, is an exterior wood /6 glass panel door, which from outside opens outward, left to right, and an interior

Lathrop Decl. Ex. 6

wood/multi-panel glass door with deadbolt, which from the outside opens inward, right to left.

EXTERIOR - FRONT/WEST YARD
The front/west yard of the property runs parallel to the north-south City sidewalk, the front/west yard is vertically elevated from the sidewalk, and the front/west yard is retained with wood timbers that run along the front/west yard side of the property. The front/west yard is accessed by steps that lead from the City sidewalk to a front sidewalk that both leads to the front/west steps of the structure and along the north side of the structure to the backyard area.
Minneapolis Police Department Crime Lab personnel identified items in the front/west yard that were marked as evidence and documented. (See Minneapolis Police Department Crime Lab supplements for complete details)

EXTERIOR - SIDE/NORTH YARD
The north side of the structure affords little area between 2717 Bryant Avenue South and 2715 Bryant Avenue South. The north side of the structure is separated from the backyard by a non-locking swinging metal/wire gate that allows/excludes access between the backyard and north side of the structure.

EXTERIOR - BACK/EAST YARD
The backyard of the structure has an established perimeter on the north, east, and south sides of the backyard. The north perimeter, separating the property from 2715 Bryant Avenue South, is established by a ? 3' high metal/wire fence that extends ? ½ the north perimeter, where the metal/wire fence terminates, and a ? 6' high wood/lumber fence continues the perimeter to the northwest corner of the garage structure, which is located in the northeast corner of the backyard.

The north side of the garage is adjacent to the property at 2715 Bryant Avenue South. The east side of the garage structure parallels the north-south alley, 2700 block Aldrich-Bryant Avenue South. The south side of the garage structure has a small window and a closed roll up garage door which opens onto a driveway apron which covers the southeast corner of the backyard and parallels the north-south alley, the west side of the garage had a closed service door near southwest corner.

At the southwest corner of the garage structure is a non-locking swinging metal/wire gate that allows/excludes access between the driveway apron and the backyard. Continuing from the gate is a ? 4' wood picket fence that extends ? ½ the east side of the backyard, separating the backyard from the driveway apron, and continues along the south side of the backyard, separating the property from the property of 2721 Bryant Avenue South. At the south west corner of the backyard, the ? 4' wood picket turns a right angle and connects to the southeast corner of the residential structure.

EXTERIOR - SCREEN PORCH
Affixed to the east side of the structure is an elevated screened porch area that is accessed from the backyard by a set of wood steps that lead to a non-secured screen door, which from the outside opens inward, right to left. The porch area was furnished with furniture and other property. Inside the porch area, on the east side of the residential structure, near the north east corner, and across from the porch door, is an exterior aluminum/glass door. This door has a lock, but was not secured. The door from the outside opens outward, left to right.

Inside the aluminum/glass door is a wood/ ? 3'x2' glass pane interior door, which from the outside opens inward left to right. The interior wood/ ? 3'x2" glass pane door, leading in the kitchen area, was standing completely open and there appeared to be damage to the glass panel, the wood door near the dead bolt, the deadbolt assembly, and the door jamb near the dead bolt striker plate. There were wood pieces, glass pieces, and door lock hardware on the interior floor of the kitchen. There was broken glass on the bottom door jamb, and outside the entryway on the porch floor.

Minneapolis Police Department Crime Lab Personnel were shown the damaged rear interior door and door lock, to be documented as evidence.

INTERIOR - KITCHEN
Through the interior wood/ ? 3'x2" glass pane door, is a kitchen area on the first floor, north east corner of the structure. Just inside the aforementioned door was a cart with a butcher block top. Lying on top of the butcher block top were two large butcher knives with black handles and stainless steel blades. On the kitchen floor, to the left of the rear door, in front of the dining room doorway, was a multi-colored piece of clothing.

I learned from Sergeant Thomsen that he had spoken with the homeowner, Jim Bickal, who had conferred with his wife, that the butcher knives on the butcher block cart belonged to them, and are kept in a drawer by the backdoor. Neither he nor his wife left the knives out as they were found at the scene. I checked the kitchen drawer that Jim referred to where the knives are stored. I observed that the drawer was slightly ajar from the other drawers.

The Minneapolis Police Department Crime Lab was advised of the knives, drawer where the knives were stored, and the multi-colored piece of clothing as potential pieces of evidence. (See Minneapolis Police Department Crime Lab supplements for complete details)

Upon documenting and processing the aforementioned items, the kitchen drawer was opened and there were several other

Lathrop Decl. Ex. 6

knives stored together in a knife organizer. The knives in the organizer appeared to match the knives found on the butcher block cart. Additionally, there were two open slotted positions in the knife organizer that did not have knives. I directed the Minneapolis Police Department Crime Lab Personnel to secure the two knives on the butcher block counter as evidence. (See Minneapolis Police Department Crime Lab supplements for complete details)

INTERIOR - FIRST FLOOR
On the first floor, south east corner, of the structure is a furnished dining room. In the southwest corner is a furnished living room. In the northeast corner is a furnished office room with a closet. Between the furnished office room and the kitchen are 2 flights of stairs ascending to the second floor. In the center of the 1st floor is an east-west hallway that separates the living room from the office room and the ascending staircase, and leads to the front/west door. There is a short north-south hallway that extends from the center hallway to the north side of the house, separating the stairway from the kitchen area. The north-south hallway allows access to a descending stairway, 3 steps to a landing, in front of the north door. The landing is at the top of a set of stairs descending into the basement.

There were containers of recycling strewn on the hallway floor near the bottom of the ascending stairway. I learned from Officer T. Gorman that the items had been in front of the north door, and quickly moved so officers could quickly egress the north doors. (See supplement of Officer T. Gorman for details)

INTERIOR - SECOND FLOOR
Ascending the staircase to the second floor, in the north east corner is a there is a full bathroom with a closet. In the southeast corner there is a furnished bedroom with a closet, on the west side of second floor is a furnished master bedroom with a large walk in closet in the south west corner. There is a small furnished room, with a closet, on the south side of the second floor, between the south east corner room and the master bedroom.

ADDITIONAL SCENE INFORMATION
Lieutenant J. Kelly provided information that he received information from Walter Louis Franklin, dob ███ 1973, that Mr. Franklin believed that his son is the deceased in the residence. Mr. Franklin identified his son as Terrance Terelle Franklin, dob █/1990. I relayed this information to Sgt. Kjos who confirmed the deceased's identity as Terrance Terelle Franklin, dob █/1990, and provided the name and phone number for the deceased's mother; Sheila O'Neil, #████████

At approximately 2020 hours, Hennepin County Medical Examiner Personnel arrived at the scene. The personnel were identified on entry to the interior scene as Medical Examiner Investigators, Estes and Osterberg, and Medical Examiner, Dr. Boeding. I provided the name and date of birth of the deceased as well as the Next of Kin Information to Medical Examiner Investigator Estes. Hennepin County Medical Examiner Personnel cleared the scene without securing the deceased for transport. After which, the Minneapolis Police Department Crime Lab continued processing the scene

At approximately 2340 hours, Hennepin County Medical Examiner Personnel, identified as Medical Examiner Investigator, C. Notch, and Health Care Trainee, W. Boots, arrived to secure the deceased for transport. After which, the Minneapolis Police Department Crime continued processing the scene.

At approximately 2359 hours, the residential structure's rear entrance/exit was secured by Board Up.
I conferred with the Mr. Bickar, who requested all 1st floor curtains be drawn and only 1st floor hallway light be left on. Additionally, I provided Mr. Bickar with a copy of the document the Hennepin County Medical Examiner Personnel left at the residence regarding Death Scene Cleanup.

At approximately 0120 hours, all Minneapolis Police Department Personnel were clear the interior of 2717 Bryant Avenue South. I advised Lieutenant J. Kelly that all crime scene tape to be removed around the residence.

END SUPPLEMENT

SGT. CHARLES GREEN #2429
MINNEAPOLIS POLICE DEPARTMENT
VIOLENT CRIMINAL INVESTIGATION DIVISION - HOMICIDE UNIT

**END of Supplement 86**

| Supplement number: | 87 | CCN: MP-13-143872 | Author: | 005786 - Luis Porras |
|---|---|---|---|---|

Supplement of Sgt L.Porras #005786 on 05/17/2013 15:27
Supplement of Sgt. Luis Porras
13-143872

Investigative Supplement for OIS at 2717 Bryant Ave South

Lathrop Decl. Ex. 6

On 05-17-2013 at approximately 1300 hours, I went to the Medical Examiner's Office and met with Megan Turak. She provided me with the blood prep kit for Terrance Franklin and 12 envelopes which contained projectiles. I signed these items out from her and hand carried them to the Minneapolis Police and Evidence Unit.

I then signed out the blood prep kit for Franklin (PI# 13-16564) and the following items:

PI# 13-16346 Lines 1 thru 8, DNA swabs from Officer Durand's MP5

PI# 13-16397 Line 1, known DNA sample from Officer Mark Durand

PI# 13-16398 Line 1, Known DNA sample from Agent Dave Scheibel.

These items were driven to the BCA by me and signed in by Staff member Diane Sloan. All these items were left at the BCA and for their analysis.

Sgt. Luis Porras
Homicide Unit
Case Open

**END of Supplement 87**

---

| Supplement number: | 88 | CCN: MP-13-143872 | Author: | 005786 - Luis Porras |
|---|---|---|---|---|

Supplement of Sgt L.Porras #005786 on 05/17/2013 15:31
Investigative Supplement of Sgt. Luis Porras
13-143872

On 05-11-2013, at approximately 1420 hours, Sgt. Kjos and I returned to 2717 Bryant Ave south and spoke with James Bickal and his wife Kristen.

Prior to the interview starting, we showed Bickal a photograph of the blue robe with the white piping that Franklin was wearing and had on at the autopsy. Bickal identified the robe as his.

I formal recorded Q&A was taken from Bickal. The following is a summary of that interview with him; please refer to the CD and or transcript for exact details.

Bickal told us that he arrived at his residence at approximately 1530 hours on Friday (05-10-13) He said that he came West on 27th street and then south on Bryant Ave South. He said that he did observe Minneapolis Police Officers in the area.

Bickal said that he tried to go north in the alley towards his house and was stopped by Police. He was told he could not drive his vehicle up to his residence. Bickal said that he parked his vehicle on a side street and walked to his residence.

Upon arrival to his house, he told me it looked as if his house had been burglarized. He walked up to the corner of 27th street and Bryant Ave south and spoke with a uniformed Officer and informed him of what he had discovered.

Bickal said that he was told to not return to his house so he went to his neighbor's house, which is one house to the north same side of the street. He told us that he heard the Officers yelling and screaming a few minutes later and observed them carrying an Officer out of the house and give medical attention to him.

Interview terminated.

Prior to Sgt. Kjos and I leaving Bickal's residence, he told us that one of his neighbors had seen someone running thru there yard on that same day.

Sgt. Kjos and I knocked on the door of 2710 Aldrich Ave South and spoke with Elizabeth Thompson. She told us that her and her boyfriend where in the back yard on 05-10-2013 around 1530 hours. She told us that a black male wearing red sweat pants, a black T-shirt who had dreads in hair ran from the east, thru her yards and then towards the alley.

She told us that she did not see where this black male ran to other than towards the alley.

On 05-13-2013, Sgt. Kjos and I met with Sgt. Stender and Officer Durand and their Attorney Fred Bruno. We took a formal Q&A from both of them. Their statements were entered and are now a permanent part of this case.

On 05-14-2013, Sgt. Kjos and I met with Officer Luke Peterson and his Attorney Fred Bruno. Sgt. Kjos and I took a formal

Lathrop Decl. Ex. 6

Q&A from him at that time. His statement was entered and is now a permanent part of this case.

On 05-14-2013, I met with Officer Meath at his residence. I presented him with an Authorization for Release of Private Health Information. This form was completed by Officer Meath and was faxed to HCMC to obtain proper records.

On this same date at approximately 1130 hours, I met with David Scheibel from the Minnesota Department of Corrections in Room 108. I explained to Mr. Scheibel that since he had been given Officer Durand's MP5 by Officer Durand, that we would need a DNA swab from him for comparative analysis.

I obtained a Known Sample Collection Kit with a sealed tamper resistant sticker. I put on latex gloves and opened the kit. I presented a single Q-tip to Mr. Scheibel and he swabbed the inner portion of his mouth-left check area. He gave me the Q-tip back and I gave him the second Q-tip for his right cheek. I placed the first Q-tip back in the original sleeve. After completing the second swab, I also placed this Q-tip back in its original sleeve.

The samples were then placed in the yellow envelope, sealed with provided red tape and initialed by me. This yellow envelope was then placed back in the blue envelope and the security seal was placed on it.

At approximately 1215 hours, I met with Officer Durand in Room 108.

I obtained a Known Sample Collection Kit with a sealed tamper resistant sticker. I put on latex gloves and opened the kit. I presented a single Q-tip to Officer Durand and he swabbed the inner portion of his mouth-left check area. He gave me the Q-tip back and I gave him the second Q-tip for his right cheek. I placed the first Q-tip back in the original sleeve. After completing the second swab, I also placed this Q-tip back in its original sleeve.

The samples were then placed in the yellow envelope, sealed with provided red tape and initialed by me. This yellow envelope was then placed back in the blue envelope and the security seal was placed on it.

Both these samples were property Inventoried in the Minneapolis Police Departments Property and Evidence Unit.

Sgt. Luis Porras
Homicide Unit
Case Open

**END of Supplement 88**

---

| Supplement number: | 89 | CCN: MP-13-143872 | Author: | 119676 - Brenda Hummel |
|---|---|---|---|---|

Supplement of For S B.Hummel #119676 on 05/18/2013 19:58
Crime Lab Unit - Latent Report
CCN 13-143872

The latent print developed on the exterior point-of-entry (POE) door knob was labeled (1), photographed, and analyzed for quality by FS Jacobson and me with the following results:

Latent 1. Insufficient for comparison purposes (exterior POE door knob)

The latent lift and photographs will be retained within the Crime Lab Unit.

WE HEREBY CERTIFY THAT THIS IS THE REPORT OF THE CONCLUSIONS OF AN EXAMINATION PERFORMED BY US

FS B. Hummel
Minneapolis Police Dept - Crime Lab Unit

FS K. Jacobson
Minneapolis Police Dept - Crime Lab Unit

**END of Supplement 89**

---

| Supplement number: | 90 | CCN: MP-13-143872 | Author: | 004898 - Ann Kjos |
|---|---|---|---|---|

Supplement of Sgt A.Kjos #004898 on 05/23/2013 10:44
INTERVIEW OF CALA SCOTT
BY SGT. KJOS
TYPED BY LM
CCN 13-143872

Lathrop Decl. Ex. 6

Q: Hi CALA.
A: Hi.

Q: I'm sorry I took so long. I'm Sgt. KJOS and I'm going to try and get you outta here but we need, has anybody explained what's been going on?
A: Not really.

Q: Okay. Your PT Cruiser has become significant in an investigation that we're doing right now, okay, it's kind of flowing (?), um then we learned that you were coming to pick it up. I need to know how that all transpired, how did you find out to go and pick it up.
A: He called me.

Q: Who called you?
A: MOOKIE.

Q: MOOKIE, and who's MOOKIE to you?
A: Um he's this guy that I talk to.

Q: Is he, do you have kids with him?
A: No.

Q: Do you have any kids?
A: Yeah.

Q: How many kids do you have?
A: I have one son.

Q: How old is he?
A: He's two years old.

Q: Two? Jump ahead because I want to get some of these questions out of the way. CALA. What's your phone number CALA?
A: ███████████

Q: There's an iPhone right outside, is that yours?
A: Yeah.

Q: Okay, um, and where do you live?
A: ████████████████████████████.

Q: So is that Brooklyn?
A: That's Robbinsdale.

Q: And um do you have a home phone there?
A: Uh-ah (no).

Q: Where do you work at?
A: Salama Child Care.

Q: I'm sorry?
A: Salama Child Care, S-A-L-A-M-A.

Q: Are you a caregiver there, or..?
A: Ah, yeah I'm a teacher there.

Q: Teacher there?
A: Mm-hm.

Q: So were you at work when you received the phone call?
A: Mm-hm.

Q: Did he call you on your cell phone or?
A: Yeah.

Lathrop Decl. Ex. 6

Q: What did he do, did he call you or text you?
A: No, I text him.

Q: Okay, why did you text him?
A: Because he was supposed to bring me food.

Q: Okay.
A: That's why he had my car.

Q: Okay.
A: I texted him what are you doing. He called me and he told me where I could pick up my car and then he hung up, and then I called back and then I just heard a whole bunch of like (rubbing hands back and forth - making a swishing sound), so I guess probably he was running.

Q: Okay.
A: And then he never said any hello so, and then after that I kept callin callin callin callin going straight to voicemail.

Q: Okay.
A: So then I just, he told me that my car was on 28th and Bryant.

Q: So, so you're calling, calling, calling, no answer.
A: Yeah. Before like when I talked to him on the phone.

Q: Okay.
A: He told me where the car was. Well he said that's where the car is, but it wasn't even there.

Q: At 28th and Bryant, he told you that's where the car was?
A: Yeah.

Q: Okay, and then.
A: He told me that the uh the police, like he told me that the police came after him, he told me that him and his sister got into it, that his sister called the police on him so the police were, pulled him over.

Q: Okay.
A: So he was like I had to leave the car, this is where the car is.

Q: Okay, at 28th and.
A: I told him, okay, I'm comin to get my car you know.

Q: Okay.
A: And then after that I didn't talk to him, so I like they told me that he robbed somebody or something.

Q: Well we don't know exactly what led to, the cops um had a call of a suspicious vehicle and then he ran from the cops and then eventually he dumped your car, and then he ran from that.
A: And he hit a police car?

Q: Yeah.
A: On purpose?

Q: It looked, trying to get away, 'cause they were, they were comin to stop him and then he hit the police car, then he came.
A: Do you know if my car is like ruined?

Q: No, your car is not ruined.
A: Okay.

Q: At all. There was, it wasn't that.
A: It wasn't that bad?

Q: That crazy big of a damage.
A: Okay.

Q: Or anything. There's areas around your car that have some damage.
A: Yeah.

Lathrop Decl. Ex. 6

Q: And what like what what what damage is on your car right now?
A: Like in front of it um there's a dent on the front of my car.

Q: Where, which side, the driver's side or the passenger side?
A: It's like in the, kind of in the middle, I guess it's more close to the passenger. And then there's, there's something else, there's like there's two dents.

Q: Okay.
A: And then I have like a small crack in my glass.

Q: On where, which glass?
A: On the windshield, the front windshield.

Q: Oh okay, so your front windshield is.
A: Just a little crack but like a little dot.

Q: What about, okay now the back, one of the taillights, so you have tape over it?
A: Yeah.

Q: So that's.
A: That's old.

Q: Old damage too?
A: INAUDIBLE.

Q: Um, and that's on the driver's side?
A: Yeah I think so.

Q: So he called you and said he got into it with his sister; who is his sister?
A: Um I literally like I know it sounds like a lie because I've known him for a while but I don't know like, we just recently started back talkin so I don't, I went to his sister's house before.

Q: Mm-hm.
A: But I don't know her, I don't know name.

Q: What does she look like?
A: Like him.

Q: Okay.
A: Um she's like his color.

Q: What color is he?
A: Like darker than me.

Q: So he's dark-skinned, she's dark skinned then?
A: Yeah. Don't you guys have him? You guys don't know what he looks like?

Q: I know, I just want you to tell me.
A: Oh okay.

Q: And, I mean when you say he's dark-skinned a lot of people, like if I see dark-skinned and you're dark-skin are different, so I don't know, and uh so she's dark-skinned like him. Is she tall, short?
A: Um I don't know, I didn't even, I never seen her standing up, um when I came to pick him up from that house where his sister lives and he was there um, I, I don't know where he lives but I pick him up.

Q: She's not in trouble or anything, but I really need to know what she looks like.
A: Yeah I don't.

Q: As close as you can get to a description for her.
A: I think she wears glasses.

Q: Okay.
A: But I'm not for sure, um.

Lathrop Decl. Ex. 6

Q: Is she a big gal, I mean heavyset?
A: No.

Q: So little?
A: She's not skinny but she's not..she like me.

Q: Okay.
A: Well maybe a little bit bigger.

Q: Okay, is she tall?
A: I'm not sure, when I seen her she was laying on the couch so I don't, not um...

Q: What was her hair like?
A: I really can't remember.

Q: How long have you known this guy?
A: We're not really together, like I've just known him for a while, like I used to date him when I was in high school.

Q: Mm-hm.
A: And then I just recently started back talking to him, like when we were in high school I never met his family or anything.

Q: Okay.
A: And then I just picked him up from his place.

Q: What place?
A: His sister's house.

Q: Okay.
A: So that's the only reason why I, I even seen her like I didn't, I don't talk to her or anything. Like I don't even know who to call to tell them that this is goin on.

Q: Your PT Cruiser, how did he get your PT Cruiser today?
A: He came and picked my car up.

Q: From your work?
A: Yeah.

Q: Where's your work at?
A: Um 14th and Nicollet.

Q: Do you know the address?
A: Yeah, 1411 Nicollet.

Q: Okay, about what time?
A: Like one o'clock.

Q: The keys for it?
A: Yeah, I gave him the keys.

Q: You gave him the keys so he doesn't have his own key for it?
A: No.

Q: The keys, what is, what do they look like?
A: Um just like.

Q: How many are, like is it on a key ring?
A: Yeah, it's on a key ring like a tan, um he said the keys are in the car.

Q: Okay.
A: Um it's like a gray thing, like handle thing.

Q: Gray, so the part that, the plastic part for the key.
A: Yeah it's gray.

Lathrop Decl. Ex. 6

Q: Is gray.
A: And there's like, my house keys are on there and then my mailbox key.

Q: (Phone rings) Yeah CHUCK? (person on phone inaudible). Okay, so he saw it. (person on phone inaudible). Okay, alright, thank you, yep. (person on phone inaudible). No we'll do him tomorrow. (person on phone inaudible). Yep, thanks. It uh, so it's a gray key, house key, your mailbox key, and then just on a ring. Is there anything special on the ring like a little plastic anything, something that would stand out that it's your key, keys?
A: Um, first of all there's, no there's, there's nothing on there like a charm or anything, there's no.

Q: No charm.
A: But there's like a couple like I would say like three key like chain circles.

Q: Oh three circle things?
A: Mm-hm.

Q: And they're linked with each other so like one key is hooked to the other key?
A: Yeah and they're kinda all separate.

Q: Okay. Um, he called you, what number does he call you from?
A: Mmm, it was in my phone but I don't, my phone's dead. But I don't know it off the top of my head.

Q: You don't know what phone number he called you from?
A: Well it's in my phone, but I don't know it off the top of my head, I don't have it memorized.

Q: Okay, but he said that, what did he say exactly?
A: He said that his sister called the police on him, the police pulled him over or, I don't, I was at work too so I was like until you said that you know the police been, that's when I started listening, but he told me the police pulled him over, his sister called the police on him. I asked him why his sister called the police on him, and then he was just like she's stupid or something like, he wouldn't tell me why she called the police on him, and then I was like where's my car, where's my car, stressing him about my car, and then he told me.

Q: 28th and Bryant?
A: Yeah, and then I just heard a whole bunch of noise and then I kept calling his name, he wouldn't answer, he wouldn't answer, and then every time I hung up the phone because I couldn't hear him. Then I hung up the phone and then I tried to call him back, tried to call him back, and it was going straight to voicemail.

Q: Did he ever text you, did you ever text him?
A: No, only the first time I texted him what are you doin?

Q: Okay.
A: And then he called me after that.

Q: Okay, and he called you 'cause you're like what are doing 'cause you didn't have any food.
A: Yeah, 'cause I was trying to figure out where like "where are you" probably like 1:30 'cause uh I came to work at 1:00.

Q: Okay.
A: And then after 30 minutes then I text him like where are you, you know.

Q: Right.
A: What are you doin, and then he, he called me, and that was the only time that I talked to him when I got in. I don't know what's going on.

Q: Um, alright, so I just wanted to make sure that you called him and you texted him about 1:30. What did you do when he calls you back and you have some conversation whatever, and then it wasn't until that he calls you and says your car's at 28th and Bryant, and you have any other conversation between that time?
A: No, that was the same phone conversation. The first time, the only time that I talked to him like when I said that he called me and then he told me where the car is, then after that I, it sounded like he must have been running or something 'cause there was like a whole bunch of noise.

Q: Mm-hm.
A: And then after that I never talked to him again. But I still can come get my car because I thought that, well I thought they probably just took him to jail and then I thought they were gonna tow my car so I was trying to hurry up and get there before the police got there, and then when I got there eighty police cars there.

Lathrop Decl. Ex. 6

Q: Mm-hm. Um, what does his, what does his phone look like, like you have an iPhone?
A: Yes, like slide out.

Q: Okay. Is it black?
A: It's black, I think black and gray.

Q: Black and gray?
A: I'm not sure of the company.

Q: Okay, and you can't remember the phone number?
A: Mm-mm.

Q: Okay.
A: But like the guy had my phone earlier and um gave it to him.

Q: That officer, the gal that brought you down?
A: It was a black officer.

Q: Okay, but in the plain clothes and the regular?
A: No, he had on a, he had on a uniform.

Q: Okay.

A: The one that told me to stay.

Q: Okay.
A: Whoever car...

Q: Oh, the big guy?
A: Yep.

Q: Okay. Um, do you have a password on your phone, is it the new iPhone or is it the?
A: Yes.

Q: Can I just bring you a...
A: Charger.

Q: A charger, is that okay?
A: I don't understand though, you guys must already him.

Q: It's...
A: Don't you already have all his information now?

Q: No, we don't have it all right now, so that's why we got to get it from you. How often does he get, so how long have you been back together with him?
A: Mmm, like a month.

Q: A month now? Is he living with you right now?
A: (Shaking head - no).

Q: Where does he live right now?
A: Um I'm not sure, like he, I always pick him up in different places, so I couldn't tell you really where he lives.

