1

1

2

3
                    UNITED STATES DISTRICT COURT
4                       DISTRICT OF MINNESOTA

5      --------------------------------
                            CASE:  0:14-CV-01467-DWF-JSM
6
       Walter Louis Franklin, II,
7      Trustee for the Estate of
       Terrance Terrell Franklin,
8
                    Plaintiff,
9
            vs.
10
       Lucas Peterson, individually
11     and in his official capacity;
       Michael Meath, individually
12     and in his official capacity;
       Janee Harteau, Chief of Police
13     for the Minneapolis Police Department,
       individually and in her official
14     capacity; and the City of Minneapolis,

15           Defendants.
       --------------------------------
16
                            DEPOSITION OF
17                          MICHAEL MEATH
                          August 27, 2015
18                           9:30 a.m.

19

20

21

22

23

24

25

                    VERBATIM  REPORTING (763)-493-4535

Lathrop Decl. Ex. 17

2

```
 1        DEPOSITION OF MICHAEL MEATH, taken by and
          on behalf of Plaintiff, at 350 South 5th Street, Room
 2        210, Minneapolis, Minnesota, 55415 on August 27,
          2015, commencing at 9:30 a.m., before Kristin Hoium,
 3        Notary Public, State of Minnesota, County of
          Hennepin.
 4
                           *   *   *   *   *
 5
                            APPEARANCES
 6
          PADDEN LAW FIRM, PLLC
 7        BY:  Michael B. Padden, Esq.
          8687 Eagle Point Blvd.
 8        Lake Elmo, Minnesota  55042
          Appeared for Plaintiff
 9
          CITY OF MINNEAPOLIS OFFICE OF CITY ATTORNEY
10        BY:  Brian S. Carter, Esq.
               Sara J. Lathrop, Esq.
11        350 South 5th Street
          Room 210
12        Minneapolis, Minnesota  55415
          Appeared for the City of Minneapolis
13
          THE DERATANY FIRM
14        BY:  Megan S. O'Connor, Esq.
          221 North LaSalle Street
15        Suite 2200
          Chicago, Illinois  60601
16        Appeared for Plaintiff

17        ALSO PRESENT:  R. Steven Rogers

18                         I N D E X

19        EXAMINATION BY:                    PAGE:
          Mr. Padden                         3
20        Mr. Carter                         125

21        EXHIBITS:                          PAGE:
          No. 1                              65
22           2                               108

23

24        *** READING AND SIGNING NOT WAIVED ***
          *** ORIGINAL TRANSCRIPT IN POSSESSION
25            OF ATTORNEY MICHAEL PADDEN ***
```

09:32:28
09:32:28

                     VERBATIM  REPORTING (763)-493-4535

Lathrop Decl. Ex. 17

3

1          MICHAEL MEATH,
2     a witness in the above-entitled action, having
3     been duly sworn, deposes and says as follows:
4               EXAMINATION
5  BY MR. PADDEN:
6  Q.  Could you state your name please for the record,
7      sir?
8  A.  Michael Meath.  M I C H A E L.  Meath is M E A T
9      H.
10 Q.  Is it okay if I refer to you throughout the
11     deposition, sir, as Officer Meath?
12 A.  Sure.
13 Q.  Sir, this deposition is being taken in a lawsuit
14     where the plaintiff has the name Franklin.  Have
15     you had a chance to see the complaint for this
16     case, sir?
17 A.  I have.
18 Q.  Have you read it?
19 A.  Yes.
20 Q.  From beginning to end?
21 A.  I believe so.
22 Q.  Did you review any documents in preparation for
23     this deposition, sir?
24 A.  I did.
25 Q.  What did you review, sir?

VERBATIM REPORTING (763)-493-4535

4

1  A.  Police report and a few schematics.
2  Q.  What are schematics?
3  A.  Computer generated drawings.
4  Q.  Drawings of what?
5  A.  Of the layout of a basement.
6  Q.  Would that be the basement of the home where
7      Franklin was killed?
8  A.  Yes.
9  Q.  Sir, you have very good attorneys representing
10     you.  Have you ever given a deposition before?
11 A.  I have.
12 Q.  How many times?
13 A.  One for sure, maybe two.
14 Q.  Were they in the context of civil rights
15     lawsuits?
16 A.  I'm not sure on that.
17 Q.  How long ago?
18 A.  A few years ago.
19 Q.  Regarding the rules, they are real basic.  I'm
20     sure you have had a chance to discuss this with
21     your attorneys, but there's three things I like
22     to let witnesses know about.
23          The first thing, as I'm sure you know,
24     sir, everything we say today is being taken down
25     by the court reporter.  So you need to respond

VERBATIM REPORTING (763)-493-4535

5

1      verbally as opposed to saying un-huh or nodding
2      your head or some other response that would be
3      nonverbal in nature.  Is that okay, sir?
4  A.  Yup.
5  Q.  Secondly, let me get the question out and I will
6      try to provide the same courtesy to you when you
7      answer.  We just can't speak together.  You are
8      doing a great job so far and the other officer
9      witnesses have done a real good job.  Just let me
10     get the question out completely before you answer
11     and we will get a better record that way.  Okay?
12 A.  Okay.
13 Q.  Lastly, if I ask you a question you don't
14     understand, tell me that and I will try to
15     rephrase it in a way you understand it.  Because
16     if you answer the question I'm going to
17     reasonably assume that you understood the
18     question.  Is that okay, sir?
19 A.  Yes.
20 Q.  Sir, where were you born and raised?
21 A.  I was born in St. Paul, Minnesota and I was
22     raised in Minneapolis.
23 Q.  Where did you go to high school?
24 A.  South High School.
25 Q.  Any education after high school, sir?

VERBATIM REPORTING (763)-493-4535

6

1  A.  Yup.  I went to New Hampshire Technical College
2      in the state of New Hampshire.
3  Q.  How did you end up in New Hampshire?
4  A.  I went out there for school.
5  Q.  How long was that program, sir?
6  A.  Two years.
7  Q.  Was it your intention to become a police officer
8      at that time?
9  A.  It was.
10 Q.  And then it is my understanding you worked as a
11     licensed peace officer in the state of New
12     Hampshire before you came back to Minnesota?
13 A.  Yes.
14 Q.  How many years were you there, sir?
15 A.  Just under three.
16 Q.  Were you ever investigated as part of an internal
17     affairs investigation when you were in New
18     Hampshire?
19 A.  I don't believe so, no.
20 Q.  Was a lawsuit ever commenced against you or the
21     department you worked for regarding a claim of
22     excessive force or civil rights violations?
23 A.  I don't believe so.
24 Q.  Good work record in New Hampshire?
25 A.  Yes.

VERBATIM REPORTING (763)-493-4535

Lathrop Decl. Ex. 17

7

1  Q.  What's your ethnicity, sir?
2  A.  American.
3  Q.  My blood is I'm German, French, English, Irish
4      and Lebanese.  Do you have any idea what your
5      background is?
6  A.  Irish and Mexican.
7  Q.  When did you first begin working for the
8      Minneapolis Police Department, sir?
9  A.  In August of 2005.
10 Q.  What was your position at that time, sir?
11 A.  Patrol officer.
12 Q.  Are you still a patrol officer?
13 A.  Yes.
14 Q.  Have you sought an increase in rank during your
15     tenure with the MPD?
16 A.  No.
17 Q.  Have you ever been up for promotion?
18 A.  No.
19 Q.  When did you first begin working in the SWAT
20     unit, sir?
21 A.  I believe it was in 2010.
22 Q.  Are you still a member of the SWAT team, sir?
23 A.  Yes.
24 Q.  Sir, there has been some discussion in the other
25     depositions of this concept of whether a member

8

1      of the team can be part-time or full-time.
2          When you began working on the SWAT
3      team, sir, during that time frame from then until
4      now have you ever been considered a full-time
5      member of the SWAT team?
6  A.  No.
7  Q.  When you became a member of the SWAT team, sir,
8      in 2010 were there members that were considered
9      to be, quote, unquote, full-time?
10 A.  I guess it would be the definition of full-time.
11     We have never had a full-time SWAT team.
12 Q.  I appreciate that.  But the reason I ask is
13     because I had read some documents.  There was an
14     investigation of two SWAT officers that were
15     involved in an incident in Green Bay, Wisconsin
16     in 2013 and their names were Thole and Powell.
17     You are familiar with them, correct?
18 A.  Correct.
19 Q.  And they were terminated.  You know that, right?
20 A.  Yes.
21 Q.  And as part of the investigation documents that
22     were generated by I think city employees, I
23     believe they were referred to as full-time SWAT
24     members.  Does that make any sense to you?
25 A.  I guess I need to understand your definition of

9

1      full-time SWAT member.  I think mine is different
2      than yours.
3  Q.  What is yours, sir?
4  A.  Mine would be you are in a full-time tactical
5      situation.  You are not doing any patrol work,
6      police work or anything else.  And the city has
7      never had that.
8  Q.  To your knowledge?
9  A.  To my knowledge.
10 Q.  When you use the term tactical, does that mean --
11     does that include SWAT events, for lack of a
12     better description?
13 A.  It depends on what SWAT events you mean.
14 Q.  When you say tactical what do you mean, sir?
15 A.  I would mean hostage situations, serving high
16     risk warrants, operation 100s with barricaded
17     suspects.
18 Q.  Would that also include the attempted
19     apprehension of suspects?
20 A.  It depends on if it meets one of those three
21     criteria I just said.
22 Q.  Let me ask it this way.
23          Was the attempted apprehension of
24     Terrance Franklin on May 10th, 2013, was that a
25     tactical operation?

10

1  A.  It was a search of a suspect.
2  Q.  So that wouldn't be tactical.
3  A.  No.
4  Q.  But SWAT was involved obviously, correct?
5  A.  Yes.
6  Q.  So it wouldn't be abnormal for SWAT to be
7      deployed in a situation concerning someone who
8      was attempting to evade arrest.
9  A.  I guess it would be -- again, when you say
10     deployed what do you mean by that?
11 Q.  Well, you guys are put into action.  Isn't that
12     the verb you use?
13 A.  It is not put into action.  It is a police
14     officer responding to a call.  It is when -- the
15     way I'm taking what you are saying is somebody
16     high up is calling in for SWAT.
17 Q.  So the word deployed has never been used in terms
18     of the SWAT unit?
19 A.  It has been used but not in that context.
20 Q.  I guess what I'm asking is was the attempt to
21     apprehend this guy Franklin that day, was that an
22     abnormal event for the SWAT team or was that the
23     type of stuff you guys do?
24 A.  For the 1280 it was abnormal.
25 Q.  What do you mean by 1280, sir?

Lathrop Decl. Ex. 17

**11**

1  A.  That's what I was assigned to when the incident
2      occurred.
3  Q.  1280, does that mean SWAT?
4  A.  It means the warrant team for the month.
5  Q.  So 1280, does that specifically relate to the
6      serving of warrants, sir?
7  A.  Yes.
8  Q.  Sir, have you ever been in the military?
9  A.  No.
10 Q.  Have you ever been trained in the concept of
11     militarization at any time in your life?
12 A.  No.
13 Q.  Do you know what militarization is?
14 A.  No.
15 Q.  Have you ever heard of that term?
16 A.  Just when you say it and in the media.
17 Q.  So you have heard it from the media.
18 A.  Yeah.
19 Q.  So you have heard it only in the context of the
20     media mentioning it and me mentioning it right
21     now.
22 A.  Yup.
23 Q.  Sir, in your history working SWAT was there ever
24     a time other than the Terrance Franklin incident
25     where a suspect was killed during a SWAT event

**12**

1      that you were involved with?
2  A.  No.
3  Q.  So this was the first and only time in your
4      career, correct?
5  A.  Correct.
6  Q.  Sir, I want to ask you some questions about your
7      injury.  You received a bullet to the right leg,
8      correct?
9  A.  Correct.
10 Q.  Was that in the right upper thigh, sir?
11 A.  Yes.
12 Q.  And has that affected your duties now, sir?
13 A.  Yes.
14 Q.  In what sense?
15 A.  Pain pretty much constantly throughout the day.
16 Q.  But you work as a patrol officer now, correct?
17 A.  Correct.
18 Q.  And that's what you did before this incident?
19 A.  Correct.
20 Q.  The incident I believe, sir, was on May 10, 2013,
21     correct?
22 A.  Correct.
23 Q.  When did you recommence your work as a patrol
24     officer after that date, sir?
25 A.  I would have to look at the computer thing that

**13**

1      says I went back to the street, but it was
2      sometime close to winter.
3  Q.  So your estimate would be the wintertime of 2013?
4  A.  Yeah.
5  Q.  Did you do any other duties for the department
6      before you returned, sir, doing your patrol
7      officer work in the winter of 2013?
8  A.  I did.
9  Q.  What did you do, sir?
10 A.  I was assigned SWAT garage.
11 Q.  How long did you work in the SWAT garage before
12     you went back in the field as a patrol officer?
13 A.  It would have been the time frame from earlier.
14     That's where -- I left there to go back to the
15     street.  I would have to look at a document to
16     give you an exact answer.
17 Q.  That's fine.  I appreciate that, sir.  It is okay
18     to give me an estimate.  If you don't feel
19     comfortable giving an estimate, that's fine too.
20         Can you give me a general idea when you
21     went back to work in essence?
22 A.  Eight months, seven months, around there.
23 Q.  But I thought that's when you came back and
24     worked as a patrol officer.  Because that would
25     be the winter, right?  That would be December?

**14**

1  A.  Correct.  That's when I came back to work
2      full-time.
3  Q.  I thought you said before you did a different
4      kind of a job working in the SWAT garage.
5  A.  Like civilian work.
6  Q.  Right.  How long was that for?
7  A.  That was for the seven, eight months.
8  Q.  Was there a period of time where you were off
9      work?
10 A.  Yes.
11 Q.  How long was that?
12 A.  A month maybe.
13 Q.  Fair enough.
14         So how long were you hospitalized for
15     if you can remember, sir?
16 A.  I believe it was three days.
17 Q.  And after you were released from the hospital did
18     you go home?
19 A.  I did.
20 Q.  Would you essentially have been at home for a
21     period of time before you went back to work?
22 A.  Correct.
23 Q.  So you were really at home on bed rest before you
24     went back to work.
25 A.  Correct.

Lathrop Decl. Ex. 17

15

1 **Q.** So if someone wanted to get a hold of you or see
2 you they would have to come to your home, I take
3 it, during that time frame?
4 **A.** Yes.
5 **Q.** Because you weren't going out away from your home
6 much I take it?
7 **A.** Not much, no.
8 **Q.** Because of your injuries?
9 **A.** Correct.
10 **Q.** Sir, other than the shot to your leg did you have
11 any other injuries that you recall from this
12 incident?
13 **A.** Nope.
14 **Q.** When you went into the hospital, sir, do you
15 recall if the doctors or the nurse did a full
16 body exam of you?
17 **A.** I'm assuming they did. They are doctors. But I
18 wouldn't know for sure.
19 **Q.** Fair enough.
20 Was there ever a period of time, sir,
21 after the incident where you were rendered
22 unconscious for any reason?
23 **A.** I don't believe so.
24 **Q.** How would you describe your level of lucidity in
25 the hospital in the three days you were there?

