1

1

2
                    UNITED STATES DISTRICT COURT
3                      DISTRICT OF MINNESOTA

4
        --------------------------------
5                                      CASE:
                 0:14-CV-01467-DWF-JSM
6
        Walter Louis Franklin, II,
7       Trustee for the Estate of
        Terrance Terrell Franklin,
8
                    Plaintiff,
9
            vs.
10
        Lucas Peterson, individually
11      and in his official capacity;
        Michael Meath, individually
12      and in his official capacity;
        Janee Harteau, Chief of Police
13      for the Minneapolis Police Department,
        individually and in her official
14      capacity; and the City of Minneapolis,

15                  Defendants.
        --------------------------------
16
                            DEPOSITION OF
17                        KRISTIN JACOBSON
                          October 1, 2015
18                          11:00 a.m.

19

20

21

22

23

24

25


                    VERBATIM  REPORTING (763)-493-4535

Lathrop Decl. Ex. 21

2

```
 1          DEPOSITION OF KRISTIN JACOBSON, taken by
       and on behalf of Plaintiff, at 350 South 5th Street,
 2     Minneapolis, Minnesota, 55415, on October 1, 2015,
       commencing at 11:00 a.m., before Kristin Hoium,
 3     Notary Public, State of Minnesota, County of
       Hennepin.
 4
                     *   *   *   *   *
 5
                       APPEARANCES
 6
            PADDEN LAW FIRM, PLLC
 7          BY:  Michael B. Padden, Esq.
            8687 Eagle Point Blvd.
 8          Lake Elmo, Minnesota  55042
            Appeared for Plaintiff
 9
            CITY OF MINNEAPOLIS OFFICE OF CITY ATTORNEY
10          BY:  Brian S. Carter, Esq.
                 Sara J. Lathrop, Esq.
11          350 South 5th Street
            Room 210
12          Minneapolis, Minnesota  55415
            Appeared for the City of Minneapolis
13


14                       I N D E X

15
       EXAMINATION BY:                        PAGE:
16     Mr. Padden                             3

17

18

19

20

21          *** READING AND SIGNING NOT WAIVED ***
            *** ORIGINAL TRANSCRIPT IN POSSESSION
11:12:26  22      OF ATTORNEY MICHAEL PADDEN ***
11:12:26
23

24

25


                VERBATIM  REPORTING (763)-493-4535
```

Lathrop Decl. Ex. 21

**3**

1             KRISTIN JACOBSON,
2    a witness in the above-entitled action, having
3    been duly sworn, deposes and says as follows:
4              EXAMINATION
5 BY MR. PADDEN:
6 Q. Could you state your name, please, for the
7    record, ma'am?
8 A. Yes. Kristin Jacobson.
9 Q. Can you spell your first name?
10 A. K R I S T I N.
11 Q. Ma'am, in the records I have looked at the
12    designation for you is FS, correct?
13 A. That is correct.
14 Q. What does that mean, ma'am?
15 A. Forensic scientist.
16 Q. Are there any other forensic scientists in the
17    department that have the same last name as you?
18 A. Not that I know of.
19 Q. So if I see FS Jacobson in relation to the
20    investigation of the Terrance Franklin case, that
21    would be you presumably, correct?
22 A. That's correct.
23 Q. I just want to ask you quickly about your
24    background.
25        What's your educational background,

**4**

1    ma'am?
2 A. Yes. I have a bachelor of science degree in
3    chem/med, which is chemistry and biology, a
4    bachelor of arts in psychology and a minor in
5    criminal justice.
6 Q. Where did you get the minor in criminal justice,
7    what school?
8 A. St. Cloud State University.
9 Q. And a BA in did you say psychology?
10 A. Yes.
11 Q. Where was that at?
12 A. St. Cloud State.
13 Q. Was that a four year program, ma'am?
14 A. Yes.
15 Q. And then the BS in chemical -- help me.
16 A. Chem/med.
17 Q. M E D, med?
18 A. Well, it is kind of a premed degree, yes.
19 Q. But chem is one word and med is the second word,
20    correct?
21 A. It is like chem/med.
22 Q. And is that degree designed for you to be able to
23    process evidence in cases? Is that what that
24    primarily is about?
25 A. Well, you do need a science degree in order to

**5**

1    work for the crime lab.
2 Q. And how long have you worked for the crime lab?
3 A. Ten years.
4 Q. Are you licensed in your field of expertise?
5 A. I wouldn't say licensed but I do have
6    certifications.
7 Q. So are you certified in forensic science, ma'am?
8 A. I went through a two year training program with
9    the crime lab, and after passing a series of
10    tests then I became certified in the crime lab.
11 Q. Is that a state certification or is that a
12    certification within the Minneapolis Police
13    Department?
14 A. That one in particular is through the crime lab,
15    the Minneapolis police. But I also do have a
16    certification in crime scene investigation.
17 Q. Is that a state wide certification?
18 A. That is through the International Association of
19    Identification.
20 Q. How long have you had that certification, ma'am?
21 A. Approximately nine years.
22 Q. What is your age?
23 A. I'm 39.
24 Q. Did you do any work in your life, in your adult
25    life, before you began doing work for the

