1

1

2

UNITED STATES DISTRICT COURT
3                    DISTRICT OF MINNESOTA

4    --------------------------------
                          CASE:  0:14-CV-01467-DWF-JSM
5
     Walter Louis Franklin, II,
6    Trustee for the Estate of
     Terrance Terrell Franklin,
7
              Plaintiff,
8
         vs.
9
     Lucas Peterson, individually
10   and in his official capacity;
     Michael Meath, individually
11   and in his official capacity;
     Janee Harteau, Chief of Police
12   for the Minneapolis Police Department,
     individually and in her official
13   capacity; and the City of Minneapolis,

14            Defendants.
     --------------------------------
15
                    DEPOSITION OF
16                  JANEE HARTEAU
                 September 17, 2015
17                  9:00 a.m.

18

19

20

21

22

23

24

25

              VERBATIM  REPORTING (763)-493-4535

Lathrop Decl. Ex. 27

2

```
 1          DEPOSITION OF JANEE HARTEAU, taken by and
        on behalf of Plaintiff, at 350 South 5th Street, Room
 2      210, Minneapolis, Minnesota, 55415 on September 17,
        2015, commencing at 9:00 a.m., before Kristin Hoium,
 3      Notary Public, State of Minnesota, County of
        Hennepin.
 4
                        *   *   *   *   *
 5
                        APPEARANCES
 6
            PADDEN LAW FIRM, PLLC
 7          BY:  Michael B. Padden, Esq.
            8687 Eagle Point Blvd.
 8          Lake Elmo, Minnesota  55042
            Appeared for Plaintiff
 9
            CITY OF MINNEAPOLIS OFFICE OF CITY ATTORNEY
10          BY:  Timothy Skarda, Esq.
            350 South 5th Street
11          Room 210
            Minneapolis, Minnesota  55415
12          Appeared for the City of Minneapolis

13          ALSO PRESENT:  R. Steven Rogers

14

15                      I N D E X

16      EXAMINATION BY:                    PAGE:
        Mr. Padden                         3
17

18

19

20

21

22
            *** READING AND SIGNING NOT WAIVED ***
23          *** ORIGINAL TRANSCRIPT IN POSSESSION
                OF ATTORNEY MICHAEL PADDEN ***
09:01:02 24

09:01:02 25
```

VERBATIM  REPORTING  (763)-493-4535

Lathrop Decl. Ex. 27

3

                    JANEE HARTEAU,
1
2    a witness in the above-entitled action, having
3    been duly sworn, deposes and says as follows:
4                    EXAMINATION
5  BY MR. PADDEN:
6  Q.  Chief Harteau, my name is Mike Padden.  I'm an
7      attorney who represents Walter Franklin in this
8      lawsuit.  I am going to be taking your deposition
9      today.  I don't think it will be appreciably
10     long.  I think we will probably be done in an
11     hour and a half to two hours.  So certainly well
12     before noon.  Okay?
13 A.  Okay.
14 Q.  Have you had a chance, Chief, to review -- is it
15     okay if I address you as Chief, ma'am?
16 A.  Sure.
17 Q.  Have you had a chance to review any documents in
18     preparation for this deposition?
19 A.  I did review my interrogatory.
20 Q.  Did you have a chance to review anything else?
21 A.  No.
22 Q.  Have you ever had a chance, Chief, to read the
23     complaint for this lawsuit?
24 A.  At one time, yes.
25 Q.  Would that have been near the time that the

4

1      lawsuit was commenced perhaps?
2  A.  Most likely.
3  Q.  You haven't looked at that since?
4  A.  No.
5  Q.  Have you had a chance, Chief, to read any of the
6      depositions of any MPD personnel that I have
7      taken to date?
8  A.  No.
9  Q.  I wanted to ask you first of all some questions
10     about your background.  I know you have an
11     impeccable history and to become a chief of
12     police in a big city like this isn't easy and I
13     have a pretty good idea what it is but I just
14     have to make a record.  Okay?
15 A.  Okay.
16 Q.  How long have you been with the police
17     department, ma'am?
18 A.  29 years in February.
19 Q.  Have you ever worked for any departments other
20     than Minneapolis?
21 A.  No.
22 Q.  What is your educational background?
23 A.  I have an associate's degree in law enforcement,
24     a bachelor's degree in police science, a master's
25     degree in public safety administration.

5

1  Q.  Where did you get your bachelor's degree?
2  A.  St. Mary's University.
3  Q.  Where is that located?
4  A.  I went to the Twin Cities campus.
5  Q.  And then where did you secure your master's
6      degree?
7  A.  Same.  St. Mary's.
8  Q.  Are you a Minnesotan?  Were you born and raised
9      in Minnesota?
10 A.  I was born in Minnesota.  I was raised in
11     California for part of my life and Duluth for the
12     other part.
13 Q.  Where did you go to high school?
14 A.  Duluth Denfeld.
15 Q.  Is that high school still around?
16 A.  Yes.
17 Q.  What year did you graduate?
18 A.  1982.  A couple years ago.
19 Q.  What is your age, ma'am?
20 A.  I'm 50.
21 Q.  I want to talk a little bit, Chief, about your
22     history with the department and how your duties
23     changed over the years.  Because it is my
24     understanding that throughout the course of your
25     time with the department there were various

6

1      promotions, correct?
2  A.  Correct.
3  Q.  What was the first work you did for the
4      department?
5  A.  It was a patrol officer in various precincts.
6  Q.  Which ones?
7  A.  Fourth precinct and then third precinct.
8  Q.  I'm not very good with math.  What year would you
9      have started with the department?
10 A.  1987.
11 Q.  How long did you do patrol work?
12 A.  About nine years total.  I left to go to
13     narcotics.  I worked undercover narcotics in the
14     early '90s.  Went back to the street.  I went
15     back to the third precinct I believe.
16 Q.  What time frame would you have worked narcotics?
17 A.  Guessing, '89 to '91.  It was two years.
18 Q.  And then after that?
19 A.  I was in the third precinct for probably five and
20     then I was reassigned to organized crime.
21 Q.  When you were reassigned to organized crime what
22     was your rank?
23 A.  I was an officer still.
24 Q.  At what point was it, Chief, that you received a
25     promotion?

Lathrop Decl. Ex. 27

7

1    A.   I believe it was 1998 I was promoted to sergeant.
2    Q.   Would you have been affiliated or associated with
3         a precinct at that time?
4    A.   No.  I was actually assigned to the Minnesota
5         Gang Strike Force.
6    Q.   How long were you with the Minnesota Gang Strike
7         Force?
8    A.   Only about five months and then I was promoted.
9    Q.   To what?
10   A.   Sergeant.
11   Q.   Is that the normal track for an officer?  Would
12        the next step in the hierarchy of the department
13        be the sergeant level?
14   A.   Yes.
15   Q.   What would typically be after sergeant?
16   A.   Lieutenant.
17   Q.   How long were you a sergeant for?
18   A.   I believe six years.
19   Q.   During the time you were a sergeant, Chief, did
20        you supervise Officer Muro?
21   A.   Not to my knowledge.
22   Q.   What about Officer Meath?
23   A.   No.
24   Q.   What about Sergeant Stender?
25   A.   No.

8

1    Q.   What about Officer Durand?
2    A.   No.
3    Q.   What about Officer Peterson?
4    A.   No.
5    Q.   I want to -- I will get back to your career moves
6         in a second here, but I'm going to talk about
7         these officers.
8              The investigation that I have read
9         about this incident was that five officers
10        primarily interacted directly with Terrance
11        Franklin in the basement in south Minneapolis
12        which is where he died.  You would agree with
13        that, correct?
14   A.   Correct.
15   Q.   I'm trying to get an idea -- I know this is a
16        police department with a lot of employees and I
17        don't know if a chief is expected to know every
18        single employee.  I mean, you probably don't know
19        every single employee that works for you, do you?
20   A.   Depends on what level, but no.  I can't possibly
21        know everybody.
22   Q.   Did you know Officer Muro before this incident in
23        May of 2013?
24   A.   I'm not even sure I knew of him actually.
25   Q.   What about Officer Meath?

