## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

_____

**WALTER LOUIS FRANKLIN, II,**
**Trustee for the Estate of Terrance**
**Terrell Franklin,**

                Plaintiffs,

      v.

**LUCAS PETERSON,**
**individually and in his official**
**capacity; MICHAEL MEATH,**
**individually, and in his official**
**capacity; JANEE HARTEAU,**
**Chief of Police for the**
**Minneapolis Police Department,**
**individually and in her official**
**capacity; and the CITY OF**
**MINNEAPOLIS,**

                Defendants.

Case No. 14-CV-1467 (DWF/JSM)

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

_____

## I. <u>INTRODUCTION</u>

On May 10, 2013, Plaintiffs' Decedent, Terrance Franklin (TF), was killed by officers of the Minneapolis Police Department (MPD) in the basement of a home in South Minneapolis.  This action was commenced primarily grounded in the theories of excessive force under federal law and wrongful death under Minnesota law.

Defendants have filed a motion for summary judgment.  The purpose of this brief is to point out to the Court the numerous factual issues that exist such that this matter is appropriate for factual conclusions by a jury on the issues of liability and damages.

The Complaint for this matter initially noted three counts/causes of action. A stipulation has been reached with Defendants to withdraw Count 3 from this case.

## II. <u>STATEMENT OF UNDISPUTED FACTS</u>

Defendants have gone into great detail in their brief detailing the facts of this case. Certainly, there are many facts that are not disputed.  TF was clearly attempting to evade arrest, at least during portions of his attempted apprehension.  There is no dispute that five SWAT team members were present in the basement of the Bickal home when Franklin was killed. There is no dispute that two MPD officers shot him multiple times with their handguns. There is no dispute that there was a large amount of blood in the area where TF was killed. There is no dispute that TF was unarmed.  There is no dispute that an MP5 firearm of a SWAT member discharged although Defendants claim that TF was able somehow to grab it and shoot it, striking two officers.  This is one of many substantive facts of dispute that will be detailed herein.

## III. <u>STATEMENT OF DISPUTED FACTS</u>

What is disputed in this matter is presumably self evident to the Court and facts not uncommon in situations where citizens are killed by firearms at the hands of the police.  MPD has a long history of excessive force and civil rights violations of citizens with payouts in the millions, and it appears that in every case of this type in at least the past 15 years, a summary judgment motion was pursued regardless of the facts.  Plaintiff and his counsel expected from the beginning that Defendants would move for summary judgment, and as such, this motion is no surprise.

Practically every fact of substance concerning the accusations of excessive force

and therefore wrongful death are in dispute in this case. The Court will see there is a common thread with the testimony of MPD personnel in this matter: exaggeration regarding factual assertions, internal inconsistency with MPD personnel with factual recollection on matters of substance for events of significance, and inconsistency with recollection when compared to other evidentiary sources such as videos or reports by MPD deponents in this litigation.

The factual disputes center on four main areas:  (1) the initial, attempted apprehension of Franklin at an apartment complex parking lot;  (2) facts regarding a citizen's video which ties into a significant time gap issue detailed herein;  (3) what occurred in the basement after the SWAT team entered same up to the time Franklin was killed including the defense contention that Franklin shot a police firearm; and (4) how it was that Franklin's DNA innocently ended up on the MP5 firearm.

**1.  <u>The parties dispute whether Franklin attempted to injure or kill an MPD officer at the time off initial, attempted apprehension.</u>**

This incident tragically began when TF was parked in a car at an apartment complex on Lyndale about 80 minutes before he was killed.  MPD was contacted because there was suspicion that TF had been involved in a burglary over a week before.[1]  (P-Ex. 4, Moore Depo. at p. 33).  As such, it was presumed he was not someone who had just committed a crime.

MPD officers arrived in separate squads, along with Dave Scheibel, a DOC fugitive officer known as "DOC Dave", who had worked with MPD personnel for years.

_____

1 *Exhibits filed by Defendants' counsel will be referred to with a "D".  Exhibits filed by Plaintiff's counsel be referred to with a "P".*

(D-Ex. 4, Scheibel Depo. at p.4).  Sgt. Katherine Smulski claimed that when she attempted to apprehend TF, he drove from the parking lot and was trying to injure or kill her.  (D-Ex. 5, Smulski Depo. at p.21).  This contention ended up over police radio and was heard by officers in the field and most of the 5-member SWAT team who later attempted to apprehend TF.  (D-Ex. 8, Durand Depo. at pp. 70, 76).  Its significance to the dynamic of this situation cannot be overemphasized and will be detailed later.