Q: That doesn't seem strange to you?
A: No, he doesn't have a job so I wouldn't assume for him to have his own place.

Q: So does he, his mom..? Who's his Mom?
A: I wanna say his Mom lives in Chicago, I'm not sure.

Q: Okay.
A: We're not like in a serious relationship like.

Q: How often does he get to use your car?
A: Well he drives it sometimes when we go places and he doesn't just, he has no car.

Lathrop Decl. Ex. 6

Q: But like today he came in and picked it up. Does he do that, has he done that before?
A: No. He just like if we go places together then he picks me up, like he drives the car and I ride, but he doesn't just have my car.

Q: Okay. But you were at work today?
A: Mm-hm.

Q: And there's people there that'll verify that?
A: (Nods head - yes).

Q: I'm gonna get a charger for your phone. I'll be right back. Do you need anything else?
A: No.

(Sgt. KJOS leaves the room for a few minutes)

Q: Is this him?
A: Yes.

Q: That's MOOKIE? What's MOOKIE's real name?
A: You, are you, you guys don't have his information, 'cause I don't..

Q: I don't have his information, this is bizarre that you are not, you are trying to keep that type of information from me.
A: I'm not trying to keep it.

Q: Okay, what's his name?
A: His name is TERRANCE.

Q: How do you spell it?
A: T-E-R-R-A-N-C-E.

Q: What's his middle name?
A: I don't know.

Q: Okay, last name?
A: FRANKLIN.

Q: And his birthday?
A: I'm not sure.

Q: Do you know how old he is?
A: 22 I think.

Q: So he doesn't work anywhere and he, where are the places that he stays, mostly where you go pick him up at?
A: Um it's literally like all different places, like I don't know addresses off the top of my head, sometimes it's in Brooklyn Park, sometimes it's in north Minneapolis.

Q: But you have addresses, I mean you, there's actually, you don't go to a city and pick him up you go to an address and pick him up.
A: Yeah but like I know the addresses off the top of my head, he'll just tell me oh it's by this gas station, or he'll like, he goes to like oh McDonald's or like you know pick him up from those places. I'm really not trying to not cooperate, I just, like I really don't want any involvement in this, like this is so bad.

Q: It's very bad right now, okay, your car is involved, alright, and he's involved. Um keeping information from us makes you look like you're involved.
A: Yeah, I know.

Q: I mean I don't think you're involved, but, because you were at work, right?
A: Yes.

Q: I mean.
A: I can give you my work number, like I had to leave work to come here.

Q: Right, and that lady that gave you a ride, she can verify that you were at work, you weren't out.

Lathrop Decl. Ex. 6

A: Yeah.

Q: With him?
A: Yeah.

Q: During the day.
A: The girl that gave me a ride, she can verify like also like.

Q: There was a female with him, okay.
A: I don't.

Q: Yep, a small light-skinned female with long hair was with him, and she had a 2-year-old child and she had an infant. Do you know who that would be?
A: Well, what were they, boys?

Q: I don't know.
A: 'Cause I know he, he has a son.

Q: He has a son?
A: Yeah.

Q: With who?
A: Um, I wanna say her name, her name's ASHLEY.

Q: ASHLEY? Is she a white girl?
A: Uh-ah (no).

Q: Is she light-skinned?
A: She's like my color.

Q: Okay. Is she a big girl?
A: (Shake head - no)

Q: Is she really little?
A: She's not really little, she's like my size.

Q: Okay, from a distance I mean.
A: Um I, I only seen her once too, so and it was nighttime, I don't know if she, I don't know if she had long hair at all.

Q: But does she have, how many kids does she have with him?
A: One, but she has other kids by somebody else.

Q: Okay, but she has a son with him?
A: Yeah.

Q: How old is the son?
A: He's 4.

Q: He's 4?
A: But I think he's gonna be 5 actually this year.

Q: Do you know if he has any other baby moms?
A: Um, he has, I don't think so.

Q: You don't have any kids with him?
A: No.

Q: Alright, I'll be right back.

(Sgt. KJOS leaves the room for a few minutes)

Q: (whisper) There's a plug-in right there.
A: Um the number is 612.

Lathrop Decl. Ex. 6

Q: 612.
A: 207-7361.

Q: 7361, now can you see what time was that that he called? Are you, can I see the text that you sent to him? What are you doin, okay, and when was that?
A: 2:05.

Q: 2:05. INAUDIBLE.
A: INAUDIBLE.

Q: And then, so he called then after that?
A: Yeah. Maybe I called him actually. I don't see, he would've called me at this time but, well that was before actually he got the car.

Q: Can I see.
A: This is when I talked to him.

Q: Okay, can I just plug it in over there so I can write those down?
A: Ah, yeah.

Q: I just want to write the times down. Yeah.
A: And when am I gonna be able to leave here?

Q: In a couple seconds. Somebody else just showed up I need to talk to quick and then. So at 2:18 you talked to him for 5 minutes.
A: Yeah, that's when he must've, he told me where the car was, but that wasn't a long conversation.

Q: 'Cause then, so that was at, and then, that was an incoming at 2:18 PM.
A: Okay.

Q: That's him coming in to you.
A: He called me.

Q: 'Cause then he calls you at 12:45, he talked for like 11 minutes, and he talked to you at 12:23.
A: Yeah, that was before he got the car, he got the car at 1:00.

Q: 'Cause you said you started work at 1:00?
A: Yeah.

Q: Okay, did he, were you two together, well you must not have been together, right?
A: No, he just picked up the car.

Q: He picked up the car? Were you at work?
A: Mm-hm.

Q: Okay. At 12:45 you were at work?
A: No, I was at the bank then. Should I be like...

Q: I'll ah...
A: Do I need like a lawyer or something.

Q: No, we're not arresting you for anything. You "canceled", what's that mean?
A: Mmm.

Q: Like you cancel but then the next one is a second.
A: (No verbal response).

Q: So the, by then, so it says one second, two second, one second, does that mean it goes right to voicemail?
A: Yeah.

Q: When you called, so the other one just rang and rang.
A: Well there's a lot of phone callin' where it's just one second.

Q: Okay.

Lathrop Decl. Ex. 6

A: INAUDIBLE. So is he still alive?

Q: Do you want to know that answer?
A: Yeah.

Q: He is not. Do you see the seriousness of this now? Did he say anything, what he was doin?
A: No, oh my god.

Q: So at 2:24 you were able to talk to him for 5 minutes.
A: That's when he told me. He's dead? Can I go put, I just need water.

Q: You need water?
A: Yes, please.

Q: Need more water to drink?
A: (Nods - yes) How long has he been dead?

Q: I don't know exactly what time that happened.
A: Are you serious?

Q: Yeah, I wouldn't.
A: Oh my god.

Q: If it's, this is him, I mean this is the man that we have.
A: Can I please go home?

Q: I'm gonna go talk to somebody quick. You can have your phone if you just sit here for a little bit, I'm going to finish up. Where do you, oh you live, you need a ride home? Okay, I'll be right back.
A: (crying)

(Sgt. KJOS leaves the room for a few minutes)


Q: I'll be right back. (unknown female): Can I help you?
A: Um I was just wondering if I'm allowed to use my phone in here?

Q: She wants to know if she can use her phone? (unknown male): DANYELLE. (unknown female): I'm sorry INAUDIBLE. (Officer DE ROSE): Can I get you something?
A: I just, I was wondering if I can use my phone in here?

Q: Um, you know what, let me to talk to the investigator. Did she give you back your phone or you just grabbed it off here?
A: She gave it to me.

Q: Okay, one second.
A: (crying).

Q: Go ahead. Do you want anything else to drink, anything else to eat, can I get you anything?
A: INAUDIBLE.

Q: Okay, if you need anything, just holler for Officer DE ROSE, okay?
A: Okay. (pause for several minutes, then made phone call): Hey T, what you doing? T, MOOKIE's dead. He's dead. Today. Today. I loaned him my car. I'm at the police station. Okay, so I let him use my car right, so I know, I don't know what happened, I guess something. I let him use my car and he was supposed to bring me some food. He was gonna come back. So after like a hour he didn't call, hey let me call you right back, let me call you right.

Q: Sgt. KJOS: Okay, you're okay to go, alright. Do you need a ride or how do you wanna?
A: I don't have a car?

Q: Okay.
A: What's going on with my car?

Q: Your car has become a crime but you know we're taking it to a forensic garage, okay, and we have to do a search warrant on it and we have to get some swabs off of it and get fingerprints off of it, we gotta look through it and see what's in it, okay. This is, this is kind of a big deal goin on, alright.

Lathrop Decl. Ex. 6

A: How long?

Q: I'll let you know. Let me get you my card, okay, and then we'll keep in contact at your phone number, you gave it to me right? I'll figure out, I'll check if somebody can give you a ride home.

END OF INTERVIEW

**END of Supplement 90**

---

**Supplement number:**      **91**     **CCN: MP-13-143872**     **Author:**          **004898 - Ann Kjos**

---

Supplement of Sgt A.Kjos #004898 on 05/24/2013 11:53
STATEMENT GIVEN BY OFFICER MICHAEL MEATH, BADGE 4686
ON 5/24/13

I want to make it clear to you that this is a voluntary statement. This is a criminal investigation into the recent incident you were involved in. The Minneapolis Police Department Homicide Unit is conducting this investigation and the information gathered will be presented to the Hennepin County Attorney. The county attorney may and usually does present matters such as this to the grand jury. The grand jury determines whether or not criminal charges are justified under the law. Your decision to or not to provide a statement will not and cannot be used against you in any employment matter. Do you understand what I have just explained to you? Yes I do.

Q: Officer Meath, can you tell us how long you have been employed with the Minneapolis Police Department?
A: I been employed with the Minneapolis Police Department since August 5, 2005.

Q: Prior to working for Minneapolis PD, did you work for any other police agency(s)?
A: I did, I worked for the Pittsfield New Hampshire police department and I worked there for approximately 3 years from 2002 to 2005.

Q: Are you currently a member of the MPD SWAT and if so, were you working in that capacity on May 10th, 2013?
A: Yes I'm currently a member of the Minneapolis Swat Team and I was working 1280 on May 10th.

Q: Who were you working with on that day?
A: I was working with Officer VALENCIA, Officer STAUFFENBERG, Officer LAUX, Officer DURAND, Officer PETERSON, and Officer MURO and Sgt. STENDER.

Q: Can you describe the uniform you were wearing that day and the type of weapon you had both on your duty belt and available to you in your police vehicle?
A: I was wearing a full summer Minneapolis Police uniform. I was wearing a nylon duty belt with a leg holster. I was carrying a Sig Sauer P220 45 caliber handgun. On my duty belt I was carrying two extra magazines for my handgun, a portable radio, and a extra magazine for an M4 patrol rifle. The P220 was loaded with 8 rounds in the magazine with an additional round chambered with a total of 9. Secured inside the 1280 van was my M4 rifle.

Q: Do you regularly qualify with the weapons you are assigned and can you explain how often and when you last qualified?
A: Yes I do regular qualify with the weapons. With my handgun I qualify twice a year through the department and another two times through the Swat Unit. I qualify with my M4 rifle twice a year through the Swat Unit. I last qualified with my firearm at the last department qualification.

Q: On May 10th at about 1430 hours did you and members of your 1280 team assist with the search of the area surrounding W 27th St and Bryant Av S, Mpls?
A: Yes.

Q: Can you explain what or who you were searching for, was this person wanted for a specific reason and if you knew a description of the person you were searching for?
A: We were currently at the Swat garage when we heard that 5th Pct squads were in a chase with a motor vehicle. While listening to the radio we heard that the suspect had fled the vehicle on foot and was somewhere in the area of 27th and Bryant Av S. At this time we loaded into the 1280 van and responded to the area of 27th and Bryant Av S. When we arrived in the area I learned that the suspect was wearing red pants and had dreadlocks. I parked the 1280 van in the area of 27th and Bryant and exited on foot to assist in the search of the area for the suspect. Once out on foot I assisted SGT STENDER and K9 NASH in searching the 2700 block of Bryant. While SGT STENDER and NASH and other patrol officers were searching the rear addresses of the block I paralleled them on the front sidewalks and attempted to keep them in sight while they were in the rear of the addresses. While in the front of the addresses I checked front porches and made sure doors and windows were secured on the front of the residences as we passed.

Lathrop Decl. Ex. 6

Q: At some point, did you learn a homeowner of a house within the perimeter you are searching came home to discover his house had been broken into and if so, what did you do?

A: Yes I learned that the resident owner of 2717 Bryant Av S had returned to his residence and observed broken glass on his rear entry door. At this time I made my way to the rear of the address and entered into a small porched area. Once inside the porch I immediately observed that the glass of the rear entry door was broken along with the locking mechanism of the door. At this time there was a large window that looked into the kitchen area directly to the left of the door. I covered this window with my hand gun drawn while Officer DURAND, who was standing directly behind me covered the rear door with is MP5. We remained in this position until SGT STENDER arrived with K9 NASH.

Q: What happened next?

A: While I was covering the kitchen window Officer PETERSON approached from my rear and advised us that the homeowner stated no one was suppose to be in the home and that there was a cat loose in the residence. When SGT STENDER and K9 NASH arrived Officer DURAND pushed the rear door open which opened easily due to the lock being broke. Once the door was open SGT STENDER loudly announced our presence and identified himself as a K9 officer and yelled that if anyone is in the home they need to come up now or they could be bit by a police dog. Officer STENDER repeated this command and then we entered into the rear kitchen area. I immediately covered left and walked through the kitchen and posted on the entry way to a dining room area. I remained posted at this location while SGT STENDER, K9 NASH, Officer DURAND and Officer PETERSON moved around the right side of the main level of the address. Once SGT STENDER, K9 NASH and Officer PETERSON made their way around the right side of the address I moved up into the living room area. Once the main level of the address was cleared by K9 we made our way up the stairs to the second floor. Prior to mounting the stairs SGT STENDER again identified ourselves and gave the commands to come out or you will be bit by the K9. I remained as cover to SGT STENDER while he was watching K9 NASH search the second floor. While on the second floor K9 NASH appeared to be interested in a closet in one of the rooms. While K9 NASH showed interest in this closet SGT STENDER again continued to give the commands to come out. After showing interest in the closet K9 NASH exited and continued through the second floor. While on the second floor I checked the closet, turning over clothing, making sure that the K9 didn't possibly miss something. At this time the K9 did not locate anyone on the second floor of the residence. SGT STENDER, K9 NASH and Officer PETERSON made their way back down to the main floor. I remained on the second floor doing double checks to make sure that the K9 didn't possibly miss something. I checked under the beds and any small location that could have been missed. I then proceeded back to the main floor and did double checks on this floor as well. While I was checking the kitchen cabinets to make sure no one was hiding inside of them, I heard loud yelling coming from the basement. At this time I made my way down the basement stairs and heard SGT STENDER giving commands to someone I perceived as the suspect.

Q: Can you recall what SGT STENDER was saying?

A: I remember SGT STENDER yelling, show me your hands, show me your hands.

Q: Once you entered the basement can you explain where SGT STENDER was along with the other officers in the basement and if possible explain the lighting situation in the basement?

A: As I came down the basement stairs I observed SGT STENDER directly to my left as I came down the stairs. Once at the bottom of the stairs I immediately turned left and observed SGT STENDER in a physical altercation with a black male wearing red pants and dread locks. K9 NASH also appeared to be attempting to bite the suspect. I remember the suspect had a blank stare on his face and his eyes appeared to be just blank. I remember feeling that the situation was strange due to the fact that the suspect was making no noise or any comments. At this time I made my way to SGT STENDER and the suspect in an attempt to help subdue the suspect. I did this because SGT STENDER was dealing with the suspect and I knew he had to control K9 NASH as his handler.

Q: Can you describe the area of the basement or the room that this struggle was taking place with the suspect?

A: At the bottom of the basement stairs there appeared to be a small like cubby hole area directly to the left of the stairs where a water heater was located. There also appeared to be multiple household items positioned in that area as well. Directly to the right and left of the stairs was completely dark at this time and I could not tell what was located in those areas. The bottom of the stairs and the area directly to the left were being lit only by the sun light coming through the doorway at the top of the basement stairs.

Q: Were there other officers in the basement with SGT STENDER and yourself?

A: Yes directly behind and to the right of SGT STENDER was Officer PETERSON and Officer DURAND standing behind him. As I made my way to assist SGT STENDER I remember Officer MURO being behind me on my left side at the base of the basement stairs.

Q: Earlier you describe a cubby hole to the left of the basement stairway, was the suspect inside this cubby hole?

A: Yes, he was positioned back in the far corner directly next to the water heater.

Q: Approximately how deep was this cubby hole and if you could describe the dimension?

A: I believe it was approximately 3 to 5 ft. in depth but some of that was taken up by the water heater. There was approximately another 3 to 5 ft. walking space directly to the left of the stairs to get back into the cubby hole. On the walking space and in the cubby hole there were various household boxes and a large wooden door turned on it's side.

Q: Can you explain what you did while assisting SGT STENDER with apprehending the suspect?

A: As I made my way back into the cubby hole area to assist SGT STENDER as he was struggling with the suspect and attempting to handle K9 NASH I did this as I feared for SGT STENDER's safety as he had no weapon drawn and I could not see both of the suspect's hands as they appeared to be behind his body. I immediately grabbed the suspect around his upper shoulders and attempted to pull his body towards my location and out of the cubby hole area. Once I grabbed a hold of the suspect he immediately started thrashing his upper body left to right using his elbows in an attempt to strike me. While I was

Lathrop Decl. Ex. 6

holding him by his upper shoulders I attempted to deliver 2 to 3 knee strikes with my right knee into his stomach and chest area. On my last knee strike the suspect used my pulling momentum against me and exploded forward, pushing me backwards to the point where I lost a hold of his shoulders.

Q: What do you mean when you say he exploded towards you?

A: As I was pulling his upper body forward towards my knee, he planted his feet and lunged forward as a football player would position himself for a tackle. I was slightly off balance as I was pulling the suspect in towards my body when he exploded into me, pushing me backwards. His actions caused me to lose my grip around his upper shoulders and I fell backwards into the wall area behind me.

Q: As you were applying knee strikes to the suspect which knee were you using?

A: I was using my right knee which is also my gun side where my gun was currently holstered in a thigh rig.

Q: At any time did the suspect attempt to grab your gun?

A: I can't remember if the suspect made an attempt for my weapon but he would have been in the perfect position to do so as my knee strikes were coming into his midsection as he exploded forward catching me with only my left foot planted and my right knee positioned in his midsection. As I was being forced backwards my knee along with my holstered weapon were directly in his midsection in close proximity to his hand.

Q: What happened next?

A: I was forced backwards into the wall and lost my grip around the suspect's shoulders. As I was trying to gain my footing the suspect was now engaged in an altercation with Officers PETERSON and DURAND. The suspect had again driven his upper body into Officer DURAND forcing him backwards through the doorway which led into what I learned later is the laundry room. I immediately made my way through the doorway into the laundry room and was attempting to find the officers and suspect's location. This was made extremely difficult due to the fact that it was extremely dark inside this room. As I made my way into the room I focused my attention to the left side of the doorway as I could hear the sounds of a struggle. As I made my way to the sounds I heard a loud bang noise which caused me to pause because I could not place the sound right away. At this time I heard someone yelling, he's got a gun, he's got a gun. At this time I immediately realized that I had pain in my right thigh and hip area. It felt as if someone had struck me very hard with a baseball bat to my right hip. I continued to hear, he's got a gun, he's got a gun.

Q: So what do you remember next?

A: I remember laying on my butt on the basement floor and hearing the sounds of a struggle directly to my left. As I looked to my left I could make out two silhouettes. The first one I recognized as the suspect due to his dreadlocks. He was positioned on the ground sitting up with Officer PETERSON directly on top of him. I could still hear, he's got a gun, he's got a gun but then at this time I heard screaming off to the right yelling, I been shot, I been shot. As I looked toward the suspect and Officer PETERSON's position I immediately observed that the two appeared to be struggling over something between each other's body. I immediately believed that this was the gun that was being yelled that the suspect had. I remember feeling extremely scared as if I was going to die in the basement along with Officer PETERSON. I also remember after hearing someone yelling they had been shot that the pain I felt in my right hip area was from my own gunshot wound.

Q: Do you remember pulling your handgun from your thigh rig?

A: I do not, I just remember being extremely scared and believing Officer PETERSON and myself were going to die. The next thing I remember is holding my fire arm in my hands and firing off my last round. I remember the suspect's body going limp against Officer PETERSON and the struggle between the two had ended. At that point I immediately knew that I had to tend to my gunshot wound. I remember feeling extremely scared because I knew I only had 30 seconds or less to get the tourniquet on.

Q: How come you believed you only had 30 seconds or less to apply a tourniquet to your wound?

A: We had just gone through training a month prior on the use of tourniquets and for some reason I could remember the instructor telling us for a wound that severed a main artery you had about 30 seconds to get a tourniquet on or it could be fatal. At this time I reached into my left cargo pocket and retrieved my tourniquet while yelling, I been shot. Once I had my tourniquet in hand I observed Officer PETERSON's face directly in front of my face. I handed Officer PETERSON my tourniquet and told him that I was shot in the right hip area. While Officer PETERSON was manipulating the tourniquet I remember an overwhelming feeling that I was going to die in that basement. I remember yelling to Officer PETERSON to hurry and get it on. Once Officer PETERSON was pulling the tourniquet tight I remember my pain level suddenly went to extreme. Officer PETERSON and Officer DURAND continued to speak with me and were telling me that I was going to be okay. At this point I remember Officer PETERSON and Officer DURAND picking me up and carrying me up the basement stairs. I was carried through the side door that was located at the top of the stairs and out into a yard area. I remember being placed in the grass and Officer DURAND and Officer PETERSON removing my uniform and equipment and checking my body for other injuries. Officer PETERSON continued to speak with me in an attempt to keep me calm. I also remember them placing a second tourniquet into position above the first one. After what seemed like forever I was picked up and placed into an ambulance. Once in the back of the ambulance I remember immediately having a calming feeling because I knew since I was in the ambulance I was going to live.

Q: After firing your handgun do you remember what you did with it?

A: After firing my last round I remember placing my handgun on the ground directly next to my left cargo pocket. After retrieving my tourniquet and handing it to Officer PETERSON I remember frantically feeling around the left side of my body on the ground for my handgun. Once my hand was on top of my handgun I remember Officer DURAND placing his hand on top of mine and telling me that he's got it and to let go.

Q: Earlier you stated that you remember firing your handgun, can you explain what exactly you were firing at and why?

A: I remember I could see the silhouette of the suspect's dreadlocks from his head and his upper shoulder area. I remember

Lathrop Decl. Ex. 6

firing in this direction as it was the only area that I knew I wouldn't strike Officer PETERSON. As I observed Officer PETERSON was directly on top of the suspect's chest area and struggling over what I believed to be a firearm between their bodies.

Q: How far away were you from the suspect?
A: I can't remember how far away I actually was from their position.

Q: Do you remember which hand you were holding your gun in when you shot at the suspect?
A: I remember holding my firearm in my right hand as I fired my last round. I'm not sure if I fired any other rounds two handed, I only remember holding it in my right hand.

Q: Can you remember firing more than one round?
A: I remember when I was lying in the stab room at HCMC replaying the incident in my mind that I believed I had fired 3 to 4 rounds. But it was more of just bits and pieces of my memory, I couldn't remember for certain how many I had fired.

Q: During the struggle between Officer PETERSON and the suspect could you see where Officer DURAND was?
A: I do not remember physically seeing Officer DURAND but I knew he was somewhere in the room during the altercation between the suspect and Officer PETERSON. I knew this because when I lost control of the suspect near the basement stairs I observed the suspect forcing his body into both Officer DURAND and Officer PETERSON forcing them into that room. It was very difficult to see inside the laundry room as the sunlight was shining down the basement stairs. So we went from bright sun light at the bottom of the stairway to a dark room. Once I entered into the room I remember my eyes were having a hard time adjusting to the darkness. I remember getting some of my night vision back prior to when I remember firing my last round.

Q: I just want to clarify earlier you had mentioned you describe the suspect as having a blank stare to his eyes, can you explain where the suspect was located in the cubby hole when you first saw him and what type of lighting was available to you?
A: I remember I had just came down the basement stairs and button hooked to my left and I observed the suspect in a standing position directly next to the water heater. While he was standing the water heater was located on the left side of his body. I remember K9 NASH was attempting to bite at the suspect's legs and the suspect was kicking his legs in NASH's direction. The suspect wasn't verbally saying anything and I remember him looking in my general direction and his eyes were blank as if they were looking directly through me. I could see all of this due to the sun light shining down the stairs from the door at the top of the stairs.

Q: Can you think of anything that I may not have asked you that you feel would be pertinent to this investigation?
A: Not at this time.

Q: To the best of your knowledge, is this a true and accurate statement?
A: Yes it is.

_____

_____

**END of Supplement 91**

| Supplement number: | 92 | CCN: MP-13-143872 | Author: | 004755 - Sara Metcalf |
|---|---|---|---|---|

Supplement of Sgt S.Metcalf #004755 on 05/29/2013 13:04
TAPED Q AND A OF HAUGH BY SGT METCALF ALONG WITH OFFICER HONEYCUTT ON 5/10/2013, TYPED BY KP, CCN 13-143872

Q: We're here at Flanders' Bike Shop with one of the employees/witnesses. Can you state your full name for me?
A: JOHN CHARLES HAUGH

Q: How do you spell your last name?
A: H A U G H

Q: And what's your date of birth?
A: ▓▓69

Q: 3/1/69?
A: Yup.

Q: And you work here?
A: Yeah.

Q: What's your role here?
A: Mechanic.

Q: Mechanic?

Lathrop Decl. Ex. 6

A: Yup.

Q: Ok. Were you working today um which is May 10th 2013 when somebody came into your store that was suspicious?
A: Yes.

Q: Can you just tell me about that?
A: Uh I was doing my duties as a mechanic working on a bike and two people came in at the same time. Um one guy that actually needed some help and then the other one that seemed a little uh questionable.