16

1 **A.** I was doped up on morphine pretty good. So I
2 would say it was pretty high.
3 **Q.** Do you remember those three days, sir?
4 **A.** Somewhat.
5 **Q.** Did people come to see you?
6 **A.** Yes.
7 **Q.** Did any members of the SWAT team come to see you
8 when you were in the hospital?
9 **A.** Yes.
10 **Q.** Who?
11 **A.** Couldn't give you exact names obviously. The
12 individuals that were involved in this incident.
13 **Q.** Let me break that down a little bit.
14 Did Lucas Peterson come to see you when
15 you were in the hospital?
16 **A.** Yes.
17 **Q.** Do you remember when?
18 **A.** No.
19 **Q.** Do you recall what you discussed with him if
20 anything?
21 **A.** No.
22 **Q.** You did have a discussion with him, right?
23 **A.** Yes. Like I said, I was extremely high on
24 morphine.
25 **Q.** That's fine.

17

1 But you don't recall the subject of the
2 conversation?
3 **A.** No.
4 **Q.** Do you recall if you discussed the incident in
5 those three days?
6 **A.** No.
7 MR. CARTER: Objection, asked and
8 answered.
9 Just make sure you give me a little
10 pause before you answer.
11 BY MR. PADDEN:
12 **Q.** Go ahead, sir.
13 **A.** No.
14 **Q.** Did Officer Durand come to see you in the three
15 days you were in the hospital?
16 **A.** Yes.
17 **Q.** Did you have a conversation with him?
18 **A.** I can't recall.
19 **Q.** You may or may not -- the first question I have
20 is if you had a conversation. You don't recall
21 if you had a conversation?
22 **A.** What's your definition of a conversation?
23 **Q.** That's where two people talk to each other.
24 That's how I define a conversation.
25 **A.** I would say is it saying hello, hi, a hug,

18

1 because that's all I remember.
2 **Q.** And so you don't recall if you had conversation
3 beyond a hi and a hug.
4 MR. CARTER: Objection, asked and
5 answered.
6 BY MR. PADDEN:
7 **Q.** Go ahead.
8 **A.** I said no.
9 **Q.** What about Sergeant Stender, did he come to see
10 you?
11 **A.** I believe so.
12 **Q.** Did you have a conversation with him?
13 **A.** No.
14 **Q.** So he came there and he saw you but you don't
15 recall speaking with him at all, correct?
16 **A.** I think we went over that on the last one. It
17 was a hug and how are you doing. That was about
18 it.
19 **Q.** I appreciate that. But I don't know unless I ask
20 you.
21 **A.** I told you no.
22 **Q.** Told me no about what?
23 **A.** When you asked me I said no. We didn't have a
24 conversation.
25 **Q.** I'm asking you about Stender.

Lathrop Decl. Ex. 17

19

1  A.  I said no to that one too.
2  Q.  I'm just trying to make a record, sir.
3        So just to be clear for the record you
4     don't recall him saying anything to you?
5  A.  No.
6  Q.  Did Officer Laux come in?
7  A.  Yes.
8  Q.  Do you recall a conversation with him?
9  A.  No.
10 Q.  What about Officer Stauffenberg?
11 A.  Yes.
12 Q.  Do you recall a conversation with him?
13 A.  No.
14 Q.  Do you remember what day he came to see you?
15 A.  No.
16 Q.  Do you remember what day Stender came to see you?
17 A.  No.
18 Q.  Do you remember what day Laux came to see you?
19 A.  No.
20 Q.  After you got out of the hospital you said you
21    went home, right?
22 A.  Correct.
23 Q.  I don't need to know your address, sir, but do
24    you live in the Twin Cities?
25 A.  I do.

20

1  Q.  And when you were at home for that period of time
2     before you went back to work did any member of
3     the SWAT team come to see you?
4  A.  Yes.
5  Q.  Who?
6  A.  I wouldn't be able to give you a list.  The
7     department paid the entire department to watch
8     me.  I had armed officers with me the entire time
9     I was at the hospital and at home.
10        I would say there's 200, 300 cops that
11    came from the hospital to my house at different
12    periods of time.  I couldn't give you their names
13    or when they were there.
14 Q.  Were they protecting you?
15 A.  You just always have an officer, especially at
16    the hospital.  And I live in the city of
17    Minneapolis.
18 Q.  I get the hospital part.  But when you got home
19    are you saying that officers were there providing
20    you protection?
21 A.  They were just always there.  I live by myself.
22    I'm unmarried.  Who's going to take care of me
23    with my medical needs?
24 Q.  Thank you for pointing that out, sir.
25        Who did take care of you with your

21

1     medical needs?
2  A.  Fellow officers and friends.
3  Q.  So some friends helped who were not members of
4     the Minneapolis Police Department, correct?
5  A.  Correct.
6  Q.  I appreciate that.  I know there was a lot going
7     on.  I'm not really concerned about other
8     officers at this point.
9        What I'm concerned about is when you
10    were at home with bed rest before you went back
11    to work, did Officer Peterson come to see you?
12 A.  Yes.
13 Q.  Did you have any conversation with him when he
14    came to see you?
15 A.  I'm sure we did.
16 Q.  How many times did he come to see you, sir?
17 A.  I would have no idea.
18 Q.  You can't remember?
19 A.  No.
20 Q.  Was it more than once?
21 A.  Yes.
22 Q.  Do you remember having conversation with Officer
23    Peterson about the incident?
24 A.  No.
25 Q.  And again, sir, I'm keying in on the time frame

22

1     from after you left the hospital and came home
2     before you went back to work.  Okay?
3  A.  The entire time or are you asking me about the
4     time at home?
5  Q.  The time at home.  Let me back up.
6        I'm talking about the time you got home
7     from the hospital and you were at home before you
8     went to work.  I think you told me that was about
9     a month, sir, correct?
10 A.  Correct.
11 Q.  Did Peterson come to see you?
12 A.  Yes.
13 Q.  Was it more than once?
14 A.  Yes.
15 Q.  Do you recall any conversations with him?
16 A.  I do not.
17 Q.  But did you have conversation.
18 A.  I'm assuming, yeah.
19 Q.  Did Durand come to see you?
20 A.  I'm sure he did.
21 Q.  More than once?
22 A.  I'm sure he did.
23 Q.  Did you have conversation with him?
24 A.  I'm sure I did.
25 Q.  Can you recall the conversations?

Lathrop Decl. Ex. 17

23

1  A.  No.
2  Q.  Sir, was there a specific directive that applied
3      regarding this incident from someone that you
4      were not allowed to discuss the incident with
5      anyone?
6  A.  I'm not sure.
7  Q.  What do you mean you are not sure?  You don't
8      remember?
9  A.  I don't remember.
10 Q.  Well, I guess what I'm asking is did anyone in a
11     position of authority above you say, Officer
12     Meath, you cannot discuss this incident with
13     anyone?  Did that ever happen?
14 A.  Not that I recall.
15 Q.  Fair enough.
16          Sir, did Sergeant Stender come to see
17     you when you were at home?
18 A.  I'm sure he did.
19 Q.  Was it more than once?
20 A.  I'm sure he did.
21 Q.  Do you recall any conversations with Sergeant
22     Stender during the time that you were home before
23     you returned to work?
24 A.  I do not.
25 Q.  When you were in the hospital -- I know it was a

24

1      relatively short period of time, three days --
2      were you texting with anyone?
3  A.  I'm sure I was.
4  Q.  So you had your cell phone with you?
5  A.  I'm sure I did.
6  Q.  Do you recall texting with Officer Peterson?
7  A.  I don't recall it, no.
8  Q.  Do you recall texting with Officer Durand?
9  A.  I do not.
10 Q.  Do you recall texting with Sergeant Stender?
11 A.  I do not.
12 Q.  But you said that you may have been texting, you
13     just don't remember, correct?
14 A.  That was two years ago.
15 Q.  Would you still have that phone and those texts,
16     sir?
17 A.  No.
18 Q.  You changed phones?
19 A.  Yes.
20 Q.  As part of the investigation by your employer did
21     they ask you for text communications with you and
22     the other officers involved in the incident?
23 A.  No.
24 Q.  Did they ask you for text communications between
25     you and Sergeant Stender?

25

1  A.  No.
2  Q.  The reason I phrase it that way, sir, when I said
3      officers, if I say officers would you interpret
4      that to include Sergeant Stender or would
5      Sergeant Stender be considered someone different
6      than an officer?
7  A.  Sergeant Stender would be considered different.
8  Q.  I want to make sure we are on the same wave
9      length.
10          Did you have a laptop when you were in
11     the hospital?
12 A.  No.
13 Q.  Do you have a laptop?
14 A.  No.
15 Q.  Did you have a laptop back in May of 2013?
16 A.  No.
17 Q.  Do you have an email address at work?
18 A.  I do.
19 Q.  When you got back to work in that month of
20     time -- you said it was about a month that you
21     went back to work, right?
22 A.  Correct.
23 Q.  Did you start emailing?
24 A.  What do you mean by start emailing?
25 Q.  It sounds like you didn't have a laptop at home

26

1      so I assume that -- maybe I should clarify this.
2          Did you have a computer at home?
3  A.  What's your definition of a computer?
4  Q.  Well, a laptop might be considered different than
5      someone that has a monitor in their home with an
6      actual computer.
7  A.  I have neither of those.
8  Q.  Fair enough.
9          Are you someone that emails at work?
10 A.  Work emails.
11 Q.  Was that the case in May of 2013 and June of
12     2013?
13 A.  My policy is I have to check my mail every day I
14     come to work.  So I would say I checked my mail.
15 Q.  It is normal, sir, with your employment for
16     people to communicate with you by way of email.
17 A.  Correct.
18 Q.  When you got back to work did you start emailing
19     again?
20 A.  I would say so, yes.
21 Q.  Did you ever email with anyone in the department
22     about this incident?
23 A.  I'm assuming that I get things through the
24     attorneys and things, but other than that I can't
25     recall.

Lathrop Decl. Ex. 17

27

1  Q.  Do you recall ever emailing Officer Peterson
2      about the Franklin incident?
3  A.  I do not.
4  Q.  But you would have the capability to email
5      Officer Peterson, correct?
6  A.  I would.
7  Q.  Did you ever email Officer Durand about the
8      Terrance Franklin incident?
9  A.  Not that I recall.  I would have to check my in
10     box and sent box.
11 Q.  Would you still have your emails from 2013, sir?
12 A.  I wouldn't.  The city would.
13 Q.  But is it accessible to you?
14 A.  Obviously.
15 Q.  I was just asking if going back -- because we are
16     now over two years ago -- you would have access
17     to that yourself?
18 A.  Whatever is in there.
19 Q.  So it is something you could check, right?
20 A.  Correct.
21 Q.  And Sergeant Stender, do you recall emailing with
22     him about this incident back in 2013?
23 A.  I do not.
24 Q.  Did the department as part of the investigation
25     ever request from you any email communications

28

1      between you and the other involved officers who
2      were directly involved with Terrance Franklin at
3      the time he passed away on May 10, 2013?
4  A.  They wouldn't have to.
5  Q.  What's that?
6  A.  They wouldn't have to.
7  Q.  They can access it on their own?
8  A.  Correct.
9  Q.  Do you know if they ever did?
10 A.  Not to my knowledge.
11 Q.  Did they ever advise you that they were going to
12     do that?
13 A.  Again, I don't think they would have.  It is
14     their property.
15 Q.  I appreciate that.  I get that.  But did they
16     ever specifically advise you they were checking
17     your email?
18 A.  It was two years ago.  I don't know.
19 Q.  So you don't remember.
20 A.  I don't remember.
21 Q.  In the first month after the incident did you
22     have any contact whatsoever with Ricardo Muro?
23 A.  I did.
24 Q.  Tell me when.
25 A.  I remember seeing him at the hospital before I

29

1      left.
2  Q.  Did you have any conversations with Officer Muro
3      in the hospital about the specifics of what
4      happened in this incident?
5  A.  I did not.
6  Q.  What about after you got out of the hospital and
7      you were home?
8  A.  I did not.
9  Q.  Any emails with Officer Muro about this incident?
10 A.  Not that I recall.
11 Q.  Any text communications with Officer Muro about
12     this incident?
13 A.  Not that I recall.
14 Q.  Were you -- texting is kind of something that has
15     come in vogue the last few years.  Were you a
16     person who utilized texting in May of 2013?
17 A.  I believe so.
18 Q.  Did you do it a lot or was it kind of a rare
19     thing for you?
20 A.  It is hard to say.  I have never liked texting.
21 Q.  You had an escort officer from the scene of
22     Franklin's death to the hospital, right?
23 A.  An ambulance.
24 Q.  You don't recall an escort officer?
25 A.  No.

30

1  Q.  Did you discuss with anyone, sir, en route from
2      the scene to the hospital what had happened?
3  A.  No.
4  Q.  Is it your testimony the first time you ever
5      spoke specifically about the actual circumstances
6      of this incident when you gave your, statement
7      your formal statement as part of the
8      investigation?
9  A.  Yes.
10 Q.  Is it fair to say you didn't discuss the facts of
11     the case -- or the facts of what happened with
12     anyone up until the time you gave your statement?
13 A.  I guess it depends what you mean by facts or what
14     you are talking about.
15 Q.  Did you ever discuss the specific circumstances?
16     By facts I mean what happened in that basement,
17     sir.  Did you ever discuss that with anyone
18     before you gave your statement?
19 A.  I guess I'm trying to understand what you mean
20     because obviously I have a gunshot wound from a
21     suspect.  Every time somebody asks me how I'm
22     doing that's factual of the case.
23 Q.  Other than that did you ever discuss with anyone
24     what happened?
25 A.  Mainly how I'm doing, my injuries, how are you

Lathrop Decl. Ex. 17

31

1    doing.  It was the most traumatic experience of
2    my life.
3  Q.  So there were conversations about how are you
4    doing with your injuries, but you did not discuss
5    with anyone before you gave your formal statement
6    what happened in that basement or anything about
7    what happened in basement other than the fact you
8    were injured, is that fair?
9  A.  No.  I discussed it.
10 Q.  With who?
11 A.  My attorney.
12 Q.  Who was your attorney, sir?
13 A.  I can't remember his name.
14 Q.  Was he assigned to you from the union?
15 A.  He was.
16 Q.  When did you first meet with the -- I'm not going
17   to ask you any conversations with the attorney,
18   sir.  That's not appropriate for me to do that.
19   But I would like to know when you first met with
20   him.
21 A.  Again, I wouldn't know.  He would probably have a
22   record of that.
23 Q.  Who would?
24 A.  The attorney.
25 Q.  But you don't know who it is, right?

32

1  A.  Well, I mean, you would have to figure that out.
2  Q.  Do you remember the name Fred Bruno?
3  A.  I do.
4  Q.  Was he your attorney?
5  A.  No.
6  Q.  Regardless of what the guy's name is, can you --
7    strike that.
8         Are you telling me you can't tell me
9    when you first met with him?
10 A.  It would be sometime prior to me giving my
11   statement.
12 Q.  How many times did you meet with him?
13 A.  I believe it was one to two times.
14 Q.  Where did you meet with him?
15 A.  In his office.
16 Q.  So you went to his office?
17 A.  Correct.
18 Q.  Do you remember where the office was located?
19 A.  It is right on the next block.
20 Q.  From where we are sitting in city hall?
21 A.  I have no idea which way we are facing in city
22   hall but it is the next building over from the
23   federal court building.
24 Q.  Fair enough.
25         And it looks like you gave your

33

1    statement on May 24, 2013 at 11:53 a.m. according
2    to the document I have.  Is that correct, sir?
3  A.  Correct.
4  Q.  I'm looking at the top.  Does that meet with your
5    memory?
6  A.  Sure.
7  Q.  So it was about two weeks after the incident,
8    right?
9  A.  Yes.
10 Q.  Did you have counsel present with you at that
11   time?
12 A.  I did.
13 Q.  So the lawyer that you met with after the time of
14   this incident was not someone you knew before
15   this incident?
16 A.  No.
17 Q.  Was it John Delmonico that lined up that attorney
18   for you?
19 A.  I have no idea.
20 Q.  How was it that you ended up going to see the
21   guy?  Didn't someone have to set up the logistics
22   of that?
23 A.  I believe they called me.  I don't know who
24   called me.
25 Q.  You just said they.  Who's the they part?