**6**

1    Minneapolis Police Department?
2 A. Yes.
3 Q. Can you tell me what, please?
4 A. I worked for Pace Analytical and tested air for
5    approximately nine months to a year.
6 Q. I take it you did other jobs too, correct?
7 A. Yes.
8 Q. Were you essentially in your late 20s when you
9    got involved in this kind of work working as a
10    forensic scientist for the Minneapolis Police
11    Department?
12 A. Yes.
13 Q. Have you worked for any other departments other
14    than MPD, ma'am?
15 A. No.
16 Q. Born and raised in Minnesota?
17 A. Yes.
18 Q. In terms of the work you do, you do processing of
19    evidence at crime scenes, correct?
20 A. Yes.
21 Q. And do you also do processing of evidence in the
22    crime lab?
23 A. Yes. That's correct.
24 Q. And when you work in the crime lab I take it when
25    you are working with evidence you are required to

Lathrop Decl. Ex. 21

7

1    wear gloves depending on what it is?
2  A. Absolutely.
3  Q. So that's a normal thing is to wear gloves when
4    you are involved with the processing of crime
5    scene evidence, correct?
6  A. Yes.
7  Q. I want to ask you in particular about your work
8    in the case involving the Terrance Franklin
9    homicide. Okay?
10       Now, that was determined to be a
11    homicide, correct?
12  A. I'm not sure if it was determined to be a
13    homicide or not.
14  Q. But you know which case I'm talking about,
15    correct?
16  A. Yes.
17  Q. And that was a death of a citizen that happened
18    on May 10, 2013 in south Minneapolis, correct?
19  A. Yes.
20  Q. And you generated some reports as a result of
21    your work, correct, ma'am?
22  A. My partners did, yes.
23  Q. And did you also generate your own report?
24  A. Yes.
25  Q. Was it just one single report, ma'am?

8

1  A. That I recall, yes.
2  Q. Your name is mentioned in other reports because
3    you're in the field with folks that do the same
4    kind of work you do, correct?
5  A. Yes.
6  Q. For example there is a report of -- what does SB
7    mean for -- the supplement for SB Hummel, that's
8    a person's name, right? Isn't that Mr. Hummel's
9    name presumably?
10  A. SB Hummel?
11  Q. Sure. Let me show you. This is supplement 81.
12  A. Oh, it is forensic scientist Brenda Hummel.
13  Q. So obviously Brenda is a woman, correct?
14  A. Yes.
15  Q. So it says 4S, but maybe that's a typo? It is
16    really FS?
17  A. That is the way that CAPRS produces the title.
18  Q. So sometimes a forensic scientist maybe referred
19    to with the label FS and sometimes it might be
20    4S, correct?
21  A. Yes.
22  Q. That was my confusion, ma'am. I apologize.
23       Ma'am, the report indicates that you
24    went to the scene of this person's death,
25    correct?

9

1  A. Yes I did.
2  Q. Did you actually go in the basement and see the
3    body in place where the body was found to be
4    deceased?
5  A. Yes I did.
6  Q. Do you recall looking at the deceased person?
7  A. Yes.
8  Q. Can you tell me what you recall about seeing the
9    dead person? I mean, I would have asked you, but
10    that is something that you recall, correct?
11  A. Yes.
12  Q. And pictures were taken too, correct?
13  A. That's correct.
14  Q. Were pictures taken at your request or someone's
15    request?
16  A. That is what we do when we are requested out to a
17    crime scene is to take photos.
18  Q. Who took the photos?
19  A. I believe forensic scientist Hummel did.
20  Q. But you didn't take any pictures, correct, in the
21    basement?
22  A. Not at the scene.
23  Q. Did you take any pictures of the MP-5 firearm
24    that was found I think in the trunk of a squad
25    car?

10

1  A. Yes. It was in the trunk of the squad car and I
2    took pictures back at the lab.
3  Q. Did you take pictures at the scene of the MP-5,
4    ma'am?
5  A. No I did not.
6  Q. So the pictures you would have taken would have
7    been at the crime lab.
8  A. Correct.
9  Q. Did you secure the MP-5 or did someone else?
10  A. My partner B. Hummel did.
11  Q. Did you see the MP-5 taken out of the trunk of
12    the vehicle?
13  A. I was with her at the time when she took it out,
14    yes.
15  Q. Brenda Hummel.
16  A. Yes.
17  Q. So you remember seeing it, correct?
18  A. Correct.
19  Q. Can you tell me anything about the condition of
20    the gun?
21  A. That it was a big gun.
22  Q. Did you observe any blood on the gun, ma'am?
23  A. No I did not.
24  Q. Did you observe any blood on the gun at the crime
25    lab?

Lathrop Decl. Ex. 21

11

1  A.  I did not.

2  Q.  Did you test for blood in the crime lab?

3  A.  If we don't see any visible blood, then we

4      wouldn't test for blood.

5  Q.  So it is a true statement that there wasn't any

6      chemical testing or other testing done to

7      determine if blood was on the gun, correct?

8  A.  I did not do any chemical testing, no.

9  Q.  And the decision not do any chemical testing

10     would have been a decision you made.  That was

11     not the decision of any superior, correct?

12  A.  That was my decision because I did not see any

13      visible blood on the gun.

14  Q.  Did you look all over the gun?

15  A.  I did.

16  Q.  When you went in the basement did you see blood

17      at the crime scene?  Maybe that's not a fair

18      label.  Let me say it this way.

19              Did you see blood in the area near

20      where the deceased person's body was found?

21  A.  Yes I did.

22  Q.  Can you quantify that for me in any way?  Was it

23      a lot of blood, was it a little bit of blood?