9

1    A.   Officer Meath I was -- I was aware of him.  I
2         believe at one point in time he was assigned to
3         the first precinct.
4    Q.   Did you ever work in the field with him?
5    A.   I don't recall directly.  I was the inspector
6         when he was assigned to the precinct I believe.
7    Q.   Would you be in a position to tell me anything
8         about his police work or was it not enough to be
9         able to say?
10   A.   No.  I don't have enough knowledge.
11   Q.   What about Sergeant Stender, did you know him
12        before May of 2013?
13   A.   I did.  I just knew of him as a K9 officer in
14        passing on calls.
15   Q.   Fair enough.
16              What about Officer Durand?
17   A.   I don't recall even knowing him.
18   Q.   Did you know Officer Peterson at all before May
19        of 2013?
20   A.   Same.  I knew of him.
21        There was -- in 2006 there was a matter that
22        received a fair amount of publicity going into
23        2007 where he had been involved with let's just
24        say a dispute with a couple of people.  One was
25        Derrick Simmons, one was named Nancy Johnson and

10

1         the incident was apparently depicted on a video,
2         a city owned street video.  I think it is called
3         Safe Zone perhaps?
4    A.   Safe Zone, yes.
5    Q.   And there was a contention in this case that what
6         he had said about the woman involved, Nancy
7         Johnson, was false.  That he prepared a false
8         police report.  That was an accusation that was
9         made.
10              Do you remember anything about that
11        case or know of that case as of May of 2013?
12   A.   I don't recall.
13   Q.   What year was it that you would have been
14        promoted to sergeant, Chief?
15   A.   To sergeant or from sergeant?
16   Q.   You were a sergeant at one point and then I
17        assume that you were promoted to lieutenant at
18        some point?
19   A.   Correct.
20   Q.   What year would that have been?
21   A.   2004.
22   Q.   As a lieutenant did you supervise a certain
23        number of employees, ma'am?
24   A.   Yes.  I don't recall how many.
25   Q.   I'm just trying to get an idea of how that would

Lathrop Decl. Ex. 27

11

1   work.  As a lieutenant are you supervising patrol
2   officers or does it work differently?
3   **A.   Generally as a lieutenant you are supervising**
4   **both sergeants and patrol officers.**
5   Q.   How long where you a lieutenant?
6   **A.   Two years.**
7   Q.   Is it reasonable to assume that during those two
8   years, Chief, you did not supervise or don't
9   recall supervising the five officers I mentioned
10  before?
11  **A.   Correct.**
12  Q.   During your tenure with the department, Chief,
13  have you ever had any direct supervisory
14  authority over the SWAT team?
15  **A.   No direct authority.**
16  Q.   Did you have any involvement with the SWAT team
17  at all -- strike that.
18        You became chief I think in was it
19  January of 2013?
20  **A.   December of 2012.**
21  Q.   I apologize.  December of 2012.
22        Up until that point, Chief, I'm just
23  trying to get an idea if you would have had any
24  involvement whatsoever with the SWAT team during
25  your tenure with the department.

12

1   **A.   Early in my career I was a hostage negotiator as**
2   **an officer.  None of those roles are a full-time**
3   **position.  So it was a role I took based on need.**
4   **As deputy chief of patrol I was the**
5   **direct supervisor of the captain or commander**
6   **that oversaw SWAT, but no -- that's as close as I**
7   **was to SWAT.**
8   Q.   When was that that you were the supervisor for
9   the commander of SWAT?
10  **A.   2009.**
11  Q.   It doesn't sound -- other than the time that you
12  were a hostage negotiator it doesn't sound like
13  you really worked with SWAT in the field other
14  than that time frame?
15  **A.   Correct.**
16  Q.   What time frame would you have been a hostage
17  negotiator?
18  **A.   About 1988 to early '90s.**
19  Q.   So the work of Officers Muro, Meath, Stender,
20  Durand and Peterson, their work in the field as
21  SWAT officers is not something you would have had
22  direct knowledge of up until May 10 of 2013
23  during your time at the department?
24  **A.   Correct.**
25  Q.   When you became chief, Chief Harteau, did that

13

1   change at all?  I mean, obviously as a chief of a
2   department this large you have a lot of duties.
3   I know that and I get that.
4         But when you became chief up until May
5   of 2013 did you really interact with the SWAT
6   team at all, give them any pep talks or talk to
7   them about what you expected of them or anything
8   of that nature from the time that you became
9   chief in December of 2012 -- and I know, ma'am,
10  that's a short period of time.  I get that.  But
11  I was just curious if there was any direct
12  involvement with SWAT during that time frame.
13  **A.   No.  I utilized my Assistant Chief Matt Clark at**
14  **that time in that capacity.  One of the reasons**
15  **he was selected for assistant chief was he had**
16  **experiences I did not have.  And one of those**
17  **would be as a SWAT commander.**
18  Q.   Is there more than one assistant chief?
19  **A.   No.**
20  Q.   What is Kris Arneson's position?
21  **A.   She is an assistant chief today.**
22  Q.   So initially Matt Clark was assistant chief?
23  **A.   Correct.**
24  Q.   Why is he no longer assistant chief?
25  **A.   He is the chief of the University of Minnesota.**

14

1   Q.   So he took another position.
2   **A.   Correct.**
3   Q.   In terms of the hierarchy of the department in
4   May of 2013, correct me if I'm wrong, would Kris
5   Arneson have been second in rank to you at that
6   time frame?
7   **A.   No.**
8   Q.   When did she take that position?
9   **A.   July of 2015.**
10  Q.   Did Assistant Chief Matt Clark have any
11  involvement at all in any investigation of the
12  Terrance Franklin incident?
13  **A.   Not to my knowledge.**
14  Q.   Was he involved in any way to your knowledge?
15  **A.   Not to my knowledge.**
16  Q.   In an investigation like that, Chief, are you the
17  person who's the ultimate authority for how the
18  investigation is conducted?
19  **A.   I guess in every investigation I would be the**
20  **ultimate authority.  We have certain processes**
21  **for critical incidents and other investigations.**
22  Q.   Is it -- again, I'm going to speak in terms of
23  May of 2013.  Would a situation where officers
24  are shot and a suspect is killed, would that be
25  considered a critical incident?

Lathrop Decl. Ex. 27

15

1  A.  Yes.

2  Q.  Is the norm the way that would work, Chief, is

3      you assign people to conduct the investigation

4      and then they report to you ultimately?

5  A.  Ultimately.

6  Q.  But, I mean, I always think of that saying of the

7      former president Harry Truman the buck stops here

8      kind of a thing.

9          I mean, ultimately you are the overseer

10     of the investigation, is that reasonable?

11 A.  I'm the overseer but I would say that I have many

12     levels involved in the investigation that have

13     expertise I do not and I rely heavily on their

14     decision making.

15 Q.  Do they have to come to you for permission to

16     conduct certain types of investigation in a

17     critical incident?

18 A.  No.

19 Q.  So they have authority to make those kinds of

20     decisions?

21 A.  Correct.

22 Q.  Let me give you an example.  I will ask you more

23     about this later.

24         If there is an issue where gunshot

25     residue testing might be appropriate depending on

16

1      the circumstances of a particular critical

2      incident, I take it they wouldn't need to seek

3      your permission to proceed with that kind of

4      testing?

5  A.  Correct.

6  Q.  Would they have the option to do that though?

7  A.  To do what?

8  Q.  To seek permission from you.  Let's say for

9      whatever reason it is a gray area as to whether

10     they should do something.  Can they come to you

11     and say, Chief, we would like to do X, is it okay

12     if we do that?

13 A.  Potentially that's always an option I guess.

14 Q.  Does that ever happen, that type of thing?

15 A.  I can't think of a time off the top of my head.

16 Q.  So you have people under you that have the

17     expertise to decide what needs to be done that's

18     appropriate, is that fair?

19 A.  Correct.

20 Q.  After the Terrance Franklin incident happened,

21     Chief, did you give any consideration to having

22     an outside agency conduct this investigation?

23 A.  I gave consideration to having an outside

24     investigation immediately when I became chief.

25 Q.  So when you first became chief you were thinking

17

1      in terms of the prospect of perhaps having

2      outside agencies investigate critical incidents?

3  A.  Correct.

4  Q.  Did you attempt to make that happen?

5  A.  Yes.

6  Q.  When did you do that?

7  A.  Throughout 2013 we had had conversations with the

8      BCA to work out an agreement on how that would

9      occur.

10 Q.  I think there was a fair amount of publicity

11     about your attempts in that regard, correct?

12 A.  Yes.

13 Q.  I'm familiar with that.

14         After the Franklin incident happened

15     did you endeavor to have an outside agency

16     conduct the investigation?

17 A.  I don't understand your question.

18         MR. PADDEN:  Can you read it back,

19     Kris?

20         (At this time the requested portion of

21     the record was read back by the Court Reporter.)

22         THE WITNESS:  I'm not sure if you mean

23     --

24 BY MR. PADDEN:

25 Q.  Is the word endeavor a problem?

18

1  A.  I'm not sure if you mean the Franklin

2      investigation or all investigations.

3  Q.  This particular question was the Franklin

4      investigation.

5  A.  No.

6  Q.  Is there any reason why you didn't attempt to do

7      that?

8  A.  I had no agreement at that time.

9  Q.  So in your mind it just wasn't feasible or

10     possible?

11 A.  Correct.

12 Q.  Are you still an advocate of that type of

13     investigation if it is a critical incident to

14     have an outside agency investigate?

15 A.  Yes.  I think it is important for perception.

16 Q.  Chief, I wanted to read you a couple quotes from

17     a book I read about how police operate in these

18     types of issues.  This was written by a man who's

19     a former police chief.  I want to see if you

20     agree with this.

21         What he said was -- this is a guy named

22     David Cooper who used to be an employee of the

23     Minneapolis Police Department.  Are you familiar

24     with him?