There was one problem with Smulski's description: it was not true.  As the court will see from video secured by MPD from the complex owner, TF clearly was not attempting to run anybody over and was merely leaving the parking lot in a slow, methodical fashion.  (P-Ex. 1, Apartment Video).  It is true TF struck a car door of the Smulski squad, but that impact merely caused paint transfer – not even a dent.  (D-Ex. 5, Smulski Depo. at p. 20).

Smulski did not view the video before she prepared her report.  At the time of her deposition almost 2 ½ years later, she amazingly claimed the video did not change her recollection.  (D-Ex. 5, Smulski Depo. at p. 14).  It should be noted her report did not mention one syllable regarding the notion that TF tried to kill or injure her.  (Id. at p. 26).  Perhaps this was her way of mitigating her guilt for conveying incorrect information to MPD personnel in the field on the date of the incident.

To make matters worse, although Smulski opined that she told others in the field what had happened, she claimed that she did not radio to others what had happened.  (Id at p. 22)  She said she believed the other MPD officer at the scene, Sgt. Gerald Moore, did.  (Id.).  The problem with this is that a SWAT officer specifically recalls that it was

Smulski who radioed that information as the SWAT team was en route to the area where TF was ultimately found.  (D-Ex 15, Muro Depo. at p. 64).  In addition, Moore opined he never radioed that information, namely, that TF attempted to injure or kill Smulski or even told anyone that in the field.  (P-Ex 4, Moore Depo. at pp. 20-21).

Moore and Scheibel changed their recollection after viewing the video.  Moore noted in his report that Smulski "jumped out of the way" to avoid TF.  But there was a problem: this was not true, and Moore realized this after watching the video.  (P-Ex. 4, Moore Depo. at pp. 49-50).  Strangely, he never prepared a supplemental report correcting this.  (Id. at p. 51).

Moore also noted that near the scene where TF was ultimately found, he interviewed a woman named Cala Scott who was a friend of TF and the owner of the PT Cruiser.  The interview lasted for 10 to 15 minutes, but Moore was vague as to whether Smulski was nearby or present when the interview occurred.  (Id. at p. 23).Scott solved that mystery when she was deposed and opined that a female officer told her that TF tried to kill her.  This was an obvious reference to Smulski.  (D-Ex. 14, Scott Depo. at pp. 36-37).

Scheibel's testimony revealed the interesting fact that Smulski rather than being in the way of the route that TF chose to exit, actually tried to kick the car with her left foot as it drove off.  (D-Ex. 5, Scheibel Depo. at p. 76).  Scheibel additionally admitted after looking at the video that Smulski clearly was out of the way of the vehicle, and he said: "I wasn't aware of that."  (Id. at p. 78).  Scheibel ultimately admitted that he was wrong as to where Smulski was located as TF left.  (Id.).  Rather than correcting this before the

grand jury proceeding, it appears his correction in this regard was not until the time of his deposition, about two years and three months after the incident.

In analyzing these facts, it is easy to see how this inaccurate information lead to the later feeding frenzy to find TF and his ultimate death, something that Defendants of course dispute the 5-member SWAT team had to have viewed TF as an attempted cop killer in flight.

**2. The parties dispute whether the Gaines' video creates a significant time gap and other evidence which calls into question the MPD version of events leading to the citizen's death.**

Jimmy Gaines had a recording device and was positioned across the street from the Bickel home during the time before and after TF's attempted apprehension there. The recording picked up important sounds which call into question significant aspects of MPD's conclusions as to how this event transpired. For example, the SWAT officers contend that TF never spoke during the event. TF's voice can be heard on the Gaines recording after the time that the MP5 discharged. (See generally D-Ex. 25, Primeau's audio expert report).

One fact that does not appear to be in dispute is that at second 11, MTC officer Geoffrey Wyatt says "officer shot" or "we have an officer shot." (D-Ex. 31, Wyatt Depo. at p. 8). Many witnesses in the case to date have confirmed that. It is clear therefore that the MP5 had already discharged. When Wyatt was deposed, the big question was how much time had elapsed from the time he heard a gun discharge and also what he had done before he articulated those two words.

Wyatt testified that he was located at the front of the house when he heard an

officer had been shot and then ran to the north door on the side of the home. He said that door was open. (Id at pp. 35-36). It should be noted that this was the reason that the act of Gaines' device would not have picked up the significant sounds it did as Primeau concluded in his report.

He could not recall specifics as to that first time period based on that movement, but he said that he was at that location inside the door looking directly down into the basement for less than 20 seconds. (Id. at p. 40). He then said that he ran back to his squad, and that time took "less than 10 seconds." (Id. at pp. 40-41). Based on this and other evidence, it is reasonable to assume that this additional time before second 11 on Gaines' is approximately 30 seconds.