Q: Ok
A: Somewhat, I asked him what was up. And he said he was uh looking for a bike. And I said what kind of bike you are interested in. And he says uh I'm just getting into it. It's my, my girlfriend's getting into it. She's into it. She's trying to get me into biking. I said sure, sure. You waiting for your girlfriend or something. And he says yeah, yeah, yeah. And then he proceeded to talk on the phone and I continued helping the customer that I was with. And then until that was over with and then he left and I kept an eye on this guy.

Q: What did that guy, the suspect look like?
A: Uh tall, skinny, wearing shorts and some kind of red shirt. I think it had stripes.

Q: Ok. What race was he?
A: Black.

Q: Ok and can you describe his hair?
A: Uh shoulder length dreads. Kind of tied back on the top.

Q: Do you know how old he was approximately?
A: I'm thinking something like early 20's maybe.

Q: Ok. So when he came into the store was it odd?
A: Yes.

Q: Why?
A: It just didn't seem like it fit. He didn't, didn't have any real reason for being there.

Q: What was his demeanor like?
A: Uh sketchy.

Q: Sketchy.
A: Yeah.

Q: Ok.
A: Always looking out the window. Looking for something.

Q: Ok.
A: Said he was looking for his girlfriend but I didn't believe it.

Q: Yeah. What happened next?
A: Uh he proceeded to talk on the phone and I kept an eye on him. Kept looking at him. He kept looking back at me and all of a sudden he got to his feet and high stepped it through the building and hurdled through the doorway into the shop. Which is a just wayside door. And then proceeded to go into the back of the shop and um where we have our bikes and all of our repair stored.

Q: Was he walking fast or running, sprinting?
A: He was uh he was running.

Q: Ok
A: Kind of a quick, quick pace. Quick pace uh INAUDIBLE. Not a high speed one but a good jog.

Q: Ok
A: If you will. And he hopped it pretty good. Pretty good at the hurdling. And ran into the back room and I proceeded to follow him in the back door er into the back room. And he tried to figure out the back door. And I said HEY. And he turned and looked at and realized that he couldn't instantly get out the door. So he ran into the next room. Kind of fumbled for a choice of where to go. Saw that there was the door to his left and proceeded further and went out that door. Came through the rest of the shop and hurdled out, dropped a phone. Quickly grabbed that and ran out of the store.

Lathrop Decl. Ex. 6

Q: Ok. Um when he came into the store uh he was wearing some clothing.
A: Yeah.

Q: Did he take all of his clothing with him when he went the store or did he drop anything in the store that you know?
A: Not that I know of no. He didn't drop anything. He was still wearing the same clothing that he came in.

Q: Ok and you said he dropped his cell phone but he picked it up?
A: Yup.

Q: Ok and he took that with him?
A: Yup.

Q: Ok when he left the store what happened when he left the store?
A: When he left the store, there's already a police car sitting front in a bus in a bus stop facing south in the northbound lane. And my co-worker had pointed to the guy like hey this guy is guilty of something. And he just may be the guy you're looking for. And so he proceeded to uh INAUDIBLE and chase after him.

Q: Did you see where the suspect ran?
A: To the other side of the street and the side of the soccer store.

Q: So west across Lyndale?
A: Yes.

Q: And then did he, where did he go from there? What's across Lyndale, don't know?
A: Don't know.

Q: Ok.
A: I didn't see where he went after that.

Q: All right. Do you have anything else that I forgot to ask you?
A: Um I think that's about all he covered.

Q: Ok
A: Oh yeah that's everything.

Q: All right thanks I'll conclude the interview.

**END of Supplement 92**

---

**Supplement number:**   **93**   **CCN: MP-13-143872**   **Author:**   **004755 - Sara Metcalf**

---

Supplement of Sgt S.Metcalf #004755 on 05/29/2013 13:07
TAPED STATEMENT OF ADRIAN COMTRERAS, TAKEN AT 2707 LYNDALE AV S, ON 5/10/13, AT 1704 HOURS, BY SGT METCALF, TYPED BY CFD

CCN 13-143872

Q. Can you state your full name for me?
A. ADRIAN COMTRERAS.

Q. How do you spell your name?
A. A D R I A N, C O M T R E R A S.

Q. And what's your date of birth?
A. ███/71.

Q. And you're an employee here?
A. Yes.

Q. What's your role here?
A. Manager.

Lathrop Decl. Ex. 6

Q. Manager. Okay. Can you tell me just what happened today?
A. A younger gentleman walked through the front door, obviously very nervous, approximately 6 ft tall, braided black hair, red t-shirt, black shorts, …(inaudible)…, he was athletic build, obviously very nervous at the front door for a few moments, who ran through our store trying to exit the back door. Couldn't succeed with that, ran back through the door and ran out our front door.

Q. Okay. Do you remember what time he showed up to your store?
A. Approximately 1, 1:15.

Q. One, or 1:15? Okay. And when he entered the store what did he do?
A. He walked in nervously, made it about as far as the cash register stating he was looking for a bike, but waited for someone.

Q. When you say nervously, describe his demeanor and what he was doing?
A. Herky, jerky movements, looking around for things, pacing, looking out the front door, looking out the window, looking down the street, and very nervously.

Q. Did anyone from the store ask him why he was there?
A. Yes, my co-worker, JOHN, asked him what's up, what can I help you with, what's going on. And that's when he stated he was waiting for his girlfriend.

Q. Waiting for his girlfriend, and maybe interested in a bike, you said?
A. Right. Looking for a bicycle and waiting for his girlfriend.

Q. Okay. How long did he wait around in the store before anything happened?
A. Three to 5 minutes.

Q. What happened then?
A. That's when he…I was walking towards him to tell him to leave. He obviously saw something outside which was-upon further notice-was the cop waiting out front. He ran east through our store trying to exit the back door, couldn't do such, circled back through the store, and then ran out the front door.

Q. Okay. And you kind of walked me through that?
A. Mm-hmm.

Q. So he came in your front door, and when you enter your door you're walking EB into the store?
A. Yes.

Q. So you're saying he ran east through your store. Did he jump a gate?
A. He jumped the gate to the service area, through the door to the storage area, up the stairs, through the back door which he couldn't get through.

Q. Okay, so all the way east, up the stairs, into…almost looks like a little bit of a warehouse in the back.
A. Storage area.

Q. Storage area. And there's a steel door back there?
A. Yes.

Q. And he couldn't get out that?
A. He didn't know how to work those…(inaudible).

Q. And then what direction did he run from that…(inaudible)?
A. Then he would have gone 15, 20 ft north making a left, running back through the second storage door going west, and then through the store again, and then jumping the next gate, dropping his phone, then taking 10 ft south and then out our front door which is another 25 ft.

Q. Where did he drop his phone?
A. On the sales floor.

Q. Okay. Did he pick it up?
A. He…yeah, had stopped, was nervous, picked up his phone and ran the rest of the way.

Q. Okay. And eventually ran out the front door again?
A. Ran out the front door which then he kind of collected himself, I'm guessing not to draw attention, and then once he saw the cop he ran across the street.

Lathrop Decl. Ex. 6

Q. So he ran out the front door, and where are the police at that point?
A. In front of the bus stop facing south.

Q. Okay. What street is that, that crosses it?
A. Lyndale and 27th.

Q. Lyndale and 27th, and the police were there facing south?
A. Policeman was on the SE corner facing south in the NB lane.

Q. Okay. Where did the suspect run then?
A. He then ran west across Lyndale between…through the parking lot between Soccer USA and the art store.

Q. The art supply store?
A. Yes.

Q. And there seems to kind of like a little alley, slash____
A. There's a small little parking lot/alley which then leads into the alley behind the businesses.

Q. Okay. And can you just describe the suspect one more time?
A. Approximately 6 ft tall, curly-well not curly-braided black hair, probably 8-10 inches long, braided, tied in a ponytail on the top, red t-shirt, black shorts, sneakers.

Q. Okay. Was he wearing anything on his head?
A. Nope.

Q. No glasses or anything?
A. Not that I saw. Just his curl…y'know was braided.

Q. Okay. And how old do you think he was?
A. Between 19, 20.

Q. Did he threaten you guys at all?
A. No, never said a word.

Q. Okay. Just ran around in your store?
A. Just ran around. The only time he said anything is when we asked him what he was doing, and then when I approached him and said he had to go he still never said anything, just ran by me.

Q. Okay. So did he leave any clothing, or any other articles in your store that you know of?
A. No.

Q. Okay. Anything you want to add that I forgot to ask?
A. Everything…this whole episode of the day.

CONCLUDED

**END of Supplement 93**

| Supplement number: | 94 | CCN: MP-13-143872 | Author: | 004755 - Sara Metcalf |
|---|---|---|---|---|

Supplement of Sgt S.Metcalf #004755 on 05/29/2013 13:14
RECORDED INTERVIEW WITH SHAWN KEOHEN
TAKEN BY SGT SARA METCALFE AND OFFICER HONEYCUTT
ON 5/9/13 AT 1814 HOURS, AT 2743 LYNDALE AV S, MANAGER'S OFFICE
CCN 13-143872, TYPED BY CMH:

Q: We're talking to?
A: SHAWN KEOHEN.

Q: Can you spell your first and last name?
A: S-h-a-w-n, K-e-o-h-e-n.

Q: What is your date of birth?

Lathrop Decl. Ex. 6

A: ██/1987.

Q: Where do you live?
A: I live at 1006 W. Lake St, Apartment 328, Minneapolis.

Q: What's a good phone number we can reach you at?
A: ██████████.

Q: What is the work number here?
A: That would be ██████████.

Q: What is your role here with the job?
A: I'm the maintenance technician for the building but I also review all the security footage for our camera system.

Q: Does this building have a name?
A: The GREEN LEAF apartments.

Q: So tell me what happened today?
A: Basically when I went to enter the building and I was passed by an individual who highly resembled the one we had a break in on April 30th. And when I passed him in the entry way I thought he seemed familiar, so I went in the office and took a look at our security camera that monitors our elevator. Basically to see where he was going, if he was headed in the same direction as the person who had done the break in because we knew he had come from an apartment in the building. So when I was watching on the elevator video camera he looked identical to the individual who had done the robbery on the 30th. So I went back out into the lobby area to see kind of if he went to exit the building and that's when I saw him with the female who was also seen on the video during the break in on April 30th.

Q: To clarify, you see a male and female and you recognize them as the suspect in a burglary from April 30, 2013?
A: Correct.

Q: Then what happened?
A: Yes, so upon seeing those two together I was positive that these were the people who had done the break in because he had the large dread lock tied up in a ponytail which I see very few of the known residents with that. And just the facial features from looking at him on the camera, he I mean matched up perfectly with who I was looking for. So then when they went to exit the building I kind of walked through the entry way with them just to confirm face to face that this is the same person. And then I saw them going to get into the vehicle which was parked right outside of the entrance So I went outside of the building to bring something to my manager's car so I could write down the license plate and then I went back in the building and made the call to 911 while they were still parked outside.

Q: So you saw them going to the car?
A: Yes they were going into a dark blue PT Cruiser and I wrote down the license plate, I believe it was KNW673, something like that. And while I was in the office I could look outside while on the phone with 911 and still confirm what that license plate was, even though I had written it down. So I explained to 911 that these are the people who had broken into one of our units and robbed stuff from one of our residents. At the time I thought they were going to exit the parking lot because kind of they were making their way to leave but instead they rounded the entrance ramp to the garage and they pulled into one of the parking spots along the side of the building.

Q: So what direction were they traveling in your rear parking lot area?
A: They would be heading SE to leave out of the exit off of 28th St by the SALEM CHURCH.

Q: But instead of fully exiting they just kind of parked a little closer to the exit?
A: Yeah they drove toward the exit and then they pulled into the parking spots. And the 911 operator told me don't confront them, don't follow them. So we have a video camera that perfectly over looks those parking spaces. So right away I pulled that up on the live feed and I was able to watch exactly where they were sitting. So I was telling 911 basically their still in the parking lot, their still here. I told them which entrance to send officers to and I'd say they were sitting there for probably like 10 minutes before the officers arrived. Which I think was the rear four squad cars. And then they confronted the individuals.

Q: Tell me about that confrontation, where were the squads?
A: There was a, I'm not sure what vehicle it's like a Impala that was blocking the 28th St side, it looked like there was an undercover pickup truck as well as another like sedan car. And then Impala looking police car kind of semi blocked the exit next to SALEM CHURCH while and there was also a I believe it was a Tahoe police vehicle. So they were parked and I could watch the PT Cruiser slowly trying to back out with the officers got out of their car, guns drawn, saying, get out of the vehicle. And he continued to back up and then put it in drive, flew out of the lot hitting one of the police cars and then sped down going east on 28th St.

Lathrop Decl. Ex. 6

Q: The officers then ..
A: Yeah the officers then hopped back in their vehicles and pursued him and that's when me as the manager as well as the caretaker went outside just kind of going where it happened, go to look down 28th St to see how far they had made it and they were out of sight at that point. So we were basically just talking about what a crazy event had just happened. And then on our way to head back into the office I looked down the alley way to see if the man in the bright red pants and dread lock hair running down the alley towards 27th St, heading north down the alley. So I ran out of the parking lot to Lyndale because I could see, besides going north down the alley he cut west between a couple of the businesses.

Q: So you saw him running a few minutes after he fled the scene, he's back now in the area on foot, back in your alley…
A: Yes.

Q: Behind your….
A: Adjacent right next to the parking lot that this had all just occurred in.

Q: Now he's running north?
A: Yup now he's running north.

Q: He's wearing red pants?
A: Yeah wearing the exact same outfit that I had seen him inside the building.

Q: Which was?
A: Which was a black shirt, like bright red pants with white lettering down the sides and yeah once again had no doubt in my mind that it was the same person especially considering how fast he was running.

Q: So he's north in the alley, he cuts west towards Lyndale?
A: Yup. So I went out of the parking lot entrance toward Lyndale heading west and I was going to look down the sidewalk heading north to see where he would pop out and which way he would go off Lyndale. And that's when I saw him come out of the side of, it's a bicycle shop and suddenly went from running in the alley to casually walking on the sidewalk and that's when I saw him enter the bike shop. And so I figure he was trying to act like any customer and wait until kind of the attention died down and carry on his way.

Q: Were you on 911 phone call right now, at this point?
A: Yeah at this point when I saw him running down the alley I grabbed my, well I pulled out my cell phone and dialed 911 again just to say he's heading in this direction. Not realizing he was deciding to go into a bike shop. So I was on the phone and I explained he went into the bike shop. The whole time I was standing on the sidewalk watching the front of the bike shop to see if he was going to leave so I can update 911 on which direction he would be heading. And then at that point he was in the bicycle shop I'd say maybe up to 5 minutes and then a marked squad car, he was heading south on Lyndale and he pulled up on the cross side of traffic so it would be the east sidewalk directly in front of the bicycle shop. He turned on his lights and as soon as he turned on his lights I saw the guy run out of the bike shop. Well he stepped at first out of the bike shop and then he made a sprint across Lyndale.

Q: Going in what direction?
A: Going west, just south of 27th St. So at that point I ran across Lyndale as well and the squad car turned down 27th St with his lights on to pursue the individual and I believe another squad car pulled up behind him. So I stood in the alley off of basically would be 27th and the alley between Lyndale and Aldrich and just watched down there to see if he had cut back or not. And then after that is when they started putting up the perimeter for the whole area. So that entire time I was on the phone with 911.

Q: Did you hear anything from the police officers at that point?
A: No I stopped down to see if either they had caught the female in the vehicle or if they had found him, probably after about 10 minutes or so and they said, really they didn't give a whole lot of information. I think they kind of assumed I was a nosey person and wondering what was going on.

Q: Do you remember what the female looked like?
A: The female she was I'd say right around 5', fairly short. She had longer black hair, she was wearing a black outfit. They had a child with them when they left the building who I knew was still in the vehicle when they sped out of the lot striking one of the police cars.

Q: Do you know who was driving the car when that happened?
A: The male was. He was definitely the driver. And I could see that, A. when he got in the car, I could also see when he was parked in the spot he was still in the driver's seat.

Q: And she is a black female?
A: Black female, I would say mid to late 20's, same as him, late 20's.

Lathrop Decl. Ex. 6

Q: Do you know their names by chance?
A: I do not. The only kind of recognition I had was off of seeing them off the video and then encountering them in the lobby.

Q: You have video footage here?
A: Yeah.

Q: It shows the back parking lot?
A: Correct.

Q: It shows the police arriving in the parking lot with the suspect vehicle there. The suspect vehicle backing out, the police are ordering the occupants out of the car?
A: Yeah.

Q: And it shows the car, the suspect vehicle striking a squad car?
A: Yup with all the officers with their guns drawn. I mean one of the officers it looked like she had to get out of the way to avoid being stuck between his vehicle and getting hit by her car door which was open kind of blocking that exit. So and I can see perfectly on the video him pulling out and slamming into her car door and then peeling out.

Q: And you have video inside the building as well as the elevator showing both suspects from today?
A: Correct. I have video of him entering basically the property, pulling up to the front entrance, going through the lobby into the elevator. I have video of him and the female in the elevator and then leaving the lobby. Them getting back in their vehicle and then on our other camera them pulling into the parking spot and then all the way up to the police arrived and then afterwards when they sped out of the lot.

Q: Do you know where these suspects went inside this building, what unit they went to?
A: Yes they went to Apartment 303.

Q: Do you know who lives there?
A: Her name is KARNSIE BRYANT.

Q: Can you spell her name?
A: Yeah that would be, I apologize it's Apartment 302 and it's C-A-R-N-E-C-I-E last name, B-R-Y-A-N-T. And we also actually have hallway cameras which recorded the female going en route of the unit and we also have the video footage of the hallway from when the break in occurred on April 30th of both of them going in and out of the unit that evening.

Q: Just to go over the details again, what time did this party arrive (Inaudible)?
A: I'm not sure exactly what time he arrived, I'd have to look at the footage to double check. But I encountered the in the lobby like say right around 1:50 to 2:00.

Q: And then you recognize this person because of the prior incident?
A: Correct.

Q: And part as that incident did you print out pictures like surveillance photos of this person?
A: Yup I turned in, there were screen shots of the individual in the elevator, kind of in our lobby area, the entry vestibules and we also had the full footage as well as the screen shots taken from the footage.

Q: So this wasn't just somebody you saw in passing one time or saw a picture of once?
A: No, this is something where not only did we do the screen shot but the screen shot is done in our office for the last 10 days since this incident occurred. Anytime we have problems we always keep a picture of the individual in the office just for the staff to keep an eye for. The more you see the picture the more your familiar you are, the more characteristics you get to know to look at.

Q: Just to clarify, you said one of the vehicles, the police vehicles that showed up as an undercover pickup truck?
A: Yes I believe so.

Q: The other two vehicles, how did you know they were police cars?
A: They were both clearly marked.

Q: Black and white vehicles?
A: Yup the sedan was a black and white one and the white was or the Tahoe was clearly familiar Minneapolis Police …

Q: Headlights and lights on top, markings….
A: Yup, lights, had the full paint job on it.

Lathrop Decl. Ex. 6

Q: Anything we forgot to ask that you want to add?
A: I don't believe so. Just after it all occurred I made sure, I kind of ran back to the building and printed out the screen shots from the elevator to give to the officers who were doing the perimeter so they have a better idea of who they were looking for.

Q: Did you give the screen shots to the officer?
A: Yes I gave them to probably 6 or 8 different officers who were doing the perimeter, including the clothing he was wearing today when he left the building.

INTERVIEW CONCLUDED AT 1831 HOURS.

**END of Supplement 94**

---

| **Supplement number:** | **95** | **CCN: MP-13-143872** | **Author:** | **004755 - Sara Metcalf** |
|---|---|---|---|---|

Supplement of Sgt S.Metcalf #004755 on 05/29/2013 13:14
RECORDED INTERVIEW WITH RAHMA SALAH
TAKEN BY SGT METCALFE ON 5/9/13 AT 1758 HOURS
2743 LYNDALE AV S, APARTMENT 405
CCN 13-143872, TYPED BY CMH:

Q: I'm here with RAHMA SALAH, can you say and spell your name for me?
A: RAHMA SALAH.

Q: How do you spell it?
A: R-a-h-m-a, S-a-l-a-h.

Q: S-a-l-a-h, and what is your date of birth?
A: ███/1983.

Q: Who do you live here with?
A: With my kids, with my 3 kids and my husband.

Q: What is your phone number?
A: ███████

Q: Were you home today?
A: Yes I was.

Q: Did you hear or see anything today?
A: Yeah me and my husband, we were sitting in the living room. We heard screaming and we looked out of the window we seen a police officer telling a car, get out of the car, get out of the car. And then there was a police woman came, coming to the car and then the car, the people that were in there they took off, that's it.

Q: So you saw the police officer yelling at a car, get out of the car, get out of the car?
A: Yes.

Q: Did anyone get out of the car?
A: No.

Q: And then did the car take off?
A: Yes.

Q: Did you see the car strike anybody?
A: Yes the police woman coming toward the car. Yup.

Q: Did your husband, did he video tape this?
A: Yeah he said, get my phone, get my phone. And then I get his phone, Iphone and he said, let me record it. And then I cannot see it if you record it but if we have it we give it to you.

INTERVIEW CONCLUDED.

**END of Supplement 95**

Lathrop Decl. Ex. 6

Supplement of Sgt A.Kjos #004898 on 05/30/2013 12:03
STATEMENT OF OFFICER RICARDO MURO, BADGE 4899, ON 5/30/13 AT 1030 HOURS
TAKEN BY SGTS. KJOS AND PORRAS, ALSO PRESENT ATTORNEY ROBERT SICOLI
CCN 13-143872
TYPED BY LM

Q: I want to make it clear to you that this is a voluntary statement. This is a criminal investigation into the recent incident you were involved in. The Minneapolis Police Department Homicide Unit is conducting this investigation and the information gathered will be presented to the Hennepin County Attorney. The county attorney may and usually does present matters such as this to the grand jury. The grand jury determines whether or not criminal charges are justified under the law. Your decision to or not to provide a statement will not and cannot be used against you in any employment matter. Do you understand what I have just explained to you?
A: Yes.

Q: Officer MURO, can you tell us how long you have been employed with the Minneapolis Police Department?
A: Since October 1st, 2001.

Q: Prior to working for Minneapolis PD, did you work for any other police agency(s)?
A: No I did not.

Q: Are you currently a member of the MPD SWAT and if so, were you working in that capacity on May 10th, 2013?
A: Yes I am and yes I was.

Q: On that day, what was your assignment/call sign that day and who were you working with?
A: Our call sign was 1280. I was working with Officer PETERSON, Officer VALENCIA, Officer STAUFENBERG, Officer DURAND, Officer LAUX, and Officer MEATH. Our Sergeant, Sgt. STENDER, was in his K9 squad.

Q: Can you describe the uniform you were wearing that day and the type of weapon you had both on your duty belt and available to you in your police vehicle?
A: My uniform was a standard summer short-sleeved uniform with a web drop-down holster. My handgun is a Sig Sauer 226 9mm. In our 1280 van I had my M4, which as 28 rounds in the magazine and no rounds in the chamber.

Q: How many bullets do you keep in your weapon? Please include both the magazine and if there was a bullet chambered into the gun.
A: My magazines are 18-round magazines and one in the chamber. I had three magazines at the time.

Q: Do you regularly qualify with the weapons you are assigned and can you explain how often and when you last qualified?
A: We do regularly qualify with our handguns and our M4. I cannot remember our last qualification date.

Q: On May 10th at about 1430 hours did you and members of your 1280 team assist with the search of the area surrounding W 27th St and Bryant Av S, Mpls?
A: Yes we did.

Q: Can you explain what or who you were searching for, was this person wanted for a specific reason and if you knew a description of the person you were searching for?
A: We knew we were searching for a black male with dreads and red pants. Over the radio we heard remarks that he had fled from 5th Pct. Officers. We also heard that he had hit a 5th Pct. Sergeant's squad. I believed that she also got on the radio saying that he almost hit her.

Q: At some point, did you learn a homeowner of a house within the perimeter you are searching came home to discover his house had been broken into and if so, what did you do?
A: Yes. Officer PETERSON and I were walking northbound from 27th and Aldrich when we heard over the radio that a homeowner at 2717 Bryant had came home and discovered his back door broken into. After we heard this, we ran towards 2717 Bryant. At that point we met up with Sgt. STENDER, Officer DURAND, and Officer MEATH.

Q: At some point did you enter this house and, if so, what was your role?
A: We did, we came into the rear porch area. We noticed that one of the windows to the door had been busted in; however, we noticed that the door was still closed. While we were holding on the porch, Officer PETERSON went and spoke with the homeowner. Officer PETERSON later aired that there should be no one else in the house. At that point, we positioned ourselves to make our way in. I myself was covering the kitchen while Officer DURAND stood by the rear door. Sgt. STENDER yelled numerous times announcing ourselves as Minneapolis Police. He also stated that he was Minneapolis Police K9 and that if anybody was in there to come on out or else you're going to get bit. The K9 was also barking loudly. We waited for a couple

Lathrop Decl. Ex. 6

of minutes and nobody did. After that one of us opened the door. Sgt. STENDER then again announced himself as Minneapolis Police K9 and once again asked for somebody to come out if they were in there or they could be bit. After waiting a few seconds and nobody coming out, we made our way into the first floor going into the kitchen. Once inside the house, we cleared the main floor first. Sgt. STENDER and a couple more officers went upstairs while I stayed covering the front porch and a room by the front door. While Sgt. STENDER and the other officers were upstairs, I noticed a cat run from upstairs past myself and Officer DURAND and ran down to the basement. After Sgt. STENDER and the officers were done in the upstairs they made their way downstairs back towards me. It should be noted that while Sgt. STENDER was upstairs with the other officers, Officer DURAND was posted on the basement and signaled to me and pointed down to the basement. I asked him if he heard something and he nodded his head as if saying yes, and he said something to the extent that he heard some shuffling going on. When Sgt. STENDER came down, he was notified of this.