34

1  A.  The federation would set it up.  I wouldn't know
2    who.
3  Q.  So it was the federation that set up the
4    logistics of you meeting with the attorney,
5    correct?
6  A.  Correct.
7  Q.  And that same attorney was present with you at
8    the time you gave the statement.
9  A.  Yes.
10 Q.  When you met with the attorney was anyone else
11   present --
12 A.  No.
13 Q.  -- in the one or two meetings?
14 A.  No.
15 Q.  Was that one or two meetings before the day of
16   the statement?
17 A.  Correct.
18 Q.  So the statement would have been the second or
19   third time you met with the lawyer, right?
20 A.  Yes.
21 Q.  Did the lawyer provide any paperwork to you in
22   those meetings?
23 A.  No.
24 Q.  Sir, when you gave your statement on May 24, 2013
25   were you aware that three of the other officers

Lathrop Decl. Ex. 17

35

1     had already given statements?
2 A. No.
3 Q. So you weren't aware that Stender and Durand gave
4     statements three days after the incident?
5 A. No.
6 Q. You weren't aware that Peterson gave a statement
7     four days after the incident?
8 A. No.
9 Q. Are you aware that the other officers had a
10     meeting with a lawyer by the name of Fred Bruno
11     before the time that you gave your statement?
12     That some of the officers had a meeting with an
13     attorney by the name Fred Bruno before you gave
14     your statement.
15 A. No.
16 Q. Did any of the other officers that were involved
17     with Franklin in the basement, sir, Stender,
18     Peterson, Durand and Muro -- strike that --
19     Stender, Peterson and Durand, tell you that they
20     had had a meeting with Fred Bruno before they
21     gave their statements?
22 A. I do not recall.  I would assume they met with an
23     attorney just as I did.
24 Q. But you don't recall discussing that topic with
25     them?

VERBATIM REPORTING (763)-493-4535

36

1 A. No.
2 Q. Did you ever see the statements, the typed up
3     statements of Stender, Durand and Peterson,
4     before you gave your statement?
5 A. No.
6 Q. Other than counsel did anyone ever brief you on
7     -- by prefacing the question that way I'm not
8     saying the attorney told you anything about what
9     they said.  I want your answer to be any
10     conversations or any information other than what
11     you may have discussed with your attorney.  Okay?
12 A. Uh-huh.
13 Q. That's a yes?
14 A. I understand your question.
15 Q. You did the uh-huh thing.
16 A. Yes.
17 Q. Did anyone brief you on what those three guys
18     said in their statements?
19 A. No.
20 Q. Did anyone brief you about the statements
21     individually?
22 A. No.
23 Q. So is it your testimony that when you gave your
24     statement on May 24, 2013 you had no idea what
25     those three officers had disseminated as part of

VERBATIM REPORTING (763)-493-4535

37

1     the official investigation in terms of how the
2     event happened?
3 A. Yes.
4 Q. You knew, sir, didn't you, before May 24, 2013
5     when you gave your statement that when an officer
6     is involved in a situation with a citizen where
7     the citizen is killed, it could be the
8     possibility that there could be a grand jury
9     investigation, right?
10 A. Correct.
11 Q. And in the beginning of the statement, sir, you
12     were advised of the possibility that the matter
13     could be presented to a grand jury, correct?
14 A. Correct.
15 Q. So you knew that the information you were
16     providing obviously could potentially be
17     significant, correct?
18 A. Correct.
19 Q. Not only for you but for other people you work
20     with, correct?
21 A. Correct.
22 Q. Do you have the calling card or anything like
23     that of the attorney?
24 A. I may have it somewhere at home.
25 Q. Would that be something that perhaps would be on

VERBATIM REPORTING (763)-493-4535

38

1     the computer, who the attorney was?
2         MR. CARTER:  Objection, vague.
3         THE WITNESS:  I guess what --
4 BY MR. PADDEN:
5 Q. On your email at work?
6 A. No.
7 Q. Did the attorney ever email you?
8 A. No.
9 Q. Sir, did anybody in a position of authority with
10     the Minneapolis Police Department, for example
11     Chief Harteau, Chris Arneson or someone with the
12     rank of lieutenant, ever ask you for your version
13     of the events in that basement before you gave
14     your statement on May 24, 2013?
15 A. No.
16 Q. Did any person in the hierarchy of the
17     Minneapolis Police Department, lieutenants, Chris
18     Arneson or Chief Harteau, tell you not to discuss
19     the matter with any of your fellow officers
20     before you gave your formal statement?
21         MR. CARTER:  Objection, asked and
22     answered.
23 BY MR. PADDEN:
24 Q. Go ahead.  You can answer, sir.
25 A. Not that I recall.

VERBATIM REPORTING (763)-493-4535

Lathrop Decl. Ex. 17

39

1  Q.  Did Stender tell you not to do that?
2  A.  Not that I recall.
3  Q.  Before you gave your statement on May 24, 2013,
4      sir, did any of the other officers in that
5      basement tell you that Terrance Franklin had shot
6      you?
7          MR. CARTER:  Could you repeat that
8      question for me?
9          MR. PADDEN:  You can read it back,
10     Kris.
11         (At this time the requested portion of
12     the record was read back by the Court Reporter.)
13 BY MR. PADDEN:
14 Q.  Let me clarify that.  Who were in the basement at
15     the time Franklin was killed.
16 A.  Not that I recall.  I obviously knew myself.  I
17     had a gunshot wound.
18 Q.  That doesn't mean that he shot you, does it?
19         MR. CARTER:  Can I just --
20         MR. PADDEN:  Make your objection.
21         MR. CARTER:  I'm going to object as
22     vague.
23         Are you talking about after the
24     incident occurred or during the incident?
25         MR. PADDEN:  I will ask it again then.

40

1  BY MR. PADDEN:
2  Q.  Sir, are you saying that because you were shot it
3      is your assumption that the suspect had to have
4      shot you?  Is that what you are saying?
5  A.  Yes.
6  Q.  Yes?
7  A.  Yes.
8  Q.  Thank you.
9          Sir, at some point did you become aware
10     of the fact that a citizen by the name of Jimmy
11     Gains had videotaped in front of the home where
12     the incident occurred?  When did you become aware
13     of that, if at all?
14 A.  I would have no idea.
15 Q.  But you did become aware of it.
16 A.  Correct.
17 Q.  Did you become aware of it before you gave your
18     statement?
19 A.  That I couldn't tell you either.
20 Q.  Before you gave your statement on May 24, 2013 do
21     you ever recall discussing that video with
22     Officer Peterson?
23 A.  I don't recall.
24 Q.  Before you gave your statement on May 24, 2013 do
25     you recall discussing that video with Sergeant

41

1      Stender?
2  A.  I do not recall.
3  Q.  Before you gave your statement on May 24, 2013 do
4      you recall discussing that video with Officer
5      Durand?
6  A.  I do not recall.
7  Q.  Before you gave your statement on May 24, 2013 do
8      you recall discussing that video with Officer
9      Muro?
10 A.  I do not recall.
11 Q.  Before you gave your statement on May 24, 2013 do
12     you recall discussing that video with Chief
13     Harteau?
14 A.  No.
15 Q.  Did anyone in the hierarchy of the Minneapolis
16     Police Department, again lieutenants, Chris
17     Arneson -- who I think is the assistant chief.
18     Is that what her title is?
19 A.  I have no idea.
20 Q.  But you understand she has a high rank in the
21     department, right?
22 A.  I have no idea.
23 Q.  You don't know who she is?
24 A.  No.
25 Q.  You have no idea who Chris Arneson is.

42

1  A.  No.
2  Q.  Chief Harteau, did any of them talk to you about
3      that video before you gave your statement on May
4      24, 2013?
5  A.  No.
6  Q.  Do you recall viewing the video that was posted
7      on YouTube, sir, in full before you gave your
8      statement on May 24, 2013?
9  A.  I do not recall.
10 Q.  But you do recall seeing it.
11 A.  Correct.
12 Q.  Do you recall in what context?
13 A.  I believe it was on the news.
14 Q.  Was it just like a brief clip of it?
15 A.  I'm not sure.
16 Q.  But you never endeavored yourself to go on to
17     YouTube and watch it yourself?
18 A.  I may have.  I don't remember.
19 Q.  You don't remember?
20 A.  No.
21 Q.  Do you happen to remember if when you watched it
22     you recall any -- if you could hear any words on
23     the video?
24 A.  I can hear words.
25 Q.  What could you hear if you remember, sir?

Lathrop Decl. Ex. 17

43

1  A.  I only remember because I had to watch it the
2      other day for the paperwork you sent over.
3  Q.  So you watched the video recently I take it with
4      your attorneys.
5  A.  Correct.
6  Q.  Is that the first time you had watched it since
7      2013?
8  A.  No.
9  Q.  Can you tell me when you watched it between 2013
10     and the time you watched it with your attorneys
11     in preparation for this deposition?
12 A.  I believe I answered that.
13 Q.  I thought you said it was before you gave your
14     statement.
15 A.  I said I could not recall when I answered it.  I
16     didn't remember within the ten seconds that you
17     just asked the question.
18 Q.  I'm sorry.  I think you told me, sir, and I'm not
19     trying to misquote you, that you may have watched
20     it before you gave your statement on May 24,
21     2013, right?
22 A.  Correct.
23 Q.  The next question I asked was since that time up
24     until the time you watched it recently with your
25     counsel had you looked at it?

VERBATIM REPORTING (763)-493-4535

44

1  A.  May have.  May have not.  I'm not sure.
2  Q.  Going back to 2013, do you recall if you are able
3      to hear any words on the video?
4  A.  Yes.
5  Q.  What did you hear?
6  A.  I would have to watch it again to make sure it
7      was a clear representation of what I'm hearing.
8  Q.  Fair enough.
9          We are going to do that later, but I
10     was just checking to see what you remembered back
11     before you gave your statement.  And that might
12     help to refresh your memory watching it, correct?
13 A.  Correct.
14 Q.  Sir, to your knowledge did your employer ever
15     enhance the video, any video taken by that
16     citizen, Jimmy Gains?
17 A.  I wouldn't know.
18 Q.  So is it fair to say there was never a point in
19     time where someone with the department sat down
20     with you and watched the video and described it
21     as an enhanced version of the audio?  That never
22     happened, correct?
23 A.  No.
24 Q.  Sir, I want to ask you about some of the members
25     on your SWAT team.

VERBATIM REPORTING (763)-493-4535

45

1          How are you doing, sir?  Are you
2      holding up okay?
3  A.  Uh-huh.
4  Q.  You don't need a break?
5  A.  No.
6  Q.  I want to ask you about your relationship with
7      them.
8          Officer Peterson, is he someone that
9      you did things socially with before May 24, 2013?
10 A.  I would have to know your definition of what
11     socially means.
12 Q.  Totally fair question, sir.  I'm assuming during
13     your work shift there will be times where you
14     guys take breaks, right?
15 A.  Correct.
16 Q.  I'm talking about outside of work.  Did you ever
17     do anything socially with him outside of work,
18     for example where you would be wearing civilian
19     clothes?
20 A.  Yes.
21 Q.  How many times?
22 A.  I would have no idea.
23 Q.  Is he a good friend of yours?
24 A.  We are friends.
25 Q.  Have you ever been to his lake home?

VERBATIM REPORTING (763)-493-4535

46

1  A.  No.
2  Q.  Do you know his wife?
3  A.  I do.
4  Q.  Do you know her by -- are you on a first name
5      basis with her?
6  A.  Yes.
7  Q.  I don't need to know her name.  I'm just trying
8      to get an idea of how well you knew him.
9          Have you ever done anything with his
10     kids?
11 A.  No.
12 Q.  What kind of things have you done with him
13     socially?
14 A.  Played hockey together.
15 Q.  Like in a men's league or something?
16 A.  Yes.
17 Q.  What league was that?
18 A.  The Blaine men's league.
19 Q.  Did you play with gentlemen, sir, that were not
20     members -- not in law enforcement?
21 A.  Yes.
22 Q.  For how long have you played in a hockey league
23     with him?
24 A.  Seven, eight years.
25 Q.  Did you first meet him when you became a member

VERBATIM REPORTING (763)-493-4535

Lathrop Decl. Ex. 17

47

1   of SWAT?
2 A. No.
3 Q. What year did you first meet Officer Peterson,
4   sir?
5 A. I couldn't give you an exact year.
6 Q. Can you give me an estimate?
7 A. Between 1995 and '97.
8 Q. Did you know him before you became a member of
9   the Minneapolis Police Department?
10 A. Yes.
11 Q. How did you meet him?
12 A. Went to high school together.
13 Q. That was Minneapolis South?
14 A. Yes.
15 Q. So you knew Officer Peterson before you became a
16   member of the department.
17 A. Yes.
18 Q. Did you have conversations with him about
19   applying for the job?
20 A. No.
21 Q. So is it fair to say you have been friends with
22   him since '95 to '97?
23 A. Yes and no.
24 Q. Of all of the members of the SWAT team would he
25   be the person that you would be closest to?

VERBATIM REPORTING (763)-493-4535

48

1 A. Define close.
2 Q. Well, I'm talking about in terms of a social
3   relationship, sir, outside of work.
4 A. No.
5 Q. Who are you closer to?
6 A. I have other friends that I'm closer with.
7 Q. That are members of the SWAT team?
8 A. Of the department.
9 Q. What about members of the SWAT team?
10 A. Yes.
11 Q. Have you ever done anything socially with Officer
12   Durand outside of work?
13 A. Yes.
14 Q. How often?
15 A. Again, wouldn't be able to give you an exact
16   number.
17 Q. Is the SWAT team, sir, in the Minneapolis Police
18   Department -- are you guys a tight knit unit?
19   Are you guys close?
20 A. No.
21 Q. What about Sergeant Stender, have you ever done
22   anything with him socially outside of work?
23 A. Yes.
24 Q. How often?
25 A. Again, I wouldn't be able to give you a number.

VERBATIM REPORTING (763)-493-4535

49

1 Q. What kind of things have you done with him
2   socially?
3 A. Outside of work?
4 Q. Sure.
5 A. I mean, we are all forced to do things outside of
6   work.
7 Q. What do you mean forced?
8 A. You go on training things.  You are not being
9   paid but you are staying in a hotel together,
10   room together, you are forced to go out to eat,
11   to dinner.
12 Q. Does the department try to set -- arrange things
13   so you guys develop a close relationship in your
14   opinion?
15 A. No.
16 Q. When I was asking you about doing things socially
17   I didn't mean training.  I'm talking about a part
18   from training like in civilian clothes.
19 A. I am in civilian clothes when I answered that
20   question.
21 Q. What's that?
22 A. We are in civil clothes when I answered that
23   question.
24 Q. When you do training?
25 A. I said after training.