24  A.  There was a lot of blood under his head and right

25      around him, but not in the whole laundry room.

12

1      There were areas of blood.

2  Q.  Did you see evidence of blood spatter?

3  A.  There was some blood spatter, yes.

4  Q.  Can you spell spatter for the court reporter,

5      please?

6  A.  S P A T T E R.

7  Q.  Because that's a word sometimes people think

8      splatter, but it is spatter, correct?

9  A.  That's correct.

10  Q.  What does that term mean, ma'am?

11  A.  What it means to me is just droplets of blood.

12      Small amounts of blood.

13  Q.  But that would be something that is within the

14      area of your scope of expertise, correct?

15  A.  I'm not a blood expert, but we do learn some

16      about the blood and what we can see at crime

17      scenes.

18  Q.  It is your belief and recollection that you saw

19      blood spatter, correct?

20  A.  Yes.

21  Q.  Do you remember where, ma'am?

22  A.  I recall seeing it on various items in the

23      laundry room.  I can't recall everything that had

24      the blood.  I would have to refer to pictures or

25      look at some pictures to know.

13

1  Q.  Sure.  The evidence in the case I think

2      indicates, ma'am, that this person's death

3      happened at approximately 3:31 p.m.  There maybe

4      some dispute as exactly when that happened.

5              Can you tell me what time you arrived

6      in the basement?

7  A.  I can't tell you exactly what time, but I can

8      tell you what time we were dispatched, or

9      approximately.

10  Q.  What time would that be?

11  A.  Around 4:00.

12  Q.  Do you know how long it took to get there?

13  A.  I don't recall.

14  Q.  Did you come with anyone?  Did you arrive with

15      anyone?

16  A.  Yes I did.

17  Q.  Who, ma'am?

18  A.  Forensic scientist Hummel and forensic scientist

19      Berget.

20  Q.  When you got to the scene did you overhear any

21      conversations or did you participate in

22      conversations about what happened with the MP-5

23      after the incident that resulted in this person's

24      death?

25  A.  Not that I recall.

14

1  Q.  So that's not something that was really the scope

2      of your investigation to find out where the gun

3      may have gone, correct?

4  A.  No.

5  Q.  It also would not have been your job to determine

6      who may have handled the gun, is that correct?

7  A.  Can you rephrase the question?

8  Q.  I said did your job include, ma'am, that day

9      trying to determine who had handled that

10      particular firearm?

11  A.  At that time, no.  We wanted to document the gun

12      where it was at the time that we arrived.

13  Q.  At some point in time did you attempt to document

14      what had happened with the gun after the time

15      that the person's death happened?

16          MR. CARTER:  Objection, vague,

17      objection to form.

18              Go ahead and answer.

19  BY MR. PADDEN:

20  Q.  Go ahead, ma'am.

21  A.  I would say that's more of the investigators that

22      get that information and then would relay that to

23      us.

24  Q.  Sure.  I thought you would tell me that, because

25      I'm thinking that -- and correct me if I'm wrong,

Lathrop Decl. Ex. 21

15

1   ma'am -- that your primary job was to secure
2   evidence -- or to assist with the process of
3   securing evidence and then to process that
4   evidence at the crime lab, is that fair?
5   **A.   At the scene and at the crime lab, yes.**
6   Q.   Sure.  And I'm really limiting -- I know there
7        was other evidence involved in this case.  I'm
8        going to ask you about that.  But I'm really
9        concerned right now with the MP-5.  Okay?
10            And when you found the MP-5 it was in
11       the trunk of a squad car, correct?
12  **A.   That's correct.**
13  Q.   And then it was forensic scientist Hummel that
14       apparently took it out of the vehicle, correct?
15  **A.   Yes she did.**
16  Q.   And you observed that.
17  **A.   Yes.**
18  Q.   And at that time you saw no visible blood on the
19       gun, correct?
20  **A.   No I did not.**
21  Q.   Can blood be on a gun like that, ma'am, that is
22       not visible to the naked eye?  Is that possible?
23           MR. CARTER:  Objection, calls for
24       speculation, incomplete hypothetical, also object
25       to the form of the question.

16

1   BY MR. PADDEN:
2   Q.   Can you answer that question, ma'am?
3   **A.   I didn't see any visible blood on the gun.**
4   Q.   Can there be trace amounts of blood on a gun?  Do
5        you know what that terms means?
6   **A.   Yes I do.**
7            MR. CARTER:  Same objection.
8   BY MR. PADDEN:
9   Q.   Isn't that possible?
10           MR. CARTER:  Same objection.
11           THE WITNESS:  I did not see any visible
12       blood on the gun.  And we took -- I got close to
13       it, I looked at it and I did not see any.
14  BY MR. PADDEN:
15  Q.   On any portion of the gun, correct?
16  **A.   I didn't see any blood, no.**
17  Q.   That's the reason you didn't do any chemical
18       testing for blood, correct?
19  **A.   That's right.**
20  Q.   In the crime lab, ma'am, was the next job in
21       terms of significant process the swabbing of the
22       gun?
23           MR. CARTER:  Objection to the form of
24       the question.
25  BY MR. PADDEN:

17

1   Q.   Would you agree with that?
2   **A.   Could you rephrase the question?**
3   Q.   Was the next significant act of processing that
4        particular item of evidence the swabbing of that
5        item of evidence?
6            MR. CARTER:  Objection to the form of
7        the question.
8            Go ahead.
9            THE WITNESS:  Could you rephrase the
10       question?
11  BY MR. PADDEN:
12  Q.   Did you swab the gun?
13  **A.   Yes I did.**
14  Q.   How did you go about doing that?
15  **A.   Well, I did wear a mask.  I know that I did**
16  **because it was a large item and I was going to be**
17  **taking multiple swabs.  I used -- I had gloves on**
18  **and underneath the gun I had clean paper.**
19  **I used sterile cotton swabs and I put a**
20  **little distilled water on the swab in order to**
21  **pick up any type of skin cells or any type of**
22  **DNA.**
23  Q.   So the swab has liquid on it, correct?
24  **A.   I did put distilled water on the swab, yes.**
25  Q.   So the swab has a liquid on it and then you take

18

1        the swab and you apply it to different portions
2        of the gun I take it?
3   **A.   I did swab each area separately with the swabs.**
4   **So I didn't take two swabs and swab the whole**
5   **gun.  I did different areas with two swabs.**
6   Q.   Why would you use two swabs?  Tell me why that
7        is.
8   **A.   The package contains two swabs and it has been**
9   **known or we have been told that the second is for**
10  **any defense if they want to retest it.  So we**
11  **just swab it with both.**
12  Q.   Sure.  Do you recall swabbing the barrel of the
13       gun?
14  **A.   I would have to refer to the report.**
15  Q.   Okay.  Supplement 103, correct?
16           MR. CARTER:  Can I just interject here?
17       Would you mind, Mr. Padden, if I just make a
18       standing objection to the references to the
19       documents based on the fact that we don't have a
20       copy of this document, I'm not exactly sure what
21       document it is, it is not being entered as an
22       exhibit?
23           So I will just make a standing
24       objection to the references to the documents.
25           MR. PADDEN:  That's fine.  I would note

Lathrop Decl. Ex. 21

19

1  for the record that this was received by your
2  office as part of the Rule 26 disclosures.  It is
3  identified as supplement 103, page 176 of 234.
4         There is a number at the top which is
5  our internal numbering system, Counsel, which
6  says S3-237, which means it is the third section
7  of the five groups of documents that were
8  provided and it is the 237th page.
9  BY MR. PADDEN:
10 Q.  Be that as it may, he made his objection.  We
11     understand his point.
12         Do you recognize this report, ma'am?
13 A.  I do.
14 Q.  And this is the report you prepared that you
15     referenced earlier, correct?
16 A.  My name is up on the top with my badge number,
17     yes.
18 Q.  Was the purpose of this report, ma'am, to
19     document the work you did on the evidence in the
20     crime lab?  Is that fair?
21 A.  Yes.
22 Q.  Can you tell me -- and feel free to refer to the
23     document if you like, ma'am.  I want to know what
24     portions of the MP-5 were swabbed.  That's what
25     I'm looking at now.

20

1         MR. CARTER:  I'm sorry, could you
2     repeat the question?
3  BY MR. PADDEN:
4  Q.  What portions of the MP-5 were swabbed?  You
5     understand that question, right?
6  A.  Yes.
7  Q.  Go ahead, ma'am.
8  A.  I swabbed the grips, trigger, trigger guard,
9     foregrips, stock.
10 Q.  Could you slow down a little, ma'am?  Excuse me.
11     I'm taking notes.  I mean, I know the court
12     reporter is getting it.
13         Foregrips and then you said stock.
14 A.  Stock, barrel and tactical light.
15 Q.  You do the swabbing and then those swabs are
16     submitted, at least in this case they were,
17     submitted to the Bureau of Criminal -- the BCA,
18     correct, the Minnesota BCA?
19 A.  That's where they test for the DNA, yes.
20 Q.  So the determination of whose DNA is on the gun
21     if anyone is done by the BCA, correct?
22 A.  Yes.  They do the testing of the DNA.
23 Q.  In your purpose or process -- in the process one
24     of the important steps is for you to swab the gun
25     and then it is the swabs that are submitted to

21

1  the BCA, correct?
2  A.  Yes.
3  Q.  And in this particular case, ma'am, are you able
4     to tell me if that's what the BCA received
5     regarding that gun was the swabs?  Would you know
6     that?
7  A.  I would say that they would receive the swabs
8     that I -- of evidence that I obtained.
9  Q.  The BCA doesn't for example receive the firearm.
10     As far as you know in this case they didn't get
11     the firearm, right?
12         MR. CARTER:  Objection to the form of
13     the question.
14         Go ahead.
15         THE WITNESS:  I don't know.
16 BY MR. PADDEN:
17 Q.  Who actually disseminates the evidence to the
18     BCA?  Is that you or someone else?
19 A.  That's not me.
20 Q.  Do you know who that is?
21 A.  It usually is an investigator.
22 Q.  You are not sure who it was in this particular
23     case?
24 A.  No.
25 Q.  When you say the barrel, ma'am, what portion of

22

1  the barrel would that be when you swab the barrel
2  of the MP-5?  Is it the entire barrel or how does
3  that work?
4  A.  I believe I swabbed the entire barrel of the
5     outside of the barrel.
6  Q.  All the way around?
7  A.  To the best of my knowledge, yes.
8  Q.  Because the barrel is kind of a circular part of
9     the nomenclature of a gun, right?
10 A.  Yes.
11 Q.  And then the stock, what's the stock?  I'm not
12     sure what that means.  I'm just trying to
13     clarify.
14 A.  The stock is usually the end that has kind of got
15     a butt end to it and that one extended.
16 Q.  So would that be the part of the gun presumably
17     that would be by a person's body if the gun was
18     being shot?  Is that what you mean?
19 A.  Yes.
20 Q.  And the barrel I presume would be the part of the
21     gun where a projectile would go out, correct?
22 A.  Correct.
23 Q.  So if you -- let's talk about the trigger guard.
24     If you swabbed the trigger guard would that be
25     all of the trigger guard, ma'am?