25 A.  Yes.

Lathrop Decl. Ex. 27

19

1  **Q.** He said that no organization can be honest with
2     the public if it is not honest with itself.
3     Leaders need to make a conscious decision to
4     support transparency and create a culture of
5     candor. And then he says and if we are serious
6     about transparency and developing a culture of
7     candor within the police it has to begin from the
8     top.
9        It sounds to me like you would agree
10    with that.
11 **A.** Absolutely.
12 **Q.** And he also goes on to say this especially
13    includes secrets about mistakes. And he says
14    that leaders who can admit mistakes will tend to
15    encourage others in the organization to own up to
16    their own mistakes so that they aren't made
17    again.
18       Would you agree with that?
19 **A.** Yes.
20 **Q.** Chief, there was -- in the materials I received
21    on the investigation there were newspaper stories
22    in the investigation. Do you know why that was?
23 **A.** **I don't know what you are specifically referring**
24    **to.**
25 **Q.** Well, during the course of the case your lawyers

20

1     produced for me something called Rule 26
2     disclosures. It was a big, massive amount of
3     paperwork. And as part of the disclosures there
4     were newspaper articles that were included which
5     I therefore assume were part of the official
6     investigation.
7        Were you aware of that?
8  **A.** **Aware of what?**
9  **Q.** The fact that newspaper stories were in the
10    official records of the case.
11 **A.** **No. I'm not personally aware of that.**
12 **Q.** Have you reviewed any of the records that were
13    produced for me in discovery, Chief, other than
14    the fact that you answered some written discovery
15    that I served upon you?
16 **A.** **Just that and then two press releases. My press**
17    **releases.**
18 **Q.** Fair enough.
19       Did you review any documents about the
20    Green Bay incident concerning former Officers
21    Thole and Powell?
22 **A.** **No, sir.**
23 **Q.** Chief, there was an editorial that appeared in
24    the Star Tribune -- again, this was a document
25    that was produced by your attorneys to me. And

21

1     it said that the motto of the department is
2     commitment, integrity and transparency. Would
3     you agree with that?
4  **A.** **No. Those are our core values. It is not a**
5     **motto.**
6  **Q.** Can you look at that? I'm reading from something
7     that you don't see so I want you to --
8  **A.** **Did you want me to read the whole thing or just**
9     **that line?**
10 **Q.** I wanted you to read the first couple paragraphs
11    if you would be so kind. You are certainly
12    welcome to read the whole thing, but I'm more
13    interested in the first couple of paragraphs.
14 **A.** **Okay.**
15 **Q.** Those would be core values, Chief?
16 **A.** **Correct.**
17 **Q.** Fair enough.
18       And one of the things that the paper
19    said you said -- and this editorial was written
20    on May 21st. It is only 11 days after the May
21    10th Franklin incident. It doesn't quote you but
22    it said that -- this is information they are
23    attributing to you but it's not a direct quote.
24    So I want to be fair with you and let you know
25    that it is not quoted.

22

1        It says Harteau says she has confidence
2     that her investigators and the county attorney
3     will review all available evidence, not just the
4     accounts from officers, but if necessary she will
5     seek an outside review.
6        And this was referring -- this
7     editorial was about the Franklin incident. Okay?
8     Is that accurate? Did you in fact say that?
9  **A.** **I don't recall saying that.**
10 **Q.** Do you want me to show it to you?
11 **A.** **Sure.**
12 **Q.** I just highlighted it in orange but feel free,
13    Chief, to read the whole thing if you would like.
14 **A.** **Okay.**
15       MR. SKARDA: Can we identify the
16    document? Is there a Bates number or anything on
17    it?
18       MR. PADDEN: There is, Counsel. I have
19    my own numbering system. Maybe I will just note
20    this for the record, Tim.
21       When I received the records they were
22    broken down into five sections. This particular
23    document was page 664 and page 665 of the second
24    section of the records you produced for me, but I
25    don't see a Bates stamp on it. However, the

Lathrop Decl. Ex. 27

23

1    title of the article is "Minneapolis Police
2    Chief's Troubling Lack of Transparency".  That's
3    their title, not mine.  It is written by the Star
4    Tribune and it's article by Star Tribune
5    editorial May 21, 2013, 7:50 p.m.
6         MR. SKARDA:  Thank you.
7    BY MR. PADDEN:
8    **Q.**  When you looked at the second page of this
9         document and the orange part that I highlighted,
10        do you recall saying that or saying something to
11        that effect?
12   **A.**  **The trouble with the article is many things are**
13        **either taken out of context or not associated**
14        **with the right time.**
15             **But I would say that if I look at that**
16        **sentence, the components of it, obviously I have**
17        **said that at some point in time.**
18   **Q.**  I mean, it seems to me you certainly made clear
19        in the beginning presumably that all available
20        evidence regarding the case would be looked at.
21   **A.**  **Yes.**
22   **Q.**  And it does say here though but if necessary she
23        will seek an outside review.  Did you say
24        something like that at some point?
25   **A.**  **I'm not sure if I was referring to the traffic**

24

1         **accident.**
2    **Q.**  I'm just curious what the if necessary part
3         means.  Does that mean if there is something that
4         comes out in the investigation and it is
5         troubling that you are more apt to send it to an
6         outside agency?
7    **A.**  **I don't know that I said that, the if necessary.**
8    **Q.**  You don't recall that?
9    **A.**  **Yeah.  I can't attribute that to me.**
10   **Q.**  Regardless of whether you said it or not is it
11        accurate?
12   **A.**  **Is what accurate?**
13   **Q.**  The notion that if necessary you would send the
14        case, the investigation, that you would seek an
15        outside review?
16   **A.**  **If there was something specific I guess that I**
17        **needed some outside support in, that would be an**
18        **option.**
19   **Q.**  Fair enough.
20             And looking back at the investigation
21        was all evidence, available evidence reviewed?
22   **A.**  **To my knowledge.**
23   **Q.**  I want to ask you about the video that was posted
24        on YouTube by a man named Jimmy Gains.  When I
25        received the information from your attorneys we

25

1    learned that the clip that Mr. Gains had posted
2    on YouTube did in fact become part of the
3    investigation.  In other words it is part of the
4    file, so to speak.
5         And I can't tell from looking at the
6    materials I have, Chief, if something was done
7    with that video other than being physically
8    placed into evidence.
9         To be fair, ma'am, we have taken his
10   deposition and when we took his deposition he
11   brought the phone that he actually recorded the
12   event with and it was learned that he had five
13   so-called clips, separate clips of the event.
14   Okay?
15   **A.**  **Okay.**
16   **Q.**  And your lawyers went ahead and secured those
17        clips off of the phone and then they were kind
18        enough to give me a jump drive.  So each side has
19        all of the clips that the man took.
20             The reason I say that to you, Chief, is
21        because it was made clear in his deposition that
22        not all of the clips were posted on YouTube.
23        Okay?
24   **A.**  **Okay.**
25   **Q.**  Have you had a chance, Chief, to see any of those

26

1    clips?
2    **A.**  **Other than the one?**
3    **Q.**  Other than the one.
4    **A.**  **No.**
5    **Q.**  Do you recall when it was, Chief, that you first
6         found out that a recording existed that may have
7         depicted part of the event?
8    **A.**  **It was close to the time that I issued the press**
9         **release, but I don't know the exact.**
10   **Q.**  Which press release was that, ma'am?
11   **A.**  **May I look at them?**
12             **The May 30th, 2013 press release.**
13   **Q.**  Did you issue the press release, Chief, because
14        of that video?
15   **A.**  **Correct.**
16   **Q.**  Do you mind if I look at that?
17             MR. PADDEN:  Is that okay, Counsel?
18             MR. SKARDA:  Yes.  That's an exhibit
19        that we provided.  What's the exhibit number on
20        it?
21             MR. PADDEN:  Exhibit L.
22             MR. SKARDA:  Which we provided in
23        discovery.
24             MR. PADDEN:  I think I have seen this.
25        I just don't have it with me today.  I apologize.

Lathrop Decl. Ex. 27

27

1          THE WITNESS:  The second page is not
2      part of that.
3  BY MR. PADDEN:
4  Q.  The second page is entitled statements, Chief?
5  A.  I don't know what that is.
6  Q.  You don't know what that is?
7  A.  No.
8  Q.  Fair enough.
9          I'm deducing from this media release on
10     May 30th, 2013, Chief, that you had a chance to
11     watch and listen to the video clip?
12  A.  Several times, yes.
13  Q.  How did you go about doing that?
14  A.  First I watched it on my computer at my desk.
15  Q.  Was anybody with you at the time?
16  A.  Yes.
17  Q.  Who?
18  A.  Assistant Chief Clark, potentially Deputy Chief
19     Glampe initially.  There could be one other
20     person.  I'm just not sure.
21  Q.  Did you turn the volume up?
22  A.  I did.
23  Q.  At any time to your knowledge did you or anyone
24     in the hierarchy of the department request that
25     the audio of the video be enhanced?