Although Plaintiff's audio expert Ed Primeau could not confirm definitively with sound science that a series of gunshots could be heard starting at second 53, he opined that he heard what he thought were gunshots, and experts Chuck Drago (many years in law enforcement) and Sean Harrington additionally confirm that gunshots can be heard at second 53.[2] (See generally the Expert Reports of Primeau, Drago, and Harrington D-Ex. 25, P-Ex.7, and P-Ex 9).

Plaintiff's retained Harrington, a digital/cyber forensics expert (who is also an attorney). Harrington was able to synchronize the Gaines' video with the Channel 3 dispatch audio provided by Defendants, certainly evidence that Defendants view as an official time source for this event. Metadata is data contained within the recording of a device that may not be readily apparent such as time the Gaines' device had this.

---

2 *Harrington calls the sounds "discrete, separate, staccato sound events."*

Importantly, the time stamp for the Gaines' device essentially matched perfectly with the dispatch audio confirming that the timing of sound events on that device are valid.  This was done primarily with the Wyatt ("officer shot") sound byte which enabled Harrington to synchronize both sounds together. (See P-Ex. 9, Harrington's expert report).

Experts are aides to assist the fact finder with their work, but it is important to note that there is no question that a fact finder could conclude that a series of gunshots can be heard at second 53 without experts and that these are the volleys that killed TF.  (See second 53 of the Gaines' video/audio, D-Ex. 24).  As such, Plaintiff has viable evidence to support the fact that the gap in time between the MP5 discharging and the killing of TF is at least 72 seconds, but even if shorter like 34 seconds, that time frame is an eternity in the context of this fact pattern and completely refutes the contention of at least one of the SWAT team that TF was dispatched within seconds of the MP5 discharging.  Certainly, if TF had grabbed the gun and shot two cops, it is presumed he would have been killed immediately.  Since all 5 SWAT-team members were armed.  No other scenario would make sense under these facts.

On this topic, Primeau notes that at second 8 and at second 27 respectively, one hears: "My name is Mookie." and "Let me go."  Any reasonable person hearing these sound bytes will conclude that it is the voice of a young black male.  Members of TF's family will testify at trial that this is TF's voice, and for the second sound byte, he says: "Man, let me go!"[3]  It will be made additionally clear at trial that TF's nickname was

---

3 *It should be noted that at second 26, Primeau hears: "Damn freakin' … ", and a third word that he cannot hear.  Plaintiff, his counsel, and many others hear: "Damn freakin' nigger."  The Defendants are vociferous about the notion that it would not be possible for MPD personnel in*

Mookie.

The SWAT team unanimously opined under oath that TF never said one word or even uttered a sound.  Certainly, if the 5-member SWAT team is to be believed, as of seconds 8 and 27 on the Gaines' video, TF should have already been dead for at least 20 seconds.

Additionally, assuming these sounds are valid, this would of course support the contention that TF was in fact successfully apprehended, and the MPD SWAT team has made up a story to cover their tracks.

**3.   The parties dispute the specific facts as to how the unarmed citizen ended up dead in the basement.**

Section 2 (the time gap issue) and section 4 of this portion of the Memorandum alone create significant factual discrepancies regarding TF's death.  However, the testimony of the five-member SWAT team themselves also creates numerous discrepancies along with internal inconsistencies further advancing the contention that a jury is needed to resolve these disputes.

The Defendant City and MPD circled the wagons after the events of 5/10/13 due in part to not only the hardly credible contentions as to how TF died, but also the fact that an MPD officer coming to the scene long after TF was dead proceeded through a red light killing a citizen on a motorcycle.  It is interesting that the MPD proceeded with this

---

3 *It should be noted that at second 26 Primeau hears "Damn freakin' …", and a third word that he cannot hear. Plaintiff, and his counsel, and many others hear: "Damn freakin' nigger." The defendants are vociferous about the notion that it would not be possible for MPD personnel in this situation to have said that word.  This contention is interesting considering the highly publicized Green Bay incident in June, 2013 where two MPD SWAT members used the "N word" often, and it was recorded – by law enforcement . . . another factual dispute. Since no MPD deponent conceded hearing the "N" word on Gaines'.*

investigation on its own.  Common sense cried out for an outside agency, and this was

particularly true considering the botched investigation of MPD Officer Duy Ngo, who

was shot by friendly fire in 2003, something that was made clear by the chief who

presided over a portion of that investigation.  (P-Ex. 2, Dolan Depo. at pp. 7-8).  In

addition, Chief Harteau previously advocated for an outside agency to investigate the

Franklin matter and continued to support that position at the time of her deposition over

two years after the TF incident.  (D-Ex. 27, Harteau Depo. at pp. 16-18).