Q: What happened next:
A: Before going downstairs, Sgt. STENDER once again announced himself as Minneapolis Police K9. He again said this numerous times. With no answer, Sgt. STENDER, Officer DURAND, and Officer PETERSON went down to the basement first since we did not know how big or the conditions of the basement. Officer MEATH and I stayed on the main floor. We then observed the cat run back upstairs to the main floor. Once they were downstairs they started yelling for trailers, which in our vocabulary means that they needed more officers downstairs to help cover the basement. Officer MEATH and I went downstairs at this time. Once downstairs I noticed that the basement was dark, there was no natural light to it, and we could not find a switch to turn on any other kind of lighting. I then turned on the flashlight in my duty weapon in order for me to see. I also noticed that the basement was full of clutter and that there was not really any room for us to walk side by side. There was just enough room for one person to walk through since there was only a narrow passageway to get around the basement. Sgt. STENDER, myself, and another officer cleared the north part of the basement first then made our way to the south. We noticed that there was a small room which the homeowner uses as a pantry. I posted myself on that room while the rest of the officers along with Sgt. STENDER cleared the rest of the basement.

Q: Can you describe the location of this pantry in relation to the stairway?
A: The pantry which I was covering is west or to the left of the stairs and then on the other side of the stairs, which is the east or right side, was a storage area. Next to the storage area is the laundry room. While I was posted on the pantry area, Sgt. STENDER along with Officer PETERSON, Officer DURAND, and Officer MEATH, started searching the storage area since the dog was giving hints that it had picked up a scent, and darted into the storage area. I stayed posted on the storage area since we did not know if there was a walk through underneath the stairs from one room to the other. Within minutes I heard Sgt. STENDER yelling verbal commands something to the extent of let me see your hands, let me see your hands. After Sgt. STENDER gave commands, I turned to see what was going on. That is when I noticed that Sgt. STENDER, Officer PETERSON, Officer DURAND, and Officer MEATH were struggling to take the black male who had been described to us into custody. They ended up in the laundry room and at that point I gave up my position in the pantry area to go and assist them. I holstered my duty weapon because I believed I was going to go hands on to assist the other officers to take the suspect into custody. Once in the laundry room, I heard somebody saying put your hands behind your back. Shortly after, I heard somebody yelling numerous times, "he's got a gun." A few seconds later I heard a gunshot go off and at the same time I felt a sharp pain in my right leg. I looked down and I noticed a tear in my pants and, at this time, I myself started yelling, "he's got a gun." I yelled this out numerous times. I also yelled out I've been hit. In my mind this was me telling the other officers that he had a gun, that he was shooting at us, and that I had been hit by one of his rounds. Once I got hit I thought about returning fire. I unholstered my duty weapon to do so. However, I saw that I did not have a shot, so I put my duty weapon back in my holster. The first person I saw was Sgt. STENDER and again I yelled out, "he has a gun, he has a gun, I've been hit." Sgt. STENDER carried me out of the laundry room onto the stairway, where I sat until other officers came to assist me.

Q: At any time did you fire your weapon?
A: No.

Q: Can you describe in more detail what you were able to see in the laundry room after the suspect and other officers went in there?
A: It should be noted that it was dark in there. We were still unable to find any kind of lighting for the basement. Really the only thing I was able to see were the other officers trying to take the suspect into custody while fighting with him.

Q: After you were shot, did you hear anymore gunshots?
A: I did. While I was in the laundry room I believe I heard two to three shots being fired. While I was sitting on the stairwell I then heard numerous shots being fired.

Q: What happened next?
A: While I was on the stairwell I heard somebody saying something to the extent I've been shot. I heard this numerous times. I later found out that it was Officer MEATH who had also been hit. I then heard Sgt. STENDER get on the radio and ask for assistance. A few seconds later other officers came into the basement where some of them started giving me first aid. Since I knew I had been hit high, I started to panic and I became scared since I knew that I had been hit close to my femoral artery. At this time I took out my tourniquet that I carry on my right cargo pocket and I gave it to one of the officers to put on me. Once it was on me, I was carried up the stairs, up to the front yard, where Sgt. STENDER and Officer VALENCIA cut my pants and

Lathrop Decl. Ex. 6

reapplied the tourniquet to give a tighter seal to it. I was then loaded onto an ambulance. Officer VALENCIA rode with me down to HCMC.

Q: What injury did you receive from this gunshot wound?
A: The round struck the upper part of my femur, which ended up shattering it in about three different places. I ended up having to get several blood transfusions during surgery and another one a couple days later due to the fact that I had lost so much blood. I also ended up having to go through an approximately 5-hour surgery where a titanium rod was inserted into my femur. The rod is also being held by four screws, two by my knee and another two by my hip.

Q: Were the doctors able to completely reconstruct your femur bone?
A: No they were not. Some of my femur is missing and at this point it is unknown if I will be able to go back to 100-percent status as I was before the incident.

Q: Are you currently on any medications to control the pain from this gunshot wound?
A: I am. I take one Percocet at night just to help me sleep because of the pain caused by the injury. I am also on a blood thinner, which is an injection that I have to give myself in the stomach area every day since the doctors are worried of blood clots in my leg since I am unable to move it.

Q: Can you think of anything that I may not have asked you that you feel would be pertinent to this investigation?
A: Not at this time.

Q: To the best of your knowledge, is this a true and accurate statement?
A: Yes it is.

_____
Officer MURO


_____
Witness

**END of Supplement 96**

| Supplement number: | 97 | CCN: MP-13-143872 | Author: | 004898 - Ann Kjos |
|---|---|---|---|---|

Supplement of Sgt A.Kjos #004898 on 05/31/2013 11:20
INTERVIEW OF IFRAH MOHAMAD
BY SGT. KJOS
TYPED BY LM
CCN 13-143872

Q: Hi.
A: Hi.

Q: Sorry to keep you waiting so long. Are you better?
A: Yeah I am now INAUDIBLE.

Q: So you had an asthma attack?
A: Yeah.

Q: Um do you, this girl. CALA?
A: Yeah.

Q: Do you work with her?
A: Yes.

Q: Okay, and was she at work today?
A: Yes.

Q: Okay, can I get your name real quick?
A: IFRAH (I-F-R-A-H) MOHAMAD.

Lathrop Decl. Ex. 6

Q: MOHAMAD?
A: Yeah, M-O-H-A-M-A-D. You, that's the last name.

Q: Okay, your middle name?
A: BASHIR.

Q: Spell it.
A: B-A-S-H-I-R.

Q: And a birth date.
A: ███/1991.

Q: Okay um, where do you live at?
A: I live at 1414 Portland.

Q: Portland?
A: Yep.

Q: Okay, in an apartment?
A: 207.

Q: And can I get your phone number?
A: ███

Q: Mm-hm.
A: ███

Q: ███?
A: Yes.

Q: Okay.
A: ███

Q: ██?
A: Mm-hm.

Q: Okay, so you, you're at work today.
A: Mm-hm.

Q: What time did you get to work?
A: Mmm at 9:15.

Q: In the morning?
A: Mm-hm.

Q: Is CARLA at work yet?
A: At that time?

Q: Yeah.
A: No, she's come at 1:00.

Q: She doesn't come in until 1:00?
A: Mm-hm.

Q: And what is her role at work?
A: She's uh assistant teacher.

Q: She's an assistant teacher, and this is at Salama?
A: Salama Child Care Center.

Q: Salama Child Care Center, okay, and that's at 1411 Nicollet South?
A: Mm-hm.

Q: Okay, and she always starts at 1:00; does she work with you?

Lathrop Decl. Ex. 6

A: No I'm front desk.

Q: You're at the front desk?
A: Mm-hm.

Q: Okay, so CARLA
A: CALA.

Q: CALA, sorry about that, and today did she start at 1:00?
A: Yes I say so.

Q: And was she upset about anything?
A: No, she was just okay.

Q: Okay, and then how did it happen that you had to give her a ride somewhere?
A: Actually, we have training for OSHA meeting.

Q: Okay.
A: And then I supposed to come like I supposed to make it to meeting but I didn't have my break so the supervisor told me I can leave at 2:30.

Q: Okay.
A: So I was just using the computer just finish typing on my stuff and then CALA came to me and was like oh please what time are you leaving, I was like I'm leaving right now, I'm supposed to leave right now and she was like okay can you give me a ride, and it's like why. My friend took my car and then he called me right now, police pull over and he get, police take him away and he left my car in the keys, he left the car in the keys, and he give me, can you give me a ride to get my car from there 'cause just sitting there somebody can steal it, and it was like are you sure, yes before the police get it because she was thinking like she, the way we were thinking is like we didn't think it was serious, just thinking he get something he had something like um not big deal like hitting boys and it's like maybe he get so we were thinking like what he did, like get a ticket maybe he didn't pay for so the police got him and you have to pay so you have to go to jail, so that's why. Anyway, so then we're talking and then it was like what was the place and then we came on Bryant and everywhere there were police and I was like, are you sure? She was like I don't know just what is the big deal he called me he say everything is okay, and I was like why don't you ask the police and they know about the car because of, what if he steal it, what if something, so I'm like, why don't you ask the police, and this guy has a gun and holding on to it and she went there and was asking him. And he was like, you talk to that officer. And that's when the problem started.

Q: So she was at work and at 2:30 you were getting.
A: I didn't, it wasn't exactly like, I would say 2, 2, 2:30 something, I wasn't sure like, it was right around that, it was around then.

Q: Okay, but he, but she, she says my boyfriend called I need to.
A: It wasn't boyfriend, she said it's my friend.

Q: Okay, did she say what his name was?
A: Mmm, she was telling the officer but I don't know. Names, if she said it to me but I don't know what it is.

Q: That's fine, but she was, then you left and you brought her there and that's when everything happened?
A: Yeah, and I was like thinking, the officer he went to your car and help you out, let's just wait here and ask her because I have to go like counselor for my school for my final exam and everything and it was like I wanna go because 3:30 I have an appointment and I have to go I have exams to do I have everything to do.

Q: Mm-hm.
A: And she is like, can you give me one second. Like, I don't know like I can't ask the police to give me a ride to work.

Q: Right.
A: But she was thinking about work at that time.

Q: Okay.
A: Cause it was like slow, they were just looking for him, and what did he did? He just hit a car so when he hit it was like it hit the police, maybe it was intentional or unintentional, right, we don't know that and we didn't think it was just beyond that. I was like, don't be rude, I just think to myself, don't be rude, she need a ride so wait a little bit. It was like 3:15 or something. And after that it was 3:30 and the boy's like, the policeman, we were standing behind a parked car, "get in the car!" And I tried to run to drive my car and then the lady said, don't let her go 'cause she was the only one who know's the guy. And he, the police get a phone call and he shot the officer, and then she said don't let her go because she was only witness there.

Lathrop Decl. Ex. 6

Q: Ahhh.
A: And it was like I was trying to run away because the policeman told me like don't stay there you have to run and he was like it's not safe in here, and then I get in my car it's like get out get out and then I heard him do, the car she was in.

Q: Okay.
A: The police didn't tell me to get in I was so scared I was thinking the police car was only safe place like I'll be safe like a little bit.

Q: Okay.
A: Some people won't go in a police car and they should. Like okay and then last time I gasp because the place was like so hot and nobody, everybody thinks we are criminals so nobody opened the door and we are knocking like, and then, and then after that we called 911, I was thinking like okay the glass is locked, the glass is locked. 'Cause the worst was, the police kept coming and shot by then another one goes by and that's it. Then I get out of the car and they came to me and then I was taken to the hospital.

Q: Okay, alright, you can go home now. What, what Officer MORALES is going to do is he's going to bring, you have your key to your car now, right?
A: Mm-hm.

Q: Uh that officer, one of the other officers made sure your car was parked legally and you can now go back there and you can go home, and thank you very much. I'm going to give you my card if you have any questions and concerns about your car.
A: Okay, what about the health insurance. I don't have health insurance.

Q: That's all, that's all part of um, I don't know exactly how that works honestly.
A: Yeah, I understand.

Q: But, but I'll try to help you figure it out. I know who can help you but I don't know here phone number right now. If you give me a call like tomorrow I can give you her phone number, okay?
A: Okay.

Q: Her name is JULIE, her name is JULIE CHALMERS. Maybe I do have her number.
A: If I don't have health insurance, I mean I don't have health insurance.

Q: No I know, boy I know, and she, she works with our witnesses and.
A: Is she in big trouble, my co-worker.

Q: No, she is not in any trouble at all.
A: Okay.

Q: Oh I don't have her phone number.
A: That's just fine, and JULIE I will call, give her a call.

Q: Yep and I will have it hopefully by tomorrow, otherwise I'll have it in a couple days, okay?
A: Is there any way I can use the bathroom?

Q: Yep.

END OF INTERVIEW

**END of Supplement 97**

---

| Supplement number: | 98 | CCN: MP-13-143872 | Author: | 005786 - Luis Porras |
|---|---|---|---|---|

Supplement of Sgt L.Porras #005786 on 06/05/2013 12:53
Investigative supplement of Sgt. Luis Porras
13-143872

On 06-05-2013, at approximately 0930 hours I went to the SOC and met with Sgt. Stender. I told him that I would need a DNA Buccal from him for comparative analysis. I opened the blue sealed envelope and told Sgt. Stender with the first Q-tip I would like a sample from his inner left cheek.

I placed this Q-tip in its original paper sleeve and handed him the second Q-tip. With this one, I asked Sgt. Stender to provide me with a sample from his inner right check. This Q-Tip was then placed in its original paper sleeve. These Q-Tips were placed in the yellow envelope and sealed with the red seal tape provided.

Lathrop Decl. Ex. 6

The yellow envelope was then placed in the larger blue envelope and I hand carried it to the Minneapolis Property and Evidence Unit.

This envelope and the DNA buccals for Officer's Meath and Muro were signed out. I filled out the proper paper required for the BCA. I accessed the DVS system for these three Officers to obtain their date of birth as it was required in the BCA paperwork.

I went to the BCA Forensic Laboratory in St. Paul where all three samples were signed in and received by Julie Dornseif.

Sgt. Luis Porras
Homicide Unit
Case Open

**END of Supplement 98**

| Supplement number: | 99 | CCN: MP-13-143872 | Author: | 006927 - Michael Strauss |
|---|---|---|---|---|

Supplement of Sgt M.Strauss #006927 on 06/06/2013 12:04
On the above date I was working in the 1st PCT when I heard a call on the radio that 2 Minneapolis officers had been shot at a house in the 5th PCT. Officer Westlund and I got into marked squad 924 and drove to about a block away from the scene, I donned my plate carrier that has "Minneapolis Police" on the front and the back, grabbed my patrol rifle and we went on foot to the scene where I observed injured officers being worked on and loaded into the ambulance. I went directly to Sgt Stender and asked him if there were any suspects still outstanding or if there was anything that needed to be searched or secured. He told me that the house was completely secure and there were no other suspects. I asked him what he needed me to do and he told me to check on his officers that were still in the basement.

I went to the side door of the house where Sgt Moore was and told him that I was asked by Sgt Stender to check on his guys and I entered the door and went directly to the bottom of the stairs in the dark basement where I observed officers Durand and Laux. I asked them if they were ok and if either of them had been shot or hurt and both of them stated they were ok. I asked them if they needed anything and they asked for water. I yelled upstairs/outside to Officer Westlund and asked him to get some water and he returned with a bottle of water which I went up and got and brought back down and gave to Durand.

While downstairs I put my arms around Durand and asked him if he was ok, he said he was and he said "it was my gun Sarge". I told him it's ok and it will all get figured out. He told me he has Meath's pistol in his back pocket because he secured it and he asked if I wanted to take it and Durand's issued MP5 that he was still in possession of and I told him no and that would be up to the investigators. I asked Durand and Laux if they needed anything else and they said no.

I went up the stairs and back outside and asked Sgt Stender what else he needed help with and he asked me to go to the hospital to check on his Officers Meath and Muro. I stated that I would do that and I went to my squad and secured my patrol rifle and plate carrier.

Officer Westlund and I then drove to HCMC where Meath and Muro had been transported.

**END of Supplement 99**

| Supplement number: | 100 | CCN: MP-13-143872 | Author: | 002880 - Deborah Heilman |
|---|---|---|---|---|

Supplement of P S T D.Heilman #002880 on 06/06/2013 15:01

On 6/6/2013 I submitted an ATF E-Trace request on the recovered gun in this case, trace # T20130154813.
**END of Supplement 100**

| Supplement number: | 101 | CCN: MP-13-143872 | Author: | 004898 - Ann Kjos |
|---|---|---|---|---|

Supplement of Sgt A.Kjos #004898 on 06/06/2013 22:11
INTERVIEW OF ANQUANETTE HOLLMAN
BY SGT. PORRAS & SGT. KJOS
TYPED BY LM
CCN 13-143872

Q: Sgt. Keegel: Okay they're out of Sprite, we have root beer, diet Coke, diet Mountain Dew is on there, um. None of those? I mean I can try a different spot and see if they got it.
A: Um anything would fine, nothing diet though.

Lathrop Decl. Ex. 6

Q: Okay, so regular type, I mean do you like root beer or not really?
A: Yeah I drink root beer.

Q: Okay, alright, I'll get your...
A: Thanks. (Unknown left room)

Q: Sure.
A: (crying)

Q: Sgt. KJOS: Hey.
A: Hi.

Q: Sgt. PORRAS: Thanks for coming down.
A: You're welcome.

Q: Sgt. KJOS: I'm ANN, this is LUIS. Sgt. PORRAS: What's a good contact number for you ANQUANETTE?
A: Um I don't have any phone besides my mom.

Q: Sgt. KJOS: Because why?
A: Blaine Police had contact me through my mom.

Q: What's that number?
A: ███████ .

Q: That's who you were with when police officers found you?
A: Mmhm (affirmative).

Q: Sgt. PORRAS: But what's your sister?
A: Hmm?

Q: Your sister, you hang with her a lot?
A: Yeah but her phone is off.

Q: Her phone's off?
A: (inaudible)

Q: Okay. Sgt. KJOS: What's your mom's name?
A: ADDIE.

Q: A?
A: A-D-D-I-E.

Q: And what's her last name?
A: HAMMOND, H-A-M-M-O-N-D.

Q: H-A?
A: M-M-O-N-D.

Q: Okay, so earlier today, can you kinda tell us what happened earlier today?
A: Mmm, MOOKIE came and picked me up and we sat in the car, but he parked us in the car for like five minutes and that's when the, I don't know, the polices came out their cars with their guns out and MOOKIE sat there, I don't know what he thought, I don't know what he's thinkin but I had put my hands on the dashboard, I did what the cops had told me to do.

Q: Is that what, what were they yelling?
A: Put your hands on the dashboard and put your hands on the steering wheel, throw the keys out the car.

Q: And what, what, why wasn't he, was he saying anything?
A: Mm-mm, no.

Q: What did he do?
A: He drove off and I kept trying to take the key out.

Q: Take the key out?

Lathrop Decl. Ex. 6

A: Out the ignition.

Q: You tried to take the key out?
A: Mmhm (affirmative). Yeah.

Q: Okay, how far did he, he didn't go very far though did he?
A: He went down two blocks and parked the car in the back of an apartment building and hopped out and ran.

Q: Did he say anything to you? Did he tell you to move the car?
A: No he didn't say nothin, nothin.

Q: What did you do then, after he left?
A: I had got out the car and got my kids and walked back to where it first happened at.

Q: But you moved the car first?
A: No.

Q: Well yeah, I mean we got.
A: Well yeah okay yeah I did move the car, I parked the car and got my kids out, then I walked and left.

Q: What um, where are the keys to the car?
A: They're at my house.

Q: Right now they're at your house?
A: Mmhm (affirmative).

Q: Which house?
A: Well they're at my granny's house.

Q: Well the house where, the one that you just got, came from?
A: Mmhm, the one that they just picked me up at.

Q: And what apartment is your granny in?
A: She's in apartment um 302.

Q: Okay, and what's her name?
A: CARNECI RYAN, I don't know how to spell her name.

Q: We're gonna have to get those.
A: Okay.

Q: So how did you, did he call you then after he ran?
A: No. I tried to call him to see if he got, you know if the police take your phone, they cut it off.

Q: Mmhm.
A: So I was gonna see if they kept goin to voicemail and when he answered one time and that's when I asked where he was at and I think he you know he was, I don't know, hide out, I don't know if he, he just told me he was over north and that's the last I heard.

Q: What time was that do you think?
A: Mmm I wasn't gonna go but it was during the daytime like right after almost everything happened and still before the shooting.

Q: Okay. What number did you call him from?
A: I called him, I don't know my grannies phone number, I'm serious, but it it it's a number in a house phone.

Q: Okay, so you went, so immediately after moving the car and getting your kids out of the car you walked back to granny's house?
A: Mmhm (affirmative).

Q: When you get to granny's house you call her from her landline, so her house phone?
A: Mmhm (affirmative).

Q: Or is it a cell phone?

Lathrop Decl. Ex. 6

A: House phone.

Q: Okay, and then he says, what did he tell you?
A: I asked him where was he at and he said he was over north.

Q: Okay, and then did you eventually, where did you go then, what did you do?
A: I just sat in my house, I didn't know what to do.

Q: Okay. How did you learn about the shooting?
A: The news, I was watching the news.

Q: Okay. Sgt. PORRAS: And what made you think it was him?
A: I just know, I mean nobody, nothing else happened at all over there today. And from him running and in that same area, I know it was him, I mean I just knew it.

Q: Why would he have ran?
A: I don't know, I don't know why he just didn't get out the car.

Q: (inaudible)
A: And everything.

Q: Sgt. KJOS: What were you guys doing in the car?
A: He was rolling some weed.

Q: Okay. Did he throw it out before the cops got to him?
A: I don't know what he did with it.

Q: Sgt. PORRAS: Um, what was he into, I mean how did he make his money, how was he supporting himself, how was he?
A: I don't know, my, from what I know is that he you know he went to school and graduated, and he had jobs before but I don't know right now how he get his money, we just started talkin three months ago.

Q: Yeah.
A: Like I gave him money before but I mean.

Q: Did um, so you don't know how he was supporting himself? He didn't have a job now did he?
A: No.

Q: Was he?
A: He had, he just had surgery somewhere right here.

Q: Sgt. KJOS: On his abdomen?
A: Yeah that's what he said, he couldn't work.

Q: Like a? Sgt. PORRAS: Like a hernia or something (inaudible)?
A: Yeah.

Q: What time did he pick you up today?
A: I don't know exactly, around 2:00.

Q: Sgt. KJOS: 2:00?
A: (inaudible)

Q: Sgt. PORRAS: Did you guys go anywhere after he picked you up?
A: Hmm?

Q: Did you guys go to like a store or did you guys go anywhere?
A: Mm-mm, we was goin nowhere. After all the police came?

Q: No, right when he picked you up at 2:00ish.
A: No, we never got to leave the parking lot.

Q: (inaudible)
A: I don't even know how they knew where, I didn't know nothing, I didn't even know that it was a stolen car.

Lathrop Decl. Ex. 6

Q: Sgt. KJOS: 'Cause then basically he picks you up, you guys park, he's rolling a blunt, and then the cops come up?
A: Mm-mm (affirmative).

Q: Is he not supposed to be in that building?
A: I don't know.

Q: Okay, so you have no idea why the cops would.
A: No that's why, he asked why the cops was there, he asked why is he getting pulled over.

Q: Did they pull their guns out right away?
A: Mm-hm (affirmative).

Q: Okay, and then you put your hands and you heard 'em, the sunroof was open right?
A: I heard, my window was open. They had my shirt.

Q: Okay.
A: And I kept telling him you know my babies are in the car so I didn't know if they was going to shoot or not, I don't know.

Q: Mmhm. But he obviously heard to you know put his hands up and all that?
A: Of course, he should've known that when they got out, I mean he knew when they got out what he had to do and that they was stopping us 'cause at first he had just pulled off when he seen the police. I guess, we was gonna pull off anyways and that's when they told us to stop the vehicle.

Q: Okay, and then he hit like a, he hit the squad right?
A: Oh yeah the door was open.

Q: On the squad car?
A: He didn't like, it wasn't like a bad hit or anything, I don't know.

Q: Not too much damage. Did you walk down to?
A: I walked back to the building.

Q: You walked back to the building but then after you saw on the news did you walk down there?
A: Mmhm (affirmative).

Q: Did you talk to anybody to find out what happened?
A: Mmm I mean I really didn't talk to nobody but the news.

Q: Sgt. PORRAS: Talked to who?
A: The news.

Q: The news? What did you tell them?
A: That I was in the car when it all started happening and basically like you know everything I was telly you guys but little stuff, like.. And I didn't really want to talk to them I mean I just they asked me like questions right, how long have you known him, what's your relationship, what kinda guy was he and did he have a gun and that was it.

Q: Sgt. KJOS: Did he have a gun?
A: Not that I know of, I don't know, I just got in the car and anyway I planned to get in the car and take me to St. Paul so I could fill out this application for an apartment building because I just lost my place I mean.

Q: Sgt. PORRAS: You ever seen him with a gun in the past?
A: Mm-mm, no.

Q: No?
A: Mm-mm, never, never, I'm surprised that he did that. I would never think he would do that. He wasn't that type of person when he was around me, he was always like laughin, always makin jokes.

Q: How is it that you met him? I see you guys have been dating for three months?
A: I've known him through mmm MICHAEL and JEREMIAH, I forgot, well he and JEREMIAH cousin used to date.

Q: Is his uh CHARLES' cousin in jail?
A: Yeah, he just went to jail. He gotta do three years (inaudible).

Q: Sgt. KJOS: But he never called you after, you called him after this and he said he was over north?

Lathrop Decl. Ex. 6

A: Mmhm (affirmative).

Q: What number did you call him at?
A: It's his cell phone.

Q: Do you know what the number is?
A: ███████████.

Q: Do you know what his real name is?
A: No, I just know him by TERRELL.

Q: Do you call him MOOKIE?
A: Mmhm, I call him MOOKIE.

Q: We'll have to bring you back to gramma's house because we gotta get those keys, alright?
A: (inaudible)

Q: Okay.
A: Is it okay if I ride with my mom?

Q: You gonna go straight back there?
A: Yeah she was gonna take me back there.

Q: It's okay if you ride with your mom.
A: My kids are in there.