VERBATIM REPORTING (763)-493-4535

50

1 Q. So you would do things socially after training.
2 A. Yes.
3 Q. Did you ever discuss with Officer Peterson an
4   incident involving a Chris Burns from 2002?
5 A. No.
6 Q. Have you ever discussed with Officer Peterson an
7   incident involving a woman named Nancy Johnson in
8   2006?
9 A. No.
10 Q. Are you familiar with the Nancy Johnson incident?
11 A. No.
12 Q. You don't know anything about it, right?
13 A. I wouldn't know who that was.
14 Q. What about the name Dominick Simons, do you know
15   that name at all?
16 A. No.
17 Q. Did you know Brian Thole before May 24, 2013?
18 A. What was the date that you gave me?
19 Q. On the date you gave your statement did you know
20   Brian Thole?
21 A. Yes.
22 Q. He is somebody that you had worked on the SWAT
23   team with, correct?
24 A. Never worked with him personally, no.
25 Q. But he was a member of the SWAT team, right?

VERBATIM REPORTING (763)-493-4535

Lathrop Decl. Ex. 17

51

1   A.   Correct.
2   Q.   Did you know him by name?
3   A.   I did.
4   Q.   First name basis?
5   A.   I usually call everybody by their last name.  So
6        no.
7   Q.   Do guys have nicknames on the team, sir?
8   A.   No.
9   Q.   What do you call Officer Peterson?
10  A.   Luke or Peterson.
11  Q.   What did you call Brian Thole?
12  A.   Thole.
13  Q.   You are aware of the fact, sir, that he was
14       involved in an incident in Green Bay, Wisconsin
15       at the end of June where he was off duty?
16  A.   Yes.
17  Q.   Are you familiar with the circumstances of that
18       incident, sir?
19  A.   Somewhat.
20  Q.   Were there ever any meetings in the department
21       with anyone, formal meetings, about Brian Thole's
22       incident in Green Bay, Wisconsin at the end of
23       June of 2013?
24  A.   I wouldn't know.
25  Q.   Did anyone in the department ever tell you not to

52

1        talk to the media about the Brian Thole incident
2        in Green Bay?
3   A.   No.
4   Q.   What about Shawn Powell?
5   A.   No.
6   Q.   So you do know something about what happened in
7        Green Bay?
8   A.   Somewhat.
9   Q.   Are you aware of the fact that it is alleged that
10       the officers when dealing with the Green Bay
11       Police Department used the word nigger?  Were you
12       aware of that?
13  A.   Yes.
14  Q.   You were aware the guys were fired, weren't you?
15  A.   Yes.
16  Q.   You are aware also, sir, that that incident was a
17       high profile event from a media perspective in
18       the Twin Cities, right?
19  A.   Yes.
20  Q.   Did you watch any of those media stories?
21  A.   Yes.
22  Q.   When you heard about what had happened in Green
23       Bay, sir, were you surprised by that?
24  A.   Yes.
25  Q.   Why?

53

1   A.   Never seen or heard anybody talk like that.
2   Q.   So in your experience working for the Minneapolis
3        Police Department you have never heard officers
4        in the department use racial slurs with African
5        American suspects in the field, would that be
6        your testimony?
7   A.   Correct.
8   Q.   Was there a specific directive, sir, when you --
9        during the time you have been with the department
10       that using racial slurs in the field with African
11       Americans or people that would be dark skinned
12       like Africans, not necessarily African Americans,
13       that that would be a violation of department
14       policy?
15  A.   It would be.
16  Q.   Who told you that?
17  A.   It is in the policy manual I believe.
18  Q.   Do you remember what part of the policy manual,
19       sir?
20  A.   No.
21  Q.   So the policy manual says you cannot use racial
22       slurs with African Americans?
23  A.   I'm not sure.
24  Q.   Do you know if the policy manual is referring to
25       all people of color or just African Americans?

54

1   A.   I'm assuming it is talking about all people of
2        the world.
3   Q.   Like for example there are derogatory racist
4        terms that you could use for people that are
5        Asian, right?
6   A.   Correct.
7   Q.   And there would be derogatory terms you can use
8        for people who are Hispanic?
9   A.   Correct.
10  Q.   But whether it is Hispanic people, Asian people
11       or African Americans, any person of color, it
12       would be a violation of department policy to use
13       racial slurs in the field, right?
14  A.   Yes.
15  Q.   Was the word nigger used in the interaction with
16       Terrance Franklin on May 10, 2013?
17  A.   No.
18  Q.   You didn't hear it, right?
19  A.   No.
20  Q.   You didn't use any racial slurs, did you?
21  A.   No.
22  Q.   During the time you interacted -- your team
23       interacted with Terrance Franklin in the basement
24       on May 10, 2013 at 2717 Bryant did Mr. Franklin
25       ever say anything?

Lathrop Decl. Ex. 17

55

1   A.   Not that I recall.
2   Q.   You don't recall ever hearing him say anything,
3        right?
4   A.   Correct.
5   Q.   Sir, back in May of 2013 were any African
6        Americans on the MPD SWAT team to your knowledge?
7   A.   Can you repeat that again?
8   Q.   Back in May of 2013 were any African Americans
9        members of the Minneapolis Police Department SWAT
10       team?
11  A.   Yes.
12  Q.   How many?
13  A.   Two I believe.
14  Q.   What were their names?
15  A.   Shawn Williams, Tyrone Bars.
16  Q.   How many members are there now that are African
17       Americans?
18  A.   I believe there is three or four, three.
19  Q.   Sir, during the time that you were in the
20       basement at 2717 Bryant did you ever see anyone
21       either during the incident or after the incident
22       who was wearing gloves?
23  A.   I can't recall of the first part and yes to the
24       second part.
25  Q.   Who was wearing gloves, sir?

56

1   A.   The paramedics that were working on me.
2   Q.   Do you recall, sir, who came in the basement
3        after Franklin had been killed other than the
4        paramedics, if you happen to recall anyone, sir?
5   A.   No.
6   Q.   Do you recall seeing DOC Dave in the basement
7        after Franklin was killed?
8   A.   No.
9   Q.   Did you actually hear the MP-5 discharging, sir?
10  A.   I guess I would have to figure out what you are
11       looking at.
12  Q.   Well, Officer Durand brought an MP-5 into the
13       basement, right?
14  A.   Correct.
15  Q.   Are you able to tell me if that firearm
16       discharged during the incident with Terrance
17       Franklin?
18  A.   No.
19  Q.   You never heard it?
20  A.   I guess I would have -- you would have to explain
21       your question better.
22  Q.   Which question?
23  A.   Are you asking me if I heard a gunshot or if I
24       heard an MP-5?
25  Q.   Isn't an MP-5 a gun?

57

1   A.   I heard a gunshot.  That's not what you asked me.
2   Q.   So you heard a gun discharge?  I'm using the term
3        discharge.  You know what that means, right?
4   A.   Yes.
5   Q.   How many times did it discharge?
6   A.   I heard one boom.
7   Q.   And did you immediately feel pain at that point?
8   A.   I did.
9   Q.   What I want to ask you, sir, is from the time
10       that you heard that discharge, how much time
11       elapsed from the time that Franklin was killed?
12  A.   I wouldn't be able to give you an exact number.
13  Q.   Was it quick?
14  A.   I mean, the whole situation was dynamic and very
15       fast.
16  Q.   Was it within seconds?
17  A.   Again, I told you I couldn't give you a number.
18  Q.   Were you ever asked that question, sir, the time
19       gap, were you ever asked that question when you
20       gave your statement to the police?  Strike that.
21       When you gave your statement as part of the
22       official investigation.
23  A.   I'm not sure.  I would have to review my
24       statement if it is in there.
25  Q.   If I ask you from the time frame that you felt

58

1        pain up until the time that Franklin was killed,
2        would you be able to give me a time estimate?
3   A.   It is the same answer I just gave you.
4   Q.   Which is what?
5   A.   I can't give you a number.
6   Q.   Fair enough.
7             Sir, it is my understanding that you
8        were in the Haaf ramp in a van when you found out
9        about this situation?
10  A.   Correct.
11  Q.   Can you recall what you heard over the radio,
12       sir, if anything?
13  A.   No.
14  Q.   Sir, isn't it true that one of the radio
15       communications said that this person, this
16       suspect, had tried to run over a Minneapolis
17       police officer?
18  A.   I wouldn't be able to say for sure.  You would
19       have to listen to the audio.
20  Q.   Do you remember?
21  A.   I don't remember hearing it over the air, no.
22  Q.   Did someone tell you that the guy that you were
23       going to go out to hopefully find had attempted
24       to run over a Minneapolis police officer?
25  A.   Again, I'm not sure if I heard it.

Lathrop Decl. Ex. 17

59

1  **Q.**  Do you recall Officer Durand during the drive
2  from the Haaf ramp to the area where 2717 Bryant
3  was -- do you recall any officer in the van
4  briefing your group as to what the situation was?
5  **A.**  **I don't recall.  I was driving.**
6  **Q.**  What's that?
7  **A.**  **I don't recall.  I was driving.**
8  **Q.**  You were driving the vehicle?
9  **A.**  **Correct.**
10  **Q.**  Are you saying that by driving that affects your
11  ability to recall what happened?
12  **A.**  **I was driving the van.  I can't remember what I**
13  **heard and what I didn't.**
14  **Q.**  Weren't the radio communications coming right out
15  of the front part of the vehicle?
16  **A.**  **There's multiple speakers.**
17  **Q.**  Where is the radio located in the van, sir?
18  **A.**  **Right in the middle between the driver and the**
19  **passenger is where the radio itself is located.**
20  **Q.**  If there was radio communication coming out of
21  the speakers in that vehicle, sir, I take it you
22  would be able to hear the communication, correct?
23  **A.**  **Correct.**
24  **Q.**  So were there radio communications en route?
25  **A.**  **Like I said, I'm sure there was.  I would have to**

60

1  **listen to the audio itself.**
2  **Q.**  But you don't recall specifically what -- you
3  don't remember what the radio communications
4  were.
5  **A.**  **No.**
6  **Q.**  Can you tell me, sir, during that drive if you
7  recall any information that came over the radio
8  about the suspect?
9  **A.**  **Again, I don't know where I learned the**
10  **information, whether it was via the radio or the**
11  **computer.**
12  **Q.**  What was it that you learned?
13  **A.**  **That a suspect had fled the scene of a vehicle**
14  **chase and ran off into a neighborhood.**
15  **Q.**  Did you receive the information that he had
16  struck a Minneapolis police vehicle?
17  **A.**  **I'm sure I did.**
18  **Q.**  Did you receive the information that he had
19  attempted to run over a Minneapolis police
20  officer?
21  **A.**  **That I do not recall.**
22  **Q.**  After you arrived at the scene did you get out of
23  the van?
24  **A.**  **I did.**
25  **Q.**  Then did you receive any other information about

61

1  the suspect up until the time you ended up in the
2  yard of 2717 Bryant?
3  **A.**  **Just the same.  That he had red sweat pants on**
4  **and long dreadlocks.**
5  **Q.**  You had received information I take it, sir, that
6  there was a thought or presumption that he
7  perhaps could be in that home.
8  **A.**  **Can you repeat that again?**
9  MR. PADDEN:  Read it back, Kris.
10  (At this time the requested portion of
11  the record was read back by the Court Reporter.)
12  MR. CARTER:  I will object to that as
13  vague and to the form of the question.  Go ahead.
14  BY MR. PADDEN:
15  **Q.**  Go ahead and answer, sir.
16  **A.**  **I guess I'm looking at when you are looking for**
17  **when I learned that or how we came to that.**
18  **Q.**  I was just curious if somebody had communicated
19  to you in any way that there was an assumption
20  that the suspect could be in that home.
21  **A.**  **I guess I'm still lost on your question.**
22  **Q.**  I was just wondering -- you ended up in the back
23  yard of that home, didn't you?
24  **A.**  **Correct.**
25  **Q.**  Didn't you receive a communication either

62

1  verbally or by radio communication that there was
2  a thought that this guy Franklin could be in the
3  house?
4  **A.**  **I guess you are still --**
5  **Q.**  You don't understand the question?
6  **A.**  **No.**
7  **Q.**  Did you receive information that there was damage
8  in the back of the home?
9  **A.**  **Yes.**
10  **Q.**  And did your team operate under the assumption,
11  sir, before you entered the home that Franklin
12  might be in there?
13  **A.**  **Again, your --**
14  **Q.**  Again what, sir?
15  **A.**  **Can I --**
16  **Q.**  Let me ask.
17  Are you telling me you don't understand
18  the question?
19  **A.**  **Yes.**
20  MR. PADDEN:  Read it back, Kris.
21  (At this time the requested portion of
22  the record was read back by the Court Reporter.)
23  THE WITNESS:  Someone was in there.
24  BY MR. PADDEN:
25  **Q.**  How long were you in the yard waiting before

Lathrop Decl. Ex. 17



**Page 63**

1  Sergeant Stender came with his K9 unit?
2  **A.  Again, I wouldn't be able to give you a time**
3  **frame on that.  It should all be documented**
4  **through MECC and GPS and radio traffic.  You**
5  **should be able to get the timelines through that.**
6  **Q.**  I appreciate that.  I'm asking for your memory.
7      Are you saying you don't remember?
8  **A.  I don't want to give it incorrect when I can**
9  **obviously get the data for myself to give it to**
10 **you correctly.  So if you had those documents I**
11 **could give you an exact.**
12 **Q.**  Can you give me an estimate as to how long you
13     were in the yard before Sergeant Stender arrived
14     with his K9 unit?
15 **A.  I cannot.**
16 **Q.**  Sir, before you went into the home -- at some
17     point you went into the home, correct?
18 **A.  Correct.**
19 **Q.**  I'm going to ask you a question about what
20     firearms you had when you went in.  Firearm or
21     firearms.  But before we do that I'm going to
22     take a short break if that's okay.
23      (At this time a recess was had.)
24 BY MR. PADDEN:
25 **Q.**  Back on the record, sir.  There was something I

**Page 64**

1  had missed that I wanted to ask you about before
2  I get into the firearms.
3      You have been the subject of a couple
4  of internal affairs investigations, sir?
5  **A.  Yes.**
6  **Q.**  Do you recall a matter concerning Max Graves,
7      Junior from January of 2012?
8  **A.  I would have to look at the complaint.**
9  **Q.**  The case settled for $90,000 according to the
10     information I received from your counsel.  And
11     you were dismissed from the case apparently.  Do
12     you recall that at all?
13 **A.  I mean, I recall being dismissed from something**
14 **but I would have to look at the actual complaint**
15 **and my report from it to give you a --**
16 **Q.**  Do you recall being questioned by internal
17     affairs about that incident?
18 **A.  I'm sure I was.**
19 **Q.**  The next one, sir, is Anna Otieno, O T I E N O,
20     and Kyle Walton and Megan Wong.  It was a case
21     that settled for $169,500 and the attorney was
22     Robert Bennett.  Do you recall that case?
23 **A.  I recall of the case but no specifics.  Again, I**
24 **would have to look at the actual complaint.**
25 **Q.**  Do you recall the matter in any event, what it

**Page 65**

1  concerned?
2  **A.  I would have to look at my report.**
3  **Q.**  That was September of 2007?
4  **A.  I wouldn't know the date.**
5  **Q.**  Sir, I also have a document that is marked as
6      Exhibit 1.
7      MR. PADDEN:  Off the record.
8      (At this time a recess was had.)
9  BY MR. PADDEN:
10 **Q.**  Sir, I'm showing you what has been marked as
11     Exhibit 1.  And it is entitled internal affairs
12     blue card report.