Lathrop Decl. Ex. 21

**23**

1  A.  To the best of my knowledge, yes.

2  Q.  Just so I understand this, when you swabbed the

3      trigger guard did you do it with one swab or two

4      swabs?

5  A.  I believe it was two swabs.

6  Q.  So after you do the swabbing what are the swabs

7      placed in if anything?

8  A.  They are placed in a glassine and then they are

9      placed inside an envelope which I seal with

10     evidence tape and then sign and date.

11 Q.  After the BCA does their analysis and makes

12     determinations in terms of the DNA analysis, is

13     that report submitted to you or do you not see

14     that?

15 A.  I don't see it.

16 Q.  So have you ever seen the lab reports from the

17     BCA in this case?

18 A.  No.

19 Q.  I'm going to shift gears here, ma'am.

20         When you saw the deceased body at the

21     scene, do you remember that image?  It is

22     probably not a pleasant image, but do you

23     remember seeing the person dead in place in the

24     basement?

25 A.  Yes.

**24**

1  Q.  Did you see blood on the person's face?

2  A.  Yes.

3  Q.  Did you see blood on the person's neck?

4  A.  I don't recall.  I would have to see some

5      photographs to refresh my memory.

6  Q.  That's fine.

7          Do you recall seeing marks on the neck

8      which appeared to be finger marks in blood?

9  A.  I don't recall.  I would have to see some

10     photographs to refresh my recollection.

11 Q.  When you saw the body would it be a true

12     statement that as far as you know the body hadn't

13     been moved at all from the time the person was

14     killed?

15 A.  That I don't know.  I know that when I arrived on

16     scene and the time that I was on scene until the

17     ME got there that the body did not move.

18 Q.  Fair enough.

19          How long were you in the basement,

20     ma'am?

21 A.  I don't recall.  I know we were there for many,

22     many hours.

23 Q.  There is a reference in Ms. Hummel's report, FS

24     Hummel's report regarding Sergeant -- it said FS

25     Jacobson and I.  So I guess it was you and Hummel

**25**

1      met with Sergeant Kingsbury, correct?

2  A.  That's correct.

3  Q.  And he was the person who told you where the gun

4      was?

5  A.  Yes.  He showed us where the gun was, yes.

6  Q.  And the report makes reference, it says under the

7      supervision of FS Jacobson I photographed the

8      firearms.  So were you supervising Hummel that

9      day?

10 A.  I was.  She was in training.

11 Q.  I see.  Was she new to the department?

12 A.  Newer.  I don't know how long she had been there,

13     but newer, yes.

14 Q.  And you actually observed her photograph -- it

15     says firearms here so perhaps there was more than

16     one firearm that was photographed?

17 A.  I was with her when she was photographing the

18     guns, yes.

19 Q.  When she photographed the MP-5 was that before or

20     after it was taken out of Kingsbury's vehicle?

21 A.  We always photograph before we touch or move

22     anything.

23 Q.  Do you know how many pictures were taken of the

24     MP-5?

25 A.  I don't know.

**26**

1  Q.  Was it more than one?

2  A.  Absolutely, yes.

3  Q.  When you take the pictures -- I take it the gun

4      was laying flat?

5  A.  I'm not sure if it was exactly flat in the trunk,

6      but --

7  Q.  Okay.  But what I'm asking is when the pictures

8      are taken do you then turn the gun over to take

9      the other side of the gun?  I'm just trying to

10     find out what your procedure is when you are

11     photographing a gun at a scene of a homicide.

12          MR. CARTER:  Objection to the form of

13     the question, vague and ambiguous as well.

14 BY MR. PADDEN:

15 Q.  Go ahead and answer if you can, ma'am.

16 A.  Can you rephrase the question?

17 Q.  I was just curious how you go about -- because

18     you told me it was a large gun, right?

19 A.  Yes.

20 Q.  Well, if it is flat in the trunk of a vehicle,

21     for example, don't you want to take it on the

22     other side, take pictures on the other side,

23     or do you just take it the way that it appears to

24     you at that time?

25 A.  I don't recall.  I would have to look at the

Lathrop Decl. Ex. 21

27

1   scene photos to refresh my memory.
2  Q.  That's fine.  But you don't have a memory as you
3      sit here today one way or the other if the gun
4      was turned over and if the other side was
5      photographed?
6          MR. CARTER:  Objection.
7  BY MR. PADDEN:
8  Q.  Or if in fact that happened?
9          MR. CARTER:  Objection to the form of
10     the question.
11 BY MR. PADDEN:
12 Q.  Go ahead, ma'am.
13 A.  I don't know if we did that at the scene, but I
14     do know at the crime lab we did get both sides of
15     the gun.
16 Q.  When the gun was photographed at the crime lab
17     who was present other than you?
18 A.  I believe FS Berget took some photos of the MP-5
19     as well as I did.
20 Q.  Was any processing of evidence done of objects in
21     the kitchen of the home, ma'am, the home where
22     the deceased person was found?
23 A.  I believe I processed -- I swabbed the handle of
24     the drawer where the homeowner had said there was
25     two knives in.