VERBATIM REPORTING (763)-493-4535

28

1  A.  Yes.  I did.
2  Q.  When did that happen, Chief?
3  A.  Immediately.  I asked Deputy Chief Glampe to see
4      if the crime lab could enhance it.  I had asked
5      Cindy Barrington who was my public information
6      officer at the time --
7  Q.  Can I back up a little, Chief?  I'm sorry.
8          When you say immediately, immediately
9      in relation to what?  Immediately in relation to
10     the time of the incident or what do you mean?
11  A.  When I first listened to and watched the video.
12  Q.  Was that May 30th?
13  A.  I'm not sure.
14  Q.  I'm just trying to figure out if you would have
15     been aware of the existence of that video before
16     May 30th.  You are not sure?
17  A.  I don't recall when I knew.
18  Q.  I apologize for interrupting you.  You were
19     speaking about the acts involved with enhancing
20     the audio.
21  A.  First Deputy Chief Glampe asked the crime lab to
22     see what their capabilities were.  I was aware
23     that this had been played on either news or radio
24     and so I asked my public information officer
25     Cindy Barrington if any of those news stations

VERBATIM REPORTING (763)-493-4535

29

1      had the ability to enhance it so I could hear it
2      enhanced.
3  Q.  Did that ever happen, Chief?
4  A.  Yes.
5  Q.  Who did that, the enhancement, in terms of the TV
6      stations?
7  A.  The enhancement didn't occur.  Nobody had the
8      capabilities to do that.
9  Q.  I see.  So you looked into the issue of
10     attempting to enhance the audio, and
11     unfortunately the conclusion was that it was not
12     possible.
13  A.  Correct.
14  Q.  When that event happened, the event of listening
15     to it and ascertaining what you believed you
16     heard, was that documented in any way, Chief?  In
17     other words did you do a report?
18  A.  No.
19  Q.  Did anybody to your knowledge do a report?
20  A.  No.
21  Q.  Was there ever an attempt to associate the sounds
22     with time on the video?  The reason I ask is
23     because I think that when we started playing it
24     early on it a feature, at least the way that
25     we were playing it, that on the bottom left of

VERBATIM REPORTING (763)-493-4535

30

1      the screen seconds would elapse.
2  A.  Yes.
3  Q.  So you would have the ability -- it is like if
4      you heard something you thought was important you
5      could say that happened at second 14 or something
6      like that.
7          Did you endeavor to record things in
8      that way or take any notes?
9  A.  As part of my press release I did look at the
10     time and what was said.  What I heard.
11  Q.  Fair enough.
12          I know you didn't do a report, but did
13     you ever document anything on paper?
14  A.  I don't know that I would.
15  Q.  I just think -- I'm just thinking out loud here.
16     I would think that that would be an aid to assist
17     you with being able to remember if you gave a
18     press conference as to what you heard and at what
19     time.  But you don't recall doing that?
20  A.  No.
21  Q.  As you sit here today, Chief, can you tell me
22     what you heard on the video?
23  A.  Officer shot is the only thing I can remember.
24  Q.  And you did provide a response to me in Requests
25     for Admissions that -- and I had listed various

VERBATIM REPORTING (763)-493-4535

Lathrop Decl. Ex. 27

31

1  quotes.  And you said that you didn't hear any of
2  those except you did hear officer shot, correct?
3  A.  Correct.
4  Q.  Is that the only thing you heard on the video,
5  ma'am?
6  A.  It is the only thing I recall hearing
7  specifically.
8  Q.  And so you would have been aware of that for sure
9  on May 30th but perhaps sooner?
10 A.  Correct.
11 Q.  And did you ever -- to your knowledge did your
12 investigators ever attempt to contact the person
13 who articulated officer shot or who appeared to
14 articulate officer shot?
15 A.  I don't know.
16 Q.  You may not have ordered that but do you know if
17 anybody attempted to figure that out?
18 A.  I don't recall at this point.
19 Q.  Fair enough.  I know it was a long time ago.
20      Chief, since I'm on that topic, would
21 your recall of the details of this matter be
22 better back near the time of the incident than it
23 would be here we are two years and four months
24 later?
25 A.  Yes.

VERBATIM REPORTING (763)-493-4535

32

1  Q.  Fair enough.
2      To your knowledge did anybody with the
3  department ever attempt to ascertain if shots
4  could be heard on the so-called Gains video?
5  A.  I don't know about investigators.  I listened to
6  everything that was on that video several times.
7  Q.  I know you did, ma'am.  I appreciate that.
8      Did you ever hear any shots?
9  A.  I don't recall.
10 Q.  If you did hear shots is that something you think
11 you would have noted?
12 A.  Yes.
13 Q.  And you don't recall ever commenting on hearing
14 shots in the press conference, right?
15 A.  Correct.
16 Q.  To your knowledge, Chief, did the investigators
17 ever address the issue in the investigation of
18 the time frame between the time that the MP-5
19 discharged and the time that Franklin was killed?
20 Do you know if that was ever addressed in the
21 investigation?
22 A.  I would have to look at the case file.  I don't
23 know that level of detail.
24 Q.  Is it reasonable to assume that nobody ever
25 specifically spoke with you about that topic?

VERBATIM REPORTING (763)-493-4535

33

1  A.  Yes.
2  Q.  Did the department, Chief -- again, I know you
3  are the chief and you have a lot of duties and
4  you have a lot of people under you that were
5  investigating this.  I can only ask what your
6  knowledge is.
7      Did anybody ever suggest to you that
8  the videographer be contacted and interviewed?
9  A.  Nobody suggested that to me.
10 Q.  Did you ever order that?
11 A.  No.
12 Q.  Did anyone ever suggest to you that the
13 videographer's phone be secured?
14 A.  No suggestion to me, no.
15 Q.  And you never ordered that?
16 A.  No.
17 Q.  Is there any reason why that didn't happen?
18 A.  I don't know that it didn't.  I personally made a
19 public plea for everybody with evidence to come
20 forward, even surrounding that video.  So my
21 assumption is that that occurred.
22 Q.  Mr. Gains testified in his deposition when your
23 lawyers took his deposition that he had never
24 been contacted by anyone with the department
25 about his phone or his video.

VERBATIM REPORTING (763)-493-4535

34

1      Do you have any reason to dispute that?
2  A.  No.
3  Q.  Was it your belief that the information contained
4  on that video was not significant?
5  A.  I wouldn't say not significant.  Certainly a
6  component of the incident.
7  Q.  If the video contains evidence that would help to
8  establish a gap in time between the time the MP-5
9  discharged and the time that Franklin was killed,
10 would that be important information to have?
11     MR. SKARDA:  Objection, calls for
12 speculation.  You can answer.
13     THE WITNESS:  I would say potentially.
14 BY MR. PADDEN:
15 Q.  Because if for example the gap in time is, as an
16 example, more significant than the officers said
17 it was, that potentially could be relevant, would
18 you agree with that?
19 A.  Potentially.
20 Q.  To your knowledge did your investigators ever
21 specifically investigate the topic of whether
22 there was any kind of a significant gap in time
23 between the time the MP-5 discharged and the time
24 that Franklin was killed?
25 A.  I don't have any knowledge of the specifics.

VERBATIM REPORTING (763)-493-4535

Lathrop Decl. Ex. 27

35

1  **Q.**  When you listened to the tape, Chief, did you
2      hear the word nigger articulated by anybody on
3      that videotape?
4  **A.**  **No.**
5  **Q.**  Did you hear any voice directives on the video
6      tape when you listened to it?
7  **A.**  **I don't recall.**
8  **Q.**  What I mean by a voice directive is something
9      like hands up.  That would be potentially a voice
10     directive, correct?
11  **A.**  **Correct.**
12  **Q.**  Chief, was there someone in your mind who was
13     designated as the primary investigator for the
14     case?
15  **A.**  **I would say -- I always look to the commander of**
16     **the violent crimes investigative division, but I**
17     **would say Sergeant Kjos and Sergeant Porras.**
18  **Q.**  I see their names a lot throughout.  And would
19     their title for an investigation like this, would
20     be they called lead investigator or what is the
21     nomenclature within the department on that kind
22     of thing?
23  **A.**  **There may be some nomenclature within homicide**
24     **and violent crimes, but not that I'm aware of.**
25  **Q.**  Did you ever have a meeting with Chief Harrington

36

1      with MTC about this case?
2  **A.**  **Yes I did.**
3  **Q.**  How many times?
4  **A.**  **I believe just once.**
5  **Q.**  Was there any discussion at that time, Chief,
6     about the recollections of any of his employees
7     in this incident?
8  **A.**  **Well, initially I called him.  I recognized Metro**
9     **Transit Police officers in the video.  So his**
10     **officers were involved.  I wanted him to listen**
11     **to it and to see if he heard things that were**
12     **accused and if he had the ability to enhance or**
13     **had any knowledge of the video.**
14  **Q.**  What did he say about the issue of enhancement?
15  **A.**  **There was no ability -- to my recollection nobody**
16     **could enhance the video.**
17  **Q.**  Did he talk to you at all about the recollections
18     of Officer Wyatt?
19  **A.**  **I believe so.  I don't recall specifics.**
20  **Q.**  You know that Officer Wyatt is the officer who
21     apparently says officer shot, correct?  Did you
22     know that the person that said officer shot is an
23     employee of MTC?
24  **A.**  **I probably did at one time.**
25  **Q.**  But when you spoke with Chief Harrington it

37

1      sounds like the topic was more along the lines of
2     what do you hear on this thing and can you folks
3     enhance it.
4  **A.**  **Correct.**
5  **Q.**  He did talk to you about the recollections of his
6     officers regarding the incident it sounds like?
7  **A.**  **Certainly not at that time, no.**
8  **Q.**  Do you know a guy named DOC Dave, Dave Schiebel?
9  **A.**  **I have heard of him.**
10  **Q.**  Chief, on the video -- I may or may not play it
11     for you.  I'm not sure yet.  But on the video
12     when you listened to it, Chief, when you watch
13     the elapsed time, when it gets to second 18 I
14     hear -- and nobody is saying I'm an expert on
15     hearing -- I hear sirens.
16          And we took a deposition yesterday of
17     one of your officers, Officer Sporny, and what he
18     said, ma'am, was that he was behind the house
19     when the SWAT team went in.  And he said that
20     during that time frame, he said it was about ten
21     minutes, there were no sirens that were
22     activated.  Things were relatively quiet in that
23     sense.  No activated sirens from EMS, fire or any
24     of your squads.
25          And then on the video after you hear

38

1      the officer say -- and this officer, ma'am, he is
2     wearing black.  It doesn't appear to be one of
3     your officers.  We have determined through
4     investigation and taking his deposition that this
5     man is Officer Wyatt.  He is an MTC officer.
6     Okay?
7  **A.**  **Okay.**
8  **Q.**  After that time one can hear sirens.  Okay?
9  **A.**  **Okay.**
10  **Q.**  Do you recall hearing sirens on the video, Chief?
11  **A.**  **I don't recall it, no.**
12  **Q.**  Would it be a true statement that after the radio
13     call went out that officers had been shot,
14     weren't there officers coming to the scene code
15     three?  Are you aware of that?
16  **A.**  **Yes.**
17  **Q.**  So if one can hear sirens after the time officers
18     were shot, that would not be surprising.
19  **A.**  **Correct.**
20  **Q.**  Chief, I want to ask you about this.  And there
21     is so much you have to know as a police chief.  I
22     don't expect you to know the last detail of every
23     piece of technology, but you have been in this
24     career for a long time and I'm going to see if
25     you can help me on this.