One example of the poor investigation in Franklin was the fact that the Q and As

or statements of the involved officers were not done in a professional fashion with, for

example, tough, difficult questions not asked at all.  For example, no member of the team

was asked any sort of detailed questions regarding the time gap problem even though an

internal report by an MPD officer had the gap at 20-30 seconds, which should have been

a huge red flag for the investigators that something was terribly wrong with the SWAT

team's story.  (P-Ex. 6, Sporny Depo. at p. 30).

Another fact that came out in the depositions was that the SWAT members as a

team, minus the two injured officers, all met together with a lawyer on 5/13/13 before

they gave their Q and As which was on 5/13/13 and 5/14/13 respectively.  (D-Ex. 8,

Durand Depo. at pp 143-144).  The problem that that of course creates is obvious.  (Muro

and Meath gave their statements multiple days after these two dates which would allow

plenty of time for them to be briefed about the attorney meeting).

Another interesting fact about the investigation was that even though MPD

personnel were making the amazing contention that the alleged bad guy had grabbed a

police gun shooting two cops, as opposed to the other likely scenario of accidental or negligent discharge, no gunshot residue (GSR) testing was ever done on TF's body.  (D-Ex. 19, Kjos Depo. at p. 31-32).  Former Chief Dolan pointed out that GSR testing would be normal protocol under a situation like this.  (P-Ex. 2, Dolan Depo. at p. 34).

And interestingly, MPD never engaged in any effort whatsoever to enhance the audio on the Gaines' video.  (D-Ex. 27, Harteau Depo. at p. 28).  The lame answer that was given on this topic was that MPD did not have the capability to do that in house (Id. at p. 29).  No evidence has been generated by Defendants so far as to why an outside expert was not utilized for this purpose.  This would deal not only with the issue of what can be heard verbally, but also issues pertaining to time gap, what other sounds can be heard other than words, and when for example if at all gunshots can be heard which would create a time stamp for the volleys that killed TF which obviously would be significant to not only what happened, but how the SWAT members would be questioned. As noted in section 2, the sound of gunfire clearly begins at second 53, which not only can be easily heard by the naked ear, but is also confirmed by two of Plaintiff's experts. This should have been uncovered by a valid, competent, in-house investigation by MPD. It was not, and the specifics of the recollection of the 5-member SWAT team only added to the confusion.

A significant matter of dispute is the Defendants' contention from near the time of the incident that TF grabbed the MP5 and shot it.  Plaintiff's expert, Richard Ernest, an expert in the area of firearm incident reconstruction, who has previously testified in Minnesota federal court, opines that in his opinion, the MP5 could have accidentally or

negligently discharged during the time of the struggle with MPD personnel and TF. (See P-Ex. 8, Ernest expert report).

**a. <u>Ricardo Muro</u>**

There was a public perception that all five officers supported the notion that TF fired the MP5. This could not be further from the truth. Muro testified that the basement was "completely dark" (D-Ex. 15, Muro Depo. at p. 85). Muro was a "trailer" and did not come down to the basement initially. After he came into the basement, he noted that what he described as a struggle with TF. He noted the existence of a small laundry room of the basement, a room that had a door. Muro noted that he was not in the laundry room when TF was killed and therefore had no idea what happened during that time frame. He additionally testified that he did not know where Stender was when TF was killed. (Id. at p. 108).

It is true that Muro was shot, but he testified that his injuries did not affect his ability to recall detail. (Id. at p. 111). He also admitted honestly that he had no idea how he got shot. (Id. at p. 100). He just heard two shots. (Id. at p. 103). He also said that he could give no estimate between the time that he was shot up until the time that TF was killed. (Id. at p. 27).

Muro also noted the interesting, bizarre fact that there was also a point where the laundry room was closed, but he goes on to note that it was not closed when TF was killed (Id. at pp. 118, 137), something that is a matter of dispute amongst the five SWAT members. There was no rational reason for that door to be closed other than the notion that it was a discrete way to kill TF without others being able to see that.

**b.  Michael Meath**

Meath was the second officer who was injured, although it is clear that his injury was not as significant as Muro, and his testimony is clear that he continued to function normally even after he was shot.  When he gave his statement on 5/24/13, he did have a lawyer present.  Although he denies this, it seems reasonable that he was briefed about the 5/13/13 lawyer meeting that the other team members had before they gave their statements.  Certainly, it is possible that his lawyer was briefed, but nonetheless, one of a long list of issues for a jury to decide.  The point is the notion that Meath had no idea about what three of the team members had said in their Q and As at the time he was questioned is specious at best.