Q: That's fine. So do we park in the back or?
A: No you can park in the back 'cause the front is (inaudible).

Q: When does your, oh your mom's here right now, so we can talk to her right now and we can tell her what's going on?
A: (groans)

Q: Does she, did you tell her?
A: She knows like from the news and I mean.

Q: Had she ever met MOOKIE?
A: Mmhm, one time or twice, she seen him twice and the first time she met him she cussed him out so.

Q: Why?
A: Because we were movin into our house and he um, my mom happened to ask him if he can um help and he told 'em that he couldn't 'cause he had surgery and they didn't believe him at first so they were kinda mad.

Q: Yeah, alright, oh, who is this?
A: That's MOOKIE.

Q: Can I get you to sign that for me?
A: Yeah. (inaudible) Right here?

Q: Yeah, sign right there, that's fine. Today is May 10th if you can put that on there.
A: (crying) Is there any more tissues?
Q: Yeah. Hold on.
A: (crying)

Q: Here you go, you can just keep that. You want to go sit with your mom?
A: No.

Q: Okay, wait right here for a sec, okay, get your stuff together and we'll get our stuff and then we can leave.
A: (crying for several minutes)

END OF INTERVIEW

**END of Supplement 101**

| | | | | |
|---|---|---|---|---|
| **Supplement number:** | 102 | **CCN:** MP-13-143872 | **Author:** | 081432 - Tracy MacDougall |

Lathrop Decl. Ex. 6

Supplement of FS T.MacDougall #081432 on 06/07/2013 08:21
Forensic Garage Report


On 06/03/13, I began processing the following vehicle per the request of Sgt. Porras, Homicide Unit and pursuant to a search warrant:

MN LIC# 647-KLW; 2002 Chrysler PT Cruiser, blue, 4dr plus rear lift gate

The vehicle was located inside the Forensic Garage and was recovered without keys. The windows were closed with the exception of the front passenger window which was partially down. The sunroof was also open. The rear driver side taillight had clear tape on it. There was minor damage to the hood and the front passenger quarter panel. Also noted was what appeared to be white scrape marks on the front passenger side of the bumper and front quarter panel.

I took overall photographs of the exterior of the vehicle to include the above listed areas.

I swabbed the exterior door handles including the rear lift gate for possible DNA evidence.
I took overall photographs of the interior of the vehicle.

The following areas of the interior of the vehicle were swabbed for possible DNA evidence:
- driver door handles and controls
- rear driver door handles
- front passenger door handles and controls
- rear passenger door handles
- lift gate grip handle
- steering wheel
- turn signal arm/switch
- wiper arm/switch
- cruise control arm/switch
- gear shift knob/lever
- radio controls
- heat/cool controls


The following items were photographed and collected:
-dark blue Hollister hooded jacket, size M from driver seat
- Kimono Thin unopened package; 1 red Bic lighter; and 1- key chain with two keys and a Dane-Elec 16GB USB from right pocket of Hollister jacket (packaged separately)
- key ring with three keys; 1- pack Trident Layers gum; and one LG Travel Adapter from left pocket of Hollister jacket (packaged separately)
- black Air Jordan bag containing one Sony PS3 game console, Model: CECH-3001A, serial number: CF765564410-CECH-3001A; miscellaneous games; miscellaneous cords, Trio tablet, Model: Stealth Pro (no serial number found); personal items; paper bearing the name of Jarrlon Ribinson from rear driver floor
- silver iPOD (no serial number found) from glove box
- MN DMV registration receipt for above vehicle bearing name of Cala Scott from glove box
- Straw from McDonald's cup that was located in the center console passenger side cup holder
- Brisk Pink Lemonade plastic bottle located between the driver and front passenger seat, next to emergency brake lever (I swabbed the mouth of the bottle for possible DNA evidence). It should be noted that the contents were dumped.

Possible paint transfer was noted on the front passenger side bumper and front passenger side quarter panel. I removed and collected sections of these areas. Additional photographs were taken of the damage.

On 06/06/13, I obtained the keys for the vehicle from Sgt. Porras so I would be able to shut the sunroof and front passenger window. The vehicle's battery was dead. Using a battery charger, I was able to shut the sunroof, front passenger window and turn off the parking lights and windshield wipers. The vehicle was towed and moved to the fenced Forensic Lot. Per Sgt. Porras, the keys will remain at the Minneapolis Impound Lot with the vehicle.

The above collected items were property inventoried in the Property and Evidence Unit. The photographs will be retained in the Crime Lab Unit files.

I completed processing the vehicle on 06/06/13. I left a copy of the search warrant and receipt inside the vehicle.

I HEREBY CERTIFY THAT THIS IS A REPORT OF THE CONCLUSIONS OF EXAMINATIONS PERFORMED BY ME.

FS T. MacDougall
MPD CLU

Lathrop Decl. Ex. 6

**END of Supplement 102**

| Supplement number: | 103 | CCN: MP-13-143872 | Author: | 108064 - Kristin Jacobson |
|---|---|---|---|---|

Supplement of FS K.Jacobson #108064 on 06/08/2013 23:24
Evidence Processing Report

CASE #13-143872

On 5/11/13, FS Berget took photographs to include close-up views of all collected items (see supplement #81), except for the following:
-Blue buttons
-DCC's
-Fired bullets
-Dreadlocks

I swabbed areas of BLS from the following items:
C - "Federal 45 Auto+P" DCC
D - "FC 9mm Luger" DCC
H - "Federal 45 Auto+P" DCC
M - "FC 9mm Luger" DCC
-Safariland leg holster
-"FC 9mm Luger" DCC (unmarked, under deceased)
-Fired bullet (closet floor along north wall)

The DCCs and fired bullet were then cleaned.

I swabbed the following items/areas for possible DNA evidence:
-LG Boost Mobile cell phone
-Handle of Wusthof black-handled kitchen knife with white powdery substance on blade
-Handle of black-handled kitchen knife with white powdery substance on blade
-Fired bullet (red toolbox organizer tray, closet along north wall)

I took samples of the white powdery substance observed on the blades of both kitchen knives.

I processed the cell phone and blades of both kitchen knives for latent print evidence. Ridge detail developed on the cell phone was insufficient for comparison purposes. No ridge detail was developed on the knives.

On 5/15/13, I swabbed the grips, trigger, trigger guard, fore grips, stock, barrel, and tactical light of the HK MP5 9mmx19 caliber sub-machine gun (SN: 62-350264) for possible DNA evidence. I also swabbed the magazine of the MP5 for possible DNA evidence. Additional photographs to include close-up views were taken of the MP5 and magazine prior to swabbing.

On 6/8/13, I swabbed the following items/areas for possible DNA evidence:
-Grips, trigger, and barrel of the Sig Sauer .45 caliber semi-automatic handgun (Model: P220, SN: G361048)
-Sig Sauer .45 caliber magazine
-Black Oakley sunglasses frames
-Two sunglasses lenses
-Black Harley Davidson sunglasses

FS Berget took photographs with scale of footwear outsole impressions on the Anthropologie paper bag with BLS.

All collected items from the scene, BLS swabs, DNA swabs, and samples of the white-powdery substance were inventoried in the Property and Evidence Unit.

The evidence photographs will be retained in the Crime Lab Unit.

I HEREBY CERTIFY THAT THIS IS A REPORT OF THE CONCLUSIONS OF EXAMINATIONS PERFORMED BY ME.

FS K Jacobson
MPD Crime Lab Unit
**END of Supplement 103**

| Supplement number: | 104 | CCN: MP-13-143872 | Author: | 002880 - Deborah Heilman |
|---|---|---|---|---|

Lathrop Decl. Ex. 6

Supplement of P S T D.Heilman #002880 on 06/12/2013 10:21


ATF E-TRACE NUMBER - T20130154813

FIREARM INFORMATION:

Manufacturer: Heckler and Koch
Model: MP5
Caliber: 9
Serial Number: 62-350264
Type: Machine Gun
Country: Germany
Importer: Heckler & Koch Inc.

PURCHASER INFORMATION:

(None)

DEALER INFORMATION:

Minneapolis Police Department
Federal Firearms License #: Z0069151
350 S. 5th St. City Hall
Minneapolis, MN 55415

SHIP-TO-DATE: 10/16/1995

RECOVERY DATE: 05/06/2013

SUMMARY OF RESULTS:

This firearm was traced to a government and/or law enforcement agency.

END

**END of Supplement 104**

---

| **Supplement number:** | **105** | **CCN: MP-13-143872** | **Author:** | **005916 - Kristin Reynolds** |
|---|---|---|---|---|

---

Supplement of FS K.Reynolds #005916 on 06/14/2013 12:42
SUPPLEMENT OF K. REYNOLDS, F.S. - CRIME LAB/FIREARMS - 6//13

I received a work order request on 6/10/13 from Sgt. A. Kjos of the MPD Homicide Unit and retrieved the following evidence from the MPD Property Room on 6/10/13 for examination:
From 13-143872:
P#13-16342:
Item - 1: Heckler & Koch, 9mm, MP5 sub machine gun, serial number 62-350264.
Item - 2: live cartridge (9mm) in envelope marked, "from chamber of MP5".
Item - 3: Magazine, capacity 31, in envelope marked, "from HK MP5" with 24 live cartridges (9mm).


From 13-143770:
P#13-15787:
Item - 4: SigSauer, 9mm, P226 semi-automatic pistol, serial number UU 703096.
Item - 5: live cartridge (9mm) in envelope marked, "from chamber….OFC Peterson".
Item - 6: Magazine, capacity 20, in envelope marked, "From OFC Peterson" with 15 live cartridges (9mm).
Item - 7A: Magazine, capacity 20, in envelope marked, "Spare Magazine A…from OFC Peterson", with 20 live cartridges (9mm).
Item - 7B: Magazine, capacity 20, in envelope marked, "Spare Magazine B…from OFC Peterson", with 20 live cartridges (9mm).


P#13-15790:
Item - 8: SigSauer, 9mm, P225 semi-automatic pistol, serial number U779353.
Item - 9: live cartridge (9mm) in envelope marked, "from chamber… OFC Muro".

Lathrop Decl. Ex. 6

Item - 10: Magazine, capacity 18, in envelope marked, "from OFC Muro's handgun" with 17 live cartridges (9mm).

From 13-143872:
P#13-19547:
Item - 11: SigSauer, 45 auto, P220 semi-automatic pistol, serial number G361048, with magazine (capacity 8).
The following evidence was retrieved from the MPD Property Room by M. Hummel (for K. Reynolds) and transferred to me @ 13:44 hours, P#13-19574:
Item - 12: Discharged cartridge casing (9mm) from "EM - F".
Item - 13: Discharged cartridge casing (9mm) from "EM - G".
Item - 14: Discharged cartridge casing (9mm) from "EM - D".
Item - 15: Discharged cartridge casing (9mm) from "EM -L".
Item - 16: Discharged cartridge casing (9mm) from "EM - I".
Item - 17: Discharged cartridge casing (9mm) from "EM - M".
Item - 18: Discharged cartridge casing (9mm) from "floor - under deceased - laundry room".
Item - 19: Discharged cartridge casing (.45) from "EM- C".
Item - 20: Discharged cartridge casing (.45) from "EM- H".
Item - 21: Discharged cartridge casing (.45) from "EM- J".
Item - 22: Discharged cartridge casing (.45) from "EM- K".
Item - 23: Fired bullet, consistent with 38 caliber family/9mm, from "red toolbox".
Item - 24: Fired bullet, consistent with 45 caliber, from "floor laundry room".

P#13-16565 (Medical Examiner)
Item - 25: Fired bulled, consistent with 45 caliber, from ME Envelope #3.
Item - 26: Fired bullet, consistent with 45 caliber, from ME Envelope #4.
Item - 27: Fired bullet, consistent with 45 caliber, from ME Envelope #8.
Item - 28: Fired bullet, consistent with 45 caliber, from ME Envelope #7.
Item - 29: Fired bullet, consistent with 38 caliber family/9mm, from ME Envelope #7 (with Item - 28).
Item - 30: Fired bullet, consistent with 38 caliber family/9mm, from ME Envelope # 5.
Item - 31: Fired bullet, consistent with 38 caliber family/9mm, from ME Envelope #11.
Item - 32A: Fired bullet jacket, consistent with 38 caliber family, from ME Envelope #9.
Item - 32B: apparent lead fragment, with Item 32A in ME Envelope #9.
Item - 32C: apparent lead fragment, with Item 32A in ME Envelope #9.
Item - 32D: apparent lead fragment, with Item 32A in ME Envelope #9.
Item - 33: metal fragment, from ME Envelope #10.
Item - 34A: metal fragment, from ME Envelope #2.
Item - 34B: metal fragment from ME Envelope #2.
Item - 34C: metal fragment from ME Envelope #2.
Item - 34D: metal fragment from ME Envelope #2.
Item - 34E: metal fragment from ME Envelope #2.
Item - 34F: metal fragment from ME Envelope #2.
Item - 34G: apparent lead fragment from ME Envelope #2.
Item - 34H: apparent lead fragment from ME Envelope #2.
Item - 34I: apparent lead fragment from ME Envelope #2.
Item - 35A: apparent lead fragment from ME Envelope #1.
Item - 35B: apparent lead fragment from ME Envelope #1.
Item - 36A: apparent lead fragment from ME Envelope #6.
Item - 36B: apparent lead fragment from ME Envelope #6.
Item - 36C: apparent lead fragment from ME Envelope #6.
Item - 37A: metal fragment from ME Envelope #12.
Item - 37B: apparent lead fragment from ME Envelope #12.

CONCLUSIONS:
Item - 1 (H&K, MP5) was test-fired and found to be a normally functioning firearm. Test-fires were obtained from Item - 1. Comparison of test-fired discharged cartridge casings from Item - 1 with Items 12 and 13 (dcc's) showed the presence of matching features. This means Items 12 and 13 are consistent with having been fired in Item - 1. Results were verified.

Item - 4 (Sig Sauer, 9mm, from Officer Peterson) was test-fired and found to be a normally functioning firearm. Test-fires were obtained from Item - 4. Comparison of discharged cartridge casings from Item - 4 with Items 14 through 18 (dcc's) revealed the presence of matching features. This means Items 14 through 18 are consistent with having been fired in Item - 1. Results were verified.

Fired bullets listed as Items 23, and 29 through 32(A - bullet jacket), revealed similar class characteristics and some matching features, most consistent with test-fired bullets from Item - 4 (Sig Sauer, 9mm, from Officer Peterson), however, results were INCONCLUSIVE. This means Items 23, and 29 through 32(A) could not be identified or eliminated as having been fired from

Lathrop Decl. Ex. 6

Item - 4. Results were verified.

Item - 8 (Sig Sauer, 9mm, from Officer Muro) was test-fired and found to be a normally functioning firearm. Test-fires were obtained from Item - 8.

Item - 11 (Sig Sauer, 45 caliber, from Officer Meath) was test-fired and found to be a normally functioning firearm. Test-fires were obtained from Item - 11. Comparison of discharged cartridge casings from Item - 11 with Items 19 through 22 (dcc's) revealed the presence of matching features. This means that Items 19 through 22 are consistent with having been fired in Item - 11. Results were verified.

Comparison of fired bullets from Item - 11 with Items 24 through 28 (fired bullets) revealed the presence of matching features. This means that Items 24 through 28 are consistent with having been fired in Item - 11. Results were verified.

Items 32B, 32C, 32D, 34G, 34H, 34I, 35A, 35B, 36A, 36B, 36C, and 37B are all apparent lead fragments and are unsuitable for comparison examination.

Items 33, 34A, 34B, 34C, 34D, 34E, 34F, and 37A are all metal fragments and are not suitable for identification.

All evidence listed will be returned to the MPD Property Room for inventory on 6/14/13.

This is the report of conclusions of an examination performed by me and verified by M. Hummel, F.S.
K. Reynolds

**END of Supplement 105**

---

| **Supplement number:** | **106** | **CCN:** MP-13-143872 | **Author:** | **004898 - Ann Kjos** |

Supplement of Sgt A.Kjos #004898 on 06/18/2013 08:30

On 5/20/2013 Sgt Porras and I met with Ann Van Bellinger at DUNN Brothers off of 7th and Nicollet Mall. From news reports, Sgt Porras and I knew Ms Van Bellinger was at FLANDER BROTHERS CYCLE, 2707 Lyndale Av. S., Mpls on 5/10/2013. While reviewing an article from the MINNEAPOLIS STAR TRIBUNE, dated 5/11/2013, written by JOY POWELL and MATT McKINNEY, Ms Van Bellinger told reporters she was in the cycle shop visiting friends when a male with dread locks in his hair came into the business. This male was acting strange and according to Ms Van Bellinger, she believed the male was "casing" the store for a robbery.

Sgt Porras and I met with Ms Van Bellinger at about 8 am and asked her to explain what she saw while at FLANDER BROTHERS CYCLE on 5/10/2013. Ms. Van Bellinger said she was in the business when a black male with long dread locks in his hair came bursting through the front door. This male apparently said he was shopping for a bike but then rather than look at the bikes on display, Ms. Van Bellinger said he sat by the window and looked outside. While sitting by the window, Ms. Van Bellinger said the male used his cell phone at least one time which made her think he was either "casing" them for a robbery or waiting for someone else so he could rob them.

Ms Van Bellinger said after several minutes, this male jumped to his feet and ran toward the back of the store. Ms Van Bellinger said the male ended up in the back warehouse area where bikes are stored and worked on. Ms Van Bellinger said this male was running throughout the warehouse and appeared to be looking for a way out of the business. Ms Van Bellinger said eventually the male ran back toward the front of the business and stopped about 3 feet away from her. Ms Van Bellinger said the male was turning his head and looking all around but it seemed to her he didn't even see her standing right in front of him. Ms Van Bellinger said the male then turned, leaped over a counter and ran out of the store.

Ms. Van Bellinger said she and other staff members went out on the sidewalk and asked the owner of a neighboring business if they had just been robbed. This business owner said he thought they (FLANDERS) had been robbed because of all the squad cars in the area.

Ms. Van Bellinger said she did give several interviews to both the print media and TV media but was not sure if any of her interviews made it on TV.

The STAR TRIBUNE article referenced earlier in this statement was found on the web site OFFICER.com. A copy of that article will be property inventoried into this case.

Clothing belonging to Officer Mark Durand and Officer Lucas Peterson was signed out of the MPD Property and Evidence along with the buccal swab obtained from Officer Peterson. These items were brought to the MN BCA for analysis and comparison to evidence already submitted in this case.

Lathrop Decl. Ex. 6

On May 24th, 2013 Officer Mike Meath came to our office along with his attorney Robert Sicoli. Officer Meath gave his formal Q and A. After completing the Q and A, Officer Meath and Mr. Sicoli reviewed the statement. Officer Meath signed the Q and A statement and the original was property inventoried into this case.

On May 30th, 2013 Officer Ricardo Muro came to our office along with his attorney Robert Sicoli. Officer Muro gave his formal Q and A. After completing the Q and A, Officer Muro and Mr. Sicoli reviewed the statement. Officer Muro signed the Q and A statement and the original was property inventoried into this case.

During the course of this investigation, Sgt Porras and I learned someone living in a home near 2717 Bryant Av S made a recording of some officers on the scene of this Critical Incident on 5/10/2013. This recording was posted on the internet site YouTube. The posting was titled Mpls Shooting part 1 and Mpls shooting part 2. With the assistance of Sgt E. Dunphy, I was able to down load both videos to a DVD. This DVD will be property inventoried into this case.

It was also learned Anquanette Hollman had posted what appears to be a threat to police officers on a FACEBOOK page titled Anquanette.trapps. On this page it was stated, I SWEAR WITH THESE 50 SHOTS ILL SHOOT IT OUT WITH 5/0 R.I.P. MOOKIE. It has been verified Anquanette Hollman was with Terrence Franklin when police officers first made contact with him behind 2743 Lyndale Av S. on 5/10/2013. Further, Anquanette Hollman and Cala Scott both told Sgt Porras and I Terrence Franklin is commonly referred by both family and friends as MOOKIE.

A preservation letter was sent to FACEBOOK requesting data on the FACEBOOK page Anquanette.trapps be saved until a search warrant can be drafted and executed. This letter was sent and received via electronic mail on May 22nd, 2013 at 8:40 am. FACEBOOK case number assigned to this request is #242898.

Sgt Ann Kjos
Homicide Unit

**END of Supplement 106**

---

**Supplement number:**      **107**      **CCN: MP-13-143872**      **Author:**      **005786 - Luis Porras**

---

Supplement of Sgt L.Porras #005786 on 06/18/2013 08:34
INTERVIEW OF JAMES BICKAL
BY SGT. PORRAS
TYPED BY LM
CCN 13-143872

Q: This is Sgt. LUIS PORRAS of the Minneapolis Police Department. The date is 5/11/2013 at approximately 1430 hours, and I am at 2717 Bryant Avenue South with the homeowner JAMES BICKAL, and Mr. BICKAL, can you spell your last name for me?
A: B as in Boy, I-C-K-A-L.

Q: Okay, and you live here with your wife, correct?
A: Yes.

Q: And.
A: Daughter's away at college, she'll be back today.

Q: Okay, and what's your wife's name?
A: KRISTIN.

Q: KRISTIN, okay, and a good contact number for you, JAMES?
A: ██████████

Q: Perfect, okay, and um I want to talk about the events yesterday, which would have been the 10th, May 10th, 2013, and we had talked earlier and you said on that morning you had left for work at approximately 6:00 AM, is that correct?
A: Yes.

Q: And you work in St. Paul?
A: Yes.

Q: Okay, so you left work at approximately 2:30 that afternoon?
A: Yes.

Q: Okay, and then you arrived home here on Bryant Avenue South about what time?
A: I stopped for gas so I got, I think I got here about 3:15.

Lathrop Decl. Ex. 6

Q: Okay, so why don't you tell me so you, you come home approximately 3:15 and then what happens, what do you see?
A: Okay um, I see, I came down 27th and turned off Lyndale onto 27th um and I saw police cars uh, I think soon there was an accident at the corner there um, then I turned down Bryant.

Q: South on Bryant?
A: Yep, and uh then I saw more officers at the corner of 28th and uh Bryant, and I turned on 28th and then I turned into the alley going north in the alley between Bryant and Aldrich and between 27th and 28th, um and then I didn't get very far in the alley when I saw um an officer um sort of tell me to, motioned to stop and to back out of the alley, um that it was not safe to be there obviously, so I um, I did that, I backed out of the alley and I found a parking space on 28th Street and I got out of my car and I talked to a um, um, I talked to a police officer. [(door opens) Can I help you? (Oh hi, are you Jim Bickal?) Yeah I'm busy right now. (inaudible) Yeah, I'm with the police department right now. (Oh I'm sorry, excuse me.)] Um and um we um, where was I, I'm sorry, so we went out.

Q: So you were standing on the corner?
A: Yeah, standing on the corner and there was a police officer there with a car um and he was directing people not to go down there and he basically, he told me that it was, that they were searching, he asked where I lived and I told him 2717 Bryant, and he said that they were searching that area and that I should wait over across the street, um.

Q: And did you eventually get the all clear?
A: Yes, and then he uh, then he told me that, he said he would let me know when it was all clear, and um like 15 minutes later he did, so I got in my car and I drove down the alley and um into my garage um, and uh came out of the garage door and walked up my back steps and onto my screened porch um, and first I saw that the rug was askew, and then I saw that the uh glass in the back door was broken.

Q: Okay, and did you, when you noticed that damage and the rug did you call 911?
A: I did not.

Q: Nope, okay, what did you do next?
A: Um well I said something to my neighbor about it who was, I could, who I could, you know who was on her porch next door um, and then I left my porch, walked around the side of the house to Bryant and walked up to the corner of 27th and Bryant um where I saw an officer and I told them that my window and my door was smashed um, and um, then he started telling me, he radioed that to somebody else and then I went to my neighbor's house and uh.

Q: Did you see all the officers kind of get together in a group?
A: Yep (inaudible).

Q: Okay, did you see the dog, the K9 dog, or not?
A: Um, did I see the dog, um, yes, I think I did see a dog.

Q: Okay, and then, but you stayed over in your neighbor's house, right?
A: Yes.

Q: And that's the house directly to the north of you, same side of the street?
A: Yes.

Q: Okay, and um when the officers went in did you hear anything, did you hear any shots being fired?
A: No, I didn't hear the shots being fired.

Q: Okay.
A: Like I say, my, I, my neighbor did um.

Q: Did you hear any yelling?
A: Yes um, I, let's see, oh uh yeah, we heard them say um you're not gonna get outa here, something like that, to the, to the, kind of a yelling coming from inside the house.

Q: Okay.
A: Um.

Q: Did you hear police yelling any commands, any type of orders?
A: Oh let's see.

Q: Or was it just a lot of yelling and.
A: Yeah, I don't remember, I don't remember hearing any other.

Lathrop Decl. Ex. 6

Q: Specifics?
A: Specifics, yeah.

Q: Okay.
A: Um, and I remember there was, well I talked to the one officer about whether uh the front door of, if this door was locked, and I said yes, and that they might need my key and uh, but then they got in the back I think and then um they um, so they didn't need my key.

Q: Okay.
A: And then we heard the, I did hear commotion, I heard you know at a certain point yelling of shots fired and um officer down and then.

Q: And how did you hear that?
A: Through the, in the house?

Q: Oh you could hear it in the, okay, okay. And then um did you see them helping, did you see officers come out the back door at all?
A: I saw, I saw them come out the side door, um, I think the side door, anyways I saw them um working on the one officer on our front yard um and uh he had a bandage on his leg and they were, and he, you know um there was a big crowd around him and uh he was, I could tell he was conscious, that he was drinking water, and (inaudible).

Q: Okay, is there anything else that I might have forgotten to ask you, anything else that you might want to add to this interview?
A: Um, I don't, I mean I, I could tell you other things that I heard, I mean the neighbor said that they um, the guy across the alley saw somebody run through his yard um, and.

Q: Do you um, before I forget, Sgt. KJOS showed you a picture of a blue robe with white piping. Do you recognize that robe?
A: Yes, I think that's my robe.

Q: Okay, okay, okay, this will conclude the interview at this time. Thank you.