**Page 66**

1

Lathrop Decl. Ex. 17



67

1     thing.

2 **A.**  **Correct.**

3 **Q.**  Sir, going back to a couple other matters before

4     we talk about the firearms.

5         Can you tell me what your cell phone

6     number was in May of 2013?

7         MR. CARTER:  So I will just object to

8     that question, also ask that this his cell phone

9     number be under seal.

10        MR. PADDEN:  That's fine.

11        THE WITNESS:  Do I have to give my

12     personal cell phone number out?

13 BY MR. PADDEN:

14 **Q.**  What I'm concerned about is the cell phone you

15     would have been using on the date of the Franklin

16     incident.  Is that -- let me ask it this way,

17     sir.

18         The cell phone, is that a department

19     issued phone?

20 **A.**  **I have a department issued phone and I have a**

21     **personal phone.**

22 **Q.**  Were you using the department issued phone that

23     day?

24 **A.**  **If I was working I always have to have it on my**

25     **person.  So it would be safe to say probably yes.**

VERBATIM REPORTING (763)-493-4535

---

68

1 **A.**  **It says MVR here which is the video system in the**

2     **squad car.  I didn't go through the set up**

3     **procedures at the beginning of my shift.  So**

4     **that's what the suspension was for.**

5 **Q.**  Were you suspended because of that?

6 **A.**  **Yes.**

7 **Q.**  Were there any other situations in your work,

8     sir, where an investigation was sustained that

9     resulted in some sort of a sanction for your

10     employment?

11 **A.**  **Not that I know of, no.**

12 **Q.**  Was that the only time you were suspended for was

13     the squad operation issue?

14 **A.**  **Not squad operation.**

15 **Q.**  The MVR thing?

16 **A.**  **The MVR not properly set up.  It has nothing to**

17     **do with driving a squad car.**

18 **Q.**  Do you recall if you had any sort of a sanction

19     for force at any time during your career?

20 **A.**  **I guess you would have to define sanction.**

21 **Q.**  A sanction would be like a fine or a suspension,

22     that type of thing.

23 **A.**  **No.**

24 **Q.**  So the only time you recall any kind of a

25     sanction from an IA investigation was the MVR

VERBATIM REPORTING (763)-493-4535

---

69

1     thing.

2 **A.**  **Correct.**

3 **Q.**  Sir, going back to a couple other matters before

4     we talk about the firearms.

5         Can you tell me what your cell phone

6     number was in May of 2013?

7         MR. CARTER:  So I will just object to

8     that question, also ask that this his cell phone

9     number be under seal.

10        MR. PADDEN:  That's fine.

---

70

1 **Q.**  Can I get that number?

2 **A.**  **That one you can have.**

3 **Q.**  Go ahead.

4 **A.**  ▮▮▮▮▮0.

5 **Q.**  Is that still your number for your work, sir?

6 **A.**  **Yes.**

7 **Q.**  Who is the carrier for that phone, sir?

8 **A.**  **It is AT&T now.  At the time I believe it was**

9     **somebody different.**

10 **Q.**  Do you remember who it was at the time?

11 **A.**  **I want to say Sprint but, again, that's kind of**

12     **not a certain answer but it is pretty close.**

13 **Q.**  I appreciate that.  This isn't a test.  Your best

14     memory is fine.

15         Sir, I asked you about computers you

16     had earlier.  I forgot to ask if you had an iPad

17     or a tablet type device back in May of 2013 or

18     during that general time frame.

19 **A.**  **I did.**

20 **Q.**  Did you disseminate emails from those devices?

21 **A.**  **Yes.**

22 **Q.**  Would those still exist?

23 **A.**  **They may.**

24 **Q.**  Did you communicate by email on that device with

25     Officer Peterson, or those devices?

VERBATIM REPORTING (763)-493-4535

Lathrop Decl. Ex. 17

71

1  A.  No.
2  Q.  I say iPad or a tablet.  Was it one or the other?
3  A.  It was an iPad.
4  Q.  Did you communicate by email with Sergeant
5      Stender with that device?
6  A.  No.
7  Q.  What about Officer Muro?
8  A.  No.
9  Q.  What about Officer Durand?
10 A.  No.
11 Q.  Was Durand, sir, in the field at times your
12     partner during your regular patrol work?
13 A.  Yes and no.
14 Q.  Have you worked in the field with him?
15 A.  I have.
16 Q.  Other than SWAT?
17 A.  Yes.
18 Q.  What time frame would you consider him to be your
19     partner?
20 A.  As of right now?
21     No.  Back previously when you would work in the
22     field with him.
23         MR. CARTER:  Objection, vague as to
24     time.
25 BY MR. PADDEN:

72

1  Q.  Let me ask it this way.
2          Were there times, sir, that you were in
3      a squad car with someone performing your patrol
4      work?
5  A.  Yes.
6  Q.  And at times would that have been Durand?
7  A.  Yes.
8  Q.  Can you give me any kind of time frame, sir, when
9      that was?
10 A.  We were partners last year.
11 Q.  Were you ever partners before May of 2013?
12 A.  No.
13 Q.  During the time you were partners did you ever
14     talk about the Franklin incident?
15 A.  I'm sure it came up in conversation.
16 Q.  Did you talk about specific facts or was it more
17     just in general like your injuries and stuff?
18 A.  Just general.
19 Q.  Sir, when you were in the field in May of 2013
20     were you wearing any kind GPS equipment?
21 A.  No.
22 Q.  You mentioned earlier about GPS.  Were your guys'
23     movements tracked by GPS on that date?
24 A.  The vehicle would have been.
25 Q.  Just the vehicle?

73

1  A.  (Witness nods head.)
2  Q.  When you left the vehicle you wouldn't have been
3      tracked by GPS?
4  A.  Correct.
5  Q.  When you guys were on your way to 2717 what was
6      the demeanor like in the car with your team?
7  A.  Cordial.
8  Q.  But were you kind of amped up with the situation
9      or was it just another event?
10 A.  Just another event.
11 Q.  It ended up being a pretty big deal though,
12     right?
13 A.  It did.
14 Q.  And do you know why it was your team was deployed
15     for the Franklin matter?
16 A.  No.
17 Q.  Who would know the answer to that question?
18     Sergeant Stender?
19 A.  He may.
20 Q.  Did you have a personal email account in May of
21     2013?
22 A.  I did.
23 Q.  Do you remember what the email address was?
24 A.  I do.
25         MR. PADDEN:  Can I ask him for that,

74

1      Counsel?
2          MR. CARTER:  Can I just make a
3      suggestion?  Can we just do this through formal
4      discovery requests and then we can put forward
5      our objections?
6          MR. PADDEN:  I'm fine with that.
7  BY MR. PADDEN:
8  Q.  Let me ask this question, sir.
9          Do you recall any email communications
10     with any of the officers that were involved in
11     the Franklin incident through that email account?
12 A.  No.
13 Q.  So if you would have communicated with them via
14     email about the Franklin incident it would have
15     been the email address at work, correct?
16 A.  Correct.
17 Q.  Sir, what type of firearm did you have with you
18     on the -- at the time you entered the home at
19     2717 Bryant?
20 A.  I had a Sig Sauer.
21 Q.  Did you have a holster?
22 A.  I did.
23 Q.  On the right side of your body?
24 A.  Correct.
25 Q.  Tell me what type of holster it was.

Lathrop Decl. Ex. 17

75

1  A.  It was a Safari Land leg holster.
2  Q.  How many rounds did you have in the firearm, sir?
3  A.  Nine.
4  Q.  Did you have a weapon mounted light on that
5      device, sir?
6  A.  I did.
7  Q.  Tell me how that worked.
8  A.  I guess -- I mean, I don't have the schematics of
9      it, how it internally works.
10 Q.  Just explain to me like I'm a five year old.  It
11     is a flashlight, right?
12 A.  I would have to have it in front of me if you are
13     a five year old to explain how to use it I guess.
14 Q.  How does it work in general?
15 A.  There is a little toggle switch.  And you put it
16     one way and it stays on, you put it the other way
17     and it only stays on as long as you hold it.
18 Q.  You didn't carry a rifle down in that basement,
19     did you?
20 A.  No.
21 Q.  Did you have a magazine for the rifle?
22 A.  I did.
23 Q.  Why?
24 A.  I always carry an extra magazine for the rifle on
25     my belt.

76

1  Q.  Sir, at some point you found out that there was
2      evidence of forced entry into 2717 Bryant,
3      correct?
4  A.  Correct.
5  Q.  And did you physically run to that address, sir?
6  A.  I don't believe so, no.
7  Q.  Do you recall where you were when you found out,
8      sir?
9  A.  I believe we were somewhere on the entire block
10     of that address.
11 Q.  Do you recall who you were with at the time?
12 A.  I do not.
13 Q.  Sir, I'm just going to take you through the
14     incident and ask you to describe for me
15     chronologically what happened.  And I might
16     interject with questions as we go, but I want to
17     just start with the time that the team decided to
18     enter the home.  Okay?
19         Did all five of you enter at the same
20     time?
21 A.  That I wouldn't be able to recall.  I only know
22     what I did.
23 Q.  Do you recall who you were with at the time, sir,
24     when you did enter, who the team was?
25 A.  It was Sergeant Stender, Officer Durand, Officer

77

1      Peterson, myself and Officer Muro.
2  Q.  And when you entered -- so you are not sure if
3      you all entered at the same time?
4  A.  Correct.
5  Q.  But at some point you all were in the home
6      together, correct?
7  A.  Correct.
8  Q.  Can you describe for me, sir, what happened
9      chronologically up to the time that the -- that a
10     member of the team or members entered the
11     basement?
12 A.  I guess I would have to -- where do you want me
13     to start and stop?
14 Q.  I was going to start with the time that you
15     entered the home and just try to get an idea of
16     how things developed kind of chronologically
17     before you or any of the other team members
18     entered the basement.
19 A.  We announced our presence with a K9 officer
20     multiple times before we even stepped foot into
21     the house through the open doorway.  Did the
22     first floor, second floor, went to the basement.
23 Q.  Do you recall how you guys went down in the
24     basement, how that worked logistically?
25 A.  I wasn't there.

78

1  Q.  Do you know who it was that entered the basement
2      first?
3  A.  Not at that time, no.
4  Q.  Do you know where you were when a member of the
5      team entered the basement?
6          MR. CARTER:  Objection, vague.  Go
7      ahead.
8          THE WITNESS:  I wouldn't be able to
9      tell you.  I didn't see it.
10 BY MR. PADDEN:
11 Q.  Were you with someone when you entered the
12     basement?
13 A.  No.
14 Q.  Is it your belief that other members of your team
15     entered the basement before you?
16 A.  Yes.
17 Q.  But you don't know who and how many, correct?
18 A.  Correct.
19 Q.  Do you know if you were the last member of the
20     team to enter the basement?
21 A.  I don't know.
22 Q.  So when you entered the basement you didn't know
23     who was down there?
24 A.  I had an idea who was down there.
25 Q.  Who was it?

Lathrop Decl. Ex. 17

79

1   A.   It was Officer Peterson, Office Durand and
2        Sergeant Stender.
3   Q.   Do you know where Muro was?
4   A.   I don't remember.  I knew he was down there at
5        some point.  I don't know if he came in before me
6        or after me.
7   Q.   But when you went down you would have gone down
8        alone.
9   A.   I believe so, yes.
10  Q.   When you went down -- so you would have gone
11       down -- you would have entered the basement on
12       the steps, correct?
13  A.   Correct.
14  Q.   Do you know where you were, sir, before you got
15       to the steps, what your route was?
16  A.   I believe I was standing in the kitchen.
17  Q.   And do you remember where you had to go to get to
18       the basement steps?
19  A.   To the basement steps.
20  Q.   But how did you do that physically, sir?
21  A.   Walked.
22  Q.   What was the configuration of the house to get
23       there, if you remember?
24  A.   I would have to look at pictures of the house to
25       give you an exact.

VERBATIM REPORTING (763)-493-4535

80

1   Q.   Do you recall at some point being at the top of
2        the steps?
3   A.   I don't recall it.
4   Q.   Do you recall before you began to go down the
5        steps that there was a door in that area?
6   A.   Not at that time, no.
7   Q.   Do you know if there was a door in the area at
8        the top of the steps?
9   A.   I do now.
10  Q.   Are you able to tell me, sir, if that door was
11       closed or open at the time you went down the
12       steps?
13            MR. CARTER:  Objection, vague.
14  BY MR. PADDEN:
15  Q.   Go ahead and answer.
16  A.   Since I didn't notice the door I would say it was
17       closed because it would have been in my way.
18  Q.   How would it have been in your way?
19  A.   If the door was open it would swing from across
20       the top of the stairs hindering me from getting
21       into the basement.  And I would have noticed a
22       door, which I don't notice a door now.
23  Q.   When you went down to the basement do you recall
24       how things developed chronologically?
25  A.   I guess I don't understand the question.

VERBATIM REPORTING (763)-493-4535

81

1   Q.   What I'm asking, sir -- I guess let me do it this
2        way.
3            I know you were injured in this
4        situation.  Okay?  Do you know if the injuries
5        you sustained, sir, affect your ability to recall
6        the details of what happened in the basement?
7   A.   I would say they do greatly.
8   Q.   And is that something you made clear when you
9        gave your statement?
10  A.   I don't believe they ever asked me.  That's not a
11       statement.  That's a Q and A.
12  Q.   I will call it a Q and A then.
13            You don't recall them ever asking that
14       question?
15  A.   I would have to read through it all, but, no, I
16       don't recall it.
17  Q.   When did you last read it?
18  A.   Last night.
19  Q.   Did that refresh your memory?
20  A.   Somewhat, but I would have to read it all over
21       again now.
22  Q.   Would you agree, sir, that your memory about the
23       details of this incident would have been better
24       when you gave the Q and A than they are today?
25  A.   No.

VERBATIM REPORTING (763)-493-4535

82

1   Q.   You think they are as good today as they were
2        when you gave your Q and A responses 14 days
3        after the incident?
4   A.   They are about the same.
5   Q.   I'm going to ask you about the statement in a
6        little while specifically, but I'm just going to
7        ask right now for your memory, sir.
8            When you went down to the basement was
9        the light on your gun activated?
10  A.   No.
11  Q.   You got down to the bottom of the steps, correct?
12  A.   Correct.
13  Q.   Alighted off the last step into the basement,
14       right?
15  A.   What off a step?
16  Q.   Alighted.
17  A.   Alighted?
18  Q.   You don't know what that word means?
19  A.   No.
20  Q.   Didn't you step from the last step on to the
21       floor of the basement?
22  A.   I would assume, so, yes.
23  Q.   Can you tell me, sir, what the lighting was like
24       when you first got down there?
25  A.   There was sunlight at the bottom of the stairs

VERBATIM REPORTING (763)-493-4535

Lathrop Decl. Ex. 17

83

1      coming from the top.
2   Q. Were you able to see okay?
3   A. Just at the bottom of the stairs.
4   Q. When you got to the bottom of the steps, sir, and
5      stepped on to the floor of the basement -- that
6      happened, right?
7   A. Yes.
8   Q. What happened next?
9   A. I turned left.
10  Q. Then what happened next?
11  A. Turned left and saw Sergeant Stender.
12  Q. What was he doing, sir?
13  A. Giving commands for someone to come out.
14  Q. Do you remember what way he was facing when he
15     was giving those commands?
16  A. Towards the water heater.
17  Q. What side of the basement was the water heater,
18     sir, in terms of direction, north, south, east,
19     west?
20            MR. CARTER:  Objection, vague.
21            THE WITNESS:  Depends which way you are
22     facing.
23  BY MR. PADDEN:
24  Q. Was Stender facing towards the north?
25  A. Again, I would have no idea.