VERBATIM REPORTING (763)-493-4535

28

1  Q.  Were those swabs ever submitted to the BCA?
2  A.  That I don't know.
3  Q.  Was there a knife that was out in the kitchen?
4  A.  There were two knives out on the counter.
5  Q.  Were they swabbed?
6  A.  Yes.  Back at the lab.
7  Q.  Do you know if those were submitted to the BCA?
8  A.  I do not know.
9  Q.  Did you see any packaging for a tourniquet in the
10     kitchen area?
11 A.  I don't recall.  I would have to see some scene
12     photos.
13 Q.  Do you recall seeing a white powdery substance in
14     the kitchen area?
15 A.  Not in the kitchen area that I recall, no.
16 Q.  Was there a white powdery substance in any other
17     portion of the house?
18 A.  Not that I recall.
19 Q.  Was the sink of the kitchen processed at all in
20     any way to your knowledge?
21 A.  No.  It was not.
22 Q.  Did you obtain any information from any source
23     whatsoever that one of the involved officers had
24     attempted to clean up blood or clean himself in
25     the kitchen of the home?

VERBATIM REPORTING (763)-493-4535

29

1  A.  I never heard that.  I never received that
2      information.
3  Q.  When you entered the home, ma'am, how did you
4      enter the home?  Do you remember which door it
5      was?
6  A.  I don't recall.
7  Q.  In forensic scientist Hummel's report there is
8      reference to BLS in the report.  Does that mean
9      blood like substance, ma'am?
10 A.  Yes.
11 Q.  In the report there is reference to BLS was noted
12     on the exterior north side frame of the laundry
13     room door.  Can I show you that part of the
14     report, ma'am?  This is page 106 of 234,
15     supplement 81 prepared by Brenda Hummel.
16         Can you look at the second paragraph,
17     ma'am, there and I will ask you about that?
18 A.  That's what it says in the report, yes.
19         MR. CARTER:  Can I see that for a
20     second?
21 BY MR. PADDEN:
22 Q.  Would that be an example ma'am of blood spatter?
23         MR. CARTER:  Can you just hold on one
24     second?
25         MR. PADDEN:  Sure.

VERBATIM REPORTING (763)-493-4535

30

1          MR. CARTER:  Okay.
2  BY MR. PADDEN:
3  Q.  Would that be an example, ma'am, of blood
4      spatter?
5  A.  That I don't know the way it is written.  We
6      don't say spatter.
7  Q.  Sure.  Is it reasonable to assume that if that's
8      in the report that a photograph would have been
9      taken of that?
10 A.  Yes.
11 Q.  A lot of pictures were taken, correct?
12 A.  Yes.
13 Q.  And if blood is seen I'm assuming that is
14     something that your department wants to document,
15     correct?
16 A.  We document as much as we can, yes.
17 Q.  Does reading that portion of the report refresh
18     your memory as to where you saw blood spatter,
19     ma'am?
20 A.  Again, I don't know if it was spatter.  But it
21     does say that there was blood on the exterior
22     north side frame of the laundry room door.
23         MR. CARTER:  Just to clarify the
24     record, it says that there was BLS.
25         THE WITNESS:  Yes.

VERBATIM REPORTING (763)-493-4535

Lathrop Decl. Ex. 21

**Page 31**

1  BY MR. PADDEN:
2  Q.  So that would mean blood like substance, correct?
3  A.  Correct.
4  Q.  Did you see discharged cartridge casings when you
5      were in the home?
6  A.  Yes.  In the laundry room.
7  Q.  The report references the deceased male lying on
8      his left side.  Do you recall that?
8  Yes I do.
10 Q.  So I'm assuming that if he was lying on his left
11     side, the right side of the neck would have been
12     visible as you looked at the body?
13 A.  That is correct.
14 Q.  The photographs that were taken of the scene by
15     FS Hummel were done under your supervision,
16     correct?
17 A.  That is correct.
18 Q.  The swabbing of the MP-5 would have taken place
19     on May 15, 2013?
20 A.  Yes.  According to the report, yes.
21 Q.  I wanted to ask you another topic if I could,
22     ma'am.
23         Did you swab any portion of the
24     deceased person's body?
25 A.  No I did not.

VERBATIM REPORTING (763)-493-4535

**Page 32**

1  Q.  Do you know what gunshot residue testing is?
2  A.  I don't know a lot about it.
3         MR. CARTER:  Object to the form of the
4      question, vague and ambiguous.
5         Go ahead and answer.
6         THE WITNESS:  Can you rephrase the
7      question?
8  BY MR. PADDEN:
9  Q.  Do you know what gunshot residue testing is?
10        MR. CARTER:  Same objection.
11        THE WITNESS:  I am not sure what it all
12     consists of.
13 BY MR. PADDEN:
14 Q.  Ma'am, when I refer to the foreign science
15     portion of MPD should I call it division,
16     department?  What's the proper nomenclature?
17 A.  Of the crime lab?
18 Q.  Yes.  Should I call it the crime lab?
19 A.  Yeah.  There's what I work for is the crime lab,
20     yes.
21 Q.  Since you have worked at the crime lab for the
22     Minneapolis Police Department to your knowledge
23     has there ever been any gunshot residue testing
24     performed?
25        MR. CARTER:  Objection to the form of