Lathrop Decl. Ex. 27

39

1  It appeared that when the radio call
2  went out officer shot that almost immediately
3  something happened that caused EMS to be apprised
4  of the situation and send emergency vehicles.  Do
5  you know how that works technically at all?
6  **A.  Sometimes an officer asks for an ambulance or**
7  **EMS, however they want to word it.  Sometimes the**
8  **dispatcher will automatically send emergency**
9  **personnel.**
10 **Q.** So can a dispatcher, Chief, when they hear a call
11 that would lead one to the conclusion that an
12 ambulance is needed, can they just press a button
13 and make that happen right away?
14 **A.  I don't know if they press a button or if they**
15 **have to actually make a phone call.**
16 **Q.** But it can be fairly simultaneous?  Is that how
17 good the technology is?
18 **A.  I would believe so.**
19 **Q.** Fair enough.
20 With an officer shot call like that,
21 Chief, would it be reasonable to assume that when
22 something as serious as that happens, that squads
23 could be rolling code three within even as early
24 as 15 or 20 seconds?  Is that possible, Chief?
25 **A.  Yes.**

40

1  **Q.** Chief, when the motorcyclist was in the accident
2  with Officer Young, was it your understanding
3  that Officer Young was going to the scene code
4  three?
5  **A.  Yes.**
6  **Q.** I think the evidence indicates that Franklin had
7  been killed approximately 30 minutes before that.
8  Was the fact that he was heading to the
9  scene code three, was that a mistake or did he
10 have a reason to be in the status of code three
11 at the time?
12 MR. SKARDA:  Objection, relevancy.  You
13 can answer.
14 THE WITNESS:  To the best of my
15 recollection he was responding to a call for
16 assistance for things that were occurring outside
17 the scene after the inside had been code four
18 which means everything was okay inside.  But the
19 situation kept evolving so they needed more
20 assistance.  I don't know if it was crowd control
21 or what it was.
22 BY MR. PADDEN:
23 **Q.** Fair enough.  Thank you, ma'am.
24 Chief, did the Hennepin County
25 attorney's office to your knowledge ever request

41

1  any information about the so-called Gains video?
2  **A.  I have no recollection or frankly probably**
3  **knowledge of what the Hennepin County attorney's**
4  **office asked for.**
5  **Q.** If they would ask for something do you know who
6  they would ask for it from?  I'm not speaking
7  hypothetically.  I'm speaking specifically about
8  the Franklin incident.
9  You are aware that a grand jury was
10 convened, correct?
11 **A.  Correct.**
12 **Q.** If they have a need for something who would they
13 have gone to for this case, ma'am?
14 **A.  Generally they should go to the commander of the**
15 **CI, but that doesn't mean that's how things**
16 **always get done.  So they may have gone to the**
17 **assistant chief.**
18 **Q.** And then if the assistant chief needs information
19 about the investigation, would it be reasonable
20 to go to Porras or Kjos?
21 **A.  Potentially.  We generally do like to go through**
22 **the chain of command and not go to that level**
23 **which is a lower level.  You usually go to the**
24 **next rank below you, which is why my direct**
25 **reports are the assistant chief and the deputy**

42

1  chief.
2  **Q.** Would it be fair to say, Chief, that if I wanted
3  to talk to the person most knowledgeable of the
4  investigation, would that be Kjos or Porras?
5  **A.  Do you mean either or?**
6  **Q.** Either or.
7  **A.  Yes.**
8  **Q.** And Kjos and Porras would have had the job of
9  securing statements from the involved officers.
10 And, ma'am, I have been calling them the basement
11 officers.  I don't mean that in a derogatory way
12 at all.  That's how we have kind of delineated
13 those officers from the other SWAT officers who
14 weren't actually in the basement.
15 **A.  Okay.**
16 **Q.** But those two would have the responsibility of
17 securing statements, correct?
18 **A.  Correct.**
19 **Q.** Chief, let me ask you about that topic.  And I'm
20 going to be taking Sergeant Kjos' deposition and
21 I will ask her about this, but it looks like when
22 there is a recorded statement that the person who
23 gives the statement then signs their name.  Okay?
24 **A.  Okay.**
25 **Q.** And is that normal protocol?

Lathrop Decl. Ex. 27

43

1  A.  Yes.
2  Q.  So when an officer gives a statement in a
3      critical incident, is the transcript of the
4      statement -- it has also been called Q and A.
5  A.  Correct.
6  Q.  Is the officer then given that right away so he
7      or she can read it and then sign off or is there
8      a process whereby they pick it up at a later
9      date?
10 A.  I believe a later date because it has to be
11     transcribed.  So it depends how long it takes for
12     the transcription.
13 Q.  Is there a typical time frame for that type of
14     thing?
15 A.  Not to my knowledge.
16 Q.  So the time can vary?
17 A.  Varies by case and frankly what volume of cases
18     are occurring in the department at the time.
19 Q.  And when the officer signs off on the statement,
20     is the protocol for that officer at that time to
21     then receive a copy of the statement at the same
22     time?
23 A.  I don't know.
24 Q.  Would that be something that Sergeant Kjos would
25     know presumably?

VERBATIM REPORTING (763)-493-4535

44

1  A.  Yes.
2  Q.  Chief, I may have asked you this.  I apologize if
3      I did but I don't think I did.  I try hard to not
4      ask the same question more than once because I
5      know your time is important.
6          When did you first become aware, Chief,
7      that there was a contention that Terrance
8      Franklin had shot a police gun?
9  A.  At some point during that evening.
10 Q.  And there has been reference in the case, and I
11     have seen reference to this especially in a
12     report of Sergeant Kjos, there is a process
13     whereby certain officers come to city hall and
14     meet in room 100?
15 A.  Correct.
16 Q.  What is that?
17 A.  That is where witness officers, involved officers
18     go where the whole process takes place initially
19     that evening.  So they will meet with the police
20     chaplain, there is usually a union representative
21     there and the initial part of the investigation.
22 Q.  Why is the union representative there?
23 A.  Officers are entitled to union representation
24     during any encounter.
25 Q.  So presumably all of the officers who are

VERBATIM REPORTING (763)-493-4535

45

1      significant or substantive to what happened will
2      all be together?
3  A.  In the same -- room 100 is a very large area.  It
4      is -- it involves many offices within the room.
5      So the officers aren't necessarily in a
6      conference room together.  It depends on their
7      role.
8          MR. PADDEN:  This report by Sergeant
9      Kjos, it is supplement 69, Counsel, page 75 of
10     the 234 page report.
11 BY MR. PADDEN:
12 Q.  It says, and I'm quoting, Chief, because we could
13     not speak at length with Sergeant Stender and it
14     was currently unclear which officers were
15     involved in the shooting and which officers
16     witnessed the shooting, we told Sergeant Stender
17     all of the members of his team need to go down to
18     room 100 and meet with their federation
19     representative.  That's what it says.
20 A.  Okay.
21 Q.  Was that an order from Sergeant Kjos?
22 A.  To go to room 100?
23 Q.  Yes.
24 A.  Yes.
25 Q.  So that would be an order?

VERBATIM REPORTING (763)-493-4535

46

1  A.  Correct.
2  Q.  You have to obey, right?
3  A.  Yes.
4  Q.  And then it says Sergeant Porras and I stated we
5      would be down as soon as we could clear the
6      scene.  So presumably the lead investigators Kjos
7      and Porras would then join the others in room
8      100.
9  A.  Correct.
10 Q.  Do you know who the federation representative was
11     that day?
12 A.  I believe it was the president, John Delmonico.
13 Q.  Chief, I saw references in the hospital
14     records -- maybe it wasn't hospital records, but
15     somewhere that Delmonico ordered that blood draws
16     be -- that he -- he ordered that blood draws of
17     the two officers who were injured not happen.
18     Are you aware of that?
19 A.  No.
20 Q.  Does he have that power?
21 A.  No.
22 Q.  How would you describe your relationship with
23     John Delmonico?
24 A.  I don't see him anymore.
25 Q.  What about back in May of 2013?