Meath provides detail in his deposition regarding the moments before he shot TF, and he opines that the other officer who was with him at the time was Lucas Peterson. He mentions not one syllable about the notion that Officer Durand was directly present in the immediate vicinity at the time TF was killed, but he does note the fact that he was in the laundry room with TF and Peterson when he shot TF multiple times in the upper shoulder and head area.  (D-Ex. 17, Meath Depo. at pp. 101 to 103).

Meath, like at least three others in the team, could give no estimate as to the time gap between the time he was shot up until the time that he killed TF along with Peterson. (Id. at p. 57).

He admits that Stender's police dog Nash was biting TF before he was killed.  (Id. at p. 85).  He opines TF never said anything which of course is a huge contradiction from

the Gaines' video.

Meath also noted that he heard the MP5 discharge, but: "I don't know the specific circumstances as to how the gun discharged. I don't know why that gun went off. I recall hearing one boom." (Id. at p. 97).

Meath noted the interesting fact that when he was shooting TF, TF was seated. (Id. at p. 101). He goes on to note that he cannot recall if the laundry room door was closed when TF was killed. (Id. at p. 111).

**c. <u>Mark Durand</u>**

Durand was the MP5 SWAT officer. Reference is made herein regarding his strange comment Durand made to DOC Dave. He handed his gun to Scheibel, and said that it was the gun that caused the injuries. (See p. 14 of this Memo). Even Scheibel opined that this did not make sense. Had TF grabbed Durand's gun and shot it, one would have expected Durand to say, in an excited utterance fashion, something like: "Dave, this is the gun the dead guy grabbed." The fact that he did not say that creates significant factual issues such as a statement like this would be consistent with the notion that the gun accidentally or negligently discharged.

But even Durand in his own deposition said, after having his memory refreshed from his statement, when questioned by a Sgt. Strauss in the basement soon after the incident: "It was my gun, Sarge." Again, this would support the notion of negligent discharge as opposed to a suspect grabbing his gun and shooting it. (D-Ex. 8, Durand Depo. at p. 147).

Durand was asked about the time gap. Between the time his gun discharged, up

14

until the time TF was killed, and he said "I have no idea." (Id at p. 60) He could give no help regarding the timing and opined that he was never asked that question by MPD investigators. (Id.).

The essence of Durand's testimony was that he was in a violent struggle with TF along with Peterson and Meath when TF was shot multiple times. There is ample evidence to indicate that in this area of the basement, the laundry room, there was blood everywhere. (See the Lucas Peterson section of this Memo). The huge problem that this presents for Durand and the defendants as a whole – is that the MP5 that was attached to Durand's body with a harness had literally not even a speck of blood on it. Kristen Jacobson is a forensic scientist for MPD. It was her job to process the gun and swab it for later DNA analysis. She noted in her deposition that she was actually in the basement after TF was killed, and she noted that there were areas of blood in the laundry room along with blood spatter. There was also blood on various items in the laundry room, and blood all over the deceased person. (D-Ex. 21, Jacobson Depo. at pp. 11-12).

She located the MP5 in a vehicle at the scene. She saw no blood on it visually. (Id. at p. 16). Both sides of the gun were photographed at the crime lab, and her testimony was that the gun literally had no blood on it. (Id. at pp. 11, 27).

The reasonable contention from this evidence is that neither the MP5, nor Durand, were in the laundry room when both Peterson and Meath emptied rounds into TF's body.

Durand admitted that before and en route to the scene, in the van video in which the team was situated except for Stender, he had heard that TF had attempted to run over a fellow officer. He admitted this created a "sense of urgency." (Id. at pp. 80-81).

15

d. **Andrew Stender**

Stender was the SWAT member who had K9 Nash.  As sergeant, he was leader of the group.  Unfortunately, Stender made a big mistake in dealing with TF.  He was the first of the team to directly encounter TF, and he claims that he started assaulting TF by hitting him in the face with his flashlight and punching him in the face with a fist because TF did not respond to his command to show his hands.  (D-Ex. 12, Stender Depo. at p. 70).

A fact finder could easily conclude that the problem with this contention is that his 75-pound dog Nash was causing TF's elbows to be pulled down and back.  As such, it was not possible for TF to comply with that command.  (Id. at pp. 63, 90).  Stender goes on to state the obvious that a K9 unit attached to a human being can affect one's ability to be compliant.  (Id. at p. 92).  For ease of reference for the Court, the 5/13/13 Q and A of Sgt. Andrew Stender is attached to this Memo as P-Ex. 11.  The reference to TF's elbows being pulled down and back can be seen at the bottom of page three of this Q and A.