**END of Supplement 107**

---

| Supplement number: | 108 | CCN: MP-13-143872 | Author: | 119913 - Benjamin Westrum |
|---|---|---|---|---|

Supplement of ForVi B.Westrum #119913 on 06/27/2013 09:41
Crime Lab Unit - Disc copied
Work order request received on 6/26/13

On 6/26/13 I signed out of the Property Room one disc inventoried under PI # 13-17215 line item 1.

At the request of Barbara Meyer of the County Attorney's Office, this disc was copied. The copied disc was labeled and Meyer was notified that it was ready for pick up from the Crime Lab.

The original disc was then sealed with evidence tape, signed and returned to the Property Room.

**END of Supplement 108**

---

| Supplement number: | 109 | CCN: MP-13-143872 | Author: | 119913 - Benjamin Westrum |
|---|---|---|---|---|

Supplement of ForVi B.Westrum #119913 on 07/02/2013 17:54
Crime Lab Unit - Discs and thumb drive copied
Work order request received on 7/1/13

On 7/2/13 I signed out of the Property Room one "imation" brand USB thumb drive inventoried under PI # 13-16835 line item one, two discs inventoried under PI # 13-19265 line items 1 and 2, and one disc inventoried under PI # 13-20824 line item 1.

At the request of Barbara Meyer of the County Attorney's Office, one disc copy of each form of media was created.

The disc copies were labeled and Meyer was notified that they were available to be picked up from the Crime Lab.

The original discs and the original USB thumb drive were then individually sealed with evidence tape, signed and returned to the Property Room.

Lathrop Decl. Ex. 6

**END of Supplement 109**

| Supplement number: | 110 | CCN: MP-13-143872 | Author: | 003643 - Jamie Karshbaum |
|---|---|---|---|---|

Supplement of Off J.Karshbaum #003643 on 08/19/2013 13:54

On 08/14/2013 I picked up PI # 017589 (line 1) from the BCA and transported it to P&E.

**END of Supplement 110**

| Supplement number: | 111 | CCN: MP-13-143872 | Author: | 004898 - Ann Kjos |
|---|---|---|---|---|

Supplement of Sgt A.Kjos #004898 on 08/26/2013 10:15
INTERVIEW OF TAMIKA O'NEAL
BY SGT. KJOS
TYPED BY LM
CCN 13-143872

Q: I'm gonna ask you some more questions. Okay. I'm ANN, that's LUIS, and we're gonna be investigating this case, okay. Um can you spell your first name for us?
A: T-A-M-I-K-A.

Q: K-A?
A: Yes.

Q: And your last name?
A: O'NEAL.

Q: And what's your phone number?
A: ▮▮▮▮▮▮.

Q: Now your Mom said that you got a phone call from this, how do you say her name? ANQUANETTE?
A: HOLLMAN.

Q: How, so how did that, what time did you get a phone call?
A: Honestly I don't' remember what time.

Q: Okay.
A: But uh she called me and she said um, she said MOOKIE dead and I asked her why and a lot of girls are screamin in the background (inaudible) and so she um hung up the, my phone was dying so the last call that come in erases when your phone dies so the number was erased. I called a couple people that I knew that knew her and they gave me a number, I called the number, it was disconnected. So then I called her twin's number.

Q: Sgt. PORRAS: Is her twin ANTOINETTE?
A: Yeah. And so um.

Q: Sgt. KJOS: What number is that?
A: It's ▮▮.

Q: Sgt. PORRAS: Now is this her twin's number?
A: Yeah.

Q: Okay.
A: ▮▮. I'm sorry my mind's so I can't call up my sister's phone. Can you call my Mom's phone so I get this number?

Q: Sgt. KJOS: Okay, what's your Mom's phone number?
A: 7▮▮▮▮. The number for ANTOINETTE is in his phone.

Q: Sgt. PORRAS: Now if I tell you, then who's this?
A: ANQUANETTE.

Q: ANQUANETTE.
A: Yeah.

Lathrop Decl. Ex. 6

Q: Sgt. KJOS: That's the girl that called you originally.
A: That's the girl he was with.

Q: Sgt. PORRAS: Okay. Can you put your initials on there. Sgt. KJOS: This is your sister's phone and I need the password for your sister's phone. Sgt. PORRAS: (inaudible). Sgt. KJOS: Is that what. Sgt. PORRAS: Yep, yep, and then today's date.
A: She's standing right outside.

Q: 5/10. Actually, how long have you known her?
A: I don't know her personally like a friendwise, but I've known her for I think five years.

Q: Now, but she's dating your brother or they're just friends? Sgt. KJOS: 0320.
A: Yeah, he, they know a lot of girls.

Q: 0320. (Quiet discussion between Sgt. KJOS & Sgt. PORRAS). Sgt. PORRAS: She still, does she live in Brooklyn Park, Center?
A: You know what, I don't know where she lives, I just know sometimes he tell me that uh he gonna meet her 35th and 5th or 34th and 5th, at her grandma's house I think, and um what did she save it under… Oh 6 ████████.

Q: Okay so she says MOOKIE's dead and then her phone's off?
A: Mmhm.

Q: So then you called.
A: And then I called around and then somebody else gave me her twin number, call the phone and um I had asked could I speak with her and she put her on the phone. I said ANQUANETTE where my brother at, she said he dead, I said where he at though. I was already there but she not out there. So it was like okay where he at though, and she was like um I think he's on 27th and Bryant. I said what happened, and she said um that he was in the car and the police rode up and he drove off and then she said that um, she said that my brother hopped out and ran. They fight a lot so I don't know if the police were you know called because they were out there arguing or fightin or whatever, but she said that he jumped out and ran and that the police came to her grandma's house, I don't know if it was because they might followed her there, they followed him there or what? I don't know, but she said the police came to her grandma house they took her in the house and they was lookin for him. Then she says um she went out the door, she said she, I don't know if that's her grandma house on 35th or what or what but she said she went out the door and she tried to go to where they were when the police first pulled up on them and said when she got there it was a whole bunch of commotion and people were hurt and there were police flying down toward Bryant, so she said she went down to Bryant and they were saying that the person that was in the house was dead and that he fired at the police. I asked her did he shoot at the police and did he have a gun. She said she didn't see a gun and she don't know if he shot at the police, when she got there she was just told that the person in the house shot at the police and then you know whatever happened in there. I told her I was gonna call her back and she told me that I could call her back. I told her I was gonna be there with the police right now, and she was like okay and that was it. Me and her like we don't really get a long like that, so I don't really talk to her. I do know that he'd be with her. She has been at my house you know so I know that they do argue a lot, so I don't know if the police was called because of that, if the police was called for some other reason, or I really don't know anything other than that, that's all she told me.

Q: Does she have any kids?
A: She got three.

Q: Okay, do you know how old they are?
A: They babies, I only saw two of 'em, but they were babies. Both of 'em wear Pampers.

Q: Okay.
A: 1, I got a baby that's 1 so one is probably about 1, the other little girl she look like maybe 2, she wasn't really talkin that good so she probably about 2.

Q: Okay.
A: And when I first met her five years ago she didn't have any kids so her oldest kid can't be older than 4 or 5.

Q: Sgt. PORRAS: Okay, but that she told you that the cops came looking for her at her at her grandma's house?
A: She said the cops came to her grandma's house lookin for him.

Q: Oh looking for him.
A: Mmhm. She said they were in there lookin for him.

Q: And where does grandma stay?
A: I don't know, I'm guessin that's her grandma house on 35th and 4th or either 5th, I don't know, but I'm guessin that's her

Lathrop Decl. Ex. 6

grandma's house, I don't know for sure, but she said then that he was on right there on you know on Bryant, that must be her grandma's house if she said it wasn't too far 'cause he was on feet, so I don't know.

Q: Sgt. KJOS: What, do you know was it dark when she called you? So you were already at the scene when you got the phone call from her?
A: No. When I first got the phone call I was at home and I was on the way out the door, it was like 5:30ish.

Q: Okay.
A: And when I talked to her it was when I was just out there. (mumble to herself).

Q: Sgt. PORRAS: Are you friends with her on Facebook?
A: She got a Facebook, he would know.

Q: Do you know what it was under, was it under her name?
A: It was under her name and her picture (inaudible).

Q: Did your brother have a Facebook page?
A: Mmhm.

Q: What was his name on there?
A: MOOKIE MOE.

Q: MOOKIE MOE?
A: (no verbal response)

Q: Um we talked to your parents a little bit okay, and I just want to explain to you kinda what's goin on, okay? Um, the officers are still at the scene okay, our forensic people, our Crime Lab people are still there processing the scene okay, and like we had told your parents um we can't make that positive ID okay, that's up to the Medical Examiner's Office, and once the scene is done they will remove the body okay, and then from there the Medical Examiner's aspect of the investigation okay. What we do is we just kind of backtrack and figure out everybody, we talk to everybody that we possibly can and that's why it's important we find her um, and then from there we talk to all the officers involved okay, and. Sgt. KJOS: Does it seem like she'll cooperate with us if she talks to us, you know, she was very forthcoming with you?
A: Honestly, she don't have a choice with me and she knows it.

Q: Okay.
A: So I don't know if she'll talk to y'all but.

Q: But she's definitely, she can be reached at her sister's house, I mean at her sister's phone?
A: Yeah.

Q: And then she's probably staying at her grandma's house, as far as you know the cops went to her grandma's house?
A: Mmhm.

Q: We gotta figure out who those cops are and then we can figure out where, but it's on 35th and 5th?
A: It's like 35th and 5th or either 35th and 4th.

Q: Okay.
A: I know it's one of the two.

Q: Okay.
A: One of the two. I never been there, I haven't been there um recently but a couple years ago um I remember being out there and it was like, I don't really know if it's a house, but I remember it was a house on 35th and 5th or either 4th, and it was more towards the corner, and uh I honestly thought she lived there but maybe you know she moved out or something but I know it's her, it's her grandma's house where the police went, 'cause she said that the police ran through her grandma's house lookin for him, and I asked her where did he you know like where did he go, I'm like so where did he go, what was he doin, like did he run in your grandma house, and she's like all crying and you doin stuff like that, she's like I don't know, she just sayin they just came here lookin for him and then, and I was okay so how did you know where to go you know, and she said that she saw police flying in that direction so that's why went to that direction. I really don't know.

Q: Do you know if she got a phone call from, she never indicated she got a phone call from him then?
A: She didn't say.

Q: She didn't.
A: She didn't say, I was calling his phone though after 5:30 after I first got the first phone call, me and my Mom were calling his

Lathrop Decl. Ex. 6

phone, it was already goin to the answering machine.

Q: Sgt. PORRAS: What's his number?
A: It wasn't even ringin.

Q: What's his number?
A: MOOKIE's is ███████ .

Q: Sgt. KJOS: And is it ████? Sgt. PORRAS: (inaudible).
A: Or is it what?

Q: Sgt. KJOS: Is it ████ or ████?
A: Sorry, my phone just got so many…I keep names in there, not numbers.

Q: I thought it was 7361? Your Mom can probably tell us?
A: Yeah, probably. His dad is coming (inaudible).

Q: Alright. Sgt. PORRAS: Do you have any questions of us?
A: Yes. So after they get done with investigatin you know his body get released, um will I be able to see him?

Q: Sgt. KJOS: That's up to the Medical Examiner's Office, I don't know what their policy is, generally they don't let people look at them, but once the body is released to the funeral home.
A: To the morgue?

Q: Yep, you get to.
A: So like, like not even my Mom, they not even gonna let my mom in there?

Q: Not at the, not at the Medical Examiner facility, but once they release the body to the morgue. Sgt. PORRAS: The funeral home. Sgt. KJOS: Yep, the funeral home.
A: Do you know if it's a day or?

Q: Sgt. PORRAS: I would say a couple of days. Sgt. KJOS: But they'll, they'll definitely do their, they'll do the autopsy tomorrow I would assume. Sgt. PORRAS: Yes, they have to do their, the science part of it for them, obviously they're doctors and they do all the medical forensic part and um that's out of our control, that's up to them um.
A: When he get to the morgue do they only let parents identify them?

Q: No no no no, the Medical Examiner's Office, like he'll, if he has his driver's license on him a lot of times that's good enough for ID, otherwise if he has some fingerprints on file we'll have our people.
A: He got fingerprints on file.

Q: Okay, we'll have the Crime Lab come over there and once they check his fingerprints against the ones we have on file, then they'll know for certain that that's him. They'll also have your Mom and his, is it his Dad's name, uh name and they'll be, that's who they'll contact and let them know alright, and then work out what funeral home you guys want him to go to and stuff like that. Sgt. PORRAS: So it's gonna take a, maybe a day or so, but um, you know we told your parents that we would let them know as soon as the Medical Examiner was there okay, and uh we have your number too so. But if you hear from her or you know you can call us.
A: Do you want me to call her right now?

Q: Well I mean. Sgt. KJOS: Where's she at?
A: I don't know if she will, honestly I don't know if the girl I mean will tell me where she at or not, but I will give it a try.

Q: Sgt. PORRAS: Just tell her the police want to talk to her.
A: I don't even understand why she, why she not out there.

Q: Right, you know I mean logic, maybe she's scared, I don't know, but yeah we do want to talk to her.
A: I don't know, I'll call her and um yeah, maybe she'll come down here or not but I'll ask her.

Q: But we definitely, for sure want to talk to her, she'll know why.

END OF INTERVIEW

**END of Supplement 111**

---

**Supplement number:**      **112**      **CCN: MP-13-143872**      **Author:**      **004898 - Ann Kjos**

Lathrop Decl. Ex. 6

Supplement of Sgt A.Kjos #004898 on 09/04/2013 14:11

On 9/3/2013 Assistant Hennepin County Attorney Marlene Senechal contacted me regarding Shawn Keohen. I was told while talking with Mr. Keohen, Ms. Senechal learned he had taken some videos with his cell phone while standing near the intersection of W 27th St and Bryant Av S on May 10th, 2013. Ms. Senechal asked that I obtain a copy of those videos and property inventory them into this case.

Shawn Keohen came to my office and I asked if I could view the videos on his phone. Mr. Keohen opened the photo APP on his iPhone and I was able to view several videos and pictures. It was clear these videos were taken from the outside, near the intersection of W 27th St and Bryant Av S.

Shawn was able to download the videos and pictures to a 16G memory stick that I provided for him. Reviewing this memory stick, I noted there were seven (7) 30 second to 2 minute videos and two still pictures. This memory stick will be property inventoried into this case.

Sgt Ann Kjos
Homicide Unit

**END of Supplement 112**

| Supplement number: | 113 | CCN: MP-13-143872 | Author: | 005786 - Luis Porras |
|---|---|---|---|---|

Supplement of Sgt L.Porras #005786 on 09/04/2013 14:31
Supplement of Sgt. Luis Porras

On 09-04-2013, at the request of the Hennepin County Attorney's Office, Sgt. Kjos and I were asked to locate and inventory the projectile removed from Officer Meath's leg.

I spoke with Officer Meath and he told me that he did have his surgery August 14th and it was performed by Dr. Quickel at HCMC. He told me that they kept the projectile as evidence and were waiting for MPD to recover it.

On this same date, I spoke with staff from the Surgical Pathology Unit and they told me that they would locate the projectile and call me when it was found.

At approximately 1130 hours, I received a phone call back from HCMC and they told me that the projectile would be available for pick up after 1300 hours.

At approximately 1300 hours, I went over to HCMC and met with Kristen Giesen. I signed the appropriate paper work and took custody of the projectile removed from Officer Meath's leg along with copies of the HCMC report.

This projectile was hand carried back to the MPD Property and Evidence Unit and inventoried by me along with the paper work provided to me by HCMC.

A work order was sent to the MPD Crime Lab for comparative purposes.

Sgt. Luis Porras
Homicide Unit

**END of Supplement 113**

| Supplement number: | 114 | CCN: MP-13-143872 | Author: | 119913 - Benjamin Westrum |
|---|---|---|---|---|

Supplement of ForVi B.Westrum #119913 on 09/05/2013 14:23
Crime Lab Unit - USB flash drive copied to disc
Work order request received on 9/4/13

On 9/5/13 I signed out of the Property Room one "imation" brand USB flash drive inventoried under PI # 13-32343 line item 1.

At the request of Barbara Meyer of the County Attorney's Office, the digital content of this flash drive was copied to disc.

The copied disc was labeled and Meyer was notified that it was ready for pick up from the Crime Lab.

The original USB flash drive was then sealed with evidence tape, signed and returned to the Property Room.

**END of Supplement 114**

Lathrop Decl. Ex. 6

| Supplement number: | 115 | CCN: MP-13-143872 | Author: | 005916 - Kristin Reynolds |

Supplement of FS K.Reynolds #005916 on 09/09/2013 11:36
SUPPLEMENT OF K. REYNOLDS, F.S. - CRIME LAB/FIREARMS - 9/6/13

At the request of Sgt. L. Porras, of the MPD Homicide Unit on 9/5/13, I retrieved the following evidence from the MPD Property Room for examination:

From P#19548, Ln 1&2:
Item 11A: Live cartridge (45) from envelope marked, "chamber of Sig Sauer…OFC Meath".
Item 11B, C, & D: (3) live cartridges (45) from envelope marked, "from magazine of Sig Sauer handgun unloaded in CLU…OFC Meath".

AND…
From P#32339:
Item 38A: apparent lead fragment from Medical envelope marked, "…MEATH, MICHAEL - foreign body 8/14/2013…"
Item 38B: metal fragment from Medical envelope marked, "…MEATH, MICHAEL - foreign body 8/14/2013…"

CONCLUSION: Items 38A and 38B (foreign bodies from MEATH) are unsuitable for comparison examination.

Evidence will be returned to the MPD Property Room for inventory.

This is the report of conclusions of an examination performed by me.
K. Reynolds
**END of Supplement 115**

| Supplement number: | 116 | CCN: MP-13-143872 | Author: | 000015 - Joseph Adams |

Supplement of Sgt J.Adams #000015 on 09/16/2013 10:23
Examination Report of MPD PI# 2013-26048 Line-1 (FCLCMS: 2013-241)
Sergeant J. Adams
13-143872
09-16-2013

CASE SUMMARY:

On September 12, 2013 the Minneapolis Digital Forensics Lab received a work request from Sergeant Luis Porras to examine one cell phone and the corresponding attached media. The specific stipulation of the request was to retrieve or document the call history, contacts list, images, text messages, video and any other information stored on the evidence item[s] and the attached media. The examiner began the examination process on Thursday, September 12, 2013.

LOCATION OF EXAMINATION:

Minneapolis Police Crime Lab
350 5th Street South, Room 102
Minneapolis, MN 55415

EVIDENCE ASSESSMENT:

1. The examination took place at the Minneapolis Police Crime Lab. Documentation was retrieved from the Minneapolis Police Departments records management system and reviewed. Computer Forensics Lab employees check the evidence out of the Minneapolis Police Department Property Room maintaining chain of custody procedures. Legal authority was established by search warrant specifically for the examination of the evidence item[s] in a laboratory setting.

2. The evidence media was photographed and entered into the Forensic Computer Laboratory Case Management System (FCLCMS). The case management system assigns a specific number to the evidence.

3. Upon completion of the examination, the original evidence was put in an appropriate container and sealed with evidence tape by the examiner. The original evidence was then placed in the Minneapolis Police Property Room.

**Lathrop Decl. Ex. 6**

GENERAL FORENSIC PROCEDURES:

1. All forensic software and equipment used during this examination is licensed to or authorized for use by the examiner and/or the Minneapolis Police Department. Various hardware and software solutions were used to protect the integrity of the data contained on the original media. A list of those tools can be viewed below:

2. Details about the evidence media such as the make, model, and serial number were entered in the forensic laboratory management database. Each evidence item is given a unique number in the database software. The assigned media numbers and corresponding information are included in the Lab Media Reports included on the case examination DVD.

3. A micro secure digital card was found attached to the evidence item[s]. The media was removed and connected to an analysis computer via a software write blocker and evidence/image files (.e01) were created from the evidence item. The evidence file is MD5 hashed to verify the integrity of the file. All the information stored on the media item (micro secure digital card) is copied to another storage media device for examination. The storage media was forensically sanitized (wiped) before the imaging procedure. The program Forensics Tool Kit Imager was used to create a bit by bit copy of the evidence media.

4. This process copies all the standard files as well as all file slack, erased files, and unallocated space. This procedure does not affect, change, or alter the information on the original evidence media in any way. An examination of an exact copy of the original evidence media was performed.


DIGITAL MEDIA EXAMINED:

LG - Cellular Phone
a. Model: LN272
b. S/N: 208CYTB0351537
c. FCC ID: ZNFLN272
d. MEID: 268435461203480719
e. Number: 651-398-1842
f. FCLCMS: 2013-241-1
g. Inventory: 2013-26048 Line-1

Unlabeled - Micro Secure Digital Card
a. Color: Black
b. Size: 2 Gigabytes
c. Origin: LG Cell Phone
d. FCLCMS: 2013-241-2
e. Inventory: 2013-26048 Line-1


FORENSIC TOOLS AND ANALYSIS:

1. The examiner used a laboratory computer to complete the analysis and report. All forensic software and equipment used during this examination is licensed to or authorized for use by the examiner and/or the Minneapolis Police Department. Various hardware and software solutions were used to protect the integrity of the data contained on the original media. A comprehensive search of the evidence item[s] was completed with emphases placed on areas listed below:


Analysis Software
a. EnCase (version 6.19.6)
b. FTK Imager (version 2.9.0.1385)
c. Fernico ZRT2 (version 2.0.93.0)
d. FTK (version 4.1)

Areas of Focus
a. Call History
b. Contacts
c. Images
d. Text Message (SMS)
e. Video


Lathrop Decl. Ex. 6

CONCLUSIONS:

Based on the information revealed by the forensic examination, as well as the examiner's experience and training, the following findings have been reported:

1. The examiner isolated each evidence item from the cellular network at the beginning of the examination. Using the menu system the examiner then manually attempted to deactivate the transmitters for each evidence item (for example airplane mode). Once the transmission mode for the evidence item was deactivated it was no longer necessary to employ cellular network disruption devices or techniques.


LG LN252 Cellular Phone
2013-241 (1-2)
651-398-1842

1. Due to various incompatibilities with the cell phone examination software, the examiner had to use the Fernico ZRT2 software and a Canon Rebel T3 digital camera to catalog the call history, contacts list, and some of the text message data stored on evidence item 2013-241-1 (LG cell phone). The examiner also used the Fernico ZRT2 device to document the general information about the phone. The examiner recorded the display screen of the evidence item while manually navigating the menu system of the phone to the desired location.

2. The Fernico software was utilized to correlate the resulting images into a report. The report was added to the case examination DVD and can be found under the title, "Fernico ZRT2 Report". It should be noted that the examiner only used the Fernico device to document the messages located under the date May 10th. Further explanation is provided below in the next section of the report.

3. The examiner was unsuccessful in the attempted to document all of the text messages stored on the phone with the Fernico ZRT2. The messages were stored in a manner that made taking individual pictures of each message very time consuming. The examiner was also concerned that due to the storage structure of the messages information may be missed using the Fernico device. As stated above, the examiner documented the messages stored under the date of May 10th with the Fernico ZRT2. The Project-a-Phone tool was used to document the remaining messages. The examiner utilized the handset to present each message while recording the display screen with the Project-a-Phone. The resulting video was added to the case examination DVD and can be located under the labeled, "Project-a-Phone Report".

4. The examiner located a micro secure digital card (evidence item 2013-241-2) attached to the LG cell phone (evidence item 2013-241-1). Before processing the cell phone with any other tools, the card was removed and a forensic image was created. The examiner used the EnCase software to examine the created image. The examiner performed a manual search for documents, image files, video files, and a search using the file finder Enscript. An Enscript is an automated process used to quickly locate the desired data. The Enscript was used to search the unallocated space (area where deleted files reside) of the evidence item.

5. Approximately 1,048 images and 19 video files were bookmarked. No documents of immediate recognizable relevance were located on the evidence item. The Enscript process located approximately 153 images in unallocated space, however; the EnCase program was unable to display any of the images or export the images into a report. The EnCase program was used to generate reports containing the bookmarked images and videos located in allocated space. Information about the items such as creation dates, physical sector location, and hash values are also included in the reports. Each report was added to the case examination DVD under the following corresponding titles, "EnCase Image Report" and "EnCase Video Report".

6. The Forensic ToolKit software was used locate and export the images found in unallocated space. Approximately 259 images were located and subsequently bookmarked. The FTK program was used to generate reports containing the bookmarked items. Information about the items such as logical size and hash values are also included in the report. The report was added to the case examination DVD under the heading, "FTK Report".


The examiner's role is to extract or document the information contained on the evidence in a consistent reliable manner. Question related to context and pertinence should be directed to the investigator that requested the examination. Any questions regarding the above procedures or additional information can be provided by the examiner upon request. One copy of the case examination DVD was created and given to Sergeant Luis Porras. A second copy of the case examination DVD was created and property inventoried in the Minneapolis Police Property Room.


Sergeant Joseph Adams
Digital Forensic Investigations
Minneapolis Crime Lab
612-673-2120

Lathrop Decl. Ex. 6

**END of Supplement 116**

---

| Supplement number: | 117 | CCN: MP-13-143872 | Author: | 003398 - Grant Johnson |
|---|---|---|---|---|

---

Supplement of Off G.Johnson #003398 on 09/18/2013 17:19
I Officer Johnson Badge #3398 am providing a supplement to clear up confusion with Officer Milners statement #43 about taking custody of a rifle.
While at the scene of the incident on 10 May 2013, I was assisting Officer Meath in the front of the residence with a tourniquet and his bleeding control.
I had responded to the scene to assist with my SWAT issued rifle, and while working on Officer Meath, I didnt want it swinging around in front of me and over him with no positive control, so I turned to Officer Milner standing behind me, and asked him to hold onto it for me while I attended to Officer Meath injuries.
After getting Officer Meath loaded into the ambulance, I again took physical control of my rifle from Officer Milner who was sitting in the ambulance. Officer Milner had had physical custody of it since I handed it to him in the front of the residence.
Officer Milner was under the impression the rifle I had handed him was Officer Meaths, when it was actually my rifle.