84

1   Q. So if I asked you questions about north, south,
2      east and west in terms of the configuration of
3      this basement with north, south, east and west,
4      is that something you wouldn't be able to answer?
5   A. Correct.
6   Q. So you saw Stender giving voice commands to
7      someone, right?
8   A. Correct.
9   Q. Then what did you see next?
10  A. I saw a subject with long dreadlocks and red
11     pants.
12  Q. What was he doing, sir?
13  A. He was partially behind a water heater with a dog
14     biting him.
15  Q. Was he standing?
16  A. He appeared to be.
17  Q. And where was the dog biting him?
18  A. His lower extremities.
19  Q. Do you know where specifically?
20  A. Lower extremities.
21  Q. I know what the lower extremities are, sir.  The
22     left leg and the right leg are lower extremities.
23     Can you be more specific about where?
24  A. Lower extremities.
25  Q. So he was -- the dog was attached on to the

85

1      subject, correct, with his mouth?
2   A. Again, I wouldn't be -- he was in the process of
3      actively --
4   Q. Was he biting him?
5   A. I mean, dogs bite, they let go.  They bite, they
6      let go.  They hold on.
7            I wouldn't be able to give you a
8      definite of what the dog was -- what position the
9      dog was in at that exact time.
10  Q. Fair enough.
11            During that time frame did you ever see
12     the dog bite the subject?
13  A. Yes.
14  Q. And that was in the lower extremities.
15  A. Yes.
16  Q. When you came down to the basement, was that at a
17     specific request from someone?
18  A. No.
19  Q. So you just did that unilaterally on your own?
20  A. I heard someone yelling.
21  Q. Yelling what?
22     Show me your hands.
23  Q. So is that what caused you come into the
24     basement?
25  A. Yes.

86

1   Q. Do you know whose voice that was?
2   A. No.
3   Q. So you saw the dog biting this man in his lower
4      extremities.  Did you say he was standing up,
5      sir?
6   A. He appeared to be.
7   Q. And then what happened next?
8   A. I pulled some debris and the door out of my way
9      and made my way back there.
10  Q. Where was the debris?
11  A. Throughout the entire length to get back behind
12     the water heater.
13  Q. So was the -- if I use the term cluttered would
14     that be a reasonable way to describe it?
15  A. Yeah.
16  Q. Was it hard to walk?
17  A. Made it difficult, yes.
18  Q. Was there clutter all over that part of the
19     basement, sir?
20  A. Yes.
21  Q. And what happened next?
22  A. I went back to assist Sergeant Stender.
23  Q. Where was Officer Peterson at the time?
24  A. He was in that general area.
25  Q. Did anyone have their flashlight activated, sir,

Lathrop Decl. Ex. 17

87

1   on their firearm?
2   A.   Not that I recall.
3   Q.   Were you able to see in the water heater area,
4        sir?
5   A.   Somewhat.
6   Q.   Was it dark?
7   A.   It was dark.
8   Q.   Was it very dark?
9   A.   Made it difficult to see.
10  Q.   Were you able to see the subject's face at that
11       point in time?
12  A.   I was.
13  Q.   And you saw that he had dreadlocks?
14  A.   Yes.
15  Q.   Did you see the color of his clothing?
16  A.   I did.
17  Q.   Was it your assumption, sir, that that was the
18       suspect you were trying to find?
19  A.   Yes.
20  Q.   Was Peterson giving any voice commands at that
21       point?
22  A.   I do not recall.
23  Q.   From that point forward up until the time that
24       Franklin was killed do you ever recall Peterson
25       giving any voice commands?

88

1   A.   Not specifically.
2   Q.   During this process, sir, did any member of your
3        team yell come out little nigger?
4   A.   No.
5   Q.   At any time during that process did Franklin say
6        man let me go?
7   A.   No.
8   Q.   And it is your testimony Franklin never said
9        anything, right?
10  A.   Correct.
11  Q.   From the time you saw him up until the time he
12       was killed he never said anything, right?
13  A.   Correct.
14  Q.   What happened next?
15  A.   I went back to assist Sergeant Stender.
16  Q.   And then what happened next?
17  A.   I grabbed a hold of the suspect.
18  Q.   Where?
19  A.   Upper body shoulder area.
20  Q.   Then what happened?
21  A.   I attempted to pull him backwards, get him out
22       from the cluttered area.
23  Q.   Was Stender holding on to him too?
24  A.   I do not recall.
25  Q.   What about Peterson?

89

1   A.   I'm not sure.
2   Q.   Do you know if anyone struck Franklin, sir, at
3        that point in time?
4   A.   At the time, no.
5   Q.   Did you ever see Franklin struck by anyone in
6        that area before Franklin ended up in the laundry
7        room area of the basement?
8   A.   Not that I recall.
9   Q.   So you never saw Sergeant Stender strike him,
10       correct?
11  A.   Correct.
12  Q.   Did Franklin react at all to being bit by the dog
13       from what you could observe, sir?
14  A.   Not really.
15  Q.   I mean, did he seem to be in pain?
16  A.   No.
17  Q.   He didn't show any signs of pain, in any event.
18  A.   None.
19  Q.   So what happened next?
20  A.   I attempted to pull him backwards through --
21  Q.   He was standing, right?
22  A.   Correct.
23  Q.   And then what happened next?
24  A.   Continued to keep pulling him backwards.
25  Q.   Was he moving towards you?

90

1   A.   No.
2   Q.   When you say pulling backwards, what do you mean
3        by that?
4   A.   I had him by his shoulders pulling him backwards.
5   Q.   You mean towards you?
6   A.   Towards me.
7   Q.   So you were trying to get him out from the water
8        heater area, correct?
9   A.   Correct.
10  Q.   Do you recall where Durand was at that point in
11       time?
12  A.   I just remember he was somewhere behind us.
13  Q.   Sir, when you were pulling Franklin out from the
14       water heater area towards you, correct?
15  A.   Correct.
16  Q.   Did anyone have their guns out?
17  A.   Not that I saw.
18  Q.   Your gun was holstered?
19  A.   Correct.
20  Q.   What happened next?
21  A.   Pulled him backwards and delivered two to three
22       knee strikes.
23  Q.   What is that, sir?  What does that mean?
24  A.   Driving my knee into his upper body area.
25  Q.   But he was standing, right?

Lathrop Decl. Ex. 17

91

1   A.  I was pulling him down each time with the strike.
2   Q.  I see.  And which knee did you do that with, sir?
3   A.  My right knee.
4   Q.  And when you did that did you physically hit his
5       body with your knee?
6   A.  I did.
7   Q.  How many times?
8   A.  Two to three.
9   Q.  Did he react to that, sir?
10  A.  Yes.
11  Q.  In what way?
12  A.  By forcing me backwards into a wall closet door.
13  Q.  And then what happened next?
14  A.  I lost my grip.
15  Q.  Sir, was the wall closet door, was that in the
16      hallway that lead from the base of the steps to
17      the laundry room area?
18  A.  It was in the basement.
19  Q.  Your back ended up against something?
20  A.  Correct.
21  Q.  Was that area, sir -- if we are overhead looking
22      at the basement, would that be from the base of
23      the -- in between the area from the base of the
24      steps to the door to the laundry room?
25  A.  I believe so.  I would have to look at a picture.

92

1   Q.  The laundry room did have a door, right?
2   A.  I believe so.
3   Q.  What happened next?
4   A.  I lost my grip of him and the suspect got away
5       from me.
6   Q.  What did the suspect do at that point?
7   A.  He then moved away and got into an altercation
8       with Officer Durand and Officer Peterson.
9   Q.  Did you observe that?
10  A.  I did.
11  Q.  Tell me what you saw, sir.
12  A.  I saw him driving Officer Durand into the laundry
13      room or what at the time I had no idea.
14  Q.  Did Officer Durand go down to the ground?
15  A.  That I do not know.
16  Q.  You didn't see that?
17  A.  Didn't see that.
18  Q.  Did you have trouble seeing when this was going
19      on, sir?
20  A.  Once they got into the room I couldn't see
21      anymore.
22  Q.  At some point were you ever physically in the
23      laundry room, sir?
24  A.  I was.
25  Q.  Was there any artifical light that came into the

93

1       laundry room, sir?
2   A.  Not that I recall.  Could have been a small
3       amount.
4   Q.  By artifical light, sir, I mean light that would
5       be coming in through a window for example.
6   A.  Not that I recall.
7   Q.  I probably asked that wrong.  Artificial light --
8       strike that.
9           Was there any electricity that was
10      being used at the time?  Were any lights on in
11      the basement?
12          MR. CARTER:  Objection, compound
13      question, form.
14  BY MR. PADDEN:
15  Q.  Go ahead.
16  A.  Not that I recall.
17  Q.  So you guys didn't turn any lights on?
18  A.  No.
19  Q.  Why?
20  A.  It is not something that we do.
21  Q.  Why is that?
22  A.  Light switches are located differently in every
23      house.
24  Q.  Was there anything that prevented you from asking
25      the homeowner where the light switches were?

94

1   A.  Me personally I never met him.
2   Q.  You know the homeowner was there, around there
3       though, right?
4   A.  Somewhere.
5   Q.  What I'm asking, sir, there was nothing that
6       prevented a member of your team from asking the
7       homeowner where the lights were, correct?
8   A.  I wouldn't know.
9   Q.  Was there any natural light, sir, coming through
10      any part of the laundry room area that you
11      recall?
12  A.  There was a small amount, but not very much.
13  Q.  Was there much difference, sir, in terms of what
14      you could see from the area of the water heater
15      into the laundry room or was it essentially the
16      same?
17          MR. CARTER:  Objection to the form of
18      the question, vague.
19  BY MR. PADDEN:
20  Q.  Go ahead and answer.
21  A.  I guess you would have to be there back in that
22      time to give you a direct answer on how it was.
23  Q.  I know.  But I wasn't there and I'm just trying
24      to find out what your perception was at the time.
25  A.  It was darker in the laundry room.

Lathrop Decl. Ex. 17

95

1  **Q.**  Fair enough.
2      So the laundry room was darker than the
3      water heater area, is that fair?
4  **A.**  Correct.
5      MR. CARTER:  Objection.  Let me get an
6      objection in to that last question.
7      Objection to the form of the question
8      and it is vague.
9  BY MR. PADDEN:
10 **Q.**  So you said that Franklin drove Durand into the
11     laundry room?  Is that your testimony?
12 **A.**  Correct.
13 **Q.**  And I may have asked you this.  I apologize.  I'm
14     just trying to get reoriented to where we were in
15     the chronology.
16     Did Durand go down on the ground?
17 **A.**  Not that I saw.
18 **Q.**  Do you know if Franklin went down on the ground?
19 **A.**  At that time I don't know.
20 **Q.**  Was there a period of time where you lost sight
21     of Franklin and Durand?
22 **A.**  There is.
23 **Q.**  What was Peterson doing at the time that Durand
24     was pushed back if anything?
25 **A.**  He was with them.

VERBATIM REPORTING (763)-493-4535

96

1  **Q.**  Where though physically?
2  **A.**  He was -- he drove him back with both of them
3      there.
4  **Q.**  So Franklin drove both Peterson and Durand into
5      the laundry room?
6  **A.**  They were all right there together.
7  **Q.**  So then what happened next?
8  **A.**  I followed into the laundry room.
9  **Q.**  Did you go into the laundry room?
10 **A.**  I did.
11 **Q.**  But you said there was a period of time where you
12     lost sight of them?
13 **A.**  Yes.
14 **Q.**  What do you remember seeing next, sir?
15 **A.**  Trying to find him in the laundry room.
16 **Q.**  Were you successful in that regard?
17 **A.**  Eventually.
18 **Q.**  How much time elapsed from the time you lost
19     sight of him up until the time that you regained
20     sight of him?
21 **A.**  Again, I wouldn't be able to give you a definite.
22     It was extremely fast.  It was a dynamic
23     situation.
24 **Q.**  By dynamic, sir, do you mean that things happened
25     quickly?  Is that fair?

VERBATIM REPORTING (763)-493-4535

97

1  **A.**  Yes.
2  **Q.**  And at some point did you hear the gun discharge?
3  **A.**  I did.
4  **Q.**  You don't know the specific circumstances as to
5      how the gun discharged, correct?
6  **A.**  Correct.
7  **Q.**  That would be about -- when I say gun, I mean the
8      MP-5, right?
9      MR. CARTER:  Object to the form of the
10     question.  I mean, you know what you mean by the
11     question.
12     MR. PADDEN:  When I said the gun -- the
13     reason I want to clarify, Counsel, is because
14     three guns discharged in this incident.  I'm just
15     trying to make sure the witness understood my
16     question.
17     THE WITNESS:  A gun went off.
18 BY MR. PADDEN:
19 **Q.**  But you don't know the circumstances of why that
20     gun went off, correct, sir?
21 **A.**  Correct.
22 **Q.**  You recall hearing one round?
23 **A.**  One boom.
24 **Q.**  And when the boom happened I think you said it
25     was immediately at that time that you felt pain?

VERBATIM REPORTING (763)-493-4535

98

1  **A.**  Correct.
2  **Q.**  But just to be fair and clear, you don't know the
3      circumstances as to what was going on, right?
4  **A.**  No.
5  **Q.**  Did anyone say anything about the gun discharging
6      before it discharged?
7  **A.**  I believe there was a statement made that he has
8      a gun.
9  **Q.**  Who made that statement?
10 **A.**  I don't know.
11 **Q.**  When you heard he has a gun -- I realize this was
12     a fluid situation -- what did you interpret that
13     to mean?
14 **A.**  That he had a gun.
15 **Q.**  That he had his own gun?
16 **A.**  Correct.
17 **Q.**  You found out at a later time that apparently
18     that may have been a reference to him holding the
19     MP-5?
20 **A.**  Correct.
21 **Q.**  But you didn't see that, right?
22 **A.**  At what time?
23 **Q.**  What's that?
24 **A.**  What time are you asking me?
25 **Q.**  I thought you told me that when you heard the

VERBATIM REPORTING (763)-493-4535

Lathrop Decl. Ex. 17

99

1   boom you didn't know the circumstances of how the
2   boom happened, right?  You don't know what was
3   going on in that sense.  You just heard a boom,
4   right?
5 **A.** **At that time.**
6 **Q.** Now, at some point did you hear Peterson fire his
7   gun?
8 **A.** **No.**
9 **Q.** Are you aware of the fact that Peterson fired his
10   gun?
11 **A.** **I am now.**
12 **Q.** When did you find out that Peterson had fired his
13   gun?
14 **A.** **Later that evening.**
15 **Q.** Sir, is it a true statement that in a history you
16   gave at the hospital, information you provided to
17   either a nurse or a doctor or some personnel at
18   the hospital, did you say that I felt blood
19   running down my leg and my pants and then I
20   started shooting?  Did you say that?
21 **A.** **I would have no idea.**
22 **Q.** You would have to see the document?
23 **A.** **And have the -- hear the audio of it if it was at**
24   **hospital.**
25 **Q.** What if it wasn't recorded?