VERBATIM REPORTING (763)-493-4535

**Page 33**

1      the question, vague and ambiguous.
2  BY MR. PADDEN:
3  Q.  Go ahead.
4  A.  I guess I don't know which kind of gunshot
5      residue testing you are referring to.
6  Q.  When you studied to become a forensic scientist
7      didn't you learn about testing that could be done
8      to determine for example if a person fired a gun?
9  A.  Yes.
10 Q.  So when I say GSR you know what I'm talking
11     about, right?
12        MR. CARTER:  Objection to the question.
13     She has already said she doesn't know what you
14     mean by GSR.
15 BY MR. PADDEN:
16 Q.  If I say gunshot residue testing, does that help?
17 A.  Well, I do, but there's different types of
18     testing that can be done.
19 Q.  Sounds good.  I'm just trying to establish if I
20     could, ma'am, does your crime lab do any GSR or
21     gunshot residue testing?
22        MR. CARTER:  Same objections.
23 BY MR. PADDEN:
24 Q.  Go ahead.
25 A.  I guess which part -- which GSR are you referring

VERBATIM REPORTING (763)-493-4535

**Page 34**

1      to?
2  Q.  I'm talking about swabbing the hands and the
3      wrists and the arms to determine if a person has
4      fired a gun.  That's what I'm talking about.
5  A.  Okay.  I do not know if our lab tests that.
6  Q.  To your knowledge has anyone in your lab ever
7      requested that from for example the medical
8      examiner?
9  A.  Not from the medical examiner, no.  Not that I
10     recall.
11 Q.  Has your crime lab ever requested that from
12     someone other than a medical examiner to do GSR
13     testing or gunshot residue testing?
14        MR. CARTER:  Objection to the form of
15     the question.
16        Go ahead.
17        THE WITNESS:  Can you rephrase that?
18 BY MR. PADDEN:
19 Q.  Here's the thing, ma'am.  Earlier in the case I
20     had taken a deposition of Sergeant Kjos who --
21     she told me she was one of the lead investigators
22     in the case.  You know who she is, right?
23 A.  Yes.
24 Q.  She told me in her deposition that the
25     Minneapolis Police Department doesn't do gunshot

VERBATIM REPORTING (763)-493-4535

**35**

1 residue testing.  That's basically what she told
2 me.
3     What I'm trying to find out is if you
4 know -- I'm not trying to cast aspersions on her
5 that she was dishonest or anything.  I'm not
6 saying that.
7     I'm just trying to find out from the
8 perspective of someone like you who works in the
9 crime lab if during your tenure in the crime lab
10 gunshot residue testing has ever been performed
11 or requested.
12     MR. CARTER:  Let me object to the form
13 of the question, also object to the question so
14 as far as it characterizes deposition testimony
15 that has already been given in this case.  We
16 don't have that testimony in front of us.  I
17 object that it is a mischaracterization of that
18 testimony potentially.  And also object to the
19 question being vague and ambiguous.
20     Go ahead and answer if you can.
21 BY MR. PADDEN:
22 Q. Go ahead, ma'am.
23 A. **You are asking specifically about swabbing hands.**
24 Q. Well, yes.  Because I'm assuming that if there
25 was gunshot residue testing someone in the crime

**36**

1 lab would have to do the swabbing maybe or maybe
2 it would be requested of the medical examiner to
3 do that.
4     That's what I'm trying to find out, if
5 you happen to know if the crime lab for the
6 Minneapolis Police Department ever does GSR
7 testing or gunshot residue testing.
8     MR. CARTER:  Objection to the form of
9 the question, vague and ambiguous.
10 BY MR. PADDEN:
11 Q. Go ahead, ma'am.
12 A. **As far as I'm aware we do not test for gunshot**
13 **residue on the hands.  That is not something our**
14 **lab does.**
15 Q. Can you remember when it was -- I take it at some
16 point in time you found out there was a claim in
17 this case that the deceased man had shot an
18 officer's gun.  You found out about that,
19 correct?
20 A. **I can say that I heard that, yes.**
21 Q. Do you happen to remember when that was, ma'am?
22 A. **No I don't.**
23 Q. Was to your knowledge consideration ever given by
24 the crime lab or the personnel in the crime lab
25 to request or endeavor to complete gunshot

**37**

1 residue testing in this case?
2     MR. CARTER:  Objection to the form of
3 the question, vague and ambiguous.
4 BY MR. PADDEN:
5 Q. Go ahead, ma'am.
6 A. **If you are talking again about swabbing the**
7 **hands, no.  We did not.**
8 Q. Is there any reason why that wasn't done, if you
9 know?
10 A. **From my knowledge it is not a reliable test.  It**
11 **doesn't mean that a person has not fired a gun or**
12 **has fired a gun.  They could be in a room, they**
13 **could have touched something that may have --**
14 **someone else had touched that had gunshot residue**
15 **on their hands.  It can be transferred very**
16 **easily.**
17 Q. And also the testing can result in a finding of
18 no gunshot residue on the body, correct?  That's
19 a possible outcome?
20     MR. CARTER:  Objection to the form of
21 the question, vague and ambiguous.  It is also an
22 incomplete hypothetical.
23 BY MR. PADDEN:
24 Q. Go ahead, ma'am.
25 A. **That I don't know because I don't know what is**