VERBATIM REPORTING (763)-493-4535

Lathrop Decl. Ex. 27

47

1  A.  I would say it is the typical chief and union
2      president relationship.
3  Q.  What does that mean, Chief?
4  A.  At points we have to agree to disagree.  We have
5      a mutual respect relationship knowing that
6      sometimes each person's position maybe different
7      but we want what's best for the city.
8  Q.  Was there any attempt, Chief, to prevent the
9      involved officers from not getting together in
10     advance of giving their statements?
11 A.  Not to my knowledge.
12 Q.  Can't that be a problem in terms of the integrity
13     of the investigation if the officers get together
14     and speak about what they recall before they give
15     their formal Q and As?
16 A.  We generally have them -- they are assigned to a
17     supervisor.  So each officer involved in a
18     critical incident will be assigned with a
19     supervisor so there is that separation initially.
20 Q.  Why is it that in this case there were days that
21     went by before the officers gave their
22     statements?  Is that some kind of a union
23     agreement or are you handcuffed -- and no pun
24     intended -- in terms of controlling when the
25     statements are given?

48

1  A.  It truly varies based on the situation.  If
2      someone is injured and hospitalized, if somebody
3      has been very traumatized due to the event, there
4      is a multitude of reasons why time frames are one
5      or the other.
6  Q.  In this case I believe that the two injured
7      officers, one gave his statement 14 days later
8      and then the other one -- Muro gave -- Meath 14,
9      Muro 21 and I think Stender was three days after
10     the incident.  And Durand and Peterson I believe
11     were around that time frame.
12         Is there any reason why those
13     statements of the non-injured offers didn't
14     happen let's say within 24 hours of the incident?
15 A.  Generally they are done more with the three days.
16     Officers are given three days to meet with
17     basically a counselor.  There have been studies
18     that your memory is a little more intact not
19     exactly immediately after an incident but when
20     you have had time to clear your mind and your
21     blood pressure is down.  So that seems to be a
22     general time frame that seems to work best for
23     all involved.
24 Q.  In this case the investigators secured statements
25     from family and relatives of Mr. Franklin that

49

1      day.  You are aware of that, correct?
2  A.  I assume so, yes.
3  Q.  Is the normal protocol for investigating an
4      incident like this to try to secure statements of
5      non officer people as quickly as possible?
6  A.  Yes.
7  Q.  Why is that?
8  A.  Often times -- we have more control over our
9      officers.  We know that we can get them to
10     appear.  Others we may not know their true
11     identity, we may not have the ability to capture
12     the evidence or their statement.  And it also
13     helps to formulate -- the investigators to
14     understand from that perspective what may
15     happened so they can ask more in depth questions
16     of the officers involved.
17 Q.  Are you aware of the fact that there was a
18     meeting that took place with the non-injured
19     members of the SWAT team three days after the
20     event at the office of Fred Bruno?
21 A.  No.
22 Q.  I take it nobody in the hierarchy of the
23     department told the involved officers to not all
24     get together and have a meeting.  Is that fair?
25     That never happened?

50

1  A.  Not to my knowledge.
2  Q.  Would you have concern that if they all got
3      together like that that perhaps could affect
4      the integrity of the investigation before they
5      give their statements?
6         MS. SKARDA:  Objection, calls for
7      speculation.
8         THE WITNESS:  Every case is different.
9      It could potentially help people to remember.
10     There could be benefits.  I would expect people
11     to be honest and forthright regardless of who
12     they talked to prior to giving a statement.
13 BY MR. PADDEN:
14 Q.  Chief, I'm aware that -- I have looked at the
15     policies and I'm aware that officers have the
16     perfect right to seek the advice of counsel.  We
17     would agree on that.
18 A.  Yes.
19 Q.  But would it be a true statement that there isn't
20     a department policy that you know of that
21     articulates the notion that officers should not
22     all get together and talk about an incident
23     before they give their Q and A?  You know of no
24     department policy, correct?
25 A.  Correct.

Lathrop Decl. Ex. 27

51

1 **Q.** I had asked you earlier, Chief, and you told me
2 that you found out you believe on the date of the
3 incident that there was a contention that the
4 suspect had grabbed a gun and shot officers,
5 correct?
6 **A.** Correct.
7 **Q.** Was there ever any attempt to your knowledge to
8 engage in the investigative technique of gunshot
9 residue testing?
10 **A.** **I don't know the specifics of what was done**
11 **forensically.  I can --**
12 **Q.** You know what GSR testing is, right?
13 **A.** Correct.
14 **Q.** Who would have had that obligation -- strike
15 that.
16 Who would have in your mind -- if it
17 was felt that GSR testing was appropriate, who
18 would you have expected to have either made that
19 recommendation or proceeded with it, Chief?
20 **A.** **I think it would be a combination between the**
21 **crime lab as their level of expertise and then**
22 **those that are leading the investigation.**
23 **Q.** When you say crime lab you mean the crime lab for
24 the Minneapolis Police Department?
25 **A.** Correct.

VERBATIM REPORTING (763)-493-4535

52

1 **Q.** So arguably that could have been something that
2 may have been the obligation or the prerogative
3 of Sergeant Porras?
4 **A.** **It could have been.  Generally that would have**
5 **been done and looked at also at a higher level.**
6 **They have supervisors.  So they have a lieutenant**
7 **and they have a commander.  Just to always give a**
8 **thorough look at cases when you are close to make**
9 **sure that -- certainly it is my expectation that**
10 **any reliable test is conducted.**
11 **Q.** It doesn't sound like anybody brought this to
12 your attention though, is that fair, Chief?
13 **A.** Correct.
14 **Q.** Who would the lieutenant have been for Sergeant
15 Porras?
16 **A.** **Lieutenant Zimmerman.**
17 **Q.** What about Sergeant Kjos?
18 **A.** **Same.**
19 **Q.** I saw a reference in the records, Chief, to
20 Lieutenant Kelly.  Was Lieutenant Kelly to your
21 knowledge involved in the investigation?
22 **A.** **Not to my knowledge.**
23 **Q.** So potentially Zimmerman may have had the
24 obligation to insure that appropriate testing was
25 done, is that fair?

VERBATIM REPORTING (763)-493-4535

53

1 **A.** Yes.
2 **Q.** Would it be normal, Chief, in your experience if
3 a suspect had shot a gun and there is an
4 investigation concerning that suspect to have GSR
5 testing?
6 **A.** **You know, there is a multitude of tests.  There**
7 **is DNA, there is GSR.  So I guess I would expect**
8 **whatever would be a reliable test, which of**
9 **course changes on a frequent basis.**
10 **Q.** Chief, we have been going for about an hour.  Do
11 you need a break?
12 **A.** **No.**
13 **Q.** Chief, is it against public policy for an officer
14 in your department to use racist names in the
15 field?
16 **A.** **Police policy?**
17 **Q.** Yes.
18 **A.** **The -- yes is the short answer.**
19 **Q.** I covered this topic with some of the other
20 officers and we talked about for example like
21 when you are trying to get a suspect to be
22 compliant sometimes you have to use tough words
23 like profanity and they said that's okay if you
24 are trying to get someone to comply.
25 Are you okay with an officer using

VERBATIM REPORTING (763)-493-4535

54

1 profanity in the field?
2 **A.** **It really does depend on the situation.**
3 **Q.** If one of your officers is dealing with an
4 African American person, an African American
5 citizen, is it a violation of public policy to
6 call that person a nigger, for example?
7 **A.** **Absolutely.**
8 **Q.** Do you know which code that is, Chief?
9 **A.** **Well, it is under the code of ethics.  It is a**
10 **code of conduct.  It is under language.**
11 **Q.** There are other derogatory terms that could be
12 used for people that are African American,
13 correct?
14 **A.** Correct.
15 **Q.** Those would be equally not allowed, correct?
16 **A.** **Absolutely.**
17 **Q.** There's obviously all kinds of different people
18 of color in our society, Hispanic people, Asian
19 people. Sadly we have derogatory terms for it
20 seems like every segment of our society, correct?
21 **A.** Correct.
22 **Q.** And that's not appropriate.
23 **A.** **No it is not.**
24 **Q.** There was an incident that happened in Green Bay,
25 Wisconsin.  And as in I believe it was the

VERBATIM REPORTING (763)-493-4535

Lathrop Decl. Ex. 27

---

**55**

1  end of June of 2013.  I don't think it came to

2  light publically until maybe two or three months

3  later.  You know which incident I'm referring to,

4  correct?

5  **A.  Yes.**

6  **Q.** I want to ask you about that.

7  The officers who were involved were

8  Brian Thole and Shawn Powell.  Do you recall

9  that?

10  **A.  Yes.**

11  **Q.** Did you know Brian Thole before that matter came

12  across your desk, Chief?

13  **A.  No.**

14  **Q.** What about Shawn Powell?

15  **A.  No.**

16  **Q.** You don't remember them at all?

17  **A.  Do I remember them now?**

18  **Q.** No.  The reason I ask is I have materials on it,

19  Chief, and I know obviously it came across your

20  desk because it was a very important matter,

21  correct?

22  **A.  Correct.**

23  **Q.** You agreed with the ultimate recommendation that

24  they be terminated, correct?

25  **A.  Yes.**

---

**56**

1  **Q.** Was that your decision, Chief, or is that

2  decision made by another entity within the city?

3  **A.  Because they were veterans they were entitled to**

4  **a veteran's preference hearing.  So ultimately**

5  **the commission supported my decision.  Had they**

6  **not they have the final decision.  But in most**

7  **cases that would have been my decision solely,**

8  **but for the fact that they were veterans.**

9  **Q.** When you say veteran, Chief, do you mean veteran

10  of the armed forces of the United States?

11  **A.  Yes.  I'm sorry.**

12  **Q.** That's fine.