It was Stender's testimony that developed this strange concept of the laundry room door being closed.  He has no idea how Muro or Meath were shot, and he admits that at the time that TF was massacred, the door was closed.  (Id. at p. 76).  He opines that Durand was in the room at the time with Peterson and Meath, but this leads one back to the problem of no blood being on the MP5.

Plaintiff's expert Charles Drago opines that the conduct of the SWAT team represented one of excessive force, and he details in his report other issues of

unprofessional conduct in this matter.  He is especially critical of Stender, and those points are addressed in his report.  (P-Ex. 7, Drago Expert Report).

### e.  Lucas Peterson

Peterson confirms that Nash was biting TF and that Stender was physically assaulting TF.  He interestingly described TF as "passively resistant."  (Id. at p. 92).  He also alleges that TF never spoke, something of course refuted by the Gaines video. (Id. at p. 93).

Peterson additionally admitted that he no idea whatsoever of how the MP5 discharged.  (Id. at p. 100).  Peterson opined that only a matter of seconds went by from the time that the MP5 discharged up until the time that TF was killed. (Id. at pp.74-75).  This hugely contradicts other evidence in this case as made clear throughout this brief.

Peterson made clear that blood from the victim was all over his body, hair, face, et cetera as a result of the shooting of TF, and he alleges that the MP5 was right in the general area.  (Id. at p. 107).  Since the MP5 had no blood on it, this could be viewed by a fact finder as false testimony.

### 4.  The parties dispute the facts as to how the citizen's DNA ended up on the MP5.

MPD's crime lab processed the MP5 for trace evidence.  A conclusion was reached that portions of the gun had TF's DNA.  The problem with this conclusion is that DOC Dave had put his hands on TF's body and then was handed the MP5 by Durand, facts MPD conveniently never told the public about when the agency was trying to convict the public that this matter was a clean kill.  (D-Ex. 4, Scheibel Depo. at pp. 14, 16, 33).  Expert testimony would not be needed to convince lay people that this was the

source of TF's DNA on the MP5 when it was analyzed.

Scheibel opined in his deposition that he wore gloves when he touched TF's body. (Id. at p. 17). The problem with this contention is that no other witness in this case corroborates this, nor did Scheibel save the gloves. (Id. at pp. 18, 20). He claimed to have disposed of them soon after he left the Bickal home. (Id.).

Scheibel additionally opined that when he was handed the gun, he was very careful not to touch its stock, rather, the gun was put over his shoulder. (Id. at p. 34). He also provided this interesting fact about Durand: "He said something that didn't make sense. I believe he said this is the gun that caused the injuries." (Id.) This was confusing to Scheibel, and he therefore thought that was the gun responsible for TF's death. (Id.) A reasonable fact finder might say: "If that was the gun that TF grabbed and shot, why did not Durand say that at the time?"

The problem with Scheibel's testimony about how he received the gun from Durand is that he says in his statement that the gun was "handed" to him. Although he mentions slinging the weapon over his shoulder, this was in the context of having his hands free to conduct other duties.

The other problem which cuts against the notion that Scheibel was wearing gloves is the fact that his DNA was determined to be on the MP5 also. (See P-Ex. 12, BCA Analysis Report dated 6/3/13). The potential factual discrepancies and the conclusions that one could reach about TF's DNA being on that gun could not be more obvious.

**IV. <u>ANALYSIS</u>**

**1.      <u>The Court should deny Defendants' motion because a reasonable finder of fact could</u>**

**conclude that Defendants – without warning – shot and killed Terrance Franklin, an unarmed man, who did not pose a threat to them**.

A finder of fact could consider the evidence as a whole in this matter and conclude that TF never grabbed and fired the MP5.  In the event that the scenario of two of the SWAT members is accurate that TF did that, he would have been immediately dispatched. The fact that he was not killed  until over seventy seconds later, based on strong, substantive evidence, is enough to support the contention that TF did not fire that gun.

The fact his DNA ended up on the gun can be easily explained away with Scheibel's conduct and the fact that Scheibel's DNA is on the gun.

It would be perfectly reasonable for a finder of fact to conclude that Peterson and Meath took TF into the small laundry room, closed the door, and intentionally killed TF with no other person present.  The fact that the MP5 did not have even a speck of blood on it indicates that the MP5, and therefore Durand, were not even in the same room when TF was shot multiple times which act resulted in a large amount of blood created in that room and on and about the body of TF.