**END of Supplement 117**

---

| Supplement number: | 118 | CCN: MP-13-143872 | Author: | 093953 - Stacey Potthier |
|---|---|---|---|---|

---

Supplement of FVA-n S.Potthier #093953 on 10/02/2013 17:07
Crime Lab Unit
Still image isolated from video, video redaction completed- work order request received on 8/19/13

On 8/21/13 I signed out of the Property Room one black Imation brand 4 GB flash drive inventoried under PI # 13-16835 line item 1. It should be noted this flash drive was previously sealed with evidence tape marked "BW 7/2/13". Commander Johnson of the Violent Crimes Investigative Division requested a viewable copy of video on this flash drive for reference for possibly making redactions from the original video.
This viewable disc copy was made available Commander Johnson.

On 8/23/13 Commander Johnson came to the Crime Lab and using the video I had previously imported into Avid from the original flash drive, pointed out the specific redactions she needed from the surveillance video. Commander Johnson also requested one still image be isolated from the video. Using the specific information Commander Johnson provided to me about the video start and end times, the requested time frames were redacted. Commander Johnson returned the viewable copy reference disc at this time, and I destroyed this disc copy.

The four requested redacted video files were exported to a Windows Media Player format and copied to disc. The requested still image that was isolated from surveillance video was also copied to this same disc. This newly created disc was labeled and Commander Johnson was notified that this disc was available for pick up from the Crime Lab. The four redacted video files and isolated still image will also be retained on a computer within the Video Section of the Crime Lab Unit.

The original Imation brand flash drive was then resealed with evidence tape, signed and returned to the Property Room.

**END of Supplement 118**

---

| Supplement number: | 119 | CCN: MP-13-143872 | Author: | 004898 - Ann Kjos |
|---|---|---|---|---|

---

Supplement of Sgt A.Kjos #004898 on 02/04/2014 14:30
INTERVIEW OF BROOKE SUTTON
BY SGT. KJOS & SGT. PORRAS
TYPED BY LM
CCN 13-143872

Q: This is Sgt. ANN KJOS with Sgt. LUIS PORRAS. We're with BROOKE ALLISON SUTTON. BROOKE, can you spell your last name for me please?
A: Yep, S-U-T-T-O-N.

Q: And what's your birthday?
A: ██/84.

Q: And this is regarding the um burglary that happened at your boyfriend's apartment back in May, back on May 1st of 2013. Are you aware of that burglary?
A: Yes.

Lathrop Decl. Ex. 6

Q: And after the burglary was discovered and reported to the police department, did you actually go to your boyfriend's apartment and help him itemize the items that were taken?
A: Yes. I was there actually when we, we called the police together, um we left here, went straight to his apartment and then we called the police, and then after we realized, we tried to go through and see what was gone.

Q: Okay. Do you know the circumstances of the burglary, first of all, were you home when the burglary occurred?
A: No.

Q: Um do you know was um your boyfriend PATRICK, and PATRICK's last name is BUXBAUM?
A: BUXBAUM, yeah.

Q: Okay, did you know the uh what happened, was he in the apartment, not in the apartment?
A: He was asleep on the couch and I'm not sure if any of the guys, the burglary, the guy who did the burglary just got in, probably realized he was asleep on the couch, grabbed you the stuff in the living room really quick and then darted out the front door off the balcony.

Q: Okay and you assisted your boyfriend and kinda categorizing what was taken, can you explain what you remember what was taken?
A: Definitely his PlayStation 3 I guess was stolen and um and then his games, like all of his games were missing, his um PlayStation games pretty much, and I'm not sure about DVDs, but then his iPod Nano, and then his black Asics bag, his wrestling bag that he had since he was little, and that was also on camera when he went out his door.

Q: Okay.
A: It was actually on camera, we saw that he had that bag when he left, the robber, the guy that did the robbery.

Q: And you say it's a black Asics bag. Is there any other writing on that bag?
A: There's a wrestling emblem, it says wrestling on it and then like a little emblem of two people wrestling.

Q: Okay, and is that emblem any specific color?
A: No it's just black and white and maybe, there might be red in it, I don't know.

Q: Okay. The PlayStation, is that a specific color?
A: I think the PlayStation, I know it's black but I'm not really into…

Q: Okay, but it's a PlayStation 3?
A: Yeah I think that's what it's called.

Q: Do you remember how many controllers he had?
A: Two.

Q: He had two?
A: One battery was dead.

Q: On the controller?
A: I think yeah.

Q: Were they um.
A: And that's what we used to provide INAUDIBLE so.

Q: Did they have, were they cordless or were they?
A: They could be.

Q: Okay, but you don't know if specifically.
A: Oh they were cordless, yeah, that's how the battery was dead, yep, obviously.

Q: Okay, and as far as the games, do you remember what games?
A: They're cordless but you hook 'em up to charge 'em, they can be cordless or not.

Q: Okay, so those are the controls you're talking about?
A: Yeah.

Q: And then the games that were taken, do you remember any specific games?
A: Definitely his um Tiger Woods golfing game and then for sure any of the Motocross games.

Lathrop Decl. Ex. 6

Q: Okay.
A: Then he wrote I always BUXE or PB as for his initials on all of 'em.

Q: And PB like?
A: PATRICK BUXBAUM.

Q: For PATRICK BUXBAUM, and I uh, some games were recovered on, during a separate incident, and I showed you um Xerox copies of those games that were recovered, is that correct?
A: Mmhm, yes.

Q: And did you look through those?
A: Yes, I remember him having Grand Theft Auto now after I look at it, uh hah.

Q: And then you also, on a couple of those games the letters PB.
A: Yes, this one right here is initialed.

Q: And you recognize
A: Yep.

Q: His handwriting?
A: Yep.

Q: Okay, and then I, I had you initial each of those
A: Yes.

Q: Xerox copies and put the date on it. Can you think of anything else? Okay, and again that was for a burglary that the case number assigned to that burglary is 13-132627. And BROOKE, real quick, nope, that's it, alright, thank you.

**END of Supplement 119**

---

| **Supplement number:** | **3** | **CCN: MP-13-143872** | **Author:** | **002986 - Roland Hillstrom** |

---

Supplement of Off R.Hillstrom #002986 on 05/10/2013 18:55

On 05/10/2013 I responded to 2717 Bryant AV S on a call which officers were requesting help. Information from dispatch reported two officers were shot along with the suspect. While I was enroute the two injured officers were being transported to HCMC. I arrived at the incident location to assist. I was instructed by Sgt. Dudgeon to assist in securing the outer perimeter in the vicinity of 27 AV S / Colfax AV S. I put up crime scene tape and maintained my position at this intersection until I was released.

**END of Supplement 3**

---

| **Supplement number:** | **4** | **CCN: MP-13-143872** | **Author:** | **006419 - Jamy Schwartz** |

---

Supplement of Off J.Schwartz #006419 on 05/10/2013 18:57

While working squad 360 with my partner, Officer Greer, we responded to a HELP call in the 5th Pct. Ofc heard dispatch, tone a help call but Ofc weren't sure on the location. I did hear dispatch advised 27/Bryant but not north or south.

I switched our squad radio over to 5th Pct channel which was channel 3. I heard Ofc airing there were Ofc shot and medical was needed code 3. Officers responded to the scene of the help call.

Ofc were advised to post up at 26/Aldrich Av S and stop SB traffic. Greer and I stayed at that location until we were advised we could clear the call.

**END of Supplement 4**

---

| **Supplement number:** | **5** | **CCN: MP-13-143872** | **Author:** | **002441 - Robert Greer** |

---

Supplement of Off R.Greer #002441 on 05/10/2013 18:59

While working squad 360 with my partner, Officer Schwartz, we responded to a HELP call in the 5th Pct. Ofc heard dispatch, tone a help call but Ofc weren't sure on the location. I did hear dispatch advised 27/Bryant but not north or south. While I drove

Lathrop Decl. Ex. 6

to the 5th Pct Officer Schwartz changed the radio and tried to find the location.

I heard Ofc airing there were Ofc shot and medical was needed code 3. Officers responded to the scene of the help call.

Ofc were advised to post up at 26/Aldrich Av S and stop SB traffic. Schwartz and I stayed at that location until we were advised we could clear the call.

**END of Supplement 5**

| Supplement number: | 6 | CCN: MP-13-143872 | Author: | 000363 - Michael Becker |
|---|---|---|---|---|

Supplement of Off M.Becker #000363 on 05/10/2013 19:07

I was working squad 420 with my partner Officer Tschida, we responded to the help call at 2717 Bryant ave S.

Upon arrival, my partner and I put up crime scene tape at 27th ave s and Bryant ave.

I then started with scene security at that intersection. At 1550 Hrs I was directed to start a crime scene entry log. I started obtaining badge numbers of arriving Officers, then expanded to obtaining Officers badge numbers that had arrived before us.

I was later relieved by Officer Martin, #3690.

I inventoried the log at Mpls property room.

**END of Supplement 6**

| Supplement number: | 7 | CCN: MP-13-143872 | Author: | 007312 - David Tschida |
|---|---|---|---|---|

Supplement of Off D.Tschida #007312 on 05/10/2013 19:08

While working Squad 420 with Officer Becker we heard an emergency tone over the radio then dispatch aired that an officer had been shot in the 5th Precinct.

We drove Code 3 to that location and assisted in taping off the perimeter at 27th and Bryant S. We maintained a position at this intersection. With authorization from Sgt. Smulski I escorted an elderly woman and her daughter to her home inside the perimeter at 2708 Bryant S.

We maintained the perimeter at this intersection with no one compromising the tape until we were secured by Lt. Kelly.

**END of Supplement 7**

| Supplement number: | 8 | CCN: MP-13-143872 | Author: | 030227 - Robert Mooney |
|---|---|---|---|---|

Supplement of Off R.Mooney #030227 on 05/10/2013 19:33

On 5/10/2013 at approximately 1410 hrs. I was working marked squad 824A and had just finished dropping a party of at the detox center 1800 Chicago Ave S. As I detox I switched my radio to channel 3 since I intended to return to my patrol are via Franklin Ave. S. I heard the end of a flee call involving a blue PT cruiser MN 647-KLW. Sgt. Moore had aired the vehicle had been lost at Chicago Ave. S. and 28th. I also heard 647-KLW had struck an MPD squad.

A few minutes later I heard that 647-KLW had been spotted in the area of 2800 Harriet Ave. S. I proceeded in that direction. As I arrived in the area a B/M suspect with dreads and red pants was seen running into Flanders Bicycle shop at 2700 Lyndale. As I arrived at Flanders the B/M suspect had been reportedly seen running W/B in the area of 2700 Aldrich. I responded to Bryant/27 at 1422 hrs. and deployed as a perimeter security. Within moments the 2700 blocks of Lyndale to Bryant were secured in a perimeter.

While on perimeter I was approached by a B/F who told me she was looking for her vehicle and that she had lent it to a friend and the friend had not returned the vehicle yet. I asked her what type of vehicle was it and she told me a dark blue PT Cruiser which was the color and make of 647-KLW. I immediately aired this owner info and directed her to Sgt. Moore who was standing 1/2 block away on 27 St and the alley of Bryant to Colfax.

At 1515 hrs. I was approached by a W/M wearing a green jacket, Tan pants and a grey-blue shirt and glasses. This part appeared to be angry and told me he had just returned to his home and the glass rear door of his home was broken. The party

Lathrop Decl. Ex. 6

asked me if I was responsible for this. I told the party we had not entered his home and ask the party his address, he responded 2717 Bryant Ave. S. I could see this house which was green with a red front door and knew the area of the home had just been cleared by MPD K-9 and SWAT members and that nobody had reported seeing this broken door. I immediately aired the information and asked if anyone had seen this broken door. By now 908 who was conducting an area search with SWAT of the 2700 Byrant to Clofax block moving from 27th to 28th. 908 aired the broken door had not been reported earlier and immediately went to 2717 Bryant which was basically across the street from his location. I yelled to 908 and pointed to the homeowner who was clearly fed up with me and had began walking to his home.

908 ran to the rear of the home and aired a request for officers to the rear of 2717 Bryant and confirmed there was forced entry. SWAT officers responded and a perimeter was set up around the home. A few minutes later officers inside 2717 Bryant aired shots fired and the called was toned for help. I ran to the rear door and assisted in evacuation of the injured officer. At this time I discovered two officers had been shot. Officers in the basement of the home confirmed to me the suspect had been shot and was DOA, I aired this information.

I then escorted the ambulance to HCMC with the first evacuated SWAT officer and maintained guard at the rear door of HCMC until Sgt. Nelson had deployed his officers to secure the hospital. I then left HCMC and returned to 2717 Bryant and checked in with Sgt. Moore and Sgt. Kjos. I was instructed to leave the scene and enter a supplement.

**END of Supplement 8**

---

| Supplement number: | 9 | CCN: MP-13-143872 | Author: | 004903 - John Murphy |
|---|---|---|---|---|

Supplement of Off J.Murphy #004903 on 05/10/2013 19:50

While working uniformed K9 Squad 962, I heard on channel 3 that squad 502 was in pursuit of a PT Cruiser that was involved in an earlier burglary. I responded to the 5th Pct from the 4th Pct code 3. As I was approaching the 2700 block of Lyndale Ave S, I heard Officer Illetchko air that the suspect was last seen in the alley of Lyndale to Aldrich Ave S just south of 27 St. As I was arriving I observed a citizen and a DOC agent pointing southbound in the alley, Aldrich Ave S to Bryant Ave S.

I then spoke to an unknown homeowner who just said he just saw a black male running southbound in the alley Aldrich to Bryant Ave S, just south of 27th St S. He said he was wearing red pants and a "wife beater" tank top. He then added that his hairstyle was dread locks. I then aired this info and advised perimeter officers to hold there positions until the canines finished the search.

I then met with Squad 908 and members of 1280 and we conducted an area search in the alley Aldrich to Bryant south to 28th St. During this sweep we conducted various garage sweeps with open doors along with a search of an open residence which was on the northwest corner 28th St and Bryant Ave S. After re- deploying my canine for rest, myself and 908 then prepared to search the Bryant to Colfax alley.

With a K9 announcement given, I then deployed K9 Bullet southbound from 27 St, Bryant to Colfax Ave S. During this search K9 Bullet pulled me to the east side (front yards) of Bryant Ave S. While searching the front yards of the even side homes of Bryant Ave S, we were alerted of a possible burglary at 2717 Bryant Ave S by 840 and the home owner. Squad 908 then advised me to finish clearing the alley and that he would assemble a team to clear 2717 Bryant Ave S.

After clearing the Bryant to Colfax Alley down to 28th St, I then began to head back to 2717 Bryant Ave S to check on 908 and his crew. While walking back I heard the sounds of officer down and shots fired over the radio. I then ran to the front of the address where I observed Officers carrying out Officer Muro. I then ran to my squad and put away K9 Bullet and grabbed my Ipok Kit. I ran back to the front yard and assisted in rendering aid to Officers Muro and Meath.

At the request of Squad 908 I then checked on the welfare of K9 Nash to make sure he had no injuries.

I was then requested by Sgt. Moore to stand by at the scene for a possible article search starting in the area of Flanders bike shop on Lyndale, back to the scene of 2717 Bryant Ave S. Squad 952 responded to the scene and assisted with this task.

**END of Supplement 9**

---

| Supplement number: | 10 | CCN: MP-13-143872 | Author: | 001107 - Anna Hansen |
|---|---|---|---|---|

Supplement of Off A.Hansen #001107 on 05/10/2013 20:00
While working as SRO 1552 I heard on Channel 3 that two officers had been shot. I was in contact with Sgt. Rena Dudgeon who stated that she would like me to assist at the scene. I arrived at 28th St. W/Bryant Ave. S. at approximately 1600 hours. I checked into the crime scene with Officer Do and then sought out Sgt. Dudgeon who assigned me to widening the crime scene with police tape. I put crime scene tape up from Bryant Ave. S./27th St. to Dupont Ave. S. down to 28th St. W. and back over to Bryant Ave. S. on the south side of 28th St. W.

Lathrop Decl. Ex. 6

I was then posted to secure the corner of 27th St. W./Colfax Ave. S. with Officer Hillstrom from 4th Pct. Officer Hillstrom left at approximately 1830 hours and was replace with a St. Paul Officer McNeill who assisted me until I was released from the scene by Sgt. Dudgeon.

**END of Supplement 10**

| Supplement number: | 11 | CCN: MP-13-143872 | Author: | 001553 - Hung Do |
|---|---|---|---|---|

Supplement of Off H.Do #001553 on 05/10/2013 20:04

On 05/10/2013, I was assigned as squad 530A and I was in full uniform and I was driving a marked squad 530. At approximately 1407hr, I assisted other Officers on a motor vehicle flee. The chase took Officers from the 5th Precinct went into 3rd Precinct and came back to 2700 blocks of Harriet where the suspect dropped off the vehicle and he fled on foot WB from Harriet Ave south. The suspect was last seen in the area of 27th street W to 28th street W in between Aldrich Ave south and Colfax Ave south.

Upon arrived, I secured the area by taking position on 27th street W between Bryant Ave south and Colfax Ave south while the Officers of the 1280 Unit and the K-9 Unit canvass the area. The suspect was subsequently was found inside of the 2717 Bryant Ave south address and the gun fight ensue between the Officers of the 1280 Units and the suspect. Two of the members of the 1280 Unit were wounded and they were transported HCMC. I was not know the condition of the suspect at that time. I then secured the crime scene with police yellow tape mid-block on 27th street W between Bryant Ave south and Aldrich Ave south and I was also assigned by squad 502, Sgt. Moore to start a crime scene log( I have to keep track on who coming in and out of the crime scene. I stay at the assignment post until I was released by Officer Ker Yang from the 5th precinct Mid-watch. The crime scene log was given to Officer Yang.

**END of Supplement 11**

| Supplement number: | 12 | CCN: MP-13-143872 | Author: | 004852 - Michael Morales |
|---|---|---|---|---|

Supplement of Off M.Morales #004852 on 05/10/2013 20:03

I was working with Officer Gorman in marked squad 160. Officer Gorman was driving and I was passenger. Around the time of 1401 hours we responded to the area of 28th and Lyndale Avenue South after hearing Squad 502 air that a suspect vehicle he went to check on involved in a previous burglary had struck a squad car and was fleeing. The vehicle was a blue PT Cruiser and a plate was given. At this time I was not sure if this was an attempt assault of an officer involving the use of a motor vehicle.

As we drove to the area more information came from callers that the possible suspect involved in this was now fleeing on foot in the area of 27th and Lyndale AvenueSouth. The suspect was described as a B/M with dreads and wearing red pants and a black shirt. I believe it was Squad 502 who aired that a perimeter was to be formed. Officer Gorman and I set up at 28th Street and Bryant Avenue South. We remained thereas additional resources arriving including 1280. Officers were advised to remain on the perimeter as K9 and 1280 conducted a search of the perimeter.

At some point Officer Mooney aired that the homeowner of a home in the 2700 block of Bryant had arrived home and stated to him that it appeared his home had been broken into. Officers on the perimeter were told to hold their positions.

While waiting an officer aired that an Officer was down and had been shot. Along with Officer Gorman and Officer Laux who was on the 28th and Bryant spot , we ran to the address in question at 2717 Bryant Avenue South. As I got to the SW corner of the home an Officer directed me to hold that position as he moved to the NW part of the exterior. At this time I was not aware if this was an active shooter or not. Within seconds Officer Moro (sp?) and Meath were escorted out of the address and taken to the front yard. EMS had been ordered. At this time I went to the side door on the north side of the home and confirmed that the situation was contained. I did not enter the home.

EMS arrived and both Officers were taken by separate ambulances.

Sgt Dundgeon had begun to establish a crime scene perimeter. I began to assist with this when Squad 502 Sgt Moore asked for assistance with two witnesses in his squad. I was ordered to remain with those two witnesses. I located 502's vehicle on 27th street between Bryant and Colfax. When I got to the squad Witness Mohamed asked to be let out as she was having a possible asthma attack. I did this and ordered paramedics to this area. Mohamed said that the reason they were in the back of

Lathrop Decl. Ex. 6

the squad was that there had been shots and an officer told them to get in the back for their safety. Mohamed said she was scared and immediately did this with her friend.

W Mohamed verbally identified herself as Ifrah Bashir Mohamed 01/01/1991, 1420 Portland #207, 612-229-9052. She works at the Salama Childcare Center at 1420 Nicollet Avenue South. Paramedics arrived and stated she should go to HCMC and Sgt Moore was notified of this. I went to HCMC with Mohamed and when she was released we went to Room 108. After her interview I was told she could be taken back to her car parked near 27th and Bryant. Officer McCadden gave us and the female witness with Mohamed a ride to 27th and Colfax. I checked with Sgt C Thompson if they and her car could be released and was given the affirmative.

I met up with Officer Gorman and we returned to the First Pct for reports.

**END of Supplement 12**

| Supplement number: | 13 | CCN: MP-13-143872 | Author: | 000585 - Bevan Blauert |
|---|---|---|---|---|

Supplement of Off B.Blauert #000585 on 05/10/2013 20:13

I was working Beat 8511 on 5-10-2013 at approximately 1430 hours when I heard that a squad car (squad 504) had been struck and the vehicle that hit the squad was fleeing the scene. I responded to the area and began checking for the vehicle. I heard that the vehicle had been abandon and officers were now looking for a possible suspect who was a black male with a black shirt and red pants in the area. This original flee call was under case number 13-143770.

After checking the area I heard that the suspect was possible in the area of 2700-2800 block of Lyndale-Colfax Ave S. I was perimeter in the area as I heard that K-9 and the swat team were checking the blocks. I heard that a home owner of 2717 Bryant Ave S had reported to an officer that his house had possibly been broken into and that officers were now checking that address which was inside the perimeter. I was posted at 27th/Aldrich Ave S when I heard that shots had been fired in the house and and that two officers had been shot.

I left my squad at 27th/Aldrich Ave S and help hang up crime scene tape on the east side alley behind 2717 Bryant Ave S. After this perimeter was established I stayed in the alley are behind 2717 Bryant Ave S guarding the perimeter until I was relieved at approximately 1942 hours by Officer Dominguez.

**END of Supplement 13**

| Supplement number: | 14 | CCN: MP-13-143872 | Author: | 005306 - Karl Olson |
|---|---|---|---|---|

Supplement of Sgt K.Olson #005306 on 05/10/2013 20:16

On 05-10-2013 I had just signed off as Squad 306, Third Precinct Day Watch Sergeant when I heard Dispatch tone and say officers needed help. A second tone and then a third tone with officers shot at 2717 Bryant Av. I put my gun belt and vest back on and proceeded to re-sign on to my squad.

I proceeded code 3 to Bryant and Lake when I heard that 28th St needed to be secured so the ambulances could have safe travel to Chicago Av S and then to HCMC. I proceeded to 28th St and ended up blocking traffic on 28th St and 5th Av S.

After the second ambulance had passed, and we were cleared from traffic control, I proceeded to HCMC to see if anyone needed assistance. On arrival, I was approached by Officers Okerberg and Hanson. They advised me that they had a portion of Officer Meath's ballistic vest and his gun belt with no gun. They were wondering what to do with it. I eventually found out that Sgt Voss was looking for these items and I took the vest and belt from Officer Okerberg and walked it over to Sgt Voss and he put them in the trunk of his car.

I was then approached by Lt. Harris who asked if I was busy. I told him no and he asked me to be the "escort" for Officer Meath. He walked me in to the ER and I stood at the doorway to Officer Meath's cubicle/room.

I was eventually released from this by Sgt. Baird and I cleared.

**END of Supplement 14**

| Supplement number: | 15 | CCN: MP-13-143872 | Author: | 003690 - Ann Martin |
|---|---|---|---|---|

Supplement of Off A.Martin #003690 on 05/10/2013 20:22
Statement of Officer Martin Badge 3690

Lathrop Decl. Ex. 6

On the above date and time I was working 210 able in full MPD uniform driving a marked squad. On this date I responded and assisted on the above call. I arrived at 27th and Bryant Av S at Approx 1535 hrs. At this time Officer Becker logged me on the crime scene log. I was advised by 5502 Lt Kelly to help maintain the perimeter at this location. I remained at this intersection until I was relieved by squad 524 mids at about 2000 hrs. I then turned over the Crime scene Log that I was given by Officer Smelter to Squad 524 Mids.

I then returned to the second precinct and completed reports.

**END of Supplement 15**

| Supplement number: | 16 | CCN: MP-13-143872 | Author: | 003200 - Robert Illetschko |
|---|---|---|---|---|

Supplement of Off R.Illetschko #003200 on 05/10/2013 20:35
On 5/10/2013 at 1530 hours I was working beat 8513 when I responded to the area of 2717 Bryant Av S, on a report of shots fired where two officers had been shot. When I arrived I set up perimeter at the intersection of 28th St/Bryant Av S and assisted with traffic and crowd control until I was relieved by Sgt Dudgeon.

Prior to the incident at 2717 Bryant, I was on a related call on perimeter searching for a possible burglary suspect that had been involved in a Flee with Sgt Moore(502) and Sgt Smulski (504). The susp of that Flee, a black male with dread locks, wearing a black shirt and red pants had been observed entering Flanders bike shop, 2707 Lyndale Av S, after he fled from officers in a vehicle.

When I arrived to that Flanders bike shop, I noticed the black male exit the front of the business and run from me w/b across Lyndale Av S. I pursued the black male in my squad to the rear of 2711 Aldrich Av S and requested a perimeter to be set up once he climbed the fence and entered the backyard of 2711 Aldrich Av S. The male was last seen running w/b across Aldrich Av and behind the address of 2710 Aldrich Av S.

See related case number 13-143770 for the originating call at 2743 Lyndale Av S which led to the 13-143872 incident.

**END of Supplement 16**

| Supplement number: | 17 | CCN: MP-13-143872 | Author: | 002105 - Gregory Freeman |
|---|---|---|---|---|

Supplement of Sgt G.Freeman #002105 on 05/10/2013 20:42
On this date, I was working as an investigator with the Minneapolis Police Assault Unit in Car 746 with my partners Sgt. Metcalf and Officer Honeycutt.