100

1 **A.** **Then I would have to say I don't remember.**
2 **Q.** Do you have -- regardless of what that record
3   says or may say, do you have a sensation of
4   shooting when you felt blood on your pants?
5 **A.** **I guess I don't understand the whole question.**
6 **Q.** Okay.  What prompted you to shoot, sir?
7 **A.** **I knew I was shot.**
8 **Q.** And when you shot did you draw focus on the
9   suspect?
10 **A.** **I did.**
11 **Q.** Did you have trouble seeing him with the
12   darkness?
13 **A.** **Again, I guess it would be I knew it was the**
14   **suspect.**
15 **Q.** So when you shot you felt you were in a position
16   to be able to accurately fire the bullets into
17   the suspect?
18 **A.** **Correct.**
19 **Q.** You weren't just going to be wildly firing,
20   correct?
21 **A.** **Correct.**
22 **Q.** Can you give us, sir, an estimate as to how far
23   you were away from Franklin when you decided to
24   shoot him?
25 **A.** **I didn't have a tape measure with me at the time**

101

1   so I wouldn't be able to give you one.
2 **Q.** Can you give me an estimate?
3 **A.** **No.  Again, I'm not good with numbers.**
4 **Q.** Where was Franklin located when you began
5   shooting him?
6 **A.** **He was off to my left side somewhere.**
7 **Q.** In the laundry room?
8 **A.** **Correct.**
9 **Q.** You were in the laundry room?
10 **A.** **Correct.**
11 **Q.** Do you recall how he was physically configured
12   when you started shooting him?
13 **A.** **Somewhat.**
14 **Q.** Tell me what please.
15 **A.** **What I remember we were pretty much in -- he was**
16   **on his butt on the ground with his legs out**
17   **seated upright with his arms extended.**
18 **Q.** Did you see if he was holding anything at the
19   time?
20 **A.** **I could see a struggle between him and Luke.**
21 **Q.** Where was Luke positioned when you started
22   shooting Franklin?
23 **A.** **Basically kind of on top of him.**
24 **Q.** Weren't you worried about hitting Luke?
25 **A.** **There was a gap between the two.**

102

1 **Q.** Where was the gap?
2 **A.** **Between the two.**
3 **Q.** Can you describe that for me?
4 **A.** **Between their chests.**
5 **Q.** Was Peterson essentially over Franklin when you
6   started shooting Franklin?
7 **A.** **It depends on what your definition of over is.**
8 **Q.** Describe for me how Peterson was physically
9   configured with Franklin when you started
10   shooting Franklin.
11 **A.** **Franklin was on the ground seated up.  Luke was**
12   **on top of him.**
13 **Q.** Didn't you see at some point Peterson's right
14   hand on his gun?
15 **A.** **No.**
16 **Q.** So is it your testimony that you don't recall at
17   all Peterson shooting Franklin?
18 **A.** **Correct.**
19 **Q.** And is it your recollection that the only firearm
20   that you heard going off was yours?
21 **A.** **At that time.**
22 **Q.** And I take it when you shot your gun it was loud.
23 **A.** **Correct.**
24 **Q.** Do you recall how many rounds you got off, sir?
25 **A.** **At that time, no.**

Lathrop Decl. Ex. 17

103

1  **Q.** Do you know where you were shooting him when you
2     began shooting him?
3  **A.** I do.
4  **Q.** Where?
5  **A.** The upper shoulder and head area.
6  **Q.** You were accurate, right?  You believe every
7     round hit?
8  **A.** I have no idea.
9  **Q.** But did you see the suspect react as a result of
10    you shooting him?
11 **A.** No.
12 **Q.** You don't remember that?
13 **A.** No.
14 **Q.** Did you have the perception that you were hitting
15    him with your rounds when you were shooting him?
16 **A.** No.
17 **Q.** What was your perception then?
18 **A.** I just remember firing the last round and him
19    going limp.
20 **Q.** How did he go limp?
21 **A.** He went limp.
22 **Q.** Did his body move during the time you were
23    shooting him?
24 **A.** I don't recall.
25 **Q.** So you are not able to tell me for example if he

104

1     moved from the seated position to a different
2     position after you were done shooting him?
3  **A.** I just told you he went limp.
4  **Q.** What does that mean?
5  **A.** He obviously moved then, didn't he?
6  **Q.** I don't know.  I'm asking you.  I'm not the
7     witness.  Just tell me.
8        MR. CARTER:  Objection.  Asked and
9     answered.  He has answered the question.
10 BY MR. PADDEN:
11 **Q.** When you say he went limp, did his body fall back
12    down?
13 **A.** In a sense, yes.
14 **Q.** So it did move.
15 **A.** He went limp.
16 **Q.** What do you mean by limp?
17 **A.** I just told you.  He went limp.
18 **Q.** What does that mean, sir?  I don't know what that
19    means.
20 **A.** I don't know what to tell you.  If you have a
21    dictionary we can look it up.
22 **Q.** Did his body move as a result of you shooting
23    him?
24       MR. CARTER:  Objection, asked and
25    answered.

105

1        That's just a yes or no question.
2        THE WITNESS:  Ask it again.
3  BY MR. PADDEN:
4  **Q.** You said that when you shot him his body went
5     limp.  Okay?  That's what you told me, right?
6  **A.** Correct.
7  **Q.** What I was asking is did his body move as a
8     result of you shooting him?
9  **A.** Yes.
10 **Q.** Tell me how.
11 **A.** It went limp.
12 **Q.** What does that mean?
13 **A.** It moved.  His body moved and went limp.  He was
14    no longer moving.
15 **Q.** Was there a lot of blood?
16 **A.** I only remember my own blood.
17 **Q.** Do you recall seeing Franklin's blood go
18    anywhere?
19 **A.** No.
20 **Q.** Do you recall, sir -- I may have asked this.  I
21    apologize.  I just want to make sure I have this
22    right.
23       You said you heard a boom and you
24    immediately felt pain, correct?
25 **A.** Correct.

106

1  **Q.** How much time elapsed from the time you felt pain
2     up until the time that you began shooting
3     Franklin?
4  **A.** Again, I'm not good with numbers.
5  **Q.** Do you recall, sir, anybody yanking any of the
6     dreadlocks out of his hair?
7  **A.** No.
8  **Q.** You never saw that, right?
9  **A.** Correct.
10 **Q.** Do you recall any conversations with DOC Dave in
11    the basement?
12 **A.** No.
13 **Q.** Do you know who DOC Dave is?
14 **A.** I do.
15 **Q.** So he is someone you knew before that date,
16    right?
17 **A.** Knew of.
18 **Q.** You don't recall seeing him in the basement after
19    the time Franklin was killed, sir?
20 **A.** No.
21 **Q.** Sir, before you killed Franklin did you have any
22    like anger against him?
23 **A.** No.
24 **Q.** Were you angry about his conduct in trying to
25    escape?

Lathrop Decl. Ex. 17

---

107

1  A.  No.

2  Q.  Sir, you know what the term racist is, don't you?

3      You know what that means, don't you?

4  A.  Yes.

5  Q.  What are your attitudes about black people if

6      any?

7          MR. CARTER:  Objection, vague.

8  BY MR. PADDEN:

9  Q.  Go ahead.

10  A.  No different than any other people.

11  Q.  You have never used a racial slur in the field

12     with African Americans, correct?

13  A.  Not out of a professional context, no.

14  Q.  When you shot Franklin could you see Officer

15     Peterson?

16  A.  I knew of where he was, yes.

17  Q.  Because you had to make sure that you weren't

18     going to shoot one of your own guys, correct?

19  A.  Correct.

20  Q.  You felt it was safe to shoot Franklin and not

21     hit Peterson, right?

22  A.  Correct.

23  Q.  Did you ever see during this situation, sir,

24     Peterson with his gun out?

25  A.  No.

VERBATIM REPORTING (763)-493-4535

---

108

1  Q.  Is Peterson a right-handed guy?

2  A.  Wouldn't be able to tell you.

3  Q.  You don't know?

4  A.  Don't know.

5  Q.  Sir, when you were in the hospital did they draw

6      blood from you for a blood test?

7  A.  They did.

8  Q.  Do you recall at some point Officer Delmonico

9      stopping blood draws?  Do you know anything about

10     that?

11  A.  No.

12  Q.  I would like to ask you some questions, sir,

13     about your statement.  Sir, I have had marked as

14     Exhibit 2 a document which I believe is your

15     statement.

16         Can you look at that, sir, and confirm

17     that for me, please?

18  A.  This is a Q and A.

19  Q.  I'm sorry.  I apologize, sir.  Q and A, right?

20  A.  Correct.

21  Q.  Sir, the document I handed you is five pages in

22     length, correct?

23  A.  Correct.

24  Q.  Sir, is your signature on the last page of that

25     exhibit?

VERBATIM REPORTING (763)-493-4535

---

109

1  A.  It is.

2  Q.  Sir, when you did the Q and A was it generated

3      right there and then given to you so you had a

4      copy when you left?

5  A.  That I do not recall.

6  Q.  So you can't tell me if you signed the statement

7      that day?

8  A.  That I did, yes.

9  Q.  You did sign the statement that day.

10  A.  That wasn't the question you asked.  You asked if

11     I left with a copy.

12  Q.  Did you leave a copy?

13  A.  I said I don't recall.

14  Q.  Did you sign the statement that day?

15  A.  I did.

16  Q.  Did they have to -- was there a period of time

17     where you had to wait to get it after it was

18     transcribed?

19  A.  I would assume so.

20  Q.  You don't remember that?

21  A.  It had to come off a printer.

22  Q.  Right.

23  A.  It would be a guess that I had to wait some time

24     before it was produced in front of me.

25  Q.  Do you know how much time that was, sir?

VERBATIM REPORTING (763)-493-4535

---

110

1  A.  Again, no.

2  Q.  Do you know whose signature that is?  There's two

3      signatures on the last page.  Do you know whose

4      those are?

5  A.  I would have no idea.

6  Q.  Which one is yours?

7  A.  The top one.

8  Q.  What does 4686 mean?

9  A.  My badge number.

10  Q.  So that's your signature, correct?

11  A.  Correct.

12  Q.  Do you know if a copy of this statement was ever

13     provided to you?

14  A.  At what time?

15  Q.  That's what I'm trying to find out.

16  A.  Yes.

17  Q.  But you don't know if you were provided with it

18     that day.

19  A.  Correct.

20  Q.  Do you know when you were provided with a copy of

21     the statement?

22  A.  The last one I remember was last week when I met

23     with my attorneys.

24  Q.  Right.  Were you provided with a copy of the

25     statement let's say within the first 30 days of

VERBATIM REPORTING (763)-493-4535

Lathrop Decl. Ex. 17

111

1     the incident?

2 **A.**  **I don't recall.**

3 **Q.**  You may have been, you just don't recall?

4 **A.**  **Correct.**

5 **Q.**  Sir, do you ever recall a period of time during

6     this incident where the laundry room door was

7     closed?

8 **A.**  **I do not.**

9 **Q.**  Are you able to confirm for me if the laundry

10     room did in fact have a door?

11 **A.**  **There wasn't a door when I went through it.**

12 **Q.**  But you don't recall ever having trouble seeing

13     into that room and being obstructed by something

14     like a door, correct?

15 **A.**  **Correct.**

16 **Q.**  Sir, did you ever receive any information during

17     this process that the suspect you were trying to

18     find was armed?

19 **A.**  **I don't believe so.**

20     MR. PADDEN:  Off the record for a

21     moment.

22     (At this time a recess was had.)

23     MR. CARTER:  I want to object to the

24     video regarding its foundation, chain of custody,

25     it has been enhanced and we don't know how.

112

1     I also want to object, as we have been,

2     to the participation of Mr. Steve Rogers as

3     articulated in several letters and emails to

4     plaintiff's counsel.

5 BY MR. PADDEN:

6 **Q.**  If you look, sir, at the video on the left can

7     you see the digits 00:00?

8 **A.**  **I can.**

9 **Q.**  I may ask you to look at that, sir, because I may

10     have some specific questions about specific time

11     frames on the video.

12     What I'm going to do now is I will have

13     the video played from beginning to end.  This

14     clip, sir, I think is 62 seconds.  So I'm going

15     to play it and the court reporter won't would be

16     taking down anything that she maybe hearing on

17     the video as we have done in the previous

18     depositions.

19     But I will play it all the way through,

20     sir, and then I will start again and ask you

21     about specific sections of it if that's okay.

22     All right?

23 **A.**  **Correct.**

24     MR. CARTER:  I apologize again.  I just want to make the

25     interrupting again.  I just want to make the

113

1     record clear that Mr. Rogers throughout these

2     depositions has been not only playing the video

3     but also appears to have been in custody of it at

4     various times.

5     MR. PADDEN:  Go ahead, Mr. Rogers.

6     (At this time the video was played.)

7 BY MR. PADDEN:

8 **Q.**  We just completed the playing of it, sir.  You

9     had a chance to see the video.  Did you hear

10     anything?  On the video, sir, you heard sounds,

11     correct?

12 **A.**  **Correct.**

13 **Q.**  Let's go ahead and start from the beginning.  And

14     what I'm going to do at this point is start from

15     the beginning and I'm going to go up to second

16     15.  I'm going to ask you some questions about

17     second nine, second 11 and seconds 13 through 15.

18     Okay?

19 **A.**  **Okay.**

20 **Q.**  Thank you.

21     (At this time the video was played.)

22 BY MR. PADDEN:

23 **Q.**  Sir, I will stop at second ten.

24     (At this time the video was played.)

25 BY MR. PADDEN:

114

1 **Q.**  Sir, at second nine did you hear the word Mookie

2     spoken?

3 **A.**  **No.**

4     MR. PADDEN:  Keep going.

5     (At this time the video was played.)

6     MR. PADDEN:  Stop.

7 BY MR. PADDEN:

8 **Q.**  Sir, did you hear the words officer shot at

9     roughly second 11?

10 **A.**  **Yes.**

11 **Q.**  You don't know who spoke those words but did you

12     hear officer shot?

13 **A.**  **Yes.**

14     MR. PADDEN:  Go ahead.

15     (At this time the video was played.)

16     MR. PADDEN:  Stop.

17 BY MR. PADDEN:

18 **Q.**  Sir, did you hear the words bad, where was he

19     shot, or words to that effect in the last couple

20     seconds we played between I believe 12 to 15?

21 **A.**  **Something along those lines.**

22 **Q.**  So you heard a voice.  And when I say did it

23     sound like bad, where was he shot, you would be

24     comfortable with hearing that, correct, or words

25     to that effect?