**38**

1 **done with the testing.  We simply would swab.**
2 Q. Fair enough.
3     During your tenure with the crime lab
4 with MPD have you ever done any swabbing for the
5 purpose of ascertaining if there is gunshot
6 residue on a person's body?  Have you ever done
7 that?
8     MR. CARTER:  Objection to the form of
9 the question, vague and ambiguous.
10 BY MR. PADDEN:
11 Q. Go ahead, ma'am.
12 A. **In my knowledge through the ten years I have been**
13 **there I do -- I have not swabbed as far as I**
14 **remember, ever swabbed someone's hand.**
15 Q. Have any of your peers in the crime lab done that
16 to your knowledge?  Again, just during the time
17 of your tenure with the department.
18     MR. CARTER:  Same objections, form and
19 vague and ambiguous.
20     THE WITNESS:  I believe someone in our
21 lab has swabbed for GSR on someone's hands.
22 BY MR. PADDEN:
23 Q. Do you remember when?
24 A. **No.**
25 Q. Do you remember who that was?

## Page 39

1  A.  No I do not.

2  Q.  You also swabbed the other firearms that were

3      involved in this case, ma'am?

4  A.  There was one other gun at the scene.  We clocked

5      in two guns.  One of the other guns at the scene,

6      I swabbed that one, yes.

7  Q.  So there was an MP-5 and then a handgun?

8  A.  Yes.

9  Q.  You don't recall two handguns being involved in

10     the case?

11 A.  That I don't know.  I believe my partner --

12     excuse me.  Someone else in the crime lab might

13     have collected another gun, but I was not a part

14     of that.

15 Q.  So your job didn't necessarily involve rounding

16     up all of the guns that were involved in the

17     case.  You just had access to two.

18 A.  That's --

19 Q.  I'm not saying there is anything wrong with that.

20     For whatever reason you were involved with the

21     processing of two of them, correct?

22 A.  That's correct.

23 Q.  Were those two at the scene of the homicide and

24     then later at the crime lab?

25 A.  Yes.

VERBATIM REPORTING (763)-493-4535

## Page 40

1  Q.  Did you test fire the MP-5 or is that someone's

2      else job?

3  A.  That's not my job.  We have a firearms section

4      that does that.

5  Q.  Fair enough.

6          That's all the question I have, ma'am.

7      Thank you.

8          MR. CARTER:  I don't have anything.  We

9      will read and sign.

VERBATIM REPORTING (763)-493-4535

## Page 41

1  STATE OF MINNESOTA )

                      ) ss.

2  COUNTY OF HENNEPIN )

3    I, Kristin Hoium, a Notary Public in and for the

4  County of Hennepin, in the State of Minnesota, do

5  hereby certify:

6    That the witness in the foregoing deposition named

7  was present at the time and place therein specified;

8    That the said proceeding was taken before me as a

9  Notary Public at the said time and place and was

10 taken down in shorthand writing by me;

11   That said proceeding was thereafter under my

12 direction transcribed into computer-assisted

13 transcription, and that the foregoing transcript

14 constitutes a full, true and correct report of the

15 proceedings which then and there took place;

16   That I am a disinterested third person to the said

17 action.

18 IN WITNESS THEREOF, I have hereto subscribed my hand

19 and affixed my official seal this 30th day of

20 September, 2015.

21          _____

            Kristin Hoium

22          Court Reporter

VERBATIM REPORTING (763)493-4535

## Page 42

1  DEPOSITION CORRECTION PAGE

   TITLE:  Franklin vs. Peterson

2  WITNESS:  Kristin Jacobson

   PAGE  LINE  DESIRED CHANGE/REASON FOR CHANGE

3  ____  ____  _____

4  ____  ____  _____

5  ____  ____  _____

6  ____  ____  _____

7  ____  ____  _____

8  ____  ____  _____

9  ____  ____  _____

10 ____  ____  _____

11 ____  ____  _____

12 ____  ____  _____

13 ____  ____  _____

14 ____  ____  _____

15 ____  ____  _____

17     _____

18

   Signature of Witness

19 Subscribed and sworn to before:

20     Notary Public _____County of

   Minnesota, _____ 20____

VERBATIM REPORTING (763) 493-4535

43

```
1              Kristin Hoium
           VERBATIM REPORTING
2      8906 ASHLEY TERRACE, SUITE 100
           Minneapolis, MN 55443
3        Telephone 763-493-4535
            Fax 763-493-4532
4

5
       September 30, 2015
6

7      Brian Carter
8      350 South 5th Street, Suite 210
       Mpls., MN  55415

9       Re: Franklin vs. Peterson

10     Dear Mr. Carter:

11          With regard to the above-entitled matter,
       enclosed please find the Reading and Signing
12     Certificate and transcript for the deposition of
       Kristin Jacobson.
13
            Please have her complete the Certificate, retain
14     a copy for your transcript, and send the original to
       Michael Padden.
15
            Thank you for your cooperation.  Feel free to
16     call me if you have any questions.

17                 Sincerely,

18

19                 Kristin Hoium

20     cc:  Mike Padden

21

22

23

24

25


           VERBATIM REPORTING (763) 493-4535
```

Lathrop Decl. Ex. 21