13  And, Chief, I'm not going to get into

14  the details of what was alleged to have happened

15  and I asked you in some of the discovery about

16  that incident and I think your response was to

17  the extent of I was not a witness to it, correct?

18  **A.  Correct.**

19  **Q.** But you did see evidence about the incident,

20  correct?

21  **A.  Correct.**

22  **Q.** For example there was video.

23  **A.  Yes.**

24  **Q.** It was pretty disturbing, wasn't it?

25  **A.  Yes.**

---

**57**

1  **Q.** One of the things that Mr. Cooper talks about in

2  his book, this book he wrote called "Arrested

3  Development", is he says that police chiefs need

4  to be concerned and aware of the development

5  potentially of so-called subcultures within the

6  department.

7  **A.  Yes.**

8  **Q.** And that being a police officer isn't an easy

9  job, right?

10  **A.  Correct.**

11  **Q.** And when you learned about the activities of

12  Officer Thole and Officer Powell in Green Bay,

13  Wisconsin, did you ever address, Chief, the

14  concern that maybe that what -- that the behavior

15  they displayed might be indicative of the

16  behavior of other members of the SWAT team or was

17  it -- in other words, did you have concern that

18  it was just limited to those two guys or is this

19  how our other guys roll?  Was that addressed at

20  all?

21  **A.  I wasn't sure, to be candid.  I met with the**

22  **Black Police Officers Association, I met with**

23  **several members of the department and had many**

24  **people come to me who were very upset by this,**

25  **who were offended by it and people of all**

---

**58**

1  **ethnicities.  So there was a tremendous dialog**

2  **about to what extent this actually occurs in the**

3  **department.**

4  **Q.** And was that -- and I ask this because I know

5  sometimes you are hamstrung by what you can do

6  because of the union, right?

7  **A.  Correct.**

8  **Q.** Was there any attempt to do actual investigation

9  of the SWAT team members as to whether this

10  conduct was limited to Thole and Powell or

11  whether other members of the SWAT team engaged in

12  these kinds of behaviors in the field?

13  **A.  There were many conversations with all of the**

14  **groups.  I had no reason to believe that this was**

15  **isolated to SWAT.  My concern was the entire**

16  **department.  They were part-time members of SWAT.**

17  **They were police officers on the street in their**

18  **full-time position.  And so that was my concern.**

19  **Q.** I wanted to ask you about that.

20  Back in May of 2013 were there any

21  members of the team who were full-time SWAT?

22  **A.  At that time probably just the commander.**

23  **Q.** So no member of a 1280 team is a full-time SWAT

24  member, correct?

25  **A.  Correct.**

Lathrop Decl. Ex. 27

59

1  Q. One of the things that was said was -- and I
2     think it may have been Thole.  I might be wrong.
3     But one of the things that he said to a Green Bay
4     police officer was words to the effect that Green
5     Bay is too nigger friendly.  Okay?
6        And that's the type of thing I think
7     that a citizen reading that would find chilling
8     because the thought might be, well, if you have
9     that mind set about Green Bay, what kind of a
10     mind set do you have in the city of Minneapolis
11     when dealing with citizens who happen to be
12     African American in the city of Minneapolis.
13        Was that something that concerned you?
14  A. Yes.
15  Q. When you looked into this issue were you able to
16     develop any evidence that this may have been a
17     problem that was not limited to Thole and Powell?
18  A. **I guess I would say that there were officers that**
19     **did say that in their past on calls that this**
20     **does occur.  It is most -- most folks would say**
21     **it is not to the level that it once was.  It is**
22     **infrequent but it still does occur, Chief.  And I**
23     **took that very seriously.**
24  Q. And one of the things that was attributed to you
25     in the report, Chief, and it pointed out that you

60

1     had three goals for the department when you
2     became chief and they are -- I'm reading from the
3     report, Chief.  It says improving public safety,
4     public trust and employment engagement and
5     morale, is that correct?
6  A. **Employee engagement and morale.**
7  Q. What I'm reading says employment.  So I think it
8     is a typo.
9  A. **I don't know what you are reading.**
10  Q. It says the core values she cited that would
11     drive the department were commitment, integrity
12     and transparency.
13  A. **Correct.**
14  Q. It says here, again quoting from the report, she
15     was also concerned that the incident was not just
16     a momentary lapse of judgment on the part of Mr.
17     Thole and Mr. Powell.
18        So I'm assuming momentary lapse of
19     judgment meaning you are looking into is this
20     just an isolated incident or is this something
21     that might be more of a problem within the
22     department.
23  A. **I don't know what that is.**
24  Q. Can I show it to you?
25  A. **Yes.  Please.**

61

1  Q. Chief, just to identify this for the record, this
2     is page seven of a document entitled Minneapolis
3     Civil Service Commission and it says in the
4     matter of the recommendation for discharge of
5     Brian Thole and Shawn Powell.  It is also
6     entitled chief findings of fact, conclusions of
7     law and recommendation.  Okay?
8  A. **Yes.**
9  Q. Have you had a chance to look at that?
10  A. **Yes.**
11  Q. Do you recall that?
12  A. **Yes.**
13  Q. Does that kind of go part and parcel with your
14     concern that this is an isolated incident or do
15     we need to be concerned that other members of the
16     department might display these kinds of behaviors
17     in the city of Minneapolis?
18  A. **Actually, in that particular statement I was**
19     **referring to it not being an isolated incident**
20     **with Thole and Powell specifically, not members**
21     **of the department.**
22  Q. Were you able to determine if Thole and Powell
23     had exhibited these kinds of behaviors performing
24     their duties in the city of Minneapolis before
25     the time that this incident happened?

62

1  A. **No.**
2  Q. Was that even looked at?
3  A. **Yes.**
4  Q. But nothing definitive was determined?
5  A. **No.**
6  Q. Chief, you noted that in your -- as part of your
7     decision that this was not only bad in the sense
8     that it was derogatory to people of color and an
9     embarrassment to your department, it also was a
10     problem for the GLBT community, correct?
11  A. **Correct.**
12  Q. Was this something, Chief, that was -- that
13     people talked about or found out about in other
14     departments nationally?  In other words was this
15     something that just wasn't limited to press
16     coverage here?  Was this something that became a
17     national issue?
18  A. **It absolutely did.**
19  Q. I take it it was a difficult situation for you?
20  A. **Yes.**
21  Q. But you did what you felt was the appropriate
22     thing to do and you felt that at the very least
23     these officers needed to be terminated.
24  A. **Correct.**
25  Q. But you made that decision only after you saw the

Lathrop Decl. Ex. 27

63

1  full investigation.
2  A.  Correct.
3  Q.  Chief, who was it that got the evidence to you?
4      How it was disseminated to you?
5  A.  It came from Green Bay through internal affairs.
6  Q.  So internal affairs routed it to you from Green
7      Bay.
8  A.  Correct.
9  Q.  Was there a lot of video or was it just like
10     bites you saw?
11 A.  Yeah.  It was a significant portion of video.
12 Q.  Do you know how long it was, Chief?
13 A.  I do not.
14 Q.  Chief, there was evidence that was produced for
15     us -- I want to kind of back up here a little
16     bit.
17         When the Terrance Franklin incident
18     began, you are aware that there was an attempt to
19     apprehend him at an apartment complex in
20     Minneapolis.
21 A.  Yes.
22 Q.  Have you ever seen the video of that attempted
23     apprehension, Chief?
24 A.  Yes.
25 Q.  And that was I think located at 2743 Lyndale

64

1      Avenue South?
2  A.  I don't recall the exact address.
3  Q.  But you have seen the video, right?
4  A.  Yes.
5  Q.  And is it your belief looking at that video that
6      Terrance Franklin attempted to run over a police
7      officer?
8  A.  Yes.
9  Q.  So there is some evidence that it went over the
10     radio airwaves that he attempted to run over an
11     officer, correct?
12 A.  I believe so.
13 Q.  And is it reasonable to assume that that would
14     have reached the members of the SWAT team?
15 A.  I don't know who was working that day.  So I
16     don't know what you mean by that.
17 Q.  Well, if the SWAT team is trying to find a guy
18     that has attempted to kill a police officer, that
19     might have a tendency to make them angry, right?
20         MR. SKARDA:  Objection, calls for
21     speculation.
22         THE WITNESS:  I don't know how they
23     feel.  I would say when you air information
24     anybody who is listening to the radio at the time
25     will have knowledge of that.

65

1  BY MR. PADDEN:
2  Q.  It is important I take it to not exaggerate when
3      you air information, correct?  You want to be
4      honest about what you perceive about something,
5      correct?
6  A.  It is important to give accurate information.
7  Q.  And it is your belief that -- I'm speaking
8      hypothetically.  If it went over the air that
9      Terrance Franklin attempted to run over a
10     Minneapolis police officer, in your mind that was
11     not an exaggeration, correct?
12 A.  Correct.
13 Q.  Who was it that he attempted to run over?
14 A.  I believe it was Sergeant Smulski.
15 Q.  So when you looked at the video it was your
16     belief from observing the video that this person
17     was trying to run over Sergeant Smulski, correct?
18 A.  As he was trying to flee, yes.
19 Q.  Did you go to room 100 that day?
20 A.  At some point, yes.
21 Q.  Had you talked to any of the involved officers
22     that day?
23 A.  Yes.
24 Q.  Who?
25 A.  I don't recall.  Probably all of them.  Generally

66

1      what I do is very brief.  With any critical
2      incident where officers are involved I check on
3      their well-being and let them know that, you
4      know, I'm there and that's about it.  I can't get
5      into any detail.  It is more of an emotional
6      support regardless of the outcome or the
7      situation.
8  Q.  So you are not interrogating them about the
9      incident, correct?
10 A.  No.
11 Q.  And they are not presumably providing you with
12     any information of substance about the incident?
13 A.  Nope.  Generally there is not a lot of two way
14     communication.
15 Q.  Are they allowed to if they want to?
16 A.  I'm sure they could.
17 Q.  You didn't meet with any of them alone, did you?
18 A.  I don't think so.
19 Q.  When you met with them, Chief, were they
20     together?  Were any of them together?
21 A.  I think -- if I recall this correctly they put
22     them all in a conference room so I could address
23     them and then they were removed.
24 Q.  Did you address them as a unit?
25 A.  Just as a group.