The predicate events, such as the attempted apprehension at the Lyndale apartment complex, up to the eventual time that TF was found, will assist the fact finder in understanding why Meath and Peterson behaved in an out of control fashion.  They were treating a young black man with extreme prejudice who they thought had almost killed a police officer.  Obviously, that was not true, but it is clear to see how the false description of that event led to the finality of what eventually happened.

2.    **The court should deny Defendants' motion because the parties' fact disputes are material to resolution of the case**.

The jury could find that: (a) TF did not grab the MP5 and shoot it; (b) the officers engaged in excessive force and were intent on simply beating TF up as retribution for the Smulski matter; (c) the accidental discharge of the MP5 firearm greatly increased their anger; (d) TF ended up alone in a small room with the door closed with the two officers who killed him; and (e) he was an unarmed citizen, defenseless, who was killed for no good reason. With this scenario, the fact finder could easily conclude that the officer's shooting of TF was not objectively reasonable under the circumstances. See e.g., Capps v. Olson, 780 F.3d 879, 884-5 (8th Cir. 2015) (affirming denial of summary judgment in Section 1983 case of lethal officer shooting because fact issues existed regarding whether decedent was moving toward officer at time of shooting and whether a reasonable officer could have believed decedent was armed); Holley, 764 F.3d at 980-1 (affirming denial of summary judgment in Section 1983 case of lethal officer shooting because circumstantial evidence demonstrated possible inconsistencies with officer's account of shooting); Nance v. Sammis, 586 F.3d 604, 608-11 (8th Cir. 2009) (affirming denial of summary judgment in Section 1983 case of lethal officer shooting because material issues of fact existed concerning "whether the officers identified themselves as police, whether they saw Farrow with a gun in his hand, whether they had reason to fear for their safety at the time of the shooting, and whether they gave warnings before using deadly force"); Wilson v. City of Des Moines, 293 F.3d 447, 454 (8th Cir. 2002) (affirming denial of summary judgment in Section 1983 case of lethal officer shooting because of contradictions between two officers' testimony and physical evidence inconsistent with

officers' account of shooting); <u>Ribbey v. Cox</u>, 222 F.3d 1040, 1043 (8th Cir. 2000) ("We believe that a genuine question of fact exists regarding whether Cox had probable cause to believe that Ribbey . . . was reaching for a weapon, and thus posed a significant threat of death or serious physical harm to the officer or others.  In so doing, we note that *this case is readily distinguishable from cases in which the officer actually observed the decedent with a weapon*") (emphasis added); <u>Marth</u>, 2012 WL 3079256, *5-7 (denying summary judgment in Section 1983 case of lethal officer shooting because, in part, material fact dispute existed regarding whether officer gave clear warning of intention to use deadly force prior to shooting: "When deadly force is employed, a warning is required to be given where feasible").

Defendants' specious claim that Franklin fired the MP5 in light of the fact that he was not killed until over seventy seconds later is something that falls well within the category of significant factual disputes alone making this matter appropriate for a jury. Even if TF's conduct was somehow relevant to the gun accidentally discharging which clearly could have increased the SWAT members' anger, the significant gap in time is such that there can be no rational explanation for dispatching him. Whether TF was somehow able to get the gun and fire it, a specious claim on its face, bears on whether he posed an immediate threat to the officers to justify their shooting.  <u>See generally</u> <u>Marth</u>, 2012 WL 3079256 at *4.  That issue also speaks to the question of whether the officers' "belief" that TF somehow had the MP5 was *objectively* reasonable.

Defendants' apparent argument that it is undisputed that they believed TF accessed the MP5 is not controlling because their actions must be judged by an objective – not

subjective – standard: a finder of fact must determine whether the officers' purported

subjective belief that TF had the MP5 and had fired it was objectively reasonable given

evidence that he did not.  See Nance, 586 F.3d at 609 ("All claims that law enforcement

officers have used excessive force . . . are analyzed under the Fourth Amendment's

*objective* reasonableness standard") (emphasis added); Marth, 2012 WL 3079256 at * 4

("Whether a seizure is objectively reasonable is determined 'in light of the facts and

circumstances confronting [the officer], without regard to [his] underlying intent or

motivation").  If the finder of fact concludes that the SWAT officers shot an unarmed,

seated man from several feet away after forcing the closing the door to a small room

leaving him alone with them, then that finder could conclude that their actions were not

objectively reasonable.

**3.**    **The Court should deny Defendants' motion because qualified immunity does not apply.**

Defendants contend that the SWAT team is entitled to immunity for their conduct.