While conducting another interview, I heard squads responding to an officer needs help call where two officers were reported to be shot and being transported to the HENNEPIN COUNTY MEDICAL CENTER for treatment.

We quickly ended our interviews and went to the scene of the shooting at 2717 Bryant Ave. S..

There we met with Sgt. Kjos and Sgt. Porras and we asked what we could do to help at the scene.

Sgt. Kjos informed me that Sgt. Stender was an involved officer and needed an escort officer. I took this role.

On the way down to Room 100 to provide statements Sgt. Stender said that he was concerned about the two officers that had been shot and were taken to the HENNEPIN COUNTY MEDICAL CENTER for medical treatment.

I felt that Sgt. Stender would be more relaxed and would be comforted by seeing that the two officers were being well cared for. I suggested that we stop by the HENNEPIN COUNTY MEDICAL CENTER to check on the officers' conditions on the way to Room 100.

We did this and I stayed with Sgt. Stender when he spoke with the officers and he just checked on them to make sure they were being cared for and they did not discuss anything about the incident.

I then escorted Sgt. Stender to Room 100 where I continued to act as an escort officer until relieved.

**END of Supplement 17**

| Supplement number: | 18 | CCN: MP-13-143872 | Author: | 002343 - Timothy Gorman |
|---|---|---|---|---|

Supplement of Off T.Gorman #002343 on 05/10/2013 21:01

Lathrop Decl. Ex. 6

I was working squad 160 with Officer Morales when we began driving S/B on Chicago Ave from 3rd Street to assist 5th Precinct squads with a fleeing PT Cruiser (13-143770). When I heard over the radio that Squad 502 stated he lost sight of the fleeing vehicle, I continued driving W/B on Franklin Ave with the intention of returning to the 1st Precinct. A short time later dispatch mentioned that the PT Cruiser was in the area of Harriet Ave South. I then drove our squad to that area and eventually we parked at Bryant Ave South and 28th Street as a parameter was set up and 1280 began house-to-house searches with K9.

At about 1530 hours I was still on the parameter and talking with Officer Morales and Officer Laux. An unknown officer aired that an officer was shot inside 2717 Bryant Ave South. I ran from my squad to 2717 Bryant behind Officer Laux, and entered the yard of 2717 Bryant from the back alley. As I was running, an officer aired that multiple officers were shot inside the house. There was continuous radio traffic by this point.

I intended to remain on the parameter of the yard of 2717 Bryant Ave, but an officer inside the rear porch stated that more officers were needed inside the house. I observed Officer Mooney run in the back door and I followed him since I believed that an armed suspect was shooting officers inside the house. From the back porch I heard an officer state that wounded officers would be taken out the rear of the house. I aired that officers would be exiting out the rear of the house so ambulances could arrive in the alley. I wanted to clear a path for the exit and moved a large white bench into the middle of the porch, along with miscellaneous items which would impede a hasty exit.

I briefly remained in the threshold of the kitchen door intending to hold it open so officers could exit. I assisted in opening several tourniquets to be applied to the wounded officers. When no officers appeared to be coming out the rear, I entered the kitchen. From the kitchen I heard a great deal of yelling and screaming in the basement, which I assumed was directly ahead and to the right, down 3 stairs from the kitchen.

Entering this 3-step area I observed a small landing, and to the immediate left 8 stairs leading into the basement. Members of 1280 were essentially in a log-jam situation in the 8-step stairwell, unable to carry a wounded officer up the stairs due to the tight confines. An old and cobwebbed door was locked at the small landing at the top of the 8 stairs. It was then collectively determined to get the officers out of the house via this secured door. I immediately began working the various locks of this old door and eventually got it open. I then forced open a secured exterior screen door, which allowed officers to exit the house via these north side doors. I used my radio to air that the wounded officers were now going to exit the North-side door instead of the rear door.

Once the wounded officers were safely removed from the house, I entered the basement and began checking the dark and cluttered areas. There was a heavy smell of gunpowder and smoke in the basement. After the 1280 officers left I realized that only one other person was in the basement with me. Unsure of who was in the basement (due to several barriers and darkness) I kept my handgun out and entered a small, very cluttered room using my flashlight. I observed a Department of Corrections officer whom I only know as 'DOC Dave', standing and facing a Black Male who was motionless and half-concealed under a large pile of miscellaneous clothes on the floor,

I pointed my handgun at this male because I was unsure if the male was deceased, although he was bleeding. I was concerned that a gun might be concealed in the piles of clothing and continued to keep my handgun trained on the male as DOC Dave repeatedly checked the male for a pulse on the neck area. When I believed that the male was deceased I re-holstered my handgun and began shining my flashlight into the clothing and clutter in an effort to locate a firearm. I used my radio to advise dispatch and responding officers that we were Code 4 with a suspect in the basement. I didn't disturb the scene as I found it and only used my flashlight to illuminate the areas around the male. I then turned on an overhead light to better illuminate the small room.

Several supervisors requested that I remain at the top of the stairs to limit persons entering the basement. I remained in the kitchen at the top of the 3 stairs because I was able to monitor anyone entering from the front door of the home or the rear door through the back porch. Officers Fairbanks and Hubert remained just outside the north-side door. At one point I was ordered by Car 710 to feed the homeowners black and white cat, which was confined to the screened back porch. I was relieved by Incident Commander Jack Kelly at 1910 hours and told to submit my narrative.

**END of Supplement 18**

| | | | | |
|---|---|---|---|---|
| **Supplement number:** | **19** | **CCN:** MP-13-143872 | **Author:** | **001901 - Jon Fairbanks** |

Supplement of Off J.Fairbanks #001901 on 05/10/2013 21:15
Typed by JPF

On 05-10-2013 at approx 1530 hrs I was working squad 514A (currently on a call) when I heard "Officers down...Officers shot". I then heard the address of 2717 Aldrich Ave S for Officers down. I then proceeded to that location red lights and siren. I arrived

Lathrop Decl. Ex. 6

at 2717 Aldrich Ave S, then realized that the incident address was at 2717 Bryant Ave S (ran towards the sounds of Officers) and observed several Officers in the front yard attending to one of the officers that had been shot (incident was not aired C4 at the scene).

I then ran towards the north door (side door) and started to enter the residence when I was informed by another Officer that the suspect was down and it was C4 in the basement. I then informed dispatch that I was clear from my previous call and out on the Officers down securing the residence (stationed at the north door..side door).

I remained at my post until I was relieved by Lt Kelly Incident Commander at approx 2027 hrs.

**END of Supplement 19**

---

| Supplement number: | 20 | CCN: MP-13-143872 | Author: | 001545 - Daniel Diedrich |
|---|---|---|---|---|

---

Supplement of Off D.Diedrich #001545 on 05/10/2013 21:27

On the above date and time I was assigned to the 5th pct daywatch squad 510 with my partner Officer Grove. Officers were in the area of 29th and Pillsbury on a call when we heard Sgt. Smulski air that a suspect driving a blue PT Cruiser had just struck her squad. An officer aired they were attempting to follow it EB on 28th St. We left our call and went to assist. When we were WB on 28th and crossing 35W we saw we were the 4th car in the flee, so we pulled over. We then continued at the speed limit and checked the area. We observed a blue PT Cruiser at Lake and 10th and stopped it. It turned out to be the wrong vehicle.

As we were returning to the 5th Pct we heard officers air info that the suspect was possibly in the area of 27/Aldrich Ave S. Officers requested a perimeter and we posted at 27/Lyndale with another squad. An officer aired that they needed a post covered at 28 and Aldrich, so we drove there. Officer Grove stayed at 28th and Aldrich with the squad and I walked NB to cover mid-block. As I was covering mid block, I observed a citizen speaking with Officer Grove. He then approached me with photos that he said were of the suspect of a recent burglary. The suspect photo was that of a black male wearing a black short and red pants. I took one of the photos. (I later gave this photo to Sgt. Thompsen.)

After the area of 27th to 28th, Aldrich to Bryant was secure, an officer requested the perimeter by moved one block West. Officer Grove and I drove to 27th and Bryant Ave S. As we were on post, Sgt Stender requested help with a perimeter at 2717 Bryant. Since other squads were at the intersection, we drove to 2717 Bryant Ave to assist. I took up a position behind a Transit squad parked so I could cover the South West corner of the house. K9 and MPD SWAT members entered the rear of the address. After a few minutes of searching I heard the sound of multiple shots coming from what appeared to be inside the house. An officer then aired that an officer was shot and requested EMS. I maintained my post because I did not hear any code 4. Officers carried and injured officer out of the house and stopped in the yard. I approached and covered them as they attended to his injury. One of the officers told me it was Code 4 in the house. I put my rifle away.

Officer Grove and I went to our squad to clear roads for ambulance travel. We drove EB on 28th until we found an intersection that wasn't covered. We stopped at Stevens and 28th and blocked traffic until we were sure the officers were at HCMC.

We returned to the scene and asked Sgt Moore what he wanted us to do. Sgt Moore instructed us to canvas the block. I started at 2700 and 2708 Bryant Ave S and there was no answer.

I next checked 2716 Bryant Ave and Hoffman, Hershel George ██-86, ████████ answered. He saw nothing but police.

2720 Bryant Ave was checked but there was no answer.

2724 Bryant Ave was checked next and Petersen, Stacey Renee ██76, ████████ answered. She saw nothing but police.

I next checked 2730 and 2738 Bryant Ave S, but there was no answer.

2746 Bryant Ave S was checked and Gilbertson, Nancy LuAnne ██-55, ████████ answered. She saw nothing but police. Also home was Taylor, Glory Joy ██-74, ████████.

I next checked 2753 Bryant Ave S and the door was answered by Hlasny, Chris J ██-75, ████████. He saw nothing but police.

I next checked 2749 Bryant Ave S and the door was answered by Munzer, Airbert Paul ██-30, ████████. He saw nothing but police.

2741 Bryant Ave S was checked next. The door was answered by Knaeble, Bernadette Marie ██-52, ████████. She saw nothing but police.

Lathrop Decl. Ex. 6

I next checked 2727 Bryant Ave South. Perala, Richard Lewis ███-33, ████████ answered the door. He saw nothing but police.

I then transported a member of car 21 to the location of the PT Cruiser in squad 504. She photographed the PT Cruiser that squad 520 was watching. I then drove her back to the Bryant address and was assigned to watch the front of the address. I was then released by 502.

**END of Supplement 20**

---

| **Supplement number:** | **21** | **CCN: MP-13-143872** | **Author:** | | **000468 - Katherine Smulski** |
|---|---|---|---|---|---|

---

Supplement of Sgt K.Smulski #000468 on 05/10/2013 21:35
I responded with squad 502, Sgt. Moore to a suspicious vehicle at 2743 Lyndale Ave South at 1410 hours. Information from MECC call:
APT 106.....RE: CCN 13-134082/INFO/INS FRM 5/2 & 13132627/BURGDR/FRM 5/1....#1 DARK BLU PT CRUISER/LIC 647KLW W/BM & BF-- BOTH WHO WERE PART OF BREAK....BM LATE 20'S/DREDS
5/10/2013 14:01:23 094131 Response [Appended, 15:32:00] APT 106.....RE: CCN 13-134082/INFO/INS FRM 5/2 & 13132627/BURGDR/FRM 5/1....#1 DARK BLU PT CRUISER/LIC 647KLW W/BM & BF-- BOTH WHO WERE PART OF BREAK....BM LATE 20'S/DREDS[Shared] [Shared]
5/10/2013 14:01:51 094131 Response [Appended, 15:32:00] ADVG THEY ARE SUSPECTS INV IN BURGD ON 5/2...CLR ALSO GAVE POL FOOTAGE ON 5/2[Shared] [Shared]

I pulled into the lot (northbound) from 28th Street West. The parking lot is east of 2743 Lyndale Ave South. I immediately observed the blue PT Cruiser parked facing WB toward the building. Car 2306 was already at the scene. The PT Cruiser was occupied by a black male (driver) with dreads and a black female in the front passenger seat. I could not tell if there was anyone in the back seat. Sgt. Moore began verbally telling the driver to show his hands, but the driver did not comply. Sgt. Moore told the driver to shut the vehicle off and to throw the keys out the window, the driver did not comply to the verbal commands. I drew my handgun and pointed it at the driver. Seeing that the driver was not responding to commands and observing the vehicle windows to be closed, I used the squad PA to order him to show his hands, turn the vehicle off and to throw the keys out the window. The driver again did not respond to my commands.

I observed the vehicle began to back up slowly and I observed the vehicle wheels began to turn toward my direction. I was standing just to the left of my open squad door and I moved to the front of the squad when it appeared that the driver was headed straight towards me. I observed the vehicle to pass by me and the vehicle struck the drivers door on squad 504 P# 76644, causing the door to close. I immediately got into 504 and back into traffic with my emergency lights and sirens on, traffic was at a moderate level and I drove EB on 28th looking for the suspect vehicle. I observed a similar blue colored vehicle at about 28th St and 1st Ave South and I attempted to catch up to the vehicle. I lost sight of the vehicle and was at no time near enough to be in a pursuit. I activated the emergency lights/sirens when I saw the blue vehicle and turned off the lights/sirens when I lost sight of the vehicle. I caught up to the vehicle about 28th and 10th Ave South and discovered that it was not the right vehicle. The color of the vehicle was the same but it was a different make.

I attempted to air this information but discovered that the squad radio had moved over to TAC3 so I went to my portable radio to inform officers that I had not found the vehicle.

Within a short time information was aired that a male matching the description from vehicle was seen going into Flanders Bike Shop (2707 Lyndale Ave South). The caller had seen officers with the vehicle earlier. I began to drive back to the area of 27th and Lyndale Ave South. In route I heard squad 8513 air that he had seen the suspect running SB on Lyndale Ave South and then WB in the 2700 block. Squads arrived in the area and immediately set up a perimeter. I maintained the corner of 27th and Aldrich. Squad 920 responded to the scene and took a picture of the squad door. There is 4 by 4 inch transfer but no dent in the door.

At 1507 hours we were told to release the perimeter on Aldrich and to fill in areas west of Aldrich (2700 block). At 1515 hours information was aired that a homeowner found the back door glass smashed and 1280 who had been in the area assisting, responded to 2717 Bryant Ave South. I was on the perimeter on 27th between Bryant and Colfax Ave South . 1280 confirmed forced entry to the home. While maintaining the perimeter I heard someone air that shots had been fired and that an officer had been shot. I began running toward 2717 Bryant Ave South and information was aired that a second officer had been shot. As I approached the house I observed a white male standing directly across the street and I told him to get to the ground as the situation in the home was unsafe. I then observed a second male standing nearby and he was also told to get to ground and I had both males crawl NB behind parked vehicles and they were escorted out of the area by Officer Hubert.

Crime scene tape was put up at 28th and Bryant and 27th and Bryant Ave South. An inner area directly near the scene was taped off. I contacted 710 and was advised that Sgt. Porras and Sgt. Kjos were enroute. Crime scene logs were established.

Lathrop Decl. Ex. 6

I left the scene at 1911 hours after being relieved by Lt. Kelly.

**END of Supplement 21**

---

**Supplement number:**   **22**   **CCN:** MP-13-143872   **Author:**   **004755 - Sara Metcalf**

---

Supplement of Sgt S.Metcalf #004755 on 05/10/2013 22:09
STATEMENT OF SGT. S. METCALF, 4755
ASSAULT UNIT

On 05-10-2013, I was with my partners, Sgt Freeman and Officer Honeycutt, working on an assault case in South Minneapolis. At approximately 1530 hours, we learned that there had been an officer involved shooting at 2717 Bryant Av S. We responded to assist Car 710.

On arrival, we checked into the crime scene and our badge numbers were logged. Officer Honeycutt and I were briefed by Sgt. Smulski. We learned that the incident started with a 911 call from a male at 2743 Lyndale Av S. The male reported that known burglars from 04-30-2013 were inside the apartment complex. A suspect vehicle description was provided by the caller (PT Cruiser). When Officers arrived at 2743 Lyndale Av S in the rear, they spotted the suspect vehicle parked in the rear lot of 2743 Lyndale Av S. It was now occupied by the suspects. The officers ordered the suspects out of the car. The driver fled in the suspect vehicle striking Sgt. Smulski's squad car while exiting the parking lot and fleeing the scene.

Sgt. Smulski also advised that a short time after the suspect fled in the PT Cruiser, the male suspect entered Flanders Bike Shop at 2707 Lyndale Av S., possibly shedding some of his clothing. After the suspect left Flanders Bike Shop, a perimeter was set up and eventually the suspect was located inside 2717 Bryant Av S where the shooting took place.

Officer Honeycutt and I went to 2707 Lyndale Av S (Flanders Bike Shop). We interviewed the manager, ADRIAN CHRIS CONTRERAS. The interview was audio recorded and downloaded. During the interview, Adrian stated that he was working inside the bike shop when a suspicious male walked into the store and stood near the door. He stated he thought the suspect entered the store at approximately 1:15pm. Adrian described the suspect as being approximately 6-00" tall, long braided hair in a ponytail wearing a red T-shirt and black shorts. The suspect was looking out the windows and acting very nervous. After 3-5 minutes, the suspect ran towards the back of the store, leaped over a swinging half door into the repair area, continued running towards the rear, up some steps and back into the storage area. He tried to escape out the rear door and could not get the door open. He ran over to another door in the storage area and could not escape out that door either. He ran back to the front of the store, dropped his cell phone, picked it up and left out the front door. The manager went out the front door, saw a squad car at the intersection of 27th and Lyndale and pointed at the suspect. The suspect took off running westbound across Lyndale Av and continued westbound between two businesses (art store and a soccer store) located mid block between 27th St and 28th St.

We also interviewed the mechanic, JOHN HAUGH, at Flanders Bike Shop. The interview was recorded and downloaded. During the interview, John stated a tall, skinny, black male wearing shoulder length dread locks tied back on top and a red shirt entered the store. He was was acting suspicious, looking at John and then looking out the windows. When asked, the suspect stated that his girlfriend was interested in a bike. The suspect was talking on his cell phone. After a few minutes, the suspect ran toward the back of the store, jumped over the half door and ran into the storage area, John followed the suspect as the suspect tried to find an escape. The suspect finally ran back to the front of the store. He dropped his cell phone and then picked it up and ran out the front door. He fled westbound across Lyndale Av.

I used a flashlight to check the areas where the suspect ran around in the store. I did not find anything that might have been dropped by the suspect. The employees stated that the suspect did not dump any of his clothing in the store. The manager told me that the store does not have any surveillance cameras inside or outside the store.

After interviewing the bike shop employees, Officer Honeycutt and I walked over to 2743 Lyndale Av S. We located the 911 caller who reported the burglars. He was identified as SHAWN KEOHEN, ███-1987, 1006 W Lake St #328, ███-█
█████████████. He is the Maintenance Technician at the Green Leaf Apartments (2743 Lyndale Av S).

Shawn explained that one of the apartments was burglarized on 04-30-2013. He posted still photos in the apartment building of the suspects (a black male and a black female.) The still photos came from the apartment complex security surveillance system. On today's date (05-10-2013) Shawn saw the suspects from the burglary enter the apartment complex. He called 911. He provided descriptions of the suspects and a description of the suspects' vehicle, including the license plate number. Shawn witnessed the suspects flee officers. He witnessed the male suspect enter Flanders Bike Shop and he witnessed the male suspect run WB across Lyndale. Shawn provided us with the surveillance video from todays date showing the suspects (black male with long dreads, wearing a black T-shirt and bright red pants, and a black female with a baby). The surveillance video also showed the suspect vehicle striking Sgt. Smulski's squad car as the suspects fled from police. Shawn stated that the male suspect was the driver of the PT Cruiser.

Lathrop Decl. Ex. 6

We interviewed Shawn. The interview was recorded and downloaded.

Shawn advised that a female (RAHMA SALAH) from apartment number 405 had also witnessed the incident. I went up to apartment 405 and interviewed Rahma. She stated that she and her husband were in the living room when they heard shouting. She observed police cars in the back parking lot down below. Officers were shouting at a vehicle, "Get out of the car!" No one got out of the car and the vehicle took off, striking the female officer's squad. Rahma stated that her husband recorded some of the incident on his iphone. Her husband was not home at the time but she stated they would bring the phone to City Hall on Monday. Rahma's phone number is ███████.

Officer Honeycutt and I returned to the crime scene at 2717 Bryant Av S. I advised Car 710 of our interviews and recovered surveillance video. We then cleared the scene and returned to City Hall for reports.

**END of Supplement 22**

---

| Supplement number: | 23 | CCN: MP-13-143872 | Author: | 003141 - Michael Honeycutt |
|---|---|---|---|---|

Supplement of Off M.Honeycutt #003141 on 05/10/2013 22:20

On 05/10/2013 I was working in the Assault Unit as Car 746 with Sgt Freeman and Sgt Metcalf. At approximately 1545 hours we responded to the area of Bryant Ave S and 27 St S on the report of an Officer Needs Help call.

Upon arrival Sgt. Metcalf and I were informed that the call originated at 2743 Lyndale Av S and that at one point the suspect had run into Flanders Bike Shop at 2707 Lyndale Av S and may have left some clothes behind before continuing to flee on foot.

Sgt. Metcalf and I then went to 2743 Lyndale Av S, the GREENLEAF APARTMENTS building. There we spoke to 911 caller SHAWN PAUL KEOHEN who is a maintenance technician at the building. KEOHEN stated that he recognized a suspicious person from a Burglary of Dwelling that occurred at the Greenleaf Apartments on 04/30/2013 (MPD CCN 13-132627). KEOHEN had still photographs printed out from building surveillance footage from the 04/30 incident hanging in his office so he was very familiar with the suspicious party's image. In that case the suspicious party had been visiting apartment 302 with a black female.

KEOHEN stated that at approximately 1350 hours he saw the suspicious person coming in the back entrance of the building. KEOHEN stated that he thought he recognized the person so he went to the surveillance system and pulled up the camera in the elevator. This is the same camera that KEOHEN made the original still photos of the suspicious person from. Once looking at similar images, KEOHEN stated that he was sure that it was the same person. KEOHEN stated that he continued his work until he saw the suspicious party and a female come back into the lobby. At that point KEOHEN stated that putting the two people together he was 100 percent sure that it was the same suspicious person. KEOHEN stated that he then took some boxes outside where he could get the license plate of the blue PT Cruiser that the suspicious party was driving. The vehicle was parked directly outside the door to the apartment building and KEOHEN's office window. KEOHEN observed as the suspicious male and female loaded two small children into the back, the female got into the front passengers side, and the suspicious male got into the driver's seat.

KEOHEN stated that he went back inside and called 911 and reported that the person from the prior burglary was in his parking lot. KEOHEN watched the vehicle until it started driving away. The vehicle started driving out the driveway past the entrance to the parking garage then stopped and pulled into a parking spot near the South end of the lot closer to 28th St S. KEOHEN stated that he continued watching the vehicle and saw two marked squad cars and what he believed to be an unmarked pickup truck pull into the lot and stop behind the blue PT Cruiser. KEOHEN watched as the suspicious person backed up, stopped, then pulled forward and accelerated out of the parking lot and rammed one of the squad cars. The squad car had the driver's side door open and the suspicious person hit the door as he exited the parking lot traveling SB. The PT Cruiser then turned EB on 28th St. and leaves the camera's field of view.

KEOHEN stated that he and the property caretaker then went out in the parking lot. A short time later KEOHEN heard the caretaker yell "There he goes" and pointed NB in the alley that runs behind the apartment building. The alley enters from Garfield Ave from the East then turns North and extends to 27 St West. KEOHEN then called 911 back and informed dispatch that the same party was running NB to 27 St and turned WB on 27 St W. KEOHEN then ran out the Lyndale Av S and saw the suspicious person come walking out onto Lyndale Av S and enter FLANDER'S BROTHERS CYCLES. KEOHEN stated that approximately five minutes later he saw the same suspicious person exit FLANDER'S BROTHERS CYCLES and at first walk WB across Lyndale Av S, then begin running when the suspicious person saw a police squad car at the corner of Lyndale Av S and 27 St W. KEOHEN stated that he followed the suspicious person across Lyndale and to the next alley between Lyndale and Aldrich Av S. There KEOHEN stated that he saw squads coming from other directions and he stopped following.

KEOHEN stated that he was sure that he was following the right person in part because of the distinctive hairstyle and bright red pants that the suspicious person was wearing.

Lathrop Decl. Ex. 6

Sgt Metcalf and I took a recorded statement from KEOHEN, and KEOHEN copied the pertinent surveillance footage to a new department issued flash drive. The footage included the parking lot where the suspicious person first came and parked in front of the office, to the person entering the lobby, going up the elevator and the suspicious female entering the elevator with two small children, all of them riding the elevator back down, crossing the lobby and exiting the building, loading into the PT Cruiser, moving and reparking, and the incident with the squad cars.

After speaking with KEOHEN Sgt. Metcalf and I walked the alley NB looking for additional cameras with negative results. We then checked across the street in the open lot where the suspicious person ran. The lot is between PLANET SOCCER, 2716 LYNDALE AVE S, and ART MATERIALS, 2728 LYNDALE AVE S. We did not find any additional exterior cameras.

**END of Supplement 23**

| Supplement number: | 24 | CCN: MP-13-143872 | Author: | 006272 - Brian Sand |
|---|---|---|---|---|

Supplement of Sgt B.Sand #006272 on 05/10/2013 22:36

I was sitting at the Northeast corner of 28th and Colfax in an unmarked car as squad 590 assisting on the perimeter in searching for the suspect. I then heard that 2 Officers were shot in 2717 Bryant Ave S. I then went to the front of this house and started to clear the intersection of 27th and Bryant so Ambulances could get in and out of the area. Once the two ambulances left the area I assisted in making sure the perimeter was secure and that cops were stationed on the perimeter. Once the perimeter was secure I went to the station to assist with the street.

**END of Supplement 24**

**End of report for case MP-13-143872. Print ID: fe7da9e2-29e8-4e94-bebe-d41b8941d7ce**

Lathrop Decl. Ex. 6