Lathrop Decl. Ex. 17

115

1           MR. CARTER:  Objection, form.
2           THE WITNESS:  That's not what I heard.
3   BY MR. PADDEN:
4   **Q.**  What did you hear, sir?
5   **A.**  **Play it back one more time.**
6           MR. PADDEN:  Let's recue it from ten
7       and play to 15.
8           (At this time the video was played.)
9           MR. PADDEN:  Stop.
10  BY MR. PADDEN:
11  **Q.**  Did you have a chance to hear it there, sir?
12  **A.**  **I did.**
13  **Q.**  What did you hear?
14  **A.**  **Ask him where is he shot.**
15  **Q.**  Did you hear the word bad?
16  **A.**  **No.**
17  **Q.**  Now we are going to play from second 16 to second
18      39 -- strike that.
19          We are going to play it from 16 to 28
20      and I'm going to ask you some questions about 24
21      to 27.  Okay, sir?
22  **A.**  **Okay.**
23          (At this time the video was played.)
24          MR. PADDEN:  Stop.
25  BY MR. PADDEN:

VERBATIM REPORTING (763)-493-4535

116

1   **Q.**  Sir, did you hear the words watch out for the
2       nigger anywhere in the last couple sound bites?
3       We are at 27 now.  From 24 to 27 did you hear
4       watch out for the nigger?
5   **A.**  **No.**
6   **Q.**  Did you hear damn freaking nigger?
7   **A.**  **No.**
8   **Q.**  So you didn't hear the word nigger at all in that
9       area, did you?
10  **A.**  **Absolutely not.**
11          MR. PADDEN:  Go ahead and play it.  I
12      want you to stop -- let's cue it from second 25
13      to second 30.
14  BY MR. PADDEN:
15  **Q.**  I'm going to ask you about second 27 and 28.
16      Okay, sir?
17  **A.**  **Okay.**
18  **Q.**  In that general area.
19          To note for the record, sir, the time
20      that is noted here does not have it broken down
21      in tenths of a second.  It appears to be just
22      seconds, correct?
23  **A.**  **I guess I don't understand what you mean.**
24  **Q.**  You don't know if that is accurate in terms of
25      from the beginning if we get to 25 and it is

VERBATIM REPORTING (763)-493-4535

117

1       25 seconds, but what you are looking at in terms
2       of time doesn't appear to show tenths of a
3       second, correct, sir?
4   **A.**  **It completely shows different times.  It shows 25**
5       **on the left and then as he is holding over it it**
6       **shows 24.  I would have to say this whole video**
7       **is completely inaccurate.**
8   **Q.**  I appreciate that.  I'm going to have you look at
9       the number on the left.  Right there it says 25,
10      right?
11  **A.**  **Correct.**
12          MR. PADDEN:  I want you to cue that
13      number, sir, from 20 to 28 and then I will ask
14      him some questions.
15          (At this time the video was played.)
16          MR. PADDEN:  Stop.
17  BY MR. PADDEN:
18  **Q.**  Starting at 27 did you hear a voice say man let
19      me go?
20  **A.**  **No.**
21  **Q.**  Did you hear a voice at that -- after -- did you
22      hear a voice in that position from 27 to 29?
23  **A.**  **I would have to be currently listening to it at**
24      **those exact numbers.**
25          MR. PADDEN:  Let's start from 25 and go

VERBATIM REPORTING (763)-493-4535

118

1       25 to 30.
2           (At this time the video was played.)
3           MR. PADDEN:  Stop.
4   BY MR. PADDEN:
5   **Q.**  Did you hear man let me go there, sir?
6   **A.**  **No.**
7   **Q.**  Let's now go from second 29 to second 38.
8       Actually 29 to 39, then I will ask you about 38,
9       sir.
10          MR. PADDEN:  Go ahead.
11          (At this time the video was played.)
12          MR. PADDEN:  Stop.
13  BY MR. PADDEN:
14  **Q.**  Sir, did you hear hands up at second 38?
15  **A.**  **No.**
16  **Q.**  Did you hear a voice at second 38?
17  **A.**  **I heard a sound.**
18  **Q.**  But the sound that you heard is not something you
19      could make out in terms of words in the english
20      language, correct?
21  **A.**  **Correct.**
22  **Q.**  Let's now play from second 40 to second 50.  And
23      I'm going to have you listen, sir, and if you
24      could concentrate on 43 and then 45 to 46.
25          (At this time the video was played.)

VERBATIM REPORTING (763)-493-4535

Lathrop Decl. Ex. 17

119

1              MR. PADDEN:  Stop.

2   BY MR. PADDEN:

3   Q.  Sir, did you hear at any time in that gap from 40

4      to what is now 48 the words come out little

5      nigger?

6   A.  No.

7   Q.  Did you hear the words don't go putting those

8      hands up now?

9   A.  No.

10   Q.  Did you hear a sound in that time frame?

11   A.  I can hear sound throughout the entire thing.

12   Q.  But did you hear a voice in that gap of time?

13   A.  I wouldn't be comfortable identifying what the

14      sound is.

15   Q.  Were you able to ascertain if it was a voice?

16   A.  No.

17   Q.  That's all the questions I have about the video.

18           I'm just about done, sir.  Let me look

19      at my notes here.

20           MR. PADDEN:  Let's take a five minute

21      break please.

22           (At this time a recess was had.)

23   BY MR. PADDEN:

24   Q.  I just have a few more questions, Officer.  Thank

25      you for telling me about the position of Franklin

VERBATIM REPORTING (763)-493-4535

120

1      when you shot him.

2           You told me that he was seated and he

3      would have -- he was away from you but you are

4      not sure what the distance was, correct?

5   A.  Correct.

6   Q.  Sir, as you were looking at Franklin before you

7      shot, was he -- I'm just trying to get a word

8      picture from you as to how he was configured when

9      you shot him.

10           Was he sideways when you shot at him?

11   A.  I guess you would have to tell me or show me what

12      you mean by sideways.

13   Q.  As you were pointing your gun at him right before

14      you shot, was he facing towards you or was he

15      facing to your left?

16   A.  I wasn't looking directly at him.

17   Q.  Can you give me any kind of help as to where he

18      was seated when you shot him?

19   A.  He was seated.

20   Q.  Was his back up against anything, sir?

21   A.  I couldn't tell.  He was upright, forward.  I

22      couldn't tell what angle it was but he wasn't

23      lying completely fat.

24   Q.  Sir, we received information from the

25      investigation of the case that indicates there

VERBATIM REPORTING (763)-493-4535

121

1      were a couple of appliances in the laundry room.

2      Which makes sense because it is called a laundry

3      room.

4           It appears that there was a washer and

5      a dryer in the laundry room.  Do you remember

6      that?

7   A.  No.

8   Q.  Are you able to tell me if his back was up

9      against anything when you shot him?

10           MR. CARTER:  Objection, asked and

11      answered.

12   BY MR. PADDEN:

13   Q.  Go ahead.

14   A.  I couldn't.

15   Q.  Was his left side facing you when you shot?

16   A.  Left side?

17   Q.  Yes.

18   A.  I don't believe so, no.

19   Q.  Was a side of his body facing you?

20   A.  His right side.

21   Q.  So was he on the -- was he closer to the left

22      side of the laundry room as you were looking at

23      him or the right side of the laundry room?

24           MR. CARTER:  Objection, vague.

25           THE WITNESS:  I guess I couldn't give

VERBATIM REPORTING (763)-493-4535

122

1      you a good answer because it wasn't really --

2      there wasn't complete right angles or straight

3      lines or anything else.  He wasn't laying one

4      direction.  It was moved over, hunched.  It

5      wasn't a complete 90 degree angle.  I couldn't

6      give you identically.

7   BY MR. PADDEN:

8   Q.  You wouldn't know if the door at the top of the

9      steps was open at the time that you shot him.

10      You wouldn't know that, correct?

11           MR. CARTER:  Objection, vague.

12           THE WITNESS:  I would have no idea.

13   BY MR. PADDEN:

14   Q.  I had asked you earlier about north, south, east

15      and west.  The door that was at the top of the

16      steps, do you know what side of the house that

17      was from a north, south, east, west perspective?

18           MR. CARTER:  Objection, vague, asked

19      and answered.

20           THE WITNESS:  Absolutely not, no.

21   BY MR. PADDEN:

22   Q.  What I am asking is the direction you were

23      looking at him before you shot your gun, would

24      you be able to say what direction you were

25      looking at from a north, south, east, west

VERBATIM REPORTING (763)-493-4535

Lathrop Decl. Ex. 17

123

1  perspective?
2  A. No.
3  Q. Sir, did you have a problem with your right hip
4     before you were injured in this incident?
5  A. I did.
6  Q. What was the problem, sir?
7  A. I had a torn labrum.
8  Q. What was that from?
9  A. I have no idea. Life.
10 Q. So it was just the wear and tear of life?
11 A. I'm assuming.
12 Q. There was no traumatic incident?
13 A. No.
14 Q. Did you have surgery on your right hip before May
15    of 2013?
16 A. I did.
17 Q. What year was that?
18 A. I would have to look at my medical records.
19 Q. Did it affect your function at all, the hip
20    problem?
21 A. Obviously. I had surgery.
22 Q. Right. But after you had the surgery were you at
23    full function or did you have any kind of
24    residual from the surgery?
25 A. I was pretty good.

124

1  Q. Sir, I forgot to ask you, the Sig Sauer, the gun
2     you had that day, what was the model number, sir?
3  A. P-220.
4  Q. What was the magazine capacity?
5  A. Eight.
6  Q. Did you have any spare magazines on you?
7  A. I did.
8  Q. How many?
9  A. Two.
10 Q. Did you have a round chambered in the gun, sir,
11    before you went down in the basement?
12 A. Yes.
13 Q. Was your weapon light on when you shot the rounds
14    that hit Franklin?
15 A. Not that I recall.
16 Q. Sir, at any time during this incident did
17    Terrance Franklin attempt to grab your weapon?
18 A. Not that I recall.
19 Q. Sir, you said earlier you learned later in the
20    evening that Officer Peterson had fired his gun.
21    Do you remember when you learned that
22    information, sir?
23 A. Later in the evening.
24 Q. Could you be more specific?
25 A. No.

125

1  Q. Was it dark?
2  A. Don't know.
3  Q. How did you find out that he had shot his weapon?
4  A. I don't know.
5  Q. You don't remember?
6  A. No.
7  Q. Did you ever see any muzzle flash in the basement
8     when any of the guns were fired?
9  A. I may have. I'm not sure.
10 Q. Do you recall seeing muzzle flash from Peterson's
11    gun?
12 A. No.
13 Q. Earlier you said you may have seen muzzle flash
14    from the other gun. Do you mean that it may have
15    happened, you just don't remember?
16 A. Correct.
17        MR. PADDEN: That's all the questions I
18    have, Counsel. Thank you.
19        MR. CARTER: I just have a few quick
20    questions.
21            EXAMINATION
22 BY MR. CARTER:
23 Q. Officer Meath, you recall your testimony from
24    earlier today about the positions of Terrance
25    Franklin and Officer Peterson right before you

126

1  shot Mr. Franklin. Do you recall that testimony?
2  A. I do.
3  Q. And more specifically do you recall your
4     testimony about there being a space in between
5     Terrance Franklin's chest and Officer Peterson's
6     chest?
7  A. I do.
8  Q. Could you explain what you meant by that
9     testimony?
10 A. I meant that there was obviously a space or a gap
11    that was between them. I couldn't tell, again,
12    with the right angles and everything else which
13    angle I was looking at, I just knew there was
14    enough space between them that I could safely
15    fire at the suspect.
16 Q. So you don't recall -- for example, you are not
17    able to constrain for example the specific angle
18    of Terrance Franklin's upper body relative to the
19    angle of Officer Peterson's upper body.
20 A. Correct.
21        MR. CARTER: I don't have any further
22    questions. We will read and sign.
23
24
25
STATE OF MINNESOTA )

Lathrop Decl. Ex. 17

127

1            ) ss.

COUNTY OF HENNEPIN )

2    I, Kristin Hoium, a Notary Public in and for the

3  County of Hennepin, in the State of Minnesota, do

4  hereby certify:

5    That the witness in the foregoing deposition named

6  was present at the time and place therein specified;

7    That the said proceeding was taken before me as a

8  Notary Public at the said time and place and was

9  taken down in shorthand writing by me;

10   That said proceeding was thereafter under my

11  direction transcribed into computer-assisted

12  transcription, and that the foregoing transcript

13  constitutes a full, true and correct report of the

14  proceedings which then and there took place;

15   That I am a disinterested third person to the said

16  action.

17   IN WITNESS THEREOF, I have hereto subscribed my hand

18  and affixed my official seal this 10th day of

19  September, 2015.

20            _____

             Kristin Hoium

21            Court Reporter

22

23

24

25

VERBATIM REPORTING (763)493-4535

---

129

1            Kristin Hoium
             VERBATIM REPORTING
2    8906 ASHLEY TERRACE, SUITE 100
             Minneapolis, MN 55443
3    Telephone 763-493-4535
             Fax 763-493-4532
4

5

     September 10, 2015

6

7    Brian Carter
     350 South 5th Street, Suite 210
8    Mpls., MN  55415

9    Re: Franklin vs. Peterson

10   Dear Mr. Carter:

11     With regard to the above-entitled matter,
     enclosed please find the Reading and Signing
12   Certificate and transcript for the deposition of
     Michael Meath.

13
       Please have him complete the Certificate, retain
14   a copy for your transcript, and send the original to
     Mr. Padden.

15
       Thank you for your cooperation.  Feel free to
16   call me if you have any questions.

17            Sincerely,

18

19            Kristin Hoium

20   cc:  Mr. Padden

21

22

23

24

25

VERBATIM REPORTING (763) 493-4535

---

128

1  DEPOSITION CORRECTION PAGE

   TITLE:   Franklin vs. Peterson

2  WITNESS:  Michael Meath

   PAGE   LINE   DESIRED CHANGE/REASON FOR CHANGE

3  _____  _____  _____

4  _____  _____  _____

5  _____  _____  _____

6  _____  _____  _____

7  _____  _____  _____

8  _____  _____  _____

9  _____  _____  _____

10 _____  _____  _____

11 _____  _____  _____

12 _____  _____  _____

13 _____  _____  _____

14 _____  _____  _____

15 _____  _____  _____

16

17        _____

18

   Signature of Witness

19  Subscribed and sworn to before:

20     Notary Public _____County of

   Minnesota, _____ 20____

21

22

23

24

25

VERBATIM REPORTING (763) 493-4535

Lathrop Decl. Ex. 17

128

```
 1   DEPOSITION CORRECTION PAGE
     TITLE:    Franklin vs. Peterson
 2   WITNESS:  Michael Meath
     PAGE  LINE  DESIRED CHANGE/REASON FOR CHANGE
 3    55    15   "BARS" TO "BARZE"; MISSPELLING
 4   120    16   "at him"  to  "at the front
 5   ___   ___      of him";   Clarification
 6   120    23   "fat"  to "flat"; Misspelling
 7   ___   ___   _____
 8   ___   ___   _____
 9   ___   ___   _____
10   ___   ___   _____
11   ___   ___   _____
12   ___   ___   _____
13   ___   ___   _____
14   ___   ___   _____
15   ___   ___   _____
16
17   _____
18   Signature of Witness
19   Subscribed and sworn to before:
20      Notary Public _____ County of
     Minnesota, _____ 20 _____
21
22
23
24
25
```

SARA J. LATHROP
NOTARY PUBLIC - MINNESOTA
My Commission Expires
January 31, 2019

VERBATIM REPORTING (763) 493-4535

Lathrop Decl. Ex. 17