Lathrop Decl. Ex. 27

67

1  Q.  What did you say?
2  A.  Generally I just say I know you have been through
3      a traumatic incident.  Make sure you take care of
4      yourself.  We want you to talk to employee
5      assistance.  It is really just more of emotional
6      support.
7  Q.  Chief, there was a story that ran in the Star
8      Tribune August 15, 2013 and it concerned the
9      topic sources in the department had released
10     information that Terrance Franklin's DNA was
11     found on the submachine gun, the MP-5, okay?
12         Was the dissemination of that
13     information allegedly by members of your
14     department a violation of department policy?
15 A.  It would be.  I don't know if it was members of
16     my department.
17 Q.  Assuming it was though, that would be a violation
18     of department policy?
19 A.  Correct.
20 Q.  Did that upset you?
21 A.  Anytime information is released it absolutely
22     does.
23 Q.  You did I think in December of that year issue a
24     directive that that type of thing would not be
25     tolerated.

68

1  A.  Correct.
2  Q.  Was that -- the fact that you issued that
3      directive in December, was that in part due to
4      the release of information in the Terrance
5      Franklin incident?
6  A.  It was due to a long history of information
7      somehow being released.  By whom, I do not know.
8  Q.  Including Franklin?
9  A.  Yes.
10 Q.  Was there an investigation conducted as to who
11     released that information, Chief?  In other words
12     was the notion that sources within the department
13     released the information valid?
14 A.  There's very little we can do to even make those
15     determinations.
16 Q.  Chief, there is a report by Officer Okerberg --
17     and I don't have a lot left, Chief, we are almost
18     done here -- back on May 10th, 2013 at 1832 --
19     actually, Chief, before I get to that I wanted to
20     ask you one more thing about Sergeant Kjos'
21     report.
22         Sergeant Kjos in her report references
23     events that happened on May 10, 2013.  Okay?
24 A.  Okay.
25 Q.  The supplement 69, however, is dated at the top

69

1      May 13, 2013, 1303.  So military time.  In lay
2      person's time that would be 1:03 p.m.
3  A.  Correct.
4  Q.  Does that mean that she prepared it on May 13th?
5  A.  No.  It could be when it was uploaded in the
6      system.
7  Q.  So would that be relevant to when she generated
8      the report, actually typed it up so to speak?
9  A.  Not always.
10 Q.  When you see a supplement like this, Chief, and
11     I'm going to show it to you.  It is pretty long.
12     It is I think five pages in length.  And I'm not
13     asking you to read it, Chief.  I'm just referring
14     to the beginning of it.
15         Does that mean -- at the top here does
16     that mean when she would have actually typed it
17     up?
18 A.  No.
19 Q.  What does that mean then?
20 A.  It is when it is uploaded into the system.  So
21     you could actually often times, and even when I
22     was an investigator, you keep a running statement
23     and then when you are ready to finally submit it
24     you hit upload.  So you could have it in a Word
25     document and put it in there.  You could have it

70

1      just in the system and not hit upload so it is
2      still there.  Especially if you have one that
3      goes over time.
4  Q.  Are you able to actually do this in the field and
5      in real time or is this something you have to do
6      when you are in front of a monitor in your
7      office?
8  A.  You have to be in front of the computer.
9  Q.  When something like this, a report like this is
10     generated by an investigator like Sergeant Kjos,
11     do they take handwritten notes normally and then
12     type it up on to their computer?
13 A.  It really -- it is individualist.  I don't know.
14 Q.  There has to be a way to remember from what you
15     are doing in field versus when you sit down to
16     type it, right?
17 A.  I would assume they could use a voice recorder or
18     notebook or something, yes.
19 Q.  Then, Chief, supplement of Officer Okerberg, May
20     10, 2013, sup one.  It is the first supplement.
21     He talks about being in the field and then he was
22     traveling east on 27th Street passing Lyndale
23     coming into the third precinct and he had a
24     partner with him, an Officer Hanson.
25         And then he heard there was a chase and

Lathrop Decl. Ex. 27

71

1  he says here that -- in the second paragraph of
2  the report, Chief, it says we were out on a
3  directed patrol at Chicago and Franklin Avenue
4  when we heard there were shots fired at 2717
5  Bryant Avenue South.  And it says we went to the
6  area of the call code three.
7        So you had told me earlier that would
8  not be surprising that if it had been aired that
9  shots were fired or that an officer had been
10  shot, you would expect your officers to get there
11  lickity split and they would be code three.
12 **A.**  **Yes.**
13 **Q.**  That would be normal protocol.
14 **A.**  **Yes.**
15 **Q.**  Chief, do you know -- the meeting that the
16  officers told me about regarding Fred Bruno --
17  you know who he is, right?
18 **A.**  **Yes.**
19 **Q.**  That meeting that happened, would that be the
20  type of thing where to your knowledge the
21  department would compensate Mr. Bruno for that
22  meeting?
23 **A.**  **No.**
24 **Q.**  The reason I ask is because in looking through
25  the materials your lawyers provided, one of them

72

1  was critical incident policy consultation with
2  legal counsel.  Involved and witness officers are
3  entitled to consult with their legal counsel
4  during the pendency of the critical incident
5  investigation up to and including any grand jury
6  proceedings.  Such reasonable and necessary
7  meeting or meetings shall be considered on time
8  duty and feasible legal counsel may be eligible
9  to be paid by the city.
10        So is there -- you don't think Bruno
11  was compensated?
12 **A.**  **I'm not aware of any time the city has paid Fred**
13  **Bruno for anything.**
14 **Q.**  On this critical incident policy, I didn't see
15  any policy that spoke in terms of preventing
16  officers, multiple officers who are witnesses to
17  an incident from all getting together with
18  counsel, correct?
19 **A.**  **Correct.**
20 **Q.**  You are not aware of that policy?
21 **A.**  **No.**
22 **Q.**  Chief, that's all the questions I have.  Thank
23  you for your time.
24
25        MR. SKARDA:  We have no questions.  We

73

1  would like to read and sign.
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

74

1  STATE OF MINNESOTA )
             ) ss.
2  COUNTY OF HENNEPIN )
3   I, Kristin Hoium, a Notary Public in and for the
4  County of Hennepin, in the State of Minnesota, do
5  hereby certify:
6   That the witness in the foregoing deposition named
7  was present at the time and place therein specified;
8   That the said proceeding was taken before me as a
9  Notary Public at the said time and place and was
10  taken down in shorthand writing by me;
11   That said proceeding was thereafter under my
12  direction transcribed into computer-assisted
13  transcription, and that the foregoing transcript
14  constitutes a full, true and correct report of the
15  proceedings which then and there took place;
16   That I am a disinterested third person to the said
17  action.
18   IN WITNESS THEREOF, I have hereto subscribed my hand
19  and affixed my official seal this 25th day of
20  September, 2015.
21        _____
          Kristin Hoium
22        Court Reporter
23
24
25

Lathrop Decl. Ex. 27

75

```
1   DEPOSITION CORRECTION PAGE
    TITLE:  Franklin vs. Peterson
2   WITNESS:  Janee Harteau
    PAGE  LINE  DESIRED CHANGE/REASON FOR CHANGE
3   ____  ____  _____
4   ____  ____  _____
5   ____  ____  _____
6   ____  ____  _____
7   ____  ____  _____
8   ____  ____  _____
9   ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16
17        _____
18
    Signature of Witness
19  Subscribed and sworn to before:

20        Notary Public _____County of
    Minnesota, _____ 20____
21
22
23
24
25
```

VERBATIM REPORTING (763) 493-4535

76

```
1           Kristin Hoium
            VERBATIM REPORTING
2   8906 ASHLEY TERRACE, SUITE 100
          Minneapolis, MN 55443
3         Telephone 763-493-4535
            Fax 763-493-4532
4
5
    September 25, 2015
6
7   Tim Skarda
    350 South 5th Street, Suite 210
8   Mpls., MN  55415
9    Re: Franklin vs. Peterson
10  Dear Mr. Skarda:
11      With regard to the above-entitled matter,
    enclosed please find the Reading and Signing
12  Certificate and transcript for the deposition of
    Janee Harteau.
13
        Please have her complete the Certificate, retain
14  a copy for your transcript, and send the original to
    Mr. Padden.
15
        Thank you for your cooperation.  Feel free to
16  call me if you have any questions.
17                  Sincerely,
18
19                  Kristin Hoium
    cc:  Mike Padden
20
21
22
23
24
25
```

VERBATIM REPORTING (763) 493-4535

Lathrop Decl. Ex. 27