This contention centers on two disputed factual questions:

1.  Was the subjective belief of two members of the SWAT team that TF had fired the MP5 reasonable given evidence that he did not?; and

2.  Did TF actually present a threat to the officers in light of the fact that he was unarmed, was outnumbered 5 to one, was dealing with individuals who all had firearms, and also had a police dog at times physically attached to him?

A finder of fact must first answer disputed factual questions before proceeding to

the qualified immunity analysis.  If the jury answers disputed questions in TF's favor –

and concludes that: 1) he did not access the MP5 before he was killed; 2) he presented no

threat to the officers; 3) the officers had no reasonable basis to open fire upon him; and 4)

the officers shot TF because of the entire set of circumstances including the fact that they

thought he had earlier tried to kill a police officer with a car.

> The test for whether an officer is entitled to qualified immunity is twofold: 1) whether the facts alleged, *taken in the light most favorable to the injured party*, show that the officers' conduct violated a constitutional right; and 2) whether the constitutional right was clearly established at the time of the deprivation so that a reasonable officer would understand his conduct was unlawful.

Nance v. Sammis, 586 F.3d 604, 609 (8th Cir. 2009) (emphasis added).  Where a suspect

"poses no immediate threat to the officer and no threat to others, the harm resulting from

failing to apprehend him does not justify the use of deadly force to do so."  Nance, 586

F.3d at 610, citing Craighead v. Lee, 399 F.3d 954, 961 (8th Cir. 2005).  "There is

extensive case law setting forth the requirement that an officer must have 'probable cause

to believe that the suspect poses a threat of serious physical harm' before using deadly

force."  Nance, 586 F.3d at 611.  "At least since Garner was decided nearly 20 years ago,

officers have been on notice that they may not use deadly force unless the suspect poses a

significant threat of death or serious physical injury to the officer or others."  Craighead,

399 F.3d at 962 (cataloguing pre-2001 8th Circuit cases denying qualified immunity in

cases where "plaintiff presented evidence to show that the officer used deadly force under

circumstances in which the officer should have known that the person did not present an

immediate threat of serous physical injury or death").

**4.**    **The Court should deny Defendants' motion because official immunity does not apply.**

> Under Minnesota law, the decision to use deadly force is a discretionary decision entitling a police officer to official immunity absent a willful or malicious wrong.  In determining whether an official has committed a

malicious wrong, the court considers whether the official has intentionally committed an act that he had reason to believe is prohibited. *Whether or not an officer acted willfully or maliciously is usually a question of fact to be resolved by the jury. The reasoning that led us to affirm the denial of qualified immunity as to plaintiffs' Section 1983 claims leads us to affirm the denial of official immunity as to the state-law claims*.

Craighead, 399 F.3d at 963 (8th Cir. 2005) (emphasis added and citations omitted); see also Grady v. Becker, 907 F. Supp.2d 975, 985 (D. Minn. 2012) (denying official immunity because "[i]f a jury were to conclude that no warning was in fact given, it could equally conclude that [officer] had "intentionally committed an act that he had reason to believe was prohibited"); Thompson v. Anoka-Hennepin East Metro Narcotics, 673 F. Supp. 2d 805, 817 (D. Minn. 2009) ("As discussed above with respect to Plaintiffs' § 1983 claim for excessive force, there is sufficient record evidence to allow a reasonable juror to conclude both that the detention and seizure of Plaintiffs in their home occurred without legal justification and that the forced used to detain Plaintiffs was excessive. For the same reasons that the Court denied summary judgment on Plaintiffs' claims for excessive force under § 1983, the Court similarly concludes that summary judgment is inappropriate on Plaintiffs' assault and battery claims").

Disputed fact questions preclude official immunity with the same force as qualified immunity. If the jury finds that the officers shot an unarmed man who did not pose a threat to them, then the jury could conclude that the officers acted willfully and with malice, rendering official immunity inapplicable.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny

24

Defendants' motion.

                                      **PADDEN LAW FIRM P.L.L.C.**

Dated: July 8, 2016                   By: _____

                                   Michael B. Padden, #177519
                                   8673 Eagle Point Boulevard
                                   Lake Elmo, MN 55042-8628
                                   Phone: (651) 789-6545
                                   Fax: (651) 433-7123
                                   Email: mike.padden@paddenlaw.com

                                   J. Ashwin Madia, #321187
                                   345 Union Plaza
                                   333 Washington Avenue North
                                   Minneapolis, MN 55041
                                   Direct: (612) 349-2723
                                   Fax: (612) 235-3357
                                   Email: jamadia@madialaw.com
                                   **COUNSEL FOR PLAINTIFFS**